1  STEPHANIE M. HINDS (CABN 154284)
   United States Attorney
2
   THOMAS S. COLTHURST (CABN 99493)
3  Chief, Criminal Division

4  JEFFREY B. SCHENK (CABN 234355)
   JOHN C. BOSTIC (CABN 264367)
5  ROBERT S. LEACH (CABN 196191)
   KELLY I. VOLKAR (CABN 301377)
6  Assistant United States Attorneys

7        150 Almaden Boulevard, Suite 900
         San Jose, California 95113
8        Telephone: (408) 535-5061
         Fax: (408) 535-5066
9        Kelly.Volkar@usdoj.gov

10 Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                   SAN JOSE DIVISION

14 UNITED STATES OF AMERICA,            )  Case No. 18-CR-00258 EJD
                                        )
15        Plaintiff,                    )  UNITED STATES' SUR-REPLY TO DEFENDANT
                                        )  ELIZABETH HOLMES' ORAL MOTION FOR
16    v.                                )  ACQUITTAL PURSUANT TO FEDERAL RULE
                                        )  OF CRIMINAL PROCEDURE 29
17 ELIZABETH HOLMES,                    )
                                        )
18        Defendant.                    )  Date:   July 21, 2022
                                        )  Time:   9:00 a.m.
19                                      )  Court:  Hon. Edward J. Davila
                                        )
20 _____)

21

22

23

24

25

26

27

28

**INTRODUCTION**

The Court should uphold the jury's unanimous verdict finding Defendant Elizabeth Holmes guilty of Counts 1, 6, 7, and 8 of the Third Superseding Indictment ("TSI"), for the reasons stated below and in the government's opposition (ECF No. 1395 ("Oppn.")).  While Defendant orally asserted, pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"), that "the evidence presented by the government is insufficient on every element of every count[,]" (11/19/21 Tr. at 7104:19–20), her written reply strays far from this claim.  *See* ECF No. 1467 ("Reply").  Notably, she challenges only one element of the substantive wire fraud counts and she thus concedes that sufficient evidence supports the remaining three elements.  *See id.* at 11–23.  Defendant's Reply demonstrates that the Court may only find insufficient evidence supporting her conviction on Counts 1, 6, 7, and 8, if the Court were to: (1) view the evidence introduced at trial in a light most favorable to the Defendant rather than to the prosecution; (2) re-weigh unfavorable credibility findings the jury made against Defendant; (3) reassess waived legal—rather than factual—arguments; and (4) determine a rational juror could not have believed that Defendant knowingly made even a single misrepresentation.  Defendant's approach is flatly inconsistent with the governing standard the Court must employ in analyzing a Rule 29 motion. When the Court views the evidence through the required lens, that evidence overwhelmingly supports the jury's verdict.  Thus, the Court should deny Defendant's Rule 29 motion.

**LEGAL STANDARD**

Nowhere in her 20-page Reply does Defendant acknowledge the fundamental principle that, when analyzing Rule 29 motions, courts must view "*all of the evidence* . . . in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (original emphasis).  In doing so, the Court "must respect the province of the jury to ascertain the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict." *United States v. Stewart*, 420 F.3d 1007, 1015 (9th Cir. 2005) (quotation omitted); *see* Oppn. at 5–6 (describing two-step inquiry in Ninth Circuit).  Moreover, courts may not *sua sponte* convert Rule 29 motions into motions for a new trial under Federal Rule of Criminal Procedure 33 ("Rule 33") and cannot grant such a remedy where, as here, a defendant has not requested it.  *United States v. Navarro Viayra*, 365 F.3d 790, 791, 793–94 (9th Cir. 2004).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ARGUMENT

### A.   Defendant's Claims of Legal Error, as Opposed to Sufficiency of the Evidence, Are Not Properly Before the Court

Rule 29 directs the Court to "enter a judgment of acquittal" where "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Nevertheless, Defendant's Reply goes far beyond the scope of her one-sentence oral Rule 29 motion and asks the Court to address various arguments about asserted legal errors that, even if meritorious, would only result in a new trial. But Defendant elected not to file a Rule 33 motion, and any such motion is now untimely. *Eberhart v. United States*, 546 U.S. 12, 19 (2005). And the Ninth Circuit has held it to be reversible error for the Court to convert a Rule 29 motion into a Rule 33 motion. *See Viayra*, 365 F.3d at 791, 793–94. In addition, Defendant has waived these legal arguments by waiting to raise them for the first time in Reply. *See Eberle v. City of Anaheim*, 901 F.2d 814, 817–18 (9th Cir. 1990).

First, Defendant's constructive amendment and variance arguments are not properly before the Court because they should have been raised, if at all, in a Rule 33 motion. *Cf.* Reply at 11, 17–18, 22–23. Even if her claims had merit—they do not[1]—Defendant would be entitled to a new trial, not an acquittal. *See*, *e.g.*, *United States v. Shipsey*, 190 F.3d 1081, 1087–88 (9th Cir. 1999), *overruled on other grounds* (finding jury instructions constructively amended indictment warranting a new trial *but* sufficient evidence supported verdict). The core difference between the two is grounded in the Double Jeopardy Clause: if the government presents insufficient evidence to support a conviction at trial, then the government is prohibited from retrying the case, whereas the government may retry cases if a trial error is found. *See Burks v. United States*, 437 U.S. 1, 15–17 (1978). Therefore, the Court should disregard Defendant's constructive amendment and variance claims.

Second, Defendant's Rule 29 motion is not the proper forum to re-litigate arguments she made with respect to jury instructions—another Rule 33 topic. *Cf.* Reply at 8, 14. While the government

---

[1] The Ninth Circuit has rejected similar constructive amendment claims that challenge the means of proving an element so long as the defendant received "fair notice of the charges against [her]." *See*, *e.g.*, *United States v. Tuan Ngoc Luong*, 965 F.3d 973, 985–86 (9th Cir. 2020); *United States v. Hui Hsiung*, 778 F.3d 738, 757–58 (9th Cir. 2015) (holding that "magic words" "were not necessary to make clear that" a general topic "was a key focus of the indictment").

1    preserves its legal positions that "willfully" is not required by either 18 U.S.C. § 1349 (conspiracy) or

2    § 1343 (wire fraud), and this is a wire fraud, not securities fraud, case,[2] the Court should not foray back

3    into discussion of jury instructions given such arguments would have been the province of a Rule 33—

4    not a Rule 29 motion.  *See United States v. Chujoy*, 207 F. Supp. 3d 660, 663, 666–69 (W.D. Va. 2016)

5    (rejecting defendant's attempt to challenge jury instructions under Rule 29).  That the Court instructed

6    the jury—over the government's objection—on the definition of willfulness (*see* 12/13/21 Tr. at

7    8831:10–25) and the jury found Defendant guilty of Count 1 even under this heightened but not required

8    *mens rea*, does not support her Rule 29 motion.  Rather, the jury's conclusion is amply supported.

9          Third, Defendant attempts to re-litigate her motion to dismiss arguments regarding the statute of

10   limitations, which are purely legal arguments that have nothing to do with the sufficiency of the

11   evidence presented at trial.  *Cf.* Reply at 23.  The government preserves its prior legal positions, but the

12   Court should ignore this argument as outside the scope of the current procedural posture.

13         Once narrowed only to cognizable claims under Rule 29, Defendant's Reply challenges the

14   sufficiency of evidence showing (i) that her agreement with co-Defendant Ramesh "Sunny" Balwani

15   was an agreement *to commit wire fraud* (rather than solely run a legitimate business), (ii) that Defendant

16   knew the goal was to commit wire fraud, and (iii) that Defendant knowingly made false

17   misrepresentations to investors on a variety of topics.  *See* Reply at 8–23.  The record overwhelmingly

18   supports the jury's verdict, as described further below.  Notably, Defendant no longer challenges three

19   of four elements of the substantive wire fraud counts—materiality, intent to defraud, and interstate wire

20   communication—and thus the government rests on its opposition for those elements.  *See* Oppn. at 17–

21   26.  Any argument raised for the first time at the hearing on these should also be precluded as waived.

22   **B.      Sufficient Evidence Supports the Jury's Verdict on Count 1**

23         A rational juror could have found that Defendant knowingly made false statements to investors

24   about a variety of topics regarding the maturity of the company, its main product, and its prior business

25

26   [2] *See* 12/03/21 Tr. at 8237:14–19, 8243:7–8244:12; 12/10/21 Tr. at 8687:23–8696:13, 8742:9–8743:7;
     *see also United States v. Miller*, 953 F.3d 1095, 1103–04 (9th Cir. 2020) (defining intent to defraud); *cf.*

27   *Bryan v. United States*, 524 U.S. 184 (1998).  Similarly, Defendant points again to cases involving
     puffery by public companies in the context of civil lawsuits brought under various securities law—but

28   those play no role with respect to wire fraud charges and are far afield of proper Rule 29 argument.

relationships, and she acted in lockstep with co-Defendant Balwani in doing so. *See* Oppn. at 5, 7–9. Evidence of Defendant's knowing participation in both the conspiracy and scheme to defraud overlap, as the Ninth Circuit has noted. *See United States v. Stapleton*, 293 F.3d 1111, 1116–18 (9th Cir. 2002). Thus, all evidence highlighted by the government in support of Defendant's knowing participation in a scheme to defraud may also support the conspiracy conviction. *Cf.* Reply at 8.

Defendant dismisses the evidence introduced at trial to show Theranos was struggling financially as irrelevant motive evidence (Reply at 10); however, viewing the evidence in the light most favorable to the verdict, a rational juror could have determined from the evidence presented that Defendant knowingly enlisted co-Defendant Balwani to help her fool potential investors because Defendant chose fraud over business failure. In 2009, the company Defendant had founded was on the brink of financial collapse. *See* 09/08/21 Tr. at 633:2–635:8. Defendant was on the phone with the bank trying to clear a check early so Theranos could make payroll. *Id.* Revenue from pharmaceutical companies was minimal and even that source of income was drying up. *See* TX 7753. Defendant asserts Theranos' cash problems in 2009 are irrelevant to the events in 2010 because Theranos received a loan that "alleviated" the cash concerns. Reply at 10. But a rational juror, viewing the evidence in the light most favorable to the prosecution, could have determined that Defendant enlisted the help of her then-boyfriend, who personally guaranteed a multi-million dollar loan to Theranos in 2009 to keep the company afloat, to switch focus in 2010 from pharmaceutical companies—which were not generating sufficient revenue— to retail companies in order to be able to pay that loan back. *See* Oppn. at 11–12. Moreover, a rational juror could have found that Defendants realized they had to lie about Theranos's past pharmaceutical relationships and financial stability in order to obtain the money they needed from Walgreens and Safeway in 2010 to repay that loan. *Id.* at 11–12, 24. Similarly, contrary to Defendant's claim that the evidence at trial did not show Theranos needed money in 2013 shortly before it sought further investments based on false misrepresentations (Reply at 10), a rational juror could have determined that Theranos was down to approximately $15 million in cash in November 2013—which Defendants knew because they were texting each other as much—with a burn rate of $1–2 million per week, and Walgreens was not willing to pay more without seeing further progress, so the Defendants turned to yet another source of money, the 2013 investors. *See, e.g.*, 09/14/21 Tr. at 717:2–720:22 (discussing

1  TX 5172 with cash balance); TX 5387D at 20; 10/13/21 Tr. at 3402:2–3406:3 (discussing TX 0971),

2  3397:6–3400:22 (discussing TX 0617); Oppn. at 14–15, 17.

3      Throughout these events, Defendants were sending text messages and emails to each other on the

4  very topics that they were misrepresenting to investors from whom Defendants needed to obtain money

5  to keep Theranos alive.  *See* Oppn. at 7–9.  To avoid this powerful evidence admitted at trial,

6  Defendant's Reply asserts that the text messages merely show Defendants communicating "on a wide

7  range of company matters" and blanketly asserts that the messages "lack necessary context."  Reply at

8  9–10 & n.5.  However, using but one example of many, the text messages in November 2014 show

9  Defendants discussing Holmes securing investments from Rupert Murdoch and others less than one day

10  before Balwani said "Normandy lab is a fucking disaster zone"—and little over a week after Holmes

11  conceded "fundamentally we need to stop fighting fires by not creating them"—and then a few weeks

12  later Holmes asked for Balwani's input on the materials to send to Rupert Murdoch.  TX 5387D at 24–

13  29, 32.  None of Defendants' internally expressed concerns regarding "fires" or the "disaster" in the lab

14  appear in the materials ultimately sent to Rupert Murdoch.  *See* TX 4869; *see also* ECF No. 1395 at 22–

15  23.  Thus, through the proper Rule 29 lens, a rational juror could have found Defendant entered an

16  agreement with at least co-Defendant Balwani to commit wire fraud while knowing of at least one of the

17  conspiracy's objects—namely, to obtain money from investors—and helping to accomplish it.

18      **C.    Sufficient Evidence Supports the Jury's Verdict on Counts 6, 7, and 8**

19      Contrary to the Rule 29 standard, Defendant's Reply asks the Court to view the evidence in the

20  light most favorable to the defendant rather than prosecution, to re-weigh unfavorable credibility

21  determinations, and to resolve evidentiary conflicts in her favor.  Reply at 11–23.  But the jury rejected

22  her version of events—which largely tracks her closing argument—and had ample evidence in doing so

23  as highlights below demonstrate.  *See also* Oppn.  The fact that there were additional false

24  misrepresentations the government could have proven does not render the evidence the government

25  chose to present at trial insufficient.[3]  Nor does Defendant's hyper-technical reading of the TSI—which

26

27  [3] The government's opposition cited several exhibits where Defendants organized misleading

28  technology demos, such as for Walgreens executives, and thus did not abandon its allegations under
    TSI ¶ 12(C).  *See* Oppn. at 14–15; *cf.* Reply at 11.

1   serves to provide notice to criminal defendants of the charges against them—have any place in

2   analyzing a Rule 29 motion. *See*, *e.g.*, *Luong*, 965 F.3d at 985.

3           Furthermore, it is well settled that the jury did not have to unanimously agree on specific false

4   statements as long as the overall scheme was deceptive. *See*, *e.g.*, *id.* at 985–86 ("[J]urors are not

5   constitutionally required to unanimously agree on alternative theories of criminal liability." (quotation

6   omitted)); *United States v. Woods*, 335 F.3d 993, 997–98 (9th Cir. 2003) ("Put another way, the

7   fraudulent nature of the scheme or artifice to defraud is measured by a non-technical standard." (internal

8   quotation omitted)).  Therefore, any one of the below categories could alone support the jury's verdict

9   on Counts 6, 7, and 8 that Defendant knowingly participated in a scheme to defraud investors.

10          ***Capabilities of Theranos' Proprietary Analyzer / Use of Third-Party Machines***.  Defendant's

11  Reply boldly—and incorrectly—states "Theranos made no secret of its use of third-party devices" and

12  proceeds to cite evidence at trial about Theranos using venous draws rather than drawing blood solely

13  through their fingerstick method. *See* Reply at 6, 11–13, 19–21.  But investors—including Brian

14  Grossman of PFM—testified that even if they knew Theranos drew blood venously, they were under the

15  impression from conversations with Defendants that it was still run on Theranos proprietary

16  technology—not unmodified third-party devices. *See*, *e.g.*, 11/16/21 Tr. at 6455:12–6457:14; 11/17/21

17  Tr. at 6647:1–6648:23.  The glaring omission in Defendant's Reply demonstrates that no evidence was

18  presented at trial to show that Theranos' use of modified and unmodified machines was ever disclosed

19  by Defendant to investors. *See* Oppn. at 13–23.  While Defendant repeats her alleged trade secret

20  defense, a rational juror could have found the defense to be a pretext and rejected the notion that

21  Theranos had to hide the use of third-party machines from investors who signed CDAs. *Cf.* Reply at 6,

22  19–21 & n.10.[4]  Defendant also points, as she did at trial, to her disclosure to CMS in December 2013

23  and later the FDA that she was using commercial lab equipment.  Reply at 6, 20 & n.11.  But a rational

24  juror could have believed disclosing the commercial devices rather than its proprietary technology to

25  regulators permitted Theranos to keep operating for years longer than it would have if it had disclosed

26  _____

27  [4] There is also no need to protect trade secrets from the Board of Directors.  While Defendant points to
    her testimony to assert that she informed the Board of Directors that Theranos used third-party
    analyzers, General James Mattis testified directly to the contrary, and the Court may not re-weigh
28  credibility determinations. *See* 09/22/21 Tr. at 1575:11–1579:20, 1612:10–1616:2.

1   the problems with its proprietary devices before using them to test human patient samples.

2          Defendant also asserts, as she did in her defense at trial, that she was describing the potential

3   capabilities of the 4-series (a/k/a minilab or next generation device) to investors, not the 3-series

4   Theranos was actually using to test patient samples in its CLIA laboratory. *See* Reply at 4–6, 11–13, 21.

5   Investors testified to the contrary at trial. *See, e.g.*, 11/16/21 Tr. at 6395:19–6396:23 (Defendant held

6   out the minilab as the device being used to test patient samples). And the written materials she approved

7   and provided to investors further undercut her post-hoc rationalization because the slides, without

8   distinction, contain her purported "vision" statements followed by statements that only relate to the 3-

9   series device, such as CLIA certifications, coefficient of variation data, and data comparisons from

10  pharmaceutical trials, in addition to data from proficiency testing—which was never run on the 4-series

11  and unbeknownst to investors related to third-party machines. *See, e.g.*, TX 278; TX 3387 at 278–330;

12  TX 4077; TX 4858; 10/19/21 Tr. at 3993:15–4001:25. A rational juror could find such a mixture of

13  information to be intentionally concealing from investors the capabilities of Theranos' analyzer, as

14  described in the TSI. *See* ECF No. 469 ¶ 12(A).

15         Investors repeatedly testified that they would have been shocked to learn Theranos' proprietary

16  analyzer, which they were often shown when they visited Theranos in person, could run no more than

17  12 assays and that modified and unmodified third-party machines were being used to run the vast

18  majority of Theranos blood tests. *See, e.g.*, 10/26/21 Tr. at 4693:14–4697:6; 11/02/21 Tr. at 5097:10–

19  5100:9, 5104:2–19; 11/16/21 Tr. at 6395:22–6396:23, 6400:23–6403:1, 6413:5–9, 6414:7–6415:23,

20  6442:18–6443:15, 6448:1–10. In addition to testimony from Theranos employees Erika Cheung,

21  Surekha Gangakhedkar, and Dr. Adam Rosendorff, about the true capabilities of Theranos' proprietary

22  analyzer—both the 4-series / minilab and the 3-series—and Defendant's knowledge thereof as described

23  in the government's opposition (at 8–23), Dr. Kingshuk Das testified that as of 2016 the next generation

24  (4-series) device still could not run patient samples and that Theranos voided all tests ever run on the 3-

25  series device. 11/09/21 Tr. at 5860:8–5861:5; 11/10/21 Tr. at 6017:6–6018:2; *cf.* Reply at 12.

26  Defendant continued lying about the range of tests Theranos could perform as late as October 2015. *See*

27  ECF No. 1395-3 at 9 (claiming on Mad Money that "[e]very test that we offer in our laboratory can run

28  on our proprietary device"); 10/15/21 Tr. at 3848:17–3849:8 ("[Edlin] no longer believed . . . that the

1  company was capable of standing behind the claims it had been making about the technology [given] the

2  company made several attempts to prove its technology, but they were all unsuccessful[.]").

3  ***Theranos' Financial Stability***.  Viewing the evidence in the light most favorable to the

4  prosecution, the jury could have found that Theranos had minimal revenue from 2009 through 2015 and

5  Defendant was aware of this fact.  *See*, *e.g.*, 09/08/21 Tr. at 623:15–626:8, 640:4–9; 09/14/21 Tr. at

6  687:4–689:5, 692:8–693:3, 696:3–14, 705:6–706:8; *see* TX 5387D at 3, 7, 10, 17–18, 20, 34–35, 54, 68.

7  Nevertheless, Defendant consistently provided false information regarding Theranos' financial stability,

8  including in 2010 to Safeway and in early 2014 to PFM (Oppn. at 24–26), which, of course, is the very

9  evidence of her *knowledge* that Theranos would earn modest revenues in 2014 and 2015 that she claims

10  in her Reply was missing at trial.  *Cf.* Reply at 13–14.  Furthermore, as detailed in the government's

11  opposition, less than a month after learning Walgreens was scaling back to 200 stores in 2015,

12  Defendant provided projections to RDV based on 900 locations.  Oppn. at 23.  Lisa Peterson explained,

13  similar to other investors, that she understood the speculative nature of projections, but the company

14  should say if their revenue were going to be "wildly different" from what was projected.  *See*, *e.g.*,

15  11/02/21 Tr. at 4978:13–24, 4984:6–4985:16.  Finally, Defendant claims it was reasonable to expect to

16  hit the projections she provided because of Theranos' deferred revenue—meaning cash already received

17  but not earned that could thus be recalled at any time—but the sources of deferred revenue did not match

18  the detailed breakdown Defendant provided investors in the 2014 and 2015 financial projections.  *See*,

19  *e.g.*, 09/14/21 Tr. at 783:4–23 (defining deferred revenue); TX 13719 (only $3 million of deferred

20  revenue from pharma); TX 1853 (projecting $40 million revenue from pharma); *cf.* Reply at 10–11 n.6.

21  A rational juror could have found the 2014 and 2015 financial projections false or misleading.

22  ***Walgreens Partnership***.  Contrary to Defendant's Reply (*cf.* Reply at 15–16), viewing the

23  evidence in light most favorable to the prosecution, a rational juror could determine that Defendant

24  misled investors in fall 2014 when she provided financial projections based on expansion to 900

25  Walgreens stores when only 200 was predicted at the time (*see* Oppn. at 23), and that Walgreens

26  executives Wade Miquelon (former CFO) and Nimesh Jhaveri *both* testified that the percentage of

27  fingerstick versus vein draw testing was important to a successful partnership between Theranos and

28  Walgreens and the agreement contemplated a successful pilot before any hoped-for national rollout.

*See*, *e.g.*, 10/13/21 Tr. at 3381:13–3382:20, 3391:1–3392:13, 3397:6–3406:3 (discussing TX 0617, TX 0971), 3517:24–3519:8; 10/14/21 Tr. at 3588:3–3591:10, 3600:6–25, 3694:24–3696:1.  Finally, there is no need to impute co-Defendant Balwani's knowledge to Defendant because he directly told her and informed her in the moment.  *See*, *e.g.*, TX 5387D at 24–26 ("we can't scale with wag"), 37, 39–42, 65, 73–75, 91, 114, 116 (in October 2015 "WAG freaking out. Lack of transparency"); TX 5663 (describing Walgreens' goals: one related to customer experience; the other related to less than 10% venous draw).

***Department of Defense (DOD)***.  Defendant's Reply inaccurately asserts the government "abandoned" its theory that Defendant misrepresented to investors that Theranos had a profitable relationship with DOD when, in truth, the company had limited revenue from military contacts—the opposition described Defendant's lies to PFM on this very topic, albeit under a different heading.  Oppn. at 24; *cf.* Reply at 16.  These facts alone support upholding the jury's verdict on a Rule 29 motion, given that "[t]he government may charge in the conjunctive and prove in the disjunctive." *United States v. Robertson*, 895 F.3d 1206, 1219 (9th Cir.).

Furthermore, Defendant attempts to parse through "deployed to the battlefield" in the same hyper-technical manner she did during cross examination and her closing argument at trial—ignoring the testimony of investors to the contrary.  *Cf.* Reply at 16–19.  The question is whether a rational juror could have found that Defendant's misrepresentations *to investors* that Theranos' proprietary analyzer was "deployed to the battlefield" were false, misleading, or a deceptive half-truth.  The evidence clearly allowed such a finding.  Defendant told investors about use of the Theranos analyzer by the DOD "in the battlefield[,]" in Afghanistan or Iraq, on medevac helicopters (to treat soldiers who have been shot), or to treat wounded soldiers in the field.  *See*, *e.g.*, 11/16/21 Tr. at 6379:12–22, 6382:25–6383:11; 10/06/21 Tr. at 2995:18–2998:7; 11/04/21 Tr. at 5441:13–5442:10 ("important for the survivor rate for folks who had been wounded in the field"); Oppn. at 13.  Defendant repeated similar statements to reporter Roger Parloff in a recorded conversation, contrary to Defendant's assertion that the "sole recording[ ]" indicates future use.  11/18/21 Tr. at 6930:1–6933:19; ECF No. 1395-2 at 17; *cf.* Reply at 19.  It is thus irrelevant whether Defendant was able to prove that AFRICOM—not Special Operations Command— flew Theranos devices around on an aircraft—not a medevac—in Africa—not Afghanistan or Iraq.  *See*, *e.g.*, 10/20/21 Tr. at 4267:4–4278:5.  Even Defendant's version of events demonstrates that she told

1   investors half-truths *in the light most favorable to her*—which is not the governing standard.[5]

2       ***Pharmaceutical Companies***.  A rational juror could conclude that—by adding other companies'

3   logos and altering the language included in reports that Theranos drafted to make it more likely to

4   appear as if those third companies wrote the reports and/or asserting that pharmaceutical companies

5   comprehensively validated Theranos' technology when they did not—Defendant misled investors into

6   believing that pharmaceutical companies examined, used, and validated Theranos' technology.  Oppn. at

7   11–12; *cf.* Reply at 21–23.  Defendant described the altered reports sent to Walgreens as "three

8   independent due diligence reports on Theranos systems" *from* pharmaceutical companies (TX 0291),

9   and multiple investors testified that they believed the pharmaceutical companies either authored or

10  approved the reports.  *See* 10/12/21 Tr. at 3186:6–3190:6; Oppn. at 11–12.  Viewing the evidence in the

11  light most favorable to the prosecution, a rational juror could believe Shane Weber's and Dr. Constance

12  Cullen's testimony that they had no further interest in working with Theranos after 2009, that Defendant

13  knew as much in switching Theranos' focus away from further pharmaceutical work, and yet Defendant

14  misled investors by providing copies of pharmaceutical-related reports that appeared to be written or

15  approved by those same companies and claiming those same companies had comprehensively validated

16  Theranos' technology when they had not.  *See* Oppn. at 11–12.[6]  Defendant's Reply reiterates her

17  argument at trial that Theranos receiving payment from third-party institutions could constitute

18  validation—but the jury was free to reject that theory, as it did, and could have found that Defendant

19  also lied about the amount of revenue they received from these third-party sources.  *See, e.g.*, 11/16/21

20  at 6383:22–6384:6 (Defendant describing over $200 million in historical revenue from third parties).

21  **CONCLUSION**

22      For the reasons stated above, the government respectfully requests that the Court deny Defendant

23  Holmes' Rule 29 Motion and reaffirm the jury's proper verdict on Counts 1, 6, 7, and 8.

24

---

25  [5] For the same reasons, Defendant's constructive amendment and variance claims (Reply at 17–19)—

26  which are not properly before the Court and waived as discussed above—would also fail on the merits.

27  [6] For the same reasons, Defendant's constructive amendment and variance claims (Reply at 22–23)—
    which are not properly before the Court and waived as discussed above—would also fail on the merits

28  as Defendant was put on notice that this was a category of evidence the government might introduce at
    trial.

DATED:  June 10, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney


___/s/ Kelly I. Volkar___
JEFFREY B. SCHENK
JOHN C. BOSTIC
ROBERT S. LEACH
KELLY I. VOLKAR
Assistant United States Attorneys

U.S.' SUR-REPLY TO DEF.'S MOT. FOR ACQUITTAL,
CASE NO. 18-CR-258 EJD                    11