# Exhibit 12

MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 2204323-MF |
| PERSON INTERVIEWED | : | Dr. Kingshuk Das |
| PLACE OF INTERVIEW | : | Videoconference Call |
| DATE OF INTERVIEW | : | June 7, 2021 |
| TIME OF INTERVIEW | : | 7:00 P.M. (Eastern) |

On June 7, 2021, Dr. Kingshuk Das (DAS) was interviewed by videoconference call regarding his knowledge of Theranos. Assistant United States Attorneys Robert Leach and John Bostic, and Food and Drug Administration-Office of Criminal Investigation Special Agent George Scavdis were present for the interview. Prior to the start of the interview, DAS was instructed to be mindful of any communications he had with attorneys which may be privileged. The following is a summary of the statements made during the interview.

DAS believed quality control (QC) data would have been sent by Theranos employees other than himself to CMS [Centers for Medicare and Medicaid Services] to respond to the Form 2567. Based on his experience, this data would have included summaries and all QC charts relevant to the identified deficiencies. This information resided in Theranos' LIS [Laboratory Information System] database and would have been requested through Daniel Young (YOUNG), Tina Lin (LIN), or Max Fosque.

DAS reviewed document CMS-009171 to CMS-009274. Page two of the document was titled "PATIENT IMPACT ASSESSMENT" and DAS recognized the general format as a part of a document that would have been sent to CMS. He said this was a standard format for this type of document, and he would have given high-level supervision to the creation of this type of document. DAS believed this specific patient impact assessment was sent as part of Theranos' first response to CMS. At the time, DAS was working part time at UCLA while simultaneously working for Theranos. He may have seen some documents like this, but DAS did not believe that he nor his associates Lisa Helfend or Donald Tschirhart (TSCHIRHART) drafted this particular patient impact assessment. The patient impact assessments he believed they drafted were formatted slightly differently.

On page two of the same document, under the subheading of "Accuracy/Trueness/Comparability," DAS identified "CL-RPT-14077" as a cited assay validation document. An $R^2$ value is an accuracy plot of a Theranos assay versus an assay from another source. An $R^2$ of 1.0 is perfect and an $R^2$ of at least 0.9 is preferred and would be seen of assays used in most clinical laboratories. Theranos' $R^2$ for this particular sodium assay, 0.58, was "poor."

DAS said it was sometimes difficult to get data, because his requests had to go through multiple layers of people to be fulfilled.

DAS stated it was necessary for him to invalidate all TSPU assay results because the assays themselves were unacceptable for clinical testing, even gauged against what he described as the

Page 1 of 4

"lowest bar." The data he used to draw this conclusion was documented in "D-tag" files he and TSCHIRHART shared with each other by email. DAS did not believe any of the data that supported his conclusion went to CMS. This information was included in Theranos' draft third response which was not sent. DAS and TSCHIRHART told Elizabeth Holmes (HOLMES) Theranos' first response to CMS was not reflective of the true work Theranos had conducted.

Typically, laboratory directors and other lab staff are the people who engaged with regulators. This was not the case at Theranos.

DAS said HOLMES freed them to do the work they felt was required to respond to CMS. He and his team audited all documents, a task the CMS inspectors simply did not have the time to do, and concluded regulators were "100%" correct with their deficiency findings. The first two responses to CMS from Theranos did not convey the depth and breadth of issues DAS identified.

On page two of the same documents, DAS reviewed the sodium assay precision validation levels and said they were unusual. These sodium levels were so low, they were not relevant to clinical testing. A normal, healthy adult would have had sodium levels of 135 to 145 mM, or possibly higher or lower if they were ill. DAS said he would need to review the specific validation document to draw any further conclusions about the assay's precision.

DAS reviewed page eleven of the same document and defined the following:

- "Level"-The levels 1, 2, and 3 most likely referred to low, medium and high and were standard for chemistry assays.
- "Lot"-A QC based identifier, most likely sourced from BioRad. DAS did not know what "pre" nor what "post" [see page eighteen] meant. He said it was possible this could have described some sort of dilution of the QC material, but the typical Theranos nomenclature for dilution was "_P," and a lack of that tag indicated to him the sample was not diluted. Page two of the document stated, "Theranos Method of Siemens Advia 1800" and DAS said this could have been another nomenclature method to indicate dilution.
- "Start" and "end" referred to the start and end dates of the QC data.
- "Target mean" and "target SD" were typically used to identify the values of the mean and standard deviation from the in-house assay. However, the inclusion of "calc mean" and "calc SD" led DAS to believe the target values were sourced from BioRad.

TSPU assays was a term interchangeable with Edison immunoassays.

DAS reviewed document THPFM0005602170 to THPFM000562655 and identified it as QC data for a specific Edison device. All Edison/TSPU devices had an "E" number, and there were hundreds of these devices. The QC data was indicative of Edison devices; it was bad and caused by poor performance.

DAS reviewed document SEC2-USAO-EPROD-000790659 to SEC2-USAO-EPROD-000790750 and identified it as an assay-by-assay report for the TSPU. "CL-PLN-14002" was a validation document and DAS said he and whomever authored the document greatly disagreed in their conclusions. For example, there are numerous tables throughout the document with column heading "Is Bias within Acceptable Limits?". The author answered "yes," but the data is unacceptable for clinical purposes, and DAS would have answered "no." DAS explained the general theory of sigma metrics and said they were typically used by clinical chemists. Excellent assays score sigma metrics of 5.0, good assays score a sigma metric of 4.0, and marginal assays

score a sigma metric of 3.0. DAS had calculated the sigma metric for thirteen TSPU assays and said almost all did not score better that 1.65, which was already an unacceptably low bar.

Sigma values were calculated as such: The absolute value of the mean bias was divided by the concentration. The returned value was then subtracted from the total allowable error and then divided by the precision CV. The result was the sigma value. DAS used the table values for the Vitamin B12 assay on page three of the document and calculated a sigma of approximately 1.42. DAS said the total allowable error of 30% for the Vitamin B12 assay is "pretty large," even after having accounted for the fact that immunoassays typically have larger error margins. Higher sigma values are better, and those calculated for the TSPU assays meant the devices had no room for any error. Most lab directors would not have used the devices.

DAS did not prepare patient impact assessments and did not remember having any communication with HOLMES about the documents. Around the time of Theranos' second response to CMS, a meeting was held where he had a conversation with HOLMES about the sigma metrics he had calculated and why the patient results from those assays needed to be invalidated. DAS said he believed the sigma metric, which was calculated using the assay validation documents, was the easiest way to convey his message. The same conclusions could have also been drawn from the Edison QC data, but DAS said the QC data was never good.

DAS told HOLMES he did not think Theranos' second response to CMS was valid.

DAS said assay validation was akin to "having to jump through all of the hoops." The assay calculations were not done correctly, and the assays themselves did not meet Theranos' own acceptance criteria, and were not performing to specification.

Page three of document SEC2-USAO-EPROD-000790659 stated, "Note the total allowable error (35%) was based on CLIA proficiency testing criteria for acceptable analytical performance, as printed in the Federal Register…" DAS said CLIA [Clinical Laboratory Improvement Amendments] set proficiency testing boundaries for all clinical labs, and a total allowable error of 35% was a "ridiculously low bar." It was inappropriate for Theranos to use this CLIA regulation for an individual clinical lab.

Page six of the same document discussed reference ranges which were intervals of values normally returned for an assay. Theranos incorrectly adopted CLSI guidelines for their TSPU assays. DAS said to adopt the reference ranges from another specific assay, the TSPU assays would have needed the same preanalytical criteria, such as patient population, storage, transportation, and storage temperature, as well as the same analytic performance and methods. The TSPU did not do this.

LIN resigned from Theranos shortly after she returned from personal leave. DAS did not know the exact reason why LIN resigned.

DAS said he would further review documents the government had provided to him for his impressions.

During the interview, we took a break from 7:47 P.M. to 7:50 P.M.

The interview ended at 8:07 P.M.

US-REPORTS-0026723

*Christopher McCollow*

| | |
|---|---|
| Christopher McCollow | June 9, 2021 |
| U.S. Postal Inspector | Date |

Attachments:

- CMS-009171 to CMS-009274
- THPFM0005602170 to THPFM000562655
- SEC2-USAO-EPROD-000790659 to SEC2-USAO-EPROD-000790750