1   JOHN D. CLINE (CA State Bar No. 237759)
    600 Stewart Street, Suite 400
2   Seattle, WA 98101
    Telephone: (360) 320-6435
3   Email: cline@johndclinelaw.com

4   KEVIN M. DOWNEY (Admitted Pro Hac Vice)
    LANCE A. WADE (Admitted Pro Hac Vice)
5   AMY MASON SAHARIA (Admitted Pro Hac Vice)
    KATHERINE TREFZ (CA State Bar No. 262770)
6   WILLIAMS & CONNOLLY LLP
    680 Maine Ave. S.W.
7   Washington, D.C. 20024
    Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
8   Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

9   Attorneys for Defendant ELIZABETH A. HOLMES

10

11                  UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                        SAN JOSE DIVISION

14

15   UNITED STATES OF AMERICA,          )   Case No. CR-18-00258-EJD
                                        )
16          Plaintiff,                  )   **MS. HOLMES' REPLY IN SUPPORT OF**
                                        )   **MOTION FOR NEW TRIAL BASED ON**
17      v.                              )   **NEWLY DISCOVERED EVIDENCE**
                                        )   **RELATING TO LIS DATABASE**
18   ELIZABETH HOLMES and               )
     RAMESH "SUNNY" BALWANI,            )
19                                      )   Hon. Edward J. Davila
            Defendants.                 )
20                                      )
                                        )
21                                      )
                                        )
22   _____)

23

24

25

26

27

28

## TABLE OF CONTENTS

I.    *Brady v. Maryland* Provides the Applicable Standard.........................................................4

II.   The Documents Underlying the *Brady* Letter Were Favorable to Ms. Holmes. ...............4

III.  The Government Suppressed the Emails Underlying the *Brady* Letter.............................8

IV.   The Suppressed Evidence is Material. ..................................................................................9

    A.    There is a Reasonable Probability of Acquittal, Because The Suppressed Evidence Undermines the Quality of the Government Investigation; Exposes Bias on the Part of the Prosecutors at Trial; and Requires Suppression of Evidence and Testimony Relating to the LIS. ................9

    B.    The Government's Arguments to the Contrary Are Unavailing...........................11

V.    Discovery and an Evidentiary Hearing Are Required. .......................................................14

VI.   The Emails Would Warrant A New Trial Even if They Were Not *Brady-Giglio* Material.....................................................................................................15

CONCLUSION...........................................................................................................................15

1

2

**CASES**

3    *Almado v. Gonzalez*, 758 F.3d 1119 (9th Cir. 2014) ....................................4

4    *Arizona v. Youngblood*, 488 U.S. 51 (1988) ...............................................4, 10

5    *Brady v. Maryland*, 373 U.S. 83 (1963) ......................................................3, 13

6    *Browning v. Baker*, 875 F.3d 444 (9th Cir. 2017) ........................................11

7    *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) (en banc) .......................8

8

   *Comstock v. Humphries*, 786 F.3d 701 (9th Cir. 2015) ...................................4

9    *Kyles v. Whitley*, 514 U.S. 419 (1995).........................................................4, 5

10

   *Morris v. Ylst*, 447 F.3d 735 (9th Cir. 2006) ...............................................14

11

12    *United Stated v. Stevers*, 603 F.3d 747 (9th Cir. 2010) ...................................4

13    *United States v. Agurs*, 427 U.S. 97 (1976) ....................................................4

14    *United States v. Doe*, 705 F.3d 1134 (9th Cir. 2013)........................................4

15    *United States v. Dupuy,* 760 F.2d 1492 (9th Cir. 1985).....................................9

16    *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979)...................2, 4, 10

17    *United States v. Obagi*, 965 F.3d 993 (9th Cir. 2020) ..............................3, 14

18    *United States v. Price*, 566 F.3d 900 (9th Cir. 2009)........................................8

19    *United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007)...............................10

20    *United States v. Van Griffin*, 874 F.2d 634 (9th Cir. 1989)..............................7

21

**RULES**

22    Fed. R. Crim. P. 29 .......................................................................................11

23    Fed. R. Crim. P. 33 ...................................................................................4, 14

24    Fed. R. Evid. 401 ...........................................................................................7

25    Fed. R. Evid. 403 ...........................................................................................7

26    Fed. R. Evid. 404 .........................................................................................12

27

28    MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY
DISCOVERED EVIDENCE RELATING TO LIS DATABASE
CR-18-00258 EJD

Fed. R. Evid. 608 ......................................................................................................................8

Fed. R. Evid. 801 ......................................................................................................................7

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY
DISCOVERED EVIDENCE RELATING TO LIS DATABASE
CR-18-00258 EJD

iii

In response to a motion questioning the quality of the government's conduct in this case, the government's opposition is notable for what it does not say.  The government does not dispute the following:

- That the government first disclosed on June 2, 2022 that Mr. Schenk, Mr. Bostic, and Mr. Leach were the "government attorneys" in the *Brady* Letter;

- That Mr. Schenk, Mr. Bostic, and Mr. Leach decided not to follow recommended options for accessing the LIS in October 2018 (approximately five months after Mr. Schenk and Mr. Bostic had been cautioned of potential complications associated with accessing the LIS by Theranos counsel, and nearly two years after Mr. Leach was informed of the critical data residing in the LIS).  According to expert testimony, one of those options would have preserved the LIS.

- That the government concealed from defense counsel its difficulty in accessing the LIS at a time when, according to expert testimony, the LIS could have been preserved;

- That the government deferred (for reasons unknown) producing the LIS copy to Ms. Holmes for more than one year after its internal deadline for completing document production to defense counsel;

- That the government's *Brady* Letter inaccurately stated that the Assignee told the government that only Mr. Balwani knew how to access the LIS;[1]

- That the emails show that Mr. Schenk, Mr. Bostic, and Mr. Leach (rather than pursue other, recommended options) decided to "push back on" the Assignee to produce the LIS "in a standard way" as late as October 30, 2018, despite the fact that counsel for the Assignee informed Mr. Bostic on October 15, 2018 that the LIS was encrypted and the Assignee lacked the code.

---

[1] In truth, Mr. Bostic was informed that a second "employee" other than Mr. Balwani might know how to access the LIS.  Dkt. 1577-10.  That fact presents one more avenue for the potential preservation of the LIS that the government did not timely explore, and thus is probative of the poor quality of the government's conduct.

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE RELATING TO LIS DATABASE
CR-18-00258 EJD

1

- That the emails tend to show bias on the part of the government to minimize the importance of the LIS through misleading questions of Dr. Adam Rosendorff, Ms. Erika Cheung, Mr. Nimesh Jhaveri, and Dr. Lynette Sawyer;

- That the government (in fact) asked misleading questions of those witnesses that minimized the significance of the LIS;

- That a government witness (Dr. Adam Rosendorff) described using the LIS to investigate questions concerning the accuracy and reliability of patient testing, including through analysis of trends;

- That government witnesses (Dr. Adam Rosendorff, Ms. Erika Cheung, and Dr. Kingshuk Das) relied on patient testing and quality control data that would have resided in the LIS for their testimony;

- That this Court has held that the emails produced to Ms. Holmes on June 2, 2022 were *Brady* material;

- That the government previously refused to produce these emails despite repeated, specific requests from Ms. Holmes;

- That Ms. Holmes lacks answers to specific, open questions relating to the government's conduct in failing to access and preserve the LIS.

Instead, the government makes four principal arguments. *First*, it claims that the emails were not suppressed and are not "material" because they contain the same "substantive information" (a term derived from a strand of case law not involving *Brady*) as the government's October 29, 2020 *Brady* Letter. That is not true—as described in Ms. Holmes' motion, the emails are admissible evidence bearing previously unknown exculpatory information, including (but not limited to) the identity of the prosecutors involved in the decision not to take steps that would have preserved the LIS. These emails would have identified the relevant witnesses, and, when viewed in the context of the record as a whole, would have enabled Ms. Holmes to expose the sloppy government investigation, the apparent bias of members of the prosecution team, and would have resulted (under the Due Process Clause and *Loud Hawk*) in the suppression of evidence and testimony relating to patient testing and quality control data.

1   Without these documents, Ms. Holmes did not know which witnesses to call at trial, or what specific

2   documents to use in connection with their examination.

3       *Second*, the government insists that, to the extent that the emails relate to alleged

4   misrepresentations concerning the accuracy and reliability of Theranos technology, those were only one

5   "sub-category" of alleged statements at issue in the investor counts.  But the government's trial

6   presentation (including opening and closing statements) put the accuracy-and-reliability allegations front

7   and center with respect to those counts.  In his closing argument, Mr. Schenk described those allegations

8   as "sort of the underlying false statement in the case" and "a thread through this scheme."  *Holmes* Tr.

9   8959:6-11 (gov't closing statement).  The emails show that members of the prosecution team failed to

10  preserve the key evidence underlying the element of falsity on this "underlying false statement in the

11  case."  *Id*.

12      *Third*, the government maintains that, because Mr. Balwani obtained these emails during his trial

13  and was convicted, there is not a reasonable probability of a different outcome for Ms. Holmes.  But

14  *Brady*'s materiality prong requires a retrospective analysis of the effect of the *Brady* evidence on Ms.

15  Holmes' trial—not Mr. Balwani's.  Mr. Balwani's trial was a different trial, with different witnesses and

16  evidence.  Apart from the factual distinctions between the cases, Ms. Holmes' case featured a split

17  verdict, with acquittals, hung counts, and a limited number of convictions.  By contrast, Mr. Balwani

18  was convicted on all twelve counts.  The Ninth Circuit has recognized that prejudice from the

19  suppression of exculpatory evidence is especially likely in cases with split verdicts and multi-day jury

20  deliberations.  *See United States v. Obagi*, 965 F.3d 993, 998 (9th Cir. 2020).

21      *Lastly*, the government suggests that the emails were not favorable, suppressed, or material

22  because Ms. Holmes did not put at issue the government's role in the loss of the LIS in her trial.  The

23  government apparently believes that Ms. Holmes should have changed her trial strategy in order to gain

24  access to exculpatory documents uniquely in the government's possession.  The record is clear that Ms.

25  Holmes diligently pursued this evidence in advance of trial through specific requests and motion

26  practice.  Had the government met its *Brady* obligations, Ms. Holmes would have known what evidence

27  was available to present at trial.  This argument turns the Due Process Clause on its head: the duty to

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY
    DISCOVERED EVIDENCE RELATING TO LIS DATABASE
    CR-18-00258 EJD
                                           3

1    disclose exculpatory evidence under *Brady* lies with the government---irrespective of whether the

2    defendant even requests the specific evidence, as Ms. Holmes did.  *See Almado v. Gonzalez*, 758 F.3d

3    1119, 1133-34 (9th Cir. 2014).

4        The emails relating to the LIS are favorable; they were suppressed by the government; and, had

5    they been available to Ms. Holmes at her trial, there is a reasonable probability that the jury would have

6    acquitted her of the offenses of conviction.  Ms. Holmes is entitled to a new trial and an evidentiary

7    hearing.

8    **I.     *Brady v. Maryland* Provides the Applicable Standard.**

9        The government spends most of its opposition applying the wrong legal standard: the Rule 33

10   test applicable to discovery errors, not to *Brady* violations.  When (as here) the evidence at issue "was in

11   the [government's] possession," the constitutionally mandated *Brady* standard governs a motion for a

12   new trial.  *United States v. Agurs*, 427 U.S. 97, 111-112 & n.19 (1976).  As the Ninth Circuit has

13   explained, the *Brady* standard is "much relaxed" from the usual Rule 33 standard governing discovery

14   violations, *United States v. Doe*, 705 F.3d 1134, 1152-53 (9th Cir. 2013), and is "more favorable to

15   defendants," *United Stated v. Stevers*, 603 F.3d 747, 755 n.2 (9th Cir. 2010)).  The government's

16   repeated citation to cases not applying the *Brady* standard is an invitation to commit error, and must be

17   rejected.

18   **II.    The Documents Underlying the *Brady* Letter Were Favorable to Ms. Holmes.**

19       The government barely contests the first *Brady* prong: that the at-issue emails are "favorable . . .

20   for *Brady* purposes" because they "would tend to call the government's case into doubt."  *Comstock v.*

21   *Humphries*, 786 F.3d 701, 708 (9th Cir. 2015).  The government does not so much as cite *Kyles v.*

22   *Whitley*, 514 U.S. 419 (1995) (holding that evidence undermining the quality of the government

23   investigation is *Brady* material); *Arizona v. Youngblood*, 488 U.S. 51 (1988) (setting out Due Process

24   standard for failure to preserve evidence); or *United States v. Loud Hawk*, 628 F.2d 1139, 1151 (9th Cir.

25   1979) (Kennedy, J.) (controlling op.) (setting out balancing test when government fails to preserve

26   evidence, but does not violate the Due Process Clause).

27

28   MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY
     DISCOVERED EVIDENCE RELATING TO LIS DATABASE
     CR-18-00258 EJD
                                            4

*First*, the government attempts to relitigate whether it even had a *Brady* obligation to turn over the emails in the first place.  Opp'n at 21-22.  But this Court has correctly held that, under *Kyles* and its progeny, the emails relating to the LIS are favorable because they undermine the quality of the government's investigation, Dkt. 1464 at 3-4.  To the extent the government believes that the emails show that "reconstructing the LIS database . . . was no longer possible," Opp'n at 22—in truth, a key email thread indicates the opposite—that position merely reaffirms the need (long requested by Ms. Holmes) for an evidentiary hearing concerning the government's failure to secure the LIS and the prejudice that ensued.  *See* Dkt. 810 at 7; Dkt. 850 at 8-14; Dkt. 1577.

*Second*, the government implies that the emails are not favorable because Ms. Holmes did not pursue the "same defense" as Mr. Balwani—*i.e.*, she did not to put at issue the government's failure to collect and preserve the LIS database at trial.  Opp'n at 22.  But Ms. Holmes did not need to decide to pursue a defense in order to make the emails favorable.  Ms. Holmes could have decided whether to pursue this defense after receiving the favorable documents (as *Brady* requires).

*Third*, the government argues that the emails are "cumulative and likely inadmissible."  Opp'n at 22.  The government is wrong on both points.  As Ms. Holmes explained in her opening brief, the emails contain specific, exculpatory information that was absent from the October 29, 2020 *Brady* Letter.  For example, the emails reveal that:

- Mr. Schenk, Mr. Bostic, and Mr. Leach were the "government attorneys" in the October 29, 2020 *Brady* Letter.  *E.g.*, Dkt. 1577-5.  The *Brady* Letter did not identify the "government attorneys" by name, office, or title.  Nor did it specify which (or how many) "government attorneys" were involved in which events.  *E.g.*, Dkt. 732-2, ¶¶ 46-47, p. 22.

- Among other newly identified non-attorney government personnel disclosed in the emails, Ms. Sutton Peirce was the Automated Litigation Support supervisor and Ms. Lakisha Holliman was the paralegal in the *Brady* Letter.  *E.g.*, Dkt. 1577-5.  The *Brady* Letter did not identify either individual.  *E.g.*, Dkt. 732-2, ¶¶ 46-47, p. 22.

- Counsel for Assignee informed Mr. Bostic on October 15, 2018 that someone other than Mr. Ramesh Balwani may have been able to access the LIS.  Dkt. 1577-10.  The *Brady*

Letter misleadingly states that the Assignee "could not identify anyone" other than Balwani.  Dkt. 732 ¶ 48, p. 22.

- Counsel for Assignee informed Mr. Bostic on October 15, 2018 that he believed that the LIS was "encrypted" and that the Assignee "did not have the code" for the LIS.  Dkt. 1577-10.  The *Brady* Letter vaguely describes this communication as occurring in "approximately October and November 2018."  Dkt. 732 ¶ 48, p. 22.

- Despite this October 15 communication, Mr. Schenk, Mr. Bostic, and Mr. Leach decided at a meeting on a still-undisclosed day in October 2018 not to pursue specific, recommended options to access and preserve the LIS.  That decision was memorialized in an October 30, 2018 email sent by Ms. Holliman.  Dkt. 1577-5.  The *Brady* Letter said only that unnamed "government attorneys" participated in that October meeting.  Dkt. 732 ¶ 47, p. 22.

- Mr. Schenk, Mr. Bostic, and Mr. Leach never responded to any email from Ms. Holliman or Ms. Peirce relating to preserving the LIS.

- Mr. Leach believed it was "important" to produce all discovery by "4/15" (presumably April 15, 2019).  Dkt. 1577-12.

The government ignores most of this new evidence, and suggests that Ms. Holmes already knew the identity of the participants in these events.  But contrary to the government's out-of-context quotations, Ms. Holmes has never once claimed to know the identity of the unnamed "government attorneys" in the *Brady* letter.  At the first motion to suppress argument, Ms. Holmes' counsel stated only that "[t]he evidence to date, *which today is still incomplete*, . . . *suggests that* . . . the prosecutors prosecuting this case repeatedly disregarded advice from their own support staff regarding steps that they should take to access and preserve the LIS database."  7/7/2021 Tr. 11:4-8 (emphasis added).  Later in the same hearing, Ms. Holmes' counsel questioned how Ms. Holmes could "exercise a judgment about whether or not to produce evidence at trial or to call witnesses on this issue" in light of the government's "refus[al] to tell us who the witness[es] are . . . [or] to actually give us the evidence."  *Id*. at 40:19-22.

1    To be sure, Ms. Holmes has at times referred to the fact that Mr. Schenk, Mr. Bostic, and Mr.

2  Leach may be witnesses as to the government's failure to preserve the LIS.  *See* 5/4/2021 Tr. 55-58; *cf.*

3  Dkt. 1003 at 2-3 (witness list).  Ms. Holmes did not base those statements on the *Brady* Letter, but

4  instead on specific documents showing that those prosecutors were on notice of the importance of the

5  evidence residing on the LIS and of the potential complications associated with accessing and preserving

6  it prior to the closure of the Theranos Newark facility.  *See, e.g.*, Dkt. 732-4 (redacted), 736-7

7  (unredacted) (June 5, 2018 email recounting prior communication to Mr. Schenk as to complications

8  associated with accessing the LIS); Dkt. 732-3 (May 23, 2018 email recounting conversation that day

9  with Mr. Schenk and Mr. Bostic on the same subject); Dkt. 732-1 (Dec. 17, 2016 letter to Mr. Leach

10 describing contents of the LIS).  Owing to the cloaked identities of the government personnel in the

11 *Brady* Letter, Ms. Holmes had no choice but to list those witnesses as "Government Attorneys LNU,"

12 "Government Paralegal LNU," "Automated Litigation Support Supervisor LNU," and "USAO

13 Employee in the Automated Litigation Support Unit LNU."  Dkt. 1003 at 3.  This information made

14 clear that Ms. Holmes wished to present this defense, but lacked sufficient information by which to do it.

15    The emails are admissible under Rules 401 and 403.  The government's argument to the contrary

16 is startling, as the *government itself* admitted two of the emails at issue in Mr. Balwani's trial.  *See* Dkt.

17 1577 at 3.  There is no question that the emails would have been admissible in Ms. Holmes' trial as well.

18 For starters, they are admissible for notice to Mr. Schenk, Mr. Bostic, and Mr. Leach concerning (among

19 other things) potential avenues to accessing and preserving the LIS.  Separately, they are admissions of a

20 party opponent, and thus admissible against the government for the truth of the matter asserted.  Fed. R.

21 Evid. 801(d)(2); *see United States v. Van Griffin*, 874 F.2d 634, 638 (9th Cir. 1989).  Ms. Holmes'

22 witness list identified individuals through whom the emails could have been admitted, and the

23 government's own use of statements of a party opponent at Ms. Holmes' trial shows that such

24 documents need not be introduced through witnesses with percipient knowledge.  This could have

25 included people who were not trial participants, such as Sutton Peirce, the ALS supervisor identified in

26 the emails.[2]  Elsewhere, the government suggests that the emails may be inadmissible because the Court

27

28    [2] Of course, defense counsel routinely call non-attorneys involved in the investigation of matters,

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY
DISCOVERED EVIDENCE RELATING TO LIS DATABASE
CR-18-00258 EJD

7

1    barred Mr. Balwani from "calling any members of the prosecution team as witnesses," but omits the fact

2    that the Court based that order on Mr. Balwani's counsel's representation that he would not call those

3    witnesses.  Dkt. 1464 at 8 n.3.  Had Ms. Holmes had the benefit of the newly produced material, she

4    could have called Ms. Peirce and admitted much of the relevant information, without needing to satisfy

5    the standard for calling prosecutors.

6          The emails easily satisfy the standard of Ninth Circuit case law, which has assessed favorable

7    evidence for materiality so long as it is "potentially admissible."  *See United States v. Price*, 566 F.3d

8    900, 911-14 (9th Cir. 2009) (concluding that suppressed impeachment evidence that would only have

9    been admissible under Rule 608(b), pursuant to an exercise of the court's discretion, was material under

10   *Brady*).[3]  Furthermore (and contrary to the government's suggestion of a *per se* requirement of

11   admissibility), it is still an open question in the Ninth Circuit whether the suppression of inadmissible

12   evidence may violate the Constitution.  *See id.*

13   **III.    The Government Suppressed the Emails Underlying the *Brady* Letter.**

14         The government suppressed the documents underlying the *Brady* Letter, and this motion is

15   timely as a result.  In response, the government insists that it "disclosed the substantive information"

16   contained in the emails to Ms. Holmes through the *Brady* Letter, and thus cannot be said to have

17   engaged in suppression.  Opp'n at 23.  But as Ms. Holmes has explained, the underlying emails did

18   contain new evidence.  "[T]he government cannot satisfy its *Brady* obligation to disclose exculpatory

19   evidence by making some evidence available and claiming the rest would be cumulative."  *Carriger v.*

20   *Stewart*, 132 F.3d 463, 481 (9th Cir. 1997) (en banc).  The *Brady* Letter did not provide Ms. Holmes

21   with "the essential facts which would enable [her] to call the witness[es] and thus take advantage of any

22

23

24   such as FBI, IRS, and other government agents.

25       [3] Although Ms. Holmes addresses the government's contention that the emails are cumulative
     and inadmissible under the first *Brady* prong (whether the evidence is favorable), the government cites

26   to no case (and Ms. Holmes is aware of none) concluding that evidence is not favorable to the defendant
     because it is cumulative or inadmissible.  The few cases analyzing whether evidence is cumulative or

27   admissible arise in the third and final prong of *Brady*: the assessment of the withheld evidence in the
     context of the record as a whole.

28   MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY
     DISCOVERED EVIDENCE RELATING TO LIS DATABASE
     CR-18-00258 EJD

                                        8

exculpatory testimony that [they] might furnish," for (among others) the simple reason that it did not

identify those witnesses at all. *United States v. Dupuy,* 760 F.2d 1492, 1502 (9th Cir. 1985).

In *United States v. Liew*, the Ninth Circuit found suppression in a similar circumstance. There, the government produced an FD-302 memorandum of interview with the deceased co-conspirator of the defendant, but not the rough notes underlying that memorandum. 856 F.3d 585, 604 (9th Cir. 2017). After the defendant proffered a declaration identifying discrepancies between the FD-302 and the interview, the Ninth Circuit held that the government had failed to show that, in light of those possible discrepancies, it "satisfied its duty to disclose all favorable evidence known to it." *Id.* (brackets omitted). The Ninth Circuit vacated the order denying defendants' production request, and remanded to the district court to assess whether the suppressed notes were material. *Id.*; *see also Dupuy*, 760 F.2d at 1503 (reversing conviction even though government disclosed identities of witnesses, because government failed to produce witness statements). A number of the government's cases relating to whether evidence is "newly discovered" do not arise in the *Brady* context, and therefore must be ignored.

## IV.    The Suppressed Evidence is Material.

### A.    There is a Reasonable Probability of Acquittal, Because The Suppressed Evidence Undermines the Quality of the Government Investigation; Exposes Bias on the Part of the Prosecutors at Trial; and Requires Suppression of Evidence and Testimony Relating to the LIS.

Had the government timely produced the documents underlying the *Brady* Letter, there is a reasonable probability that the jury would have acquitted Ms. Holmes of the offenses of conviction. That is because the emails call into question the integrity of the government's investigation; expose bias in its presentation at trial; and because the emails would have resulted in the suppression of key government evidence in the case. *See* Dkt. 1577.

The government does not meaningfully engage with these arguments. *First*, rather than defend the quality of its investigation, the government merely incorporates by reference arguments previously made to (and rejected by) this Court. Opp'n at 24. The government has no answer to the fact that government's own witnesses established that the LIS was the central repository of patient-testing and

1   quality-control data at Theranos; that the LIS was used in order to investigate whether testing results

2   were accurate; and that the government's knowing failure to take appropriate steps to collect the LIS (as

3   illustrated by the emails) discredits its entire case.  *See* Dkt. 1577.  And while the government argues

4   that the emails are not material today, Mr. Schenk and Mr. Bostic strenuously objected to Ms. Holmes'

5   examination of witnesses about the LIS at trial, and to any argument about the government's failure to

6   obtain the LIS.  *See, e.g.*, *Holmes* 9/29/21 Tr. 2371-74, 11/10/21 Tr. 5877-89, 11/16/21 Tr. 6306-21.

7   That conduct is a recognition that the government was concerned about the impact on trial of evidence

8   relating to the LIS.

9           *Second*, the government does not even attempt to contest that the emails would have exposed the

10  prosecutors' motive to minimize the significance of the LIS and inflate the significance of anecdotal test

11  results.  Nor does the government dispute that it suggested, without a good-faith basis for doing so, that

12  data in the LIS (and R&D data) was unreliable or even falsified.

13          *Third*, the government does not grapple with the effect of the emails under the *Youngblood* or the

14  *Loud Hawk* frameworks, which governed Ms. Holmes' prior motions to suppress and to strike.  The

15  record shows that, months before the dismantlement of the LIS in August 2018, Mr. Schenk and Mr.

16  Bostic were informed of potential complications associated with the LIS.  Mr. Leach was informed that

17  the LIS hosted critical patient-testing data as early as December 2016.  The newly produced emails

18  establish that these very prosecutors later ignored the recommendations of expert government personnel

19  on ways to access and preserve the LIS.  That fact is highly relevant to whether the government acted in

20  bad faith in failing to preserve the LIS.  The emails also show that the government concealed its

21  difficulty in accessing the LIS for more than one year after its internal deadline for completing document

22  productions to the defense—again, probative of bad faith under *Youngblood*, and highly relevant under

23  the "quality of government conduct" prong under *Loud Hawk* balancing.  Similarly, the fact that Mr.

24  Schenk and Mr. Bostic were on notice of the technical difficulties associated with the LIS; attended a

25  meeting where utilizing FBI expertise was apparently discussed; committed to pursuing that option for

26  preserving the LIS; and yet have never produced material (written or unwritten) showing an attempt to

27  follow up with the FBI or another agency, is directly relevant to the *Youngblood* inquiry.  *See United*

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY
    DISCOVERED EVIDENCE RELATING TO LIS DATABASE
    CR-18-00258 EJD
                                                10

1  *States v. Rodriguez*, 496 F.3d 221, 222 (2d Cir. 2007) ("When the Government is in possession of
2  material information that impeaches its witness or exculpates the defendant, it does not avoid the
3  obligation under *Brady/Giglio* to disclose the information by not writing it down.").

4      In response to all this, the government asserts that the LIS "would not have allowed the parties to
5  sort accurate from inaccurate patient results or determine an overall failure rate for Theranos' blood
6  tests." Opp'n at 15. The government's position is inconsistent with Dr. Rosendorff's testimony that he
7  used the LIS to identify the source of any error in testing results, assess "how the Theranos results had
8  been trending," and "gather all of the information" about a particular test result. Dkt. 1577 at 8; *see also*
9  *Holmes* 11/19/2021 Tr. 7101-02. Most importantly, the government does not dispute that the evidence
10  on which it relied to support the alleged falsity of Ms. Holmes' representations concerning the accuracy
11  and reliability of Theranos testing ultimately traced to the LIS.

12      **B.    The Government's Arguments to the Contrary Are Unavailing.**

13      The government's arguments against materiality fall flat. *First*, the government argues that Ms.
14  Holmes cannot "show that the eleven LIS-Related Documents were relevant to a single element of her
15  counts of conviction." Opp'n at 24. But the emails relate directly to the element of falsity in the
16  investor counts. The government's evidence that statements regarding the accuracy and reliability of
17  Theranos technology were false was ultimately based on information in the LIS, and the emails show
18  that the government acted poorly in failing to preserve the LIS. This undermines the government's
19  proof.[4] *See infra* p. 12; Dkt. 1577.

20      *Second*, the government argues that "nothing in the LIS-Related Documents would materially
21  alter the information" available to Ms. Holmes in deciding whether to "put at issue the government's
22  conduct." Opp'n at 24. Not so. As described above, the emails contained previously unknown

---

25      [4] Elsewhere in its brief, the government conflates the Rule 29 sufficiency-of-the-evidence
26  standard with the *Brady* standard, contrary to black-letter law. *Compare, e.g.*, Opp'n at 20 (arguing that
   evidence in record "could uphold Defendant's conviction on the four investor-related counts"), *with*
27  *Browning v. Baker*, 875 F.3d 444, 470 (9th Cir. 2017) ("Even if the jury—armed with all of this new
   evidence—*could* have voted to convict … we have no confidence that it *would* have done so.").

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY
   DISCOVERED EVIDENCE RELATING TO LIS DATABASE
   CR-18-00258 EJD
                                        11

1  information; were admissible; and would have enabled Ms. Holmes to identify the appropriate witnesses

2  to testify as to the events of fall 2018.

3      *Third*, the government contends that the emails cannot be material because Ms. Holmes has

4  taken the position that its failure to preserve the LIS is "not relevant." Opp'n at 17.  The government

5  quotes Ms. Holmes' counsel at the May 2021 motion *in limine* argument concerning the government's

6  Rule 404(b) notice as to "decommissioning Theranos' Laboratory Information System database."

7  4/3/2020 Gov't Rule 404(b) Letter at 16.  At that hearing, Ms. Holmes argued that the government

8  should be precluded from insinuating, without evidence, that *she* was at fault for the loss of the LIS.  But

9  defense counsel stated that "we should have no restrictions on our ability to offer that evidence" relating

10  to the government's failure to collect the LIS.  5/4/21 Tr. 50-51 ("[W]e should have no limitations with

11  respect to our ability to argue about [the government's] failures to obtain that evidence.").  And Ms.

12  Holmes' diligent efforts to obtain the emails reflect her belief in their relevance.

13      *Fourth*, the government suggests that the Court has already held that the at-issue emails do not

14  relate to accuracy and reliability.  Opp'n at 24.  But the Court order directing the production of the

15  emails in Mr. Balwani's trial did not take a position (one way or the other) on the emails' relevance to

16  that issue.  Opp'n at 24; Dkt. 1464 at 5.  To the extent that the government intends to refer to the Court's

17  order precluding Mr. Balwani's LIS expert from testifying that the "LIS database and its contents would

18  have demonstrated that Theranos tests were accurate and reliable," it is no surprise that a computer

19  expert would not have an opinion on the accuracy and reliability of laboratory test results, and that

20  associated cross-examination and rebuttal would be limited according to the scope of that opinion.  That

21  says nothing about whether the emails and the LIS relate to accuracy and reliability.  Dkt. 1464 at 9.  In

22  any event, the emails relate to the government's accuracy-and-reliability allegations for a simple reason:

23  the government sought to prove that Ms. Holmes' statements concerning the accuracy and reliability of

24  Theranos technology were false through evidence and testimony ultimately based on LIS data that is

25  now lost, due to government misconduct described (in part) in the emails.

26      *Fifth*, the government attempts to downplay its reliance on accuracy-and-reliability allegations in

27  connection with the investor counts.  But in closing, Mr. Schenk described Ms. Holmes' alleged

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY
DISCOVERED EVIDENCE RELATING TO LIS DATABASE
CR-18-00258 EJD

1   misrepresentations concerning the accuracy of Theranos technology as "sort of the underlying false

2   statement in the case" and "a thread through this scheme." *Holmes* 12/16/21 Tr. 8959 (emphasis added);

3   *see also id.* at 8910, 8915, 8936-37.  Apart from its closing, the government highlighted the accuracy-

4   and-reliability allegations in its opening, *see also, e.g.*, 9/8/21 Tr. 532, 537-38, 540-41 (opening); and its

5   questioning of investor witnesses (including the testifying C-2 investors), *see, e.g.*, 11/2/21 Tr. 5102-03

6   (D. Mosley) ("Q. Why?  Forgive me, it might be obvious, but why was accuracy in blood testing

7   important to you when you were considering investing?  A.  Well, you know, from an economic

8   standpoint, the company would obviously do a lot better if it had a highly effective test, technology with

9   high accuracy."); 10/26/21 Tr. 4670 (L. Peterson) ("Q.  Was it impressive to you that Theranos provided

10  the highest levels of accuracy and precision?  A.  Yes, of course."); 11/16/21 Tr. 6390-91 (B. Grossman)

11  ("Q.  And the very first question, 'How does your accuracy and speed stack up against traditional tests.'

12  Do you see that?"  A.  Yes.  Q.  And why were you asking that?  A.  Well, it was, it was a fundamental

13  part of understanding what their technology was capable of doing, and what their competitive advantage

14  – what competitive advantage that they had against the conventional laboratory equipment.").

15          In the government's words, the accuracy-and-reliability allegations were a "thread" through the

16  two alleged conspiracies in the case.  The LIS was the repository of data used by the company to store

17  patient testing and quality control data, to track that data, and to investigate questions concerning

18  whether particular tests (and test results) were accurate.  The fact that Ms. Holmes at times argued that

19  the loss of the LIS related to the patient counts does nothing to undermine the prejudice associated with

20  the loss of the LIS to Ms. Holmes' ability to confront the government's accuracy-and-reliability

21  allegations in the investor counts (particularly when Ms. Holmes renewed her motion to suppress and

22  motion to strike at trial without limitation, 11/19/2021 Tr. 7101-02).

23          *Last*, the government argues that there is no "reasonable likelihood" of a different outcome

24  because Mr. Balwani obtained the emails during his trial, and was convicted.  But *Brady* requires a

25  "retrospective determination" based on the entire record in *Ms. Holmes'* case.  Although the indictment

26  alleged the same offenses against Ms. Holmes and Mr. Balwani, there were numerous differences

27  between their trials (including the evidence admitted against them, and the witnesses who testified).  Ms.

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY
    DISCOVERED EVIDENCE RELATING TO LIS DATABASE
    CR-18-00258 EJD

1   Holmes' case featured a split verdict, with acquittals, hung counts, and a limited number of convictions.

2   In passing, the government suggests that the fact that Ms. Holmes testified may be grounds for denying

3   that motion, but relies on a Rule 33 case not applying the *Brady* standard.  Opp'n at 20.  In cases like

4   Ms. Holmes', with a split verdict and deliberations for seven days, the Ninth Circuit has recognized that

5   "[p]rejudice is especially likely . . . because the case was so close."  *United States v. Obagi*, 965 F.3d

6   993, 998 (9th Cir. 2020) (finding prejudice in part because "[t]he jury deliberated for three days and still

7   delivered a split verdict on the charges").  And the potential applications at Ms. Holmes' trial (including

8   in exposing prosecutor bias) go beyond the way in which Mr. Balwani chose, pursuant to his own trial

9   strategy, to use the emails.  *See* Dkt. 1577.

10  **V.      Discovery and an Evidentiary Hearing Are Required.**

11          The government objects to an evidentiary hearing on the grounds that Ms. Holmes has identified

12  no "'new' substantive information."  Opp'n at 25.  But as discussed, the emails contain exculpatory

13  information that was previously undisclosed, and raise various specific questions requiring resolution in

14  an evidentiary hearing.  *See supra* pp. 5-6; Dkt. 1577 at 12-13; Dkt. 810, 850.  The government

15  complains that an evidentiary hearing would constitute a "fishing expedition to question members of the

16  prosecution team about their litigation choices."  Opp'n at 25.  But this Court has recognized that "what

17  the government did or did not do are facts that are not protected."  Dkt. 1464 at 6.  The government has

18  not explained how questions concerning its failure to collect and preserve evidence constitute protected

19  "opinions and mental impressions of the case."  *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006).  More

20  fundamentally, attorney work product cannot trump the requirements of the Constitution.  *See id.* ("[I]n

21  general, a prosecutor's opinions and mental impressions of the case are not discoverable under *Brady*

22  *unless* they contain *underlying exculpatory facts*." (emphasis added)).  If there is potential *Brady-Giglio*

23  material that the government is continuing to withhold on this basis, Ms. Holmes asks the Court to

24  require that the government produce a privilege log to Ms. Holmes (or produce the information to the

25  Court for *ex parte* review) in advance of any evidentiary hearing.

26

27

28  MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY
    DISCOVERED EVIDENCE RELATING TO LIS DATABASE
    CR-18-00258 EJD

**VI.     The Emails Would Warrant A New Trial Even if They Were Not *Brady-Giglio* Material.**

Even were the Court to determine that the emails are not *Brady-Giglio* evidence, they would require a new trial.

*First*, the documents were produced to Ms. Holmes after trial, and contain new information. *See supra* pp. 5-6, 9-11; Dkt. 1577 at 14. The government cites various cases for the proposition that evidence that "existed all along" is not "newly discovered." Opp'n at 12. Those have no bearing here, where the government withheld specific information and admissible evidence, despite repeated requests by Ms. Holmes.

*Second*, Ms. Holmes diligently sought to obtain this evidence. Dkt. 1577 at 1-3, 14. The government does not dispute (nor could it) that she repeatedly requested these documents and information for months prior to her trial. And while the government faults Ms. Holmes for not injecting the question of fault for the loss of the LIS into her trial, it cites no authority for the proposition that this strategic judgment unwinds Ms. Holmes' specific, targeted requests for this discovery over a matter of months. Ms. Holmes expects that the government would have resisted any attempt on her part to call members of the prosecution team, or other personnel from the U.S. Attorney's Office, based solely on the representations in the *Brady* Letter.

*Third*, the emails were not cumulative, nor were they merely impeaching. *See* Dkt. 1577 at 14.

*Fourth*, the evidence is material, for the reasons discussed. Given the new information contained in the emails, they would have helped Ms. Holmes prepare her defense, and inform her trial strategy. *See* Dkt. 1577 at 14.

*Fifth*, the emails probably would have resulted in acquittal, for the reasons stated above and in Ms. Holmes' motion. *See supra* pp. 9-14; Dkt. 1577 at 15.[5]

### CONCLUSION

For the foregoing reasons, the Court should grant Ms. Holmes' Motion and order a new trial.

---

[5] Ms. Holmes incorporates by reference the arguments addressing harmlessness and timeliness in her Reply in Support of Motion for New Trial Based on Newly Discovered Evidence from Mr. Balwani's Trial. And for the reasons stated in this Reply, because the emails are favorable, were suppressed, and are material, their suppression is not harmless and this Motion is timely. *See* Dkt. 1577.

MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE RELATING TO LIS DATABASE
CR-18-00258 EJD

1   DATED:  September 28, 2022                    Respectfully submitted,

2                                                 /s/ Amy Mason Saharia
                                                  KEVIN DOWNEY
3                                                 LANCE WADE
                                                  AMY MASON SAHARIA
4                                                 KATHERINE TREFZ
                                                  Attorneys for Elizabeth Holmes
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
MS. HOLMES' REPLY IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON NEWLY
DISCOVERED EVIDENCE RELATING TO LIS DATABASE
CR-18-00258 EJD
                                                  16

1

**<u>CERTIFICATE OF SERVICE</u>**

2

      I hereby certify that on September 28, 2022 a copy of this filing was delivered via ECF on all

3

counsel of record.

4

5

                                   /s/ Amy Mason Saharia
                                   AMY MASON SAHARIA

6

                                   Attorney for Elizabeth Holmes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28