# EXHIBIT 3

## MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 2204323-MF |
| PERSON INTERVIEWED | : | Dr. Adam Rosendorff |
| PLACE OF INTERVIEW | : | United States Attorney's Office, San Jose, CA |
| DATE OF INTERVIEW | : | August 30, 2021 |
| TIME OF INTERVIEW | : | 9:40 A.M. |

On August 30, 2021, Dr. Adam Rosendorff (ROSENDORFF) was interviewed at the United States Attorney's Office-San Jose in preparation for possible trial testimony. Assistant United States Attorneys John Bostic, Robert Leach, and Jeffrey Schenk conducted the interview. U.S. Food and Drug Administration Office of the Inspector General Special Agent George Scavdis was present. Daniel Koffmann was present as ROSENDORFF's counsel. Prior to the start of the interview, AUSA Bostic explained the trial testimony process. There was also a discussion of motions that had been filed with the court. The following is a summary of the statements made during the course of the interview and may not contain all statements made which have been documented in previous memoranda.

ROSENDORFF recently moved to the San Francisco Bay Area.

ROSENDORFF reviewed his work history prior to Theranos. ROSENDORFF was searching for a new position in the biotechnology industry and saw a opportunity with Theranos. He applied and was interviewed by Elizabeth Holmes (HOLMES), Sunny Balwani (BALWANI), and Daniel Young (YOUNG). During the interview, they spoke of Theranos' mission. He learned Theranos had developed a proprietary technology that measured analytes from blood drawn by fingerstick, but they did not elaborate further. ROSENDORFF also reviewed some online patent filings. He started at Theranos in April 2013 as laboratory director but did not become the director of record until later in 2013. During the interim, Spencer Hiraki (HIRAKI), a consultant, acted as laboratory director of record. Mark Pandori (PANDORI) joined the CLIA [Clinical Laboratory Improvement Amendments] lab after ROSENDORFF was added to the license.

ROSENDORFF replaced Arnold Gelb (GELB) as lab director and reported directly to BALWANI who was President and Chief Operating Officer at the time. BALWANI had a background in software and was responsible for overall execution at Theranos. He also worked with investors and testified before the Arizona legislature. ROSENDORFF believed BALWANI was inappropriately involved with the CLIA lab. For example, BALWANI fired a CLIA lab employee on ROSENDORFF's second or third day. HOLMES was involved with the CLIA lab, but she was also the face of Theranos and secured investors, while BALWANI made things happen. ROSENDORFF was told by other Theranos employees that any email sent to BALWANI was automatically sent to HOLMES by bcc.

ROSENDORFF left Theranos in December 2014 because of a lack of quality control, an absence of proficiency testing, and a concern about the accuracy of Theranos' data.

The Children's Hospital of Pittsburgh ran clinical chemistry, hematology, and biochemical metabolic genetic assays, and had a hemoglobin service. The lab was responsible for point-of-care devices located within the hospital. The hospital ran mainly FDA-approved tests and devices. ROSENDORFF estimated the hospital ran millions of blood assays while he was employed there. Even though ROSENDORFF was not the lab director of record, that did not change his responsibilities. He oversaw quality control (QC) and proficiency testing (PT) and had a good understanding of how well the hospital ran its QC and PT.

Lab results generated at the Children's Hospital were released into the LIS system. If a result was flagged, ROSENDORFF may have reviewed that result. This did not happen frequently.

A laboratory director is required for CLIA regulated labs. The position of lab director was responsible for, among other things, training staff, proficiency testing, ensuring devices were operating correctly, reviewing and approving validation and standard operating procedures, communicating with doctors and patients to address concerns, and ensuring accuracy and reliability. A laboratory director must either have a medical license and one year of experience in a clinical lab, or a PhD with approval from an appropriate certification board.

Accuracy was the closeness of an assay's result with the true result, usually when compared to a gold standard, and was considered across an assay's entire analytical range with a number of samples greater than twenty. This was a CAP requirement. Bias was a measure of accuracy versus the result. While reliability was not a defined term, it could be described as either precision or reproducibility. There could be variation of some sample results, including intra-day and inter-day variability. Variability could be due to the person operating the device. Coefficient of variation (CV) was a figure calculated for quantitative assays. A low CV indicated an assay was reproducible and performed consistently. An assay with a high CV was inconsistent, and when the primary concern is patient care, consistency was important. Consistency spoke to the stability of the assay system. An assay could not have accuracy without precision.

Labs were required to register for proficiency testing, a process that was run two to three times per year. For U.S. Food and Drug Administration (FDA) approved tests, a lab was provided with a sample of a target analyte. The sample was run in the lab, a result generated, and that result submitted for review. Proficiency testing results were graded in comparison to a collection of the lab's peer in the United States. Even though the proficiency testing entity knew the sample's true measurement, there could have been variation of the results when compared to the results of the other peer labs.

Proficiency testing was also required for LDT's [laboratory developed test] and was conducted under alternative assessment of proficiency (AAP) guidelines. ROSENDORFF said there were several ways AAP could have been conducted and described an example protocol as rerunning known samples through the lab's AAP and passing four of five tests. ROSENDORFF oversaw a group of scientists that conducted AAP for a mass spectrometer assays while he was at the Children's Hospital of Pittsburgh. Most of the proficiency testing conducted there, however, was on FDA-approved testing methods.

Quality control was run on every device, every shift, for every assay using QC material at low, medium, and high levels before patient testing started. Theranos used BioRad QC material. ROSENDORFF did not remember if QC was run in the mornings or in the evenings. If a device failed QC, it would be run again, and possibly a third time, before the device was removed for recalibration or further servicing.

Quality assurance (QA) was an umbrella term used to collect preanalytical, analytical, and postanalytical best practices. Quality assurance was a lab director's responsibility with the assistance of a director of quality assurance who supported those practices.

ROSENDORFF said it was good practice for a laboratory director to be involved early in the R&D processes to communicate assays specifications, ensure good results are returned, and that any assay was fit for patient care. Theranos' CLIA lab director was separate from the R&D section.

From his review of documents, ROSENDOFF identified Theranos' launch with Walgreens as September 9, 2013. Up until that time, Theranos had been running Safeway samples on predicate devices and methods in the CLIA lab. The devices included the Advia, Abbott Ruby, and Immulite. They CLIA lab also ran internal fingerstick testing. HIRAKI was the lab director most involved with the Safeway project. ROSENDORFF thought the contract with Safeway ended around the time he was added to Theranos' CLIA license.

The Edison was a Theranos proprietary device that ran immunoassays only. It was meant to replace the Immulite which ran immunoassays on venous samples. Theranos did not run any LDT's in the CLIA lab before ROSENDORFF was listed on the company's license. The first time an LDT was run in the CLIA las was in connection with the Walgreens launch. At launch, Theranos used Siemens Advia devices with fingerstick collected blood samples. These samples were spun and run on the Adiva after having been diluted with saline. Theranos also ran tests using predicate methods, just like conventional labs. ROSENDORFF did not think the Edison was used in the CLIA lab at the time of the launch.

The Adiva devices' software was customized on open channels. "T-cups" were designed and used so the probe could reach the sample. Results were multiplied by dilution factors.

ROSENDORFF reviewed document TS-0034961 to TS-0034962. He did not remember if the physician in this email was concerned about Theranos' turnaround time. Creatinine was a protein released by muscle and filtered through the kidneys. Abnormal creatinine results could have indicated renal failure. ROSENDORFF did not remember this interaction, but from his review believed he had verified the results.

ROSENDORFF reviewed document THPFM0000273433 to THPFM0000273434 and said Theranos wanted to hide modifications they had made to the Siemens devices from Siemens technicians. To do this, they removed any open channel programming before the technician arrived. No one at Theranos ever told Siemens they were not using the devices strictly as Siemens had intended, and also did not tell anyone at Siemens they were using non-Siemens reagents. ROSENDORFF signed an NDA [non-disclosure agreement] and did not tell anyone outside of Theranos about the use of modified third-party devices. ROSENDORFF remembered an instance documented in an email to BALWANI where he wanted to note on a lab report that an unmodified device had been used to generate a result. Theranos wanted to keep this a secret. ROSENDORFF told his brother about Theranos' use of predicate devices while seeking his counsel. ROSENDORFF said it was uncommon for labs to alter predicate devices although open channels were used for non-Siemens reagents. For some of the other devices, the only modification Theranos made to them was for the use of fingerstick blood samples.

ROSENDORFF understood from BALWANI the deployment of Theranos' minilab device was imminent. A site had been secured in Mountain View where the minilab was going to be used in

conjunction with Edison devices. The minilab ran clinical chemistry assays and was going to replace the Advia. The 4s device had a centrifuge and ran hematology assays. The minilab and 4s devices were never used for clinical testing. Per Chinmay Pangarkar (PANGARKAR), they were "not ready for primetime." ROSENDORFF never physically saw any minilab or 4s devices, and never saw any minilab or 4s validation reports. These devices were developed at Theranos' Newark facility. He did not know what a monobay device was.

From conversations with Paul Patel (PATEL) and Ian Gibbons (GIBBONS), minilab and 4s development was not successful. BALWANI knew this and ROSENDORFF was aware of an instance that BALWANI yelled at a minilab engineer during a meeting. YOUNG developed the idea to dilute blood samples. This was communicated to HOLMES and BALWANI and they approved.

ROSENDORFF reviewed document THPFM0000000500 to THPFM0000000501. ROSENDORFF described the environment of Theranos at the time of this document as hectic and rushed. The R&D sections were working 24/7, and he remembered BALWANI had called him at 11:00 P.M. one night to come into the office to sign documents. Ideally, this process would have started earlier, but ROSENDORFF was most concerned about validating assays before they were used for patient testing. ROSENDORFF disagreed with using venous blood to validate assays, and he felt rushed, but conceded the reports looked good. Fingerstick blood was used to verify reference ranges which followed CLSI [Clinical and Laboratory Standards Institute] guidelines. Theranos did not establish reference ranges at this time. ROSENDORFF argued with YOUNG that precision should be calculated with fingerstick samples for quality, and validation should match the patient testing method. ROSENDORFF and YOUNG argued often.

ROSENDORFF reviewed document THPFM0003106027 to THPFM0003106029. ROSENDORFF was concerned about Theranos' sodium and potassium ion assays. He had an in-person meeting with HOLMES where he told her Theranos was not ready. The glucose assay had significant negative bias which meant it consistently returned results lower than actual. In his email to HOLMES, ROSENDORFF compared the published reference range to the Siemens chemistry reference range and the Theranos chemistry reference range and said the Theranos chemistry suffered from accuracy problems.

- ROSENDORFF wrote, "The CLIA total allowable error (precision plus bias) is 10%, which means that our entire error budget has already been spent on just precision." The Theranos chemistry's high CV accounted for almost all the total allowable error before any bias calculations were added. In essence, this assay needed to "go back to the drawing board."
- Some assays had different total allowable error specifications.
- ROSENDORFF said it was possible to get a sense of overall accuracy and precision from just one test and referenced his statements in this document regarding sodium. Errors and outliers happened, but it was concerning when they started to happen with frequency. Testing volume must also be considered, but ROSENDORFF noted only demos had been run at the time of this document. The sodium results raised troubling red flags.
- ROSENDORFF was concerned about operational issues in the Normandy lab. The technicians were insufficiently trained, and the training they had completed was not documented properly. This could have affected results. For example, a poorly trained

Page 4 of 14

technician could have run the wrong program on a device and may not have recognized any issues.

ROSENDORFF asked HOLMES to delay the launch which was something and he had spoken to his colleagues in the CLIA lab about. He did not make the request lightly. During this in-person meeting, ROSENDORFF articulated his concerns. HOLMES seemed nervous, was pale, and stuttered, but he did not sense this was new information for her. HOLMES said Theranos would simply use venous samples to resolve the issues and was not open to delaying the launch. ROSENDORFF understood there was significant pressure from the Board of Directors to launch. ROSENDORFF felt it was his responsibility to make the request. He went to HOLMES directly because she was the CEO and had the authority to delay the launch. He did not approach BALWANI because ROSENDORFF thought he would have deflected and passed the concerns over to YOUNG for resolution. He did not trust BALWANI to do the right thing. ROSENDORFF could not delay the launch by himself without being fired.

ROSENDORFF reviewed document THPFM0000291329 to THPFM0000291331. In the email, Rose Edmonds (EDMONDS) wrote, "I feel that Daniel and Paul are the ones who ignored the CLIA regulations for the testing in order to shorten the time it takes to complete, …" ROSENDORFF did not know what EDMONDS meant and said she was not in a position to comment about CLIA regulations. ROSENDORFF thought the glucose, sodium, and potassium problems were not solved by the time of the launch.

ROSENDORFF reviewed document THPFM0001464140 to THPFM0001464142 and said it seemed as though the glucose issue was not solved by the time of launch. The glucose assay was a significant issue as it is part of every metabolic panel. Abnormal glucose results could have signalled diabetes, dehydration, and renal problems. YOUNG wrote in an email to BALWANI, "The chemists did not pull out the old data after they made a change in the glucose calibration." ROSENDORFF believed YOUNG thought he had reviewed old data. ROSENDORFF thought the glucose issues were eventually addressed, but not sodium and potassium. ROSENDORFF implemented a rule that critical potassium results were not reported, but that worried him. He also thought there were on-board sodium plate calibrations implemented but could not remember when that happened.

ROSENDORFF reviewed document THPFM0001361307 to THPFM0001361309 and said he was informed when VIP demos were scheduled and was sometimes asked to review results. Samples were run in the CLIA lab and the VIP's were told their results were for demonstration purposes only. The Normandy lab contained modified Siemens devices, as well as Tecan and Edison devices. This was where Theranos' LDT's were run. Normandy did not contain any minilabs or 4s devices. The minilab and 4s were not used for clinical testing. From his review of the document, ROSENDORFF said there was a potential for deception with how demos were run. Modified Siemens devices were not in the room when demos were run. General chemistry assays were run on the Advia device. ROSENDORFF did not have a sense at the time for how the devices were being used but said he would have been concerned about potential misrepresentations to investors. However, his most important job was to ensure the validity of the numbers reported by the CLIA lab.

ROSENDORFF had some awareness of media articles published while he worked for Theranos and said the articles he saw suggested dishonestly from Theranos and HOLMES. ROSENDORFF remembered an article written by Roger Parloff (PARLOFF) that claimed

Theranos provided more accurate and rapid results. Theranos was not transparent with the media about what they were doing. Sometime after the *Wall Street Journal* article critical of Theranos was published, PARLOFF reached out to ROSENDORFF through LinkedIn and said he felt bad about the first article he had written and wanted to correct it.

ROSENDORFF reviewed document THPFM0000850665. ROSENDORFF had communicated a change to the Vitamin D reference range. However, the range had not been changed and did not comport with the proper range when contacted by Wade Miquelon (MIQUELON).

ROSENDORFF reviewed document THPFM0002147554 to THPFM0002147556 and said the predicate device referred to a commercial Immulite device, which was used for patient testing. Several fingerstick assays could not be run on the Edison and had to be run on the Immulite.

ROSENDORFF reviewed document THPFM0005255919. The Edison devices had a high failure rate and were difficult to pass QC. When a device failed QC, a patient sample could not be run. ROSENDORFF treated an investor sample the same as any patient sample, and he understood Theranos wanted those samples moved to the front of the queue. However, the QC process for a patient or investor sample would have been treated identically. An investor sample may have also been more closely scrutinized by YOUNG and ROSENDORFF if any of the results had been flagged by a CLS [clinical laboratory scientist]. YOUNG was more involved with the demo process and VIP results.

ROSENDORFF reviewed document THPFM0001608214 to THPFM0001608216. There was significant debate whether venous drawn and fingerstick drawn samples were equivalent. ROSENDORFF believed each sample type needed its own reference range and this was something that should not be pushed aside. LDT sample types and methods could alter reference ranges. ROSENDORFF wanted to leverage the data they had collected from fingerstick samples collected through Walgreens and views and opinions on the topic became more forceful as time progressed. He wanted to do what was best for patients and to comply with regulation, and not make any reference range assumptions. He established reference ranges and entered those into the LIS. HOLMES did not have a strong opinion on the topic.

- On THPFM0001608214, ROSENDORFF wrote, "If we focused on the venous and fingerstick reference range study with a limited number (n=60), then operationally it would be easier because (i) we wouldn't need match venous and FS and (ii) we wouldn't need pathologicals." ROSENDORFF proposed running twenty normal samples by fingerstick and verifying the range. This was not paired collection. As time progressed, they could use the data they gathered to adjust the fingerstick ranges. The initial validation was done by diluting venous samples, running them on LDT and predicate methods, and comparing to fingerstick samples. These were not paired.

ROSENDORFF reviewed document THPFM0002747643 to THPFM0002747646. In an email to ROSENDORFF, BALWANI wrote, "Also, we do do studies by aliquoting from vacutainers and if we don't, we will add more studies." ROSENDORFF explained BALWANI wanted to take venous blood, transfer it to a capillary tube, and analyze it like it was capillary drawn blood while using the same reference ranges, but this made no sense. Furthermore, BALWANI was not medically trained. ROSENDORFF wanted to stop this practice and to report the correct sample method. It served no operational purpose to transfer blood from a vacutainer into a capillary tube. ROSENDORFF felt it was important to distinguish normal from abnormal based on the sample

type and method. Fingerstick drawn blood had a larger reference range due to edema and vacuum force which caused the release of potassium from lysed cells. ROSENDORFF's recommendation reflected the biology better and provided additional context for physicians to consider. There was no medical reason to withhold the sample method. BALWANI wrote, "Yes- lets discuss next week in person." This was how BALWANI ended the conversation.

ROSENDORFF remembered phlebotomists were instructed to calculate sample draw types. Theranos' market benefit was avoiding venipuncture, but they collected venipuncture samples. Theranos' tests were run as is, and venipuncture samples were not run any differently than fingerstick samples. Dilution lowered an analytes concentration in the sample, and lower concentrations invariably raised total allowable error. The Siemens assays also returned different results than the validated assays. ROSENDORFF did not say this was an inherent flaw of dilution; rather the Theranos assays needed revalidation. The lower limit of quantitation (LLOQ) for Theranos assays was not as low as manufacturer's LLOQ for predicate assays.

ROSENDORFF, HOLMES, YOUNG, and others held a meeting to discuss Westgard rules. If an assay returned ten values above one standard deviation, or three values above two standard deviations, a lab could be alerted to assay problems. QC and patient samples could be run at the same time, but Theranos collected so little sample volume that it was disadvantageous to do so. Standard lab practice was to retest a sample if the first results generated a panic value. Theranos did not do this because there was no remaining sample to retest.

ROSENDORFF reviewed document TS-0547369 to TS-0547372.

- BALWANI wrote, "I would like the 2 Advias on Normandy to be 100% dedicated to CLIA micro samples starting this week (or next weekend at the latest). I would like 1 Advia setup to process ONLY our fingerstick/micro samples for GC and the other setup for our immunoassays. If we can consolidate this on 1 machine then that's great, but if we cant then we need to move R&D out of Normandy by end of the week or create controlled shifts for productions vs R&D and calibrate machines accordingly." Advia devices did not run immunoassays, and ROSENDORFF thought BALWANI did not know this. BALWANI also did not want R&D in Normandy as these processes should have been separate. At the time of this email, the Advia was still used for clinical testing and was still used for all general chemistry testing when ROSENDORFF resigned.
- EDMONDS wrote, "ADVIA 3 is the likely second choice as p-protocol sample testing machine." P-protocols referred to an unmodified predicate device running venous samples.
- ROSENDORFF wrote, "Right now there is no established procedure to check QC against the Biorad controls- ie we are flying with a GPS basically." ROSENDORFF wanted a study to establish QC ranges using Immulite ranges with the Edison devices. Theranos needed to reestablish QC ranges to inform the process. ROSENDORFF said the study was executed, and he became more confident a QC failure was an actual failure. This was basic lab practice.

ROSENDORFF reviewed document THPFM0001550137 to THPFM0001550139. BALWANI wrote to HOLMES and YOUNG, "The Advia/GC scenario continues to be a mess…" ROSENDORFF did not know what BALWANI meant. ROSENDORFF thought some Advia devices were washed with saline, and others with water, and by extension some samples were

US-REPORTS-0036067

diluted with saline and others with water. Best practice was to wash the devices with the same reagent used to dilute samples.

A Siemens Advia cost $300K to $400K, but total cost depended on the pricing structure. It was not something a company would simply "just buy." ROSENDORFF wondered about Theranos' economic model, and PANDORI told him Theranos was "burning through money." The Siemens Advia was a very high throughput device, the highest throughput device in use at Theranos' CLIA lab. The Immulite devices were faster than the Edison devices, even considering immunoassays generally took longer to run.

ROSENDORFF reviewed document THPFM0004225477 to THPFM0004225484 and said he did not recall specific issues with the Vitamin D QC. However, all Edison assays experienced QC issues. In an email to Erika Cheung (CHEUNG) and Sharada Sivaraman (SIVARAMAN), ROSENDORFF wrote, "The CV% at 18 ng/mL is way to high (~33%)- according to our validations it should be around 20%." In practice, the CV% tended to be higher than what was seen during assay validation. ROSENDORFF used guidance to assess CV, however, the document suggested the observed CV was too high. There were general issues with inter-instrument comparability, which ROSENDORFF attributed in part to Theranos reagent manufacturing problems. Reagents needed consistent formulations. He could not say whether the issues arose from the devices themselves. ROSENDORFF wrote, "Yes I agree the within-instrument precision is good but the between instrument precision is not- this might be a manufacturing issue." This was a general statement about reagent lots but ROSENDORFF stated the Theranos hardware could also be at fault. He could not recall any specifics that lead him to think the issues were a result of manufacturing issues.

Before the implementation of the six-tip procedures, one patient sample was split and run on three separate Edison devices. The Edison devices acted as one system and generated six results. Two outlier results were discarded through a manual process and the remaining results averaged. The purpose of this procedure, created by YOUNG, was to generate more data points for more reliable results.

ROSENDORFF reviewed document THPFM0002147453 to THPFM0002147456 and said the QC for TSH (thyroid stimulating hormone) failed. TSH was a protein that when low caused hyperthyroidism resulted in restlessness. Hypothyroidism (high TSH) resulted in edema, hair loss, and depression. Dropping tip results would have caused the loss of tip variability, but it was still possible to examine instrument QC performance. ROSENDORFF took issue with averaging results for Edison assay validation and discussed it with YOUNG.

ROSENDORFF said Theranos' six-tip averaging procedure had the potential to mask variability, but a comparison with predicate methods was needed to determine accuracy. ROSENDORFF could not comment on how the internals of Edison devices operated in the manner they did but said Siemens Advia devices did not use multiple tips or averaging. The Edison device would not have needed six tips if it worked better and the only reason to have six tips was if the designer knew the device had inherent variability. If each of the tips were treated independently, the device would have a higher CV. Six tips were not widely deployed in clinical practice leading one to conclude a single observation was good.

CV's were a component of error in a system, and ROSENDORFF was not sure if per-tip CV's were relevant for patient care. Highly accurate/high precision and highly accurate/low precision results were clinically relevant if they returned biological accurate results.

ROSENDORFF reviewed document THPFM0000003311 to THPFM0000003312. ROSENDORFF wrote to CHEUNG, "Yes- process tomorrow-this is the safest course of action as the right result is better than a fast inaccurate result." ROSENDORFF recommended the test wait until the following day because they needed a QC calibration curve. He prioritized accuracy and said to rush could do more harm. PANDORI wrote, "I guess my growing concern is why these fail so often." PANDORI's comment referenced quality control. Reagent lots could have affected QC.

ROSENDORFF reviewed document THPFM0000170875 to THPFM0000170876. ROSENDORFF believed BALWANI's comments in this document addressed the Tyler Shultz incident. It was ROSENDORFF's opinion at the time the Edison devices had issues. He wanted patients to receive accurate results, but the Edison performance was poor.

ROSENDORFF reviewed document THPFM0000001277 and said he thought PANDORI was addressing turnaround time in the lab and the need to dedicate Edison devices for certain tests. However, the point was moot if the devices failed QC. It occasionally took until the next day to bring an Edison that failed quality control back into service. That affected turnaround time, too. ROSENDORFF discussed the issue with HOLMES and BALWANI.

ROSENDORFF reviewed document THPFM0001362138 to THPFM0001362139 and said the quality control failure rate was bad but was a fair representation of his time at Theranos. In contrast, the predicate devices at the Children's Hospital of Pittsburgh failed QC less than 10% of the time. Theranos' failure rate was multiples higher. Quality control did not guarantee bad results were not reported. The ideal way to run QC was simultaneous or on-board QC run with a patient sample as opposed to sequential quality control.

ROSENDORFF could not estimate the number of assays run at Theranos on any given shift.

ROSENDORFF reviewed document THPFM0001150894 to THPFM0001150897. Quality control failures caused Edison backlogs with regular occurrence. ROSENDORFF recommended they stop aliquoting samples into CTN's. He also said two QC levels were run on the Edison devices.

ROSENDORFF reviewed document THPFM0000002944 to THPFM0000002945. He wrote in the document, "Finally (and there is objective data on this), the rate of QC failure is lower on predicate devices than it is on Edisons, as is the throughput of predicate devices." The quality control failure rate of predicate devices was lower than that of the Edison. ROSENDORFF said again that it did not guarantee that bad results were not reported. Once QC was completed, there is nothing to guarantee results. A high rate of QC failure, though, is cause for alarm for the test system and overall results.

ROSENDORFF hypothesized that proficiency testing was an important process paired with quality control because proficiency testing told CMS [Centers for Medicare and Medicaid Services] how well certain device systems worked. It was also an independent check of a laboratory and regulated process. PT samples also mimicked the matrix where QC did not. When it came to patient testing, ROSENDORFF believed a lab could never be too careful. He also said there was an economic cost for low volume testing. This was not an issue at Theranos.

ROSENDORFF reviewed document THPFM0001551308 to THPFM0001551309 and said Theranos had not established an upper limit of quantitation (ULOQ) for certain general chemistry

assays and had not established performance specifications for other assays. This was not proficiency testing. BALWANI wrote to him and HOLMES, "…you have never brought this issue." ROSENDORFF did not always have a complete understanding of what needed to be done and raised the issues at the time because he recognized then that they had not been done.

ROSENDORFF reviewed document THPFM0000500903 to THPFM0000500908 and said it was improper to reference a Siemens ULOQ if the assay was run as an LDT. Specificity studies were used to identify substances that interfered with test results, such as lipids or hemolysis. ROSENDORFF said there was no pushback to conducting the study.

ROSENDORFF reviewed document TS-0906564 to TS-0906565. HOLMES' role with the CLIA audit centered around the path the inspectors took thought the building. Otherwise, BALWANI was more involved with audit preparation.

ROSENDORFF reviewed document THPFM0005761722 and said the audit by New York State inspectors took place shortly after he joined Theranos. While he was not involved, ROSENDORFF thought he worked the day of the inspection. HOLMES wrote to ROSENDORFF, YOUNG, and Kerry Elenitoba-Johnson (ELENITOBA-JOHNSON), "(Kerry please delineate this based on what we did with the NY inspector recently and send that out)." He did not know what HOLMES meant. Per BALWANI, no one was to enter or exit the Normandy lab during the CLIA inspection which contained Edison devices and modified LDT's. ROSENDORFF did not know why BALWANI gave this instruction. The inspectors were given Edison and modified LDT validation reports, but YOUNG said the inspectors should not be shown the downstairs lab unless specifically asked. From his review of the document, ROSENDORFF believed HOLMES was open to showing the auditors the downstairs lab. ROSENDORFF also believed the R&D section should have been avoided. The auditors were shown what they wanted to see, but ROSENDORFF was still troubled that they were not shown the Normandy lab. As is the case with similar audits, labs approach these inspections with the mindset of, "Don't offer too much information," and "Don't volunteer to take them."

ROSENDORFF reviewed document THPFM0001191384 to THPFM0001191385. The number of venous samples (n=31) and fingerstick samples (n=32) collected at Walgreens from 10/10/2103 to 11/27/2013 seemed accurate, especially when friends and family data was removed. The CLIA lab was slow until Theranos moved into the Arizona market.

ROSENDORFF reviewed document TS-0231163 to TS-0231168 and said YOUNG's assessment was correct. Theranos should not have enrolled in proficiency testing, and instead should have conducted an alternative assessment of proficiency. ROSENDORFF advocated for this, but it was not implemented while he was employed at the company. Langly Gee (GEE) and PANDORI ran leftover PT sample previously used for predicate devices on an Edison device. This resulted in some good results and some failures.

- BALWANI wrote, "And our validation against immulite has been excellent in the past. It is these PT samples that are off." BALWANI was incorrect as the PT samples were frozen and stable. He was correct, however, that the CLIA lab should not be doing ad-hoc testing.
- YOUNG wrote, "There are additional points we can discuss about the 'primary' test method, and treating PT samples in the same manner as patient specimens." PT samples

Page 10 of 14

cannot be run multiple times. The purpose is to the accreditation body results that were reflective of actual patient testing.
- HOLMES wrote, "…it is critical that no one is guessing on matters like these." ROSENDORFF found HOLMES' comment offensive. He was not guessing, and as lab director, it was his responsibility to understand and apply CLIA regulations.

There was a meeting with HOLMES, BALWANI, YOUNG, and Brad Arington (ARINGTON) in late 2014 to discuss the implementation of AAP. The planned procedure was to run five to ten venous samples on the Immulite and then dilute and run those sample samples on the Edison. 80% of the samples must have returned results within 10% of each other to pass. AAP was never implemented for the Edison nor for the modified third-party devices. Proficiency testing was the cornerstone of lab oversight and BALWANI did not dedicate any resources to its development.

ROSENDORFF reviewed document THPFM0001580129. In May 2014, ROSENDORFF asked PANGARKAR for updates of the Edison assay proficiency testing. No progress had been made. ROSENDORFF sent this email to himself by blind carbon copy because he was worried about his license, patient lawsuits for fraudulent practices at Theranos, and other potential legal consequences for how the CLIA lab was run. He saw misrepresentations made to the media and thought the company lacked transparency when communicating with physicians. ROSENDORFF wanted a paper trail to protect himself. At one point, he considered filing a qui tam lawsuit and retained attorney Nancy Hirsch (HIRSCH) in October 2014. He provided those emails he kept to her. Theranos did not know at the time he had retained certain company emails. Sam Sheldon later suggested he get the emails back from HIRSCH, which she eventually returned.

ROSENDORFF reviewed document THPFM0002162916 to THPFM0002162917. The assays contained in this email were run primarily as LDT's, not by predicate methods. He was concerned CMS would believe Theranos used predicate methods as the primary method of testing. He did not seek permission to de-enroll in CMS reporting. ROSENDORFF also thought this would trigger auditors to look for an AAP. ROSENDORFF forwarded this email to his personal email address. He was worried Theranos would sue him for sending messages to his personal email account and believed they would not be happy with him violating his NDA. Still, ROSNDORFF believed it was important to protect himself and thought creating a paper trail was the lessor risk.

ROSENDORFF reviewed document TS-0231413 to TS-0231415 and said it was a mistake when he carbon copied his personal email when responding to others in this chain. He was not challenged by anyone for sending emails outside the company at the time. Instead, BALWANI confronted him on his last day. He was offered representation if he allowed Mona Ramamurthy (RAMAMURTHY) to watch him as he deleted the Theranos emails from his personal account. He took his final check but declined the offer. ROSENDORFF described his resignation as "mutual" and said he would have been allowed to stay even if he wanted to. He was committed to Theranos' patients, but also looked for other opportunities. Working at Theranos was a constant uphill battle, but he felt he did some good with the implementation of certain SOP's and by voiding certain results.

As the only medical doctor at Theranos, he communicated with physicians to discuss results. Theranos also engaged with Dr. Jain in a consultant role. In mid-2014, HOLMES put her brother Christian Holmes (CHRISTIAN) in charge of communicating with doctors as a complaint

Page 11 of 14

coordinator. ROSENDORFF did not know why CHRISITAN was given the responsibility of communicating with physicians and was not provided any explanation by HOLMES or BALWANI. ROSENDORFF said he felt pressure to vouch for results he did not believe.

ROSENDOFF had experience discussing patient results with physicians while at the Children's Hospital of Pittsburgh. He investigated issues and addressed his findings to others. There was no one at the hospital in a role equivalent to CHRISTIAN's. There was no buffer and no spin.

ROSENDORFF reviewed document TS-1077814 to TS-1077816. The potassium assay was used to diagnose hypokalemia and hyperkalemia, medical problems that could have resulted in renal disease or heart arrythmia. In the document, BALWANI wrote, "But do we know if this result was accurate given this is an ISE assay." The potassium assay, and ISE (ion sensitive electrode) assays generally, consistently had issues and BALWANI knew this. Sodium and chloride were two other assays measured by ISE. Calcium was not.

ROSENDORFF reviewed document TS-1076741 to TS-1076742 and said "Voided" would be included in a lab report if the numerical result for a certain assay was not included. ROSENDORFF said certain critical values were voided because he did not want patients acting on critical results if they were not truly critical. ROSENDORFF had no confidence in the assays and was troubled reporting results when he lacked confidence in those results. Conversely, he was also concerned about patients not acting on true critical results. In an email to HOLMES and BALWANI, ROSENDORFF wrote, "All of us in CLIA share the same concerns." Members of the CLIA lab discussed critical results being voided. BALWANI, in a follow-up email to HOLMES, YOUNG, and Nishit Doshi (DOSHI) wrote, "there is growing suspicion in CLIA that the non-CLIA team involved with CLIA lab tries to hide information from Elizabeth and myself and I know that's not the case but we need to know about problems in real time so we can push on all fronts to solve the problem." ROSENDORFF thought YOUNG and PATEL may have told HOLMES and BALWANI what they wanted to hear, but ROSENDORFF communicated the unfiltered issues to both HOLMES and BALWANI. BALWANI later wrote to HOLMES, YOUNG, DOSHI, and Tina Lin (LIN), "I have not heard any issues on Advias or ISEs but I know there are issues that are now causing us a lot of pain." This was not true because ROSENDORFF told BALWANI about these issues.

ROSENDORFF reviewed document THPFM0000057351. Some clinical labs were used third and fourth generation assays at the time and reported their use on lab reports in sections that described methodology and limitations. This information was important for physicians to interpret the results. ROSENDORFF wanted to say Theranos used second generation assays on lab reports to identify the assays' limitations. There was no medical reason to withhold the information. However, it could look bad and hurt Theranos' image if other labs were viewed as running better assays.

ROSENDORFF reviewed document THPFM0001402159 to THPFM0001402161. In an email from CHRISTIAN to HOLMES and YOUNG, he wrote, "Unfortunately this doc called back and reached a different CSR who saw Adam approved the redraw, forgot to check with me, and told the doc we need a redrawn." ROSENDORFF did not remember any SOP for redraw approvals and did not remember CHRISTIAN had to approve redraws. ROSENDORFF saw this process as going over the lab director's authority for reputational purposes.

ROSENDORFF reviewed document THPFM0005008055 to THPFM0005008060. It was problematic to run HbA1c on two different methods, because this was an assay where trends were

US-REPORTS-0036072

important. There was no standardization of instruments and ROSENDROFF believed there were at least eight devices used to measure HbA1c in CLIA laboratories. HbA1c levels do not change over the course of five days, and it was hard to view trends when different devices were used. One of the proposed benefits of Theranos' technology was the benefit to track changes in the body over time through increased testing. ROSENDROFF wrote to CHRISTIAN and Max Fosque (FOSQUE), "It is essential that persons with the right medical background make these decisions." He stood by his statement. Dr. Phelan should have been told Theranos used two different devices to measure HbA1c, but he was not contacted.

ROSENDORFF reviewed document THPFM0003759624 to THPFM0003759627. A physician could tell from reviewing the results of an assay that those results were wrong. Two example assays were HbA1c and HDL/LDL. In the document, there was a discussion of contacting a physician to discuss incorrect cholesterol results. Part of cholesterols results were determined by a calculation. CHRISTIAN calculated cholesterol incorrectly, and he wanted ROSENDORFF to contact a physician to tell him CLIA allowed a 10% error. ROSENDORFF pushed back and said a lab director should not minimize errors or mistakes.

ROSENDORFF reviewed document TS-1124314 to TS-1124318. ROSENDORFF said Theranos should have simply reported the truth which should not have taken a backseat to profit. Even though much of Theranos technology was protected as trade secret, ROSENDORFF believed certain points still should have been disclosed to inform discussions with physicians. Regarding the conversation in this email, ROSENDORFF believed he recommended the patient have their blood redrawn then he ended the conversation.

A lab director often sees all the problems at a lab, but sometimes it is too much. The problems at Theranos were systemic, not sporadic.

Validation was important to start patient testing, but in practice ROSENDORFF observed differences between what the validation report said and what actual practice showed. Theranos approached this process with a "delete and repeat" mentality. Theranos' methods also changed over time.

ROSENDORFF stated he was anxious about his potential testimony and cross examination. Specifically, regarding the *Wall Street Journal*, he is concerned about future employment opportunities if he is labelled a whistleblower.

We took breaks at the following times to rest, for lunch, and to allow ROSENDORFF time to confer with his counsel.

10:53 A.M. to 11:02 A.M.
11:53 A.M. to 11:57 A.M.
12:45 P.M. to 1:40 P.M.
3:00 P.M. to 3:07 P.M.
4:06 P.M. to 4:11 P.M.

The interview ended at 5:12 P.M.

*Christopher McCollow*

Christopher McCollow
U.S. Postal Inspector

September 7, 2021
_____
Date

Attachments:

TS-0034961 to TS-0034962
THPFM0000273433 to THPFM0000273434
THPFM0000000500 to THPFM0000000501
THPFM0003106027 to THPFM0003106029
THPFM0000291329 to THPFM0000291331
THPFM0001464140 to THPFM0001464142
THPFM0001361307 to THPFM0001361309
THPFM0000850665
THPFM0002147554 to THPFM0002147556
THPFM0005255919
THPFM0001608214 to THPFM0001608216
THPFM0002747643 to THPFM0002747646
TS-0547369 to TS-0547372
THPFM0001550137 to THPFM0001550139
THPFM0004225477 to THPFM0004225484
THPFM0002147453 to THPFM0002147456
THPFM0000003311 to THPFM0000003312
THPFM0000170875 to THPFM0000170876
THPFM0000001277
THPFM0001362138 to THPFM0001362139
THPFM0001150894 to THPFM0001150897
THPFM0001551308 to THPFM0001551309
THPFM0000500903 to THPFM0000500908
TS-0906564 to TS-0906565
THPFM0005761722
THPFM0001191384 to THPFM0001191385
TS-0231163 to TS-0231168
THPFM0001580129
THPFM0002162916 to THPFM0002162917
TS-0231413 to TS-0231415
TS-1077814 to TS-1077816
TS-1076741 to TS-1076742
THPFM0000057351
THPFM0001402159 to THPFM0001402161
THPFM0005008055 to THPFM0005008060
THPFM0003759624 to THPFM0003759627
TS-1124314 to TS-1124318