# EXHIBIT 5

MEMORANDUM OF INTERVIEW

| | | |
|---|---|---|
| CASE NUMBER | : | 2204323-MF |
| PERSON INTERVIEWED | : | Adam Rosendorff |
| PLACE OF INTERVIEW | : | Securities and Exchange Commission, San Francisco, CA |
| DATE OF INTERVIEW | : | June 7, 2017 |
| TIME OF INTERVIEW | : | 9:15 A.M. |

On June 7, 2017, at the Securities and Exchange Commission's (SEC) San Francisco Field Office in San Francisco, CA, Adam Rosendorff (ROSENDORFF) was interviewed regarding his knowledge of Theranos. Present for the interview were Assistant United States Attorney Robert Leach, SEC Staff Attorneys Jessica Chan, Jason Habermeyer, and Rahul Kolhatkar, SEC Staff Accountant Michael Foley and me. Assistant United States Attorney Jeffrey Schenk and SEC consultant Dr. Stephen Serowitz participated in the interview by telephone. Present as ROSENDORFF's counsel were Sean Coyle and Rees Morgan. Prior to the start of the interview, ROSENDORFF was admonished. The following is a summary of the statements made during the interview.

ROSENDORFF was employed with Theranos from April 2013 to December 2014. He became the director of record at Theranos in September 2013 after obtaining his California M.D. license. At the time of the interview, ROSENDORFF was laboratory director of record for Invitae. His responsibilities at Invitae included reviewing validation documents, standard operating procedures (SOP's), and patient reports. ROSENDORFF was also responsible for ensuring regulatory compliance with state and federal agencies. His responsibilities at Invitae were the same as those at Theranos.

Spencer Hiraki and Arnold Gelb (GELB) were Theranos' lab directors prior to ROSENDORFF. GELB left approximately one month before ROSENDORFF started at Theranos.

During his tenure at Theranos, ROSENDORFF reported to Daniel Young (YOUNG) and Sunny Balwani (BALWANI). YOUNG, a Massachusetts Institute of Technology Ph. D. graduate, was a Theranos vice president who had many roles within the company. YOUNG was responsible for equipment design and review, technical specifications, validation, equipment maintenance, and for assay quality control (QC). YOUNG was also responsible for ensuring demos went smoothly.

ROSENDORFF clarified a point that he felt was confused during his prior interview with the government. The "t-protocol" involved the dilution of serum for use on an Adiva device. The "p-protocol" involved the use of venous blood on a predicate device.

The Edison device took a small amount of blood and produced a result. The device could only test one analyte at a time. The sample would be completely consumed by the Edison.

Approximately twelve analytes were validated for use on the Edison device, while other analytes were in the validation process. The Edison, with its limited set of assays, could not replace a minilab device. The minilab device was not used during ROSENDORFF's tenure at Theranos. He described the minilab as an integrated diagnostic box that could run CBC, immunoassays and other chemistries.

In October 2013, around the time of the Walgreens launch, only one or two assays had been validated on the Edison device. By December 2013, approximately twelve tests had been validated on the Edison device. ROSENDORFF was the person who signed the assay validation reports.

At the time of the launch, Theranos could run 30 tests. Two tests were run on the Edison device. All of the remaining tests were run on predicate devices using venous blood.

ROSENDORFF listed four groups of assays and the group leads. These are:

- Immunoassays (Surekha Ganghedakar)
- General Chemistry (Paul Patel (PATEL))
- Cytometry (Chinmay Pangakar)
- TNAA/nucleic acid (PATEL)

The requirements for becoming the laboratory director of a high complexity lab include one year of work experience and board certification in pathology.

ROSENDORFF described HOLMES' responsibilities at Theranos as someone who gave talks and interviews, and who discussed strategy with BALWANI and YOUNG. Her involvement in the clinical lab was limited to large problems. BALWANI was responsible for Theranos' strategy and personnel issues such as scheduling, and hiring or firing people.

Mark Pandori (PANDORI) was hired by Theranos to conduct infectious disease research. PANDORI, who had previously worked at a state laboratory, also managed Theranos' lab. When PANDORI left in mid-2014, BALWANI emailed ROSENDORFF stating that BALWANI would take over PANDORI's responsibilities. ROSENDORFF described that as unusual.

A Theranos technical supervisor was responsible for equipment and devices and a Theranos general supervisor was responsible for proficiency testing. ROSENDORFF stated all technical and general supervisors were qualified. The supervisors needed to be licensed CLS's [clinical laboratory scientist], have a number of years of experience, and had to know how to work with devices and assays. ROSENDORFF thought Hoda Alamdar (ALAMDAR) and Keri Elintinoba-Johnson (JOHNSON) were technical supervisors and Li Ding Peng (*spelled phonetically*) was a general supervisor.

ROSENDORFF described a product manager as a person responsible for ensuring timelines were met. A product manager took a more broad view of Theranos and the development, manufacturing, and validation of Theranos' technology. A product manager also assisted with store setup. ROSENDORFF said a product manager position had no required qualifications, but

those individuals probably had a technical background. Daniel Edlin (EDLIN), Jeff Blickman, and Nick Menschel were product managers.

ROSENDORFF stated Theranos' CLIA [Clinical Laboratory Improvement Amendments] laboratory and R&D laboratory conducted assay validation and ran tests. He stated that this was how Theranos worked. The R&D lab was split into two parts: a design and development group and an assay development group.

ROSENDORFF described the assay development process as such: there is a need, resources are assigned, an instrument is designed, and then the assay is validated in CLIA.

Theranos manufactured antibody tips, wet chemical reagents, "t-cups" for use on the Advia devices, nanotainers, and Edison devices.

A Tecan is a device Theranos purchased to dilute samples. To process a diluted sample, Theranos followed the procedure below:

1. Blood was received in anti-coagulant lined nanotainers.
2. These were spun on a centrifuge.
3. The plasma was removed and placed onto plates and diluted using the Tecan device.
4. The samples were loaded into t-cups and put into the Advia device.

ROSENDORFF stated the Advia devices were modified to allow for smaller samples and longer read times. The Theranos method changed the kinetics of the chemical reactions taking place. The Adiva devices had open channels which allowed for device modification. Advia's manufacturer allowed modifications, but ROSENDORFF had not seen it done previously.

The process of diluting samples started in the summer of 2013. The minilab device was not working and the Edison could only run immunoassay tests. ROSENDORFF described a meeting with HOLMES, BALWANI, and other laboratory and manufacturing personnel where the decision was made to purchase Tecan machines and to dilute samples utilizing the "t-protocol." The "t-protocol" had been under development prior to this meeting by YOUNG and Sam Gong (GONG). ROSENDORFF said this protocol was not a novel idea. He viewed it as a stop-gap measure to satisfy the contract. ROSENDORFF did not know what precipitated the summer 2013 meeting, but speculated there was pressure from the Board of Directors and investors.

At the time of the Walgreens launch, the "t-protocol" was used for the chem-12 assay. Development of the "t-protocol" continued after the October 2013 Walgreens launch. The protocol was further validated and documented. ROSENDORFF said Theranos was generated good validation data for the protocol.

When ROSENDORFF started at Theranos, the company was conducting diagnostic blood testing for Safeway employees, mostly using venous blood draws. Fingerstick blood draws were not used for diagnostic purposes. At the time, Theranos was using Siemens, Stiga and Abbott Ruby devices. BALWANI referred to predicate devices like these as, "clunkers."

ROSENDORFF estimated Theranos was running approximately 30 samples per day from Walgreens in late 2013.

ROSENDORFF did not know what Theranos' lab plan was at the time he was hired. He asked BALWANI and HOLMES but was not sure if Theranos would be a CLIA lab or a device manufacturer. Theranos wanted to be in the CLIA lab business. HOLMES also had a narrative of an uncle that died from melanoma. She wanted people to have more access to medical information.

ROSENDORFF reviewed documents THPFM0001360951 to THPFM0001360952. He stated BALWANI did not want "Sarah," a Theranos CLS, to be exposed the optimization process and development of the "t-protocols" for fear that she would leave and take the knowledge to another employer. "Sarah" had been looking for new employment and eventually left Theranos. BALWANI viewed the optimization techniques and "t-protocol" as intellectual property.

ROSENDORFF reviewed document THPFM0000003306 to THPFM0000003307. He identified GONG as an engineer and David Ramos as a CLS. ROSENDORFF stated Theranos had three Advia devices which may have been differentiated by assay subset. The tests listed in the document may have been the assays that could be run.

All other devices at Theranos were used in a predicate, non-modified manner. The Siemens Advia was the only modified device. ROSENDORFF said BALWANI wanted to keep the use of Siemens machines a secret. He presumed this was because BALWANI thought the technology was proprietary. ROSENDORFF stated the secrecy of Siemens device modification was not because Theranos thought Siemens would have issues with modifying the devices.

ROSENDORFF stated that if two methods were used to conduct a blood test, the law dictates the primary method and result should be reported. For Theranos, this would mean results would be reported from predicate, venous draw tests used under the "p-protocol." Predicate methods were the most used test method at Theranos. At some point in time, "t-protocol" tests happened with greater frequency.

ROSENDORFF stated the Edison devices were very slow, with assays taking 30 to 60 minutes to run. He contrasted that with an Immulite device, which Theranos also used. This device conducted tests in 25 minutes. Edison devices also suffered from frequent QC failures. At the end of 2013, ten to twelve Edison devices were available for use in the lab. ROSENDORFF believed a blood sample could be run on an Edison and run through the "t-protocol."

ROSENDORFF and all other Theranos employees knew of the Walgreens launch from an all-hands meeting in August 2013. From his discussions with BALWANI after the launch, ROSENDORFF learned the Walgreens stores would expand through Arizona and would eventually rollout nationwide. Blood was drawn in Arizona Walgreens stores and flown to the California lab for testing. ROSENDORFF never attended any Walgreens meetings and had no understanding of what Walgreens' knowledge of Theranos technology was.

In preparation for the launch, Theranos employees worked to complete SOP's and assay validation. The process started in earnest after the summer 2013 meeting. There was also a push

US-REPORTS-0007230

to transition the technology from the R&D lab to the CLIA lab. The "t-protocols" and Edison devices were validated. CLS's calculated upper and lower limitation values. "P-protocols" did not need to be validated; the devices just needed to be installed.

ROSENDORFF discussed potassium issues with HOLMES. Potassium levels were too high using the "t-protocol" due to cell lysis. High levels of potassium, and false negatives, concerned ROSENDORFF and he explained this to HOLMES. In response, HOLMES stated that Theranos could go back to using venous blood for the assay. Ultimately, YOUNG resolved the potassium issue, probably though some calibration exercise. ROSENDORFF was comfortable that the issue had been resolved and was comfortable sending results. BALWANI was aware of the potassium issues and resolution.

ROSENDORFF estimated he voided potassium tests approximately five times per week. He recalled an incident in early 2014 where a CLS contacted a patient due to a high potassium level. The patient went to the hospital where a second potassium test returned normal results. ROSENDORFF did not know if BALWANI knew about this incident.

Information regarding test results was maintained in the Theranos' LIS system. The system, put into use around the time of the Walgreens launch, could search test results by analyte, analyte values and patient. Documents were auto signed through the LIS system, with an exception for critical values which required immediate medical attention.

The potassium fingerstick assay was validated using twenty samples. If one of the values was far out of range, it was due to cell lysis. There were no critically high values seen during validation.

ROSENDORFF stated he felt pressure from BALWANI to get the assays ready. This pressure was exerted on ROSENDORFF through email and in-person. BALWANI stated that any assay issues would be fixed by YOUNG, but ROSENDORFF rebutted that cell lysis issues could not be fixed. ROSENDORFF thought it was an issue for Theranos to advertise fingerstick tests, and then take a venous sample. ROSENDORFF felt pressure from YOUNG, too, but he did not remember what form this pressure took. ROSENDORFF stated if he pushed back, or "put his foot down," the repercussions for saying no would lead to his firing. YOUNG and BALWANI would fix the issues, and ROSENDORFF did not feel he was welcome to assist.

ROSENDORFF, JOHNSON, PANDORI, and ALAMDAR had weekly meetings with BALWANI. They discussed operations, analyte issues, and staffing. BALWANI was also kept up-to-date on other lab processes. BALWANI and HOLMES were aware of QC failures in mid-2014 for certain analytes.

ROSENDORFF was concerned about the reproducibility of pregnancy results on the Edison devices, which he expressed to HOLMES. The issues with the assay would not allow Theranos to accurately determine the length of pregnancy. ROSENDORFF was unsure of the source of the issue, because the validation for the pregnancy assay was good.

ROSENDORFF stated the "t-protocol" and fingerstick draw worked remarkably well for most analytes. Other than potassium, ROSENDORFF had no other concerns about Theranos' assays.

US-REPORTS-0007231

ROSENDORFF reviewed document THPFM0003106027 to THPFM0003106029. In the document, ROSENDORFF raised issues with HOLMES about certain Theranos assays. ROSENDORFF said he would typically copy HOLMES on lab issues. In-person, HOLMES would refer these issues to YOUNG. ROSENDORFF stated "CV" referred to the reproducibility of a result, not the assay's accuracy. "New protocols" referred to the "t-protocols" and "9/9" referred to the Theranos/Walgreens launch. Based on his review of the document, the glucose assay produced results that were too low and the CV was too high. The sodium assay produced a few outlying results, but ROSENDORFF was not too concerned and stated he would keep running these tests.

Once validation was completed for a particular assay, ROSENDORFF set reference ranges. This included assays run by "t-protocol" and on the Edison devices. Theranos also used published reference ranges which were specific to devices and populations. ROSENDORFF stated this was the best starting point given the situation. ROSENDORFF would have preferred to set reference ranges before the Walgreens launch, but Theranos was, "in a hurry." Reference ranges are mostly the same across the industry. ROSENDORFF has changed reference ranges of assays, but not as a result of a particular patient's results.

ROSENDORFF reviewed document THPFM0001608214 to THPFM0001608216. ROSENDORFF identified Erez Galli as a Theranos statistician. "T-assay" referred to the "t-protocol" and "S-assay" referred to the "p-protocol." ROSENDORFF thought "Walgreens normals" may have referred to normal patients. YOUNG wanted to set one reference range that encompassed both "t-protocol" and "p-protocols" for a particular assay while ROSENDORFF argued for method specific reference ranges. While there was no formal reference range study conducted before the Walgreens launch, the ranges were under constant review after the Walgreens launch.

ROSENDORFF reviewed document THPFM0001464140 to THPFM0001464142. ROSENDORFF described this email as a time when he "put his foot down." A Theranos assay generated results which were lower than predicate devices. ROSENDORFF was not sure if the results observed were due to bias alone since the document references a glucose bias greater than 6.0. YOUNG stated in the document, "We have them but they need more sample volume. . .I can send them in a bit." ROSENDORFF said YOUNG was speaking about venous blood draws.

ROSENDORFF reviewed document THPFM0001550137 to THPFM0001550139. ROSENDORFF identified Nicholas Haase (HAASE), Rose Edmonds, and PATEL as clinical chemistry employees. Tina Lin was an employee in Theranos' Normandy lab that worked with the Tecan conducting sample dilutions. Theranos' Normandy lab was on the lower floor at Theranos office and Jurassic Park was on the upper level. Theranos had three Advia machines; one upstairs and two downstairs. Advia #2 was setup to run "t-protocols." On page THPFM0001550138, HAASE wrote, "It has reagents for the Next 15, but, again, is mainly used for CMB and Lipid panel testing of samples." ROSENDORFF surmised this sentence referred to the next fifteen "t-protocol" assays.

ROSENDORFF never saw a minilab device. BALWANI's plan, as of mid-2013, was to have minilabs running all tests by October 2013.

ROSENDORFF was present when the New York Department of Public Health conducted an initial lab visit shortly after he started.

ROSENDORFF participated in a December 2013 Centers for Medicare and Medicaid Services (CMS) lab inspection and was present for about half of the three hour inspection. The inspection reviewed all aspects of Theranos' testing, from test to result reporting. Personnel documents, QC data, and maintenance records were reviewed, as well as assays that produced critical results. YOUNG and ALAMDAR guided the inspector through Theranos. ROSENDORFF gathered validation and SOP documents and discussed the Edison device and the "t-protocols" and "p-protocols" with the inspector. While the deficiencies identified during this inspection were not serious, HOLMES and BALWANI were upset about the number of deficiencies. He reviewed the results with them and YOUNG. ROSENDORFF and PANDORI responded to the deficiency report. HOLMES and BALWANI did not review their response.

Jerry Hurst (HURST) was a consultant ROSENDORFF met with prior to the CMS audit. ROSENDORFF did not remember specifics of the meeting. He did remember that BALWANI did not want HURST learning about Theranos' methods, especially before the Walgreens' launch.

ROSENDORFF thought the CMS inspector knew about the Normandy lab, however, the inspector kept to the Jurassic Park lab. There was no instruction from HOMES or BALWANI to not show the inspector the Normandy lab. ROSENDORFF stated the inspector would not review any non-predicate devices or methods.

SOP's needed to be in-place before patient testing started. There were a few outstanding at the time of the audit.

ROSENDORFF reviewed document THPFM0001197574 to THPFM0001197576 and THPFM0001332758 to THPFM0001332760. On page THPFM0001197574, ROSENDORFF writes, "For instance t protocols changing to p protocols." ROSENDORFF did not remember what he meant by that particular sentence. On page THPFM0001332758, "ASR" referred to "analyte specific reagent." In addition, JOHNSON referred to, "'Friends and Family' patients." These patients are friends and family of Theranos employees who tried Theranos blood testing services. ROSENDORFF stated these tests could be considered actual lab testing with all of the legal implications that come with it. ROSENDORFF did not differentiate between a "demo" and an actual test. Finally, ROSENDORFF thought reports sent to patients noted results were generated by assays ran at ARUP.

Regarding document THPFM0001197574 to THPFM0001197576 and THPFM0001332758 to THPFM0001332760, ROSENDORFF described the Normandy lab as immature compared to the Jurassic Park lab because Normandy lacked some SOP's. He further described the Normandy lab as secretive. Dividers were installed in vendors were present.  Patient testing happened at the time of launch. There was no phase-in of services.

ROSENDORFF reviewed document THPFM0000500903 to THPFM0000500908. ROSENDORFF stated this document represented an email he sent to BALWANI stating the lab was not in compliance with CLIA regulations. Reportable range is roughly defined as the assay's

high and low sensitivity. This was done at Theranos before patient testing was done. Specificity is defined as interference of the assay by other substances. Specificity studies were done after ROSENDORFF had signed validation documents. He needed to sign the documents again. YOUNG was responsible for ISE testing for the "t-protocols."

ROSENDORFF reviewed documents THPFM0005762828 and THPFM 0005761698. He did not remember specifics about the content of these documents. BALWANI installed wall dividers in the Normandy lab to hide the Tecan devices. ROSENDORFF speculated he wanted to hide the fact that Theranos was diluting samples because dilution was not proprietary.

Some Edison tests frequently failed QC. QC was run with BioRad control samples. Devices were recalibrated if the results were outside of the standard deviation. ROSENDORFF estimated 20% QC issues for the Vitamin D assay.

In October 2014, ROSENDORFF advocated for Theranos to conduct an alternative assessment of proficiency (AAP) testing. ROSENDORFF contacted Inspector Gary Yamamoto for guidance for reporting results from Theranos LDT's (laboratory developed tests), but was told to wait until a subsequent inspection. Ultimately, ROSENDORFF felt he was received "lip service" regarding the AAP issue and gave up. He felt BALWANI would not put the resources into the project.

ROSENDORFF reviewed document THPFM0000003941 to THPFM0000003946. ROSENDOFFF noted that HbA1c assays were being conducted on different devices, namely a DCA Vantage in the "upstairs" lab. Using different devices is not recommended because of inter-instrument variability. ROSENDORFF stated that an HbA1c reading should not change in five days.

ROSENDORFF reviewed document THPFM0005008026 to THPFM0005008029. ROSENDORFF identified Megan Matsumoto as a Theranos CLS. ROSENDORFF felt he was being asked to identify a patient issue to justify the disparate results, when he felt the issue was technical. The unreliable results came from the method used. Christian Holmes (C. HOLMES) role at Theranos was dealing with anomalous lab results. ROSENDORFF assumed C. HOLMES was placed there by HOLMES.

ROSENDORFF discussed QC issues with HOLMES, BALWANI, YOUNG, and Karthic (Last name unknown//LNU) in mid-2014. Karthic LNU helped build Theranos devices. QC failures were resolved by recalibrating devices, or changing batches of QC material. Occasionally, the devices were removed from service. However, the overall QC problems were not resolved. ROSENDORFF proposed proficiency testing of the Edison devices versus predicate devices.

ROSENDORFF reviewed document THPFM0000313444 to THPFM0000313456. ROSENDORFF identified Langly Gee as Director of Quality Issues. Leftover proficiency testing (PT) material was run on an Edison device which it should not have been. The assay could produce inaccurate results for some analytes.

ROSENDORFF reviewed document THPFM0002162916 to THPFM0002162917. Brad Arrington was Theranos' counsel. ROSENDORFF recommended Theranos de-enroll from CMS reporting because AAP testing had not been initiated.

ROSENDORFF described demonstrations as fingerstick blood draws for VIP's. Typically, the VIP would go to a room outside of the lab and have a blood draw. The blood was run in the lab using "t-protocols." Results were reviewed by YOUNG. VIP results were always reviewed, and YOUNG sometimes consulted ROSENDORFF on VIP results. ROSENDORFF's knowledge of demonstrations, or demos, came from JOHNSON and ALAMDAR. ROSENDORFF did not know what the VIP was shown or told about the demo, and he did not view the process himself. ROSENDORFF was not aware if any software was used to make the machines appear to work. He also did not know if YOUNG changed, removed, or averaged any results. ROSENDORFF stated averaging results was not appropriate, and running a sample multiple times did not sound appropriate. Removing results was acceptable if the report stated the result was voided by the lab and the result was still documented.

While ROSENDORFF was not privy to many details of demos, he said he was not concerned about resources assigned to demos and that the demos were not disruptive.

ROSENDORFF reviewed document THPFM0003735159 to THPFM0003735161. In the document, EDLIN states, "Can you please review and let me know if any changes need to be made?" ROSENDORFF did not know what EDLIN meant by "changes." Results cannot be changed. ROSENDORFF thought he had responded to EDLIN.

ROSENDORFF reviewed document THPFM0001361307 to THPFM0001361309. ROSENDORFF identified Samartha Anekal as a senior Theranos employee, Sharada Sivaraman as the immunoassay group lead, and Michael Craig as an employee responsible for software. The 4s and minilab devices added chemistry and PCR testing methods. PATEL told ROSENDORFF the minilab was not working and that PATEL had to run his assays on the bench. ROSENDORFF stated if the minilab was working, Theranos would have used them. He felt it was "crazy" to have minilabs present for demos. HOLMES and BALWANI both knew at the summer 2013 meeting that tests were not being run on the minilab devices.

ROSENDORFF reviewed document THPFM0001361600 to THPFM0001361603. ROSENDORFF identified "Normandy" as an email list for all employees in the Normandy lab, "Color Chemistry" as an email list for PATEL's group, Ciara Miranda as a phlebotomist, and "BCD_InternalRequests" as an email list related to the Theranos Blood Collection Device (BCD). Barring a compelling reason, ROSENDORFF would not have approved a report if results were changed. He would have wanted the results be voided.

ROSENDORFF reviewed documents THPFM0005764037 to THPFM0005764042 and THPFM0000850665. ROSENDORFF changed a reference range after results were reported to Walgreens executive Wade Miquelon. ROSENDORFF was not aware of any other instances where he did this.

ROSENDROFF reviewed THPFM0001677212 to THPFM0001677219. ROSENDORFF was not aware of a demo SOP. This document was approved after he left Theranos.

ROSENDORFF reviewed documents THPFM0001361886 to THPFM0001361889, THPFM0000170872 and THPFM0000170874. ROSENDORFF defined daily QC as something

that was run every day and before a run. The QC results must be in-range before samples could be tested. Continuous QC referred to Westgard rules, a comparison method which was a concept new to the CLIA lab. His email was meant to inform the CLIA lab about the new QC SOP.

ROSENDORFF reviewed document THPFM0003891645 to THPFM0003891652 and THPFM0004225477 to THPFM0004225484. QC and validation of the Edison devices was done with a six-tip device. The high and low results were discarded. ROSENDORFF stated this practice was permitted and he approved it.

ROSENDORFF stated he was scared of BALWANI and afraid of being fired. He saw how BALWANI treated other people. BALWANI was upset when ROSENDORFF informed him of the ASR disclosure in mid-2014. ROSENDORFF was not afraid of HOLMES. He was comfortable talking to her about issues, but felt she often deflected his concerns to YOUNG. ROSENDORFF met with YOUNG occasionally. He felt there were turf issues between him and YOUNG. ROSENDORFF had no issues with any of the product managers involved with the CLIA lab.

ROSENDORFF did not learn about Theranos' Ebola project until late in its development.

ROSENDORFF thought he would have been involved in the minilab validation. The validation did not happen.

ROSENDORFF thought BALWANI wanted R&D out of the Normandy lab. It happened eventually.

ROSENDORFF reviewed document THPFM0005430425 to THPFM0005430426. ROSENDORFF thought it was required to disclose the devices being used to conduct testing. His conclusions are based on U.S. Food and Drug Administration (FDA) guidance. He discussed this issue with BALWANI, but the change never happened.

ROSENDORFF reviewed document THPFM0002136354 to THPFM0002136355. ROSENDORFF identified Gurbir Sidhu and Maria Millare as Theranos CLS's. "AST" is a liver enzyme. QC procedures in CLIA are separate from R&D. CLIA sets QC rules.

ROSENDORFF reviewed document THPFM0002747643 to THPFM0002747646. More specifically regarding this document:

- The document denotes the following: "(1) Capillary blood Theranos test." ROSENDORFF stated this referred to Edison device use with the "t-protocol."
- The document denotes the following: "(2) Venous blood Theranos test." ROSENDORFF stated BALWANI had venous blood aliquoted into capillary tubes and run on Edison devices.

ROSENDORFF was not involved with any projects with Department of Defense (DOD) or pharmaceutical companies. While he was aware of a DOD project examining troponin, he did not know if a device had been sent to the DOD. ROSENDORFF had no knowledge of a project with the National Aeronautics and Space Administration (NASA).

US-REPORTS-0007236

ROSENDORFF reviewed document THPFM0001619622. He did not remember the email.

ROSENDORFF was aware of discussions of Theranos involvement with hospitals, namely Intermountain Health and Mayo Labs. ROSENDORFF stated EDLIN approached Sloan Kettering to see if they would send samples to Theranos. There was also talk of placing a minilab in the emergency room at University of California-San Francisco. It was, however, just talk as the minilab was not working. ROSENDORFF was not aware of any discussions with physician's offices. There were no Theranos devices placed outside of Theranos.

ROSENDORFF knew of Theranos' FDA submission for the HSV-1 assay. If Theranos devices were sold, they would require FDA approval. However, if the assay was used as an LDT in-house, FDA approval was not required. ROSENDORFF had no interactions with the FDA.

ROSENDORFF had no interaction with investors or with any members of Theranos' Board of Directors.

ROSENDORFF reviewed document TS-0000456 to TS-0000495. Specifically regarding these documents:

- ROSENDORFF reviewed a chart on page TS-0000460. He remembered seeing the chart on Theranos' website after the *Wall Street Journal* article. Based on what he knew in 2014, the data depicted in the chart showed a correlation between Theranos and a predicate device for analyte ft4. ROSENDORFF stated the comparison would have been done with venous blood. ROSENDORFF thought the predicate device was an Immulite device. ROSENDORFF also stated that Theranos conducted research using "t-protocols" on the Immulite device, but he did not know if the process was used for patient testing.
- ROSEDORFF reviewed a chart on page TS-0000461. The chart showed a comparison for of "t-protocols" versus "p-protocols" for the AST analyte.
- ROSEDORFF reviewed a chart on page TS-0000462. The chart showed a comparison for of "t-protocols" versus "p-protocols" for the CTN1 analyte.
- ROSENDORFF reviewed page TS-0000463. He stated this page showed a comparison of sensitivity and specificity for HCV of Theranos assays.
- ROSENDORFF reviewed page TS-0000464. ROSENDORFF stated automated reflex testing could not be done using fingerstick blood because there was not enough sample left over.

ROSENDORFF stated Theranos could run approximately six multiplexed tests with the "t-protocols" from one drop of blood.

ROSENDORFF did not calculate the cost of running a blood testing lab. He never constrained with his resources.

ROSENDORFF visited a Siemens factory at the end of 2014 to evaluate new machinery for higher throughput.

ROSENDORFF emailed approximately 150 documents to himself. He was told to delete these by Mona from Human Resources. ROSENDORFF also considered a qui tam lawsuit. He felt the public had the right to know about what was happening at Theranos. He decided against proceeding on advice of counsel.

Since leaving Theranos, ROSENDORFF has only communicated with JOHNSON when she was looking for a job. He has also communicated with HURST, and Farzin Shadpour.

During the course of the interview, we took breaks at the following times for lunch and to allow ROSENDORFF to confer with his counsel.

BREAK 10:40 A.M. to 10:50 A.M.

LUNCH 12:05 P.M. to 12:52 P.M.

BREAK 2:00 P.M. to 2:10 P.M.

BREAK 3:00 P.M. to 3:10 P.M.

BREAK 4:06 P.M. to 4:20 P.M.


The interviewed ended at 4:25 P.M.

_[signature]_

Christopher McCollow                                                                      March 8, 2018
U.S. Postal Inspector                                                                              Date


ATTACHMENTS:

- THPFM0001360951 to THPFM0001360952 (Tab 1)
- THPFM0000003306 to THPFM0000003307 (Tab 2)
- THPFM0003106027 to THPFM0003106029 (Tab 6)
- THPFM0001608214 to THPFM0001608216 (Tab 9)
- THPFM0001464140 to THPFM0001464142 (Tab 11)
- THPFM0001550137 to THPFM0001550139 (Tab 12)
- THPFM0001197574 to THPFM0001197576 and THPFM0001332758 to THPFM0001332760 (Tab 35)
- THPFM0000500903 to THPFM0000500908 (Tab 36)
- THPFM0005762828 and THPFM 0005761698 (Tab 37)
- THPFM0000003941 to THPFM0000003946 (Tab 16)

US-REPORTS-0007238

- THPFM0005008026 to THPFM0005008029 (Tab 50)
- THPFM0000313444 to THPFM0000313456 (Tab 38)
- THPFM0002162916 to THPFM0002162917 (Tab 39)
- THPFM0003735159 to THPFM0003735161 (Tab 26)
- THPFM0001361307 to THPFM0001361309 (Tab 27)
- THPFM0001361600 to THPFM0001361603 (Tab 30)
- THPFM0005764037 to THPFM0005764042 and THPFM0000850665 (Tab 31)
- THPFM0001677212 to THPFM0001677219 (Tab 34)
- THPFM0001361886 to THPFM0001361889, THPFM0000170872 and THPFM0000170874 (Tab 21)
- THPFM0005430425 to THPFM0005430426 (Tab 46)
- THPFM0002136354 to THPFM0002136355 (Tab 48)
- THPFM0002747643 to THPFM0002747646 (Tab 47)
- THPFM0001619622 (Tab 41)
- TS-0000456 to TS-0000495