JOHN D. CLINE (CA State Bar No. 237759)
600 Stewart Street, Suite 400
Seattle, WA 98101
Telephone: (360) 320-6435
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Telephone: (202) 434-5000 | Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ELIZABETH HOLMES and RAMESH "SUNNY" BALWANI,

Defendants.

Case No. CR-18-00258-EJD

**MS. HOLMES' SUPPLEMENTAL FILING RE: MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE REGARDING ADAM ROSENDORFF**

Hon. Edward J. Davila

# TABLE OF CONTENTS

Page

BACKGROUND ..... 2

ARGUMENT ..... 4

I. The Court Should Grant a New Trial Due to the Government's Misconduct in Presenting False or Misleading Testimony. ..... 5

A. The Government Presented Highly Misleading Evidence Through Dr. Rosendorff. ..... 5

B. The Government Knew Or Should Have Known the Evidence Was False Or Misleading. ..... 8

C. The False Evidence Was Material. ..... 9

II. Dr. Rosendorff's Statements Warrant a New Trial Independently of the Government's Misconduct. ..... 12

CONCLUSION ..... 13

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Amado v. Gonzalez*, 758 F.3d 1119 (9th Cir. 2014) ....................9

*Berger v. United States*, 295 U.S. 78 (1935) ....................1

*Burr v. Jackson*, 19 F.4th 395 (4th Cir. 2021) ....................5

*Dow v. Virga*, 729 F.3d 1041 (9th Cir. 2013) ....................9

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) (en banc) ....................5, 7, 9, 10

*Kyles v. Whitley*, 514 U.S. 419 (1995) ....................11

*Martin v. Allison*, 2014 WL 3058442 (E.D. Cal. July 3, 2014). ....................7

*United States v. Freeman*, 650 F.3d 673 (7th Cir. 2011) ....................5

*Napue v. Illinois,* 360 U.S. 264 (1959) .................... *passim*

*Panah v. Chappell,* 935 F.3d 657 (9th Cir. 2019) ....................5

*United States v. Anderson*, 574 F.2d 1347 (5th Cir. 1978) ....................5

*United States v. Butler*, 567 F.2d 885 (9th Cir. 1978) ....................6, 11

*United States v. Fulcher*, 250 F.3d 244 (4th Cir. 2001) ....................12

*United States v. Harrington*, 410 F.3d 598 (9th Cir. 2005) ....................1, 4, 12

*United States v. Hernandez-Rodriguez,* 443 F.3d 138 (1st Cir. 2006) ....................13

*United States v. Howell*, 231 F.3d 615 (9th Cir. 2000) ....................11

*United States v. LaPage*, 231 F.3d 488 (9th Cir. 2000) ....................10

*United States v. Mendez*, 619 F. App'x 644 (9th Cir. 2015) ....................12

*United States v. Walgren*, 885 F.2d 1417 (9th Cir. 1989) ....................4

## OTHER AUTHORITIES

Fed. R. Crim. P. 29 ....................6, 11

Fed. R. Crim. P. 33 ....................1, 4

The Court ordered an evidentiary hearing on Ms. Holmes' Motion for a New Trial to explore the possibility of government misconduct and the truthfulness of Dr. Rosendorff's testimony. 10/3/22 Hr'g Tr. 31:9-32:20. In her Motion, Ms. Holmes indicated that Dr. Rosendorff's statements to Mr. Evans during his extraordinary visit to her residence could mean, among other things, that (1) he answered the government's questions honestly, but nonetheless the resulting presentation of evidence was misleading; and (2) he answered the government questions honestly, but the government's selective questioning and exhibits and his resulting testimony presented an incomplete picture to the jury and made things seem "worse than they were." Dkt. 1574 at 7 (citing Evans Decl., Ex. A at 1). The evidentiary hearing proved both meanings.

At the hearing, the government sought to elicit high level statements in which Dr. Rosendorff confirmed his belief as to the truthfulness of his under-oath statements at trial. But that is not the beginning or end of the issue. Dr. Rosendorff also acknowledged that his testimony on direct examination at Ms. Holmes' trial was incomplete. It is well-settled that the government's constitutional and ethical obligations are higher than simply presenting a view of the evidence that is most favorable to the government. *E.g.*, *Berger v. United States*, 295 U.S. 78, 88 (1935) (The government's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."). The government cannot present misleading evidence at trial, and when it does so, defense counsel's attempts to correct the record through cross-examination are not a sufficient cure for the violation of the defendant's constitutional rights.

Dr. Rosendorff's failure to dispute any material fact of Mr. Evans' account, combined with his admission that the government elicited incomplete testimony, requires a new trial under Rule 33. First, Dr. Rosendorff's testimony showed that the government's presentation of materially false or misleading testimony violated *Napue v. Illinois,* 360 U.S. 264 (1959). Second, even without a finding of government misconduct, Dr. Rosendorff's testimony constitutes newly discovered evidence that undermines the credibility of the government's case and would probably lead to an acquittal, requiring a new trial under *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005). For these reasons, the

Court should grant Ms. Holmes' Motion for a New Trial.

**BACKGROUND**

At the October 17, 2022 hearing, Dr. Rosendorff testified under oath regarding his visit to Ms. Holmes' residence. Despite professing at trial to remember events from over eight years ago, Dr. Rosendorff stated over *20 times* at the evidentiary hearing that he could not recall the details of his encounter with Mr. Evans just two months ago.[1] *See generally* 10/17/22 Hr'g Tr. In particular, Dr. Rosendorff claimed that he was unable to recall:

- Whether he recorded his conversation with Mr. Evans. *Id.* at 14:4-5.
- Whether he told Mr. Evans he was struggling with certain issues. *Id.* at 18:4-5.
- Whether he told Mr. Evans he had been friends with Ms. Holmes, or talked to Mr. Evans about his friendship with Ms. Holmes. *Id.* at 20:6-11.
- Whether he told Mr. Evans that Ms. Holmes had been kind to him. *Id.* at 20:17-19.
- Whether he told Mr. Evans that the government made things sound worse than they were when Dr. Rosendorff was on the stand. *Id.* at 25:13-16.
- Whether he told Mr. Evans that he felt like he had done something wrong. *Id.* at 27:5-7.
- Whether he told Mr. Evans that he had trouble sleeping. *Id.* at 27:15-16.
- Whether he told Mr. Evans he wanted to help Ms. Holmes. *Id.* at 27:25-28:1.
- Whether he described to Mr. Evans his interactions with Ms. Holmes at company events. *Id.* at 29:19-30:1.
- Whether he told Mr. Evans that many people have made money off of Ms. Holmes and the story they created, and that Ms. Holmes herself made no money. *Id.* at 30:7-20.
- Whether there were multiple drafts of his declaration that was submitted to this Court or how many. *Id.* at 38:17-18.

Ultimately, despite his inability to recollect, Dr. Rosendorff did not deny making any of these statements to Mr. Evans. *E.g.*, 10/17/22 Hr'g Tr. 25:13-18 (stating that he would neither "deny nor affirm"). Critically, Dr. Rosendorff testified that there were instances during his trial testimony when he

---

[1] In Dr. Rosendorff's motion to quash, he previewed that "his recollection of his conversation with Mr. Evans did not align with Mr. Evans's description" without providing any details. Dkt. 1602 at 5. At the hearing, however, the only fact Dr. Rosendorff disputed was whether he was turned around when driving away from Ms. Holmes' residence. 10/17/22 Hr'g Tr. 16:16-22.

was not "given the opportunity to tell the full story with respect to a particular event at Theranos during [his] direct examination." 10/17/22 Hr'g Tr. 23:24-24:2. He further testified during those times "there was only a limited amount of information that came out during the direct examination." *Id.* at 24:3-6. Dr. Rosendorff also testified that there were times when he was provided more complete information on cross-examination in response to the government's presentation on direct examination. *Id.* at 43:7-9. This testimony explains Dr. Rosendorff's statements to Mr. Evans regarding the government's conduct at trial.

Dr. Rosendorff's behavior and testimony at the hearing also suggested that notwithstanding his testimony there may be reasons to question his testimony at trial and at the hearing more generally. Dr. Rosendorff testified that he went to Palo Alto with the intention to see Ms. Holmes and that his mental state was "solid" during the interaction. 10/17/22 Hr'g Tr. 18:7-8. But when defense counsel asked about statements that could support Ms. Holmes' Motion for a New Trial, Dr. Rosendorff was evasive, had a poor memory for critical details, and at times refused to answer questions. Dr. Rosendorff testified that he received Ms. Holmes' Motion the morning after it was filed, *id.* at 35:21-36:5, and recognized that based on how his statements were interpreted there could be some legal risk to him, *id.* at 33:2-5, and that the verdict could be cast into doubt, which could lead to a new trial, *id.* at 55:1-11. Dr. Rosendorff's acknowledgement that he understood his statements to Mr. Evans potentially could cause him legal jeopardy perhaps partially explains his demeanor at the hearing. 10/17/22 Hr'g Tr. 32:17-33:5.

Additionally, among the questions Dr. Rosendorff refused to answer were several questions about his mental health that were intended to probe the credibility of his testimony at trial and in the hearing. Dr. Rosendorff objected on privacy grounds, the government objected on Dr. Rosendorff's behalf, and the Court sustained those objections. *Id.* at 56:7-8, 57:4-6. To be clear, Dr. Rosendorff disclosed these issues publicly between his visit to Ms. Holmes' residence and the October 17 hearing; they were previously undisclosed to the defense. In fact, as of the filing of this motion, Dr. Rosendorff currently has linked on his *public* LinkedIn profile an interview he did with the South African Jewish

Report dated *last month*. Saharia Decl., Ex. 1 (Public LinkedIn profile), Ex. 2 (Article). The article summarizing the interview indicates that the stress of cooperating with the government "led to a breakdown, medication, hospitalisation, and health problems. For eight years, he was interviewed over and over again by the Federal Bureau of Investigation, department of justice, and U.S. Postal Inspection Service. 'I was only really able to come off medication when the trials were scheduled in early 2020,' Rosendorff says." Saharia Decl., Ex. 2 at 1. Despite currently publicizing the article himself, Dr. Rosendorff cited privacy concerns in his testimony on October 17. 10/17/22 Hr'g Tr. 18:14-19:9. And despite the fact that the article is dated September 2022, at the October 17 hearing, Dr. Rosendorff professed a lack of memory about what he disclosed. *Id.* There can be little doubt that, depending on the nature of the mental health issue, it could be relevant to the credibility of his testimony at trial, at the evidentiary hearing, and/or his conduct at Theranos. Ms. Holmes intends to file a motion compelling answers to the questions her counsel sought to ask, under an appropriate protective order.

## ARGUMENT

Ordinarily, a new trial should be ordered under Rule 33 on the basis of newly discovered evidence where a defendant shows the following: (1) the evidence is newly discovered; (2) the defendant was diligent in seeking the evidence; (3) the evidence is material to the issues at trial; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence indicates the defendant would probably be acquitted in a new trial. *See United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005). Because this motion implicates government misconduct, however, Ms. Holmes needs to show only that there was a reasonable probability that the result would have been different if the evidence was available to the defense. *United States v. Walgren*, 885 F.2d 1417, 1427-28 (9th Cir. 1989).[2]

The government's misconduct warrants a new trial under *Walgren*. Alternatively, the Court should order a new trial under *Harrington* because the newly discovered evidence would have led to acquittal in a new trial.

[2] Ms. Holmes incorporates by reference all arguments in her Motion for New Trial and her Reply in Support at Dockets 1574 and 1590.

## I. The Court Should Grant a New Trial Due to the Government's Misconduct in Presenting False or Misleading Testimony.

The conduct at issue here is a violation of *Napue v. Illinois*. In *Napue*, the Supreme Court held that "that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 U.S. at 269. A *Napue* claim succeeds when three elements are satisfied: (1) the "testimony or evidence in question must have been false or misleading"; (2) the government "[knew] or should have known that it was false or misleading"; and (3) the "testimony or evidence in question must be material." *Panah v. Chappell,* 935 F.3d 657, 664 (9th Cir. 2019).

During trial, Ms. Holmes raised with the Court her substantial concerns about the government's direct examination of Dr. Rosendorff under *Napue*. Holmes 10/5/21 Tr. 2714:3-8 (citing *Napue*). Dr. Rosendorff's statements to Mr. Evans and his testimony at the evidentiary hearing now prove that the government did indeed violate *Napue*.

### A. The Government Presented Highly Misleading Evidence Through Dr. Rosendorff.

The first element of *Napue* claim is satisfied when there is evidence that testimony or evidence is false or misleading. *Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019). The element is satisfied even if the false or misleading testimony falls short of perjury. *Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005) (en banc) ("There is nothing in *Napue*, its predecessors, or its progeny, to suggest that the Constitution protects defendants only against the knowing use of perjured testimony.").

Even literally truthful testimony can mislead the jury under *Napue*. Objectionable testimony under *Napue* includes "evidence that, though not itself factually inaccurate, . . . creates a false impression of facts which are known not to be true." *Burr v. Jackson*, 19 F.4th 395, 410 (4th Cir. 2021) (internal quotation marks omitted); *see also United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978) ("[*Napue*] applies if the prosecution, although not actively soliciting false evidence, passively but knowingly allows it to go uncorrected or allows the jury to be presented with a materially false impression."). Importantly, "'half-truths' and vague statements that could be true in a limited, literal sense but give a false impression to the jury" may violate *Napue*. *United States v. Freeman*, 650 F.3d

673, 680 (7th Cir. 2011); *see also United States v. Butler*, 567 F.2d 885, 889 (9th Cir. 1978) (finding a "new trial on the basis of prosecutorial misconduct" appropriate when the government acquiesced in misstatements during trial and continued in its "deception and half-truths" in post-trial proceedings).

In this case, Dr. Rosendorff's statements to Mr. Evans and testimony at the evidentiary hearing proved that the government selectively presented evidence that misled the jury. The government repeatedly created a false impression during Dr. Rosendorff's testimony through its use of documents and incomplete testimony. For example, the government questioned Dr. Rosendorff about a 2013 laboratory inspection and showed him an email that it claimed showed that Ms. Holmes hid from inspectors the Theranos Normandy laboratory containing its modified devices. Holmes 9/28/21 Tr. 1935:6-1936:22 (discussing TX 4047 and implying that Ms. Holmes instructed her employees to avoid certain paths in order to hide the "downstairs lab" containing modified Siemens devices.). On cross-examination, Ms. Holmes' counsel provided the full email exchange to Dr. Rosendorff, which showed that the recommended path actually *included* the "Normandy lab" that the government implied was hidden from the inspectors. Holmes 9/29/21 Tr. 2143:18-2144:9 (TX 12479 stating "I would suggest the path to the Normandy lab be the stairs by the back door and walk through the shipping area"). When confronted with this email, Dr. Rosendorff admitted that he told the government "that Ms. Holmes was open to showing the auditors the downstairs lab" during an interview with the prosecutors. *Id.* at 2145:19-23. In fact, he told this to the government in a pre-trial interview when prosecutors showed him the very same email the government then used in his direct testimony. Holmes 10/6/21 Tr. 2903:8-17; *see also* Saharia Decl. Ex. 3, 8/30/21 MOI at 10 ("From his review of the document, Rosendorff believed that [Ms.] Holmes was open to showing the auditors the downstairs lab."). The government nonetheless chose to mislead the jury about this email at trial.[3] At the October 17 hearing,

[3] This is not a circumstance where the government left the full picture exposed through the cross-examination of Dr. Rosendorff without returning to the issue. The government chose to present this misleading view of the 2013 CDPH inspection in its rebuttal argument at the close of trial. Holmes 12/17/21 Tr. 9291:16-9293:3. And it has persisted in doing so in defending Ms. Holmes' conviction, indicating that it views this story as material to the counts of conviction. *See* Rule 29 Opp'n, Dkt. 1395 at 15:3-6 (citing the trial exhibits used during Dr. Rosendorff's direct examination).

the government elicited testimony from Dr. Rosendorff that highlights why it is so important that the government heard the complete story during trial prep: "Q. In other words, it wasn't only in connection with your trial testimony that the government asked you to be honest, but it was also in those out-of-court discussions with the government team; is that right? A. Yes." 10/17/22 Hr'g Tr. 48:20-24.

Other examples of the defense attempting to correct the government's misleading presentation of evidence include the following:

- *Compare* Holmes 9/24/21 Tr. 1725:2-1726:13 (government discussing TX 1049 and stating that Dr. Rosendorff had concerns about the September 2013 commercial launch); *id.* at 1711:16-18 (describing commercial launch as "early September 2013"); *id.* at 1721:10-25 (government describing "broader commercial launch in September of 2013), *with* Holmes 9/28/21 Tr. 2011:16-2014:16 (defense showing that government elicited false testimony about the date and nature of Theranos' launch); *see also* Saharia Decl., Ex. 4, 3/22/18 Grand Jury Tr. 82:16-83:5 (Dr. Rosendorff explaining to grand jury in response to government questioning that September 2013 launch was "restricted" and "wasn't open to the general public").
- *Compare* Holmes 9/28/21 Tr. 1911:12-1913:14 (government eliciting statement that there was no proficiency testing program in place and that Dr. Rosendorff left the company in November 2014 with no progress made on the issue), *with* Holmes 9/29/21 Tr. 2256:18-2257:22 (Dr. Rosendorff stating on cross-examination that he recalled reviewing a Standard Operating Procedure for proficiency testing and that there was a program for an alternative proficiency testing procedure that produced good results on the Edison.); *id.* at 2262:8-2263:11 and TX10451 (Rosendorff email stating "we are continually doing proficiency testing").
- *Compare* Holmes 9/28/21 Tr. 1911:12-1913:14 (government eliciting testimony that there was no proficiency testing program in place and that Dr. Rosendorff left the company in November 2014 with no progress made on the issue), *with* Holmes 10/1/21 Tr. 2476:17-2477:7 (defense establishing that, despite the government's questioning on direct, all of Dr. Rosendorff's concerns regarding proficiency testing were addressed).
- *Compare* Holmes 9/24/21 Tr. 1821:10-1825:10 (government focusing on one portion of TX 4116 and stating there were issues with bicarbonate assay that led Dr. Rosendorff to doubt the accuracy of that test), *with* Holmes 10/5/21 Tr. at 2651:5-2657:25 (defense showing that government raised issues with bicarbonate assay on direct examination, but did not review TX 12587 (the full email chain) that showed the issue was investigated and addressed within 24 hours).

"Due process protects defendants against the knowing use of any false evidence by the State, whether it be by document, testimony, or any other form of admissible evidence." *Hayes*, 399 F.3d at 981. Here, the government created a misleading picture by eliciting half-truths about key issues. *Martin*

*v. Allison*, 2014 WL 3058442, at *13 (E.D. Cal. July 3, 2014), *subsequently aff'd*, 671 F. App'x 479 (9th Cir. 2016) ("Unless trial is to be reduced to a game, where the accurate information is withheld until the last minute, or half-truths are dribbled in over the course of trial, the rule should prohibit the deliberate introduction of false evidence—period."). The government created a misleading impression that constitutes false or misleading evidence under *Napue*, as Dr. Rosendorff's admissions at the evidentiary hearing demonstrate.

**B. The Government Knew Or Should Have Known the Evidence Was False Or Misleading.**

The second *Napue* element is whether the government knew or should have known the evidence was misleading. This element is satisfied here. The government had access to the interview memoranda (which it created), grand jury testimony, and deposition testimony that defense counsel used to clarify some of the misstatements during Dr. Rosendorff's direct examination. It also had access to all documents that defense counsel presented to Dr. Rosendorff. Dr. Rosendorff testified at the October 17 hearing that the government met with him to prepare him for his direct testimony, reviewed exhibits with him, discussed with him topics that would come up at trial, and prepared him for cross-examination. *See* 10/17/22 Hr'g Tr. 39-40. In those meetings, the government gained knowledge of Dr. Rosendorff's more complete understanding of the facts, from which it then chose what to present at trial. *Id.* at 39:17-22. For example, as noted above, with respect to the 2013 CDPH laboratory inspection, the government had elicited from Dr. Rosendorff in its trial preparation that Ms. Holmes was open to showing the inspector the Normandy laboratory[4]; yet the government chose to introduce a misleading, incomplete story during its direct examination of Dr. Rosendorff. The fact that the government knew Dr. Rosendorff had an obligation to tell the truth in his trial prep interviews, 10/17/22 Hr'g Tr. 48:20-24,

---

[4] Dr. Rosendorff also told the government the approach they took in this inspection was consistent with the approach they took at other laboratories he worked at. Saharia Decl., Ex. 3, 8/30/2021 MOI at 10. In addition, Dr. Rosendorff stated repeatedly in prior testimony to which the government had access that the inspector was told about the downstairs laboratory but was not shown it because she did not ask to see it. Saharia Decl., Ex. 5 (Colman Dep. Tr.) 41:8-21, 165:17-166:5; Saharia Decl., Ex. 6 (AZ Dep. Tr.) 43:8-16.

leaves no doubt about whether the government knew or should have known its presentation was misleading. On each of the issues Ms. Holmes attempted to correct in cross-examination, the government either knew or should have known the truth regarding the subjects of Dr. Rosendorff's testimony.

**C. The False Evidence Was Material.**

"In assessing materiality under *Napue*, [a court] determine[s] whether there is any reasonable likelihood that the false testimony could have affected the judgment of the jury; if so, then the conviction must be set aside." *Hayes*, 399 F.3d at 984 (internal quotation marks omitted). Under this materiality standard, the question is "whether the error *could* have affected the judgment of the jury, . . . [not] whether the error *would* have done so." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013) (contrasting *Napue* materiality standard with ordinary harmless error review) (emphasis in original). "[I]f it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'" *Hayes*, 399 F.3d at 978.

The at-issue evidence could have affected the jury's judgment, and therefore was material, for at least three reasons:

***First***, Ms. Holmes specifically argued to the jury that the government's cherry-picked evidence "obscured the full picture" and that the government was incorrectly viewing the evidence through a "dirty lens." *See* Holmes 12/16/21 Tr. 9031:19-9041:10. At trial, Ms. Holmes repeatedly attempted to demonstrate the government's cherry-picking of evidence through Dr. Rosendorff's cross-examination, but defense counsel lacked Dr. Rosendorff's own statements—made to Mr. Evans and in his testimony at the October 17 hearing—that the government was eliciting incomplete testimony. This argument was central to Ms. Holmes' defense. Dr. Rosendorff's post-trial statements and testimony would have corroborated this defense. That Dr. Rosendorff was impeached at times during trial does not change the analysis. *See Amado v. Gonzalez*, 758 F.3d 1119, 1139 (9th Cir. 2014) (the fact the witness had been impeached at trial by cross-examination about his weak vision did not defeat a finding of materiality as to the undisclosed evidence).

To the extent that Dr. Rosendorff professed at the October 17 hearing a belief that the government was not "cherry picking or being selective," that testimony should not be credited. 10/17/22 Hr'g Tr. 22:22-23. As the Court already observed, Dr. Rosendorff's subjective "critique of the trial is not . . . the basis for a new trial." 10/3/22 Hr'g Tr. 25:17-18. Dr. Rosendorff's subjective belief about the government's intentions is beside the point. What matters are the objective facts that (1) Dr. Rosendorff went to Ms. Holmes' home and stated that the prosecutors tried to make things sound worse than they were; (2) he did not deny making these statements at the hearing; (3) he agreed that the government did not present a complete story in its direct examination of him; and (4) the trial record confirms that the government did not present a complete story.

***Second***, the government's violation of its constitutional duty to correct the false or misleading statements is also material evidence that the jury could have considered in assessing the strength of the government's case. "Where the prosecutor knows that his witness has lied, he has a constitutional duty to correct the false impression of the facts," even if the "defense counsel knows, and the jury may figure out, that the testimony is false." *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000). In *Hayes*, the Ninth Circuit explained that, had the government corrected the witness's misleading statement that the government itself elicited, the jury would have viewed the credibility of the entire prosecution case with skepticism. 399 F.3d at 988. The *Napue* violation therefore was material. *Id.*

The same holds true in this case. To avoid violating Ms. Holmes' due process rights, the government would have been forced to disclose to the jury that, despite meeting with Dr. Rosendorff on several occasions and going over documents and testimony with him, it presented an incomplete picture of the documents and the testimony when Dr. Rosendorff took the stand. As in *Hayes*, "[s]uch a disclosure would have had a devastating effect on the credibility of the entire prosecution case." *Id.* In particular, the jury would have had reason to doubt the government's credibility when the same prosecutor who examined Dr. Rosendorff again advanced the misleading picture of the 2013 CDPH audit in the government's rebuttal closing argument. *See* Holmes 12/17/21 Tr. 9291:16-9293:3.[5]

---

[5] This is not a circumstance where the government left the full picture exposed through the cross-examination of Dr. Rosendorff without returning to the issue. The government chose to present this

The impact would have been even more pronounced given that Dr. Rosendorff was the government's star witness. The government relied on Dr. Rosendorff's testimony in its opposition to Ms. Holmes' Motion for Judgment of Acquittal and did so again during the argument on that motion. Dkt. 1395 at 11; 9/1/22 Hr'g Tr. 24:8-25:3. In closing, the government mentioned Dr. Rosendorff more than any other government witness. Holmes 12/16/21 and 12/17/22 Tr. (collectively referencing Dr. Rosendorff over 50 times). A government admission that it elicited misleading testimony from Dr. Rosendorff would have had a significant impact on how the jury perceived Dr. Rosendorff and the government's presentation of the facts in general.

***Third***, the evidence calls into question the government's investigation into the facts of this case. Evidence undermining the reliability of the government's investigation is necessarily material. *See Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (evidence was material because it could have been used to attack the reliability of the government's investigation); *United States v. Howell*, 231 F.3d 615, 625 (9th Cir. 2000) ("[I]nformation which might 'have raised opportunities to attack . . . the thoroughness and even good faith of the investigation . . .' constitutes exculpatory, material evidence."). That the government only showed portions of documents that supported its theory when it was clear that contrary evidence existed calls into question the reliability of its investigation. And this testimony almost certainly would have diminished the weight the jury would have ascribed to Dr. Rosendorff's testimony, which the government used to support key elements of its case. *See United States v. Butler*, 567 F.2d 885, 890–91 (9th Cir. 1978) ("Both by casting doubt on the prosecution case and by increasing the scope of the closing defense arguments, disclosure of the exact nature of the prosecution's dealings with its key witness would certainly have affected the weight given his testimony by the jury.").

Because a *Napue* violation occurred, Ms. Holmes need only show a reasonable probability that the result would have been different if the evidence was available to the defense. For the reasons stated

---

misleading view of the 2013 CDPH inspection in its rebuttal argument at the close of trial. And it has persisted in doing so in defending its convictions, indicating that it views this story as material to the counts of conviction. *See* Rule 29 Opp'n, Dkt. 1395 at 15:3-6 (citing the trial exhibits it used during Dr. Rosendorff's direct examination).

above, and the reasons stated in her prior papers (Dkts. 1574 and 1590), that standard is satisfied and the Court should order a new trial.

**II. Dr. Rosendorff's Statements Warrant a New Trial Independently of the Government's Misconduct.**

Even absent a finding of misconduct, a new trial is warranted because Dr. Rosendorff's statements to Mr. Evans and subsequent testimony would probably lead to an acquittal in a new trial. *Harrington*, 410 F.3d at 601.

Dr. Rosendorff agreed that at times he was not "given the opportunity to tell the full story with respect to a particular event at Theranos during [his] direct examination." 10/17/22 Hr'g Tr. 23:24-24:6. This statement is consistent with his prior statements to Mr. Evans that the prosecutors tried to make everyone look bad in the company and that the government tried to make things worse than they were. Evans Decl. Ex. A. at 2. Dr. Rosendorff did not deny making those statements. *See, e.g.*, 10/17/22 Hr'g Tr. 25:17-18.

For all the reasons already stated, this evidence undermines the quality of the government's presentation of evidence and investigation in this case, diminishes Dr. Rosendorff's credibility, and bolsters the defense's theory of the case. If the jury had heard that Dr. Rosendorff went to Ms. Holmes' home, told her partner that the government made things seem worse than they were, and admitted in sworn testimony that the government did not present a complete picture on direct examination, it would have viewed this case very differently. This evidence from the government's star witness would have bolstered Ms. Holmes' attempts to show that the government was not presenting an accurate picture, as she attempted to do through cross-examination.

Dr. Rosendorff's statements would have "significantly bolstered [Ms. Holmes'] defense and directly rebutted the government's primary response." *United States v. Mendez*, 619 F. App'x 644, 646 (9th Cir. 2015) (reversing denial of new trial motion after holding that "[a] new trial, with the benefit of [newly discovered records], would probably result in acquittal"); *see also United States v. Fulcher*, 250 F.3d 244, 251, 255 (4th Cir. 2001) (affirming district court findings that new evidence "would paint a 'significantly more persuasive picture than the one presented to the jury at trial,'" and would "certainly

create a record more favorable for [the defendants]"); *United States v. Hernandez-Rodriguez,* 443 F.3d 138, 146-48 (1st Cir. 2006) (reversing denial of new trial motion where "district judge failed to consider the full import of the defendant's new evidence"). Even without this new testimony, this was a close case, as evidenced by the split verdict. Had this evidence been before the jury, there is a strong probability that the jury would have acquitted Ms. Holmes on the remaining counts in this case.[6]

## CONCLUSION

For the foregoing reasons, the Court should grant Ms. Holmes' Motion for a New Trial.

DATED: October 24, 2022

/s/ Amy Mason Saharia
KEVIN DOWNEY
LANCE WADE
AMY MASON SAHARIA
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

---

[6] The government's motion to dismiss Counts 3-5 remains pending. *See* Dkt. 1255. Ms. Holmes respectfully requests that the Court grant the government's motion.

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2022 a copy of this filing was delivered via ECF on all counsel of record.

/s/ Amy Mason Saharia
AMY MASON SAHARIA
Attorney for Elizabeth Holmes