# Exhibit I


**FORTRESS**
CREDIT CORP.

<u>CONFIDENTIAL</u>

November 3, 2017

Theranos, Inc.
1701 Page Mill Road
Palo Alto, CA 94304
Attention: David Taylor, General Counsel

### Re: Proposed Senior Secured Term Loan

Dear David:

    Theranos, Inc. (the "**Company**") has requested that Fortress Credit Corp., on behalf of itself and/or as agent on behalf of one or more of its affiliates or assignees (the "**Lender**") consider providing it with financing. The Lender is pleased to confirm that it would consider engaging in a potential transaction on the terms and conditions set forth in the Outline of Proposed Terms and Conditions attached hereto as Annex B (the "**Term Sheet**" and the transactions described therein, the "**Transaction**"). The Company and the Lender are targeting a closing and funding of the Transaction for no later than November 22, 2017.

    Except for those terms included in Annex A (the "**Binding Terms**"), this letter and the Term Sheet (together with this letter and the Binding Terms, the "**Proposal Letter**") are non-binding and are not intended to be, and shall not be deemed to be or construed as, a commitment by Lender to provide the Transaction or any other financial accommodation to the Company or any of its respective affiliates or as an obligation to negotiate or execute Transaction Documents (as defined in the Binding Terms). The Binding Terms are binding.

    Please confirm that the Company desires (i) for the Lender to continue to consider the Transaction on the terms and conditions set forth in the Term Sheet and (ii) to be bound by the Binding Terms by signing and returning a copy of this Proposal Letter to the Lender along with the Expense Deposit described in the Binding Terms prior to 5:00 p.m. New York time on November 6, 2017 ("**Expiration Date**").

[SIGNATURE PAGE FOLLOWS]

Very truly yours,

FORTRESS CREDIT CORP. for itself
and/or as agent on behalf of one or more of
its affiliates or assignees.

By: _____
    Name:
    Title: **CONSTANTINE M. DAKOLIAS**
          **PRESIDENT**

Agreed and Accepted on this 3 day of November, 2017:

THERANOS, INC.

By: _____
    Name: Elizabeth Holmes
    Title: CEO

[Letter of Intent for Theranos, Inc.; November 2017]

2

## ANNEX A

## BINDING TERMS AND CONDITIONS

Non-binding Term Sheet. The Term Sheet is not binding, is intended as an outline only and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive legal documentation for the Transaction (the "**Transaction Documents**"). Any commitment by Lender will be subject to completion of due diligence satisfactory to Lender, receipt of Lender's internal approvals and the execution and delivery of Transaction Documents in form and substance satisfactory to Lender, all in Lender's sole discretion. The Term Sheet is based on preliminary information provided by the Company. The Lender's willingness to engage in the Transaction is subject to its satisfactory due diligence of the Company and its continuing satisfaction with the results thereof. If the Lender discovers information which it believes is negative information with respect to the condition (financial or otherwise), business, operations, assets, liabilities or prospects of the Company, the Lender may, in its sole discretion, suggest alternative financing amounts or structures or decline to engage in the Transaction. Each party hereto reserves the right at any time to terminate discussions regarding the Transaction at any time and for any reason (or for no reason) and the parties hereto agree that there is no obligation on any party hereto to negotiate in good faith, or otherwise, with any other party hereto regarding the Transaction or any alternative transaction. Furthermore, please note that all indicated interest rates and indicative other terms referred to herein are subject to change based on prevailing market conditions.

Exclusivity. In order to induce the Lender to pursue the Transaction, the Company agrees that during the Exclusivity Period (defined below), neither it, nor any of its affiliates, will, nor will it cause or permit its directors, officers, agents or representatives or any other person acting on its behalf to, directly or indirectly, (i) solicit offers, letters of intent, inquiries, proposals or indications of interest or commitments for, or entertain any offer, letter of intent inquiries, proposal or indication of interest or commitment to enter into a debt transaction similar to or competing with the Transaction (other than a debtor-in-possession financing) (a "**Competing Transaction**"), (ii) engage in any discussions or negotiations, provide any information to, or enter into any agreement, arrangement or understanding regarding a Competing Transaction or (iii) enter into any other transaction (including any equity issuance or a full or partial sale of the Company) that competes with the Transaction if the Lender confirms it is ready, willing and able to consummate the Transaction (after being given a reasonable opportunity to provide such confirmation). As used herein, the term "Exclusivity Period" shall mean the period beginning on the date of execution of the Term Sheet on behalf of the Company and expiring 30 days thereafter. For the avoidance of doubt, the Company agrees to immediately cease any discussions or negotiations regarding any Competing Transaction.

Expiration Date. If the signed Proposal Letter is not received satisfactorily to Lender on or before the Expiration Date, the Proposal Letter and the Term Sheet shall expire on the Expiration Date and, shall be deemed null and void *ab initio* and of no force or effect; provided that the existence of the Proposal Letter and the Term Sheet shall continue to be kept confidential as described below.

3

Expenses. The Company understands that it will be necessary for the Lender to incur certain out-of-pocket costs and expenses in connection with the proposed Transaction (including, without limitation, due diligence, legal and transportation fees and expenses) (collectively, "Lender Expenses"). In consideration of the Lender's undertaking the work associated with this Term Sheet, the Company agrees to pay to the Lender, upon acceptance of this Term Sheet, an expense deposit of $450,000 (the "Expense Deposit"), which Expense Deposit will be used to pay the Lender Expenses. If the Expense Deposit is not sufficient to reimburse the Lender for all Lender Expenses, the Company shall reimburse the Lender for such Lender Expenses upon request by the Lender. If for any reason the Lender does not enter into the Transaction, the Lender shall return the Expense Deposit to the Company net of the Lender Expenses; provided, however, that Lender shall not be required to return the balance of the Expense Deposit to the Company if the Company breaches the exclusivity provisions contained in this letter. The Company also hereby agrees to pay all costs and expenses of the Lender (including, without limitation, fees and disbursements of counsel) incurred in connection with the enforcement of any of their rights and remedies hereunder, including, for the avoidance of doubt, any costs and expenses incurred in connection with the collection of the Lender Expenses (all of which shall be considered Lender Expenses). If the Transaction is consummated and the Expense Deposit exceeds the Lender Expenses, the Lender will return the excess to the Company or credit such amount against the Upfront Fee.

Confidentiality. The Term Sheet is delivered to the Company on the condition that neither the existence of the Term Sheet nor any of its contents shall be disclosed except on a confidential and "need to know" basis solely to the Company's respective directors, officers, employees, current shareholders, and advisors and as may be compelled to be disclosed in a judicial or administrative proceeding or as otherwise required by law. The Company shall not release any public announcement in which reference is made to the Lender, any of its affiliates or this Term Sheet.

Indemnification and Limitation of Liability. The Company agrees to indemnify and hold harmless the Lender, its affiliates and each of the Lender's and its affiliates' respective officers, directors, employees, affiliates, advisors and agents from and against any and all losses, claims, damages and liabilities (whether direct or indirect) to which any such person or entity may become subject arising out of or in connection with the Proposal Letter or the Term Sheet, except to the extent that such have been found by a final, non-appealable judgment of a court that any such loss, claim, damage or liability results from the willful misconduct of Lender in connection with the Proposal Letter or the Term Sheet. If for any reason the foregoing indemnification is unavailable to any indemnified person or entity or is insufficient to hold it harmless, then the Company shall contribute to the amount of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative economic interests of the Company, on the one hand, and the Lender on the other hand in the matters contemplated by the Proposal Letter or the Term Sheet as well as the relative fault of the Company or Lender with respect to such loss, claim, damage or liability and any other relevant equitable considerations. In no event shall Lender or any other indemnified person have any liability for any indirect, consequential or punitive damages in connection with or as a result of such indemnified party's or such other parties' activities related to the Proposal Letter or the Term Sheet. It is understood and agreed that the Lender will act under the Proposal Letter or the Term Sheet as an independent contractor

Dynasty003469
SEC3-USAO-EPROD-000019775

and nothing herein, the Transaction contemplated hereby or otherwise, shall be deemed to create a fiduciary duty or fiduciary or agency relationship between the Company or any of its affiliates on the one hand, and the Lender or any of its affiliates on the other. The Lender is not advising the Company in any respect, including but not limited to providing accounting, legal or tax advice. The Company agrees that it shall not make, and hereby waives, any claim based on an assertion of such a fiduciary duty or relationship.

Other Fortress Activities. As you know, the Lender is an affiliate of Fortress Investment Group LLC, a full service investment advisory firm engaged, either directly or through affiliates in various activities, including securities trading, financial advisory, investment management, principal investment, hedging, financing and brokerage activities. In the ordinary course of these activities, Fortress Investment Group LLC and its affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and/or financial instruments (including loans) for its own account and for the accounts of its clients and may at any time hold long and short positions in such securities and/or instruments. Such investment and other activities may involve securities and instruments of Company, as well as of other entities and persons and their affiliates which may (i) be involved in transactions arising from or relating to the transaction described herein, (ii) be customers or competitors of Company, or (iii) have other relationships with Company. Nothing in the Proposal Letter or the Term Sheet shall restrict or preclude the Lender or any of its respective affiliates from pursuing any business opportunities either on its or their own behalf or in conjunction with third parties.

Miscellaneous. The Proposal Letter, the Term Sheet and these Binding Terms (i) supersede all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the parties with respect thereto; (ii) may be signed in multiple counterparts and may be delivered by facsimile or by electronic transmission in Adobe .pdf format, each of which shall be deemed an original and all of which together shall constitute one and the same instrument; and (iii) may be amended, modified or waived only in writing signed by each of the parties hereto. Except as set forth herein, nothing in the Proposal Letter, the Term Sheet or these Binding Terms is intended to or shall confer upon any other person or entity (including affiliates, stockholders, employees or creditors of the Company) any rights or remedies hereunder or by reason hereof.

Governing Law. These Binding Terms shall be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed within such State. The Company (a) irrevocably consents to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan of the City of New York, and (b) irrevocably consents that any process or notice or motion or other application to the court or judge thereof may be served within or outside of the State of New York by registered or certified mail or nationally-recognized overnight delivery service, or by personal service, provided a reasonable time for appearance is allowed. THE COMPANY HEREBY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING, WHETHER AT LAW OR EQUITY, BROUGHT BY IT IN CONNECTION WITH THIS TERM SHEET OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Dynasty003470
SEC3-USAO-EPROD-000019775

## ANNEX B

## TERM SHEET

## NON-BINDING / NOT A COMMITMENT

*This Term Sheet is the non-binding Term Sheet referenced in Annex A (the "Non-binding Term Sheet"). It outlines certain terms of the Transaction referred to in the letter to which this Term Sheet is attached. Certain capitalized terms used in this Term Sheet and not defined herein are defined in such letter.*

| | |
|---|---|
| **Borrower:** | The SPV (as defined below) (the "**Borrower**"). |
| **Guarantor(s):** | Theranos, Inc. ("**Theranos**" or the "**Company**") and its subsidiaries. |
| **Lender and Agent:** | Fortress Credit Corp., for itself and/or as agent on behalf of one or more of its affiliates or assignees (the "**Lender**"). |
| **Term Loan:** | $100 million senior secured delayed draw term loan (the "**Term Loan**"). The Term Loan is broken up into three tranches (individually referred to as "**Loans**") that rank pari passu and are available as follows:<br>• **Tranche A**: $65 million drawn on the Closing Date;<br>• **Tranche B**: $10 million available subject to the FDA EUA authorization or 510(k) clearance (whichever is earlier) of the Company's Zika application;<br>• **Tranche C**: $25 million available subject to a milestone that is mutually agreed upon in the loan documents by Lender and the Company. |
| **Maturity Date:** | All outstanding Loans shall become due and payable 42 months from the Funding Date of each Loan. |
| **Interest:** | 1-month LIBOR + 11.00% per annum, subject to a floor of 2.0% on 1-month LIBOR, of which 8.0% per annum will be paid in kind, accruing monthly, and the balance will be paid monthly in arrears. For any period when an Event of Default shall occur and be continuing, the interest rate shall be 1-month LIBOR + 13.0% per annum, subject to a floor of 2.0% on 1-month LIBOR. |
| **Upfront Fee:** | 5.0% of each Loan funded, provided that the Upfront Fee shall be due and payable at the time of each draw and only in an amount equal to 5.0% of the applicable draw. Lender may fund each Loan net of the applicable |

Dynasty003471
SEC3-USAO-EPROD-000019775

| | Upfront Fee. |
|---|---|
| **Final Payment Fee:** | 7.5% of each Loan funded, provided that the Final Payment Fee shall be payable upon the repayment of the Term Loan in full (whether at maturity or otherwise). |
| **Scheduled Amortization:** | • Tranche A: Twenty-one (21) monthly amortizing payments starting twenty-one (21) months after the Funding Date. The first three (3) payments shall be $325,000 each, followed by nine (9) payments of $1.3 million each and then nine (9) remaining payments of $3.25 million each.<br><br>• Tranche B: Twenty-one (21) monthly amortizing payments starting twenty-one (21) months after the Funding Date. The first three (3) payments shall be $50,000 each, followed by nine (9) payments of $200,000 each and then nine (9) remaining payments of $500,000 each.<br><br>• Tranche C: Twenty-one (21) monthly amortizing payments starting twenty-one (21) months after the Funding Date. The first three (3) payments shall be $125,000 each, followed by nine (9) payments of $500,000 each and then nine (9) remaining payments of $1.25 million each. |
| **Collateral:** | The Term Loan will be a senior secured debt obligation of the Borrower and will rank contractually senior to all current and future debt of the Borrower. The Lender will have a perfected first lien security interest on all assets of the Borrower and of each guarantor including, without limitation, patents and patent applications (see Special Purpose Vehicle Structure clause below) and the capital stock of all wholly-owned subsidiaries of the Borrower and each guarantor. |
| **Special Purpose Vehicle** | As part of the Transaction, all Patents and Patent Rights assigned or owned by the Company, shall be sold to a newly formed Special Purpose Vehicle (the "**SPV**") whose equity will initially be 99.8% owned by the Lender and 0.2% owned by the Company. Upon the repayment of the Term Loan, assuming no event of default has occurred and is continuing, the Company shall automatically issue additional equity to the Company such that after giving effect to such issuance, the SPV is owned 99.8% by the Company and 0.2% owned by the Lender (and the operating agreement of the SPV shall permit and contemplate such equity issuance).<br><br>However, if an event of default has occurred and is continuing and the Lender elects to monetize the SPV's assets, any proceeds received by the SPV or the Company from the monetization of the SPV's assets, including its intellectual property (the "**Gross Proceeds**") shall be applied as follows: |

7

| | |
|---|---|
| | - First, to repay all outstanding Term Loans and all other obligations under the Term Loan (including accrued and unpaid interest)<br><br>- Second, in accordance with the Lender's on the one hand, and the Company's on the other hand, share of the equity in the SPV, which shall automatically be adjusted as follows:<br><br>  - Lender will own 99.8% of the equity in the SPV until it receives a multiple of 2.50x on the Term Loan Amount (as defined below);<br><br>  - Once Lender has received a multiple of 2.50x on the Term Loan Amount, the SPV will automatically issue additional equity to the Company such that after giving effect to such issuance, the SPV is owned 50.0% by the Company and 50.0% owned by the Lender; and<br><br>  - Once Lender has received a multiple of 3.00x on the Term Loan Amount, the SPV will automatically issue additional equity to the Company such that after giving effect to such issuance, the SPV is owned 99.8% by the Company and 0.2% owned by the Lender.<br><br>**"Term Loan Amount"** shall mean aggregate amount of all advances made under the Term Loan (including any interest paid-in-kind) and any amounts expended by Lender to monetize the SPV's intellectual property.<br><br>The Company will enter into an agreement with the SPV that shall grant the Company a non-exclusive license to use the Patents and Patent Rights.<br><br>For the avoidance of doubt, during the term of the Term Loan, provided no event of default has occurred and is continuing, any action to enforce, license or encumber the patents in the SPV and any bankruptcy filing can only be done by unanimous consent of the Company and the Lender (and after an event of default has occurred and is continuing, any such actions will be controlled and directed by the Lender). |
| **Events of Default:** | The Term Loan documents will contain events of default customarily found in loan agreements for similar financings (with customary grace periods for certain events of default).<br><br>Upon the occurrence and during the continuance of an event of default, the ownership structure of the SPV will not change; however, Fortress shall have sole control over the monetization of the SPV's assets. |
| **Permitted Uses:** | General working capital needs of the Company and its subsidiaries, including transaction-related expenses, settlement costs for legal matters |

8

| | |
|---|---|
| | open as of the Closing Date (not to exceed a cap of $40 million), $1.4 million allocated per year to patent prosecution and maintenance and $2.5 million allocated over the term of the Term Loan to patent development and enhancement (collectively, the "**Permitted Uses**"). |
| **Mandatory Amortization:** | Net cash proceeds from asset sales (other than the sale of Intellectual Property) in excess of $5 million in aggregate, shall, in each case, be used to reduce the outstanding amount of the Term Loan, first to retire Tranche A, then Tranche B and then the Tranche C.<br><br>Net cash proceeds from the sale of Intellectual Property or the monetization of Intellectual Property, shall, in each case, be used to reduce the outstanding amount of the Term Loan, first to retire Tranche A, then Tranche B and then the Tranche C. |
| **Prepayment Premium:** | As a result of a prepayment (for any reason other than mandatory amortization, including as a result of acceleration of the Term Loans or a bankruptcy) by or on behalf of the Company of all or a portion of the outstanding Term Loan, the following premiums shall apply with respect to the payment of such Loans: 5% in months 1-12 after the Closing Date, 3.5% in months 13-24, and no premium thereafter. |
| **Warrants:** | Company to grant the Lender detachable penny warrants for the Company's next or last series of Preferred Stock in an amount equivalent to 4.00% of the Company's outstanding shares on a fully-diluted basis at the time of exercise. |
| **Board Observer:** | The Lender shall have the right to appoint a board observer during the term of the Term Loan, subject to such observer entering into a mutually agreeable confidentiality agreement with the Company. |
| **Covenants:** | Customary for this type of transaction, including, without limitation, limitation on asset sales, mergers, and future acquisitions, etc., in each case with the Lender's prior written consent. Company will provide Lender with customary financial reporting, as well as such other reports as Lender may reasonably require. |
| **Operational Covenants:** | Customary for this type of transaction, but including, without limitation, light operational covenants to be mutually agreed upon with the Company. |
| **Due Diligence:** | The Company will promptly provide due diligence information per a due diligence checklist to be provided by Lender, including, but not limited to, organizational documents, copyrights and trademarks, inter-company and other agreements with affiliates, leases, licenses, supply agreements, and insurance policies. |
| **Conditions** | Funding of the Term Loan will be made subject to the satisfaction of |

9

| Precedent: | conditions precedent customary for similar financings. |
|---|---|
| Representations and Warranties: | The Term Loan documents will contain representations and warranties customarily found in loan agreements for similar financings. |
| Governing Law: | All documentation in connection with the Term Loan will be governed by the laws of the State of New York. Venue for resolution of any disputes shall be in the Federal or State courts in the Borough of Manhattan. Parties will agree to waive jury trial in connection with any litigation arising from the Term Loan agreement. |

Dynasty003475
SEC3-USAO-EPROD-000019775