# Exhibit K

### Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN JOSE DIVISION
 4
     SECURITIES AND EXCHANGE    )
 5   COMMISSION,                )
                                )
 6         Plaintiff,            )
                                ) CASE NO:
 7     vs.                       ) 5:18-cv-01603-EJD
                                )
 8   RAMESH "SUNNY" BALWANI,     )
                                )
 9         Defendant.            )
                                )
10
11
12
13         FORTRESS HIGHLY CONFIDENTIAL
14      VIDEOTAPED DEPOSITION OF EREZ LEVY
15     TUESDAY, SEPTEMBER 24, 2019, 9:30 A.M.
16          SAN FRANCISCO, CALIFORNIA
17
18
19
20
21
22   Reported By:  JoAnne T. Ichiki, CSR No. 11660
              CLS Job No. 108647
23
24        CENTEXTLEGAL.COM - 855.CENTEXT
25
```

### Page 2

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN JOSE DIVISION
 4
     SECURITIES AND EXCHANGE    )
 5   COMMISSION,                )
                                )
 6         Plaintiff,            )
                                ) CASE NO:
 7     vs.                       ) 5:18-cv-01603-EJD
                                )
 8   RAMESH "SUNNY" BALWANI,     )
                                )
 9         Defendant.            )
                                )
10
11
12
13
14
15
16
17
18
19
20      THE VIDEOTAPED DEPOSITION Of EREZ LEVY,
21   taken at 505 Montgomery Street, Suite 800, San
22   Francisco, California, on Tuesday, September 24,
23   2019, at 9:30 a.m. before JoAnne T. Ichiki,
24   Certified Shorthand Reporter, in and for the State
25   of California.
```

### Page 3

```
 1   APPEARANCES:
 2
 3   For the Plaintiff:
 4        UNITED STATES SECURITIES AND EXCHANGE
          COMMISSION
 5        BY:  SUSAN F. LAMARCA, ATTORNEY AT LAW
          BY:  ANDREW J. HEFTY, ATTORNEY AT LAW
 6        44 Montgomery Street, Suite 2600
          San Francisco, California 94104
 7        415.705.2456
          415.705.2500 fax
 8        lamarcas@sec.gov
          heftya@sec.gov
 9
10   For the Defendant:
11        DAVIS WRIGHT TREMAINE, LLP
          BY:  JEFFREY B. COOPERSMITH, ATTORNEY AT LAW
12        BY:  BENJAMIN J. BYER, ATTORNEY AT LAW
          920 Fifth Avenue, Suite 3300
13        Seattle, Washington 98101
          206.757.8020
14        206.757.7020 fax
          jeffcoopersmith@dwt.com
15        benbyer@dwt.com
16   For the Deponent:
17        MILBANK
          BY:  LAUREN N. DRAKE, ATTORNEY AT LAW
18        2029 Century Park East, 33rd Floor
          Los Angeles, California 90067-3019
19        213.312.7406
          ldrake@milbank.com
20
21   ALSO PRESENT:   Alfredo Domador, Videographer
22                   Michele Moreland, Fortress
23
24
25
```

### Page 4

```
 1                      INDEX
 2   WITNESS:  Erez Levy
 3
 4   EXAMINATION                                 PAGE
 5   Examination By Mr. Coopersmith               8
 6
 7            INFORMATION REQUESTED
 8          PAGE      LINE
 9                    NONE
10
              QUESTIONS NOT ANSWERED
11
            PAGE      LINE
12
13           26        21
14           36        11
15
```

Page 29

1  that we were looking at a few minutes ago, we're
2  back to this page that has the heading "Transaction
3  Strengths."
4          And we looked at the first sentence, but
5  going to the second sentence of the first paragraph
6  it reads, "Additionally, in a default scenario, the
7  proposed transaction represents an opportunity to
8  make an attractive return based on the monetization
9  of the company's patent portfolio."
10         Do you see that?
11     A.  I do see that.
12     Q.  Okay.  What does that mean?
13     A.  It means that in case there was a
14  default on the loan and we had to foreclose on the
15  assets, we can recoup our investment amount with
16  hopefully some return if we had to monetize the
17  assets.
18     Q.  Okay.  And we'll talk about monetization
19  in a little bit.  But that means even in a default
20  scenario, Fortress felt like it was protected where
21  it could still expect to make an attractive return
22  even if Theranos defaulted on the loan?
23     A.  That's what this sentence says, yes.
24     Q.  Okay.  And you believed that to be true
25  at the time of the deal?

Page 30

1      A.  At the time we did the deal, we believed
2  that that was true.
3      Q.  And then the next sentence after that
4  reads, "Alternatively, if the company is successful
5  in executing on its strategy, the proposed
6  transaction represents an opportunity to make an
7  attractive return through interest and fees with
8  potential upside in the form of warrants."
9          Do you see that?
10     A.  I do see that.
11     Q.  Okay.  That would be the scenario where
12  the company was able to repay the loan; is that
13  correct?
14     A.  That is correct.  We would make money
15  out of interest and fee payments as well as an
16  equity position via warrants that we had in the
17  company.
18     Q.  Those warrants would allow Fortress to
19  acquire an equity stake in the company, which it
20  could do if it saw a value in that proposition.
21         Is that fair?
22     A.  That is correct.  The warrants give us
23  the ability to buy shares in the company.
24     Q.  So it sounds like at the time of the
25  deal, whether Theranos was able to repay the loan or

Page 31

1  whether it defaulted on the loan, Fortress believed
2  that it stood to make -- to recoup its investment
3  and make a return.
4          Is that fair?
5      A.  That is a correct statement.  In both
6  scenarios, we saw a path to make a return.
7      Q.  And if Fortress didn't see value in the
8  IP so that it could realize a return, even in a
9  default scenario, would it ever have made this loan,
10 in your view?
11         MS. LAMARCA:  Objection.
12         THE WITNESS:  In my view, Fortress would
13 not have made the investment if we didn't see value
14 in the IP.
15 BY MR. COOPERSMITH:
16     Q.  I'd like to have you look at a new
17 exhibit?
18         MR. COOPERSMITH:  We'll mark this 192.
19         Tab 2, Ben.
20         (Whereupon, Defendant's Exhibit 192 was
21  marked for identification.)
22 BY MR. COOPERSMITH:
23     Q.  Okay.  So looking at this document, it's
24 Theranos Confidential Information Memorandum,
25 October 2017.

Page 32

1          Do you recall receiving this document
2  from Theranos around that time, October 2017?
3      A.  I do not recall receiving this specific
4  document at that time.
5      Q.  But do you recall receiving some
6  information from Theranos about the company and
7  about its assets and things like that?
8      A.  We did receive information from Theranos
9  about the company and its assets.
10     Q.  Okay.  How did you -- you or Fortress --
11 get introduced to Theranos in the first place?
12     A.  The company's counsel, Perkins Coie,
13 reached out and made the introduction.
14     Q.  And Theranos had retained Perkins Coie;
15 is that right?
16     A.  I don't know if they actually retained
17 Perkins Coie.  But somehow Perkins Coie was
18 involved with Theranos.
19     Q.  Okay.  And do you know anything about
20 Perkins Coie?  Have you worked with them before?
21     A.  I have worked with them before.
22     Q.  Did you know them to be a large,
23 well-regarded law firm here on the West Coast and
24 elsewhere?
25         MS. LAMARCA:  Objection.

Page 89

```
 1  the nature of the transaction between Theranos and
 2  Fortress?
 3       A.   That is my understanding.
 4            MS. DRAKE:  Objection.
 5            THE WITNESS:  That is my understanding.
 6  BY MR. COOPERSMITH:
 7       Q.   And Fortress is in business to make a
 8  profit.
 9            Is that a fair statement?
10            MS. DRAKE:  Objection.
11            THE WITNESS:  Fortress is in the
12  business of making a profit for its investors.
13  BY MR. COOPERSMITH:
14       Q.   And it's not like in any way a charitable
15  organization, anything like that, is it?
16            MS. DRAKE:  Objection.
17            THE WITNESS:  Not that I'm aware of.
18            MR. COOPERSMITH:  If we can take a
19  break, I just want to study my notes and see if I
20  have any other questions.  Okay?
21            THE VIDEOGRAPHER:  We are going off the
22  record.  The time is 11:17 a.m.
23            (Recess taken from 11:17 to 11:32.)
24            THE VIDEOGRAPHER:  We are back on the
25  record.  The time is 11:32 a.m.
```

Page 90

```
 1  BY MR. COOPERSMITH:
 2       Q.   So Mr. Levy, we're almost done, but I
 3  want to return to a subject of loan-to-value ratio
 4  and rates of return.
 5            So when, in general, Fortress invests in
 6  a company, either by equity or loan, is there a
 7  particular rate of return that Fortress is looking
 8  for?
 9       A.   It depends on the specific fund.  And
10  each fund has its own target rate of return.
11       Q.   Okay.  Which fund was used for Theranos?
12       A.   The one -- the one piece I know is the
13  Intellectual Property Finance Group fund --
14       Q.   Okay.  And?
15       A.   -- IP fund.
16       Q.   For that fund in general, what rate of
17  return is targeted?
18       A.   It's typically two to three -- for
19  the -- and this is the whole -- this is from a
20  portfolio approach, right?  So it's not -- this is
21  not deal specific.
22            The rate of return that we target for
23  the fund is two to three times the money invested
24  at a rate of return of about 25 percent.
25       Q.   And the rate of return could come from
```

Page 91

```
 1  either, in the case of a loan, a company paying back
 2  the loan or the collateral becoming the property of
 3  the fund, or Fortress.
 4            Is that fair?
 5       A.   The rate of return for any investment is
 6  calculated based on the amount invested and how
 7  much money was received.  And it's a mathematical
 8  calculation that takes time and consideration.
 9       Q.   But in doing a deal, like a loan
10  transaction, in looking at what the expected rate of
11  return will be for a particular deal, Fortress has
12  to take into account that the rate of return could
13  come from taking possession of the collateral and
14  monetizing it; is that correct?
15            MS. LAMARCA:  Objection.
16            THE WITNESS:  That is correct.  We
17  assess the potential of return of the collateral as
18  well.
19  BY MR. COOPERSMITH:
20       Q.   Okay.  So it doesn't -- in the case of a
21  loan transaction, the expected rate of return
22  doesn't necessarily have to come from the company
23  paying back the principal and interest as agreed in
24  the loan transaction?  It could also come from
25  Fortress taking possession of the collateral and
```

Page 92

```
 1  monetizing it?
 2            MS. LAMARCA:  Objection.
 3            THE WITNESS:  Yes.  It's one way that we
 4  can get our money back and some return.
 5  BY MR. COOPERSMITH:
 6       Q.   And that's something that is contemplated
 7  at the beginning of a deal in the case of a
 8  distressed company.
 9            Is that fair?
10            MS. DRAKE:  Objection.
11            THE WITNESS:  We look at a variety of
12  scenarios when we do the -- when we initiate a
13  deal, and one of them is in the downside scenario
14  when we have to foreclose on the assets.
15  BY MR. COOPERSMITH:
16       Q.   Okay.  And if the Fortress fund at issue
17  doesn't believe that it can reach the targeted rate
18  of return or close to it in the case of lending
19  money to a distressed company, it definitely
20  wouldn't do the deal in the first place.
21            Is that fair?
22            MS. LAMARCA:  Objection.
23            MS. DRAKE:  Objection.
24            THE WITNESS:  We will not do the deal
25  unless it meets certain return criteria.
```