# Exhibit T

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
                           ) File No. SF-04030-A
THERANOS, INC.             )

WITNESS:   Elizabeth Holmes

PAGES:     302 through 578

PLACE:     Securities and Exchange Commission

           44 Montgomery Street, Suite 2600

           San Francisco, CA  94104

DATE:      Thursday, July 13, 2017

   The above entitled matter came on for hearing, pursuant to notice, at 9:04 a.m.

Diversified Reporting Services, Inc.

(202) 467 9200

Page 347

1    Q   Background in statistics and data analysis?
2    A   Yeah.
3    Q   And you hired him for this position, correct?
4    A   No. We hired him many years before as a
5    scientist and promoted him up within our organization
6    over time.
7    Q   So you promoted him to this position?
8    A   We promoted him into product development, and
9    ultimately Sunny decided to make him a lab director.
10   Q   But here as we're looking, July 2013, he was in
11   the role to make this decision because of you, correct?
12   A   I mean, again, I was the CEO of the company, so
13   I take responsibility for this company. I did not place
14   Daniel in this role. I did not directly oversee the
15   labs, but I tried to pick people who I trusted to do this
16   right. And --
17   Q   So who was overseeing Mr. Young at this time?
18   A   To the extent that he was engaged in anything
19   in the clinical lab operations, Adam Rosendorff was the
20   ultimate decision maker at the time he became clinical
21   lab director. I don't know when that was. And Sunny was
22   overseeing anything associated with operations in the
23   laboratory.
24   Q   But I don't see Sunny or Mr. Rosendorff on this
25   e-mail.

Page 348

1    A   I don't know.
2        BY MS. CHAN:
3    Q   Why didn't you include them on the e-mail?
4    A   Again, I -- I -- it's July of 2013. I read
5    this as a technology demo that was done in an R & D
6    setting prior to the lab going live.
7        BY MR. KOLHATKAR:
8    Q   And, I guess, what's the -- what was the
9    difference in your mind between the importance of results
10   in an R & D setting versus the importance of the results
11   in a CLIA setting?
12   A   I understand the results to be important across
13   the board. I believe there was a different process in
14   place once the lab went live for how decisions like this
15   were made based on the authority and discretion of the
16   lab director.
17   Q   I -- did you communicate a distinction for --
18   to the Walgreens folks receiving these demonstrations
19   that, that Theranos didn't have those SOPs in place at
20   this time?
21   A   I don't know.
22   Q   Did you tell anyone at Theranos to communicate
23   that to these folks at Walgreens?
24   A   I believe that Walgreens understood the lab
25   wasn't ready to go live yet because we hadn't gone live,

Page 349

1    and they were pushing us really hard to go live as soon
2    as possible. So they certainly knew we weren't
3    operational at that time. I don't know what else was
4    discussed or what the circumstance of this demo or, I
5    mean, frankly, I don't even know if this was for
6    Walgreens. I defer to you if you're saying it was.
7        BY MS. CHAN:
8    Q   Well, why don't you take a look at the
9    attachments. So the attachments include lab reports for
10   Mia Scholz and Alan Nielsen.
11       Does that ring a bell to you? Do those two
12   names sound familiar to you?
13   A   I generally recognize Nielsen's name. I don't
14   recognize Scholz.
15   Q   Who is Alan Nielsen?
16   A   I don't know.
17   Q   You don't know whether he's a Walgreens
18   executive or not?
19   A   I'm -- I'm not sure. I think so, but I'm not
20   sure.
21   Q   So instead of removing the results entirely,
22   why didn't you just instruct Daniel Young and Daniel
23   Edlin to just include the results but maybe either
24   indicate that it's out of range or just indicate that
25   they needed to re-draw for those results? Why not go

Page 350

1    that route?
2    A   Again, I'm not a laboratory. And we thought
3    the right thing to do, I believe, if there was a result
4    that was incorrect was not share the value. We thought
5    that was -- that was not proper.
6    Q   But you -- you must have known that Walgreens
7    would want to know that all of the tests that they
8    were -- that were being performed would be performed
9    correctly.
10       So why wouldn't you want to be as transparent
11   as possible and let them know, actually, there were some
12   issues with, it looks like, at least six results? So
13   what's your answer to that?
14   A   Again, the lab was not even live at this point
15   in time. I don't think they even came in with specific
16   test orders. I think that the team was picking tests to
17   do and made the decision that if test results were wrong,
18   they shouldn't be reported. I don't know anything
19   further than that.
20   Q   But isn't another reason why you wouldn't want
21   to include any indication that there were questions about
22   the results that had you put something like an
23   out-of-range result or, you know, needs re-draw, that
24   that would raise questions with Walgreens?
25   A   I mean, I'm speculating, but my guess is that

Page 351

1  the bigger issue would be that if you potentially
2  communicated something that there might be a medical
3  issue with someone and there actually wasn't.
4      BY MR. FOLEY:
5      Q   You said this was for R & D purposes, right?
6      A   Yes.
7      Q   So no one was going to be relying on the
8  results of these tests anyway for medical treatment,
9  right?
10     A   Correct.
11     Q   So I guess why in an R & D setting would you
12 apply the protocols that are used for clinical lab
13 purposes?
14     A   We were trying to do the right thing.  We were
15 trying to report results that we believed in and not
16 report results if we thought there was any issue.  And if
17 there was an issue, we would need to understand why.  And
18 I believed that our team was trying to do the right
19 thing.
20     BY MR. KOLHATKAR:
21     Q   Is it fair to say that at this time Theranos
22 was trying to demonstrate to Walgreens that it was
23 technologically capable of running tests in a lab
24 setting?
25     A   I -- I don't know what the circumstances of

Page 352

1  this demo were, so I would be speculating on that.  I
2  know that we were very focused on showcasing the
3  fingerstick experience, on training their technicians, on
4  creating the front end.  We certainly had gone through
5  the CLIA certification process and were very focused on
6  trying to put the right infrastructure in place from the
7  CLIA perspective on an ongoing basis as we led up to
8  launch.
9      Q   Sure.  I guess, just more basically, I mean,
10 if -- was it your understanding that if Walgreens didn't
11 think that Theranos could run tests, it wouldn't -- it
12 wouldn't allow Theranos to open in its stores?
13     A   I mean, I don't know.  We would be speculating.
14 I know that ultimately, you know, we ended up with an
15 all-venipuncture model.  Had that -- you know, had we
16 talked about doing that at this point?  I don't know what
17 that conversation would have been.
18     Q   I guess, was it important to you in the summer
19 and fall of 2013 to demonstrate that Theranos could
20 perform clinical lab testing on blood samples to
21 Walgreens?
22     A   Of course.  Absolutely.
23     BY MS. CHAN:
24     Q   And so when did Theranos end up rolling its
25 services out with Walgreens?

Page 353

1      A   So I think the first patient in California was
2  in October of '15, and the first one in Arizona was
3  November -- I'm sorry -- of '13.  And the first one in
4  Arizona was in November of '13.
5      Q   Okay.  So at the time of this technology
6  demonstration, you're about three months away from going
7  live --
8      A   Yeah.
9      Q   -- in the patient setting?
10     Did it concern you that a number of tests
11 weren't working on Theranos' devices?
12     A   I know that we made mistakes in our clinical
13 lab, and I picked people who I trusted and believed in to
14 do the right thing here.  I believed that as issues were
15 raised, we were looking into them, doing root cause
16 analysis, and solving them.
17     I believed that when our lab director signed
18 off on validation reports, it meant that we were -- we
19 were in good shape.  And I know that we made so many
20 mistakes on this front, but we were trying to take this
21 forward and at that time thought that -- thought that we
22 were doing the right thing.
23     Q   Do you know if any of these issues were ever
24 resolved, that the Theranos device was unable to test for
25 creatinine and Vitamin D and TT4 and TT3 and fT4?

Page 354

1      Do you know if --
2      A   I believe that we -- some of those --
3      Q   -- all of those -- sorry.  Let me just finish
4  my question.
5      A   I'm sorry.  I'm sorry.
6      Q   Do you know if any of those issues were finally
7  resolved?
8      A   I believe that at least a number of these were
9  validated in the lab as LDTs later, yes.
10     BY MR. KOLHATKAR:
11     Q   On the TSPU?
12     A   I think so.  Some of them.
13     Q   Which ones?
14     A   I think Vitamin D was and I think some of the
15 thyroid markers.  I don't know which ones specifically.
16     BY MS. CHAN:
17     Q   So you'll see that -- you know, we looked at a
18 couple of reports that are attached to this e-mail.
19     A   Yeah.
20     Q   There are Ms. Scholz and Mr. Nielsen's reports.
21 And if you look in the -- if you look on 64613, which is
22 the first page of the e-mail, it looks like Daniel Edlin
23 is getting ready to send these reports out.
24     Did you ever tell Ms. Scholz and Mr. Nielsen
25 that a number of tests that were run on the blood samples

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:           )
                            )  File No. SF-04030-A
THERANOS, INC.              )

WITNESS:   Elizabeth Holmes

PAGES:     579 through 869

PLACE:     Securities and Exchange Commission

           44 Montgomery Street, Suite 2600

           San Francisco, CA  94104

DATE:      Wednesday, August 23, 2017

    The above entitled matter came on for hearing, pursuant to notice, at 9:13 a.m.

Diversified Reporting Services, Inc.

(202) 467 9200

Page 620

1  operationalized that in the lab.
2          Is that your testimony?
3      A   We'd developed multiple methods.
4          I believe by this point we'd operationalized
5  the menu that we thought would realize that, but we
6  never got the patient traffic that matched those
7  ordering patterns.
8      Q   And then Mr. Balwani then goes on to write at
9  8:58 -- so directly after that text message -- "In
10 parallels from today onwards, we need legal strategy to
11 deal with Courtney and Alberto aggressive, through
12 lawyers only."
13         Do you see that?
14     A   I do.
15     Q   Was Mr. Balwani referring here to Courtney
16 Lias and Alberto Gutierrez of the FDA?
17     A   I -- I don't know.  I can, sitting here now,
18 guess that Alberto means Alberto, but -- Gutierrez, but
19 I don't know.
20     Q   Did you view your interactions with the FDA as
21 aggressive?
22     A   You know, not up until this point.  During
23 this inspection, and after it, I think we made very
24 significant mistakes in how we interacted with them.
25         And I regret that deeply and have tried to

Page 621

1  change our entire legal infrastructure to do it the
2  right way.
3      Q   So back in September of 2015, did you agree
4  with Mr. Balwani that you need to engage on a legal
5  strategy to deal with the FDA aggressively?
6      A   I -- I don't know.
7          I know that we, from this point, did not deal
8  with the FDA the right way.  We made mistakes in how we
9  engaged with them.
10     Q   Did you have any conversations outside of
11 these text messages with Mr. Balwani about dealing with
12 FDA aggressively?
13     A   I -- I can't sit here now and remember
14 specific ones.
15         I remember, during this time, being really
16 upset that I thought we had been doing the right thing
17 in terms of how we were engaging with them and deferring
18 to others, including counsel, on things that I probably
19 shouldn't have in how we engaged with them.
20         And we didn't take a constructive approach,
21 and I think that really hurt us.
22     Q   What do you mean by you didn't take a
23 constructive approach?
24     A   We were -- we ended up being aggressive in our
25 responses.  And that was the wrong thing to do.

Page 622

1  BY MR. KOLHATKAR:
2      Q   So a minute ago, when you said sort of you'd
3  come to realize that Theranos made mistakes with -- in
4  connection with its interactions with the FDA, other
5  than sort of the aggressive responses, what -- what
6  mistakes are you referring to?
7      A   We had a team of people who believed that we
8  were properly operating with the systems as LDTs and
9  that the fact that they had not yet been documented
10 under the quality system was consistent with public
11 guidance on LDTs.
12         And instead of responding to the FDA coming in
13 and saying, "Okay, you have concerns, we'll do whatever
14 it takes to fix it" and -- and do what we've ultimately
15 done in terms of how we've responded to the lab and
16 responded to FDA, they fought -- they fought the agency,
17 right, and they told them they didn't have jurisdiction.
18         And that was completely the wrong approach.
19 BY MS. CHAN:
20     Q   Did you agree with your attorneys at the time
21 to fight with the agency?
22         (Simultaneous colloquy.)
23         MR. DAVIES:  I mean, look, we -- we're not --
24 so far, we haven't gone into the content of
25 conversations with counsel.  You're -- you're right at

Page 623

1  that line.
2          And asking whether she agreed with legal
3  advice is asking what the legal advice was.
4          So she's talked about approach and whether
5  the -- and -- and her reaction to the approach.  That
6  doesn't go into the content of the legal advice.
7          MR. KOLHATKAR:  I guess I wanted just one
8  clarification on the last answer, was when you referred
9  to just "a team," who did you mean by "the team"?  Maybe
10 that --
11         MR. DAVIES:  That's fine.
12         MR. KOLHATKAR:  -- that'll help clear it up.
13         THE WITNESS:  Yeah, it -- it was a team led
14 by -- by counsel.  I think we -- we were --
15         MR. NEAL:  Wait.  Hold on a second.  That was
16 a team led by counsel.
17         Going back to the -- it seems to me you
18 could -- if you want, you could ask whether she agreed
19 at the time with the -- with an aggressive approach or
20 didn't.
21         MR. DAVIES:  That's fine.
22         MR. NEAL:  Yeah.
23         THE WITNESS:  Yeah, I -- I deferred to it.
24         I didn't know what to do when FDA came in to
25 inspect.  I thought we'd been doing the right thing, and

Page 688

1  A  I don't think so.
2     BY MR. KOLHATKAR:
3  Q  Did you ever tell Mr. Parloff that Theranos
4  was using commercially available machines in any
5  capacity?
6  A  I believe we did.
7  Q  In what context?
8  A  Use of venous draws.
9  Q  The -- so what do you recall telling him?
10 A  I don't recall conversations about it.
11 Q  I guess -- well, what leads you -- what leads
12 you to the impression, then, that you told him about
13 Theranos's use of the commercially available machines?
14 A  Because we were very open about it.  At the
15 time, we thought that it was a feature to be able to do
16 both the fingerstick testing, as well as an end-to-end
17 menu, so patients didn't have to go to multiple
18 locations to get their full order done.
19 Q  So I understand your answer, you -- you think
20 the discussions around having a venous draw capability
21 is -- is what you would have disclosed to Mr. Parloff?
22 A  Yes.
23    At the time, we used the -- the word "venous
24 draw" to be synonymous with the use of commercial
25 analyzers.

Page 689

1  Q  Did you explain that to Mr. Parloff?
2  A  I don't know.
3     BY MS. CHAN:
4  Q  Did you tell Mr. Parloff that most of
5  Theranos's tests were run on commercially available
6  analyzers?
7  A  I -- I don't think so.
8  Q  Why not?
9  A  I don't think we talked about the breakdown of
10 what tests were run on what analyzer at all.
11 Q  Were you worried that if Mr. Parloff wrote an
12 article mentioning only Theranos's manufactured devices
13 that people would be given an inaccurate impression of
14 how Theranos was conducting its patient testing, that it
15 was using its Theranos-manufactured devices to conduct
16 that patient testing?
17 A  Not at the time.  Because at the time I
18 thought it was all about the aspiration and the vision.
19    Looking back at it now, I absolutely wish we
20 had handled our communications differently.
21    MR. NEAL:  It's been about an hour.  If you're
22 switching to something else, could we take a break?
23    MS. CHAN:  Sure, we can take a short break.
24    We are off the record at 11:30 a.m.
25    (A brief recess was taken.)

Page 690

1     (End DVD 2.)
2     MS. CHAN:  We're on the record at 11:45 a.m.
3     BY MS. CHAN:
4  Q  Ms. Holmes, did you have any substantive
5  conversations with the SEC staff during the break?
6  A  No.
7  Q  Thank you.
8     I'm going to hand to you what's previously
9  been marked Theranos Exhibit 248.
10    Have you seen Exhibit 248 before?
11    And just for the record, Exhibits 248 is a
12 document with Bates numbers starting TS-000613.
13 A  Not in this form, but I've seen the article.
14 Q  I'll represent to you that this is the copy of
15 the Fortune article that was included in Rupert
16 Murdoch's binder in the December 2014.
17    Were you aware that this article was included
18 in Mr. Murdoch's binder?
19 A  I am now.  I don't know at the time if I was.
20 Q  Were you aware that this article was included
21 in binders of materials that Theranos sent to other
22 investors?
23 A  I don't know.
24 Q  Did you ever ask for this article to be
25 included in investor binders?

Page 691

1  A  Not that I can remember.  I -- I don't know.
2  Q  So if you turn to the page with Bates number
3  ending 616, you'll see there's -- and there are two
4  columns on that page.  I'm looking at the second column
5  on the right side, second paragraph down.
6     It says:
7     "Theranos runs what's called a high-complexity
8  laboratory certified by the Federal Centers for Medicare
9  and Medicaid Services, CMS, and it is licensed to
10 operate in nearly every state.  It currently offers more
11 than 200, and is ramping up to offer more than 1,000, of
12 the most commonly ordered blood diagnostic tests, all
13 without the need for a syringe."
14    Is the statement that Theranos currently
15 offers more than 200, and is ramping up to offer more
16 than 1,000, of the most commonly ordered blood
17 diagnostic tests, all without the need for a syringe,
18 was that statement correct as of July 2014?
19 A  Reading it now, I don't think it is.
20 Q  Why not?
21 A  Because I've -- I've read Roger's follow-on
22 articles and how he interpreted it in the context of the
23 Wall Street Journal articles.  And it -- it's not
24 correct in that context.
25 Q  What are the current numbers of tests that

Page 696

1  blood that could come from a finger.
2      Q   Okay.
3          If you turn the page, then, to 618, on the
4  right-hand side of the column, four -- the fourth full
5  paragraph down, it starts, "Importantly."
6          Do you see that?
7          It says:
8          "Importantly, it's not just the blood draws
9  that are tiny, it's also the analytical systems Theranos
10 uses to perform the test. They take up a small fraction
11 of the footprint required by a conventional lab today."
12         Was this statement true in July 2014?
13     A   It's true as to the MiniLab systems that we
14 were using -- or the -- the prior version of the MiniLab
15 systems that we were using.
16     Q   Okay.
17         But it wasn't true as to the commercially
18 available machines that Theranos was using --
19     A   No.
20     Q   -- for patient testing?
21     A   Correct.
22     Q   Were you concerned after reading this that
23 people who were reading Mr. Parloff's article might
24 think that Theranos was only using its own devices to
25 perform patient testing?

Page 697

1      A   Again, we weren't concerned after reading
2  this. But later, in the context of looking back at it, I
3  wish that -- I wish that this had been done differently.
4      Q   Why weren't you concerned?
5      A   I think multiple reasons.
6          One, we were of the mindset that we were
7  talking about our vision and aspiration; two, we really
8  believed that we were farther along in executing it than
9  we were and really close to getting there; and three, we
10 were reading these statements in the context of our own
11 understanding of the technology and the conversations
12 we'd had with Roger and thinking about them as specific
13 to that.
14     Q   But this statement isn't aspirational, right?
15 It's talking about the analytical systems that Theranos
16 uses to perform tests.
17         So how is this statement accurate as of July
18 2014?
19     A   We were using earlier versions of MiniLabs to
20 perform some tests then, and it was --
21         (Interruption.)
22         (Reporter clarification.)
23         THE WITNESS:  -- of MiniLabs to perform some
24 tests then, and it was true about the MiniLab technology
25 family.

Page 698

1  You know, at the time this came out, we were
2  not -- I think I read it once.  We were not focused on
3  every sentence in the article.
4          BY MS. CHAN:
5      Q   But it seems -- it does seem incomplete to you
6  because it doesn't mention the other commercially
7  available machines that Theranos was using; is that
8  right?
9      A   Reading it now, I -- I would have communicated
10 differently with Roger to help him frame this in the
11 context of our Phase 1 and Phase 2 model.  And that's
12 not clear in this article, as clear as I -- I wish it
13 had been.
14     Q   At the time that you read it after it was
15 published, you thought it was clear?
16     A   At the time I read it after it was published,
17 I just remember thinking, this talks about our vision
18 well.
19     Q   So if you turn to 619, which is the next page,
20 third full paragraph down, it says, "Theranos, which
21 does not buy any analyzers from third parties, is
22 therefore in a unique position."
23         Was this statement true as of July 2014?
24     A   No.
25     Q   Why not?

Page 699

1      A   We were using analyzers from third parties.
2      Q   So were you worried about this statement when
3  it was published?
4      A   No.  I -- the first time that I paid attention
5  to this sentence was much later, in, I think, this year.
6      Q   And then a couple of paragraphs down from
7  that, there's a paragraph that starts, "Moreover."
8          Do you see that?
9      A   Yes.
10     Q   It says, "Moreover, Holmes stresses Theranos
11 is currently seeking FDA clearance for every one of its
12 tests, even though it's under no legal obligation to do
13 so."
14         Was this statement true as of July 2014?
15     A   My understanding of the sentence is that it's
16 talking about the fact that LDTs do not have to be
17 regulated by the FDA.
18         And so I believe so.
19     Q   Where does it say that LDTs do not have to be
20 regulated by the FDA?
21     A   I think it's the context of the last two
22 paragraphs, that if you make your own analyzers, then
23 they're LDTs, and that at that point in time there was
24 not a legal obligation for LDTs to be submitted to the
25 FDA.