FD-302 (Rev. 5-8-10)

 OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    01/28/2020

KENDRA FADIL (FADIL), previously interviewed, date of birth (DOB)
        home address                                                was
interviewed at her place of business, Sports Medicine Institute (SMI)
located at 260 Sheridan Avenue, Palo Alto, California. Also present for the
interview was Assistant United States Attorney Bob Leach. After being
advised of the identity of the interviewing parties and the nature of the
interview, FADIL provided the following information:

FADIL is an Orthopedic Massage Therapist and is not a Medical Doctor.
FADIL graduated from Loyola University with a Bachelors degree in Business
and Accounting. After graduating from college, FADIL went to work at Dean
Witter in New York before moving to San Francisco where she continued
working in finance. While in San Francisco, FADIL went to the World's
School of Massage and became a Certified Massage Therapist. FADIL's
husband, MARK FADIL, co-founded SMI in 1997, where FADIL started working in
1999. FADIL and MARK FADIL have three daughters who were 14, 12 and 6 years
old at the time of the interview.

FADIL had thought she signed a Non-Disclosure Agreement (NDA) with
ELIZABETH HOLMES (HOLMES), but she could not find a record of an NDA in her
files. FADIL thought it was possible HOLMES could have handed her a paper
copy and she just signed it and handed it back to her.

DON LUCAS (LUCAS) started as FADIL's client in 1999 and FADIL worked on
LUCAS three times a week for 15 years. LUCAS would talk to FADIL about what
he was investing in while she worked on him. LUCAS would teach FADIL about
business because he knew about her business background. LUCAS was a giving
person who liked to help people. LUCAS gave FADIL's two oldest daughters
shares of Theranos when they were born and also gave some shares to FADIL.
LUCAS had given shares of other companies to FADIL's daughters, but this was
the first company he also gave FADIL shares. LUCAS gave shares of companies

| Investigation on | 01/21/2020 | at | Palo Alto, California, United States (In Person) |
|---|---|---|---|

| File # | 318A-SF-7315857 | | Date drafted | 01/21/2020 |

by  Mario C. Scussel

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

US-REPORTS-0014694

318A-SF-7315857

Continuation of FD-302 of   (U) Interview of Kendra Fadil _____ , On   01/21/2020 , Page   2 of 6

to a lot of people including MELISSA FINDLEY (FINDLEY), LUCAS's assistant.
LUCAS did not have an email address so any email communication would go
through FINDLEY.  FADIL corresponded with FINDLEY in regards to the shares
of Theranos LUCAS had gifted to her and her family.  In receiving these
shares FADIL did not have any direct contact with anyone from Theranos.

FADIL first met HOLMES at LUCAS's home.  FADIL would also go to LUCAS's
investor meetings where HOLMES would present about Theranos.  HOLMES was the
only one from Theranos who would present at these meetings.  Some of the
investors in LUCAS's fund would complain that HOLMES did not provide them
enough information about the company.  This group of investors included
CHRIS LUCAS, LUCAS's nephew and a PAUL Last Name Unknown (LNU) from
Minnesota.  LUCAS would stick up for HOLMES and provide reasons why she was
not able to provide more details about the business.  The shareholders in
LUCAS's fund included a lot of his family.  KEN PREMINGER was LUCAS's
trainer, and FADIL thought he might have been part of LUCAS's Teton Fund,
which was LUCAS's friends and family fund.

BETH STERNBERG, a friend and client of FADIL's, was hired by Theranos as
an Executive Coach type in 2008.  STERNBERG said the culture and leadership
at Theranos was a disaster as HOLMES wanted control of everything and
refused to hire a Chief Financial Officer (CFO).

REBECCA WALKER (WALKER) had worked for FADIL at SMI, but then went to
work at Theranos as HOLMES's assistant.  HOLMES had called FADIL as a
reference for WALKER when she was applying for the job.  WALKER got the job,
but stopped working at THERANOS because she thought HOLMES was crazy.  FADIL
also knew a couple of HOLMES other assistants including CAROLYN BALKENHOL
and LISA DURKIN.

Prior to the point when HOLMES became a client, FADIL had spent some time
with HOLMES on a few occasions, to include a trip to Los Angeles in 2009 and
a trip to a museum in San Francisco in 2010.  LUCAS had heart surgery in Los
Angeles so FADIL went down to work on LUCAS after his surgery.  LUCAS had a
dinner afterwards for those who had come to help him, and HOLMES was at this
dinner.  HOLMES was always all business when she was talking with LUCAS.
Then the trip to San Francisco was to the DeYoung Museum where a piece of
art LUCAS had purchased was going to be displayed, so they made a trip up to
see it, and HOLMES was also present during this trip.

US-REPORTS-0014695

FD-302a (Rev. 5-8-10)

318A-SF-7315857

Continuation of FD-302 of  (U) Interview of Kendra Fadil                          , On  01/21/2020  , Page   3 of 6

 

In 2013, FADIL told LAURA ARRILLAGA-ANDREESSEN (ARRILLAGA-ANDREESSEN) about HOLMES because ARRILLAGA-ANDREESSEN was being interviewed by VOGUE as part of a story about influential women and FADIL thought they would be interested in HOLMES as well.  HOLMES and ARRILLAGA-ANDREESSEN then became friendly and would do things like go to yoga together.  FADIL did not think ARRILLAGA-ANDREESSEN invested in Theranos, as FADIL did not think she was given an opportunity to invest.

At the end of 2013 FADIL and her husband made their own investment in Theranos in the amount of $75,000, which was a large investment for them. Prior to making this investment FADIL thought she was corresponding with HOLMES.  However, it turned out she was corresponding with the general email for Theranos's Shareholder Information, but the emails appeared to be coming from HOLMES's email address.  HOLMES did later respond directly to FADIL and advised that the previous messages had not been from her.  Prior to making this investment, most of the information FADIL received about Theranos came from LUCAS.  From LUCAS, FADIL knew Theranos was working with the United States Military, and trying to get MiniLabs on military bases.  FADIL advised that prior to Theranos's relationship with Walgreens, which she was also aware of, they were supposed to have a business relationship with Safeway.  However, FADIL was not sure what ended up happening with Theranos's relationship with Safeway.  FADIL recalled HOLMES mentioning trying to do something with the Zika virus, possibly also in relation to the military, and also thought HOLMES said they were working with a local sports team.  FADIL and her husband did not subcribe to the Wall Street Journal. In addition to the information from LUCAS, the FADILS did read articles about Theranos prior to making their investment.

The FADILS decided to invest in Theranos based on a combination of what they had learned about Theranos, the company's valuation, and the knowledge that other big names were also investing so if these people were making an investment in Theranos then it must be a good investment.

After making her investment, HOLMES encouraged FADIL to get her blood tested at Theranos and invited her to come to the company to have it tested.  Theranos tried to schedule a time to have FADIL come in to have her blood tested, but she never ended up scheduling a time.  Instead FADIL ended up going to the Theranos Wellness Center at Walgreens in Palo Alto, California.  For this test FADIL's blood was taken using a venous blood

US-REPORTS-0014696

FD-302a (Rev. 5-8-10)

318A-SF-7315857

Continuation of FD-302 of (U) Interview of Kendra Fadil , On 01/21/2020 , Page 4 of 6

draw, not a finger-stick blood draw.  The test did not cost FADIL anything because it was covered by insurance.  FADIL received the results on an app on her phone about 10 minutes after she had her test done.  FADIL thought the app was pretty cool and told her Doctor about the experience.  FADIL's doctor subsequently started sending patients to Theranos.  FADIL compared her test results to a blood test she had done at Stanford and recalled the tests having similar results.  Months after she had the blood test at the Theranos Wellness Center, someone from Theranos contacted FADIL advising that they had seen she had gone in for the test, which FADIL thought was strange.  HOLMES asked FADIL about her testing experience and FADIL advised that she had a venous blood draw instead of a finger-stick.  HOLMES explained that the draw had to do with the certain tests and that was why she wanted her to come into Theranos to have her blood drawn.

When HOLMES started as a client of FADIL's in February 2014, FADIL saw HOLMES sporadically at first then more frequently.  FADIL would go to HOLMES's house on Park Lane in Atherton, California to work on her, usually early in the morning at 6:30 A.M.  When FADIL went to this address, she would notice SUNNY BALWANI's (BALWANI) Mazerati in the garage and would hear it leave shortly after she would start working on HOLMES.  FADIL was able to hear the car leave because it was so loud.  FADIL only went to the pool house at this address as this was where HOLMES had all of her stuff set up, including a massage table.  Later, FADIL also went to work on HOLMES at her house which was located off Page Mill Road.  HOLMES told FADIL she was locked into a three year lease at this residence.  HOLMES and FADIL did not talk much about Theranos when FADIL first started working on HOLMES, but HOLMES was always positive and excited about how things were going with the business.  HOLMES did not tell FADIL anything about BALWANI or her relationship with BALWANI.  FADIL never asked HOLMES about their relationship and she never heard HOLMES complain about BALWANI.

The only information FADIL had about HOLMES and BALWANI's relationship was from LUCAS.  LUCAS did not like BALWANI and questioned why he was there.  LUCAS knew the two were in a relationship and told FADIL that BALWANI had proposed to HOLMES at the beginning.

FADIL used to work on STEVE JOBS (JOBS), after HOLMES learned this she would ask FADIL a lot of questions about JOBS.

US-REPORTS-0014697

318A-SF-7315857

Continuation of FD-302 of   (U) Interview of Kendra Fadil _____ , On  01/21/2020 , Page   5 of 6

BALWANI was also a client at SMI, and SHANNON RISK was his Therapist. The only contact FADIL had with BALWANI was in regards to a couple of payments of his which did not go through.

When the first negative Wall Street Journal article came out about Theranos, someone emailed the article to FADIL. FADIL texted HOLMES about the article, and asked HOLMES about the articles and why she was not responding. HOLMES told FADIL that Quest was out to get her and her company. HOLMES said JOHN CARREYROU (CARREYROU) was trying to win a Pulitzer and had a vendetta against her and Theranos. HOLMES also said CARREYROU was getting a kickback from Quest. When asked why she was not responding, HOLMES told FADIL that the first time CARREYROU contacted her he asked "How many people she had slept with in order to get these patents." Accordingly, HOLMES told FADIL that she did not want to respond to someone who asked her such a question, which seemed reasonable to FADIL as it made CARREYROU sound like a dirtbag.

FADIL noticed HOLMES's voice would get deeper when she was talking about Theranos, and was noticeably different than when she was talking about personal things.

In 2016 Theranos sent a letter for all shareholders to sign. FADIL went to Theranos to speak with HOLMES about this letter. Later, FADIL also spoke with Theranos General Counsel, DAVID TAYLOR on the phone about this letter. FADIL recalled thinking HOLMES was accommodating in making time for the meeting considering she was a very busy person. FADIL went to Theranos to speak with HOLMES on October 24, 2016 and recorded their conversation on her phone. FADIL wanted to record the conversation because MARK FADIL could not be present for the meeting and she wanted to be able to remember what was said so she could relay the information to him correctly later. HOLMES was not aware FADIL recorded this conversation. FADIL had only played the recording of her conversation with HOLMES for MARK FADIL.

FADIL went to have this conversation with HOLMES because she wanted to get her money back and accordingly wanted to sell her shares. FADIL did not believe in the company anymore and she thought she was going to lose all of the money she invested. This conversation happened around the time Partner Fund Management (PFM) brought a lawsuit against Theranos. FADIL recalled that during her meeting with HOLMES, HOLMES kept saying they wanted to take

US-REPORTS-0014698

318A-SF-7315857

Continuation of FD-302 of  (U)  Interview of Kendra Fadil                                    , On  01/21/2020 , Page   6 of 6

care of the shareholders and they needed to focus on their vision and the
MiniLab.  When FADIL asked HOLMES about repurchasing her shares, HOLMES
advised that her hands were tied and she could not do anything at the time,
but said she would try to do something in the future, but also needed them
to sign the letter.

(Agent Note: At this time FADIL played the recording for AUSA Bob Leach and
SA Mario Scussel)

   As LUCAS's health started to deteriorate, FADIL would call CHRIS LUCAS
about Theranos. FADIL remained a cheerleader for Theranos until the end.
FADIL stopped defending HOLMES and Theranos when she saw footage on 60
Minutes.

   HOLMES never blamed BALWANI when speaking with FADIL.  FADIL thought
BALWANI had control over HOLMES, which was something she understood from her
conversations with LUCAS.

   CHRISTIAN HOLMES, HOLMES's brother, came in to SMI once to get worked
on.  HOLMES told FADIL that CHRISTIAN HOLMES was working for Theranos in
Washington, D.C. on the military stuff.  HOLMES's parents were both also
clients at SMI as was CHRISTIAN HOLMES's friend DAN EDLIN.

   NICOLE WATSON, a friend of FADIL, worked at SIEMENS and told FADIL she
was supposed to go there to do maintenance on the machines, but Theranos
would not let them in the door.

   DON FAUL (FAUL), who was prior military and had worked at Facebook,
interviewed at Theranos   FAUL was escorted out of the building during the
interview because he was asking too many questions about Theranos in trying
to understand the company.

   FADIL had heard a rumor about a relationship between HOLMES and DAVID
BOIES, as a friend had seen the two of them together in Las Vegas, Nevada.

   FADIL provided copies of the Theranos related documents she had in her
possession, these documents will be maintained in the 1A portion of the case
file.

US-REPORTS-0014699

Donald L. Lucas
3000 Sand Hill Road, #3-210
Menlo Park, CA  94025
(650) 854-4223

February 11, 2008

Mrs. Kendra Fadil
2005 Park Boulevard
Palo Alto, CA 94306

Dear Kendra,

On this day, I am making a gift of 1,000 shares of Theranos, Inc. Common Stock
to each of your daughters, Ella and Elise.  For your records, the purchase date of
the shares is May 9, 2006 and the cost basis is $0.15 per share.  The transfer is
in process and the shares will be delivered under separate cover.

Best regards,

Donald L. Lucas

US-REPORTS-0014700

SEE RESTRICTIVE LEGEND(S) ON REVERSE

**Number 76**

**\*1,000\* Shares**
**Common Stock**

THIS CERTIFIES THAT **\*ELLA FADIL\*** is the record holder of **One Thousand (1,000)** shares of Common Stock of

# THERANOS, INC.

### a Delaware corporation

transferable only on the records of the corporation upon surrender of this certificate, properly endorsed or assigned.

This certificate and the shares it represents are subject to the provisions of the Certificate of Incorporation and the Bylaws of the corporation, and any amendments thereto, as well as the restrictive legends on the back of this certificate. Upon request, stockholders may obtain free of charge from the corporation's principal office a statement describing the preferences, limitations and relative rights granted to or imposed upon each class or series of shares or upon the holders of such shares.

This corporation's duly authorized officers have signed this certificate as of this 11th day of February, 2009.

_____
Elizabeth Anne Holmes, Secretary

_____
Elizabeth Anne Holmes, President

GOES 748

LITHO IN U S

US-REPORTS-0014701

## INVESTMENT REPRESENTATIONS STATEMENT

THE COMPANY:        Theranos, Inc.

THE TRANSFEREE:      Ella Fadil

THE TRANSFEROR:      Donald L. Lucas, TTEE, Donald L. Lucas & Lygia S. Lucas Trust Dtd. 12-3-84

TYPE OF SECURITY:     Common Stock

AMOUNT:             1,000 Shares

      In connection with the acquisition of the Company's securities specified above (the "Securities"), the Transferee hereby represents to the Company as follows:

1. **Investment Intent.** The Transferee is acquiring the Securities solely for the Transferee's own account for investment purposes only and not with a view to, or for resale in connection with any "distribution" thereof as that term is used for purposes of the Securities Act of 1933 (the "Securities Act").

2. **Information About the Company.** The Transferee is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities.

3. **High Risk.** The Transferee realizes that investment in the Securities involves a high degree of risk. The Transferee is able to bear the risk of the investment, to hold the Securities for an indefinite period of time and to suffer a complete loss of the investment.

4. **Securities Not Registered.** The Transferee understands that the Securities have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein. In this connection, the Transferee understands that, in the view of the Securities and Exchange Commission (the "SEC"), the statutory basis for such exemption may be unavailable if the Transferee's representations were predicated solely upon a present intention to hold these Securities (i) for the minimum capital gains period specified under tax statutes, (ii) for a deferred sale, (iii) for or until an increase or decrease in the market price of the Securities, or (iv) for a period of one year or any other fixed period in the future.

5. **Restrictive Legend.** The Transferee understands and agrees that the Company shall cause the legends set forth below, to be placed upon any certificate(s) evidencing ownership of the Securities together with any other legends that may be required by the Company or by state or federal securities laws:

US-REPORTS-0014702

·THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.   SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD NOT TO EXCEED 180 DAYS FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT THE CONSENT OF THE COMPANY.

THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A AMENDED AND RESTATED VOTING AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING AGREEMENT.

6.  **Held Indefinitely**. The Transferee further understands that the Securities must be held indefinitely unless subsequently registered under the Securities Act or unless an exemption from registration is otherwise available.  Moreover, the Transferee understands that the Company is under no obligation to register the Securities except as may be provided by express written agreement.   In addition, the Transferee understands that the certificates(s) evidencing the Securities will be imprinted with a legend which prohibits the transfer of the Securities unless they are registered or such registration is not required in the opinion of counsel satisfactory to the Company.

7.  **Rule 144.** The Transferee is aware of the provisions of Rule 144, promulgated under the Securities Act, which in substance, permits limited public resale of "restricted securities" acquired in a transaction not involving a public offering subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public

US-REPORTS-0014703

that pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sale, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

11. **Address.** The address set forth below is the Transferee's true and correct principal address, and the Transferee has no present intention of becoming a resident of any other state or jurisdiction.

12. **Transferee Bound by the Obligation of Agreements.** By accepting the Securities transferred hereunder the Transferee agrees to be bound by the obligations with respect to the Company's Right of First Refusal and Restrictive Legends and Stop-Transfer Orders set forth in the exercise documents dated July 19, 2006 between the Company and Donald L. Lucas. Such obligations are attached hereto as Exhibit A. By accepting the Securities transferred hereunder, the Transferee agrees to be bound by the obligations of the Company's Amended and Restated Voting Agreement, dated October 13, 2006 and to which the Transferor is a party (the "Voting Agreement"), a copy of which is attached hereto as Exhibit B, as if the Transferee was a Voting Party (as defined in the Voting Agreement).

*[Remainder of Page Left Intentionally Blank]*

US-REPORTS-0014704

Executed as of _____, 2009

Signature of Transferee:

**Ella Fadil**

By: _Kendra Fadil_

Name: _Kendra Fadil_

Title: _mother_

US-REPORTS-0014705

## Exhibit A

### Sections 5 and 7 of the Exercise Documents
### dated July 19, 2006 between the Company and Donald L. Lucas

5.     Company's Right of First Refusal.  Before any Shares held by Optionee or any transferee (either being sometimes referred to herein as the *"Holder"*) may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section (the *"Right of First Refusal"*).

(a)     Notice of Proposed Transfer.  The Holder of the Shares shall deliver to the Company a written notice (the *"Notice"*) stating:  (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee (*"Proposed Transferee"*); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the *"Offered Price"*), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

(b)     Exercise of Right of First Refusal.  At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)     Purchase Price.  The purchase price (*"Purchase Price"*) for the Shares purchased by the Company or its assignee(s) under this Section shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)     Payment.  Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)     Holder's Right to Transfer.  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

C:\NrPortbl\PALIB2\JBM\4587437_1.DOC

US-REPORTS-0014706

(f)     Exception for Certain Family Transfers.  Anything to the contrary contained in this Section notwithstanding, the transfer of any or all of the Shares during the Optionee's lifetime or on the Optionee's death by will or intestacy to the Optionee's immediate family or a trust for the benefit of the Optionee's immediate family shall be exempt from the provisions of this Section. *"Immediate Family"* as used herein shall mean spouse, lineal descendant or antecedent, father, mother, brother or sister.  In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section, and there shall be no further transfer of such Shares except in accordance with the terms of this Section.

(g)     Termination of Right of First Refusal.  The Right of First Refusal shall terminate as to any Shares upon the earlier of (i) first sale of Common Stock of the Company to the general public, or (ii) a Change in Control in which the successor corporation has equity securities that are publicly traded.

7.     Restrictive Legends and Stop-Transfer Orders.

(a)     Legends.  Optionee understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.  SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD NOT TO EXCEED 180 DAYS FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT THE CONSENT OF THE COMPANY.

US-REPORTS-0014707

(b)     Stop-Transfer Notices.  Optionee agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)     Refusal to Transfer.  The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Exercise Notice or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d)     Successors and Assigns.  The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this Exercise Notice shall inure to the benefit of the successors and assigns of the Company.  Subject to the restrictions on transfer herein set forth, this Exercise Notice shall be binding upon Optionee and his or her heirs, executors, administrators, successors and assigns.

US-REPORTS-0014708

## Exhibit B

Amended and Restated Voting Agreement

C:\NrPortbl\PALIB2\JBM\4587437_1.DOC

US-REPORTS-0014709

# THERANOS, INC.

## AMENDED AND RESTATED VOTING AGREEMENT

This Amended and Restated Voting Agreement (this "**Agreement**") is made as of October 13, 2006 by and among Theranos, Inc., a Delaware corporation (the "**Company**"), the persons and entities listed on **Exhibit A** attached hereto (each a "**Series C Investor**," and collectively the "**Series C Investors**"), the persons and entities listed on **Exhibit B** attached hereto (each a "**Prior Investor**," and collectively the "**Prior Investors**"), the persons listed on **Exhibit C** hereto (the "**Founder**"), and the persons listed on **Exhibit D** hereto (each an "**Eligible Employee**"). The Series C Investors and the Prior Investors are referred to herein collectively as the "**Investors**." The Investors, the Founder and the Eligible Employees are referred to herein collectively as the "**Voting Parties**."

WHEREAS, the Company proposes to sell shares of the Company's Series C Preferred Stock to the Series C Investors pursuant to the Series C Preferred Stock Purchase Agreement (the "**Purchase Agreement**") of even date herewith (the "**Financing**");

WHEREAS, the Company's Amended and Restated Certificate of Incorporation (the "**Certificate**") provides that (i) so long as at least 1,241,135 shares of Series C Preferred Stock are outstanding, the holders of the Series C Preferred Stock, voting together as a single class, shall be entitled to elect one director of the Corporation (the "**Series C Director**"), (ii) so long as at least 3,791,408 shares of Series B Preferred Stock are outstanding, the holders of the Series B Preferred Stock, voting together as a single class, shall be entitled to elect one director of the Corporation (the "**Series B Director**"), (iii) the holders of the Common Stock, voting as a separate class shall be entitled to elect one director of the Corporation (the "**Common Director**"), and (iv) the holders of a majority of the voting power of the Preferred Stock and the Common Stock, voting together as a single class on an as converted to Common Stock basis, shall be entitled to elect up to four additional directors of the Corporation (the "**At-Large Directors**"); and

WHEREAS, as a condition to the Financing, the Voting Parties have agreed to enter into this Agreement;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, and other consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.     *Shares*. During the term of this Agreement, the Voting Parties each agree to vote all shares of the Company's voting securities now or hereafter owned by them, whether beneficially or otherwise, or as to which they have voting power (the "**Shares**") in accordance with the provisions of this Agreement.

US-REPORTS-0014710

2. ***Election of Boards of Directors***

(a) *Voting.* During the term of this Agreement, each Voting Party agrees to vote all Shares in such manner as may be necessary to elect (and maintain in office) as members of the Company's Board of Directors the following individuals:

(i) The one Series C Designee (as defined below) as the Series C Director;

(ii) The one Series B Designee (as defined below) as the Series B Director;

(iii) The one Common Designee (as defined below) as the Common Director; and

(iv) The four At-Large Designees (as defined below) as the At-Large Directors, one of which shall be the At-Large Founder Designee (if applicable) (as defined below).

(b) *Designation of Directors.* The designees to the Company's Board of Directors described above (each a "**Designee**") shall be selected as follows:

(i) So long as the ATA Ventures Investors, collectively, continue to hold at least 80% of the shares of Series C Preferred Stock purchased by the ATA Ventures Investors in the Financing (as such number of shares of capital stock may be adjusted for any stock splits, stock combinations, stock dividends or similar events), the Series C Director (the "**Series C Designee**") shall be the individual designated in writing by a majority in interest of the ATA Ventures Investors. The "**ATA Ventures Investors**" means, collectively, ATA Ventures I, L.P., ATA Affiliates Fund I, L.P., and ATA Investment Fund I, L.P.

(ii) So long as the DLL Investors, collectively, continue to hold at least 80% of the shares of Series B Preferred Stock purchased by the DLL Investors in the Series B Preferred Stock financing dated February 3, 2006 (as such number of shares of capital stock may be adjusted for any stock splits, stock combinations, stock dividends or similar events), the Series B Director (the "**Series B Designee**") shall be the individual designated in writing by a majority in interest of the DLL Investors. The "**DLL Investors**" means, collectively, Black Diamond Ventures XII, Cassin Family Trust, Cassin Family Partners, Dixon Doll, Lawrence J. Ellison, Kevin Gaunt, Donald L. Lucas, SUCC TEE; Donald L. Lucas Profit Sharing Trust dtd 1-1-84, Richard M. Lucas Foundation, Sand Hill Financial Company, Teton Capital Company and John Thompson.

(iii) The one "**Common Designee**" shall be elected by the holders of Common Stock;

(iv) The four "**At-Large Designees**" shall be elected by the holders of the Preferred Stock and Common Stock, voting together; *provided, however,* that (A) one of the At-Large Designees shall be Elizabeth Holmes so long as she holds at least 12,112,500 shares of the Company's Common Stock (as such number of shares of capital stock may be adjusted for any stock splits, stock combinations, stock dividends, or similar events) (the "**At-Large Founder Designee**"),

US-REPORTS-0014711

and (B) any other At-Large Designee shall be such person as is designated from time to time in a writing delivered to the Company by all of the then-current members of the Board of Directors.

(c)     *Current Designees.* The initial directors of the Company shall be: (i) Elizabeth Holmes as the At-Large Founder Designee, (ii) Channing Robertson as the Common Designee, (iii) Donald L. Lucas as the Series B Designee, (iv) Peter Thomas as the Series C Designee, and (v) Avadis Tevanian as an At-Large Designee. The two other At-Large Director positions shall initially be vacant. By signing this Agreement, each Voting Party is deemed, effective as of the Closing (as defined in Section 2.1(a) of the Purchase Agreement) to vote in favor of the election of Elizabeth Holmes and each such Designee.

(d)     *Changes in Designees.* From time to time during the term of this Agreement, Voting Parties who hold sufficient Shares to select a Designee pursuant to this Agreement may, in their sole discretion:

(i)     notify the Company in writing of an intention to remove from the Company's Board of Directors any incumbent Designee who occupies a Board seat for which such Voting Parties are entitled to designate the Designee; or

(ii)     notify the Company in writing of an intention to select a new Designee for election to a Board seat for which such Voting Parties are entitled to designate the Designee (whether to replace a prior Designee or to fill a vacancy in such Board seat).

In the event of such an initiation of a removal or selection of a Designee under this section, the Company shall take such reasonable actions as are necessary to facilitate such removals or elections, including, without limitation, soliciting the votes of the appropriate stockholders, and the Voting Parties shall vote their Shares to cause: (a) the removal from the Company's Board of Directors of the Designee or Designees so designated for removal; and (b) the election to the Company's Board Directors of any new Designee or Designees so designated.

3.     *Cumulative Voting.* In the event that any stockholder of the Company exercises its right to cumulate its votes in connection with any election of directors, the Voting Parties shall coordinate their voting to ensure that the maximum number of Designees is elected to the Board of Directors. In determining the maximum number of Designees which may be ensured election, the parties hereto shall assume that all outstanding Shares are voted and shall assume that any Shares held by persons who are not parties to this Agreement will vote their Shares for candidates other than the Designees. If less than all of the Designees can be assured election, then the priority given to the Series C Designee shall be determined by a majority in interest of the holders of Series C Preferred Stock, the priority given to the At-Large Designees shall be the At-Large Founder Designee (if applicable).

4.     *Termination.* This Agreement shall terminate upon the earlier of (i) the conversion of all outstanding shares of the Company's Preferred Stock into Common Stock; (ii) a Change of Control Transaction; or (iii) the agreement of (A) a majority-in-interest of the Founder and Eligible Employees, voting together, (B) a majority-in-interest of the Investors, acting separately, (C) the ATA Ventures Investors (but only for so long as the ATA Ventures Investors continue to hold the

US-REPORTS-0014712

minimum number of shares required under Section 2(b)(i) above necessary for them to have rights thereunder), and (D) the DLL Investors (but only for so long as the DLL Investors continue to hold the minimum number of shares required under Section 2(b)(ii) above necessary for them to have rights thereunder). **"Change of Control Transaction"** means either (a) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) that results in the voting securities of the Company outstanding immediately prior thereto failing to represent immediately after such transaction or series of transactions (either by remaining outstanding or by being converted into voting securities of the surviving entity or the entity that controls such surviving entity) a majority of the total voting power represented by the outstanding voting securities of the Company, such surviving entity or the entity that controls such surviving entity; or (b) a sale, lease or other conveyance of all or substantially all of the assets of the Company.

5.      ***Additional Shares.*** In the event that subsequent to the date of this Agreement any shares or other securities (other than pursuant to a Change of Control Transaction) are issued on, or in exchange for, any of the Shares by reason of any stock dividend, stock split, consolidation of shares, reclassification or consolidation involving the Company, such shares or securities shall be deemed to be Shares for purposes of this Agreement.

6.      ***Restrictive Legend.*** Each certificate representing any of the Shares subject to this Agreement shall be marked by the Company with a legend reading as follows:

> "THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A AMENDED AND RESTATED VOTING AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING AGREEMENT."

7.      ***Miscellaneous***

(a)      *Certain Definitions.* Shares **"held"** by a Voting Party shall mean any Shares directly or indirectly owned (of record or beneficially) by such Voting Party or as to which such Voting Party has voting power. **"Vote"** shall include any exercise of voting rights whether at an annual or special meeting or by written consent or in any other manner permitted by applicable law. A **"majority-in-interest"** of either (i) the Founder and Eligible Employees, or (ii) the Investors (each, a **"Group"**) shall mean the holders of a majority of the Common Stock (determined on an as-converted basis) then held by such Group.

(b)      *Notices.* All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and mailed, or delivered to each party as follows: (i) if to a Voting Party, at such Voting Party's address set forth in the Company's records, or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, at 1430 O'Brien Drive, Suite H, Menlo Park, California 94025, Phone: (650)

US-REPORTS-0014713

838-9292, Attn: Chief Executive Officer, or at such other address as the Company shall have furnished to the Voting Parties in writing, with copies to John V. Roos and Robert F. Kornegay, Wilson Sonsini Goodrich & Rosati, P.C., 650 Page Mill Road, Palo Alto, California 94304. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being deposited with an overnight courier service of recognized standing or (iv) four days after being deposited in the U.S. mail, first class with postage prepaid. In the event of any conflict between the Company's books and records and this Agreement or any notice delivered hereunder, the Company's books and records will control absent fraud or error.

(c) *Successors and Assigns.* The provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto. The Company shall not permit the transfer of any Shares on its books or issue a new certificate representing any Shares unless and until the person to whom such security is to be transferred shall have executed a written agreement pursuant to which such person becomes a party to this Agreement and agrees to be bound by all the provisions hereof as if such person was a Voting Party hereunder.

(d) *Governing Law.* This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

(e) *Titles and Subtitles.* The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

(f) *Further Assurances.* Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to effectuate the terms and conditions of this Agreement.

(g) *Entire Agreement.* This Agreement and the exhibits hereto constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and supercede any prior agreements or understandings with respect to the subject matter hereof.

(h) *No Grant of Proxy.* This Agreement does not grant any proxy and should not be interpreted as doing so. Nevertheless, should the provisions of this Agreement be construed to constitute the granting of proxies, such proxies shall be deemed coupled with an interest and are irrevocable for the term of this Agreement.

(i) *Not a Voting Trust.* This Agreement is not a voting trust governed by Section 218 of the Delaware General Corporation Law and should not be interpreted as such.

(j) *Specific Performance.* It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement by any party,

US-REPORTS-0014714

that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

(k)     *Amendment*. Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by (i) the Company, (ii) a majority-in-interest of the Founder and Eligible Employees, voting together, (iii) a majority-in-interest of Investors, (iv) a majority in interest of the ATA Ventures Investors (but only for so long as the ATA Ventures Investors continue to hold the minimum number of shares required under Section 2(b)(i) above necessary for them to have rights thereunder), and (v) a majority in interest of the DLL Investors (but only for so long as the DLL Investors continue to hold the minimum number of shares required under Section 2(b)(ii) above necessary for them to have rights thereunder); *provided, however*, that Series C Investors purchasing Shares under the Purchase Agreement after the Initial Closing (as defined in the Purchase Agreement) may become parties to this Agreement without any amendment of this Agreement pursuant to this paragraph or any consent or approval of any other Voting Party; and provided, further, that if any amendment, waiver, discharge or termination operates in a manner that treats any Eligible Employee or Investor different from other Eligible Employees or Investors, as the case may be, the consent of such Eligible Employee or Investor shall also be required for such amendment, waiver, discharge or termination. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each Voting Party that has entered into this voting agreement. Each Voting Party acknowledges that by the operation of this paragraph, the holders of a majority of the Shares held by the Founder and Eligible Employees, voting together, and the holders of a majority of the Shares held by the Investors will have the right and power to diminish or eliminate all rights of such Voting Party under this Agreement.

(l)     *No Waiver*. The failure or delay by a party to enforce any provision of this Agreement will not in any way be construed as a waiver of any such provision or prevent that party from thereafter enforcing any other provision of this Agreement. The rights granted both parties hereunder are cumulative and will not constitute a waiver of either party's right to assert any other legal remedy available to it.

(m)     *Severability*. If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

(n)     *Counterparts*. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages will be deemed binding originals.

US-REPORTS-0014715

(o)     *Aggregation.* All shares of Preferred Stock of the Company held or acquired by affiliated entities or persons of an Investor (including but not limited to: (i) a constituent partner or a retired partner of an Investor that is a partnership; (ii) a parent, subsidiary or other affiliate of an Investor that is a corporation; (iii) an immediate family member living in the same household, a descendant, or a trust therefore, in the case of an Investor who is an individual; or (iv) a member of an Investor that is a limited liability company) shall be aggregated together for the purpose of determining the availability of any rights under this Agreement which are triggered by the beneficial ownership of a threshold number of shares of the Company's capital stock.

(p)     *Prior Agreement Superseded.*     Pursuant to Section (k) of the Voting Agreement dated February 3, 2006 by and among the Company, the Prior Investors, the Founder and the Eligible Employee (the **"Prior Agreement"**), the undersigned parties who are parties to such Prior Agreement hereby amend and restate the Prior Agreement to read in its entirety as set forth in this Agreement, all with the intent and effect that the Prior Agreement shall be hereby be terminated and entirely replaced and superseded by this Agreement.

*(signature page follows)*

US-REPORTS-0014716

The parties have executed this Amended and Restated Voting Agreement as of the date first above written.

**THERANOS, INC.**
**a Delaware corporation**

_Signature of Authorized Signatory_

ELIZABETH HOLMES , PRESIDENT &CEO

_Name and Title of Authorized Signatory_

_[Signature Page to Amended and Restated Voting Agreement]_

US-REPORTS-0014717

SEE RESTRICTIVE LEGEND(S) ON REVERSE

**Number 77**

**\*1,000\* Shares**
**Common Stock**

THIS CERTIFIES THAT **\*ELISE FADIL\*** is the record holder of **One Thousand (1,000)** shares of Common Stock of

# THERANOS, INC.

### a Delaware corporation

transferable only on the records of the corporation upon surrender of this certificate, properly endorsed or assigned.

This certificate and the shares it represents are subject to the provisions of the Certificate of Incorporation and the Bylaws of the corporation, and any amendments thereto, as well as the restrictive legends on the back of this certificate. Upon request, stockholders may obtain free of charge from the corporation's principal office a statement describing the preferences, limitations and relative rights granted to or imposed upon each class or series of shares or upon the holders of such shares.

This corporation's duly authorized officers have signed this certificate as of this 11th day of February, 2009.

Elizabeth Anne Holmes, Secretary

Elizabeth Anne Holmes, President

GOES 748

LITHO IN U S

US-REPORTS-0014718

## INVESTMENT REPRESENTATIONS STATEMENT

THE COMPANY:         Theranos, Inc.

THE TRANSFEREE:     Elise Fadil

THE TRANSFEROR:     Donald L. Lucas, TTEE, Donald L. Lucas & Lygia S. Lucas Trust Dtd. 12-3-84

TYPE OF SECURITY:    Common Stock

AMOUNT:           1,000 Shares

In connection with the acquisition of the Company's securities specified above (the "Securities"), the Transferee hereby represents to the Company as follows:

1. **Investment Intent.** The Transferee is acquiring the Securities solely for the Transferee's own account for investment purposes only and not with a view to, or for resale in connection with any "distribution" thereof as that term is used for purposes of the Securities Act of 1933 (the "Securities Act").

2. **Information About the Company.** The Transferee is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities.

3. **High Risk.** The Transferee realizes that investment in the Securities involves a high degree of risk. The Transferee is able to bear the risk of the investment, to hold the Securities for an indefinite period of time and to suffer a complete loss of the investment.

4. **Securities Not Registered.** The Transferee understands that the Securities have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein. In this connection, the Transferee understands that, in the view of the Securities and Exchange Commission (the "SEC"), the statutory basis for such exemption may be unavailable if the Transferee's representations were predicated solely upon a present intention to hold these Securities (i) for the minimum capital gains period specified under tax statutes, (ii) for a deferred sale, (iii) for or until an increase or decrease in the market price of the Securities, or (iv) for a period of one year or any other fixed period in the future.

5. **Restrictive Legend.** The Transferee understands and agrees that the Company shall cause the legends set forth below, to be placed upon any certificate(s) evidencing ownership of the Securities together with any other legends that may be required by the Company or by state or federal securities laws:

C:\NrPortbl\PALIB2\JBM\4587439_1.DOC

US-REPORTS-0014719

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.   SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD NOT TO EXCEED 180 DAYS FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT THE CONSENT OF THE COMPANY.

THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A AMENDED AND RESTATED VOTING AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING AGREEMENT.

6. **Held Indefinitely**. The Transferee further understands that the Securities must be held indefinitely unless subsequently registered under the Securities Act or unless an exemption from registration is otherwise available.  Moreover, the Transferee understands that the Company is under no obligation to register the Securities except as may be provided by express written agreement.   In addition, the Transferee understands that the certificates(s) evidencing the Securities will be imprinted with a legend which prohibits the transfer of the Securities unless they are registered or such registration is not required in the opinion of counsel satisfactory to the Company.

7. **Rule 144.** The Transferee is aware of the provisions of Rule 144, promulgated under the Securities Act, which in substance, permits limited public resale of "restricted securities" acquired in a transaction not involving a public offering subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public

US-REPORTS-0014720

information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month period not exceeding specified limitations; the sale being effected through a "brokers' transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable.

8.  **Market Standoff Agreement**. The Transferee hereby agrees that such Transferee shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Common Stock (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Common Stock (or other securities) of the Company held by such Transferee (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed one hundred eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act.

    The Transferee agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto.  In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, such Transferee shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act.  The obligations described in this Section shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Securities and Exchange Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future.  The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said one hundred eighty (180) day period.  The Transferee agrees that any transferee of the Securities shall be bound by this Section.

9.  **No Public Market.** The Transferee further understands that at the time the Transferee wishes to sell the Securities, there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, the Transferee would be precluded from selling the Securities under Rule 144 even if the one-year minimum holding period were satisfied.

10. **Substantial Burden of Proof.** The Transferee further understands that, notwithstanding the fact that Rule 144 is not exclusive, the staff of the SEC has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise

US-REPORTS-0014721

that pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sale, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

11. **Address.** The address set forth below is the Transferee's true and correct principal address, and the Transferee has no present intention of becoming a resident of any other state or jurisdiction.

12. **Transferee Bound by the Obligation of Agreements.** By accepting the Securities transferred hereunder the Transferee agrees to be bound by the obligations with respect to the Company's Right of First Refusal and Restrictive Legends and Stop-Transfer Orders set forth in the exercise documents dated July 19, 2006 between the Company and Donald L. Lucas. Such obligations are attached hereto as Exhibit A. By accepting the Securities transferred hereunder, the Transferee agrees to be bound by the obligations of the Company's Amended and Restated Voting Agreement, dated October 13, 2006 and to which the Transferor is a party (the "Voting Agreement"), a copy of which is attached hereto as Exhibit B, as if the Transferee was a Voting Party (as defined in the Voting Agreement).

*[Remainder of Page Left Intentionally Blank]*

US-REPORTS-0014722

Executed as of _____, 2009

Signature of Transferee:

**Elise Fadil**

By: _Kendra Fadil_

Name: _Kendra Fadil_

Title: _Mother_

US-REPORTS-0014723

## Exhibit A

### Sections 5 and 7 of the Exercise Documents
### dated July 19, 2006 between the Company and Donald L. Lucas

5.     Company's Right of First Refusal.  Before any Shares held by Optionee or any transferee (either being sometimes referred to herein as the *"Holder"*) may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section (the *"Right of First Refusal"*).

(a)     Notice of Proposed Transfer.  The Holder of the Shares shall deliver to the Company a written notice (the *"Notice"*) stating:  (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee (*"Proposed Transferee"*); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the *"Offered Price"*), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

(b)     Exercise of Right of First Refusal.  At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)     Purchase Price.  The purchase price (*"Purchase Price"*) for the Shares purchased by the Company or its assignee(s) under this Section shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)     Payment.  Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)     Holder's Right to Transfer.  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

C:\NrPortbl\PALIB2\JBM\4587439_1.DOC

US-REPORTS-0014724

(f)     Exception for Certain Family Transfers.  Anything to the contrary contained in this Section notwithstanding, the transfer of any or all of the Shares during the Optionee's lifetime or on the Optionee's death by will or intestacy to the Optionee's immediate family or a trust for the benefit of the Optionee's immediate family shall be exempt from the provisions of this Section. *"Immediate Family"* as used herein shall mean spouse, lineal descendant or antecedent, father, mother, brother or sister.  In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section, and there shall be no further transfer of such Shares except in accordance with the terms of this Section.

(g)     Termination of Right of First Refusal.  The Right of First Refusal shall terminate as to any Shares upon the earlier of (i) first sale of Common Stock of the Company to the general public, or (ii) a Change in Control in which the successor corporation has equity securities that are publicly traded.

7.     Restrictive Legends and Stop-Transfer Orders.

(a)     Legends.  Optionee understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.  SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD NOT TO EXCEED 180 DAYS FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT THE CONSENT OF THE COMPANY.

US-REPORTS-0014725

(b)     <u>Stop-Transfer Notices</u>.  Optionee agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)     <u>Refusal to Transfer</u>.  The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Exercise Notice or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d)     <u>Successors and Assigns</u>.  The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this Exercise Notice shall inure to the benefit of the successors and assigns of the Company.  Subject to the restrictions on transfer herein set forth, this Exercise Notice shall be binding upon Optionee and his or her heirs, executors, administrators, successors and assigns.

US-REPORTS-0014726

## Exhibit B

### Amended and Restated Voting Agreement

C:\NrPortbl\PALIB2\JBM\4587439_1.DOC

US-REPORTS-0014727

# THERANOS, INC.

## AMENDED AND RESTATED VOTING AGREEMENT

This Amended and Restated Voting Agreement (this "**Agreement**") is made as of October 13, 2006 by and among Theranos, Inc., a Delaware corporation (the "**Company**"), the persons and entities listed on **Exhibit A** attached hereto (each a "**Series C Investor**," and collectively the "**Series C Investors**"), the persons and entities listed on **Exhibit B** attached hereto (each a "**Prior Investor**," and collectively the "**Prior Investors**"), the persons listed on **Exhibit C** hereto (the "**Founder**"), and the persons listed on **Exhibit D** hereto (each an "**Eligible Employee**"). The Series C Investors and the Prior Investors are referred to herein collectively as the "**Investors.**" The Investors, the Founder and the Eligible Employees are referred to herein collectively as the "**Voting Parties**."

WHEREAS, the Company proposes to sell shares of the Company's Series C Preferred Stock to the Series C Investors pursuant to the Series C Preferred Stock Purchase Agreement (the "**Purchase Agreement**") of even date herewith (the "**Financing**");

WHEREAS, the Company's Amended and Restated Certificate of Incorporation (the "**Certificate**") provides that (i) so long as at least 1,241,135 shares of Series C Preferred Stock are outstanding, the holders of the Series C Preferred Stock, voting together as a single class, shall be entitled to elect one director of the Corporation (the "**Series C Director**"), (ii) so long as at least 3,791,408 shares of Series B Preferred Stock are outstanding, the holders of the Series B Preferred Stock, voting together as a single class, shall be entitled to elect one director of the Corporation (the "**Series B Director**"), (iii) the holders of the Common Stock, voting as a separate class shall be entitled to elect one director of the Corporation (the "**Common Director**"), and (iv) the holders of a majority of the voting power of the Preferred Stock and the Common Stock, voting together as a single class on an as converted to Common Stock basis, shall be entitled to elect up to four additional directors of the Corporation (the "**At-Large Directors**"); and

WHEREAS, as a condition to the Financing, the Voting Parties have agreed to enter into this Agreement;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, and other consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

1.      *Shares.* During the term of this Agreement, the Voting Parties each agree to vote all shares of the Company's voting securities now or hereafter owned by them, whether beneficially or otherwise, or as to which they have voting power (the "**Shares**") in accordance with the provisions of this Agreement.

US-REPORTS-0014728

2.    ***Election of Boards of Directors***

(a)    *Voting.* During the term of this Agreement, each Voting Party agrees to vote all Shares in such manner as may be necessary to elect (and maintain in office) as members of the Company's Board of Directors the following individuals:

(i)    The one Series C Designee (as defined below) as the Series C Director;

(ii)    The one Series B Designee (as defined below) as the Series B Director;

(iii)    The one Common Designee (as defined below) as the Common Director; and

(iv)    The four At-Large Designees (as defined below) as the At-Large Directors, one of which shall be the At-Large Founder Designee (if applicable) (as defined below).

(b)    *Designation of Directors.* The designees to the Company's Board of Directors described above (each a "**Designee**") shall be selected as follows:

(i)    So long as the ATA Ventures Investors, collectively, continue to hold at least 80% of the shares of Series C Preferred Stock purchased by the ATA Ventures Investors in the Financing (as such number of shares of capital stock may be adjusted for any stock splits, stock combinations, stock dividends or similar events), the Series C Director (the "**Series C Designee**") shall be the individual designated in writing by a majority in interest of the ATA Ventures Investors. The "**ATA Ventures Investors**" means, collectively, ATA Ventures I, L.P., ATA Affiliates Fund I, L.P., and ATA Investment Fund I, L.P.

(ii)    So long as the DLL Investors, collectively, continue to hold at least 80% of the shares of Series B Preferred Stock purchased by the DLL Investors in the Series B Preferred Stock financing dated February 3, 2006 (as such number of shares of capital stock may be adjusted for any stock splits, stock combinations, stock dividends or similar events), the Series B Director (the "**Series B Designee**") shall be the individual designated in writing by a majority in interest of the DLL Investors. The "**DLL Investors**" means, collectively, Black Diamond Ventures XII, Cassin Family Trust, Cassin Family Partners, Dixon Doll, Lawrence J. Ellison, Kevin Gaunt, Donald L. Lucas, SUCC TEE; Donald L. Lucas Profit Sharing Trust dtd 1-1-84, Richard M. Lucas Foundation, Sand Hill Financial Company, Teton Capital Company and John Thompson.

(iii)    The one "**Common Designee**" shall be elected by the holders of Common Stock;

(iv)    The four "**At-Large Designees**" shall be elected by the holders of the Preferred Stock and Common Stock, voting together; *provided, however,* that (A) one of the At-Large Designees shall be Elizabeth Holmes so long as she holds at least 12,112,500 shares of the Company's Common Stock (as such number of shares of capital stock may be adjusted for any stock splits, stock combinations, stock dividends, or similar events) (the "**At-Large Founder Designee**"),

US-REPORTS-0014729

and (B) any other At-Large Designee shall be such person as is designated from time to time in a writing delivered to the Company by all of the then-current members of the Board of Directors.

(c)     *Current Designees*. The initial directors of the Company shall be: (i) Elizabeth Holmes as the At-Large Founder Designee, (ii) Channing Robertson as the Common Designee, (iii) Donald L. Lucas as the Series B Designee, (iv) Peter Thomas as the Series C Designee, and (v) Avadis Tevanian as an At-Large Designee. The two other At-Large Director positions shall initially be vacant. By signing this Agreement, each Voting Party is deemed, effective as of the Closing (as defined in Section 2.1(a) of the Purchase Agreement) to vote in favor of the election of Elizabeth Holmes and each such Designee.

(d)     *Changes in Designees*. From time to time during the term of this Agreement, Voting Parties who hold sufficient Shares to select a Designee pursuant to this Agreement may, in their sole discretion:

(i)     notify the Company in writing of an intention to remove from the Company's Board of Directors any incumbent Designee who occupies a Board seat for which such Voting Parties are entitled to designate the Designee; or

(ii)     notify the Company in writing of an intention to select a new Designee for election to a Board seat for which such Voting Parties are entitled to designate the Designee (whether to replace a prior Designee or to fill a vacancy in such Board seat).

In the event of such an initiation of a removal or selection of a Designee under this section, the Company shall take such reasonable actions as are necessary to facilitate such removals or elections, including, without limitation, soliciting the votes of the appropriate stockholders, and the Voting Parties shall vote their Shares to cause: (a) the removal from the Company's Board of Directors of the Designee or Designees so designated for removal; and (b) the election to the Company's Board Directors of any new Designee or Designees so designated.

3.     *Cumulative Voting*. In the event that any stockholder of the Company exercises its right to cumulate its votes in connection with any election of directors, the Voting Parties shall coordinate their voting to ensure that the maximum number of Designees is elected to the Board of Directors. In determining the maximum number of Designees which may be ensured election, the parties hereto shall assume that all outstanding Shares are voted and shall assume that any Shares held by persons who are not parties to this Agreement will vote their Shares for candidates other than the Designees. If less than all of the Designees can be assured election, then the priority given to the Series C Designee shall be determined by a majority in interest of the holders of Series C Preferred Stock, the priority given to the At-Large Designees shall be the At-Large Founder Designee (if applicable).

4.     *Termination*. This Agreement shall terminate upon the earlier of (i) the conversion of all outstanding shares of the Company's Preferred Stock into Common Stock; (ii) a Change of Control Transaction; or (iii) the agreement of (A) a majority-in-interest of the Founder and Eligible Employees, voting together, (B) a majority-in-interest of the Investors, acting separately, (C) the ATA Ventures Investors (but only for so long as the ATA Ventures Investors continue to hold the

US-REPORTS-0014730

minimum number of shares required under Section 2(b)(i) above necessary for them to have rights thereunder), and (D) the DLL Investors (but only for so long as the DLL Investors continue to hold the minimum number of shares required under Section 2(b)(ii) above necessary for them to have rights thereunder). "**Change of Control Transaction**" means either (a) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is party (including, without limitation, any stock acquisition, reorganization, merger or consolidation but excluding any sale of stock for capital raising purposes) that results in the voting securities of the Company outstanding immediately prior thereto failing to represent immediately after such transaction or series of transactions (either by remaining outstanding or by being converted into voting securities of the surviving entity or the entity that controls such surviving entity) a majority of the total voting power represented by the outstanding voting securities of the Company, such surviving entity or the entity that controls such surviving entity; or (b) a sale, lease or other conveyance of all or substantially all of the assets of the Company.

5.     *Additional Shares.* In the event that subsequent to the date of this Agreement any shares or other securities (other than pursuant to a Change of Control Transaction) are issued on, or in exchange for, any of the Shares by reason of any stock dividend, stock split, consolidation of shares, reclassification or consolidation involving the Company, such shares or securities shall be deemed to be Shares for purposes of this Agreement.

6.     *Restrictive Legend.* Each certificate representing any of the Shares subject to this Agreement shall be marked by the Company with a legend reading as follows:

> "THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A AMENDED AND RESTATED VOTING AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING AGREEMENT."

7.     *Miscellaneous*

(a)     *Certain Definitions.* Shares "**held**" by a Voting Party shall mean any Shares directly or indirectly owned (of record or beneficially) by such Voting Party or as to which such Voting Party has voting power. "**Vote**" shall include any exercise of voting rights whether at an annual or special meeting or by written consent or in any other manner permitted by applicable law. A "**majority-in-interest**" of either (i) the Founder and Eligible Employees, or (ii) the Investors (each, a "**Group**") shall mean the holders of a majority of the Common Stock (determined on an as-converted basis) then held by such Group.

(b)     *Notices.* All notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and mailed, or delivered to each party as follows: (i) if to a Voting Party, at such Voting Party's address set forth in the Company's records, or at such other address as such Investor shall have furnished the Company in writing, or (ii) if to the Company, at 1430 O'Brien Drive, Suite H, Menlo Park, California 94025, Phone: (650)

US-REPORTS-0014731

838-9292, Attn: Chief Executive Officer, or at such other address as the Company shall have furnished to the Voting Parties in writing, with copies to John V. Roos and Robert F. Kornegay, Wilson Sonsini Goodrich & Rosati, P.C., 650 Page Mill Road, Palo Alto, California 94304. All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally, (iii) one business day after being deposited with an overnight courier service of recognized standing or (iv) four days after being deposited in the U.S. mail, first class with postage prepaid. In the event of any conflict between the Company's books and records and this Agreement or any notice delivered hereunder, the Company's books and records will control absent fraud or error.

(c)     *Successors and Assigns.* The provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto. The Company shall not permit the transfer of any Shares on its books or issue a new certificate representing any Shares unless and until the person to whom such security is to be transferred shall have executed a written agreement pursuant to which such person becomes a party to this Agreement and agrees to be bound by all the provisions hereof as if such person was a Voting Party hereunder.

(d)     *Governing Law.* This Agreement shall be governed in all respects by the internal laws of the State of Delaware as applied to agreements entered into among Delaware residents to be performed entirely within Delaware, without regard to principles of conflicts of law.

(e)     *Titles and Subtitles.* The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

(f)     *Further Assurances.* Each party hereto agrees to execute and deliver, by the proper exercise of its corporate, limited liability company, partnership or other powers, all such other and additional instruments and documents and do all such other acts and things as may be necessary to effectuate the terms and conditions of this Agreement.

(g)     *Entire Agreement.* This Agreement and the exhibits hereto constitute the full and entire understanding and agreement among the parties with regard to the subjects hereof and supercede any prior agreements or understandings with respect to the subject matter hereof.

(h)     *No Grant of Proxy.* This Agreement does not grant any proxy and should not be interpreted as doing so. Nevertheless, should the provisions of this Agreement be construed to constitute the granting of proxies, such proxies shall be deemed coupled with an interest and are irrevocable for the term of this Agreement.

(i)     *Not a Voting Trust.* This Agreement is not a voting trust governed by Section 218 of the Delaware General Corporation Law and should not be interpreted as such.

(j)     *Specific Performance.* It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement by any party,

US-REPORTS-0014732

Number 152                                                    *2.500* Shares
                                                              Common Stock

        THIS CERTIFIES THAT **Elise Fadil*** is the record holder of ***Two Thousand Five Hundred (2.500)*** shares
of Common Stock of

# THERANOS, INC.

### a Delaware corporation

transferable only on the records of the corporation upon surrender of this certificate, properly endorsed or assigned.

        This certificate and the shares it represents are subject to the provisions of the Certificate of Incorporation and
the Bylaws of the corporation, and any amendments thereto, as well as the restrictive legends on the back of this
certificate.  Upon request, stockholders may obtain free of charge from the corporation's principal office a statement
describing the preferences, limitations and relative rights granted to or imposed upon each class or series of shares or
upon the holders of such shares.

        The shares represented by this certificate are deemed issued effective **July 1, 2009**.  This corporation's duly
authorized officers have signed this certificate as of **31** day of August, 2009.

Elizabeth Anne Holmes, Secretary                        Elizabeth Anne Holmes, President

GOES-746                                                              LITHO NU A

## INVESTMENT REPRESENTATIONS STATEMENT

THE COMPANY:            Theranos, Inc.

THE TRANSFEREE:         Elise Fadil

THE TRANSFEROR:         Donald L. Lucas

TYPE OF SECURITY:       Common Stock

AMOUNT:                 2,500 Shares

In connection with the acquisition of the Company's securities specified above (the "Securities"), the Transferee hereby represents to the Company as follows:

1. **Investment Intent.** The Transferee is acquiring the Securities solely for the Transferee's own account for investment purposes only and not with a view to, or for resale in connection with any "distribution" thereof as that term is used for purposes of the Securities Act of 1933 (the "Securities Act").

2. **Information About the Company.** The Transferee is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities.

3. **High Risk.** The Transferee realizes that investment in the Securities involves a high degree of risk. The Transferee is able to bear the risk of the investment, to hold the Securities for an indefinite period of time and to suffer a complete loss of the investment.

4. **Securities Not Registered.** The Transferee understands that the Securities have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein. In this connection, the Transferee understands that, in the view of the Securities and Exchange Commission (the "SEC"), the statutory basis for such exemption may be unavailable if the Transferee's representations were predicated solely upon a present intention to hold these Securities (i) for the minimum capital gains period specified under tax statutes, (ii) for a deferred sale, (iii) for or until an increase or decrease in the market price of the Securities, or (iv) for a period of one year or any other fixed period in the future.

5. **Restrictive Legend.** The Transferee understands and agrees that the Company shall cause the legends set forth below, to be placed upon any certificate(s) evidencing ownership of the Securities together with any other legends that may be required by the Company or by state or federal securities laws:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND

US-REPORTS-0014741

## Exhibit A

### Sections 5 and 7 of the Exercise Documents
### dated December 23, 2008 between the Company and Donald L. Lucas

5.      Company's Right of First Refusal.  Before any Shares held by Optionee or any transferee (either being sometimes referred to herein as the *"Holder"*) may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section (the *"Right of First Refusal"*).

(a)      Notice of Proposed Transfer.  The Holder of the Shares shall deliver to the Company a written notice (the *"Notice"*) stating:  (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee (*"Proposed Transferee"*); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the *"Offered Price"*), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

(b)      Exercise of Right of First Refusal.  At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)      Purchase Price.  The purchase price (*"Purchase Price"*) for the Shares purchased by the Company or its assignee(s) under this Section shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)      Payment.  Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)      Holder's Right to Transfer.  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

C:\NrPortbl\PALIB2\DLS\4778785_1.DOC

US-REPORTS-0014742

MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.   SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD NOT TO EXCEED 180 DAYS FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT THE CONSENT OF THE COMPANY.

THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A AMENDED AND RESTATED VOTING AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING AGREEMENT.

6. **Held Indefinitely**. The Transferee further understands that the Securities must be held indefinitely unless subsequently registered under the Securities Act or unless an exemption from registration is otherwise available. Moreover, the Transferee understands that the Company is under no obligation to register the Securities except as may be provided by express written agreement.   In addition, the Transferee understands that the certificates(s) evidencing the Securities will be imprinted with a legend which prohibits the transfer of the Securities unless they are registered or such registration is not required in the opinion of counsel satisfactory to the Company.

7. **Rule 144.** The Transferee is aware of the provisions of Rule 144, promulgated under the Securities Act, which in substance, permits limited public resale of "restricted securities" acquired in a transaction not involving a public offering subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any

US-REPORTS-0014743

three-month period not exceeding specified limitations; the sale being effected through a "brokers' transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable.

8. **Market Standoff Agreement**. The Transferee hereby agrees that such Transferee shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Common Stock (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Common Stock (or other securities) of the Company held by such Transferee (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed one hundred eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act.

The Transferee agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, such Transferee shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act. The obligations described in this Section shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Securities and Exchange Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said one hundred eighty (180) day period. The Transferee agrees that any transferee of the Securities shall be bound by this Section.

9. **No Public Market**. The Transferee further understands that at the time the Transferee wishes to sell the Securities, there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, the Transferee would be precluded from selling the Securities under Rule 144 even if the one-year minimum holding period were satisfied.

10. **Substantial Burden of Proof**. The Transferee further understands that, notwithstanding the fact that Rule 144 is not exclusive, the staff of the SEC has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise that pursuant to Rule 144 will have a substantial burden of proof in establishing that an

US-REPORTS-0014744

exemption from registration is available for such offers or sale, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

11. **Address.** The address set forth below is the Transferee's true and correct principal address, and the Transferee has no present intention of becoming a resident of any other state or jurisdiction.

12. **Transferee Bound by the Obligation of Agreements.** By accepting the Securities transferred hereunder the Transferee agrees to be bound by the obligations with respect to the Company's Right of First Refusal and Restrictive Legends and Stop-Transfer Orders set forth in the exercise documents dated December 23, 2008 between the Company and Donald L. Lucas. Such obligations are attached hereto as Exhibit A. By accepting the Securities transferred hereunder, the Transferee agrees to be bound by the obligations of the Company's Amended and Restated Voting Agreement, dated October 13, 2006 and to which the Transferor is a party (the "Voting Agreement"), a copy of which is attached hereto as Exhibit B, as if the Transferee was a Voting Party (as defined in the Voting Agreement).

*[Remainder of Page Left Intentionally Blank]*

US-REPORTS-0014745

Executed as of _____, 2009

Signature of Transferee:

**Elise Fadil**

By: _Kendra Fadil_

Name: _Kendra Fadil_

Title: _Mother to Elise Fadil_

C:\NrPortbl\PALIB2\DLS\4778785_1.DOC

US-REPORTS-0014746

Donald L. Lucas
3000 Sand Hill Road, #3-210
Menlo Park, CA  94025
(650) 854-4223

August 20, 2009

Mrs. Kendra Fadil
2005 Park Boulevard
Palo Alto, CA 94306

Dear Kendra,

On this day, I am making a gift of 1,000 shares of Theranos, Inc. Common Stock
to you.  For your records, the purchase date of the shares is December 23, 2008
and the cost basis is $0.36 per share.  The transfer is in process and the shares
will be delivered under separate cover.

Best regards,

Donald L. Lucas

US-REPORTS-0014747

SEE RESTRICTIVE LEGEND(S) ON REVERSE

**Number 189**

**\*1,000\* Shares**
**Common Stock**

THIS CERTIFIES THAT **\*Kendra Fadil\*** is the record holder of **\*One Thousand (1,000)\*** shares of Common Stock of

# THERANOS, INC.

### a Delaware corporation

transferable only on the records of the corporation upon surrender of this certificate, properly endorsed or assigned.

This certificate and the shares it represents are subject to the provisions of the Certificate of Incorporation and the Bylaws of the corporation, and any amendments thereto, as well as the restrictive legends on the back of this certificate. Upon request, stockholders may obtain free of charge from the corporation's principal office a statement describing the preferences, limitations and relative rights granted to or imposed upon each class or series of shares or upon the holders of such shares.

The shares represented by this certificate are deemed issued effective **August 20, 2009**. This corporation's duly authorized officers have signed this certificate as of 10th day of May , 2010.

_____
Elizabeth Anne Holmes, Secretary

_____
Elizabeth Anne Holmes, President

GOES 748

LITHO IN U.S.A

US-REPORTS-0014748

## INVESTMENT REPRESENTATIONS STATEMENT

THE COMPANY:         Theranos, Inc.

THE TRANSFEREE:      Kendra Fadil

THE TRANSFEROR:      Donald L. Lucas, TTEE Donald L. Lucas & Lygia S. Lucas Trust DTD
                     12-3-84

TYPE OF SECURITY:    Common Stock

AMOUNT:              1,000 Shares

     In connection with the acquisition of the Company's securities specified above (the "Securities"), the Transferee hereby represents to the Company as follows:

1. **Investment Intent.** The Transferee is acquiring the Securities solely for the Transferee's own account for investment purposes only and not with a view to, or for resale in connection with any "distribution" thereof as that term is used for purposes of the Securities Act of 1933 (the "Securities Act").

2. **Information About the Company.** The Transferee is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities.

3. **High Risk.** The Transferee realizes that investment in the Securities involves a high degree of risk. The Transferee is able to bear the risk of the investment, to hold the Securities for an indefinite period of time and to suffer a complete loss of the investment.

4. **Securities Not Registered.** The Transferee understands that the Securities have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein. In this connection, the Transferee understands that, in the view of the Securities and Exchange Commission (the "SEC"), the statutory basis for such exemption may be unavailable if the Transferee's representations were predicated solely upon a present intention to hold these Securities (i) for the minimum capital gains period specified under tax statutes, (ii) for a deferred sale, (iii) for or until an increase or decrease in the market price of the Securities, or (iv) for a period of one year or any other fixed period in the future.

5. **Restrictive Legend.** The Transferee understands and agrees that the Company shall cause the legends set forth below, to be placed upon any certificate(s) evidencing ownership of the Securities together with any other legends that may be required by the Company or by state or federal securities laws:

US-REPORTS-0014749

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN
REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND
MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED,
PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED
UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY
TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR
TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE
THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO
CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST
REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN
THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL
HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED
AT THE PRINCIPAL OFFICE OF THE ISSUER.   SUCH TRANSFER
RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON
TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO
RESTRICTIONS ON TRANSFER FOR A PERIOD NOT TO EXCEED 180
DAYS FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN
PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT
BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT
THE CONSENT OF THE COMPANY.

THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A AMENDED
AND RESTATED VOTING AGREEMENT (A COPY OF WHICH MAY BE
OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN
SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE
DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE
PROVISIONS OF SAID VOTING AGREEMENT.

6. **Held Indefinitely**. The Transferee further understands that the Securities must be held
indefinitely unless subsequently registered under the Securities Act or unless an exemption from
registration is otherwise available.  Moreover, the Transferee understands that the Company is
under no obligation to register the Securities except as may be provided by express written
agreement.   In addition, the Transferee understands that the certificates(s) evidencing the
Securities will be imprinted with a legend which prohibits the transfer of the Securities unless
they are registered or such registration is not required in the opinion of counsel satisfactory to the
Company.

7. **Rule 144.** The Transferee is aware of the provisions of Rule 144, promulgated under the
Securities Act, which in substance, permits limited public resale of "restricted securities"
acquired in a transaction not involving a public offering subject to the satisfaction of certain
conditions, which may include, among other things, the availability of certain current public

US-REPORTS-0014750

information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month period not exceeding specified limitations; the sale being effected through a "brokers' transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable.

8. **Market Standoff Agreement**. The Transferee hereby agrees that such Transferee shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Common Stock (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Common Stock (or other securities) of the Company held by such Transferee (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed one hundred eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act.

The Transferee agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, such Transferee shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act. The obligations described in this Section shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Securities and Exchange Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said one hundred eighty (180) day period. The Transferee agrees that any transferee of the Securities shall be bound by this Section.

9. **No Public Market.** The Transferee further understands that at the time the Transferee wishes to sell the Securities, there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, the Transferee would be precluded from selling the Securities under Rule 144 even if the one-year minimum holding period were satisfied.

10. **Substantial Burden of Proof.** The Transferee further understands that, notwithstanding the fact that Rule 144 is not exclusive, the staff of the SEC has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise

US-REPORTS-0014751

that pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sale, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

11. **Address.** The address set forth below is the Transferee's true and correct principal address, and the Transferee has no present intention of becoming a resident of any other state or jurisdiction.

12. **Transferee Bound by the Obligation of Agreements.**  By accepting the Securities transferred hereunder the Transferee agrees to be bound by the obligations with respect to the Company's Right of First Refusal and Restrictive Legends and Stop-Transfer Orders set forth in the exercise documents dated December 23, 2008 between the Company and Donald L. Lucas.  Such obligations are attached hereto as Exhibit A.  By accepting the Securities transferred hereunder, the Transferee agrees to be bound by the obligations of the Company's Amended and Restated Voting Agreement, dated October 13, 2006 and to which the Transferor is a party (the "Voting Agreement"), a copy of which is attached hereto as Exhibit B, as if the Transferee was a Voting Party (as defined in the Voting Agreement).

*[Remainder of Page Left Intentionally Blank]*

US-REPORTS-0014752

## Exhibit A

## Sections 5 and 7 of the Exercise Documents
## dated December 23, 2008 between the Company and Donald L. Lucas

5.      Company's Right of First Refusal.   Before any Shares held by Optionee or any transferee (either being sometimes referred to herein as the *"Holder"*) may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section (the *"Right of First Refusal"*).

(a)      Notice of Proposed Transfer.   The Holder of the Shares shall deliver to the Company a written notice (the *"Notice"*) stating: (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee (*"Proposed Transferee"*); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the *"Offered Price"*), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

(b)      Exercise of Right of First Refusal.   At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)      Purchase Price.   The purchase price *("Purchase Price"*) for the Shares purchased by the Company or its assignee(s) under this Section shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)      Payment.   Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)      Holder's Right to Transfer.   If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or

US-REPORTS-0014753

its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(f)     Exception for Certain Family Transfers.  Anything to the contrary contained in this Section notwithstanding, the transfer of any or all of the Shares during the Optionee's lifetime or on the Optionee's death by will or intestacy to the Optionee's immediate family or a trust for the benefit of the Optionee's immediate family shall be exempt from the provisions of this Section. *"Immediate Family"* as used herein shall mean spouse, lineal descendant or antecedent, father, mother, brother or sister.  In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section, and there shall be no further transfer of such Shares except in accordance with the terms of this Section.

(g)     Termination of Right of First Refusal.  The Right of First Refusal shall terminate as to any Shares upon the earlier of (i) first sale of Common Stock of the Company to the general public, or (ii) a Change in Control in which the successor corporation has equity securities that are publicly traded.

7.     Restrictive Legends and Stop-Transfer Orders.

(a)     Legends.  Optionee understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.   SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD NOT TO EXCEED 180 DAYS FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT

US-REPORTS-0014754

BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT
THE CONSENT OF THE COMPANY.

(b)      Stop-Transfer Notices.  Optionee agrees that, in order to ensure compliance
with the restrictions referred to herein, the Company may issue appropriate "stop transfer"
instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may
make appropriate notations to the same effect in its own records.

(c)      Refusal to Transfer.  The Company shall not be required (i) to transfer on its
books any Shares that have been sold or otherwise transferred in violation of any of the provisions of
this Exercise Notice or (ii) to treat as owner of such Shares or to accord the right to vote or pay
dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d)      Successors and Assigns.  The Company may assign any of its rights under this
Exercise Notice to single or multiple assignees, and this Exercise Notice shall inure to the benefit of
the successors and assigns of the Company.  Subject to the restrictions on transfer herein set forth,
this Exercise Notice shall be binding upon Optionee and his or her heirs, executors, administrators,
successors and assigns.

US-REPORTS-0014755

<u>Exhibit B</u>

**Amended and Restated Voting Agreement**

C:\Documents and Settings\Melissa\Local Settings\Temporary Internet Files\OLKD07\THERANOS_ Inv Rep Stmt - D Lucas to Kendra Fadil_(PALIB2_4967153_1).DOC

US-REPORTS-0014756

Donald L. Lucas
3000 Sand Hill Road, #3-210
Menlo Park, CA  94025
(650) 854-4223

June 3, 2011

Mrs. Kendra Fadil
2005 Park Boulevard
Palo Alto, CA 94306

Dear Kendra,

On this day, I am making a gift to you of 2,000 shares of Theranos, Inc. Common
Stock.  For your records, the purchase date of the shares is December 23, 2008
and the cost basis is $0.36 per share.

The transfer is in process and the shares will be delivered under separate cover.

Best regards,

Donald L. Lucas

US-REPORTS-0014757

Number **254**

**\*2,000\*** Shares
Common Stock

THIS CERTIFIES THAT **\*KENDRA FADIL\*** is the record holder of **\*Two Thousand (2,000)\*** shares of Common Stock of

# THERANOS, INC.

### a Delaware corporation

transferable only on the records of the corporation upon surrender of this certificate, properly endorsed or assigned.

This certificate and the shares it represents are subject to the provisions of the Certificate of Incorporation and the Bylaws of the corporation, and any amendments thereto, as well as the restrictive legends on the back of this certificate. Upon request, stockholders may obtain free of charge from the corporation's principal office a statement describing the preferences, limitations and relative rights granted to or imposed upon each class or series of shares or upon the holders of such shares.

The shares represented by this certificate are deemed issued effective **August 10, 2011.** This corporation's duly authorized officers have signed this certificate as of 21st day of _December_ , 2011 .

Elizabeth Anne Holmes, Secretary

Elizabeth Anne Holmes, President

® GOES 748
All Rights Reserved

LITHO IN U · A

US-REPORTS-0014758

SEE REVERSE SIDE FOR RESTRICTIVE LEGENDS

**Number PC-1-14**

# THERANOS, INC.
## A Delaware Corporation

**\*5,000\*shares**

**Series C-1 Preferred Stock**

THIS CERTIFIES THAT **Kendra Fadil** is the record holder of **Five Thousand (\*5,000\*)** fully paid and nonassessable shares of Series C-1 Preferred Stock of Theranos, Inc., a Delaware corporation, transferable only on the share register of said Corporation, in person or by duly authorized attorney, upon surrender of this certificate properly endorsed or assigned.

This certificate and the shares represented hereby are issued and shall be held subject to all the provisions of the Certificate of Incorporation and the Bylaws of the Corporation and any amendments thereto, to all of which the holder of this certificate, by acceptance hereof, assents.

A statement of the number of shares constituting each class and/or series of shares of stock of the Corporation and the designation thereof, and a statement of the rights, preferences, privileges, and restrictions granted to or imposed upon such shares and the holders thereof, may be obtained by any stockholder at the principal office of the Corporation, upon request and without charge.

The shares represented by this certificate are deemed issued effective **January 14, 2014.** This corporation's duly authorized officers have signed this certificate as of this 12th day of February, 2014.

_____
Elizabeth Anne Holmes, Secretary

_____
Elizabeth Anne Holmes, Chairperson of the Board

© GOES 748

LITHO IN U S A

US-REPORTS-0014759

THERANOS, INC.

SERIES C -1 PREFERRED STOCK CERTIFICATE RECEIPT

The undersigned acknowledges receipt of stock certificate no. **PC-1-14** representing **Five Thousand (5,000)** shares of Series C-1 Preferred Stock of Theranos, Inc. held in the name of **Kendra Fadil**.

The undersigned further acknowledges that this certificate contains restrictive legends, including a legend referring to the Securities Act of 1933.

Dated: _6 / 11 / 14_

**Kendra Fadil**

By: _Kendra Fadil_

Name: _Kendra Fadil_

## Sign, Date and Return via

1.) Email: shareholderinfo@theranos.com or,

2.) Mailing to:

Shareholder Information
Theranos, Inc
1601 S. California Ave,
Palo Alto, CA 94304

US-REPORTS-0014760

This action by written consent shall be effective as of the date the Company receives the requisite consent of the Company's stockholders. By executing this action by written consent, each undersigned stockholder is giving written consent with respect to all shares of the Company's capital stock held by such stockholder in favor of the above resolutions. This action by written consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile or other reliable reproduction of this action by written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reliable reproduction is a complete reproduction of the entire original writing. This action by written consent shall be filed with the minutes of the proceedings of the stockholders of the Company.

_____

*Signature*

_____

*Print Name*

_____

*Name of Stockholder (if different than above)*

_____

*Organization (if applicable)*

_____

*Title (if applicable)*

_____

*Date*

*[Action by Written Consent of the Stockholders of Tela Innovations, Inc.]*

Number PC-1B-9

# THERANOS, INC.
### A Delaware Corporation

\*5,000\*shares
**Series C-1B Preferred Stock**

THIS CERTIFIES THAT **Kendra Fadil** is the record holder of **five thousand (\*5,000\*)** fully paid and nonassessable shares of Series C-1B Preferred Stock of Theranos, Inc., a Delaware corporation, transferable only on the share register of said Corporation, in person or by duly authorized attorney, upon surrender of this certificate properly endorsed or assigned.

This certificate and the shares represented hereby are issued and shall be held subject to all the provisions of that certain Exchange and Release Agreement dated as of May 15, 2017, the Certificat e of Incorporation and the Bylaws of the Corporation and any amendments thereto, to all of which the holder of this certificate, by acceptance hereof, assents.

A statement of the number of shares constituting each class and/or series of shares of stock of the Corporation and the designation thereof, and a statement of the rights, preferences, privileges, and restrictions granted to or imposed upon such shares and the holders thereof, may be obtained by any stockholder at the principal office of the Corporation, upon request and without charge.

The corporation has caused this certificate to be signed by its duly authorized officers as of May 15, 2017.



David Taylor, Secretary

Elizabeth Anne Holmes, Chairperson of the Board

GOES 745

LITHO IN U S A

US-REPORTS-0014762

Dear Stockholder of Theranos, Inc.,

As a reminder, the exchange offer (the "Offer") set forth in the Theranos, Inc. (the "Company") Offer to Exchange Preferred Stock Information Statement dated March 20, 2017 expired on May 15, 2017. Accordingly, that certain Exchange and Release Agreement relating to the Offer became effective as of May 15, 2017 (the "Effective Time") and the closing of the Offer occurred immediately thereafter. You are receiving this message because you elected to participate in the Offer. At the Effective Time, your tendered shares of Series C-1 Preferred Stock or Series C-2 Preferred Stock were exchanged for Series C-1A Preferred Stock, Series C-1B Preferred Stock or Series C-2A Preferred Stock, as applicable, as provided by the Exchange and Release Agreement. Stock certificates evidencing these new shares have been mailed to your address of record with the Company. If you would like to confirm or update your address of record or other contact information, please contact Cody Gaynor at cgaynor@wsgr.com or (650) 849-3128.

As disclosed in the Fourth Supplemental Notice Concerning Certain Litigation dated May 1, 2017 (the "Supplemental Notice"), you may receive, subject to certain contingencies, additional shares of Class A Common Stock (the "PFM Shares") pursuant to the terms of that certain Settlement Agreement dated as of April 29, 2017 among Partner Investments, L.P., PFM Healthcare Master Fund, L.P. and PFM Healthcare Principals Fund, L.P, the Company, and the other parties thereto. The PFM Shares are proposed to be distributed pro rata to the stockholders who elected to participate in the Offer based on the formula set forth in the Supplemental Notice.

If you wish to accept your allocated portion of the PFM Shares, you must complete and return a signed copy of the attached Acknowledgement and Representation Statement to Cody Gaynor at cgaynor@wsgr.com or 650 Page Mill Road, Palo Alto, CA 94304 **by July 30, 2017 at 5:00 p.m. Pacific time (the "Deadline")**. We anticipate that the PFM Shares will be distributed on or around July 31, 2017.

If you have any questions, please contact David Taylor at dtaylor@theranos.com.

Thank you,

Cody Gaynor
Wilson Sonsini Goodrich & Rosati, P.C.

US-REPORTS-0014763

**THERANOS, INC.**

**ACKNOWLEDGEMENT AND REPRESENTATION STATEMENT**

This Acknowledgement and Representation Statement (this "*Statement*") is made as of _____, 2017 by the undersigned (the "*Holder*") in connection with the acquisition by the Holder of shares of Class A Common Stock ("*Class A Common Stock*") of Theranos, Inc., a Delaware corporation (the "*Company*"), pursuant to that certain Settlement Agreement, dated as of April 29, 2017, by and among Partner Investments, L.P., a Delaware limited partnership, PFM Healthcare Master Fund, L.P., a Cayman Islands limited partnership, and PFM Healthcare Principals Fund, L.P., a Delaware limited partnership (collectively, "*PFM*"), the Company and the other parties thereto (the "*Settlement Agreement*"). In connection with the acquisition of the Securities (as defined below), the Holder represents and warrants to, and agrees with, the Company as follows:

1.      **Acknowledgement.** The Holder is party to that certain Exchange and Release Agreement, dated as of May 15, 2017, by and among the Company and the other parties thereto (the "*Exchange Agreement*"). Subject to the terms and conditions of this Statement, the Holder hereby accepts ownership of its pro rata portion, based on its total dollar investment in the Company's Series C-1 Preferred Stock and Series C-2 Preferred Stock relative to all of the Company's stockholders that exchanged shares of the Company's capital stock pursuant to the Exchange Agreement, of the shares of Class A Common Stock transferred by PFM pursuant to the Settlement Agreement (the "*Securities*").

2.      **No Registration.** The Holder understands that the Securities have not been, and will not be, registered under the Securities Act of 1933, as amended (the "*Securities Act*"), by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the *bona fide* nature of the investment intent and the accuracy of the Holder's representations as expressed herein or otherwise made pursuant hereto.

3.      **Investment Intent.** The Holder is acquiring the Securities for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, any distribution thereof in violation of the Securities Act. The Holder has no present intention of selling, granting any participation in, or otherwise distributing the Securities.

4.      **Accredited Investor.** The Holder is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission and agrees to submit to the Company such further assurances of such status as may be reasonably requested by the Company. The Holder has furnished or made available any and all information requested by the Company or otherwise necessary to satisfy any applicable verification requirements as to "accredited investor" status. Any such information is true, correct, timely and complete.

5.      **Residency.** The residency of the Holder (or, in the case of a partnership or corporation, such entity's principal place of business) is correctly set forth on the signature page hereto.

6.      **Restrictions on Resales.** The Holder acknowledges that the Securities must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. The Holder is aware of the provisions of Rule 144 promulgated under the Securities Act, which permit resale of shares purchased in a private placement subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month

US-REPORTS-0014764

period not exceeding specified limitations; the sale being effected through a "broker's transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable. The Holder acknowledges and understands that the Company may not be satisfying the current public information requirement of Rule 144 at the time the Holder wishes to sell the Securities and that, in such event, the Holder may be precluded from selling the Securities under Rule 144 even if the other applicable requirements of Rule 144 have been satisfied. The Holder understands and acknowledges that, in the event the applicable requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Securities. The Holder understands that, although Rule 144 is not exclusive, the Securities and Exchange Commission has expressed its opinion that persons proposing to sell restricted securities received in a private offering other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for those offers or sales and that those persons and the brokers who participate in the transactions do so at their own risk.

7.    **No Public Market.** The Holder understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

8.    **Legend Requirements.**

(a) Legends. The Holder understands and agrees that the Company shall cause the legends set forth below, or substantially equivalent legends, to be placed upon any certificate(s) evidencing ownership of the Securities, together with any other legends that may be required by the Company, by applicable state or federal securities laws, or by any other agreement between the Holder and the Company:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING, AND A RIGHT OF FIRST REFUSAL IN FAVOR OF THE ISSUER, A SECONDARY RIGHT OF REFUSAL AND ASSIGNEE RIGHT OF REFUSAL AS SET FORTH IN AN INVESTOR RIGHTS AGREEMENT AND THE BYLAWS, COPIES OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

US-REPORTS-0014765

THE SHARES EVIDENCED HEREBY ARE SUBJECT TO AN AMENDED AND RESTATED VOTING AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING AGREEMENT.

(b) Stop-Transfer Instructions. The Holder agrees that, in order to ensure compliance with the restrictions imposed by this Statement, the Company may issue appropriate "stop-transfer" instructions to its transfer agent, if any, and if the Company acts as its own transfer agent, it may make appropriate notations to the same effect in its own records. The Company will not be required (a) to transfer on its books any Securities that have been sold or otherwise transferred in violation of any of the provisions of this Statement or (b) to treat as owner of such Securities, or to accord the right to vote or pay dividends, to any transferee or other purchaser to whom such Securities have been so transferred. The Holder further understands and agrees that the Company may require written assurances, in form and substance satisfactory to counsel for the Company (which may include a requirement that the Holder's counsel provide a legal opinion acceptable to the Company), before the Company effects any future transfers of the Securities.

9.    **Additional Agreements.**

(a) Agreement to be Bound. As a condition to the transfer of the Securities, the Holder hereby agrees to be bound by, and that the Securities shall be subject to, all of the restrictions set forth in the Company's Amended and Restated Investors' Rights Agreement dated as of May 15, 2017 (the "***Rights Agreement***") and the Company's Amended and Restated Voting Agreement dated as of May 15, 2017 (together with the Rights Agreement, the "***Acquisition Agreements***") in the same manner as PFM is bound by all the restrictions of the Acquisition Agreements, including, but not limited to, the "Market Stand-Off Agreement" contained in Section 2.9 of the Rights Agreement. The Holder further acknowledges and agrees that all future transferees of all or part of the Securities shall receive and hold such shares subject to the restrictions set forth in the Acquisition Agreement and this Statement.

(b) Tax Consequences. The Holder has reviewed with its own tax advisors the federal, state, and local tax consequences, if any, of accepting the Securities. The Holder is relying solely on such advisors and not on any statements or representations of the Company or any of the Company's agents. The Holder understands it (and not Company) shall be responsible respectively for its own tax liability that may arise as a result of accepting the Securities.

(c) No Statements by the Company. The Holder acknowledges that the Company has made no statements, representations or warranties to it. The Holder acknowledges that it has consulted its own financial, legal and tax advisors, and is solely responsible for the decision to accept the Securities in accordance with the terms of this Statement.

*(signature page follows)*

3

US-REPORTS-0014766

The Holder is signing this Acknowledgement and Representation Statement on the date first written above.

**HOLDER (IF AN ENTITY):**

Name: _____

By: _____

Name: _____

Title: _____

Address: _____

_____

_____

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: _Kendra Fadil_

Address: _3005 Park Blvd._
_Palo Alto, CA 94306_

_____

(Signature Page to Theranos, Inc. Acknowledgement and Representation Statement)



1701 Page Mill Road     P 650.838.9292     theranos.com
Palo Alto, CA 94304     F 650.838.9165

March 20, 2017

Dear Stockholder,

As you may know, Theranos, Inc. (the "**Company**") has finalized negotiations with certain holders of its outstanding Series C-1 Preferred Stock and Series C-2 Preferred Stock regarding an offer to exchange such shares for shares of newly-created series of preferred stock, in consideration for a release of any potential claims as stockholders against the Company, its employees, directors and officers, and other parties (the "**Exchange**"). Twenty-two holders of Series C-1 Preferred Stock and Series C-2 Preferred Stock have signed non-binding term sheets indicating their interest in participating in the Exchange. The Company hereby invites you to participate in the Exchange.

Earlier today, we sent an email from venueclientservices@dfsco.com to the email address we have on file for you. This email will provide you access to a secure online data room for "Project Epsilon." The documents related to the Exchange are available for your review through that data room. If you have any issues accessing the data room or if you did not receive an email, please contact Cody Gaynor at cgaynor@wsgr.com or (650) 849-3128. The data room also contains informational materials and directions for how to participate in the Exchange, should you choose to do so. These documents are important and may affect your rights as a stockholder of the Company, even if you do not participate in the Exchange. You are encouraged to read the contents of these documents in their entirety. Please also note that this offer to participate in the Exchange will close on April 14, 2017.

You may access the project at any time by logging into Donnelley Financial Solutions Venue at www.rrdvenue.com.

If this is your first time logging into Donnelley Financial Solutions Venue, you will receive a personalized link in a separate email with the subject "Your credentials for rrdvenue.com." That link allows you to enable your account with the username located at the bottom of the email and you will be asked to create a password. The link will expire within seven (7) days, so please enable your account promptly. Once your account is enabled, you can immediately log into Venue and access the project.

The above summary is not and does not purport to be a complete description of the Exchange. Please review carefully the documents available in the data room for a full description of the terms of the Exchange. If you have any questions, please contact me at dtaylor@theranos.com or (650) 546-2205.

Thank you,

David Taylor
General Counsel

Number 152

*2.500* Shares
Common Stock

THIS CERTIFIES THAT **\*Elise Fadil\*** is the record holder of **\*Two Thousand Five Hundred (2.500)\*** shares of Common Stock of

# THERANOS, INC.

### a Delaware corporation

transferable only on the records of the corporation upon surrender of this certificate, properly endorsed or assigned.

This certificate and the shares it represents are subject to the provisions of the Certificate of Incorporation and the Bylaws of the corporation, and any amendments thereto, as well as the restrictive legends on the back of this certificate. Upon request, stockholders may obtain free of charge from the corporation's principal office a statement describing the preferences, limitations and relative rights granted to or imposed upon each class or series of shares or upon the holders of such shares.

The shares represented by this certificate are deemed issued effective **July 1, 2009**. This corporation's duly authorized officers have signed this certificate as of **31** day of August, 2009.

Elizabeth Anne Holmes, Secretary

Elizabeth Anne Holmes, President

GOES-748

LITHO IN U. A

## INVESTMENT REPRESENTATIONS STATEMENT

THE COMPANY:             Theranos, Inc.

THE TRANSFEREE:          Elise Fadil

THE TRANSFEROR:          Donald L. Lucas

TYPE OF SECURITY:        Common Stock

AMOUNT:                  2,500 Shares

In connection with the acquisition of the Company's securities specified above (the "Securities"), the Transferee hereby represents to the Company as follows:

1. **Investment Intent.** The Transferee is acquiring the Securities solely for the Transferee's own account for investment purposes only and not with a view to, or for resale in connection with any "distribution" thereof as that term is used for purposes of the Securities Act of 1933 (the "Securities Act").

2. **Information About the Company.** The Transferee is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities.

3. **High Risk.** The Transferee realizes that investment in the Securities involves a high degree of risk. The Transferee is able to bear the risk of the investment, to hold the Securities for an indefinite period of time and to suffer a complete loss of the investment.

4. **Securities Not Registered.** The Transferee understands that the Securities have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein. In this connection, the Transferee understands that, in the view of the Securities and Exchange Commission (the "SEC"), the statutory basis for such exemption may be unavailable if the Transferee's representations were predicated solely upon a present intention to hold these Securities (i) for the minimum capital gains period specified under tax statutes, (ii) for a deferred sale, (iii) for or until an increase or decrease in the market price of the Securities, or (iv) for a period of one year or any other fixed period in the future.

5. **Restrictive Legend.** The Transferee understands and agrees that the Company shall cause the legends set forth below, to be placed upon any certificate(s) evidencing ownership of the Securities together with any other legends that may be required by the Company or by state or federal securities laws:

   THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND

C:\NrPortbl\PALIB2\DLS\4778785_1.DOC

US-REPORTS-0014741

## Exhibit A

### Sections 5 and 7 of the Exercise Documents
### dated December 23, 2008 between the Company and Donald L. Lucas

5.     Company's Right of First Refusal.   Before any Shares held by Optionee or any transferee (either being sometimes referred to herein as the *"Holder"*) may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section (the *"Right of First Refusal"*).

(a)     Notice of Proposed Transfer.   The Holder of the Shares shall deliver to the Company a written notice (the *"Notice"*) stating:  (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee (*"Proposed Transferee"*); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the *"Offered Price"*), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

(b)     Exercise of Right of First Refusal.   At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)     Purchase Price.   The purchase price (*"Purchase Price"*) for the Shares purchased by the Company or its assignee(s) under this Section shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)     Payment.   Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)     Holder's Right to Transfer.   If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

C:\NrPortbl\PALIB2\DLS\4778785_1.DOC

US-REPORTS-0014742

MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.   SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD NOT TO EXCEED 180 DAYS FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT THE CONSENT OF THE COMPANY.

THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A AMENDED AND RESTATED VOTING AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING AGREEMENT.

6. **Held Indefinitely**. The Transferee further understands that the Securities must be held indefinitely unless subsequently registered under the Securities Act or unless an exemption from registration is otherwise available. Moreover, the Transferee understands that the Company is under no obligation to register the Securities except as may be provided by express written agreement.   In addition, the Transferee understands that the certificates(s) evidencing the Securities will be imprinted with a legend which prohibits the transfer of the Securities unless they are registered or such registration is not required in the opinion of counsel satisfactory to the Company.

7. **Rule 144.** The Transferee is aware of the provisions of Rule 144, promulgated under the Securities Act, which in substance, permits limited public resale of "restricted securities" acquired in a transaction not involving a public offering subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any

US-REPORTS-0014743

three-month period not exceeding specified limitations; the sale being effected through a "brokers' transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable.

8. **Market Standoff Agreement**. The Transferee hereby agrees that such Transferee shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Common Stock (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Common Stock (or other securities) of the Company held by such Transferee (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed one hundred eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act.

The Transferee agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, such Transferee shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act. The obligations described in this Section shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Securities and Exchange Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said one hundred eighty (180) day period. The Transferee agrees that any transferee of the Securities shall be bound by this Section.

9. **No Public Market**. The Transferee further understands that at the time the Transferee wishes to sell the Securities, there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, the Transferee would be precluded from selling the Securities under Rule 144 even if the one-year minimum holding period were satisfied.

10. **Substantial Burden of Proof**. The Transferee further understands that, notwithstanding the fact that Rule 144 is not exclusive, the staff of the SEC has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise that pursuant to Rule 144 will have a substantial burden of proof in establishing that an

US-REPORTS-0014744

exemption from registration is available for such offers or sale, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

11. **Address.** The address set forth below is the Transferee's true and correct principal address, and the Transferee has no present intention of becoming a resident of any other state or jurisdiction.

12. **Transferee Bound by the Obligation of Agreements.** By accepting the Securities transferred hereunder the Transferee agrees to be bound by the obligations with respect to the Company's Right of First Refusal and Restrictive Legends and Stop-Transfer Orders set forth in the exercise documents dated December 23, 2008 between the Company and Donald L. Lucas.  Such obligations are attached hereto as Exhibit A.  By accepting the Securities transferred hereunder, the Transferee agrees to be bound by the obligations of the Company's Amended and Restated Voting Agreement, dated October 13, 2006 and to which the Transferor is a party (the "Voting Agreement"), a copy of which is attached hereto as Exhibit B, as if the Transferee was a Voting Party (as defined in the Voting Agreement).

*[Remainder of Page Left Intentionally Blank]*

US-REPORTS-0014745

Executed as of _____, 2009

Signature of Transferee:

**Elise Fadil**

By: _Kendra Fadil_

Name: _Kendra Fadil_

Title: _Mother to Elise Fadil_

US-REPORTS-0014746

Donald L. Lucas
3000 Sand Hill Road, #3-210
Menlo Park, CA  94025
(650) 854-4223

August 20, 2009

Mrs. Kendra Fadil
2005 Park Boulevard
Palo Alto, CA 94306

Dear Kendra,

On this day, I am making a gift of 1,000 shares of Theranos, Inc. Common Stock
to you.  For your records, the purchase date of the shares is December 23, 2008
and the cost basis is $0.36 per share.  The transfer is in process and the shares
will be delivered under separate cover.

Best regards,

Donald L. Lucas

US-REPORTS-0014747

SEE RESTRICTIVE LEGEND(S) ON REVERSE

**Number 189**

**\*1,000\* Shares**
**Common Stock**

THIS CERTIFIES THAT **\*Kendra Fadil\*** is the record holder of **\*One Thousand (1,000)\*** shares of Common Stock of

# THERANOS, INC.

### a Delaware corporation

transferable only on the records of the corporation upon surrender of this certificate, properly endorsed or assigned.

This certificate and the shares it represents are subject to the provisions of the Certificate of Incorporation and the Bylaws of the corporation, and any amendments thereto, as well as the restrictive legends on the back of this certificate. Upon request, stockholders may obtain free of charge from the corporation's principal office a statement describing the preferences, limitations and relative rights granted to or imposed upon each class or series of shares or upon the holders of such shares.

The shares represented by this certificate are deemed issued effective **August 20, 2009**. This corporation's duly authorized officers have signed this certificate as of 10th day of May , 2010.

Elizabeth Anne Holmes, Secretary

Elizabeth Anne Holmes, President

GOES 748

LITHO IN U.S.A.

US-REPORTS-0014748

## INVESTMENT REPRESENTATIONS STATEMENT

THE COMPANY:          Theranos, Inc.

THE TRANSFEREE:       Kendra Fadil

THE TRANSFEROR:       Donald L. Lucas, TTEE Donald L. Lucas & Lygia S. Lucas Trust DTD
                      12-3-84

TYPE OF SECURITY:     Common Stock

AMOUNT:               1,000 Shares

In connection with the acquisition of the Company's securities specified above (the "Securities"), the Transferee hereby represents to the Company as follows:

1. **Investment Intent.** The Transferee is acquiring the Securities solely for the Transferee's own account for investment purposes only and not with a view to, or for resale in connection with any "distribution" thereof as that term is used for purposes of the Securities Act of 1933 (the "Securities Act").

2. **Information About the Company.** The Transferee is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities.

3. **High Risk.** The Transferee realizes that investment in the Securities involves a high degree of risk. The Transferee is able to bear the risk of the investment, to hold the Securities for an indefinite period of time and to suffer a complete loss of the investment.

4. **Securities Not Registered.** The Transferee understands that the Securities have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein. In this connection, the Transferee understands that, in the view of the Securities and Exchange Commission (the "SEC"), the statutory basis for such exemption may be unavailable if the Transferee's representations were predicated solely upon a present intention to hold these Securities (i) for the minimum capital gains period specified under tax statutes, (ii) for a deferred sale, (iii) for or until an increase or decrease in the market price of the Securities, or (iv) for a period of one year or any other fixed period in the future.

5. **Restrictive Legend.** The Transferee understands and agrees that the Company shall cause the legends set forth below, to be placed upon any certificate(s) evidencing ownership of the Securities together with any other legends that may be required by the Company or by state or federal securities laws:

US-REPORTS-0014749

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.   SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD NOT TO EXCEED 180 DAYS FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT THE CONSENT OF THE COMPANY.

THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A AMENDED AND RESTATED VOTING AGREEMENT (A COPY OF WHICH MAY BE OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID VOTING AGREEMENT.

6. **Held Indefinitely**. The Transferee further understands that the Securities must be held indefinitely unless subsequently registered under the Securities Act or unless an exemption from registration is otherwise available. Moreover, the Transferee understands that the Company is under no obligation to register the Securities except as may be provided by express written agreement. In addition, the Transferee understands that the certificates(s) evidencing the Securities will be imprinted with a legend which prohibits the transfer of the Securities unless they are registered or such registration is not required in the opinion of counsel satisfactory to the Company.

7. **Rule 144.** The Transferee is aware of the provisions of Rule 144, promulgated under the Securities Act, which in substance, permits limited public resale of "restricted securities" acquired in a transaction not involving a public offering subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public

US-REPORTS-0014750

information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month period not exceeding specified limitations; the sale being effected through a "brokers' transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable.

8.  **Market Standoff Agreement**. The Transferee hereby agrees that such Transferee shall not offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any Common Stock (or other securities) of the Company or enter into any swap, hedging or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Common Stock (or other securities) of the Company held by such Transferee (other than those included in the registration) for a period specified by the representative of the underwriters of Common Stock (or other securities) of the Company not to exceed one hundred eighty (180) days following the effective date of any registration statement of the Company filed under the Securities Act.

    The Transferee agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. In addition, if requested by the Company or the representative of the underwriters of Common Stock (or other securities) of the Company, such Transferee shall provide, within ten (10) days of such request, such information as may be required by the Company or such representative in connection with the completion of any public offering of the Company's securities pursuant to a registration statement filed under the Securities Act. The obligations described in this Section shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a Securities and Exchange Commission Rule 145 transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions with respect to the shares of Common Stock (or other securities) subject to the foregoing restriction until the end of said one hundred eighty (180) day period. The Transferee agrees that any transferee of the Securities shall be bound by this Section.

9.  **No Public Market.** The Transferee further understands that at the time the Transferee wishes to sell the Securities, there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, the Transferee would be precluded from selling the Securities under Rule 144 even if the one-year minimum holding period were satisfied.

10. **Substantial Burden of Proof.** The Transferee further understands that, notwithstanding the fact that Rule 144 is not exclusive, the staff of the SEC has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise

US-REPORTS-0014751

that pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sale, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

11. **Address.** The address set forth below is the Transferee's true and correct principal address, and the Transferee has no present intention of becoming a resident of any other state or jurisdiction.

12. **Transferee Bound by the Obligation of Agreements.** By accepting the Securities transferred hereunder the Transferee agrees to be bound by the obligations with respect to the Company's Right of First Refusal and Restrictive Legends and Stop-Transfer Orders set forth in the exercise documents dated December 23, 2008 between the Company and Donald L. Lucas.  Such obligations are attached hereto as Exhibit A.  By accepting the Securities transferred hereunder, the Transferee agrees to be bound by the obligations of the Company's Amended and Restated Voting Agreement, dated October 13, 2006 and to which the Transferor is a party (the "Voting Agreement"), a copy of which is attached hereto as Exhibit B, as if the Transferee was a Voting Party (as defined in the Voting Agreement).

*[Remainder of Page Left Intentionally Blank]*

US-REPORTS-0014752

## Exhibit A

### Sections 5 and 7 of the Exercise Documents
### dated December 23, 2008 between the Company and Donald L. Lucas

5.     Company's Right of First Refusal.   Before any Shares held by Optionee or any transferee (either being sometimes referred to herein as the *"Holder"*) may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section (the *"Right of First Refusal"*).

(a)     Notice of Proposed Transfer.   The Holder of the Shares shall deliver to the Company a written notice (the *"Notice"*) stating: (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed purchaser or other transferee (*"Proposed Transferee"*); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the *"Offered Price"*), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

(b)     Exercise of Right of First Refusal.   At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)     Purchase Price.   The purchase price (*"Purchase Price"*) for the Shares purchased by the Company or its assignee(s) under this Section shall be the Offered Price. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)     Payment.   Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)     Holder's Right to Transfer.   If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the Shares in the hands of such Proposed Transferee. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or

US-REPORTS-0014753

its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(f)     Exception for Certain Family Transfers.  Anything to the contrary contained in this Section notwithstanding, the transfer of any or all of the Shares during the Optionee's lifetime or on the Optionee's death by will or intestacy to the Optionee's immediate family or a trust for the benefit of the Optionee's immediate family shall be exempt from the provisions of this Section. *"Immediate Family"* as used herein shall mean spouse, lineal descendant or antecedent, father, mother, brother or sister.  In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section, and there shall be no further transfer of such Shares except in accordance with the terms of this Section.

(g)     Termination of Right of First Refusal.  The Right of First Refusal shall terminate as to any Shares upon the earlier of (i) first sale of Common Stock of the Company to the general public, or (ii) a Change in Control in which the successor corporation has equity securities that are publicly traded.

7.     Restrictive Legends and Stop-Transfer Orders.

(a)     Legends.  Optionee understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND A RIGHT OF FIRST REFUSAL HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.  SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A PERIOD NOT TO EXCEED 180 DAYS FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT

US-REPORTS-0014754

BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT THE CONSENT OF THE COMPANY.

(b)     Stop-Transfer Notices. Optionee agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)     Refusal to Transfer. The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Exercise Notice or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d)     Successors and Assigns. The Company may assign any of its rights under this Exercise Notice to single or multiple assignees, and this Exercise Notice shall inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer herein set forth, this Exercise Notice shall be binding upon Optionee and his or her heirs, executors, administrators, successors and assigns.

US-REPORTS-0014755

<u>Exhibit B</u>

**Amended and Restated Voting Agreement**

C:\Documents and Settings\Melissa\Local Settings\Temporary Internet Files\OLKD07\THERANOS_ Inv  Rep  Stmt  - D  Lucas to Kendra  Fadil_(PALIB2_4967153_1).DOC

US-REPORTS-0014756

Donald L. Lucas
3000 Sand Hill Road, #3-210
Menlo Park, CA  94025
(650) 854-4223

June 3, 2011

Mrs. Kendra Fadil
2005 Park Boulevard
Palo Alto, CA 94306

Dear Kendra,

On this day, I am making a gift to you of 2,000 shares of Theranos, Inc. Common
Stock.  For your records, the purchase date of the shares is December 23, 2008
and the cost basis is $0.36 per share.

The transfer is in process and the shares will be delivered under separate cover.

Best regards,

Donald L. Lucas

US-REPORTS-0014757

Number **254**

**\*2,000\*** Shares
Common Stock

THIS CERTIFIES THAT **\*KENDRA FADIL\*** is the record holder of **\*Two Thousand (2,000)\*** shares of Common Stock of

# THERANOS, INC.

### a Delaware corporation

transferable only on the records of the corporation upon surrender of this certificate, properly endorsed or assigned.

This certificate and the shares it represents are subject to the provisions of the Certificate of Incorporation and the Bylaws of the corporation, and any amendments thereto, as well as the restrictive legends on the back of this certificate. Upon request, stockholders may obtain free of charge from the corporation's principal office a statement describing the preferences, limitations and relative rights granted to or imposed upon each class or series of shares or upon the holders of such shares.

The shares represented by this certificate are deemed issued effective **August 10, 2011**. This corporation's duly authorized officers have signed this certificate as of 21st day of _December_ , _2011_ .

Elizabeth Anne Holmes, Secretary

Elizabeth Anne Holmes, President

@ GOES 748
All Rights Reserved

LITHO IN U · A

SEE REVERSE SIDE FOR RESTRICTIVE LEGENDS

**Number PC-1-14**

# THERANOS, INC.
### A Delaware Corporation

**\*5,000\*shares**

**Series C-1 Preferred Stock**

THIS CERTIFIES THAT **Kendra Fadil** is the record holder of **Five Thousand (\*5,000\*)** fully paid and nonassessable shares of Series C-1 Preferred Stock of Theranos, Inc., a Delaware corporation, transferable only on the share register of said Corporation, in person or by duly authorized attorney, upon surrender of this certificate properly endorsed or assigned.

This certificate and the shares represented hereby are issued and shall be held subject to all the provisions of the Certificate of Incorporation and the Bylaws of the Corporation and any amendments thereto, to all of which the holder of this certificate, by acceptance hereof, assents.

A statement of the number of shares constituting each class and/or series of shares of stock of the Corporation and the designation thereof, and a statement of the rights, preferences, privileges, and restrictions granted to or imposed upon such shares and the holders thereof, may be obtained by any stockholder at the principal office of the Corporation, upon request and without charge.

The shares represented by this certificate are deemed issued effective **January 14, 2014.** This corporation's duly authorized officers have signed this certificate as of this 12th day of February, 2014.

Elizabeth Anne Holmes, Secretary

Elizabeth Anne Holmes, Chairperson of the Board

© GOES 748

LITHO IN U S A

US-REPORTS-0014759

THERANOS, INC.

SERIES C -1 PREFERRED STOCK CERTIFICATE RECEIPT

The undersigned acknowledges receipt of stock certificate no. **PC-1-14** representing **Five Thousand (5,000)** shares of Series C-1 Preferred Stock of Theranos, Inc. held in the name of **Kendra Fadil**.

The undersigned further acknowledges that this certificate contains restrictive legends, including a legend referring to the Securities Act of 1933.

Dated: ___6/11/14___

**Kendra Fadil**

By: _Kendra Fadil_

Name: _Kendra Fadil_

**<u>Sign, Date and Return via</u>**

1.) Email: shareholderinfo@theranos.com or,

2.) Mailing to:

Shareholder Information
Theranos, Inc
1601 S. California Ave,
Palo Alto, CA 94304

US-REPORTS-0014760

This action by written consent shall be effective as of the date the Company receives the requisite consent of the Company's stockholders. By executing this action by written consent, each undersigned stockholder is giving written consent with respect to all shares of the Company's capital stock held by such stockholder in favor of the above resolutions. This action by written consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile or other reliable reproduction of this action by written consent may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reliable reproduction is a complete reproduction of the entire original writing. This action by written consent shall be filed with the minutes of the proceedings of the stockholders of the Company.

_____

*Signature*

_____

*Print Name*

_____

*Name of Stockholder (if different than above)*

_____

*Organization (if applicable)*

_____

*Title (if applicable)*

_____

*Date*

*[Action by Written Consent of the Stockholders of Tela Innovations, Inc.]*

**Number PC-1B-9**

# THERANOS, INC.
## A Delaware Corporation

**\*5,000\*shares**
**Series C-1B Preferred Stock**

THIS CERTIFIES THAT **Kendra Fadil** is the record holder of **five thousand (\*5,000\*)** fully paid and nonassessable shares of Series C-1B Preferred Stock of Theranos, Inc., a Delaware corporation, transferable only on the share register of said Corporation, in person or by duly authorized attorney, upon surrender of this certificate properly endorsed or assigned.

This certificate and the shares represented hereby are issued and shall be held subject to all the provisions of that certain Exchange and Release Agreement dated as of May 15, 2017, the Certificat e of Incorporation and the Bylaws of the Corporation and any amendments thereto, to all of which the holder of this certificate, by acceptance hereof, assents.

A statement of the number of shares constituting each class and/or series of shares of stock of the Corporation and the designation thereof, and a statement of the rights, preferences, privileges, and restrictions granted to or imposed upon such shares and the holders thereof, may be obtained by any stockholder at the principal office of the Corporation, upon request and without charge.

The corporation has caused this certificate to be signed by its duly authorized officers as of May 15, 2017.



David Taylor, Secretary

Elizabeth Anne Holmes, Chairperson of the Board

GOES 745

LITHO IN U S A

US-REPORTS-0014762

Dear Stockholder of Theranos, Inc.,

As a reminder, the exchange offer (the "Offer") set forth in the Theranos, Inc. (the "Company") Offer to Exchange Preferred Stock Information Statement dated March 20, 2017 expired on May 15, 2017. Accordingly, that certain Exchange and Release Agreement relating to the Offer became effective as of May 15, 2017 (the "Effective Time") and the closing of the Offer occurred immediately thereafter. You are receiving this message because you elected to participate in the Offer. At the Effective Time, your tendered shares of Series C-1 Preferred Stock or Series C-2 Preferred Stock were exchanged for Series C-1A Preferred Stock, Series C-1B Preferred Stock or Series C-2A Preferred Stock, as applicable, as provided by the Exchange and Release Agreement. Stock certificates evidencing these new shares have been mailed to your address of record with the Company. If you would like to confirm or update your address of record or other contact information, please contact Cody Gaynor at cgaynor@wsgr.com or (650) 849-3128.

As disclosed in the Fourth Supplemental Notice Concerning Certain Litigation dated May 1, 2017 (the "Supplemental Notice"), you may receive, subject to certain contingencies, additional shares of Class A Common Stock (the "PFM Shares") pursuant to the terms of that certain Settlement Agreement dated as of April 29, 2017 among Partner Investments, L.P., PFM Healthcare Master Fund, L.P. and PFM Healthcare Principals Fund, L.P, the Company, and the other parties thereto. The PFM Shares are proposed to be distributed pro rata to the stockholders who elected to participate in the Offer based on the formula set forth in the Supplemental Notice.

If you wish to accept your allocated portion of the PFM Shares, you must complete and return a signed copy of the attached Acknowledgement and Representation Statement to Cody Gaynor at cgaynor@wsgr.com or 650 Page Mill Road, Palo Alto, CA 94304 **by July 30, 2017 at 5:00 p.m. Pacific time (the "Deadline")**. We anticipate that the PFM Shares will be distributed on or around July 31, 2017.

If you have any questions, please contact David Taylor at dtaylor@theranos.com.

Thank you,

Cody Gaynor
Wilson Sonsini Goodrich & Rosati, P.C.

## THERANOS, INC.

### ACKNOWLEDGEMENT AND REPRESENTATION STATEMENT

This Acknowledgement and Representation Statement (this "*Statement*") is made as of _____, 2017 by the undersigned (the "*Holder*") in connection with the acquisition by the Holder of shares of Class A Common Stock ("*Class A Common Stock*") of Theranos, Inc., a Delaware corporation (the "*Company*"), pursuant to that certain Settlement Agreement, dated as of April 29, 2017, by and among Partner Investments, L.P., a Delaware limited partnership, PFM Healthcare Master Fund, L.P., a Cayman Islands limited partnership, and PFM Healthcare Principals Fund, L.P., a Delaware limited partnership (collectively, "*PFM*"), the Company and the other parties thereto (the "*Settlement Agreement*"). In connection with the acquisition of the Securities (as defined below), the Holder represents and warrants to, and agrees with, the Company as follows:

1. **Acknowledgement.** The Holder is party to that certain Exchange and Release Agreement, dated as of May 15, 2017, by and among the Company and the other parties thereto (the "*Exchange Agreement*"). Subject to the terms and conditions of this Statement, the Holder hereby accepts ownership of its pro rata portion, based on its total dollar investment in the Company's Series C-1 Preferred Stock and Series C-2 Preferred Stock relative to all of the Company's stockholders that exchanged shares of the Company's capital stock pursuant to the Exchange Agreement, of the shares of Class A Common Stock transferred by PFM pursuant to the Settlement Agreement (the "*Securities*").

2. **No Registration.** The Holder understands that the Securities have not been, and will not be, registered under the Securities Act of 1933, as amended (the "*Securities Act*"), by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the *bona fide* nature of the investment intent and the accuracy of the Holder's representations as expressed herein or otherwise made pursuant hereto.

3. **Investment Intent.** The Holder is acquiring the Securities for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, any distribution thereof in violation of the Securities Act. The Holder has no present intention of selling, granting any participation in, or otherwise distributing the Securities.

4. **Accredited Investor.** The Holder is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission and agrees to submit to the Company such further assurances of such status as may be reasonably requested by the Company. The Holder has furnished or made available any and all information requested by the Company or otherwise necessary to satisfy any applicable verification requirements as to "accredited investor" status. Any such information is true, correct, timely and complete.

5. **Residency.** The residency of the Holder (or, in the case of a partnership or corporation, such entity's principal place of business) is correctly set forth on the signature page hereto.

6. **Restrictions on Resales.** The Holder acknowledges that the Securities must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. The Holder is aware of the provisions of Rule 144 promulgated under the Securities Act, which permit resale of shares purchased in a private placement subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month

US-REPORTS-0014764

period not exceeding specified limitations; the sale being effected through a "broker's transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable. The Holder acknowledges and understands that the Company may not be satisfying the current public information requirement of Rule 144 at the time the Holder wishes to sell the Securities and that, in such event, the Holder may be precluded from selling the Securities under Rule 144 even if the other applicable requirements of Rule 144 have been satisfied. The Holder understands and acknowledges that, in the event the applicable requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Securities. The Holder understands that, although Rule 144 is not exclusive, the Securities and Exchange Commission has expressed its opinion that persons proposing to sell restricted securities received in a private offering other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for those offers or sales and that those persons and the brokers who participate in the transactions do so at their own risk.

7.      **No Public Market.** The Holder understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

8.      **Legend Requirements.**

(a) Legends. The Holder understands and agrees that the Company shall cause the legends set forth below, or substantially equivalent legends, to be placed upon any certificate(s) evidencing ownership of the Securities, together with any other legends that may be required by the Company, by applicable state or federal securities laws, or by any other agreement between the Holder and the Company:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD OF UP TO 180 DAYS (SUBJECT TO EXTENSION) IN THE EVENT OF A PUBLIC OFFERING, AND A RIGHT OF FIRST REFUSAL IN FAVOR OF THE ISSUER, A SECONDARY RIGHT OF REFUSAL AND ASSIGNEE RIGHT OF REFUSAL AS SET FORTH IN AN INVESTOR RIGHTS AGREEMENT AND THE BYLAWS, COPIES OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

US-REPORTS-0014765

THE SHARES EVIDENCED HEREBY ARE SUBJECT TO AN AMENDED
AND RESTATED VOTING AGREEMENT (A COPY OF WHICH MAY BE
OBTAINED FROM THE ISSUER) AND BY ACCEPTING ANY INTEREST
IN SUCH SHARES THE PERSON HOLDING SUCH INTEREST SHALL BE
DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE
PROVISIONS OF SAID VOTING AGREEMENT.

(b) Stop-Transfer Instructions. The Holder agrees that, in order to ensure compliance with the restrictions imposed by this Statement, the Company may issue appropriate "stop-transfer" instructions to its transfer agent, if any, and if the Company acts as its own transfer agent, it may make appropriate notations to the same effect in its own records. The Company will not be required (a) to transfer on its books any Securities that have been sold or otherwise transferred in violation of any of the provisions of this Statement or (b) to treat as owner of such Securities, or to accord the right to vote or pay dividends, to any transferee or other purchaser to whom such Securities have been so transferred. The Holder further understands and agrees that the Company may require written assurances, in form and substance satisfactory to counsel for the Company (which may include a requirement that the Holder's counsel provide a legal opinion acceptable to the Company), before the Company effects any future transfers of the Securities.

9.    **Additional Agreements.**

(a) Agreement to be Bound. As a condition to the transfer of the Securities, the Holder hereby agrees to be bound by, and that the Securities shall be subject to, all of the restrictions set forth in the Company's Amended and Restated Investors' Rights Agreement dated as of May 15, 2017 (the "*Rights Agreement*") and the Company's Amended and Restated Voting Agreement dated as of May 15, 2017 (together with the Rights Agreement, the "*Acquisition Agreements*") in the same manner as PFM is bound by all the restrictions of the Acquisition Agreements, including, but not limited to, the "Market Stand-Off Agreement" contained in Section 2.9 of the Rights Agreement.   The Holder further acknowledges and agrees that all future transferees of all or part of the Securities shall receive and hold such shares subject to the restrictions set forth in the Acquisition Agreement and this Statement.

(b) Tax Consequences. The Holder has reviewed with its own tax advisors the federal, state, and local tax consequences, if any, of accepting the Securities. The Holder is relying solely on such advisors and not on any statements or representations of the Company or any of the Company's agents. The Holder understands it (and not Company) shall be responsible respectively for its own tax liability that may arise as a result of accepting the Securities.

(c) No Statements by the Company. The Holder acknowledges that the Company has made no statements, representations or warranties to it. The Holder acknowledges that it has consulted its own financial, legal and tax advisors, and is solely responsible for the decision to accept the Securities in accordance with the terms of this Statement.

*(signature page follows)*

3

US-REPORTS-0014766

The Holder is signing this Acknowledgement and Representation Statement on the date first written above.

**HOLDER (IF AN ENTITY):**

Name: _____

By: _____

Name: _____

Title: _____

Address: _____

_____

_____

**HOLDER (IF AN INDIVIDUAL):**

By: _____

Name: Kendra Fadil

Address: 3005 Park Blvd.
Palo Alto, CA 94306

_____

(Signature Page to Theranos, Inc. Acknowledgement and Representation Statement)

US-REPORTS-0014767



1701 Page Mill Road   P 650.838.9292   theranos.com
Palo Alto, CA 94304   F 650.838.9165

March 20, 2017

Dear Stockholder,

As you may know, Theranos, Inc. (the "**Company**") has finalized negotiations with certain holders of its outstanding Series C-1 Preferred Stock and Series C-2 Preferred Stock regarding an offer to exchange such shares for shares of newly-created series of preferred stock, in consideration for a release of any potential claims as stockholders against the Company, its employees, directors and officers, and other parties (the "**Exchange**"). Twenty-two holders of Series C-1 Preferred Stock and Series C-2 Preferred Stock have signed non-binding term sheets indicating their interest in participating in the Exchange. The Company hereby invites you to participate in the Exchange.

Earlier today, we sent an email from venueclientservices@dfsco.com to the email address we have on file for you. This email will provide you access to a secure online data room for "Project Epsilon." The documents related to the Exchange are available for your review through that data room. If you have any issues accessing the data room or if you did not receive an email, please contact Cody Gaynor at cgaynor@wsgr.com or (650) 849-3128. The data room also contains informational materials and directions for how to participate in the Exchange, should you choose to do so. These documents are important and may affect your rights as a stockholder of the Company, even if you do not participate in the Exchange. You are encouraged to read the contents of these documents in their entirety. Please also note that this offer to participate in the Exchange will close on April 14, 2017.

You may access the project at any time by logging into Donnelley Financial Solutions Venue at www.rrdvenue.com.

If this is your first time logging into Donnelley Financial Solutions Venue, you will receive a personalized link in a separate email with the subject "Your credentials for rrdvenue.com." That link allows you to enable your account with the username located at the bottom of the email and you will be asked to create a password. The link will expire within seven (7) days, so please enable your account promptly. Once your account is enabled, you can immediately log into Venue and access the project.

The above summary is not and does not purport to be a complete description of the Exchange. Please review carefully the documents available in the data room for a full description of the terms of the Exchange. If you have any questions, please contact me at dtaylor@theranos.com or (650) 546-2205.

Thank you,

David Taylor
General Counsel