Page 1

1    IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

2

     PARTNER INVESTMENTS, L.P., a
3    Delaware limited partnership,
     PFM HEALTHCARE MASTER FUND,
4    L.P., a Cayman Islands limited
     partnership, and PFM HEALTHCARE
5    PRINCIPALS FUND, L.P., a
     Delaware limited partnership,

6

              Plaintiff,
7
     vs.                            Case No. 12816-VCL
8

9    THERANOS, INC., a Delaware
     corporation, ELIZABETH HOLMES,
10   an individual, RAMESH BALWANI,
     an individual, and DOES 1-10,

11

              Defendants.
12   ----------------------------/

13

14                 ** CONFIDENTIAL **
15            VIDEOTAPED DEPOSITION OF
16         THE HONORABLE GEORGE P. SHULTZ
17            San Francisco, California
18             Tuesday, April 4, 2017
19

20

21

22   Reported by:
23   LORRIE L. MARCHANT, CSR No. 10523
                     RMR, CRR, CCRR, CRC
24

25   Job No. 121073

Trial Exh. 5520 Page 0001

PFM-DEPO-00014157

CONFIDENTIAL

Page 2

1          April 4, 2017

2             10:07 a.m.

3

4    Videotaped deposition of THE HONORABLE

5    GEORGE P. SHULTZ, held at the offices of

6    Gibson, Dunn & Crutcher, LLP, 555 Mission

7    Street, 30th Floor, San Francisco,

8    California, before Lorrie L. Marchant, a

9    Certified Shorthand Reporter, Registered

10   Merit Reporter, Certified Realtime

11   Reporter, California Certified Realtime

12   Reporter, Certified Realtime Captioner.

13

14

15

16

17

18

19

20

21

22

23

24

25

PFM-DEPO-00014158

Page 3

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4           GIBSON, DUNN & CRUTCHER
             BY:  MATTHEW KAHN, ESQ.
 5                ELI LAZARUS, ESQ.
             555 Mission Street
 6           San Francisco, CA 94105
 7
 8
 9   FOR THE DEFENDANT THERANOS:
10           WILMERHALE
             BY:  THOMAS STRICKLAND, ESQ.
11           1875 Pennsylvania Avenue, NW
             Washington, DC 20006
12
13
             WILMERHALE
14           BY:  KATIE MORAN, ESQ.
             350 South Grand Avenue
15           Los Angeles, CA 90071
16
17
18   FOR THE DEFENDANT RAMESH BALWAMI:
19           DAVIS WRIGHT TREMAINE
             BY:  BEN BYER, ESQ. (via phone)
20           1201 Third Avenue
             Seattle, WA 98101
21
22
23   (Continued)
24
25
```

PFM-DEPO-00014159

CONFIDENTIAL

Page 4

1                    A P P E A R A N C E S

2

3    FOR THE DEFENDANT, ELIZABETH HOLMES:

4             COOLEY
              BY:  KATHLEEN GOODHART, ESQ.

5             101 California Street
              San Francisco, CA 94111

6

7

8    FOR THE WITNESS, THE HONORABLE GEORGE P. SHULTZ:

9             FARELLA BRAUN & MARTEL
              BY:  DOUGLAS YOUNG, ESQ.

10                 JESSICA NALL, ESQ.
              235 Montgomery Street

11            San Francisco, CA 94104

12

13

14            YOUNG CONAWAY STARGATT & TAYLOR
              BY:  MARTIN LESSNER, ESQ.

15            Rodney Square
              1000 North King Street

16            Wilmington, DE 19801

17

18

19   ALSO PRESENT:

20            Marcus Majers, Videographer

21                    ---oOo---

22

23

24

25

PFM-DEPO-00014160

CONFIDENTIAL

Page 5

1          SAN FRANCISCO, CALIFORNIA

2          TUESDAY, APRIL 4, 2017

3              10:07 A.M.

4          THE VIDEOGRAPHER:  Good morning.  This is

5    the start of tape labeled No. 1 of the videotaped

6    deposition of Secretary George Shultz in the matter

7    of Partner Investments, LP, et al., versus Theranos,

8    Inc., et al., in the Court of Chancery of the State

9    of Delaware.  Case No. 12816-VCL.

10         This deposition is being held at

11   555 Mission Street, 30th Floor, San Francisco,

12   California, on April 4th, 2017, at approximately

13   10:07 a.m.

14         My name is Marcus Majers from TSG

15   Reporting, Inc., and I am the legal video

16   specialist.  The court reporter today is

17   Lorrie Marchant, in association with TSG Reporting.

18         Will counsel please introduce themselves.

19         MR. KAHN:  Matthew Kahn from Gibson, Dunn &

20   Crutcher, for plaintiffs.

21         MR. LAZARUS:  Eli Lazarus from Gibson, Dunn

22   & Crutcher, also for plaintiffs.

23         MR. STRICKLAND:  Tom Strickland,

24   WilmerHale, for the company, Theranos.

25         MS. GOODHART:  Kathleen Goodhart, Cooley,

PFM-DEPO-00014161

1   for Elizabeth Holmes.

2        MR. LESSNER:  Marty Lessner, Young,

3   Conaway, Stargatt & Taylor of Wilmington, Delaware,

4   for Secretary Shultz.

5        MS. NALL:  I'm Jessica Nall from Farella

6   Braun & Martel for Secretary Shultz.

7        MR. YOUNG:  Douglas Young, Farella Braun &

8   Martel, for Secretary Shultz.

9        THE WITNESS:  George Shultz for Secretary

10  Shultz.

11       THE VIDEOGRAPHER:  All those joining via

12  telephone conference as well.

13       MR. BYER:  Ben Byer from Davis Wright

14  Tremaine for Sunny Balwani.

15       THE VIDEOGRAPHER:  Will the court reporter

16  please swear in the witness.

17        THE HONORABLE GEORGE P. SHULTZ,

18   FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:

19             EXAMINATION BY MR. KAHN

20       BY MR. KAHN:

21   Q.   Good morning, Mr. Secretary.

22   A.   Good morning.

23       MR. YOUNG:  Matthew, before you begin, as

24  we discussed before we started, it's our desire,

25  under whatever protocol you're using, to designate

PFM-DEPO-00014162

1    the deposition and the transcript as confidential.

2         MR. KAHN:  Understood.  Thank you.

3         BY MR. KAHN:

4    Q.  Mr. Secretary, it is an honor and a

5    privilege to meet you.  And I'm sorry that we had to

6    drag you here today.  We know your time is valuable,

7    so we'll make this as quick as possible.  I'll dive

8    right in.

9         How did you first become involved with

10   Theranos?

11   A.  A very good colleague of mine at Stanford,

12   named John Shoven, an economist with whom I worked

13   at the Stanford Institute for Economic Policy

14   Research and with whom I have written a book,

15   brought her to see me.

16   Q.  And by "her" you mean Elizabeth Holmes?

17   A.  Elizabeth Holmes.

18   Q.  Okay.  And was that in 2010?  2011?

19   A.  Well, there is an exact date, and I could

20   look that up somewhere.

21        MR. YOUNG:  You don't need to.  Just do

22   your best memory.

23        THE WITNESS:  It was around then.  I think

24   it was in the spring.

25   ///

PFM-DEPO-00014163

CONFIDENTIAL

1          BY MR. KAHN:

2      Q.    Okay.  And when you first met --

3      A.    That's a fact that can be ascertained, so I

4  don't want to...

5      Q.    That's okay.  I'm just trying to generally

6  put us in a time context.

7          When you first met Ms. Holmes, do you

8  recall what she told you about Theranos?

9          MS. GOODHART:  Objection.  Form.

10          THE WITNESS:  Not in detail.  But in

11  general, she described a system of taking blood by a

12  fingerstick and analyzing it in a machine she had

13  invented.  And the process was such that you would

14  enhance the analytic quality of the test.

15          BY MR. KAHN:

16      Q.    Okay.

17      A.    And make it easier, and, therefore, more

18  people likely to take it.

19      Q.    Did you eventually join Theranos's board of

20  directors?

21      A.    Yes.  I think it was always on the advisory

22  board.

23      Q.    Okay.  Do you have an understanding that at

24  one point you were on the board of directors, and

25  later you were on something called the "board of

PFM-DEPO-00014164

1  counselors"?

2      A.    Well, there was an overall board which was

3  an advisory board.

4      Q.    Okay.

5      A.    And subsequently that was changed.  And

6  part of the people remained on a -- I guess a more

7  fiduciary board, and I was on an advisory board.

8      Q.    Okay.  So when -- strike that.

9          Did Ms. Holmes ask you to join what you've

10  called the "advisory board"?

11      A.    Yes.

12      Q.    Okay.  And did she tell you why she wanted

13  you to join that board?

14      A.    No.  I just assumed that she knew about me

15  and had discussed me with John Shoven, with whom I'd

16  written a book on healthcare.

17      Q.    What was your understanding of your role on

18  that first board that Ms. Holmes asked you to join?

19      A.    To give advice as best I could, and

20  observing what was going on, making my comments.

21      Q.    And did you understand your role to be only

22  an advisory role?

23      A.    Yes.  That was brought out in one of our

24  meetings with great clarity in an exchange between

25  Senator Sam Nunn and the lawyer, David Boies.

PFM-DEPO-00014165

1    Q.   Okay.  Did Ms. Holmes tell you that your

2   role on that first board was an advisory role only?

3    A.   Well, she was present at the exchange that

4   I mentioned, and there was subsequent follow-up in

5   paper.  And I think Sam Nunn wrote something, and I

6   wrote, saying I agreed with Sam.

7    Q.   Okay.  And did Ms. Holmes also agree that

8   your role on the board was an advisory role?

9         MS. GOODHART:  Objection.  Form.

10        THE WITNESS:  Well, I just said that she

11  was present at this discussion and that I wrote to

12  her and others did too, so I assume she can read.

13        BY MR. KAHN:

14   Q.   Did Ms. -- do you recall Ms. Holmes saying

15  at this meeting that your role on the board was an

16  advisory role?

17   A.   I don't remember whether she -- how much

18  she took part in the discussion.  The lawyer,

19  David Boies, was representing her, as I understood

20  it.

21   Q.   Okay.  Back before that meeting with

22  Senator Nunn and Ms. Holmes and Mr. Boies, when you

23  first joined the board at that time, did you

24  understand that it was just an advisory role for

25  you?

CONFIDENTIAL

Page 11

1    A.   That's what I thought, but it wasn't -- I

2  didn't sort of delve into it much.

3    Q.   Okay.  At the time you joined the board,

4  did Ms. Holmes tell you what your role would be on

5  the board?

6    A.   Not in any explicit way.

7    Q.   Okay.

8    A.   But I noticed that some people who were

9  there at the first meeting I went to weren't there

10  at the next one.  So it was obvious that she was the

11  decider.

12    Q.   Okay.  What do you remember Ms. Holmes

13  telling you at the time you joined the board about

14  what the board's role was in managing Theranos?

15    A.   I don't think there was any explicit

16  discussion about that.

17    Q.   Okay.  Did you get an understanding from

18  your time on the board what the board's role was in

19  managing Theranos?

20    A.   It seemed to me our role was to give

21  advice.

22    Q.   But not to manage?

23    A.   Not to be -- we had no decision-making

24  authority.

25    Q.   If the board had no decision-making

PFM-DEPO-00014167

CONFIDENTIAL

Page 12

1    authority, do you recall who did have

2    decision-making authority?

3           MS. GOODHART:  Objection.  Form.

4           THE WITNESS:  Did somebody say something?

5           MR. YOUNG:  That's okay.  She's making a

6    record, but you can keep going.

7           THE WITNESS:  What did you ask again?

8           BY MR. KAHN:

9    Q.    Sure.

10          My question was if the board had no

11   decision-making authority, do you recall who did

12   have decision-making authority?

13   A.    Elizabeth Holmes.

14   Q.    Okay.  And was she the only one?

15   A.    She was -- had over half the stock, and she

16   was very glad to exercise her authority.

17   Q.    In addition to being on the board, did you

18   also become a shareholder of Theranos?

19   A.    Yes.

20   Q.    Are you still a shareholder of Theranos

21   today?

22   A.    Yes.  Actually, I bought shares on the

23   options I had.  And since it was a private company,

24   I figured at the age of 96, it's going to be a long

25   while.  So I put a great proportion of my shares

Trial Exh. 5520 Page 00012

PFM-DEPO-00014168

1    into the name of my children and my great

2    grandchildren.

3        Q.   Okay.  When you were on Theranos's board,

4    did you, from time to time, meet with Ms. Holmes in

5    person?

6        A.   Yes.

7        Q.   Did you meet with her on a weekly basis?

8        A.   I wouldn't say a weekly basis, but we met

9    from time to time.

10        Q.   Would you say maybe a monthly basis?

11        A.   I wouldn't want to characterize it any

12    particular way.

13        Q.   Okay.  In addition to meeting with

14    Ms. Holmes to discuss Theranos business, did you

15    also, during your time on the board, interact with

16    Ms. Holmes at social gatherings?

17        A.   Well, she -- we gave her a 30th birthday

18    party, so that was at our house at Stanford.  And

19    her parents came.

20        Q.   And did Ms. Holmes also attend any holiday

21    celebrations at your house or with your family?

22        A.   I think I brought her over once so she

23    would meet them, but I don't remember exactly.

24        Q.   Okay.  Other than in-person interactions

25    with Ms. Holmes when you were on the board, did you

PFM-DEPO-00014169

CONFIDENTIAL

Page 14

1   also interact with Ms. Holmes by telephone during

2   that period?

3       A.    Probably, but I don't remember very much.

4       Q.    Okay.  Did you also send letters back and

5   forth to Ms. Holmes?

6       A.    Not particularly, no.

7       Q.    Not letters?  Okay.

8       A.    I think there may have been, you know, a

9   notice or something or -- I told you earlier that I

10  sent a message saying I agreed with what Sam Nunn

11  had written about the advisory board.

12      Q.    Did you also, during that period through

13  your assistant, communicate with Ms. Holmes by

14  e-mail?

15      A.    I don't think so, but I don't know that.

16      Q.    Do you think that you have gotten to know

17  Ms. Holmes well as a result of your work with

18  Theranos?

19      A.    Yes.

20            MS. GOODHART:  Objection.  Form.

21            THE WITNESS:  Excuse me.

22            MR. YOUNG:  It's okay.

23            MS. GOODHART:  I'm objecting to questions,

24  which I'll do from time to time.

25            THE WITNESS:  Do I stop and you exercise

PFM-DEPO-00014170

1    your objection, or what happens?

2            MR. YOUNG:  Yeah.  She says the objection,

3    and then unless I tell you not to keep going, you

4    can keep going in answer to it.  But it's her right

5    to make the objection.

6            THE WITNESS:  Well, I would like to know

7    why she objects.

8            MR. YOUNG:  Well, under -- under the rules

9    of the Delaware court, she makes an overarching

10   objection that preserves any number of possible

11   reasons, and it just pertains to the form of the

12   question.  So it doesn't -- it's not anything you

13   have to worry about.

14           BY MR. KAHN:

15       Q.   Do you have a high opinion of Ms. Holmes?

16       A.   Yes.

17       Q.   Do you believe that Ms. Holmes was truthful

18   with you in all of your interactions with her?

19       A.   Yes, I think so.

20       Q.   In any of her interactions with you, did

21   Ms. Holmes ever do anything to give you reason to

22   believe that she was trying to deceive you?

23       A.   No.

24       Q.   Do you still see Ms. Holmes regularly since

25   you've left the board?

CONFIDENTIAL

Page 16

1     A.   No.

2     Q.   When was the last time that you saw

3   Ms. Holmes?

4     A.   The board was dissolved in December, and I

5   think I've seen her once since that time.

6     Q.   Okay.   When was that?

7     A.   I don't remember exactly.

8     Q.   When was the last time that you

9   communicated with Ms. Holmes in any fashion, by

10   phone or letter?

11     A.   I think she called me maybe a month or so

12   ago.

13     Q.   What did you discuss?

14     A.   Whether or not we could have lunch

15   together.   And we never did.

16     Q.   Did you discuss anything other than lunch?

17     A.   No.

18     Q.   You mentioned that the board was dissolved

19   in December.   Are you referring to the board of

20   counselors?

21     A.   There was a board of -- an advisory board.

22   It was very large in number.   And in December, I

23   believe, that was changed.   So some of the people

24   who were on it became members of what I gathered was

25   a fiduciary board, and the balance of us were on an

Trial Exh. 5520 Page 00016

PFM-DEPO-00014172

1    advisory board, as before.

2        Q.    Okay.  And that advisory board was

3    dissolved in December?

4        A.    Yes.

5        Q.    Okay.  Do you know why it was dissolved?

6        A.    You'll have to ask her, but I assume that

7    she had so many boards by the time.  She had the

8    board I mentioned.  She had a -- I think she had a

9    scientific advisory board and maybe a medical

10   advisory board.  So she had lot of people around

11   giving advice.

12       Q.    Did you talk to Ms. Holmes about your

13   deposition today?

14       A.    No.

15       Q.    Other than your lawyers, did you talk with

16   anyone about your deposition today?

17       A.    My wife.

18       Q.    Other than your lawyers and your wife, did

19   you speak with anyone about the deposition today?

20       A.    No.  My assistant, Susan, knows that I'm

21   here giving a deposition, but we didn't discuss it.

22       Q.    Have you spoken with Ms. Holmes' lawyers or

23   Mr. Balwani's lawyers about the deposition today?

24       A.    No.

25       Q.    Have you spoken with Theranos's lawyers

CONFIDENTIAL

Page 18

1  about the deposition today?

2      A.    No.

3      Q.    Okay.  Do you know who Sunny Balwani is?

4      A.    Yes.

5      Q.    Okay.  Did you interact with him during

6  your time on the Theranos board?

7      A.    Not very much.

8      Q.    One of the things that Theranos did as a

9  company was to run blood tests on patients' blood;

10  correct?

11      A.    Correct.

12      Q.    And there are many different types of tests

13  that can be run on patients' blood; correct?

14      A.    Yes.

15      Q.    Okay.  Did Ms. Holmes ever tell you how

16  many different kinds of blood tests that Theranos

17  was running on patients' blood?

18      A.    I don't think we had a detailed discussion

19  like that.

20      Q.    Okay.  Did you have an understanding, as a

21  result of being on Theranos's board, of how many

22  different kinds of blood tests Theranos was running

23  on patients' blood?

24      A.    What I knew and was told and what I

25  observed by being there when it was done, that blood

Trial Exh. 5520 Page 00018

PFM-DEPO-00014174

CONFIDENTIAL

Page 19

1    would go into something called an Nanotainer, the

2    object of which was to keep the temperature

3    reasonably constant.

4           And from there it went on a little device

5    on which chemistry could be changed, depending on

6    what you wanted to diagnose for.  And that device

7    went into the machine that she invented and which

8    did the analysis.

9       Q.   Did you have an understanding that Theranos

10   was running hundreds of blood tests on patients'

11   blood?

12      A.   Well, they were gradually expanding.  It

13   was slow.  They had a place in Palo Alto where you

14   could go and give blood.  And then they developed a

15   string of testing places in Arizona -- in a central

16   analytic place in Arizona.

17      Q.   Did you ever have an understanding that

18   Theranos was running hundreds of different kinds of

19   blood tests on the blood that it was taking and

20   putting into the Nanotainer?

21           MS. GOODHART:  Objection.  Form.

22           THE WITNESS:  What I knew is what I told

23   you already, that you could change the chemicals on

24   that device that went into the machine, depending

25   upon what you were diagnosing for.  How many ways

PFM-DEPO-00014175

CONFIDENTIAL

Page 20

1   you could change it, I don't know.

2          BY MR. KAHN:

3      Q.   Okay.  Was it your understanding that all

4   of the tests that Theranos ran were done on that

5   blood that was taken by fingerstick and put into the

6   Nanotainer?

7      A.   Yes.

8          MS. GOODHART:  Objection.  Form.

9          BY MR. KAHN:

10     Q.   Okay.  And did you have that understanding

11  because Ms. Holmes told you that from time to time?

12         MS. GOODHART:  Objection.  Form.

13         THE WITNESS:  I observed on countless

14  occasions somebody, including me, having their

15  finger stuck, and the blood winding up going into

16  this machine.  They did this, and you see a machine,

17  it goes in.

18         BY MR. KAHN:

19     Q.   Sure.  But leaving aside what you observed,

20  did Ms. Holmes also tell you that all of the tests

21  were run on the blood in the Nanotainer?

22         MS. GOODHART:  Objection.  Form.

23         THE WITNESS:  That was my assumption.

24  There wasn't any discussion about it.

25  ///

PFM-DEPO-00014176

1   BY MR. KAHN:

2   Q.   Did you ever have an understanding that

3   Theranos was running some of its blood tests on

4   blood that was taken with a traditional needle and

5   put into a tube the way that other labs, like Quest,

6   do it?

7   A.   I know that they had a venous draw system,

8   but it was different from the typical one, a little

9   easier.  And when they drew blood, they drew less.

10          And on one occasion when I was there and

11  had my fingerstick and went into the machine and

12  outcome, I saw that there was a venous draw place.

13  I said, "Oh, I'll have a venous draw too."  So I did

14  that.  And it went in the machine and the result was

15  the same.  So it was a little sample of one that

16  said the fingerstick works.

17  Q.   You mentioned the machine that Ms. Holmes

18  invented.  Are you referring to a blood analyzer

19  device that Theranos manufactured?

20  A.   Yes.

21  Q.   Okay.  And have you heard different

22  versions of that device called the "Edison" and the

23  "MiniLab" and things like that?

24  A.   I've seen those words around.  I just

25  always called it "the device."

Page 22

1    Q.   Okay.  And did you understand, from your

2    discussions with Ms. Holmes, that all the blood

3    tests that Theranos ran were being run on those

4    Theranos-manufactured devices?

5           MS. GOODHART:  Objection.  Form.

6           THE WITNESS:  That was my assumption.  We

7    didn't have a big discussion about it.

8           BY MR. KAHN:

9    Q.   Well, sure.  But when you talked with

10   Ms. Holmes about the blood tests, you and she were

11   talking about running blood tests on

12   Theranos-manufactured devices?

13   A.   Yes.

14          MS. GOODHART:  Objection.  Form.

15          BY MR. KAHN:

16   Q.   Was that a "yes"?

17   A.   Yes.

18   Q.   Okay.

19   A.   She has to speak lower so you can hear me.

20   Q.   I agree with you.

21          MS. GOODHART:  Oh, just to be clear, the

22   objections -- typically the witness waits until the

23   objection has been made so the court reporter can

24   take it down before you respond, and that way we're

25   not talking over each other.

Trial Exh. 5520 Page 00022

PFM-DEPO-00014178

CONFIDENTIAL

Page 23

1          THE WITNESS:  Okay.  So I assume,

2     therefore, you're going to say why you object.

3          MR. YOUNG:  No, no.  Just when he -- when

4     Mr. Kahn asks you a question, we'll just do a --

5     just take a beat, and then if there's an objection,

6     then you can answer.  They don't have to -- they're

7     not allowed, actually, to give long, long speaking

8     objections under the rules.

9          THE WITNESS:  But why -- it would be

10    interesting to me to know why she's objecting.

11         MR. YOUNG:  Well, we'll discuss it off the

12    record another time, after the deposition is over,

13    if that's okay with you.

14         THE WITNESS:  It seems like I'm being left

15    in the dark here.

16         MR. YOUNG:  That's all right.

17         BY MR. KAHN:

18     Q.   Here's what I'll suggest:  I'll ask a

19    question.  If we could just pause for a second.

20    She'll say the words "objection to form."  That's

21    all she's allowed to say.  After she says "objection

22    to form," then you can answer my question.

23     A.   What does "objection to form" mean?

24     Q.   It basically means that she thinks there's

25    something wrong with the way I phrased my question,

Page 24

1   not that there's something wrong about asking you

2   what I'm asking you for, but that I should be

3   wording it in a different way.

4          I disagree with her.  I think my questions

5   are fine.  But I'm allowed to ask the question the

6   way I want to, and she's allowed to say "objection

7   to form."  And if we have to fight about it later,

8   it will be a long time from now.

9          MS. GOODHART:  And the form, the things

10  that could be wrong with his question is he might be

11  asking you to speculate, he might be asking you to

12  testify about something that you don't have a

13  foundation for testifying about, and so I think that

14  his question is improper under the rules, and he can

15  fix his question or not.

16         BY MR. KAHN:

17    Q.    But either way, I suggest that I -- I'll

18  ask it.  She'll say "objection to form," and then

19  you can answer my question, if that's okay with you.

20    A.    Well, okay.  If that's the way you lawyers

21  do it.  It doesn't sound right to me.

22         MR. YOUNG:  That's the way they do it in

23  this particular case, in this particular

24  jurisdiction, so we're in good shape.

25  ///

PFM-DEPO-00014180

CONFIDENTIAL

Page 25

1          BY MR. KAHN:

2      Q.    Did Ms. Holmes ever tell you that Theranos

3   was running blood tests on patient bloods using any

4   device other than the Theranos-manufactured device

5   that she invented?

6          MS. GOODHART:  Objection.  Form.

7          THE WITNESS:  So now what?

8          MR. YOUNG:  Now you can answer.

9          THE WITNESS:  No.

10          BY MR. KAHN:

11      Q.    Okay.  And you believed that all of the

12   tests that Theranos was running were being done on

13   the Theranos-manufactured blood analyzer device;

14   correct?

15      A.    Yes.

16      Q.    And that was an important fact to you as an

17   investor in Theranos; right?

18          MS. GOODHART:  Objection.  Form.

19          THE WITNESS:  Can I speak a little bit in

20   the answer or "yes" or "no"?

21          MR. YOUNG:  I prefer you answer "yes" or

22   "no" and let him follow up.

23          THE WITNESS:  The point is that she had or

24   has a vision that can have a profound effect on our

25   healthcare system.  And the vision is that blood

PFM-DEPO-00014181

1   contains a lot of information about what's going on

2   in your body.  And if you do it right, what may be

3   going on, in other words, a look into the future.

4           And so since an astonishing proportion of

5   people who are asked by a doctor to get a blood test

6   don't do it, presumably because it's too expensive

7   or too inconvenient or unpleasant, if you could find

8   a way that was inexpensive, located in a handy way,

9   and not obtrusive, then this process would work much

10  better.

11          In addition, you probably have given blood

12  somewhere, and you see it go into some test tubes

13  that sit there, and people hold them and -- so

14  there's no attention paid to what's happening to

15  their temperature.

16          She paid attention to what's happening to

17  their temperature.  Why?  Because when the

18  temperature changes, the blood changes.  And when

19  time passes, the blood changes.  So she wanted to

20  have a system that held the temperature as close as

21  possible to the temperature when it was given.

22  That's the purpose of the Nanotainer.

23          And to get an analytic place pretty

24  apparently near where you give the blood, so you can

25  minimize time.  Time also is a variable.

PFM-DEPO-00014182

CONFIDENTIAL

Page 27

1        So if you reduce those variables, then you
2   can compare last week with this week and next week.
3   If you don't reduce the variables, there's so much
4   static that you can't make any decent comparison.
5        But if you can make a comparison like that,
6   then you have, in a sense, a moving picture as a
7   more powerful diagnostic than a snapshot.  So all
8   the way through what she's looking for is a way to
9   use your blood analysis system to understand what's
10  happening to you and what may happen to you.
11       BY MR. KAHN:
12  Q.   Okay.  I understand that.
13       And would you agree with me, though, that
14  one of the key components of Ms. Holmes's vision was
15  using the blood analyzer device that she invented to
16  test the blood?
17       MS. GOODHART:  Objection.  Form.
18       THE WITNESS:  Yes.  And among other
19  reasons, because it's small, light, and easy to move
20  around.  So you can put it somewhere near where you
21  want to use it.
22       BY MR. KAHN:
23  Q.   Right.  And so if it turned out that
24  Theranos was running its blood tests not on the
25  device that Ms. Holmes invented but on commercially

PFM-DEPO-00014183

Page 28

1  available blood analyzers made by companies like

2  Siemens, you would have wanted to know that; right?

3          MS. GOODHART:  Objection.  Form.

4          THE WITNESS:  Right.

5          MR. KAHN:  Let's mark that, please.

6          (Marked for identification purposes,

7           Exhibit 722.)

8          BY MR. KAHN:

9      Q.   So, Secretary Shultz, a document has just

10  been put in front of you.  It's marked Exhibit 722.

11          (Discussion off the record.)

12          MR. KAHN:  Okay.  So, Secretary Shultz,

13  you've been handed a document marked Exhibit 722.

14          And the Bates number, for those on the

15  phone, starts with TGPS00010537.

16          BY MR. KAHN:

17      Q.   Do you recall when you interviewed

18  Ms. Holmes on March 12, 2015?

19      A.   Yes.

20      Q.   Okay.  I would like to ask you just a

21  couple of questions about some specific statements

22  that Ms. Holmes made during the interview.

23          MR. YOUNG:  Just for your record, you said

24  March 12, and this says March 13.  I don't know if

25  that matters to you.

PFM-DEPO-00014184

Page 29

1          MR. KAHN:  Thank you.  You're right.  It

2     was March 13th.  I'm not sure it matters either, but

3     it's good to be precise.

4          BY MR. KAHN:

5      Q.   If you could turn, Mr. Secretary, to page 7

6     of the document, which is the Bates number ending in

7     543.  And there's a very long portion of the

8     interview here by Ms. Holmes.  And if you draw your

9     attention to the middle of the page, there's a line

10    that starts with the words "like large needles."

11         Let me know when you're there.  Maybe you

12    could assist him.

13         MR. YOUNG:  Yeah, I'm looking for it

14    myself.

15         MR. KAHN:  Sure.

16         MR. YOUNG:  Right there.

17         BY MR. KAHN:

18     Q.   Okay.  Do you see that line?

19     A.   Yes.

20     Q.   Okay.  And then about halfway into the

21    line, there's a sentence that starts with the word

22    "so."

23     A.   Yes.

24     Q.   Okay.  I'm going to read aloud two

25    sentences, and then I'm going to ask you a question.

PFM-DEPO-00014185

1      So Ms. Holmes said:

2          "So we've redeveloped the lab

3      infrastructure to make it possible to run

4      any combination of lab tests from tiny

5      droplets of blood.  People can come in

6      and do full service laboratory testing

7      with a fingerstick as opposed to having

8      tubes and tubes taken from your arm.  We

9      do that not just for basic tests, but for

10     any tests."

11     Secretary Shultz, did you understand all of

12  that to be true at the time of this interview in

13  March 2015?

14          MS. GOODHART:  Objection.  Form.

15          THE WITNESS:  Yes.  Yes.

16          BY MR. KAHN:

17     Q.    Thank you.

18          And did you believe it to be true because

19  you had discussed it with Ms. Holmes?

20          MS. GOODHART:  Objection.  Form.

21          THE WITNESS:  I can't recall all

22  discussions I had with her.  But this was in line

23  with the general understanding I had of why this was

24  so important.

25  ///

1           BY MR. KAHN:

2       Q.   And part of your general understanding came

3   from your discussions with Ms. Holmes; correct?

4       A.   Yes, of course.

5           MS. GOODHART:  Objection.  Form.

6           BY MR. KAHN:

7       Q.   Okay.  Now, if you look just below the

8   portion that we read, there's a sentence that starts

9   "we have."

10      A.   Yes.

11      Q.   Do you see that?

12          Okay.  And I'll read that aloud.  It

13  says -- or, rather, Ms. Holmes said:

14              "We have focused on access in the

15          context of our Wellness Centers, so we've

16          begun building out in every Walgreens in

17          the country, starting with our work in

18          Arizona."

19          Secretary Shultz, did you understand that

20  as of March 2015, Theranos had begun building out in

21  every Walgreens in the country?

22      A.   Well, obviously they started in Arizona,

23  and that's a big undertaking.  So you get around to

24  things when you get around to them.

25      Q.   Sure.  But I'm trying to draw a distinction

Page 32

1    between a plan to build out in the rest of the

2    country and actually having begun the process of

3    putting Wellness Centers into every Walgreens in the

4    country.

5            And my question is:  Did you have an

6    understanding in March 2015 that Theranos had

7    actually started to construct Wellness Centers in

8    every Walgreens in the country?

9            MS. GOODHART:  Objection.  Form.

10           THE WITNESS:  I knew that that was the

11   aspiration.

12           BY MR. KAHN:

13       Q.   Okay.

14       A.   Where they are exactly, I didn't know.  Not

15   only in the country but around -- Walgreens had an

16   affiliation with Booth that were located in --

17   mostly in Europe, I think.  So there was a potential

18   large footprint.

19       Q.   Did you talk with Ms. Holmes from time to

20   time about the partnership between Theranos and

21   Walgreens?

22       A.   Not much.  A little bit.

23       Q.   Did you have an understanding that Theranos

24   had an agreement with Walgreens that gave Theranos

25   the right to put a Theranos Wellness Center in every

CONFIDENTIAL

Page 33

1   Walgreens in the country?

2           MS. GOODHART:  Objection.  Form.

3           THE WITNESS:  That was my assumption.

4           BY MR. KAHN:

5       Q.   Okay.  And that assumption was based on

6   your discussions with Ms. Holmes?

7           MS. GOODHART:  Objection.  Form.

8           THE WITNESS:  That we had this -- this

9   thing in Arizona was going forward.  And when that

10  got well in hand and you learned what you learned

11  from doing that, you could go elsewhere.

12          BY MR. KAHN:

13      Q.   And that understanding that you just

14  described is based on your discussions with

15  Ms. Holmes; correct?

16      A.   Yes.

17      Q.   Did you ever talk with Ms. Holmes about

18  Theranos's partnership with Safeway?

19      A.   A little bit.

20      Q.   What do you recall about that?

21      A.   Not a lot.  She had that before I was

22  involved.  There was some problem with Safeway.  I

23  don't know what.  Between Safeway and the man who

24  was the chief executive.  I forget his name.  With a

25  beard.  Anyway -- and somehow it all got caught up

PFM-DEPO-00014189

Page 34

1    in that and didn't go anywhere.

2        Q.   Did you have an understanding that Theranos

3    had a contract with Safeway to build Theranos stores

4    inside -- sorry, Theranos Wellness Centers inside

5    Safeway?

6        A.   That was the idea.

7        Q.   Okay.  And you had that understanding based

8    on your conversations with Ms. Holmes?

9        A.   The idea was to make the Wellness Center

10   easy to get to.  So things like retail stores and

11   pharmacies locate themselves near parking lots so

12   they want people to get there easily.  That was the

13   whole idea.

14       Q.   Sure.  And your understanding, based on

15   your discussions with Ms. Holmes, was that Theranos

16   had a contract with Safeway to build Wellness

17   Centers in Safeway stores?

18       A.   Yes.  But that didn't materialize the way

19   the Walgreens one did.  And for what reasons it fell

20   apart, I don't know.

21       Q.   So your understanding, based on your

22   discussions with Ms. Holmes, was that there was a

23   contract for Theranos to build Wellness Centers

24   inside Safeway, but ultimately Theranos didn't build

25   any; is that right?

Page 35

1        MS. GOODHART:  Objection.  Form.

2        THE WITNESS:  That's right.  But why

3   involves something that I didn't understand mixed up

4   about Safeway.

5        BY MR. KAHN:

6    Q.   Sure.

7    A.   And I didn't probe into it particularly.

8    Q.   Did you ever see a demonstration of the

9   blood analyzer machine that Theranos manufactured?

10   A.   Did I ever see it operate?  Yes.  Many

11   times.

12   Q.   Okay.  What do you recall about that?

13   A.   Well, I recall it was a very simple

14   process.  This little pallet was put into a slot in

15   the machine.  And you wait about 30 minutes, and out

16   comes the result.

17   Q.   Okay.  Do you know which version of the

18   Theranos blood analyzer device you saw this action?

19   A.   No.  But I did see a factory making them,

20   and what was very much automated.  And I could see

21   that there was a large effort made to see that they

22   were all exactly the same.

23   Q.   And so am I correct that you witnessed

24   personally a Nanotainer with blood in it being put

25   into a Theranos-manufactured machine, and then about

Page 36

1   30 minutes later results coming out?

2       A.   No.  First the blood goes from the

3   Nanotainer onto a -- I don't know how to describe

4   it.  A pallet.

5       Q.   A cartridge maybe?

6       A.   Sort of like that.  And that's the thing in

7   which they could change the chemistry.

8       Q.   Okay.  So then --

9       A.   And then that's what goes into the machine.

10      Q.   Okay.  And did you personally stand there

11  next to the machine for 30 minutes while it did its

12  analysis?

13      A.   I was sitting on a -- someplace, and I was

14  in the room.

15      Q.   Okay.  So what were you doing in the room

16  while it was doing its analysis for 30 minutes?

17      A.   It depends upon the situation.

18      Q.   Okay.  Well, what do you recall from any

19  given instance?

20      A.   Well, we had the machine once in New York

21  at Henry Kissinger's 90th birthday.  She was invited

22  to it, so we went.  And we had the machine in the

23  hotel room.  And we invited some people that Henry

24  located to come and get their fingers stuck and

25  observe what happened, so I saw that.

CONFIDENTIAL

Page 37

1    Q.   Okay.  And so did they get their fingers

2    stuck, the blood went in, and you all talked while

3    it did its analysis, and then the analysis was

4    complete and it delivered a result?

5    A.   Right.

6    Q.   Do you know if the result that came out of

7    that particular meeting in New York was accurate?

8    A.   I would have no way of checking that.  But

9    I do know that one of the people who came was a

10   surgeon who Henry Kissinger says is the smartest man

11   in the world.  I don't know.  Anyway, he took it and

12   he was intrigued.

13        So on his own notion, he made a trip to

14   California, and he spent a whole day exploring

15   Theranos.  Whatever he did exactly, I don't know,

16   but he wanted to satisfy himself.  And he came away

17   very impressed.  And he said he thought it would

18   have a big impact on surgery.

19        I said, "Why?"

20        He said, "Because what happens in surgery

21   is you have the surgery, and then the patient stays

22   in the hospital for a couple of days, then goes home

23   and quite often gets an infection, and then back in

24   the hospital.  So you've got this little machine.

25   It's right in the operating room.  Very small thing.

PFM-DEPO-00014193

CONFIDENTIAL

Page 38

1  One thing you have in an operating room is plenty of

2  blood.  So you put the blood in the thing and test

3  it, and maybe you'll see a potential infection and

4  deal with it right then.  And that will save a lot

5  of pain and agony."

6       Anyway, that's what -- was how he explained

7  his interest.

8       Q.   Did you understand from your discussions

9  with Ms. Holmes that there were actually some

10 Theranos-manufactured blood analyzers being used in

11 operating rooms?

12      A.   No.  I don't know that this was ever put

13 into operation, but that was what the surgeon

14 thought.  And I believe he became a member or maybe

15 even the chairman of a science advisory board of

16 some kind that she put together.

17      MR. KAHN:  Doug, we doing okay?

18      MR. YOUNG:  Yeah, I would say maybe at

19 11 o'clock, we might take a break.

20      MR. KAHN:  Perfect.  We'll just do this

21 document.

22           (Marked for identification purposes,

23            Exhibit 723.)

24      MR. KAHN:  Mr. Secretary, you've been

25 handed a document marked Exhibit 723.

1          For those on the phone, it's a letter dated

2    March 7, 2014, Bates-numbered TGPS00001780.

3          BY MR. KAHN:

4      Q.   Mr. Secretary, do you recognize this as a

5    letter that you sent to Governor Jerry Brown in

6    March 2014?

7      A.   Yes.

8      Q.   Okay.  Do you see, in the second paragraph,

9    you wrote:

10              "We likewise look forward to

11              welcoming you to Theranos's headquarters

12              before our dinner to brief you on the

13              infrastructure that is now live in

14              California for people to get laboratory

15              tests done with tiny droplets of blood

16              and the associated impact for Medi-Cal."

17          Do you see that, sir?

18      A.   (Nonverbal response.)

19      Q.   Okay.  What was the infrastructure that you

20    were referring to here?

21      A.   Well, it's the device and the other things

22    that went along with it.  That's the infrastructure.

23      Q.   Okay.  And what did you mean when you wrote

24    that the infrastructure was now live in California?

25      A.   That it was useable.  And I think by this

1   time, there was a place in Palo Alto that you could

2   go to and have your finger stuck.

3       Q.   Okay.  And so your understanding in

4   March 2014, when you wrote this letter, based on

5   your discussions with Ms. Holmes, was that blood was

6   being taken from patients at the Theranos Palo Alto

7   location, and all of that blood was being tested on

8   Theranos-manufactured blood analyzer devices;

9   correct?

10          MS. GOODHART:  Objection.  Form.

11          THE WITNESS:  I -- what date is what, I'm

12  not sure.  But, anyway, yes.

13          BY MR. KAHN:

14      Q.   Okay.  Am I correct that -- Mr. Secretary,

15  that no one ever told you, in March 2014 or

16  otherwise, that some of the blood tests that

17  Theranos was running on patient blood were being run

18  on commercially available blood analyzers made by

19  third-party companies like Siemens; correct?

20          MR. YOUNG:  There will be an objection.

21  Nope?  Okay.

22          THE WITNESS:  What?

23          MR. YOUNG:  Go ahead.

24          THE WITNESS:  No, I was not aware of that.

25  ///

PFM-DEPO-00014196

Page 41

1        BY MR. KAHN:

2     Q.    Okay.  And if that was true, that Theranos

3  was doing some of its blood tests on commercially

4  available blood analyzers, that's something that you

5  would have wanted to know; correct?

6        MS. GOODHART:  Objection.  Form.

7        THE WITNESS:  Yes.

8        BY MR. KAHN:

9     Q.    Okay.  And am I also correct --

10    A.    I probably would have assumed there was

11  some reason, and what was the reason.

12    Q.    Okay.  Am I also correct, Mr. Secretary,

13  that no one ever told you, in March 2014 or

14  otherwise, that some of the tests that were done on

15  the patient blood that Theranos collected were done

16  by third-party labs as opposed to being done by

17  Theranos itself?  No one ever told you that;

18  correct?

19    A.    No.

20    Q.    And that's something you would have wanted

21  to know; right?

22        MS. GOODHART:  Objection.  Form.

23        THE WITNESS:  I did.  But it didn't make

24  sense to me, because I saw with my own eyes that the

25  device she invented worked.

PFM-DEPO-00014197

1          BY MR. KAHN:

2      Q.   You'll notice, sir, in the last sentence of

3   that second paragraph, you mention the possibility

4   of "demonstrating our system and its implications

5   live for the governor"?

6      A.   Yes.

7      Q.   And by "our system," did you mean the same

8   thing as when you said "infrastructure" earlier?

9      A.   I meant that he would come in and either he

10  or Anne would get their fingers pricked, and he

11  would see that moved to a pallet.  Then he could see

12  it go into a machine, and he would see results come

13  out of the machine.

14          MR. KAHN:  And for the court reporter, I

15  think what he said was "either her or Anne."

16          BY MR. KAHN:

17     Q.   Did Governor Brown or his wife actually

18  have a demonstration done for them, to your

19  knowledge?

20     A.   I think so, yes.  I'm not -- I can't

21  remember explicitly, but I think so.

22     Q.   Okay.  Did you understand, around the time

23  of this letter, that there were still some

24  limitations on the Theranos-manufactured blood

25  analyzer device in terms of tests that it was not

Page 43

1    capable of running?

2        A.    No.

3        Q.    So your understanding as of March 2014 was

4    the Theranos blood analyzer device could run all of

5    the tests that Theranos was offering to patients;

6    right?

7            MS. GOODHART:  Objection.  Form.

8            THE WITNESS:  That was my assumption.

9            BY MR. KAHN:

10       Q.    And that was based on your discussions with

11   Ms. Holmes; correct?

12           MS. GOODHART:  Objection.  Form.

13           THE WITNESS:  And I also could observe that

14   sometimes it took longer than other times for the

15   machine to do whatever it did.  And that was because

16   the things you asked it to do were more complicated

17   than others, but it seemed to do them.

18           BY MR. KAHN:

19       Q.    Okay.  So, again, your understanding, based

20   on your discussions with Ms. Holmes around

21   March 2014, was that the Theranos-manufactured blood

22   analyzer device could run all of the blood tests

23   that Theranos was offering to patients; correct?

24           MS. GOODHART:  Objection.  Form.

25           THE WITNESS:  Yes.

1          BY MR. KAHN:

2          Q.   And just to make sure I'm being clear, your

3     understanding, based on your discussions with

4     Ms. Holmes around March 2014, was that the

5     Theranos-manufactured blood analyzer not only could

6     run all of the blood tests that Theranos was

7     offering, but it was running all of the blood tests

8     that Theranos was offering; correct?

9          MS. GOODHART:   Objection.   Form.

10          THE WITNESS:   That's what I assumed.   I

11     didn't probe into it.   It didn't occur to me.

12          BY MR. KAHN:

13          Q.   And if, in fact, it was not true that

14     Theranos was running all of the blood tests it

15     offered on the Theranos-manufactured device, that is

16     something you would have wanted to know; correct?

17          MS. GOODHART:   Objection.   Form.

18          THE WITNESS:   I would have wanted to know,

19     and I would have wanted to know why.   For instance,

20     I could conceive that they might not have any space

21     on the ones they were using and they needed to do,

22     just for the sake of time or some other item.

23          But since I didn't know, I didn't have

24     anything to look into.

25          MR. KAHN:   Okay.   We've been going about an

Page 45

1   hour.  Would it be all right with you if we take a

2   short five-minute break?

3           THE WITNESS:  Whatever you want to do.

4           MR. KAHN:  Okay.  Great.  Let's go off the

5   record.

6           THE VIDEOGRAPHER:  Off the record at

7   10:58 a.m.

8           (Recess taken, from 10:58 to 11:14.)

9           THE VIDEOGRAPHER:  Back on the record at

10  11:14 a.m.

11          BY MR. KAHN:

12     Q.   Mr. Secretary, am I correct that your

13  grandson, Tyler Shultz, worked for Theranos for a

14  period of time?

15     A.   Yes.

16     Q.   And he left the company around April 2014?

17     A.   I guess so.  Something like that.

18     Q.   Okay.

19     A.   There was a date you can fix.

20     Q.   Do you recall meeting with Tyler about his

21  departure from the company just after he left?

22     A.   Yes.

23     Q.   What do you recall about that?

24     A.   Well, he had come to see me sometime before

25  that, and he said he saw a blood test taken and

CONFIDENTIAL

1  tested on a big machine and then labeled a Theranos

2  result, which he thought was wrong.

3         And I said, "Well, why don't you" -- he

4  knew Elizabeth Holmes.  I said, "Why don't you talk

5  to Elizabeth about it and get it straightened out."

6         And the next time I saw him, he came to my

7  office at Stanford, and he was badly shaken up, I

8  could see.  I said, "What's the matter, Tyler?"

9         He said, "I just resigned from Theranos."

10        I said, "Well, what did you resign for?"

11   Q.   Do you mind speaking up just a little bit,

12  Mr. Secretary.

13   A.   I said, "What did you resign for?  You

14  seemed to be enjoying" -- he seemed like he was

15  having a good time.

16        He said, "Because you said I should talk

17  this over with Elizabeth, and I couldn't get to her.

18  So somebody suggested I write down my problem, which

19  I did, and send it in."

20        And the response was from Sunny Balwani,

21  who sent me a demeaning, angry note, saying, "If it

22  weren't for your grandfather, I'd really let you

23  have it."

24        And so he said, "I resigned immediately."

25        And so we talked for a while.  And I tried

PFM-DEPO-00014202

Page 47

1    to be helpful.  And I could see he wasn't settled

2    down, so I said, "Why don't you come and join

3    Charlotte and me for dinner tonight."  So he

4    accepted.

5            And a little while later, he called and

6    said, "There's a woman I would like to bring to

7    dinner too."

8            So we said, "Fine."  So they came.

9            We didn't have any extensive discussion

10   about Theranos, although the woman seemed to give

11   the impression that she was leaving because she

12   wanted to go to the Columbia Business School.  That

13   didn't make much sense to me, knowing something

14   about business schools that time of year.  But

15   anyway, that's what she said.

16       Q.   You mentioned that when Tyler first came to

17   you, he said that he had seen a blood sample tested

18   on a big machine but then labeled as a Theranos

19   result?

20       A.   That's right.

21       Q.   Okay.  And did you understand him to mean

22   that he had seen blood tested on a commercially

23   available blood analyzer but then labeled as though

24   it had been tested on the Theranos-manufactured

25   device?

PFM-DEPO-00014203

CONFIDENTIAL

Page 48

1          MS. GOODHART:  Objection to form.

2          THE WITNESS:  That's what I interpreted him

3    to mean.

4          BY MR. KAHN:

5     Q.   Okay.  And did he tell you anything else

6    about that?

7     A.   No.  He said he observed that, and he

8    thought it was wrong.  And so as a conscientious

9    employee, he wanted to report that to the head table

10   and get it straightened out.

11    Q.   And did you also -- do you agree with him,

12   that if, in fact, Theranos was testing patient blood

13   on commercially available analyzers but reporting it

14   as something done on a Theranos-manufactured device,

15   that would be wrong?

16         MS. GOODHART:  Objection.  Form.

17         THE WITNESS:  Well, all I thought was this

18   looks like a problem.  You should talk it over with

19   Elizabeth and get it straightened out.

20         BY MR. KAHN:

21    Q.   Okay.  And then -- so am I right that you

22   thought it was appropriate for Tyler to escalate his

23   concerns within the company?

24    A.   Yes.  He had a problem and wanted to get it

25   straightened out, and obviously the person to do it

PFM-DEPO-00014204

CONFIDENTIAL

Page 49

1  would be Elizabeth Holmes.

2      Q.   Okay.

3      A.   She's the boss.

4      Q.   And did you think it was appropriate for

5  Theranos to have responded to Tyler's concerns by

6  having Mr. Balwani send that e-mail?

7      A.   When Tyler came to me, he was very upset.

8  And he had been a very enthusiastic employee at

9  Theranos, so it was a big shock to me.  And as his

10 grandfather, I know I like him.  He's a great kid.

11      We sat -- we must have sat for an hour and

12 listening to him and trying to settle him down a

13 little bit.  And I could see that I -- I had gotten

14 quite a distance, but not all the way.

15      So I said, "Why don't you come over and

16 have supper."  My wife is very good at settling

17 people down.

18      Q.   I've had the pleasure of meeting her once.

19 She's very lovely.

20      My question, though, is when Tyler told you

21 that instead of Ms. Holmes responding to him,

22 Mr. Balwani had sent that nasty e-mail, did you

23 think in your mind that that was an appropriate

24 response for Theranos to take to those issues?

25      MS. GOODHART:   Objection.   Form.

PFM-DEPO-00014205

1          MR. BYER:  Objection.  Form.

2          THE WITNESS:  What's going on here anyway?

3          MR. YOUNG:  You can answer the question

4    now.

5          THE WITNESS:  So what was the question

6    again?

7          MR. KAHN:  Sure.  And we'll stipulate that

8    the objections are noted, and I'm going to say it

9    again.

10         BY MR. KAHN:

11   Q.   My question is when Tyler told you that

12   instead of Ms. Holmes responding to him, Mr. Balwani

13   sent that nasty e-mail, did you think in your mind

14   that that was an appropriate response for Theranos

15   to take to the issues that Tyler had raised?

16         MS. GOODHART:  Objection.  Form.

17         THE WITNESS:  I thought the response to

18   Tyler that is angry and demeaning to Tyler was

19   basically wrong.  So I agreed with Tyler that he

20   resigned.

21         BY MR. KAHN:

22   Q.   Did you think that Mr. Balwani's e-mail to

23   Tyler was an attempt to silence Tyler from raising

24   his concerns about Theranos's operations?

25   A.   I have no way to speculate about that.

Page 51

1    Q.   Okay.  In your capacity as a member of

2    Theranos's board at that time, did you think that

3    Theranos should have taken Tyler's concerns

4    seriously?

5    A.   I've had the privilege of managing a lot of

6    big organizations, and I know that if you're going

7    to be successful, you have to have upward

8    communication, because you don't know what's going

9    on down below always.

10         I know Jim Mattis, who's now Secretary of

11   Defense, but he's a Marine, I said "Jim, who did you

12   listen to?"

13         He said, "I listened to the sergeants.

14   They're the people who see."

15         So I think you've got to listen to people

16   like Tyler.  And, of course, I inquired, "What's

17   going on here?"  And I was told that they were just

18   checking something out with this machine.  And it

19   somehow didn't add up to me, but, anyway, that's

20   what I was told.

21   Q.   And who told you that?

22   A.   I think Elizabeth told me that.

23   Q.   Okay.  You said that you have experience

24   managing big organizations.  Do you mean sitting on

25   the board of directors of big organizations?

Trial Exh. 5520 Page 00051

PFM-DEPO-00014207

Page 52

1      A.   No.   I mean, I was president of Bechtel

2   Company.   I was Secretary of State.   A big

3   organization.

4      Q.   That's a big organization.

5      A.   To make it work, people think being

6   Secretary of State is just running around the world

7   negotiating with people.   No, that's not your

8   primary job.   Your primary job is to manage a huge

9   organization and get it to work for you.

10      Q.   Have you also sat on the board of directors

11   of companies other than Theranos?

12      A.   Yes.

13      Q.   Okay.   Approximately how many?

14      A.   I don't know.   I've sat on GM boards,

15   Chevron board, Boeing board, Gilead Sciences.

16      Q.   So all private companies?

17      A.   Gilead Sciences was a start-up company

18   where we worried about our burn rate.   Now it's very

19   successful.

20      Q.   It is.

21          How would you contrast the role that you

22   played as a director on those boards to your role on

23   the Theranos board that you described as an advisory

24   board?

25      A.   Well, on a fiduciary board, you're

PFM-DEPO-00014208

CONFIDENTIAL

Page 53

1   responsible for things that go on, and so you take

2   votes and you work at it that way.

3           In the case of Theranos, nobody took any

4   votes on anything.  We just gave advice, and

5   Elizabeth would decide what she wanted to do.

6       Q.   So am I correct that your understanding of

7   the Theranos board that you served on starting in

8   2011 was that it was not a fiduciary board; it was

9   just an advisory board?

10      A.   Earlier I explained to you the

11  back-and-forth between Senator Nunn and the lawyer,

12  and they established that.  And there was some

13  correspondence, and Sam Nunn said something to

14  Elizabeth, and I sent her a note saying, "I agree

15  with Sam."

16      Q.   And I remember you telling me about that

17  correspondence and that meeting, and I believe that

18  was from 2013.  And you joined the board in around

19  2011.

20          What I'm trying to get at is separate from

21  that meeting.  In your mind when you were on the

22  Theranos board in 2011 and 2012, did you have

23  understanding that that board was just an advisory

24  board and not a fiduciary board?

25          MR. YOUNG:  Objection.  This has been asked

PFM-DEPO-00014209

CONFIDENTIAL

Page 54

1   and answered earlier in the day.

2          BY MR. KAHN:

3      Q.   You may answer.

4      A.   I wasn't really thinking about it that way.

5   I was interested in what was going on, and I was

6   impressed with the mission that was set out.  And

7   it's a very important mission, and I was glad to be

8   part of it.  And I was interested to hear as it

9   progressed what was going on.

10     Q.   The board, I think you mentioned, when you

11  were on it, didn't take any votes; is that right?

12     A.   No.

13     Q.   No, that's not right?

14     A.   That's not right.  We never took any votes

15  at Theranos.  It was pointless.  Elizabeth was going

16  to decide whatever she decided.

17     Q.   Okay.  Did the board have a chairman, to

18  your recollection?

19     A.   I think she was the chairman.

20     Q.   Okay.  Do you recall if the board had

21  minutes of board meetings?

22     A.   I think there were minutes.  They

23  distributed some big books occasionally at board

24  meetings and, I looked at them and...

25     Q.   Prior to Mr. Boies's involvement, did -- to

PFM-DEPO-00014210

Page 55

1    your recollection, did the board have counsel

2    advising it?

3        A.   I think Boies was involved right from the

4    beginning, at least as I remember it.  He was not on

5    the board, but he was the counsel.  Later he became

6    a member of the board.

7        Q.   Okay.  Do you recall a time after Tyler

8    left Theranos, when Tyler came to your home and

9    there was some attorneys from the Boies Schiller

10   firm there?

11       A.   I wouldn't call them attorneys.

12       Q.   What would you call them?

13       A.   They were in David Boies's law firm.  They

14   were -- one was a woman.  She was perfectly nice.

15   The man was some sort of an animal.  Wild animal.

16   And he assaulted my grandson.  It's one of the

17   dumbest things I've ever observed.

18            But that ended.  When it did, my wife was

19   about to pick a hand iron out of the fireplace and

20   clobber him.

21       Q.   Okay.  Maybe you can kind of take us back

22   to the beginning of that.

23            How did it come to pass that Tyler came

24   over and the Boies Schiller people were there?

25       A.   Apparently when you become an employee of

Page 56

1   Theranos, you sign an agreement of not disclosing

2   what went on.  And they were worried about a Wall

3   Street Journal article, and they thought that Tyler

4   had talked to the reporter.

5           And Elizabeth Holmes told me that she

6   wanted to help Tyler out, and if he would sign

7   something or other, then that would be the end of

8   it.  And so it was arranged that he would meet with

9   the lawyers, I guess, from the David Boies firm, and

10  he would sign something.

11          So he had the meeting.  You know, two of

12  them, there was this woman and this fellow.  I think

13  his name was Brille.  Anyway, he assaulted my

14  grandson to the point where we all got rather angry

15  at him.  So that stopped.

16     Q.   And -- sorry.  Go ahead.

17     A.   And then it was agreed that he -- they

18  would come the next day and present something that

19  Tyler could decide whether or not to sign.

20          So when they left, I called

21  Elizabeth Holmes, and I said, "Your law firm sent

22  over people who were" -- or at least one -- the

23  woman didn't say anything, so nothing against her --

24  "who were totally unacceptable, and they did a

25  terrible job.  If they wanted to somehow get

PFM-DEPO-00014212

CONFIDENTIAL

Page 57

1  anything from Tyler, that wasn't the way to do it.

2  It was dumb and totally stupid and one of the worst

3  little things I've ever seen anybody try to do.  As

4  lawyers, you should try to get him out of your

5  profession."

6     Q.   When you say that the man assaulted your

7  grandson, can you be a little more specific?

8     A.   Verbally.  He just went after him.

9     Q.   Do you recall what he said?

10     A.   No, I don't.

11     Q.   Okay.  Did the Boies Schiller people try to

12  get Tyler to sign something that night?

13     A.   No.  They came the next morning.  And my

14  son, Tyler's father, came.  And they presented the

15  woman who was -- he stayed silent.  And the woman

16  presented it all and put it in front of us.

17        And I could sort of see Tyler's wheels

18  spinning and basically saying to himself, "This was

19  prepared by a person who's clearly my enemy.  I

20  should have a lawyer of my own."

21        So we called George Argyris, who I've known

22  for a long time, and he got a lawyer for Tyler.

23  That lawyer must have told him not to say anything

24  or not to sign anything.

25        And his mother complained to me and said,

PFM-DEPO-00014213

Page 58

1    "I'm his mother.  He won't even talk to me."  But I

2    think he must have felt if she knew something, then

3    this beast would go after her, and he didn't want

4    that to happen to his mother.

5        Q.    And by "the beast," you're referring to?

6        A.    Brille.

7        Q.    Did you have any understanding, based on

8    witnessing the altercation between Brille and Tyler,

9    what it was that Brille was trying to accomplish?

10   Intimidation?  Silencing Tyler?

11            MR. YOUNG:  I'm going to object to the

12   form.

13            THE WITNESS:  I presume that they had this

14   thing they wanted Tyler to sign, and he was trying

15   to intimidate him enough to get him to sign it.

16   That's the only possible explanation.  There is no

17   kind of explanation for the kind of performance he

18   put on.

19            BY MR. KAHN:

20       Q.    Do you remember -- let's move on past that

21   incident.

22            Do you remember that, in or around

23   October 2015, The Wall Street Journal published an

24   article that was critical of Theranos?

25       A.    Yes.  There were a series of articles.  I

PFM-DEPO-00014214

1    don't remember which one you're talking about.

2        Q.   Okay.  You remember that there was -- there

3    was a first one and then there were more?

4        A.   Right.

5        Q.   Okay.  And did you read those articles?

6        A.   Sure.

7        Q.   Do you recall what your reaction was to

8    them?

9        A.   Well, I was -- they were very critical, and

10   I didn't know -- to some extent I felt that you

11   really can't evaluate this carefully.  But then

12   there were reports of things, like the CMS

13   investigation, that said that the Theranos lab was

14   not doing things right.  And that's on appeal, so

15   just where that stands, I don't know.

16       Q.   Any other reactions?

17       A.   Well, I don't like it.

18       Q.   Do you recall having any other reactions to

19   any of the specific allegations made in the

20   articles?

21       A.   I don't remember the discussion

22   subsequently in the board meeting, but Elizabeth did

23   address the article.  And I think Bill Perry, in

24   particular, and Sam Nunn and I -- Bill, in

25   particular, wanted to have some independent

Page 60

1   examination done.  And I supported that.  I thought

2   it would be a good idea to do.

3       Q.   Was that done, to your knowledge?

4       A.   Not to my knowledge.

5       Q.   Did you have any --

6       A.   But I think they brought in -- I don't

7   know.  I'm away from it.  But they had brought in

8   additional people and people who are supposedly

9   skilled at dealing with regulatory issues.

10      Q.   Do you recall having any one-on-one

11  conversations with Ms. Holmes about The Wall Street

12  Journal articles?

13      A.   I may have had them, but I don't remember

14  any distinct one.

15      Q.   Okay.  Do you remember anything that

16  Ms. Holmes told you personally -- I'm going to ask

17  about board meetings in a minute.

18           Do you remember anything that Ms. Holmes

19  told you personally about The Wall Street Journal

20  articles, such as whether they were false, whether

21  they were true, things like that?

22           MS. GOODHART:  Objection.  Form.

23           THE WITNESS:  I don't remember.

24           BY MR. KAHN:

25      Q.   Okay.

Page 61

1          MR. YOUNG:  You're fine.

2          BY MR. KAHN:

3      Q.   Do you remember what Ms. Holmes --

4      A.   Not to say that she didn't, but I don't

5  remember.

6      Q.   Sure.  That's fine.

7          Do you remember what Ms. Holmes said about

8  The Wall Street Journal articles in board meetings?

9      A.   Again, I'm sure she made comments, and I

10  don't remember precisely what they were.

11      Q.   Do you recall, after these articles came

12  out, anyone on the board saying, in sum or

13  substance, that information had been kept from the

14  board that should have been provided to the board?

15      A.   No.  That didn't come up.  But there were

16  much more extensive -- with slides and so forth --

17  presentations that were made.

18          And as I said earlier, Bill Perry, in

19  particular, but Sam and I joined him, wanted to set

20  up some sort of independent method of verifying what

21  was taking place.

22      Q.   So when you say "they were much more

23  forthcoming with slides," do you mean that after The

24  Wall Street Journal articles, Theranos's management

25  provided more information at board meetings than

PFM-DEPO-00014217

Page 62

1   they had before?

2           MS. GOODHART:  Objection.  Form.  Misstates

3   testimony.

4           THE WITNESS:  No.  They provided

5   information before.  It's just that they -- they

6   provided information about this particular subject.

7           BY MR. KAHN:

8       Q.   Okay.  So what did you mean when you said

9   they were much more extensive with slides?

10      A.   Just on this subject.  They used slides in

11  practically all the board meetings to subsequent...

12      Q.   Okay.  When you read The Wall Street

13  Journal articles, did you personally feel that

14  information had been kept from you that should have

15  been provided to you before?

16      A.   No.  I didn't feel that.  I was -- I was

17  upset at the articles and wanted to know what was

18  taking place.

19          MR. KAHN:  Let me get 27, please.

20          (Marked for identification purposes,

21           Exhibit 724.)

22          MR. KAHN:  Mr. Secretary, you've been

23  handed a document marked Exhibit 724.

24          For those on the phone, it's a letter dated

25  October 26th, 2015, Bates-numbered TGPS00014435.

PFM-DEPO-00014218

1          BY MR. KAHN:

2      Q.   Mr. Secretary, do you recognize this to be

3  a letter that you sent to Ms. Holmes in

4  October 2015?

5      A.   Well, I see I signed it.

6      Q.   Okay.  This letter suggests that

7  Ms. Holmes -- or I don't want to put words in your

8  mouth.  The letter says:

9          "Dear Elizabeth, you might consider

10         sending out a statement along these

11         lines."

12         And then you have something that you

13  suggest.

14         Did you discuss such a statement with

15  Ms. Holmes after sending this letter, to your

16  recollection?

17     A.   I don't remembering having a major

18  discussion about it.

19     Q.   Do you remember having any discussion about

20  it?

21     A.   No.  But this was a suggestion of mine --

22  on my part, that she might make a statement along

23  these lines.

24     Q.   Okay.  And my question is do you recall

25  discussing your suggestion later?

PFM-DEPO-00014219

Page 64

1    A.    Probably we did, but I don't remember it.

2    Q.    Okay.  In your proposal for this statement,

3  in the second paragraph of the proposal, you

4  suggested that Theranos or Ms. Holmes state:

5              "All of the tests are performed on

6         Theranos-developed and produced

7         machinery."

8         Do you see that?

9    A.    Yes, I do.

10    Q.    Okay.  Did you believe that to be an

11  accurate statement at the time that you wrote it?

12    A.    Yes.

13    Q.    Okay.  And did you believe that to be an

14  accurate statement at the time that you wrote it

15  based, in part, on your discussions with Ms. Holmes?

16         MS. GOODHART:  Objection.  Form.

17         THE WITNESS:  I -- I don't have any

18  recollection of a particular discussion.  This was

19  my belief that I put down here.  Where it came from

20  exactly.

21         BY MR. KAHN:

22    Q.    Okay.  And when you sent this letter to

23  Ms. Holmes, did she respond to it and say,

24  "Mr. Secretary, the statement that all of the tests

25  are performed on Theranos-developed and produced

Page 65

1   machinery is incorrect"?

2      A.   I don't recall any statement like that.

3      Q.   Ms. Holmes never told you that the

4   statement "all of the tests are performed on

5   Theranos-developed and produced machinery" was

6   false; correct?

7           MS. GOODHART:  Objection.  Form.

8           THE WITNESS:  It was my belief when I wrote

9   the letter that that was a correct statement.

10          BY MR. KAHN:

11     Q.   I understand that.

12          What I'm trying to get at is Ms. Holmes

13   never told you, after you sent her this letter, that

14   that statement was false; correct?

15     A.   Not that I know of.

16     Q.   Okay.  Did you ever come to learn that the

17   statement "all of the tests are performed on

18   Theranos-developed and produced machinery" is

19   incorrect?

20          MS. GOODHART:  Objection.  Form.

21          THE WITNESS:  No, I have not -- nobody has

22   said, yes, that's the case.

23          BY MR. KAHN:

24     Q.   Okay.  After The Wall Street Journal

25   articles came out, do you recall helping to set up a

CONFIDENTIAL

1    meeting between Ms. Holmes and some people from

2    Chevron to discuss crisis management?

3        A.    The head of Chevron is a friend of mine,

4    and we were having a discussion.  And he had been

5    reading about Theranos, and he said at Chevron,

6    occasionally they have some big crisis that comes

7    up, and so they have people who are good at managing

8    the crisis.  And he'd be glad to send them over and

9    provide whatever help they could.

10           So I discussed that with Elizabeth.  I

11   said, "That sounds like a constructive thing."  So

12   they came over, and they were briefed on what

13   happened and made some suggestions, constructive, I

14   thought, but...

15       Q.    Okay.  Do you remember any of the

16   suggestions they made?

17       A.    I don't remember with any precision.

18       Q.    Do you remember if Ms. Holmes implemented

19   any of the suggestions that they had made?

20       A.    I don't.  I imagine she did, but I don't

21   want to say something that's not correct.

22           MR. KAHN:  Doug, I think I'm done.  I would

23   like to take five just to review my notes and make

24   sure, if that's all right.

25           MR. YOUNG:  That's fine with me.

PFM-DEPO-00014222

Page 67

1          MR. KAHN:  Okay.

2          THE VIDEOGRAPHER:  Off the record at

3    11:42 a.m.

4          (Recess taken, from 11:42 to 11:55.)

5          THE VIDEOGRAPHER:  Back on the record at

6    11:55 a.m.

7          MR. KAHN:  Mr. Secretary, thank you very

8    much for your time and your patience.  I have no

9    further questions at this time.

10         Anyone else?  May we release this witness?

11         MS. NALL:  The phone people?  I don't know.

12         MR. KAHN:  Ben.

13         MR. BYER:  None for me.  Thank you.

14         MR. KAHN:  All right.

15         THE VIDEOGRAPHER:  This concludes today's

16   deposition of Secretary George Shultz on April 4th,

17   2017, which consists of one media and Volume No. 1.

18   The original media will remain in the custody of TSG

19   Reporting.  Off the record at 11:56 a.m.

20         (Deposition concluded at 11:56 a.m.)

21                     ---oOo---

22

23

24

25

CONFIDENTIAL

Page 68

1                    CERTIFICATE OF WITNESS

2

3

4

5           I, the undersigned, declare under penalty

6    of perjury that I have read the foregoing

7    transcript, and I have made any corrections,

8    additions or deletions that I was desirous of

9    making; that the foregoing is a true and correct

10   transcript of my testimony contained therein.

11

12        EXECUTED this _____ day of _____,

13   20_____ at _____,_____.

14

15

16        _____

17                    THE HONORABLE GEORGE P. SHULTZ

18

19

20

21

22

23

24

25

Trial Exh. 5520 Page 00068

PFM-DEPO-00014224

Page 69

1          DEPOSITION OFFICER'S CERTIFICATE
2    STATE OF CALIFORNIA )
                         ) ss.
3    COUNTY OF SONOMA    )
4          I, LORRIE L. MARCHANT, hereby certify:  I
     am a duly qualified Certified Shorthand Reporter in
5    the State of California, holder of Certificate
     Number CSR 10523 issued by the Court Reporters Board
6    of California and which is in full force and effect.
     (Bus. & Prof. Section 8016)
7          I am not financially interested in this
     action and am not a relative or employee of any
8    attorney of the parties, or of any of the parties.
     (Civ. Proc. Section 2025.320(a))
9          I am authorized to administer oaths or
     affirmations pursuant to California Code of Civil
10   Procedure, Section 2093(b), and prior to being
     examined, the deponent was first duly sworn/affirmed
11   by me.  (Civ. Proc. Section 2025.320, 2025.540(a))
12         I am the deposition officer that
     stenographically recorded the testimony in the
     foregoing deposition and the foregoing transcript is
13   a true record of the testimony given.  (Civ. Proc.
     Section 2025.540(a))
14         I have not and shall not offer or provide
     any services or products to any party's attorney or
15   third party who is financing all or part of the
     action without first offering same to all parties or
16   their attorneys attending the deposition and making
     same available at the same time to all parties or
17   their attorneys.  (Civ. Proc. Section 2025.320(b))
18         I shall not provide any service or product
     consisting of the deposition officer's notations or
     comments regarding the demeanor of any witness,
19   attorney or party present at the deposition to any
     party or any party's attorney or third party who is
20   financing all or part of the action, nor shall I
     collect any personal identifying information about
21   the witness as a service or product to be provided
     to any party or third party who is financing all or
22   part of the action. (Civ. Proc. Section 2025.320(c))
23   Dated: April 4, 2017
24   _____
                   LORRIE L. MARCHANT, CSR NO. 10523
25                 RMR, CRR, CCRR, CRC

Trial Exh. 5520 Page 00069

PFM-DEPO-00014225

CONFIDENTIAL

Page 70

```
 1                        I N D E X
 2                 INDEX OF EXAMINATION
 3                                              PAGE
 4   MR. KAHN                                     6
 5                      ---oOo---
 6                  INDEX OF EXHIBITS
 7    EXHIBIT       DESCRIPTION                  PAGE
 8    Exhibit 722   Document entitled "Preventive   28
                    Medicine (Stanford Institute for
 9                  Economic Policy Research SIEPR
                    Summit - March 13, 2015) George
10                  Shultz interviews Elizabeth
                    Holmes (Production Nos.
11                  TGPS00010537 - TGPS00010549)
12    Exhibit 723   Letter to The Honorable Jerry   38
                    Brown from George P. Shultz,
13                  dated 3/7/2014 (Production No.
                    TGPS00001780)
14
      Exhibit 724   Letter to Elizabeth Holmes from   62
15                  George P. Shultz, dated
                    10/26/2015 (Production Nos.
16                  TGPS00014435 - TGPS00014436)
17                      ---oOo---
18
19
20
21
22
23
24
25
```

Trial Exh. 5520 Page 00070

PFM-DEPO-00014226

CONFIDENTIAL

Page 71

```
 1    NAME OF CASE:  Partner Investments v. Theranos
 2    DATE OF DEPOSITION:  4/4/2017
 3    NAME OF WITNESS:  The Honorable George P. Shultz
 4    Reason Codes:
 5         1.  To clarify the record.
           2.  To conform to the facts.
 6         3.  To correct transcription errors.
 7    Page _____ Line _____ Reason _____
      From _____ to _____
 8
      Page _____ Line _____ Reason _____
 9    From _____ to _____
10    Page _____ Line _____ Reason _____
      From _____ to _____
11
      Page _____ Line _____ Reason _____
12    From _____ to _____
13    Page _____ Line _____ Reason _____
      From _____ to _____
14
      Page _____ Line _____ Reason _____
15    From _____ to _____
16    Page _____ Line _____ Reason _____
      From _____ to _____
17
      Page _____ Line _____ Reason _____
18    From _____ to _____
19    Page _____ Line _____ Reason _____
      From _____ to _____
20
      Page _____ Line _____ Reason _____
21    From _____ to _____
22    Page _____ Line _____ Reason _____
      From _____ to _____
23

                       _____
24                     GEORGE P. SHULTZ
25
```

Trial Exh. 5520 Page 00071

PFM-DEPO-00014227