1   STEPHANIE M. HINDS (CABN 154284)
    United States Attorney
2
    THOMAS A. COLTHURST (CABN 99493)
3   Chief, Criminal Division

4   JEFF SCHENK (CABN 234355)
    JOHN C. BOSTIC (CABN 264367)
5   ROBERT S. LEACH (CABN 196191)
    KELLY I. VOLKAR (CABN 301377)
6   Assistant United States Attorneys

7        150 Almaden Boulevard, Suite 900
         San Jose, California 95113
8        Telephone: (408) 535-5061
         Fax: (408) 535-5066
9        Email:  Robert.Leach@usdoj.gov

10  Attorneys for United States of America

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                       SAN JOSE DIVISION

14  UNITED STATES OF AMERICA,              )   Case No. 18-CR-00258 EJD
                                           )
15           Plaintiff,                    )   UNITED STATES' SENTENCING
                                           )   MEMORANDUM
16      v.                                 )
                                           )   Date:   November 18, 2022
17  ELIZABETH A. HOLMES,                   )   Time:   10:00 a.m.
                                           )   Court:  Hon. Edward J. Davila
18           Defendant.                    )
                                           )
19  _____)

20

21

22

23

24

25

26

27

28

1

2
# TABLE OF CONTENTS

3 TABLE OF AUTHORITIES ...........................................................................................1

4 INTRODUCTION .........................................................................................................1

5 FACTS .........................................................................................................................2

6 I.     THE OFFENSE CONDUCT ...............................................................................2

7        A.     The Investor Fraud ...............................................................................2

8        B.     The Impact on Patients.........................................................................8

9        C.     The Cover Up.......................................................................................13

10 II.    PROCEDURAL HISTORY.................................................................................15

11 THE SENTENCING GUIDELINES CALCULATION ...................................................15

12 I.     LOSS MORE THAN $550,000,000 ...................................................................16

13 II.    OFFENSE INVOLVING 10 OR MORE VICTIMS .............................................20

14 III.   OFFENSE INVOLVING CONSCIOUS OR RECKLESS RISK
       OF DEATH OR  SERIOUS BODILY INJURY ..................................................21

15
       A.     Defendant's Conduct Created a Risk of Serious Harm to Theranos Patients...................21
16
       B.     Holmes' Treatment of Theranos Patients is Relevant Conduct ........................24
17
18 IV.    ROLE IN THE OFFENSE...................................................................................26

       A.     Holmes Was a Leader and Organizer ..................................................26
19
       B.     Holmes' Fraud Was "Otherwise Extensive".........................................27
20

21 ARGUMENT ...............................................................................................................31

22 I.     LEGAL STANDARD..........................................................................................31

23 II.    GOVERNMENT RECOMMENDATION ............................................................32

       A.     The Nature and Circumstances of Holmes' Crimes (18 U.S.C. § 3553(a)(1))...................32
24
       B.     The History and Characteristics of Holmes (18 U.S.C. § 3553(a)(1)) .............................34
25
       C.     The Need to Reflect the Seriousness of the Offense, Promote Respect for the
26            Law, and Provide Just Punishment for the Offense (18 U.S.C.
              § 3553(a)(2)(A))................................................................................................35
27
       D.     The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C.
28            § 3553(a)(2)(B))................................................................................................35

E.     The Need to Protect the Public From Future Crimes by Holmes (18 U.S.C. § 3553(a)(2)(C)) .................................................................................36

F.     The Properly Calculated Sentencing Guideline Range and Pertinent Policy Statements Provided by the Sentencing Commission (18 U.S.C. §§ 3553(a)(4) & 3553(a)(5)) .........................................................................37

G.     The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6)) ...........................38

H.     The Need to Provide Restitution to Any Victim.................................................40

III.   RESTITUTION AND FINE .................................................................................40

CONCLUSION .................................................................................41

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**Cases**

4
5
*Gall v. United States,*
   552 U.S. 38 (2007)................................................................................................................ 31

6
7
*United States v. Bakhit,*
   218 F. Supp. 2d 1232 (C.D. Cal. 2012) ............................................................................ 16

8
*United States v. Berger,*
   587 F.3d 1038 (9th Cir. 2009) ........................................................................................... 16

9
10
*United States v. Booth,*
   309 F.3d 566 (9th Cir. 2002) ....................................................................................... 28, 29

11
12
*United States v. Bright,*
   353 F.3d 1114 (9th Cir. 2004) ........................................................................................... 17

13
*United States v. Bryson,*
   101 F. Supp. 3d 147 (D. Conn. 2015)............................................................................... 17

14
15
*United States v. Byors,*
   586 F.3d 222 (2d Cir. 2009)............................................................................................... 17

16
17
*United States v. Carty,*
   520 F.3d 984 (9th Cir. 2008) ............................................................................................. 31

18
19
*United States v. George,*
   949 F.3d 1181 (9th Cir. 2020) ........................................................................................... 20

20
*United States v. Goffer,*
   721 F.3d 113 (2nd Cir. 2013)............................................................................................. 36

21
22
*United States v. Govan,*
   152 F.3d 1088 (9th Cir.1998) ............................................................................................ 30

23
24
*United States v. Henderson,*
   893 F.3d 1338 (11th Cir. 2018) .............................................................................. 21, 22, 23

25
*United States v. Johansson,*
   249 F.3d 848 (9th Cir. 2001) ............................................................................................. 21

26
27
*United States v. Laurienti,*
   611 F.3d 530 (9th Cir. 2010) ............................................................................................. 17

28

*United States v. Leung,*
 35 F.3d 1402 (9th Cir. 1994) ........................................................................ 28

*United States v. Martin,*
 796 F.3d 1101 (9th Cir. 2015) ...................................................................... 19

*United States v. Moran,*
 778 F.3d 942 (11th Cir. 2015) ...................................................................... 22

*United States v. Musgrave,*
 761 F.3d 602 (6th Cir. 2014) ........................................................................ 36

*United States v. Pham,*
 545 F.3d 712 (9th Cir. 2008) ........................................................................ 20

*United States v. Popov,*
 555 F. App'x 671 (9th Cir. 2014).................................................................. 22

*United States v. Ressam,*
 679 F.3d 1069 (9th Cir. 2012) ...................................................................... 31

*United States v. Rose,*
 20 F.3d 367 (9th Cir.1994) ........................................................................... 30

*United States v. Turk,*
 626 F.3d 743 (2d Cir. 2010).......................................................................... 17

*United States v. Watts,*
 519 U.S. 148 (1997)................................................................................. 24, 33

*United States v. Zolp,*
 479 F.3d 715 (9th Cir. 2007) ........................................................................ 16

**Statutes**

18 U.S.C. § 3553.............................................................................................. 2, 7
18 U.S.C. § 3553(a) .............................................................................. 31, 32, 38
18 U.S.C. § 3553(a)(1) .......................................................................... 32, 33, 34
18 U.S.C. § 3553(a)(2)(A) .................................................................................. 35
18 U.S.C. § 3553(a)(2)(B) .................................................................................. 35
18 U.S.C. § 3553(a)(2)(C) .................................................................................. 36
18 U.S.C. § 3553(a)(6) ................................................................................. 38, 39
18 U.S.C. § 3663A(a)(1) ..................................................................................... 40
18 U.S.C. § 3664(d)(5) ....................................................................................... 41

# INTRODUCTION

Over the course of many years, Elizabeth Holmes defrauded dozens of investors of hundreds of millions of dollars.  Time and again, she chose deceit over candor.  She forged her own endorsements.  She preyed on hopes of her investors that a young, dynamic entrepreneur had changed healthcare.  She leveraged the credibility of her illustrious board.  And, through her deceit, she attained spectacular fame, adoration, and billions of dollars of wealth.

When a journalist dared to ask questions about Theranos' actual achievements, she tried to dupe him and then attacked him, along with his sources.  After her fraud was revealed, she lied, obfuscated, and concealed.  At trial, she blamed her COO (and longtime boyfriend), her board, her scientists, her business partners, her investors, her marketing firm, her attorneys, the media—everyone, that is, but herself.

She also put patients at risk.  As money was drying up, she went to market with an unproven and unreliable medical device.  When her lead assay developer quit as Theranos launched, she chillingly told the scientist: "she has a promise to deliver to the customer, she doesn't have much of a choice but to go ahead with the launch."  Trial Transcript ("Tr.") at 1216.  As her lab director kept encountering issues with Theranos' device and tests, she chose "PR and fundraising" over patient care.  Tr. at 1703.  During her fraud scheme, women received wrong tests about their pregnancies, Theranos generated wrong results for cancer tests, and one victim was led to believe she had the virus that causes AIDS.  Even after Theranos itself concluded that there was a possible patient impact for every single test run for patients on its "Edison" device and voided all Edison tests, Holmes minimized its primary regulator's findings of immediate jeopardy and condition-level deficiencies as not "major."  Tr. at 4709.

Holmes speaks eloquently about her desire to innovate and improve healthcare.  She has demonstrated a strong work ethic, charisma, and ambition.  But she is blinded by that ambition.  Her reality distortion field put, and will continue to put, people in harm's way.  She stands before the Court remorseless.  She accepts no responsibility.  Quite the opposite, she insists she is the victim.

She is not.  Holmes was the CEO and the Chairperson of Theranos.  She repeatedly chose lies, hype, and the prospect of billions of dollars over patient safety and fair dealing with investors.  Elizabeth

Holmes' crimes were not failing, they were lying—lying in the most serious context, where everyone needed her to tell the truth.

The Sentencing Guidelines appropriately recognize that Holmes' crimes were extraordinarily serious, among the most substantial white collar offenses Silicon Valley or any other District has seen. According to the Presentence Investigation Report ("PSR"), they yield a recommended custodial sentence beyond the statutory maximum.  The factors set forth in 18 U.S.C. § 3553—notably the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense and promote respect for the law, and the need for both specific deterrence and general deterrence—demand a significant custodial sentence.  With these factors in mind, the government respectfully recommends a sentence of 180 months in custody.  The Court should also order Holmes to serve a three-year term of supervised release, pay full restitution to her investors (including Walgreens and Safeway), and pay the required special assessment for each count.

FACTS

## I.   THE OFFENSE CONDUCT

### A.   The Investor Fraud

Through numerous misrepresentations and half-truths, Holmes sold investors on the fact that Theranos had a customer-ready device—proven through its use and validation by several large pharmaceutical companies, the Department of Defense, and Walgreens—that analyzed tiny drops of blood taken from the finger to produce better, faster, cheaper, more accurate laboratory test results. Specifically, Holmes secured dozens of investors in Theranos over several years by falsely claiming that Theranos had manufactured one single, proprietary blood analyzer device that could run any blood test that was run by conventional labs, all from a blood sample drawn via a fingerstick rather than the traditional draw from a vein, with higher accuracy and less variability than traditional methods, due in part to its more automated process that reduced human error inherent in running blood tests in a laboratory.  To support her bold claims, Holmes repeatedly told potential investors that Theranos' technology had been comprehensively validated by multiple major pharmaceutical companies and was being used in the battlefield by the Department of Defense to treat wounded soldiers.  Holmes also asserted that Theranos was a profitable company and had a healthy ongoing relationship with retail

1  pharmacy company Walgreens, through which it provided blood tests to patients beginning in

2  September 2013.  Not only did several representatives of investors testify that Holmes made these

3  statements to them in meetings, Holmes also began providing written materials and binders to investors

4  in 2014 and 2015 that contained these false statements.

5          In truth, scientists who had worked at Theranos testified that Theranos' proprietary device could

6  never complete more than 12 types of blood tests, often with less accuracy, less automation, and more

7  variability than traditional "predicate" machines manufactured by third-party companies, such as

8  Siemens AG.  Because of these shortcomings, pharmaceutical companies did very little work with

9  Theranos and did not validate its technology, and the Department of Defense never used Theranos'

10  analyzer to clinically treat soldiers.  Theranos had zero revenue in 2012 and 2013 and desperately

11  needed new sources of cash.  Holmes hid the shortcomings of Theranos' proprietary device by using—

12  without telling potential investors—modified and unmodified third-party machines to fulfill the

13  remainder of Theranos' available blood test menu to patients at Walgreens stores.  As a result, Theranos'

14  relationship with Walgreens was faltering because the percentage of traditional venous draws was too

15  high.  But none of this information was shared with investors in Theranos.

16          As but a few examples of misrepresentations made by Holmes to Theranos investors:

17          •       In April 2010, Holmes emailed executives of Walgreens reports with favorable

18  conclusions about Theranos' technology that were emblazoned with logos of large pharmaceutical

19  companies Pfizer, GlaxoSmithKline, and Schering Plough (now Merck) and Holmes described the

20  attached reports as "three independent due diligence reports on Theranos systems" that were "from"

21  those companies.  However, at trial, Holmes admitted that she added the logos of the pharmaceutical

22  companies to reports written by Theranos and enhanced the conclusions shortly before sending to

23  Walgreens.  And, while a Pfizer representative testified at trial that he told Holmes directly that Pfizer

24  did not see a use for Theranos' technology in 2009, Holmes continued to send the doctored Pfizer report

25  to investors throughout 2014 and 2015.

26          •       In 2010, Holmes told Steve Burd, then-CEO of Safeway, that Theranos was cash flow

27  neutral and projected revenue for 2011 of $223 million when, in truth, Theranos' revenue was steadily

28  declining from approximately $2.8 million in 2009 to less than $600,000 in 2011.  Despite Theranos

1    earning *zero* revenue in 2012 and 2013, Holmes and COO Ramesh Balwani provided investors with

2    projections that Theranos would earn $140 million in revenue for 2014 and nearly $1 billion in 2015.

3    Indeed, Holmes told one investor in December 2013 that Theranos had historically earned over $200

4    million from its work with the Department of Defense and pharmaceutical companies, when, in reality,

5    Theranos had never earned more than $10 million from both sources combined.

6         •    In August and September 2013, internal Theranos scientists, including long-time

7    employee Surekha Gangakhedkar and then-laboratory director Dr. Adam Rosendorff warned Holmes

8    that Theranos' proprietary device was not able to reliably test patient samples.  They both testified that

9    Holmes pressured and rushed the scientists to quickly validate assays for clinical use in advance of the

10   launch with Walgreens.  Ms. Gangakhedkar and other scientists ultimately resigned shortly before the

11   Walgreens launch because of concerns with reliability of running patient tests on Theranos' proprietary

12   device, but when Ms. Gangakhedkar informed Holmes of her concerns, Holmes responded that she had

13   made a promise to deliver to the customer (Walgreens) that she must fulfill.  Despite these internal

14   concerns being voiced repeatedly to Holmes, Holmes reviewed and approved an article in *The Wall*

15   *Street Journal* claiming Theranos' device could run 1,000 laboratory tests with more accuracy than

16   conventional methods.  Holmes shared the article with investors.

17        •    In 2013 and 2014, Holmes repeatedly told investors that the Department of Defense was

18   using Theranos' proprietary analyzer on medevac helicopters, in the battlefield, or to treat soldiers in

19   Afghanistan or Iraq.  In truth, the Department of Defense never used Theranos' device to clinically treat

20   patients, nor did it ever move out of initial testing phases.  One investor victim impact statement

21   captures the depravity of Holmes' lies in this respect as follows: "I feel strongly that the sentencing

22   should take into account Defendants' intentional decision to prey upon investors' reverence for our

23   servicemen and servicewomen in the Armed Forces.  Our country's freedom is protected everyday by

24   the courageous and selfless service of these men and women, and the Defendants took advantage of

25   investors' patriotic feelings for selfish gain through deceit.  Indeed, Elizabeth Holmes lied to me about

26   saving soldiers' lives through military contracts and Theranos' use of 'proprietary technology' on

27   military helicopters.  Simply put, Holmes's actions were loathsome and un-American."  Victim Impact

28   Statement of Craig Hall dated Sept. 6, 2022, at p.1.

- In August 2014, Balwani forwarded to Holmes an email from Walgreens executives expressing a desire to reduce venous draws to below 10% (whereas they had been hovering around 40% for most of the year) before expanding further.  Nevertheless, Holmes presented financial projections to at least one investor in October 2014 that projected Theranos would increase from being in a few dozen Walgreens stores to being in 900 locations by 2015.

Holmes exploited investors' altruistic motives to dupe investors of all experience levels to invest in Theranos.  Holmes fooled investors who were new to the healthcare investment sphere as well as investors with deep sophistication and experience in the healthcare and bio-tech sector, such as PFM, a regulated investment entity, led by managing partner and chief investment officer Brian Grossman, who had over twenty years of experience analyzing or investing in companies like Theranos.  Mr. Grossman testified that he sent lengthy due diligence questions to Holmes and Balwani to ensure there was no ambiguity about the limitations of Theranos' proprietary technology, and yet he was shocked to learn more than eighteen months after his investment that Theranos used third-party commercial machines and not exclusively Theranos' proprietary device as Holmes had previously led him to believe.  Former Secretary of State George Shultz invested in Theranos on behalf of his family members and, as his son and daughter-in-law described in their victim impact statement, "[Holmes] succeeded by using my father (and others) and played him for the fool."  Victim Impact Statement of Alex & Janel Shultz at p.1.  Holmes often seized upon investors' desire to make the world a better place in order to lure them into believing her lies.  For example, Lisa Peterson, a representative of investor RDV Corporation, was moved by Holmes' pitch because she could envision the benefits Holmes promised Theranos could deliver on her husband's health condition.  Holmes and Balwani knew this and even sent text messages to each other such as "[t]hey also care about our mission to do good because they are a religious org" to which Holmes responds "Good[.]"  TX 5387D at 21.

While Holmes was publicly touting Theranos as a revolution in healthcare, she and Balwani quietly and repeatedly acknowledged the dark reality within Theranos to each other.  For example, they texted as follows:

| Date | Exchange | TX 5387D page |
|---|---|---|
| 5/9/2012 | EAH: "We have to work together on the rev piece" | 7 |

|  | | |
|---|---|---|
|  | SB: "you are the company.  we need revenue . . . ." | |
| 11/20/2013 | SB: "Pissing me off we don't have anyone managing PSC, ctn production, cart production, elisa assays, TSH"<br><br>EAH: "I know." | 14-15 |
| 11/19/2014 | SB: "Need to focus on ops. . . . Lab, customer service, tat, all need director level people . . . . We need. The lab and call center fixed. . . . Rebuild."<br><br>EAH:  "Fundamentally we need to stop fighting fires by not creating them . . .  Need to fix root cause here . . . Yes" | 23-24 |
| 11/19/2014 | SB: "We can't scale with wag." | 24 |
| 11/28/2014 | SB: "Normand lab is a fucking disaster zone." | 29 |
| 4/10/2015 | SB: "The point about narrowing down menu to hit high fs % came to me like gift of God. . . . We must hit our volume goals now.  We need to make it a matter of life and death.  Survival.  We must not lose" | 43 |
| 4/25/2015 | SB: "I am worried about over exposure without solid substance which is lacking right now.  We can talk tomorrow about over exposure."<br><br>EAH: "Agree." | 54 |
| 4/28/2015 | SB: "It is most maddening there is no focus in any chem teams and no product coming out."<br><br>EAH: "I know." | 58 |
| 5/6/2015 | SB: "We need our heads down and execute.  Bring billion equity and billion revenue."<br><br>EAH: "I know.  Thinking same." | 68 |
| 5/13/2015 | SB: "We need a better strategy for Normandy.  For a long time to come we will have hybrid solutions. . . ."<br><br>EAH: "I agree." | 78 |
| 6/3/2015 | SB: "We need to focus on being a technology company.  We spend all our time with CLIA morons."<br><br>EAH: "Yes"<br><br>SB: "I deal with CLIA everyday and I hate the low quality of people in lab . . . ."<br><br>EAH: "I was thinking about the exact same." | 83 |

| 7/28/2015 | SB: "We need to commit to each other and get out of this hell so we can live in paradise we both have."<br><br>EAH: "I have literally been meditating on exact same. Whole time I was running was thinking that. . . ."<br><br>SB: "We need to commit to focusing and getting in paradise."<br><br>EAH: "Product company.  Winning" | 90 |
| --- | --- | --- |
| 9/22/2015 | SB: "Our validation reports are terrible.  Really painful going thru this process.  Same issues fda pointed out. . . . Going bad so far.  Pray.  Daniel has nothing ready . . . ."<br><br>EAH: "Praying" | 107 |

In a note to herself, Holmes said Balwani was "[c]onvinced never happen ever.  Not thanksgiving not ever."  TX 7534.  Balwani, Holmes wrote, bemoaned there was "[n]o product" and the "[f]ucking mediocre quality of this piece of shit company."  *Id.*  When they drew government scrutiny, Holmes and Balwani bragged about their ability to "run circles around others and fda by manipulating their game."  TX 5387D at 102; *id.* (EAH: "We can definitely run circles.").

Holmes' fraud was spectacularly successful.  At the peak, she was "one of the richest and most celebrated woman leaders in our [country's] history."  Victim Impact Statement of Alex and Janel Shultz at 2.  By the end of 2014, Holmes' shares in Theranos were valued at more than **$4 billion**.  Tr. at 8014.  She took home hundreds of thousands of dollars in annual salary.  PSR ¶ 162.  She traveled in a Theranos-paid private jet.  Tr. at 721-22; TX 5387D at 3 (Holmes and Balwani musing about "get[ting] a plane for these short journeys after C2 [a reference to the C-2 investment round]").  She and Balwani ruled Theranos from a $15 million mansion in Atherton.  PSR ¶ 166 at p. 44.  She donned the cover of *Fortune*, *Forbes*, *Inc.*, *Glamour*, and *T: The New Your Times Style Magazine*. *See* https://www.nytimes.com/2015/10/30/business/the-narrative-frays-for-theranos-and-elizabeth-holmes.html.  She dined at the White House; she gave the commencement address at Pepperdine University; she joined the Board of Fellows of Harvard Medical School; and at the peak of the fraud was named by *Time* as one of the 100 Most Influential People in the World.  *Id.*; TX 5387D at 34;

1   https://blogs.bmj.com/bmj/2019/04/12/jeffrey-flier-elizabeth-holmes-and-harvard-medical-school-
2   board-of-fellows-a-cautionary-tale/.

3          Between 2010, when she induced Walgreens and Safeway to invest based on false

4   pharmaceutical company endorsements and fantastical revenue projections, and March 2015, Holmes

5   raised hundreds of millions of dollars.  As the PSR notes, $730,840,309 came from "Series C-1" and

6   "Series C-2" investors who invested subsequent to Theranos' public relations push in September 2013

7   during the conspiracy.  Representatives of seven such investors testified in the trials: Alan Eisenman,

8   Brian Grossman (Partner Investments LP/PFM Healthcare), Chris Lucas (Black Diamond Ventures XII-

9   B, LLC), Pat Mendenhall (Mendenhall TF Partners), Daniel Mosley (Mosley Family Holdings LLC),

10  Lisa Peterson (RDV Corporation/Dynasty Financial II/Lakeshore Capital Management), and Bryan

11  Tolbert (Hall Black Diamond II LLC).  At least eight additional investor/investor representatives

12  (including three board members) were interviewed by the government, testified before the SEC, or

13  submitted victim impact statements:  David Boies (Boies, Schiller & Flexner LLP), Kendra Fadil, Frank

14  Gordon (Crofton Capital/Gordon Family Trust), Henry Kissinger, Richard Kovacevich, Don Lucas Jr.

15  (Lucas Venture Group), Mark Campbell and Jared Hutchings (Peer Ventures Group), and Natalie Ravitz

16  (Rupert Murdoch).  *See* 11/11/2022 Decl. of AUSA Robert S. Leach in Support of U.S.' Sentencing

17  Memorandum, Exhibits B-L, filed concurrently.  The $730,840,309 in C-1 and C-2 investments does *not*

18  include an additional $70 invested by Walgreens and Safeway on account of convertible promissory

19  notes and $3 million invested by director George Shultz, who testified in PFM's civil action against

20  Holmes and whose family also submitted a victim impact statement.

21          **B.     The Impact on Patients**

22          Throughout the relevant time period, Holmes touted Theranos as a company that would

23  revolutionize blood testing, making health information more reliable and more accessible.  Beginning in

24  late 2013, Theranos actually offered clinical blood testing services to the public, first in the Bay Area,

25  then in Arizona.  To jumpstart the process of making its tests available to the public, and to reach as

26  many patients as it could, Theranos partnered with retail pharmacy chain Walgreens—a company with a

27  nationwide footprint that could make Theranos' product accessible to most of the country's population.

28  In so doing, Holmes and Balwani benefitted from goodwill and credibility associated with the

1   Walgreens name.  There can be no doubt that, as with investors, patients were more comfortable trusting

2   Theranos because they assumed that an established business like Walgreens would not promote a service

3   that was not similarly legitimate and reputable.  Thus, Walgreens was not only Theranos' launchpad but

4   also its de facto ambassador.  Throughout the partnership with Walgreens, Defendants pushed for wider

5   and faster expansion, with Walgreens holding back and expressing concerns over Theranos' inability

6   conduct much of its testing using its vaunted fingerstick method, among other things.  Despite

7   Walgreens' hesitations about expanding the Theranos partnership more rapidly, thousands of patients

8   ended up receiving blood test services from Theranos between 2013 and 2015.

9         The evidence at trial revealed something Holmes and Balwani worked hard to hide from those

10  patients:  Theranos' proprietary testing was not reliable.  Theranos' homegrown "TSPU" device—used

11  for several important tests including HCG (to assess the presence and stage of a pregnancy), PSA (to

12  check for potentially lethal prostate cancer), and TSH (a measure of thyroid health) (TX 4533)—was

13  plagued by issues.  It broke down frequently and, when it did return results, it suffered from serious

14  accuracy problems.  *See* TX 1587, 1633.  Erika Cheung, a Theranos employee who operated the TSPU

15  to generate patient test results, had the following to say about her faith in the technology:

16         I was really stressed and uncomfortable with what was going on because I had at that

17         point amassed a lot of evidence to suggest that the technology, the Edison device

18         specifically, were not adequate to test on patients, and I did not feel comfortable running

19         patient samples.

20  9/15/21 Tr. at 968.  Ms. Cheung went on to explain that she was concerned about patients, who

21  "think that they're getting accurate results, and they're making very important medical decisions

22  about what their treatments are, what their diagnoses are, what medications they take…."  *Id.* at

23  969.  Dr. Rosendorff agreed that the Edison device was flawed, explaining that he resigned from

24  his job as Theranos lab director partly because he was being asked to vouch for tests that he did

25  not have confidence in, and he felt that the testing platform "was not allowing [him] to function

26  effectively as a lab director."  9/24/21 Tr. at 1703.  Similar problems arose when Theranos used

27  modified third-party devices to test finger-stick samples.  *See* 10/6/21 Tr. at 2810 (Dr.

28  Rosendorff testifying that the Theranos modifications to third-party devices made them less

accurate).

Erika Cheung and Dr. Rosendorff were not alone in their concerns about the reliability of Theranos technology. Surekha Gangakhedkar was a senior scientist who resigned from Theranos upon learning of the company's plan to use its Edison 3.0 and 3.5 devices to conduct clinical testing for patients. 9/17/21 Tr. at 1149-50. She explained that she knew of "reliability issues" with those devices that were not fully resolved, affecting their ability to return consistent results. *Id.* at 1186-87.

Given the dim view that Theranos' own scientists took of its technology, it is no surprise that a number of Theranos patients received results that were suspicious or demonstrably incorrect. For example, Dr. Mark Burnes testified at trial about a patient named Mehrl Ellsworth, who sought PSA (prostate specific antigen) testing from Theranos in advance of an international trip. 11/18/21 Tr. at 6836. Theranos reported Dr. Ellsworth's PSA levels to be extremely elevated compared to his previous results—a change that could have indicated prostate cancer if accurate. TX 4938, 4415; 11/18/21 Tr. at 6882. Dr. Ellsworth's next test from Theranos, however, showed normal PSA levels. TX 4938, 4415; 11/18/21 Tr. at 6842-6856. The third test from Theranos was once again dramatically elevated, but subsequent testing returned normal results. *Id.* It turned out that the two unexpectedly elevated PSA results from Theranos had something in common: they were both run on a Theranos proprietary system, whereas the normal results had been generated by traditional, FDA-approved methods. *Id.* Dr. Burnes was able to conclude that the elevated PSA levels indicated by the Theranos-specific tests were not valid. 11/18/21 Tr. at 6858. Theranos' repeated failure to return an accurate PSA test result after multiple attempts using its proprietary equipment speaks volumes about the reliability of Theranos technology.

Theranos patients also experienced problems with the company's PT/INR test, which relates to blood clotting. Patient "AT" suffered from atrial fibrillation (AFib) and her doctor instructed her to obtain a PT/INR test from Theranos. PSR ¶ 55. Although her PT/INR level was normally between two and three, Theranos returned an unusually low level of 0.08. *Id.* "AT's" doctor did not believe the Theranos results could be accurate, and sent her to a traditional lab for confirmatory testing, which yielded a result of 2.8—in her typical range for that assay. *Id.* "AT" told government investigators that, had she adjusted her medication in response to the erroneously low Theranos PT/INR value, she would

1   have been at risk for internal bleeding, a common complication of AFib.  *Id.*  Theranos' own employees

2   were not immune from questionable results.  "EG" was a Theranos phlebotomist who had been on

3   blood-thinning medication for years due to a history of blood clots.  *Id.* at 56.  When she went to

4   Theranos for a PT/INR test, her results came back markedly different from her usual levels, and her

5   doctor adjusted her medication in response.  *Id.*  Due to skepticism over the validity of the Theranos

6   results, "EG" had confirmatory testing performed at a traditional lab and received results matching her

7   usual values, showing that the adjustment to her medication had been unnecessary.  *Id.*

8          Several Theranos patients received erroneous HCG tests providing inaccurate information about

9   the status of their pregnancies.  Brittany Gould and her treating nurse practitioner, Dr. Audra Zachman,

10  testified at trial about multiple dubious HCG results provided by Theranos in October 2014.  *See* TX

11  5410, 2044, 4242, 3305, 5411.  Ms. Gould, who had suffered multiple miscarriages in the past, obtained

12  a series of HCG values from Theranos and traditional lab Quest Diagnostics over the course of a week.

13  The Theranos results—which included a dramatic drop in HCG value—strongly indicated that Ms.

14  Gould was having another miscarriage, but confirmatory testing by Quest indicated a viable pregnancy,

15  and Ms. Gould went on to deliver a healthy baby.  9/21/21 Tr. at 1396-1403.  Dr. Zachman testified that

16  she doubted the accuracy of both Theranos test results received by Ms. Gould, and stated that she had

17  never had accuracy issues with HCG tests from other labs the way she did with the results for Ms.

18  Gould.  *Id.*  Unfortunately, Ms Gould's experience with Theranos' HCG test was not unique.  In May

19  2014, a physician had called Theranos about HCG results that turned out to be unexpectedly low and

20  would have suggested a miscarriage if accurate, prompting the company to collect another sample and

21  rerun the test.  TX 4145.  Five months later, a provider contacted Theranos to complain about Theranos

22  HCG tests that had suggested that a pregnant patient was miscarrying.  TX 4222.  In response to that

23  Theranos test value, the patient's doctor had her discontinue pregnancy medications and get ready for

24  her next cycle.  *Id.*  When the patient was tested again for HCG, however, her value was over 2000 and a

25  subsequent scan detected a fetal heartbeat.  *Id.*  When Holmes learned about this erroneous test result,

26  she asked Balwani, "How did that happen?"—a strange question from someone who had been aware of

27  problems with Theranos' HCG test for months.

28  / /

1    It is impossible to know exactly how many times frightening scenarios like these played out in

2    the lives of patients who trusted their blood testing to Theranos.  The government's investigation of

3    Theranos did not reveal a centralized, comprehensive log of customer complaints.  Instead, that

4    information was apparently stored in multiple places and compiled as needed.  *See* Balwani TX 4520.

5    (complaint log selections provided to Balwani in connection with Adam Rosendorff).  Equally alarming

6    is the high likelihood that numerous patients relied on inaccurate blood test results from Theranos

7    without ever realizing that they were unreliable.  It is likely that some portion of Theranos patients

8    experienced harm to their health as a result of invalid Theranos test results without ever realizing the

9    cause.

10    The evidence available paints a bleak picture of Theranos' ability to return valid results using its

11    TSPU analyzer.  Internal quality control checks at Theranos provided a valuable objective measure of

12    how accurate the analyzer was.  Analyzing standardized samples, with known concentrations of the

13    substance being tested, the Theranos machines would either pass or fail daily checks of individual

14    assays.  In March of 2014, records indicate that nearly 26% of quality control checks on the TSPU

15    resulted in failures, i.e., inaccurate results.  TX 1633.  Some of the individual assays performed even

16    worse.  Theranos' PSA test failed quality control nearly 30% of the time, and the company's test for

17    triiodothyronine failed more than 50% of the time.  *Id.*  Because there is no guaranteed way to identify

18    inaccurate patient test results, Theranos' poor QC numbers are the best available method to estimate

19    how frequently Theranos was sending incorrect values to patients.  *See* 9/15/21 Tr. at 967.

20    When Centers for Medicare and Medicaid Services (CMS) inspected Theranos in the late

21    summer and fall of 2015, the agency found systemic issues with quality control for the Theranos

22    miniature analyzer or TSPU.  PSR ¶ 58.  In particular, CMS put Theranos on notice of "multiple and

23    recurrent time periods (across all analytes tested) of abrupt shifts in [quality control] means, high rates

24    of 1-2s QC rule failures, and QC CVs far exceeding limits for a stable testing process."  *Id.*  In other

25    words, Theranos' own quality control data revealed severe reliability problems with its testing systems,

26    just as employees had warned Defendants years earlier.  Faced with CMS's findings, Theranos itself

27    admitted that there had been "a global and long-term failure of the quality control program for this

28    instrument," and further concluded that "there is a possible patient impact for every test reported from

1    the laboratory's TPS 3.5 instruments." *Id.* Based on the scale of the problems highlighted by CMS,

2    Theranos voided every patient test result ever run on its Edison device in the clinical lab. Of course, this

3    step did nothing to mitigate the harm patients would already have suffered due to their reliance on

4    inaccurate medical test information.

5         **C.**      **The Cover Up**

6         In April 2015, Holmes learned that a *Wall Street Journal* reporter was working on a negative

7    story about Theranos. *See* TX 5387D at 50 ("Wsj guy might show up tomorrow"). She and Balwani

8    scrambled to have the Phoenix store prepared to perform only fingerstick tests rather than vein draws –

9    hoping to avoid the possible impression Theranos was doing ordinary blood testing. *Id.* (SB: "We need

10    tomorrow to test and then the team can push production tomorrow night. . . . So Wednesday it will

11    trigger fs for gc18 [general chemistry] . . . [s]o if he comes it may be 3 fs."). Ultimately, Balwani told

12    Holmes "[t]he team is not confident about pushing out fingerstick tonite . . . we don't want to rush this.

13    We went thru hell." *Id.* at 52. Unable to dupe the reporter, they then hired David Boies to try to get him

14    to drop the story. Tr. at 7998. When that failed, Holmes personally appealed to the owner of *The Wall*

15    *Street Journal*, who also was a significant investor in Theranos, to quash the story. Tr. at 7999; TX

16    5704.

17         Holmes also attacked those she believed to be the reporter's sources. *See* Victim Impact

18    Statement of Alex & Janel Shultz at 1 ("[S]he sure did her best to intimidate and silence the truth

19    tellers."). In June 2015, she had a man sit all day outside of Erika Cheung's new workplace to serve a

20    letter from Boies Schiller Flexner LLP threatening her with legal action. Tr. at 982-985, 7974-77; TX

21    2567; TX 5387D at 85 (SB: "I am ok sending letter to Erika as in [General Counsel] heather [King's]

22    email"). After the reporter published a negative story, Holmes tried to dismiss Cheung as a low-level

23    disgruntled employee. Tr. at 7978. She also had Boies Schiller lawyers surprise Tyler Shultz at his

24    grandfather George Shultz's house to have him sign an affidavit identifying himself as a source for the

25    reporter. Tr. at 7995-97; Leach Decl. Ex. L at 55-58; TX 5387D at 76 (EAH: "If Tyler thinking abt

26    George fyi at right time"); *id.* at 82 (SB: "You not calling George back also sends a message that we are

27    about to suit"). The incident enraged George Shultz, which he described as "one of the worst little

28    things he had seen anybody try to do." Tr. at 7995-96; Leach Decl. Ex. L at 57; TX 5387D at 84

1   ("George wants to know what Tyler has done. Would you ask David if I should say or tell him we'll let

2   him know la[t]er and txt me back").  During this time period, Holmes and Balwani also discussed

3   "nail[ing] this mother fucker" "in CLIA" who they believed to be spreading negative information, and at

4   various times contemplated action against "Tyler [Shultz],", "Erika [Cheug]," "Adam [Rosendorff],"

5   and "Rochelle [Gibbons]," the wife of a Theranos scientist who committed suicide in 2013.  TX 5387D

6   at 76-78, 86; Tr. at 1468-71, 8474; Balwani Trial Transcript at 6531.

7        When the negative *Wall Street Journal* story broke, Holmes lied and dissembled.  On October

8   15, 2015, when confronted on Jim Cramer's *Mad Money* with the *Journal*'s claim that Edison could

9   only do 15 out of 240 tests, Holmes falsely stated "every test that we offer in our laboratory can run on

10  our proprietary devices."  TX 2851.  At the time, Theranos was not using Edison (or any future iteration

11  of its device) for *any* tests, and had never used Edison for more than 12.  On October 21, 2015, she

12  falsely stated at a public conference that Theranos "never used commercially available lab equipment for

13  finger-stick based tests."  ECF No. 588 at 14; https://www.wsj.com/video/elizabeth-holmes-discusses-

14  theranos-at-wsjdlive-2015/20CE68A0-CAEE-48E0-BAB4-FD6C47D283BE.html.  The comment so

15  concerned Balwani that he texted: "Worried about your 'all fingersticks on our technology' comment."

16  TX 5387D at 117.

17       Months later, Holmes "continued to withhold information from [RDV] and other investors,

18  which . . . made it impossible to make informed decisions about the status and value of our investment."

19  *See* Victim Impact Statement of RDV Corporation dated Aug. 26, 2022 at p.4.  She insisted the issues

20  CMS identified were not major and downplayed their significance.  Tr. at 4709.

21       Holmes' coverup had lasting and devastating effects.  According to one victim impact statement,

22  Holmes "intentionally lied to [George Shultz] about Tyler to discredit him to prevent [George Shultz]

23  from learning the truth," creating a "permanent rift" within the family.  *See* Victim Impact Statement of

24  Alex & Janel Shultz at p.2 (describing how Holmes "[took] a wrecking ball to [Shultz's] family" and

25  stating "[t]he most heart breaking of all is to hear your son describe that he contemplated suicide

26  because he felt abandoned, isolated, threatened and hopeless, for doing the right thing.").

27  / /

28

## II.    PROCEDURAL HISTORY

On July 28, 2020, the government filed the Third Superseding Indictment, charging Holmes and Balwani with ten counts of wire fraud (Counts 3-12) and two counts of conspiracy to commit wire fraud (Counts 1-2).  ECF No. 469.  The Court severed the case in March 2020.  ECF No. 362.  Beginning on August 31, 2021, Holmes' trial spanned four months, during which over 900 exhibits were admitted and 32 witnesses testified.  *See* ECF No. 1395.  On January 3, 2022, the jury found Holmes guilty of four counts charging conspiracy to commit wire fraud during the period 2010 to 2015 and wire fraud against three specific investors in Theranos (Mosley, RDV, and PFM).  ECF No. 1235.  The jury did not reach a unanimous verdict with respect to the remaining investor-related counts and acquitted Holmes on the patient-related counts.  *Id.*  Balwani's separate trial began in March 2022 on the same twelve counts.  Following a comparably lengthy trial, the jury found Balwani guilty of all twelve counts.  ECF No. 1507.

### THE SENTENCING GUIDELINES CALCULATION

The government calculates the total offense level as follows:

|   |   |   |   |
|---|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(1) | | 7 |
| b. | Specific offense characteristics, U.S.S.G. § 2B1.1(b) | | |
| | Loss more than $550,000,000, U.S.S.G. § 2B1.1(b)(1)(P) | | +30 |
| | Offense involving 10 or more victims, U.S.S.G. § 2B1.1(b)(2)(A) | | +2 |
| | Offense involving the conscious or reckless risk of death or serious bodily injury, U.S.S.G. § 2B1.1(b)(16) | | +2 |
| c. | Adjustment for Role in the Offense, U.S.S.G. § 3B1.1(c) | | +4 |
| d. | Total Offense Level | | 43[1] |

Holmes falls within Criminal History Category I.  Thus, for Offense Level 43, the Guidelines recommend a sentence beyond the statutory maximum of 80 years.  The PSR omits the 2B1.1(b)(16) enhancement; the government objects to the omission.  The PSR recommends that the Court vary from Guidelines and impose a sentence of 108 months.  *See* PSR Sentencing Recommendation at p.1.

---

[1]      The Guidelines provide that "[a]n offense level of more than 43 is to be treated as an offense level of 43."  U.S.S.G. Ch. 5, Part A applic. note 2.

1    The government agrees with the Probation Office that the total offense level is 43.  Holmes

2   objects to the application of certain adjustments.  The government thus addresses them in turn.

3   **I.    LOSS MORE THAN $550,000,000**

4    Under the Guidelines, loss "is the greater of actual or intended loss."  U.S.S.G. § 2B1.1(b)

5   applic. note 3(A).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from

6   the offense."  *Id.* note 3(A)(i).  "'Intended loss' . . . [includes] the pecuniary harm that the defendant

7   purposely sought to inflict."  *Id.* note 3(A)(ii).  "'[R]easonably foreseeable pecuniary harm' means

8   pecuniary harm [i.e., harm that is monetary or otherwise readily measurably in money] that the

9   defendant knew or, under the circumstances, reasonably should have known, was a potential result of the

10  offense."  *Id.* notes 3(A)(iii & iv).

11    "The guidelines do not present a single universal method for loss calculation under

12  § 2B1.1 . . . ."  *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  The Court "need only make a

13  reasonable estimate of the loss."  U.S.S.G. § 2B1.1(b) note 3(C).  Because the Court is in a unique

14  position to assess the evidence and estimate the loss, its determination is entitled to appropriate

15  deference.  *Id.*  In estimating loss, the Guidelines direct the Court to consider "the cost to the victim of

16  replacing [the unlawfully taken] property," "[t]he approximate number of victims," and "reduction that

17  resulted from the offense in the value of equity securities or other corporate assets."  *Id.*

18    In the context of public company securities, the Ninth Circuit has expressly rejected the need to

19  show "loss causation."  *United States v. Berger*, 587 F.3d 1038, 1044-45 (9th Cir. 2009).  In the public

20  company context, the Ninth Circuit has observed:

21        Measurement of loss becomes considerably more complex, however, when the court
         confronts a "pump-and-dump" scheme involving an otherwise legitimate company.  In
22        such a case, because the stock continues to have residual value after the fraudulent
         scheme is revealed, the court may not assume that the loss inflicted equals the full pre-
23        disclosure value of the stock; rather, the court must disentangle the underlying value of
         the stock, inflation of that value due to the fraud, and either inflation or deflation of that
24        value due to unrelated causes.

25  *Zolp*, 479 F.3d at 719 (citing cases involving public company securities and efficient markets); *United*

26
27  *States v. Bakhit*, 218 F. Supp. 2d 1232, 1236-37 (C.D. Cal. 2012) (cited by *Zolp* with approval and

28

1  noting "after the fraud was fully disclosed and absorbed by the market, [the] stock continued to trade at

2  around $5.00 per share.").

3      Conversely, the "pecuniary harm" to an investor induced to invest by fraud is the amount of the

4  investment.  *See*, *e.g.*, *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("[T]he crux of

5  [defendant's] offense is that she obtained loans by fraudulently leading unsecured creditors to believe

6  that they were secured creditors.  Without this deceit, she could not have obtained her victims'

7  money."); *United States v. Bryson*, 101 F. Supp. 3d 147, 155 (D. Conn. 2015) ("[F]or those investors

8  who were fraudulent induced to invest following the onset of the conspiracy, a reasonable estimate of

9  the actual loss attributable to the offense conduct is the total value of their investment.") (citing *Turk*,

10  626 F.3d at 750).  Where a defendant's victims are "left with nothing of value when the fraud was

11  uncovered," a court may find "loss based on the victims' total . . . investment."  *United States v. Byors*,

12  586 F.3d 222, 226 (2d Cir. 2009).

13      "Because [Holmes] was convicted of conspiracy, and because the losses were incurred because

14  of that conspiracy, the 'preponderance of the evidence' standard applies."  *See United States v.*

15  *Laurienti*, 611 F.3d 530, 556 (9th Cir. 2010); *id.* at 557 (noting a court may infer in the conspiracy

16  context all investors who purchased a particular security were duped by the conspiracy).

17      Here, Holmes was convicted of three counts of wire fraud relating to investments by Mosley,

18  RDV, and PFM.  Mosley and representatives of RDV testified at length in both trials about the

19  misrepresentations and half-truths that induced their investments.  Mosley invested $5,999,997 on

20  October 31, 2014.  PSR ¶ 47.  He lost his entire investment.  RDV invested $99,999,984 on October 31,

21  2014.  *Id.*  It also lost its entire investment.  *See* Victim Impact Statement of RDV Corporation dated

22  Aug. 26, 2022.  PFM invested $96,139,998 in three separate wires on February 4, 2014.  *See* Victim

23  Impact Statement of PFM dated Sept. 6, 2022; PSR ¶ 46-47.  Although $43,500,00 was returned on May

24  1, 2017, as settlement of a civil lawsuit, this does not offset the loss.  *See* U.S.S.G. § 2B1.1 applic. Note

25  (E)(i) ("Loss shall be reduced by . . . [t]he money returned . . . by the defendant or other persons acting

26  jointly with the defendant, to the victim before the offense was detected."); *United States v. Bright*, 353

27  F.3d 1114, 1118 (9th Cir. 2004) (the defendant is only "entitled to credit for refunds paid prior to the

1   discovery of the offense").  The Mosley, RDV, and PFM investments *alone* account for $202,139,979 in

2   loss.[2]

3          Holmes also was convicted of conspiracy to commit wire fraud against Theranos investors

4   during the period 2010 to 2015.  ECF No. 1235 at 1; ECF No. 469.  Between September 2013, when

5   Theranos publicly launched its partnership with Walgreens, and 2015, Holmes raised $730,840,309 from

6   investors in the Series C round – Series C-1 and C-2 (including Mosley, RDV, and PFM).  According to

7   Daniel Edlin, who reported to Holmes, he prepared binders to investors based on an approved checklist.

8   Tr. at 3993-94.  He authenticated a "typical investment related binder" that went to one specific investor.

9   *See* Tr. 3996 & TX 1940, 4869.  He explained that a confidential Theranos briefing "was included in all

10  of the investment binders to my knowledge."  Tr. at 4001; *see also* Tr. at 3997-4000.  The government

11  also presented evidence of a recorded call between Holmes and a group of C-1 investors in advance of

12  investments by Chris Lucas' and Bryan Tolbert's firms.  Because investors were generally provided

13  similar information, and because they were exposed to similar public information (e.g., the September

14  2013 *Wall Street Journal* promotion, the September 2013 press release regarding Walgreens, the June

15  2014 Roger Parloff article), it is reasonable to conclude for sentencing purposes that they too are victims

16  of the scheme to defraud the jury found.  But for settlements of lawsuits after the fraud was exposed,

17  there is no evidence the C-1 or C-2 investors received any money or property or return on account of

18  their investments.  They too lost the entirety of their investment when Theranos declared bankruptcy

19  through an assignment for the benefit of creditors.

20         The trial also included evidence that Safeway and Walgreens invested $30 million and $40

21  million respectively on account of convertible promissory notes.  None of these investments yielded a

22  return.  *See, e.g.*, ECF No. 517-1.

23         Holmes appears to suggest that the "loss" is somehow not the money investors actually lost.  She

24  appears to argue that the loss is not reasonably estimable because Theranos was a real company with

25  cash and patent rights at certain periods of time, and that the actual loss must be reduced by some

26  hypothetical fair market value of Theranos when the fraud was discovered, or some other date.  This

27

28  _____

[2]      The Guidelines provide for a 26-level increase for losses more than $150,000,000.  *See* U.S.S.G.
§ 2B1.1(b)(1)(N).

defies logic and is unsupported by Ninth Circuit authority.  *Zolp* applies in the *public company* context, which makes sense: when a fraud is revealed in a public and efficient market, one can determine through the price change what the impact is to investors.  Here, by contrast, there is no dispute: the C-1 and C-2 investors received nothing of value from their Theranos investment (save for some amounts returned through lawsuits after the fraud was revealed that cannot be a credit against loss).  There were no sales of Theranos securities after the October 2015 *Wall Street Journal* article from which a fair market value could be derived; indeed, there was no market for Theranos shares at all.  Holmes' victims were induced to invest in Theranos based on the premise that its technology was market ready and comparable to Quest and LabCorp; after the truth was revealed, they found themselves stuck in a market-less investment with nothing but a hope (never realized) that it would some day be market-ready.

The Ninth Circuit has said that "district courts should 'take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss.'"  *United States v. Martin*, 796 F.3d 1101, 1110 (9th Cir. 2015).  Here, any realistic approach must recognize that, except for lawsuit settlements, the victim investors in this case have never received any monetary payment from Holmes or Theranos.

To the extent the Court nonetheless concludes that it is necessary to ascribe some hypothetical value to Theranos at the time victims invested or when the fraud revealed, the government has engaged and proffers the opinions of Carl Saba, a partner with the Forensic Consulting Group at Hemming Morse, LLP, and a Certified Valuation Analyst and Accredited Senior Appraiser with decades of experience in the valuation of businesses.  Leach Decl. Ex. A.  At the government's request, Mr. Saba attempted to estimate the fair market value of Theranos' equity on October 15, 2015 (when the fraud first started to come to light) and other valuation dates based on available information, and to calculate the loss to Theranos Series C-1 and C-2 investors based on those valuations.  *Id.* ¶ 6.  Mr. Saba was asked to define a minimum range of loss to investors and to apply assumptions that provide a favorable interpretation of the equity value of Theranos on October 15, 2015, and other valuation dates, including adoptions of optimistic management forecasts that assume Theranos' significant technology challenges would be resolved and Theranos would realize high revenue growth.  *Id.* ¶¶ 7-8.

1    Applying widely accepted valuation methods, and based on assumptions favorable to Holmes,

2   Mr. Saba determined that the loss to C-1 and C-2 investors – i.e. the loss measured by the difference

3   between the price paid by the investors and his estimated value as of the valuation date of October 15,

4   2015 – to be between $237.323 million and $273.646 million, depending on the valuation method used.

5   *Id.* ¶ 15 & Ex. A-1.  Mr. Saba's report, which was provided to the defense and Probation in advance of

6   the draft presentence report, demonstrates by any standard of proof that Holmes inflicted hundreds of

7   millions of losses on her investors.  *Id.*

8    For the reasons set forth above, the 30-point enhancement for a loss of more than $550 million is

9   warranted.  In no event is the loss less than $150 million.

10   **II.    OFFENSE INVOLVING 10 OR MORE VICTIMS**

11    The PSR applies a two-point enhancement for the number of victims.  This enhancement also is

12   warranted.

13    The Guidelines provide for a two-level increase if the offense "involved 10 or more victims."

14   U.S.S.G. § 2B1.1(b)(2)(A)(i).  For purposes of Section 2B1.1, "victim" means "any person who

15   sustained any part of the actual loss determined under subsection (b)(1)."  U.S.S.G. § 2B1.1 applic. note

16   1.  As with loss, estimating the number of victims does not require absolute precision, and the Court

17   may make a reasonable estimate based on available information.  *See United States v. George*, 949 F.3d

18   1181, 1186 (9th Cir. 2020) ("It [is] 'sufficient for the government to produce evidence for enough of the

19   [victims] to allow the sentencing court reasonably to infer a pattern." (quoting *United States v. Pham*,

20   545 F.3d 712, 720 n.3 (9th Cir. 2008) (alteration in original))).

21    The PSR correctly finds that this enhancement applies.  PSR ¶¶ 93, 107.  More than 10

22   individuals and entities invested in Theranos in the C-1 and C-2 rounds subsequent to September 2013,

23   when Theranos issued a press release announcing its launch and induced *The Wall Street Journal* to

24   falsely tout Theranos' capabilities.  Seven of those investors testified in the trials to the

25   misrepresentations and half-truths they were told.  An additional nine provided statements to the

26   government or the SEC or submitted a victim impact statement.  *See generally* Leach Decl. Exs. B-L.

27   Representatives of Walgreens and Safeway also testified in the trial to how they were deceived into

28

1  investing in Theranos.  Under any measure, more than 10 individuals or entities sustained a loss as a

2  result of Holmes' conspiracy and wire fraud offenses.

3  **III.    OFFENSE INVOLVING CONSCIOUS OR RECKLESS RISK OF DEATH OR**
   **SERIOUS BODILY INJURY**

4

5      **A.    Defendant's Conduct Created a Risk of Serious Harm to Theranos Patients**

6          The Guidelines provide for a two-level increase in offense level if the conduct involved "the

7  conscious or reckless risk of death or serious bodily injury."  U.S.S.G. § 2B1.1(b)(16)(A).  The evidence

8  in this case establishes that this enhancement is warranted.  Holmes could have founded any kind of

9  business when she dropped out of Stanford.  She chose to create a startup operating in the medical field,

10  where the stakes are inevitably high.  As described above, Holmes caused Theranos to market and

11  perform blood tests that were not sufficiently accurate or reliable for clinical use.  Despite knowing of

12  the serious flaws in Theranos' testing, Holmes continued to promote and offer those tests to patients

13  with the knowledge that those patients and their physicians would rely on the Theranos tests to make

14  medical decisions.  Her conduct created a significant risk of death or serious injury as a result of

15  misdiagnosis; an inaccurate test result could cause a patient to undergo an unnecessary treatment that

16  could harm them, or to forego a necessary treatment that could save them.  As Dr. Rosendorff testified at

17  trial, "Accuracy is critical.  Physicians and other health care providers depend on the accuracy of a test

18  to make medical decisions, sometimes life and death medical decisions."  9/24/21 Tr. at 1706.

19          The obvious danger associated with inaccurate and unreliable medical tests is sufficient to

20  warrant application of U.S.S.G. § 2B1.1(b)(16)(A), regardless of whether the government can show how

21  much harm resulted.  Courts recognize that this two-level enhancement "focuses on the defendant's

22  disregard of risk, rather than on the result." *United States v. Henderson*, 893 F.3d 1338, 1351 (11th Cir.

23  2018) (quotation omitted).  In other words, the government "need not show actual injury to any

24  particular victim."  *Id.*  Additionally, under Ninth Circuit law, a defendant cannot escape this

25  enhancement by claiming ignorance of the risk created by his conduct.  *United States v. Johansson*, 249

26  F.3d 848, 859 (9th Cir. 2001) (interpreting similar provision in U.S.S.G. § 2F1.1, now consolidated with

27  Section 2B1.1).  "[A] defendant does not have to subjectively know that his conduct created the risk."

28  *Id.*  Nor does the enhancement require that the defendant take some violent or direct action toward

victims.  Thus, in *Henderson*, it was enough that the government presented evidence that false entries in a computerized patient record system "could have delayed and influenced patient care."  *Henderson*, 893 F.3d at 1352.  In *United States v. Moran*, the enhancement was applied where defendants ran a healthcare facility and admitted elderly patients with dementia although the facility and staff were not equipped to meet those patients' needs.  *United States v. Moran*, 778 F.3d 942, 978 (11th Cir. 2015).  In *Popov*, the Ninth Circuit affirmed application of the standard where a doctor signed patient charts and Medicare reimbursement forms indicating he had supervised medical examinations when he had not. *United States v. Popov*, 555 F. App'x 671, 676 (9th Cir. 2014).  The risk to Theranos patients created by Holmes' conduct is at least as serious and certain as the dangers posed by the criminal conduct in the above cases.

Moreover, the evidence shows that Holmes was fully conscious of the risks caused by Theranos' unreliable tests—starting years before the company launched its testing service and continuing through the point when they finally discontinued it.  As early as 2010, Holmes laughed off a dire warning she received from an outside consultant evaluating Theranos technology.  Kevin Hunter was hired by Walgreens in May or June 2010 as a laboratory consultant to advise Walgreens on its incipient partnership with Theranos.  *See* 12/6/21 Kevin Hunter 302 (Leach Decl. Ex. K).  Hunter participated in regular meetings with Holmes and Balwani, during which they told him that the Theranos Edison analyzer could perform approximately 193 tests.  *Id.*  Hunter's team wanted to perform comparison testing of Theranos against a lab at Stanford, but Holmes and Balwani would not agree.  *Id.*  Nor would Holmes allow Hunter to take a tour of the Theranos lab.  *Id.*  As Hunter asked more pointed questions, Holmes and Balwani began to take him out of the loop in conversations with Walgreens.  *Id.* Eventually, Hunter's frustration with the lack of substantiation for Theranos' claims moved him to confront Holmes during a video teleconference.  *Id.*  He admonished her that her company was going to offer lab tests that people would use to make medical decisions, and warned her of the risk that she could be responsible for killing someone if the lab put out bad tests, and that she might go to jail as a result.  *Id.*  Holmes reportedly responded with something to the effect of, "They don't put pretty people like me in jail."  *Id.*  Hunter eventually separated from the Theranos-Walgreens project.  *Id.*

Holmes's lax attitude toward patient safety continued into 2013 and beyond.  Leading up to the launch of Theranos' testing services, Theranos' lab director spoke to Holmes personally in order to "raise alarm bells" about assays that he "didn't feel were ready for launch."  9/24/21 Tr. at 1725-1730; TX 1049.  During that time period, Holmes and Balwani had set a schedule for assay validation that Dr. Rosendorff viewed as "rushed."  *Id.*  In his communication to Holmes, Dr. Rosendorff suggested that Theranos might need to delay the launch and work on its calibrators or chemistry—essentially returning to the fundamentals to identify and solve "a basic problem" with the company's equipment.  *Id.*  Dr. Rosendorff testified that Holmes did not seem surprised to hear of problems with Theranos' tests, but that the conversation seemed to make her very nervous.  *Id.* at 1731-32.  Ultimately, she refused to delay the launch as he recommended, suggesting instead that certain tests could be performed on traditional equipment.  *Id.*

While Theranos' clinical lab was in operation, Holmes received reports of serious problems with the company's tests.  In April 2014, Balwani received an email from a senior scientist at Theranos reporting that the company's proprietary potassium results were running high as a result of sample hemolysis, forcing the lab to review images of all samples to determine whether to rerun—a practice Balwani told Holmes was "not scalable."  TX 4124.  Earlier in that email chain, Balwani had questioned the accuracy of the test "given this is an ISE," indicating awareness of preexisting accuracy problems with Theranos' ion-selective-electrode blood tests.  *Id.*  Also in April, employee Tyler Shultz sent Holmes a detailed email to alert her to several ways in which Theranos was overstating the accuracy of its tests and potentially masking problems.  TX 1660.  The points raised by Mr. Shultz gained no traction with Holmes.  In late May 2014, Dr. Rosendorff halted all testing of HCG (a pregnancy hormone) on Theranos analyzer in light of inaccurate results, and Balwani immediately passed along that news to Holmes.  TX 4147.  Dr. Rosendorff testified that the company resumed HCG testing on the Edison despite the fact that issues with that test persisted.

In August of that year, Dr. Rosendorff emailed Balwani to inform him that Theranos' bicarbonate test had lost all diagnostic value "and probably also reliability" due to the fact that the company voided all abnormal results in response to accuracy problems with this test.  TX 4189. Balwani forwarded that notice to Holmes.  Around that same time, another email exchange

1  memorialized Balwani asking another Theranos scientist about the company's PT/INR test reporting
2  inaccurately low numbers.  TX4181.  When the scientist provided a theoretical explanation and
3  proposed an internal study to address the problem, Balwani emailed Holmes complaining, "Always
4  another study after the fact."  *Id.*  In September 2014, Defendant's brother Christian Holmes sent her an
5  individual email seeking a "candid conversation" because it was "pretty obvious" the company was
6  having issues with the accuracy of its calcium, potassium, and sodium tests.  TX 1953.  In that message,
7  Christian went so far as to suggest Theranos stop offering those tests until the problem was identified
8  and solved.  *Id.*  By late November 2014, Defendants' collective faith in their lab still had not improved,
9  with Balwani texting Holmes that the Normandy lab (where Theranos conducted its proprietary testing)
10  was a "f___ing disaster zone."  TX 5387D at 29.  Despite ample notice of serious issues plaguing
11  Theranos' technology, Holmes and Balwani stubbornly continued to send out clinical test results from
12  their "disaster zone" of a laboratory, forcing Theranos' patients to unknowingly incur a risk of death or
13  injury.  Ultimately, they had to void every single Edison test following extremely negative CMS
14  findings and their own assessment of possible patient impact.

15  **B.  Holmes' Treatment of Theranos Patients is Relevant Conduct**

16  Holmes' acquittal on the counts relating to her scheme to defraud patients does not prevent this
17  enhancement from applying.  The Supreme Court has held that a sentencing court may consider facts
18  underlying acquitted counts as relevant conduct for sentencing purposes as long as the conduct is proven
19  by a preponderance of the evidence.  *United States v. Watts*, 519 U.S. 148 (1997).  In this case, it is
20  impossible to know the precise reasons why the jury did not return guilty verdicts on the patient-focused
21  counts, and the Court should disregard any speculation proffered by the defense on this question.  The
22  Court is well aware, though, of the evidence presented at trial demonstrating Holmes' role in the scheme
23  to defraud Theranos patients.  Even if the jury concluded that at least one element of those charged
24  counts was not proven beyond a reasonable doubt, the Court should still conclude that Holmes' conduct
25  toward patients has been proven by a preponderance.  Indeed, the jury in the Balwani trial convicted on
26  all counts based on substantially overlapping evidence, including Count 2 of the Third Superseding
27  Indictment alleging a conspiracy between Holmes and Balwani to defraud patients.  ECF No. 1507
28

1        Given that Holmes' actions toward patient victims have been shown by a preponderance of the

2  evidence, they easily qualify as relevant conduct for sentencing purposes.  Guidelines ranges are to be

3  determined based on, in pertinent part, "all acts and omissions committed, aided, abetted, counseled,

4  commanded, induced, procured, or willfully caused by the defendant," as well as certain acts of

5  coconspirators, that "occurred during the commission of the offense of conviction, in preparation for that

6  offense, or in the course of attempting to avoid detection or responsibility for that offense."  U.S.S.G.

7  § 1B1.3(a)(1).  The Guidelines go on to include as "relevant conduct" any such acts that were "part of

8  the same course of conduct or common scheme or plan as the offense of conviction."  *Id.* at

9  § 1B1.3(a)(2).

10        Holmes' actions directed toward Theranos patients are undoubtedly part of the same course of

11  conduct and scheme or plan as their fraud on investors.  In order to attract investors and induce them to

12  purchase Theranos stock, Holmes and Balwani sought to portray Theranos' technology as advanced,

13  novel, and, critically, mature without any significant research and development remaining.  As victims

14  explained at trial, investing in a company whose key device was already market-ready carried

15  significantly less risk than investing in an earlier-stage startup still working to develop its technology.

16  11/10/21 Tr. at 6081-83.  With Theranos short on money in the second half of 2013, Defendants were

17  motivated to show that their technology could actually be used for clinical patient testing—or at least to

18  give the public that impression.  With the commercial launch of Theranos testing services in September

19  2013, Holmes and Balwani sent a message to the world—and the pool of potential investors—that

20  Theranos' technology could be trusted and there was nothing standing in the way of the company's

21  expansion.  Holmes made that message explicit in communications celebrating the launch.  *See* TX 1113

22  (press release); TX 1334 (email to investors claiming Theranos is "rapidly scaling" following

23  commercial launch).  This method worked, igniting a wave of interest among investors that led to

24  Theranos raising approximately $730 million between fall of 2013 and 2015.  PSR ¶ 47.  From 2013 on,

25  the operation of Theranos' clinical lab furthered Defendant's goal of defrauding investors, constituting

26  part of the same plan or scheme or course of conduct as the offenses of conviction.

27        Accordingly, a two-level increase is warranted under U.S.S.G. § 2B1.1(b)(16)(A), reflecting the

28  fact that Holmes' conduct involved a conscious or reckless risk of death or serious bodily injury

1    imposed on Theranos patients.  Alternatively, the Court should account for Holmes' conduct toward

2    patients under U.S.S.G. § 1.4, which allows the Court to consider, "without limitation," any information

3    concerning the conduct of the defendant, in order to determine the sentence to impose within the

4    guideline range or whether to depart from the guidelines.

5    **IV.   ROLE IN THE OFFENSE**

6         Holmes should also receive an additional enhancement due to her role as a manager and leader of

7    the extensive criminal activity that occurred in connection with the company she founded.  Under the

8    Guidelines, a four-level increase is warranted if a defendant was an "organizer or leader" of criminal

9    activity that either (1) involved five or more participants or (2) was otherwise extensive.  U.S.S.G.

10   § 3B1.1(a).  The commentary for that section of the Guidelines defines "participant" as "a person who is

11   criminally responsible for the commission of the offense," although that person "need not have been

12   convicted."  *Id.* applic. note 1.  In this case, the Court need not determine whether the offense involved

13   five or more participants.  Section 3B1.1(a) applies because, regardless of the number of culpable

14   participants, the criminal activity here was "otherwise extensive."  The Guidelines commentary advises

15   that, in determining whether criminal activity was extensive under this provision, a court should

16   consider "all persons involved during the course of the entire offense."  *Id.* applic. note 3.  Even if a

17   fraud involves fewer than five participants, it still can qualify as extensive under section 3B1.1(a) if it

18   "used the unknowing services of many outsiders."  *Id.*  That language perfectly describes the way

19   Holmes and Balwani used the many employees of Theranos—along with Walgreens personnel,

20   marketing experts, journalists, and others—to carry out their scheme to defraud investors.

21        **A.    Holmes Was a Leader and Organizer**

22        First, there can be no dispute that Holmes was an organizer and leader of the criminal activity

23   charged in this case, satisfying the first requirement for this four-level enhancement.  The Guidelines

24   instruct that, in identifying defendants with a leadership or organizational role, courts should consider

25   factors including "the exercise of decision making authority," "the claimed right to a larger share of the

26   fruits of the crime," "the degree of participation in planning or organizing the offense," and "the degree

27   of control and authority exercised over others."  U.S.S.G. § 3B1.1 applic. note 4.  Here, the evidence at

28   trial revealed the unsurpassed level of authority that Holmes wielded inside her company.  In terms of

1    reporting relationships at Theranos, Holmes acknowledged that all roads ultimately led to her as Chief

2    Executive Officer.  11/30/21 Tr. at 8007.  Holmes' power at Theranos was enhanced by her role as

3    President of the Board of Directors and the fact that she was by far the company's largest shareholder.

4    And because she held far more Theranos stock than anyone else, she stood to gain the most from the

5    inflated share price caused by her false and misleading statements about the company.

6          Holmes was a hands-on leader at Theranos, working long hours in the office.  10/15/21 Tr. at

7    3854.  Throughout the trial, documentary evidence and witness testimony highlighted Holmes' control

8    over many of Theranos' business.  While Holmes restricted the flow of information among employees at

9    Theranos, she and Balwani were unique in that they had access to all information about the company's

10   activities.  *Id.* at 3855-57.  As CEO, Holmes had the authority to:  approve the training program for the

11   personnel who would staff Theranos Wellness Centers at Walgreens stores (10/15/21 Tr. at 3862-63);

12   give or withhold permission for an individual outside Theranos to receive a tour of specific areas inside

13   company facilities (*id.* at 3865-66); order demonstrations of Theranos technology (*id.* at 3869); review

14   and weigh in on the content of demo reports (TX 860); and control communications between Theranos

15   and outside entities like pharmaceutical companies (TX 528), the U.S. military (10/19/21 Tr. at 4018-

16   19), and potential investors (TX 1940; 10/19/21 Tr. at 3994), among many other things.  Holmes herself

17   confirmed at trial that she was the founder and owned a majority of the company.  11/30/21 Tr. at 8005.

18   She understood that her status gave her the power to terminate anyone at the company, including

19   second-in-command Balwani, the lab directors, and even members of the board.  *Id.* at 8005-06.

20          Holmes was clearly a leader and organizer at Theranos.  When it came to carrying out the

21   scheme to defraud investors, the evidence at trial showed that she stayed true to that role, as explained

22   below.

23          **B.     Holmes' Fraud Was "Otherwise Extensive"**

24          This case satisfies the second requirement for the four-point enhancement under section 3B1.1(a)

25   because Holmes used her authority to direct many others in furtherance of the scheme to defraud

26   Theranos' investors.  Therefore, her criminal activity was "otherwise extensive" as contemplated by the

27   Guidelines.  The Ninth Circuit has made clear that this enhancement is not limited to cases where the

28   defendant is aided by multiple people with criminal intent.  Instead, criminal activity can be "otherwise

1    extensive" where it involves the *unknowing* participation of people who were simply doing their jobs.

2    *See United States v. Leung*, 35 F.3d 1402, 1406 (9th Cir. 1994) (affirming application of enhancement in

3    case where defendant rented a warehouse to store drugs and hired shipping and transport companies to

4    move the drugs).  In the case of Theranos, Holmes' efforts to attract investors were supported by the

5    hard work of hundreds of employees and outside partners who were doing their jobs in good faith:

6    designing and manufacturing Theranos' analyzers, managing Theranos' finances, securing Theranos'

7    intellectual property and other legal rights, and outfitting and maintaining Theranos' facilities.  The fact

8    that those individuals had no idea their efforts were furthering a fraudulent scheme is no barrier to this

9    four-level enhancement.  *See United States v. Booth*, 309 F.3d 566, 577 (9th Cir. 2002) (affirming four-

10   level enhancement under Section 3B1.1(a) "because of the involvement, albeit unknowing, of more than

11   ten employees and the geographical reach of the scheme").

12         The evidence at trial included additional specific examples of Holmes and Balwani's reliance on

13   others' services within Theranos to further the fraud.  For example, several groups of employees at

14   Theranos were involved in setting up and running technology demonstrations for potential investors,

15   including personal assistants, engineers, lab personnel, and phlebotomists.  10/15/21 Tr. at 3869-70.

16   Those demonstrations directly furthered their scheme to defraud investors in that they left victims with

17   an unrealistic image of the capabilities of Theranos' proprietary analyzer and the extent to which the

18   company was using it for clinical testing.  *See* TX 957; Balwani 4/19/22 Tr. at 2919-20 (testimony of

19   Walgreens representative Nimesh Jhaveri that he was not aware the sample collected from him during a

20   Theranos demo was tested on a third-party device).  Similarly, multiple Theranos employees—along

21   with outside consultants and contractors—were involved in creating and maintaining the Theranos

22   company website.  Holmes stayed involved and in charge, receiving input from several employees and

23   outside lawyers regarding claims on the website that might be difficult to defend.  *See, e.g.*, TX 3965,

24   3981, 5438.  Holmes evidently decided to ignore much of that guidance, and the Theranos website

25   ended up containing a number of materially misleading claims about Theranos technology.  *See* Balwani

26   TX 5805 (Theranos website pages).  The work done by Holmes' agents on the Theranos website

27   unwittingly furthered her scheme to defraud investors, as the website was an effective tool to spread

28   misinformation that induced victims to invest.

1    Holmes and Balwani's scheme to defraud investors also relied on the use of members of the

2    media.  Journalists who obtained information from Holmes and Balwani and their agents unknowingly

3    passed along false and misleading information about the company's achievements and abilities,

4    embellishing Theranos' reputation and fueling investor excitement about the opportunity to buy a stake

5    in the company.  The evidence at trial included several articles repeating and amplifying Holmes' false

6    statements, including articles published in *The Wall Street Journal* and *Fortune* magazine.  TX 1106,

7    1776.  In connection with the *Fortune* article, several Theranos employees answering to Holmes worked

8    together to provide journalist Roger Parloff with requested information presenting a favorable image of

9    Theranos.  *See* TX 1753 (email including action item list with assigned employees).

10    As discussed in Section III above, Holmes and Balwani's scheme to defraud investors also

11    depended on the successful operation of Theranos' blood testing business.  Holmes had ultimate

12    authority over that part of Theranos' operations just as she did for every other aspect of the company's

13    activity.  An org chart presented to CMS by Theranos displayed Holmes at the top of the CLIA lab

14    operation, overseeing a group comprised of more than sixty Theranos employees including her

15    coconspirator Ramesh Balwani.  TX 4528 at 9.

16    The success of Holmes and Balwani's scheme turned on their ability to contain bad news about

17    Theranos' accuracy problems.  If word had gotten out about the poor reliability of Theranos' blood tests,

18    prospective investors surely would have hesitated to part with the large sums that they did, and current

19    investors would have asked questions Defendants did not want to answer.  Defendants' efforts to

20    suppress the truth depended on the participation of the Theranos employees who interacted with doctors

21    and patients.  Theranos' customer service group included more than twenty individuals who responded

22    to questions about Theranos' test results.  Complaint records document the ways in which Defendants

23    used these employees to quell doubts about Theranos' test accuracy.  For example, in connection with

24    potentially erroneous results in April and August 2015, one Theranos customer representative assured a

25    doctor that he believed the test results were accurate.  TX 4520.  In the log of that call, the employee

26    noted, "When I talk to physicians or guests I try to offer them different variables or scenarios to consider

27    when they question our results.  *Of course none of them have to do with our testing methods*."  *Id.*

28    (emphasis added).

1   This use of other employees to appease doctors and patients troubled by dubious test results was

2   an important part of Holmes and Balwani's plan.  Indeed, when employees refused to spin Theranos'

3   flawed test results as Defendants demanded, significant conflict arose.  For example, Dr. Rosendorff,

4   Theranos' lab director, testified that he felt pressured him to vouch for and explain away test results that

5   he viewed as questionable, leading to heated internal exchanges over how to respond to inquiries from

6   Theranos' customers.  *See* 9/28/21 Tr. at 1940-1946; TX 4323, 4314.  Ultimately, Dr. Rosendorff

7   resigned partly out of unwillingness to keep "endorsing results that [he] essentially didn't have faith in."

8   10/5/21 Tr. at 2733; TX 4330.  In addition to all the other ways Holmes' fraud depended on the work of

9   numerous others, her exploitation of unknowing—and sometimes unwilling—employees to help cover

10  up problems at Theranos certainly qualifies her for the offense level increase in Section 3B1.1(a).

11      Finally, even if this case did not involve the unknowing participation of so many people, the

12  "otherwise extensive" requirement under Section 3B1.1(a) would still be satisfied.  As the Ninth Circuit

13  has instructed, "[w]hether criminal activity is 'otherwise extensive' depends on such factors as (i) the

14  number of knowing participants and unwitting outsiders; (ii) the number of victims; and (iii) the amount

15  of money fraudulently obtained or laundered."  *United States v. Rose*, 20 F.3d 367, 374 (9th Cir.1994)

16  (citations omitted); *see also United States v. Govan*, 152 F.3d 1088, 1096 (9th Cir.1998) (finding that a

17  conspiracy was "clearly 'otherwise extensive'" because it "involved interstate travel, a large number of

18  victims… as well as nearly $100,000 in robbery proceeds").  Here, the large number of investor victims,

19  the fact that Theranos' activities stretched across state and national borders, and the nine-figure loss

20  amount all weigh heavily in favor of a finding that Holmes organized a led criminal activity that was

21  "otherwise extensive" under the Guidelines.

22      In sum, the facts of this case compel application of U.S.S.G. § 3B1.1(a).[3]

23  / /

---

[3]     Even if Section 3B1.1(a) were not satisfied, subsection (c) undoubtedly applies.  *See* U.S.S.G. § 3B1.1(c) ("If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.").

1

2

## ARGUMENT

## I.    LEGAL STANDARD

3

4

The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect

5

the seriousness of the offense, promote respect for the law, and provide just punishment; to afford

6

adequate deterrence; to protect the public; and to provide the defendant with needed education or

7

vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d

8

1069, 1088-89 (9th Cir. 2012) (*en banc*); *see United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008);

9

18 U.S.C. § 3553(a).  The Court should begin the sentencing process by correctly calculating the

10

applicable Guidelines range and must "remain cognizant of them throughout the sentencing process."

11

*Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).  The Court should then consider the factors outlined in

12

Section 3553(a) to determine the appropriate sentence.  *Ressam*, 679 F.3d at 1089.  If the Court

13

determines that a sentence outside of the Guidelines range is warranted, it must ensure that the

14

"justification is sufficiently compelling to support the degree of the variance." *Id.* (internal quotation

15

omitted). "[A] major departure should be supported by a more significant justification than a minor

16

one." *Gall*, 552 U.S. at 50

17

The Section 3553(a) factors are:

18

(1)    the nature and circumstances of the offense and the history and characteristics of
the defendant;

19

20

(2)    the need for the sentence imposed (A) to reflect the seriousness of the offense, to
promote respect for the law, and to provide just punishment for the offense; (B) to
afford adequate deterrence to criminal conduct; (C) to protect the public from
further crimes of the defendant; and (D) to provide the defendant with needed
educational or vocations training, medical care, or other correctional treatment in
the most effective manner;

21

22

23

(3)    the kinds of sentences available;

24

(4)    the kinds of sentence and the sentencing range established in the Guidelines;

25

(5)    any pertinent policy statement by the Sentencing Commission;

26

(6)    the need to avoid unwarranted disparities among defendants with similar records
who have been found guilty of similar conduct; and

27

(7)    the need to provide restitution to any victims.

28

*See* 18 U.S.C. § 3553(a)(1)-(7).

**II.    GOVERNMENT RECOMMENDATION**

With these principles in mind, the government respectfully recommends a sentence of 180 months in custody.

The factors the Court should consider in determining the appropriate sentence include (i) the nature and circumstances of the offense and the history and characteristics of the defendant, (ii) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment, (iii) the Sentencing Guidelines and related Sentencing Commission policy statements, (iv) the need to avoid unwarranted sentence disparities among similarly-situated defendants, and (v) the need to provide restitution to the victim of the crime.  18 U.S.C. § 3553(a).

As described above, Holmes' Total Offense Level (43) and Criminal History Category (I) yield a sentence within Zone D.  PSR ¶¶ 114, 118, and 176.  Zone D sentences shall be satisfied with a custodial sentence.  *Id.* and § 5C1.1(f).  The applicable sentencing custodial range is capped at 960 months' imprisonment.  PSR ¶ 170.  This range assumes a sentence of 240 months' imprisonment (the statutory maximum) would be imposed for each of the four counts of conviction, run consecutively.  *Id.* Considering the extensiveness of Holmes' fraud, the sentencing factors support a sentence of 180 months' imprisonment, as it would reflect the seriousness of the offenses, promote respect for the law, provide for just punishment for the offenses, and deter Holmes and others.

**A.    The Nature and Circumstances of Holmes' Crimes (18 U.S.C. § 3553(a)(1))**

Elizabeth Holmes' charged conduct was extremely serious.  The Indictment in this case lays out the key events in the story of Holmes' company Theranos, focusing on the fraudulent schemes that Holmes and Balwani devised and executed to benefit themselves and attract business and investment capital to Theranos.  PSR ¶¶ 10-84.  As detailed in the Indictment, one of Holmes' fraud schemes targeted investors in Theranos—individuals and entities who entrusted defendants with hundreds of millions of dollars based on representations made by Holmes and Balwani.  *Id.*  In a separate but closely related fraud, defendants targeted patients who paid for and relied upon Theranos' testing services to investigate and diagnose health conditions and make high-stakes decisions about medical care.  *Id.*  In

1   each of these fraudulent schemes, Holmes and Balwani misled victims regarding material facts about

2   Theranos and the capabilities of its blood-testing technology.  *Id.*  The effects of Holmes and Balwani's

3   fraudulent conduct were far-reaching and severe:  dozens of investors lost over $700 million and

4   numerous patients received unreliable or wholly inaccurate medical information from Theranos' flawed

5   tests, placing those patients' health at serious risk.  PSR ¶¶ 49, 106

6          Holmes was convicted at trial of four counts related to her scheme to defraud investors (Counts 1

7   and 6 through 8 of the Third Superseding Indictment, ECF. No. 469).  PSR ¶ 5.  Holmes was acquitted

8   of the four counts related to her scheme to defraud patients (Counts 2, 10 through 12).  PSR ¶ 6.

9   Nevertheless, the Court should consider Holmes' role in each scheme to defraud when evaluating the

10  nature and circumstances of the offenses and to determine the appropriate sentence.  *See United States.*

11  *v. Watts*, 519 U.S. 148 (1997) (Sentencing court may consider conduct of which defendant has been

12  acquitted, so long as that conduct has been proved by a preponderance of the evidence).

13         As alleged in the Indictment and proven at trial, Theranos was founded by Holmes in

14  approximately 2003, and drew little public attention for its first ten years.  PSR ¶¶ 10-84.  The

15  company's stated goal was to develop innovative methods for testing tiny blood samples obtained from

16  a fingertip with a small lancet without the need for traditional venous blood draws.  *Id.*  In or around

17  2013, Theranos began to publicize its technology and tout its purported advantages, all while soliciting

18  massive contributions from investors and gearing up toward the public launch of its testing services.  *Id.*

19  Beginning in September 2013, Theranos offered blood testing to patients at its "Wellness Centers" in

20  various locations in California and Arizona.  *Id.*

21         Unbeknownst to those outside the company, defendants were presenting investors with a

22  deceptive picture of their company and its technology, overstating Theranos' achievements, promising

23  unrealistically favorable developments on the horizon, and misrepresenting the abilities of its proprietary

24  analyzer.  *Id.*  In dealing with doctors and patients, defendants promoted the company's blood-testing

25  services through explicit and implicit representations that Theranos' test results were reliable and

26  accurate although they knew that was not the case.  *Id.*

27         The nature and circumstances of Holmes' crimes are aggravating factors for several reasons.

28  First, Holmes' crimes were not isolated events.  They were not the result of poor choices on a single day.

1  They were not limited to her interactions with one investor or a single patient.  Instead, Holmes

2  developed a complex scheme, and executed it over the course of many years.  Holmes presented a fake

3  story about Theranos' technology day after day in meeting after meeting.  Holmes maintained this

4  façade of accomplishments, after making the calculated decision that honesty would destroy her

5  company.  She ignored innumerable opportunities to chose a lawful path.

6  Second, each investment in Theranos came with opportunity cost.  Money invested with Holmes'

7  company was money not invested in legitimate, promising technology.  Holmes' scheme not only

8  diverted valuable funding to her fraudulent purposes, but it also has the effect of discouraging

9  investments generally in new technologies, as investors reasonably remain skeptical that the next

10  investment pitch is too good to be true.  In short, Holmes' criminal activities were serious, extended, and

11  extremely damaging.  The nature and circumstances of Holmes' criminal activity are significant

12  aggravating factors in determining an appropriate sentence.

13  **B.     The History and Characteristics of Holmes (18 U.S.C. § 3553(a)(1))**

14  In addition to the nature of the offenses, Holmes' history and characteristics militate in favor of a

15  significant custodial sentence.  Some defendants have difficult childhoods filled with obstacles that must

16  be overcome.  Holmes did not.  PSR ¶¶ 122-125.  Some defendants have few formal educational

17  opportunities, and instead are left to receive their educations informally, where they can find them.

18  Holmes had many educational opportunities.  PSR ¶¶ 122-126, 158-160.  Some defendants have no

19  support networks, and instead must fend for themselves.  Holmes had and continues to have a substantial

20  one.  PSR ¶¶ 144-148.  While some defendants certainly deserve consideration from a sentencing court

21  for the obstacles they have overcome and the regrettable criminal motivations they adopt, Holmes does

22  not.  Holmes, with strong family support, exceptional educational opportunities, and financial stability,

23  chose to commit fraud, repeatedly.  Holmes' history and characteristics are aggravating factors that

24  should lead this Court to impose a significant custodial sentence.  Similarly, the presence of these

25  aggravating factors should discourage the Court from varying substantially from the applicable

26  Guidelines range.

27  / /

28

C.     **The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A))**

This Court should send a clear message to the community that white collar crime is serious and deserving of significant punishment.  Through this sentencing proceeding, the public will observe the law, through this Court, treat fraudsters fairly for significant crimes.  Statements from victims in this prosecution provide additional support for the argument that a significant custodial sentence is needed to promote respect for the law.  In his statement, investor Craig Hall wrote, "…I urge you, first and foremost, to consider the broader and more significant impact this sentencing will have on our society moving forward.  Given the high-profile nature of this case, the sentencing will undoubtedly send a message to the community at large.  That messaging should, in my opinion, clearly and unequivocally communicate that there is no justification for or tolerance of fraud in the business world.  Deterring similar debacles is critical to avoid society's future loss of hundreds of millions of dollars, amounts which could otherwise be used to aid in the entrepreneurial efforts of hard-working, honest Americans, bolstering the economy and fostering the American Dream."  PSR ¶ 95; Craig Hall Letter, dated Sept. 6, 2022, at p. 1.  In Brent Bingham's victim impact statement, he wrote, "I feel sentencing should reflect a standard that medical related technology shouldn't be Beta tested by patients without consent.  Medical technology companies should receive a very clear message that placing finance and 1st to market considerations above engineering and science is not acceptable."  In Elizabeth R. Daoust's victim impact statement, she wrote, "Penalties for white collar crime seem too often to be slap[]s on the wrist.  People/companies perpetuating financial fraud often get light, if any, sentences in a minimum security prison and keep most of the stolen money.  This system of 'justice' has alienated a large swath of our citizens, weakened values, and turned more people against our government.  It is a serious problem that both the courts and legislatures need to remedy."  These, and many other, victim impact statements demonstrate the need for this sentence to reflect the seriousness of the offenses and promote respect for the law.

D.     **The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))**

A sentence of 180 months in custody will serve to deter others from committing or contemplating committing white collar crimes, especially those who might consider taking advantage of

investors or vulnerable patients. General deterrence is of particular importance in white collar cases such as this one because would-be offenders need to be put on notice that there are severe consequences for engaging in this type of criminal conduct. *See, e.g.*, *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (citation and internal quotation omitted); *United States v. Goffer*, 721 F.3d 113, 132 (2nd Cir. 2013) (addressing the need for general deterrence for those who might otherwise feel that some white-collar crimes are "game[s] worth playing").

Holmes' criminal scheme was committed in Silicon Valley. This region is known for innovation, where companies rely upon investments to fund ideas before they become profitable. This investment relationship is built, at least in part, on trust. The relationship between innovators and investors generates tremendous good far beyond this community. Unfortunately, Holmes' crimes damaged the trust and integrity that are necessary for this community to thrive. A significant custodial sentence will serve not only to deter future startup fraud schemes, but it will also serve to rebuild the trust investors must have when funding innovators.

**E.    The Need to Protect the Public From Future Crimes by Holmes (18 U.S.C. § 3553(a)(2)(C))**

Specific deterrence, due to the brazenness of Holmes' conduct, coupled with the lack of any discernable economic need that might have motivated her, also counsels in favor of a sentence that is sufficiently punitive to deter Holmes from ever contemplating committing fraud again. There is a need for this Court's sentence to deter Holmes from future criminal conduct. First, Holmes has not accepted responsibility for her criminal conduct. PSR ¶ 98. Rather than acknowledge her role in this fraud, Holmes continues to view herself as one of Theranos' victims. PSR ¶ 99. Moreover, Holmes' experiences at Theranos apparently have not deterred her from similar employment. Holmes continues to work on new patents involving chemistry within the health care space. PSR ¶¶ 138-139. Likewise, Holmes' settlement with the Securities and Exchange Commission allows her to return as an officer or director in the future. *Securities and Exchange Commission v. Elizabeth Anne Holmes and Theranos Inc.*, 18-CV-01602-EJD, ECF. No. 9 at 3.

1    Finally, during her trial testimony, the following exchange occurred during her cross

2    examination:

3        Q:      Okay.  And holding a patent does not necessarily mean the invention described in the

4    patent works; correct?

5        A:      Yes.

6        Q:      For example, you don't have an ingestible pill that enables you to, to measure lipids in

7    the blood, correct?

8        A:      **Not yet**.

9    12/7/21 Tr. at 8484. (emphasis added).  Approaching sentencing, this Court cannot be confident that

10   Holmes has been deterred from future fraud.  Therefore, the Court must deter future criminal fraud,

11   especially in the health care space, by Holmes through a significant custodial sentence.

12   **F.      The Properly Calculated Sentencing Guideline Range and Pertinent Policy
            Statements Provided by the Sentencing Commission (18 U.S.C. §§ 3553(a)(4) &
13          3553(a)(5))**

14       Holmes' Total Offense Level (43) and Criminal History Category (I) yield a sentence within

15   Zone D.  PSR ¶¶ 114, 118, and 176.  Zone D sentences shall be satisfied with a custodial sentence.  PSR

16   ¶¶ 169, 170, and 176.  The applicable sentencing range is capped at 960 months' imprisonment.  PSR

17   ¶ 70.  This range assumes a sentence of 240 months' imprisonment (the statutory maximum) would be

18   imposed for each of the four counts of conviction, run consecutively.  *Id.*

19       The Sentencing Commission makes clear that the focus on loss amount in federal fraud

20   sentencing hearings is reasonable and appropriate.  In particular, the Sentencing Commission states,

21   "The Commission has determined that, ordinarily, the sentences of defendants convicted of federal

22   offenses should reflect the nature of magnitude of the loss caused or intended by their crimes.

23   Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the

24   seriousness of the offense and the defendant's relative culpability and is a principal factor in determining

25   the offense level under this guideline."  *See* U.S. Sentencing Guidelines Manual, 2021, p. 102.

26       The government agrees with the Commission's assessment of the importance of loss amount as a

27   measure of the gravity of a fraud conviction.  Here, Holmes' loss number is so high that a portion of it is

28   not accounted for within the Section 2B1.1 table, as there is no additional increase for any loss amount

1    above $550 million.  This provides an additional basis to conclude that a sufficient sentence is 180

2    months' imprisonment.

3        **G.    The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6))**

4            The government recommends the Court impose a custodial sentence of 180 months'

5    imprisonment.  This sentence would amount to a variance of 60 months from the statutory maximum

6    sentence applicable to each count of conviction.  The basis for this five-year variance request is found in

7    the 3553(a) factors.  First, this variance request acknowledges the gap that exists between the losses

8    sustained by victim-investors and Holmes' realized financial gain through this fraud.  Through this

9    variance request, the government also acknowledges that the Holmes' crimes were not motivated by a

10   short-term desire for financial gain.  Second, this recommended sentence satisfies the "sufficient but not

11   greater than necessary" standard found in 18 U.S.C. § 3553(a).  Finally, the Court will achieve the

12   important sentencing goal of providing adequate deterrence to criminal conduct through a 15-year

13   custodial sentence.

14           The United States Probation Office agrees that a variance is appropriate.  PSR Addendum.

15   Certain of Holmes' history and characteristics persuaded Probation to make this recommendation,

16   including her family and social support, collateral punishments, and her experience with trauma.  *Id*.

17   While the government agrees that a variance is appropriate and agrees that her history and

18   characteristics are relevant factors this Court should weigh at sentencing, a variance of eleven years

19   from the statutory maximum sentence, and a significantly greater variance from the applicable Guideline

20   range, is not justified.  Even more, a significant variance also fails to achieve important sentencing

21   goals, such as general deterrence and promoting respect for the law.

22           The determination that a custodial sentence is or is not reasonable should not be based upon its

23   absolute number alone, that is, their number of years.  Instead, custodial sentences are reasonable

24   through the process that is followed to arrive at them.  And if the process includes too significant a

25   variance, general deterrence and respect for the law suffer.  In the government's view, a nine-year

26   custodial sentence would be the result of too significant a variance, especially when based upon factors

27   such as the collateral consequences of Holmes' trial and conviction.  The Probation Office is correct that

28   this case has garnered significant national media attention.  *Id*.  The Probation Office is also correct that

1   this causes significant collateral consequences for Holmes.  *Id*.  And in many cases, the defendant

2   cannot control which cases draw media coverage and which do not.  This case is different.  As the Court

3   knows from the trial, Holmes not only sought out media attention for her company, but she made false

4   statements to the media and used false stories in the press to corroborate false statements she had made

5   to investors.  Therefore, not only should this Court discount the collateral consequences of Holmes' trial

6   and conviction, the Court also should feel comfortable emphasizing the significant general deterrence

7   opportunity presented by this sentencing hearing.

8          Additional support for the government's sentencing recommendation is found in similar cases.

9   The Judiciary Sentencing Information (JSIN) data supports the government's sentencing

10  recommendation.  PSR ¶¶ 188-191.  Holmes' primary guideline will be § 2B1.1, with a Total Offense

11  Level of 43 and a Criminal History Category of I.  *Id*.  According to the JSIN data, during the last five

12  fiscal years (FY2017-2021), there were 29 offenders whose primary guideline was § 2B1.1, with a Final

13  Offense Level of 43 and a Criminal History Category of I, after excluding offenders who received a

14  §5K1.1 substantial assistance departure.  *Id*.  For the 29 offenders (100%) who received a sentence of

15  imprisonment in whole or in part, the average length of imprisonment imposed was 226 months and the

16  median length of imprisonment imposed was 180 months.  *Id*.  While one may think this prosecution is

17  unique, the data suggests otherwise.  Roughly six fraud defendants each year face sentencing at the very

18  top of the Guidelines.  And it appears that a variance is common.  This is not surprising, since the

19  Guidelines in each case are likely higher than the statutory maximum sentence.

20         Furthermore, a review of certain specific sentences imposed in similar cases demonstrate the

21  wide range of custodial sentences imposed in large-dollar fraud cases.  While each case is different,

22  there is precedent for Courts to impose significant custodial sentences in white collar cases.

| Defendant | Case No. | Approximate Loss Amount | Sentence |
|---|---|---|---|
| Charles W. McCall (McKesson-HBOC Chairman of the Board) | 00-CR-505 WHA (N.D. Cal.) | $8.6 billion | 120 months (no cooperation) |
| Walter A. Forbes (Cendant CEO) | 02-CR-264 AHN (D. Conn.) | More than $1 billion | 151 months (no cooperation) |
| Timothy J. Rigas (Adelphia CFO) | 02-CR-1236 LBS (S.D.N.Y) | More than $100 million | 204 months (no cooperation) |

| John Rigas (Adelphia CEO) | 02-CR-1236 LBS (S.D.N.Y) | More than $100 million | 144 months (no cooperation) |
|---|---|---|---|
| Bernard J. Ebbers (WorldCom CEO) | 02-CR-1144 BSJ (S.D.N.Y) | More than $1 billion | 300 months (no cooperation) |
| Sanjay Kumar (Computer Associates CEO) | 04-CR-846 ILG (E.D.N.Y.) | More than $400 million | 144 months (no cooperation) |
| Jeffrey K. Skilling (Enron CEO) | 04-CR-025 (S.D. Tex.) | More than $80 million | 168 months (no cooperation) |
| Samuel "Mouli" Cohen | 10-CR-547 CRB (N.D. Cal.) | $31 million | 264 months (no cooperation) |
| Ebrahim Shabudin (United Commercial Bank Chief Credit Officer) | 11-CR-664 JSW (N.D. Cal) | $677 million | 97 months (no cooperation) |
| John Geringer | 12-CR-888 EJD (N.D. Cal) | Approx. $45 million | 140 months (with cooperation) |
| Christopher Luck | 12-CR-888 EJD (N.D. Cal) | Approx. $45 million | 130 months (no cooperation) |
| Sean Clark Cutting (Sonoma Valley Bank CEO) | 14-CR-139 SI (N.D. Cal) | $47 million | 100 months (no cooperation) |

### H.      The Need to Provide Restitution to Any Victim

The Court should order Holmes to pay restitution as further described below.

## III.      RESTITUTION AND FINE

The Mandatory Victims Restitution Act of 1996 (the "MVRA") provides that "when sentencing a defendant convicted of an offense described in [§ 3663A(c)], the court shall order . . . that the defendant make restitution to the victim of the offense."  18 U.S.C. § 3663A(a)(1).  A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."  *Id.* § 3663A(a)(2).  The MVRA applies to cases of an offense resulting in damage to or loss or destruction of property of a victim.  *Id.* § 3663A(b)(1).  "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."  *Id.* § 3664(f)(1)(A).

1    Any dispute as to the proper amount or type of restitution shall be resolved by the court by the

2    preponderance of the evidence. *Id.* § 3664(e).

3         Here, the preponderance of evidence shows that Theranos C-1 and C-2 investors, Walgreens,

4    Safeway, and George Shultz suffered a loss of $803,840,309.  This amount was fully foreseeable by

5    Holmes.  Although the amount of restitution may dwarf Holmes' ability to pay, those factors simply are

6    not relevant to the Court's determination of the restitution amount.  The Court should order restitution as

7    required by the MVRA.  Alternatively, if the Court determines that the victims' losses are not fully

8    ascertainable at this time, the Government requests that the Court postpone a final determination of the

9    restitution amount for 90 days.  *See* 18 U.S.C. § 3664(d)(5).

10        Based on the PSR, it appears that Holmes has modest assets outweighed by $450,000 in "loan[s]

11   for SEC Settlement" and a liability for legal fees in excess of $30 million.  The PSR notes it is unknown

12   whether any third parties, guarantors, or others are also liable on or expected to pay the legal fees.  The

13   PSR also notes that Holmes' family appears to have substantial assets and that Holmes is managing her

14   affairs to avoid subjecting their assets to any judgment in this case.  Before foregoing a fine, the Court

15   should assure itself that such liabilities are current and genuine and consider whether Holmes'

16   management of her affairs reflects a genuine desire to make her investors whole.

17                                          **CONCLUSION**

18        For these reasons, the government recommends the Court sentence the defendant to 180 months

19   in custody and order her to pay $803,840,309 in restitution and a $400 special assessment.

20

21   DATED:  November 11, 2022                      Respectfully submitted,

22                                                 STEPHANIE M. HINDS
                                                   United States Attorney
23

24
                                                     */s/ Robert S. Leach*
25                                                 ROBERT S. LEACH
                                                   JEFF SCHENK
26                                                 JOHN C. BOSTIC
                                                   KELLY I. VOLKAR
27                                                 Assistant United States Attorneys

28