# Exhibit CC

```
                                          Page 1
 1            UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF ARIZONA
 3           CIVIL ACTION NO. 2:16-cv-2138-HRH
 4                        - - -
 5
                                  :
 6  IN RE ARIZONA THERANOS, INC.:
    LITIGATION                    :
 7
                        - - -
 8              ***CONFIDENTIAL***
 9        Videotaped deposition of DR. JAY ROSAN,
10  taken pursuant to notice, held in the LAW OFFICES
11  OF DUANE MORRIS, LLP, 30 South 17th Street,
12  Philadelphia, Pennsylvania, on Thursday, May 16,
13  2019, beginning at approximately 10:20 a.m.,
14  before Robin A. Vance, a Certified Court Reporter
15  and Notary Public for the states of New Jersey,
16  Pennsylvania and Delaware.
17                        - - -
18
19
20
21
22  Reported By:
23  Robin A. Vance, CCR
24  CCR-NJ License No. XI 02131
25  Job No. 10054876
```

```
                                          Page 2
 1  A P P E A R A N C E S:
 2
 3    LIEFF CABRASER HEIMANN & BERNSTEIN
      BY:  MELISSA A. GARDNER, ESQUIRE
 4         275 Battery Street, 29th Floor
           San Francisco, CA 94111-3339
 5         415-956-1000
           Mgardner@lchb.com
 6         Attorneys for Consumer Plaintiffs
 7
      KELLER ROHRBACK, LLP
 8    BY:  TANYA KORKHOV, ESQUIRE
           1140 Avenue of the Americas
 9         Ninth Floor
           New York, NY 10036
10         646-380-6690
           Tkorkhov@kellerrohrback.com
11         Attorneys for Consumer Plaintiffs
12
      DUANE MORRIS, LLP
13    BY:  STEPHEN H. SUTRO, ESQUIRE
           Spear Tower
14         One Market Plaza, Suite 2200
           San Francisco, CA 94105-1127
15         415-957-3008
           Shsutro@duanemorris.com
16         Attorneys for Dr. Jay Rosan
17
      DAVIS WRIGHT TREMAINE, LLP
18    BY:  STEPHEN M. RUMMAGE, ESQUIRE
           920 Fifth Avenue, Suite 3300
19         Seattle, Washington 98104-1610
           206-757-8136
20         Steverummage@dwt.com
           Attorneys for Ramesh Balwani
21
22    DAVIS WRIGHT TREMAINE, LLP
      BY:  KELLY M. GORTON, ESQUIRE
23         505 Montgomery Street, Suite 800
           San Francisco, CA 94111-6533
24         415-276-6584
           Kellygorton@dwt.com
25         Attorneys for Ramesh Balwani
```

```
                                          Page 3
 1  APPEARANCES CONTINUED:
 2
 3    SIDLEY AUSTIN, LLP
      BY:  KRISTEN R. SEEGER, ESQUIRE
 4         LAWRENCE P. FOGEL, ESQUIRE
           One South Dearborn
 5         Chicago, IL 60603
           312-853-7450
 6         312-853-6892
           Kseeger@sidley.com
 7         Lawrence.fogel@sidley.com
           Attorneys for Walgreens
 8
 9  Also Present:  Raymond Lerro, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                          Page 4
 1                I N D E X
 2  WITNESS                                    PAGE
 3  DR. JAY ROSAN
 4      Examination by
 5          MS. GARDNER                       8, 328
            MR. RUMMAGE                          228
 6
                          - - -
 7              EXHIBITS
 8  No.            DESCRIPTION                 PAGE
 9  Exhibit 214    Subpoena                       9
10  Exhibit 215    Document - Bates WG006129     27
11  Exhibit 216    Document - Bates WG000368     60
12  Exhibit 217    Email Chain - Bates WG031043  80
13  Exhibit 218    Email Chain - Bates WG000572  90
14  Exhibit 219    Meeting and Agenda Minutes
                   Bates WGO39882              112
15
    Exhibit 220    Email - Bates WG005122      125
16
    Exhibit 221    Email - Bates WG000058      129
17
    Exhibit 222    Theranos Meeting Minutes
18                 Bates WG000059              130
19  Exhibit 223    Email - Bates THER-AZ-06086006 147
20  Exhibit 224    Email Chain - Bates WG06181  168
21  Exhibit 225    Email/Executive Meeting Notes
                   Bates WGO18950              178
22
    Exhibit 226    Email - Bates WG031844      189
23
    Exhibit 227    Email - Bates WG006173      191
24
    Exhibit 228    Email - Bates WGOo1117      196
25
```

Page 233

1  on like an official tour where you were being
2  pointed out specific things or were you just
3  walking around?
4    A.   Primarily walking around.
5    Q.   You said when you went into the lab
6  one time, you went with Mr. Finnegan; is that
7  right?
8    A.   I believe so, yes.
9    Q.   Do you know whether he went more than
10 once?
11   A.   I don't know.
12   Q.   And my recollection is that you
13 testified that Mr. Finnegan had worked for a
14 blood testing company; is that right?
15   A.   Yes.
16   Q.   What company was that?
17   A.   I think it was Quest, but I'm not
18 sure.
19   Q.   All right. And as between the two of
20 you, did you have an understanding as to who was
21 more familiar with blood testing processes and
22 laboratory processes?
23   A.   Yes.
24   Q.   Who?
25   A.   He.

Page 234

1    Q.   He was more familiar?
2    A.   Yes.
3    Q.   Do you recall whether he asked
4  questions when you went through the lab?
5    A.   I don't recall.
6    Q.   Do you know where he is today?
7    A.   He's -- I forget.
8    Q.   Okay. I also want to talk a little
9  bit about the devices that were provided to
10 Walgreens. And I said that in plural, so maybe
11 I'm presupposing something. Did Walgreens have
12 more than one device that it was able to run
13 cartridges on?
14   A.   Theranos devices?
15   Q.   Yes.
16   A.   Two.
17   Q.   Two. And I believe you testified to
18 Ms. Gardner that you weren't sure when you got
19 those; is that right?
20   A.   Correct.
21   Q.   Do you recall why you got those?
22   A.   To do samples.
23   Q.   Was that at your request?
24   A.   Yes.
25   Q.   And who did you make that request to?

Page 235

1    A.   Either Elizabeth or Sunny.
2    Q.   And they accommodated it?
3    A.   Yes.
4    Q.   And when you got the devices, were any
5  restrictions placed on you in what you could do
6  with them?
7    A.   Just the tests that I had cartridges
8  for.
9    Q.   All right. And how did you get the
10 cartridges?
11   A.   From Theranos.
12   Q.   Did you -- what would happen when you
13 ran out?
14   A.   I would order more.
15   Q.   And did they give you more?
16   A.   Yes.
17   Q.   Okay. Did you request specific
18 cartridges?
19   A.   No.
20   Q.   In other words -- okay. So, you just
21 took whatever tests it was that they sent you?
22   A.   Yes.
23   Q.   And you understood that the cartridges
24 could only do specific assays, correct?
25   A.   Yes.

Page 236

1    Q.   And that would be limited by the
2  reagents that were on the cartridges?
3    A.   Correct.
4    Q.   Did you ever have any concerns about
5  the cartridges that were sent to you?
6    A.   No.
7    Q.   So, where exactly were the two
8  machines located, if you can recall?
9    A.   One was in my office and one was in
10 Deerfield.
11   Q.   And Deerfield is Walgreens
12 headquarters; is that right?
13   A.   Yes.
14   Q.   So, when you say your office, do you
15 mean physically the -- the four corners that you
16 sat within, or just generally within the same
17 office space that you shared with others?
18   A.   No, in my office, my physical office.
19   Q.   In your physical office. And how
20 often did you use it?
21   A.   I don't remember.
22   Q.   Okay. How often did you test
23 yourself?
24   A.   Occasionally.
25   Q.   And what does occasionally mean in

Page 237
1  that context?
2      A.    In the beginning I -- probably every
3  couple weeks.
4      Q.    And when you say "in the beginning,"
5  define for me --
6      A.    When I first had it.
7      Q.    Okay.  Is that over a period of
8  several months that you did it every couple of
9  weeks?
10     A.    No.  In the beginning, first month or
11  so.
12     Q.    Okay.  And by the way, when they
13  arrived, how were they set up?
14     A.    I don't understand the question.
15     Q.    Well, let me kind of make it more
16  fundamental.  How did they arrive?
17     A.    They came by UPS.
18     Q.    In a box?
19     A.    In a box.
20     Q.    Who unpacked it?
21     A.    Me.
22     Q.    Who set it up?
23     A.    Me.
24     Q.    And what instructions did you have to
25  set it up?

Page 238
1      A.    I -- if I'm not mistaken, there was an
2  instruction sheet.
3      Q.    And so, just kind of like when you get
4  something from Ikea, you open the box and you
5  follow the instruction sheet and set it up?
6      A.    Easier than Ikea.
7      Q.    Easier than Ikea.  That's a low bar.
8      A.    I --
9           MR. SUTRO:  I don't know.
10          MS. SEEGER:  Ikea is hard.
11          MR. RUMMAGE:  I know, that's why I
12     said it.
13          THE WITNESS:  That's why he's
14     right.
15          MR. RUMMAGE:  It's a low bar.
16 BY MR. RUMMAGE:
17     Q.    Okay.  And do you know how the one
18  that went to Deerfield was delivered?
19     A.    Same.
20     Q.    Do you know who set that up?
21     A.    I think it was Kim Romanski.
22     Q.    Okay.  And do you know where it was in
23  Deerfield?
24     A.    In a cubicle.
25     Q.    Did you ever use that?

Page 239
1      A.    Yes.
2      Q.    And what did you use it for?
3      A.    Tests.
4      Q.    On who?
5      A.    Different people.
6      Q.    On yourself?
7      A.    No.
8      Q.    So, the one in Deerfield you never
9  tested yourself?
10     A.    Correct.
11     Q.    And were you responsible for ordering
12  cartridges when they ran out in the Deerfield
13  machine?
14     A.    No.
15     Q.    Who did that, do you know?
16     A.    Kim.
17     Q.    Kim.  By the way, did -- did they ever
18  turn you down when you asked for cartridges?
19     A.    No.
20     Q.    Do you recall what tests or assays you
21  ran?
22     A.    No.
23     Q.    Do you recall how many different types
24  of cartridges you ran over time?
25     A.    I think there were three.

Page 240
1      Q.    Three different types?
2      A.    (Indicating).
3      Q.    You're nodding your head yes?
4      A.    Yes.
5      Q.    Okay.
6      A.    Sorry.
7      Q.    Just as a reminder?
8      A.    Yes, sorry.
9      Q.    Okay.  And just for my information,
10  sometimes, as I understand it, blood tests
11  essentially are just a yes or no value, sometimes
12  they return numeric values.  You know what I
13  mean?
14     A.    Yes.
15     Q.    And did the tests that you ran on the
16  device, did some of them return numeric values?
17     A.    Yes.
18     Q.    And did some of them return yes or no
19  values?
20     A.    Yes.
21     Q.    All right.  And by the way, all of
22  these tests that you ran on this device, let's
23  start first with your device, the one that was in
24  your office, you did that without a Theranos
25  employee present?

Page 241
1   A.   Yes.
2   Q.   And did you ever have, in the course
3  of running those tests, anything occur that made
4  you doubt the viability of the technology?
5   A.   No.
6   Q.   And do you know whether the tests that
7  were run in Deerfield were run without a Theranos
8  employee present?
9   A.   There was no Theranos employee.
10   Q.   And did you ever get reports from your
11  colleagues in Deerfield that, in running the
12  tests on the device, they were concerned about
13  the viability of the technology?
14   A.   No.
15   Q.   So, can I sum up fairly and say that
16  the experience you had in running tests on the
17  devices that Walgreens had was a positive
18  experience?
19        MS. GARDNER:  Objection.
20        THE WITNESS:  There were -- there
21     were no problems.
22  BY MR. RUMMAGE:
23   Q.   There were no problems.  Did it
24  reenforce your view of the viability of the
25  technology?

Page 242
1   A.   Yes.
2   Q.   And again, to stress, Theranos didn't
3  tell you that you couldn't run tests more
4  frequently than X number of times a week; is that
5  right?
6   A.   No.
7   Q.   They didn't put any limitation on
8  that?
9   A.   Except for the number of cartridges.
10   Q.   Exactly.  And I'm not sure I asked
11  this, but did you ever ask for cartridges for a
12  specific test or assay?
13   A.   No.
14   Q.   Is there any particular reason why
15  not?
16   A.   Tests -- cartridges were given to me.
17  I didn't -- I didn't see the need for that
18  request.
19   Q.   They seemed satisfactory to you?
20   A.   Yes.
21   Q.   And do you know, did any other
22  Walgreens executives have tests run on these two
23  machines?
24   A.   Oh, yes.
25   Q.   Who else, if you can recall?

Page 243
1   A.   A whole series of people.  I don't
2  recall specifically who.
3   Q.   Well, let me just throw some names out
4  at you.  Did Mark Vainisi?
5   A.   I don't remember.
6   Q.   How about Wade Miquelon?
7   A.   Miquelon.
8   Q.   Miquelon, I'm sorry.
9   A.   Yes, I believe he did.
10   Q.   How about Brad Wasson?
11   A.   I believe he did.
12   Q.   How about Greg Wasson?
13   A.   I don't remember about Greg Wasson.
14   Q.   Okay.  Kim Romanski?
15   A.   Yes.
16   Q.   And did any of them express concerns
17  to you about the results that came back on the
18  tests?
19   A.   No.
20   Q.   And by the way, you mentioned earlier
21  that when you ran the tests, the results would
22  come to you.  I assume that was true for the unit
23  that was in your office; is that correct, that
24  the test results would come back to you?
25   A.   Yes.

Page 244
1   Q.   And what about the test results for
2  the Deerfield unit; who would those go to?
3   A.   Come back to me.
4   Q.   And they would come by e-mail.  Was it
5  just from an ordinary lab person at Theranos that
6  they came from or did they come from Sunny and
7  Elizabeth, who sent them?
8   A.   No, there was a person at Theranos.
9  There was a -- there was a password protected,
10  HIPAA compliant system that was set up that I
11  could access to get that.
12   Q.   Okay.  And so, I think you mentioned
13  in response to questions from Ms. Gardner that
14  you actually were pipetting blood into the
15  cartridge; is that right?
16   A.   In the beginning, yes.
17   Q.   Okay.  So, that actually anticipates
18  my question.  Was there a point in time when you
19  started using a nanotainer?
20   A.   Yes.
21   Q.   And did the nanotainers work
22  satisfactorily for you?
23   A.   They worked for me.
24   Q.   And so, physically how would this
25  work?  You prick your finger and collect the