# Exhibit DD

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF ARIZONA
 3   IN RE:                  )
 4                           )  Civil Action No.
 5   THERANOS INC.,          )  No. 2:16-cv-2138-HRH
 6   LITIGATION,             )
 7
 8
 9              *** CONFIDENTIAL ***
10
11       VIDEOTAPED DEPOSITION OF WADE MIQUELON
12                  August 9, 2019
13                  Chicago, Illinois
14
15
16
17
18
19
20
21
22
23   REPORTED BY:
     Sheri E. Liss,
24   CSR, RPR, CRR, CLR
25   JOB NO. 10057960
```

Page 2

```
 1          Videotaped deposition of WADE MIQUELON,
 2   taken at the offices of Sidley Austin LLP,
 3   One South Dearborn Street, Chicago, Illinois,
 4   Before Sheri E. Liss, IL-CSR, RPR, and
 5   CRR, commencing at the hour of 9:08 a.m. on
 6   Friday, August 9, 2019
```

Page 3

```
 1   APPEARANCES:
 2
 3   ON BEHALF OF THE CONSUMER PLAINTIFFS:
 4        LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
 5        BY:  MELISSA GARDNER, ESQ.
 6             mgardner@lchb.com
 7             415.956.1000
 8             275 Battery Street, 29th Floor
 9             San Francisco, CA 94111
10   ON BEHALF OF WALGREENS:
11        SIDLEY AUSTIN LLP
12        BY:  KRISTEN R. SEEGER, ESQ.
13             kseeger@sidley.com
14             312.853.7450
15             One South Dearborn Street
16             Chicago, Illinois 60603
17   ON BEHALF OF SUNNY BALWANI:
18        DAVIS WRIGHT TREMAINE LLP
19        BY:  RENEE M. HOWARD, ESQ.
20             reneehoward@dwt.com
21             206.622.3150
22             920 Fifth Avenue, Suite 3300
23             Seattle, WA 98104-1610
24
25
```

Page 4

```
 1   APPEARANCES (continued):
 2   ON BEHALF OF ELIZABETH HOLMES:
 3        COOLEY LLP
 4        BY:  JEFF LOMBARD, ESQ. (Via teleconference)
 5             jlombard@cooley.com
 6             206.452.8796
 7             1700 Seventh Avenue, Suite 1900
 8             Seattle, Washington 98101-1355
 9   ON BEHALF OF THE WITNESS:
10        LAURENCE H. LEVINE LAW OFFICES
11        BY:  LAURENCE H. LEVINE, ESQ.
12             laurence.levine@lhlevine.com
13             312.927.0625
14             189 East Lake Shore Drive, 16th Floor
15             Chicago, IL 60611
16
17
18   ALSO PRESENT:
19        SLAWOMIR KOJRO, videographer
20
21
22
23
24
25
```

Page 197
1  meeting, it doesn't mean everybody's in the same
2  meeting.
3      Q.   As far as you know, did Mr. Hunter have
4  access to all of the information that he needed from
5  Walgreens in order to make his assessment of
6  Theranos?
7          MR. LEVINE:  Foundation.
8  BY THE WITNESS:
9      A.   I can't judge that.  How would I know?
10 BY MS. HOWARD:
11     Q.   Are you aware of anyone ever denying a
12 request made by Mr. Hunter for information?
13     A.   I am not aware of that.
14     Q.   At any point did Mr. Hunter ever advise
15 Walgreens that he did not think it was possible for
16 the Theranos technology to work as claimed?
17     A.   He certainly didn't tell me or anybody
18 that I know.
19     Q.   Would you have expected him to tell you
20 something like that if that was his belief?
21     A.   I mean, I would just say that I work
22 with so many consulting firms throughout the years,
23 at least the ones that are credible, if they see an
24 issue, they raise it.  That's why you pay them.  But
25 I don't even know the man so I don't know what he

Page 198
1  thinks, but for sure he never came to me and raised
2  an issue to me.
3      Q.   Do you have an understanding as to how
4  long Mr. Hunter was a consultant for Walgreens?
5      A.   I do not.
6      Q.   At some point have you reviewed the
7  reports that Mr. Hunter generated on behalf of
8  Walgreens?
9      A.   I don't know what those reports are.  I
10 remember one report that had the circa 180 labs on a
11 chip company.
12     Q.   Can you repeat that?
13     A.   I think it was a report that was done by
14 his firm that was basically assessing the landscape
15 of the 180 or so companies in the lab space or lab
16 on a chip or point of care lab space, that's the
17 only document that I can remember by that firm.
18 There could have been others.
19     Q.   Do you know one way or another if Mr.
20 Hunter continued to provide consulting services to
21 Walgreens after he issued those reports?
22     A.   I do not know.
23     Q.   Do you know who he would have likely
24 worked with at Walgreens in his consulting capacity?
25     A.   Those names that I mentioned before.

Page 199
1      Q.   Such as?
2      A.   Mr. Rosan, perhaps Mr. Finnegan at that
3  time, Colin Watts.
4      Q.   Are you aware of accounts that Mr.
5  Hunter has given to the media about the in-person
6  meeting that he says he attended at Theranos with
7  Walgreens executives?
8      A.   Not specifically, no.
9      Q.   Have you read the book Bad Blood?
10     A.   I have not.
11     Q.   Have you watched or listened to the ABC
12 news reporting or podcast regarding Theranos called
13 The Drop Out?
14     A.   I've heard part of The Drop Out.  I was
15 listening to it.  My wife was listening to it, and I
16 overheard some of it.
17     Q.   Do you recall overhearing the part where
18 Mr. Hunter was interviewed?
19     A.   I don't know if it was from that or not
20 but I caught some snippet at some point of him.
21     Q.   You don't have a specific recollection
22 of Mr. Hunter being interviewed in that podcast?
23     A.   Whatever I saw externally, I don't know
24 if it was TV or podcast or something snippety, he
25 was essentially saying he saw the train wreck

Page 200
1  coming.  He was the only one.  He knew all of this,
2  whatever.  I was pretty disgusted by the whole
3  thing, if you want to know the truth.
4      Q.   Why was that?
5      A.   Because if he did, he should have said
6  something.  Not just because he was a client and had
7  a fiduciary responsibility to tell us, but because
8  he's allegedly a professional lab.  And if you think
9  a company is about to do something that could
10 potentially harm people, just from a moral point of
11 view you should say something.
12     Q.   Again just to clarify what you said
13 earlier, Mr. Hunter never told you or anyone else to
14 your knowledge that he believed the Theranos
15 technology didn't work, correct?
16     A.   Never told me, no one to my knowledge.
17     Q.   He never told you or anyone else at
18 Walgreens that Walgreens should not move forward
19 with the Theranos partnership, correct?
20         MS. GARDNER:  Object to form.
21 BY MS. HOWARD:
22     Q.   You may answer.
23     A.   Not to my knowledge, no.
24     Q.   Do you recall at the meeting I
25 referenced earlier, which I'll represent to you