JOHN D. CLINE (CA State Bar No. 237759)
600 Stewart Street, Suite 400
Seattle, WA 98101
Telephone: (360) 320-6435
Email: cline@johndclinelaw.com

KEVIN M. DOWNEY (Admitted Pro Hac Vice)
LANCE A. WADE (Admitted Pro Hac Vice)
AMY MASON SAHARIA (Admitted Pro Hac Vice)
KATHERINE TREFZ (CA State Bar No. 262770)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: (202) 434-5000 │Facsimile: (202) 434-5029
Email: KDowney@wc.com; LWade@wc.com; ASaharia@wc.com; KTrefz@wc.com

Attorneys for Defendant ELIZABETH A. HOLMES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR-18-00258-EJD |
| Plaintiff, | ) | |
| | ) | **MS. HOLMES' SENTENCING MEMORANDUM** |
| v. | ) | **AND MOTION FOR DOWNWARD** |
| | ) | **DEPARTURE** |
| ELIZABETH HOLMES and | ) | |
| RAMESH "SUNNY" BALWANI, | ) | Date:      November 18, 2022 |
| | ) | Time:      10:00 AM |
| Defendants. | ) | CTRM:    4, 5th Floor |
| | ) | |
| | ) | Hon. Edward J. Davila |
| | ) | |
| | ) | **REDACTED PUBLIC VERSION** |
| | ) | **UPDATED TO REMOVE CERTAIN REDACTIONS** |

# **CONTENTS**

I.      PRELIMINARY STATEMENT .................................................................1

II.     MS. HOLMES' PERSONAL HISTORY AND CHARACTERISTICS ...................3

    A.      Ms. Holmes' Personal History.....................................................3

        1.      Childhood.........................................................3

        2.      College ..........................................................5

        3.      CEO of Theranos .................................................7

        4.      Relationship with Mr. Balwani .................................11

        5.      Ms. Holmes' Current Family Life .............................18

        6.      Volunteer Work .................................................20

    B.      Personal Characteristics..........................................................21

        1.      Deep Interest in Making the World a Better Place .............22

        2.      Caring and Reliable Friend .....................................24

        3.      Advisor and Mentor .............................................25

        4.      Intelligent and Visionary.......................................26

        5.      Positive Impact on Others.......................................27

III.    CALCULATION OF THE SENTENCING GUIDELINES RANGE AND
OBJECTIONS TO PRESENTENCE REPORT ...............................................28

    A.      Ms. Holmes Objects to the PSR's Calculation of Loss. ...................29

        1.      Loss Must Be Proven by Clear and Convincing Evidence. ....30

        2.      Each Investor and Associated Loss Must Be Considered Separately...................31

        3.      The Entirety of Each Investment Is Not An Appropriate Measure of
Loss and the Government Has Not Shown a Reasonable Estimate by
Clear and Convincing Evidence or a Preponderance of the Evidence...................35

        4.      Gain To Ms. Holmes As An Alternative Measure.................39

        5.      If the Court Accepts the PSR's Calculation of Loss, A Downward
Departure is Warranted Under Section 2B1.1, Application Note 21(C). ..............40

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

i

B.   Ms. Holmes Objects to the Calculation of the Number of Victims. ...................................40

C.   Ms. Holmes Should Not Receive a 4-Level Increase for Her Role. ...................................41

    1.   Ms. Holmes Was Not a Leader of "Criminal Activity." ..........................................41

    2.   The Adjustment Does Not Apply Because Ms. Holmes Was Co-Equal or Less Responsible Than Her Co-Defendant, the Other "Participant." ...............42

    3.   The "Otherwise Extensive" Provision Does Not Apply. ...........................................43

D.   Ms. Holmes Should Receive Credit for Acceptance of Responsibility Pursuant to U.S.S.G. § 3E1.1(a). ...........................................................................43

IV.   18 U.S.C. § 3553(a) SUPPORTS SUBSTANTIAL LENIENCY FOR MS. HOLMES. ..............47

A.   The Nature and Circumstances of the Offense Strongly Support Leniency. .....................48

    1.   The Offense Conduct Occurred Within a Unique World of Investments in Start-Up Companies. ..........................................................................48

    2.   Theranos Developed Innovative Technology and Provided Real Services to Real Customers in Furtherance of Its Mission to Improve Access to Healthcare. ..........................................................................52

    3.   The Company Retained Substantial Value Even After the Alleged Fraud Was Revealed. ................................................................................59

    4.   The Circumstances Show Ms. Holmes To Be a Founder and CEO Deeply Committed to the Company's Mission, Rather Than Her Own Personal Gain. .................................................................................59

    5.   Because of Their Extreme Focus on Loss, the Guidelines Are Unhelpful in Fashioning a Fair, Just, and Reasonable Sentence. .........................60

B.   Ms. Holmes' Personal History and Characteristics Strongly Support Leniency. ..............62

C.   Incarceration Is Not Necessary to Afford Adequate Deterrence or Protect the Public. .......................................................................................64

    1.   Incarceration Is Not Necessary for Specific Deterrence. ........................................64

    2.   Incarceration Is Not Necessary for General Deterrence. .......................................66

D.   Just Punishment and Respect for the Law Are Not Served by a Lengthy Incarceration. ....................................................................................68

E.   Section 3553(a)(6) Supports a Downward Variance from the Guidelines. .......................69

F.   Section 3553(a)(7) Does Not Counsel In Favor of Incarceration. ...................................71

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

G.      Ms. Holmes' Capacity to Do Good Supports a Sentence That, In Part, Orders Ms. Holmes to Engage in Significant Community Service. ...............................................72

CONCLUSION...............................................................................................................................74

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## FEDERAL CASES

*Gall v. United States*, 552 U.S. 38 (2007) ........................................................28, 47, 48

*Kimbrough v. United States*, 552 U.S. 85 (2007) ...................................................47, 48

*Koon v. United* States, 518 U.S. 81, 113 (1996).........................................................62

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ......................... *passim*

*United States v. Atilla*, 1:15-cr-00867-RMB (S.D.N.Y.).............................................70

*United States v. Avila,* 95 F.3d 887 (9th Cir. 1996)....................................................41

*United States v. Block*, 16-cr-595 (S.D.N.Y. Dec. 4, 2017) .........................................39

*United States v. Burgum*, 633 F.3d 810 (9th Cir. 2011) ..............................................72

*United States v. Connors*, 2007 WL 2955612 (E.D. Pa. Oct. 9, 2007)..........................60

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ................................................62

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010)............................................48, 49

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) ...........................................66

*United States v. Egge*, 223 F.3d 1128 (9th Cir. 2000) .................................................43

*United States v. Executive Recycling, Inc.*, 953 F. Supp. 2d 1138 (D. Colo. 2013) ...............32, 33

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ............................. *passim*

*United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000) ................................................32

*United States v. Holden*, 908 F.3d 395 (9th Cir. 2018) ...........................................28, 42

*United States v. Holmes*, 2021 WL 2044470 (N.D. Cal. May 22, 2021).......................33

*United States v. Hussain*, 2019 WL 1995764 (N.D. Cal May 6, 2019) ...................35, 38, 39, 40

*United States v. Johnson*, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018)......................62

*United States v. Jordan*, 256 F.3d 922 (9th Cir. 2001).................................................30

*United States v. Lonich*, 23 F.4th 881 (9th Cir. 2022)......................................30, 31, 32

*United States v. McClellan*, 1:16-cr-10094 (D. Mass.)...............................................70

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

iv

1  *United States v. McFarland*, 1:17-cv-00600 (S.D.N.Y.) ................................................70

2  *United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) .................................65

3  *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008)...................................62

4  *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012)................................................60

5  *United States v. Rowan*, No. 1:16-cr-10343 (D. Mass.) ...............................................71

6  *United States v. Shor*, 1:18-cr-00328 (S.D.N.Y.) ........................................................70

7  *United States v. Showalter*, 569 F.3d 1150 (9th Cir. 2009)..........................................40

8  *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017) ...............................................32

9  *United States v. Taylor*, 1:19-cr-00850-JSR (S.D.N.Y.) ..............................................69

10  *United States v. Tuzman*, No. 1:15-cr-00536 (S.D.N.Y.) .............................................70

11  *United States v. Wang*, 1:16-cr-10268 (D. Mass.) .......................................................70

12  *United States v. Zolp*, 479 F.3d 715 (9th Cir. 2007)...............................................35, 36

**STATUTES AND RULES**

18 U.S.C. § 3553(a) ............................................................................................. *passim*

Cal. Civ. Code § 3426.1(d)(2) .....................................................................................54

U.S.S.G. § 2B1.1 ................................................................................................ *passim*

U.S.S.G. § 3B1.1 ................................................................................................ *passim*

U.S.S.G. § 3E1.1 .................................................................................................43, 47

**OTHER AUTHORITIES**

1 Melvin F. Jager, Trade Secrets Law §§ 5:21, 5:26, 13:3 (2022) .........................54, 68

*A Mixed-Methods Examination of Sexual Coercion and Degradation Among Women in Violent Relationships Who Do and Do Not Report Forced Sex*, 22 Violence and Victims 71 (2007) ...................................................................................................................................15

Deborah K. Anderson & Daniel G. Saunders, *Leaving an Abusive Partner: An Empirical Review of Predictors, the Process of Leaving, and Psychological Well-Being,* 4 Trauma, Violence, & Abuse (2003)..................................................................................................................16

Elizabeth Szockyj, *Imprisoning White-Collar Criminals?,* 23 S. Ill. Univ. L. J. 485 (1999)…………………………………………………………………………………...67

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

v

Francis T. Cullen., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S, 60S (2011)……………………………………………………………64

Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After,* 20 Fed. Sent'g Rep. 167 (2008) ..........................................................................................................61

Hamberger et al., *Coercive Control in Intimate Partner Violence*, 37 Aggression & Violent Behavior 1 (2017) ...................................................................................................14

Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should Be Scrapped*, Fed. Sent'g Rep. 226 (2017)................................................................................................................61

Jessica R. Goodkind et al., *A Contextual Analysis of Battered Women's Safety Planning,* 10 Violence Against Women 514 (2004) ..........................................................................16

Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 Yale L. J. 1018 (2016) ...............................................................................................61

Logan et al., *Silenced Suffering: The Need for a Better Understanding of Partner Sexual Violence*, 16 Trauma, Violence, & Abuse 111 (2015)............................................15

Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19 (2013) ............61

Mary Ann Dutton & Lisa A. Goodman, *Coercion in Intimate Partner Violence: Toward a New Conceptualization*, 52 Sex Roles 743 (2005)..........................................................12

Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159 (2014) .......................67

Nicolas Rabener, *"Portfolio Construction in Venture Capital,"* Harvest, at 3 (May 24, 2021)....50

Paul A. Gompers et al., *How Do Venture Capitalists Make Decisions?*, 135 J. Fin. Econ. 169 (2020)...........................................................................................................51, 52

Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67 (2005) ........................................67

S. Rep. No. 98-225 (1983)...........................................................................................66

Shannon B. Nicholson & David J. Lutz, *The Importance of Cognitive Dissonance in Understanding and Treating Victims of Intimate Partner Violence*, 26 Journal of Aggression, Maltreatment, & Trauma 475 (2017)................................................................17

United States Department of Justice National Institute of Justice, *5 Things About Deterrence* (2016)...........................................................................................................67

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      PRELIMINARY STATEMENT**

Elizabeth Holmes stands before the Court having been convicted of conspiracy to commit wire fraud and three individual counts of wire fraud with respect to certain sophisticated investors in her company, Theranos.  In sentencing her, the Court's task is a heavy one.  Ms. Holmes was 19 when she founded her company, her first business experience; in 2010, the beginning of the charged period, she was 25 and turned 26; and when her company shut down in 2018 she was just 34 years old.  She founded and built Theranos for indisputably good reasons.  She worked tirelessly along with hundreds of brilliant and committed employees to improve access to affordable health information.  The company achieved incredibly valuable inventions for which the United States government is still issuing patents as recently as July of *this year*.  Ex. B.[1]  She suffered substantial trauma throughout the time period of the offense.  When criticisms arose, she committed fully to identifying, acknowledging, and fixing errors.  She never cashed out, and she went down with the ship when the company failed.  And regardless of the sentence the Court imposes, for the rest of her life, she and her family will be punished.  As her partner knows all too well, "[t]here is no avoiding the scorn that accompanies Elizabeth Holmes." Ex. A at 7-8 (B. Evans Ltr. at 7-8).

Among the countless people in our society who do not know Elizabeth Holmes yet think they know about her case from the unusually intense media coverage of it, Ms. Holmes has become a caricature to be mocked and vilified.  The Court has the opportunity (and obligation) here to look beyond that caricature, as it has throughout this case, and examine Ms. Holmes the human being.  More than 130 individuals who actually know Ms. Holmes have written to the Court to help in that process.  Among them are friends, family, Theranos investors, Theranos Board members, and former employees who served in a variety of roles at Theranos, all of whom submit these letters despite the risk that they will be criticized for their support.  These are people who know Ms. Holmes and her character, remorse, and capacity to do good.

---

[1] All Exhibits cited herein as "Ex." are exhibits to the Declaration of Katherine Trefz.  Admitted trial exhibits are cited as "TX."

1    The real Elizabeth Holmes is "a compassionate friend who is there for the people around her—to

2    support, comfort, cheer on, problem solve, and connect."  Ex. A at 62 (G. Bianchini Ltr. at 1).

3    The real Elizabeth Holmes is the friend who writes "letters that I still keep and read again

4    anytime I need to be reminded of my purpose and inner strength."  Ex. A at 181 (J. Lamping Ltr. at 2).

5    The real Elizabeth Holmes is a devoted mother who "turns . . . ordinary moments into magical

6    experiences of unbounded love and wonder" for her son.  Ex. A at 6 (B. Evans Ltr. at 6).

7    The real Elizabeth Holmes is "[e]xtremely genuine, giving, and selfless," "unlike anyone else

8    I've met in Silicon Valley."  Ex. A at 271 (Y. Yu Ltr. at 1).

9    The real Elizabeth Holmes was an "approachable, attentive, and supportive" "employee focused

10   CEO[]."  Ex. A at 78 (T. Brumett Ltr.).

11   The real Elizabeth Holmes faced the challenges at Theranos from 2016 to 2018 with "steadfast

12   ethical principles, complete dedication to what was best for Theranos, and admirable courage."  Ex. A at

13   74 (F. Bonanni Ltr. at 3).

14   The real Elizabeth Holmes is "driven by a single and simple purpose; she wants to make the

15   world a better place than it would have been without her."  Ex. A at 96 (T. Cooper Ltr. at 1).

16   The real Elizabeth Holmes "has within her a sincere desire to help others, to be of meaningful

17   service, and possesses the capacity to redeem herself."  Ex. A at 77 (C. Booker Ltr. at 2).

18   *          *          *

19   Section 3553(a) requires the Court to fashion a sentence "sufficient, but not greater than

20   necessary," to serve the purposes of sentencing.  If a period of confinement is necessary, the defense

21   suggests that a term of eighteen months or less, with a subsequent supervised release period that requires

22   community service, will amply meet that charge.  But the defense believes that home confinement with a

23   requirement that Ms. Holmes continue her current service work is sufficient.  We acknowledge that this

24   may seem a tall order given the public perception of this case—especially when Ms. Holmes is viewed

25   as the caricature, not the person; when the company is viewed as a house of cards, not as the ambitious,

26   inventive, and indisputably valuable enterprise it was; and when the media vitriol for Ms. Holmes is

27   taken into account.  But the Court's difficult task is to look beyond those surface-level views when it

28

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

2

fashions its sentence.  In doing so, we ask that the Court consider, as it must, the real person, the real company and the complex circumstances surrounding the offense conduct, and the important principle that "no defendant should be made a martyr to public passion."  *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) (Rakoff, J.).  As discussed in more detail in the pages that follow, this is a unique case and this defendant is a singular human with much to give.

## II.    MS. HOLMES' PERSONAL HISTORY AND CHARACTERISTICS

As the more than 130 letters submitted on her behalf attest, Ms. Holmes is a warm, thoughtful friend; a loving and dedicated mother and partner; a good listener; a mentor to young women and entrepreneurs; a boss who cared about the company's employees; a chief executive dedicated to her company's mission; an intelligent and inventive problem solver; and a humble, hardworking, and compassionate woman who deeply wants to give what she can to the world.  Her positive impact on her friends, family, and former employees and advisors is evident in this outpouring of support.  Despite her current circumstances, she is an "ardently resilient optimist"—a person whose "devotion to constructive impact remains natural, profound, and inspirational" even as she faces the prospect of a profound loss of liberty.  Ex. A at 95 (A. & S. Kiessig Ltr.).

### A.    Ms. Holmes' Personal History

#### 1.    Childhood

Ms. Holmes began developing her good qualities through a childhood for which she has always been grateful.  Born in Washington, D.C. in 1984, Ms. Holmes was raised primarily in Washington, D.C. and Houston, Texas with her brother Christian, two years her junior.  Her parents were both public servants.  Her mother, Noel, worked on Capitol Hill for Members of Congress and Committees in the House of Representatives.  Ex. A at 31 (N. Holmes Ltr. at 2).  Her father, Chris, spent years working at the Environmental Protection Agency, the United States Agency for International Development (USAID), and the State Department, focused on issues related to disaster relief.  Chris was Ms. Holmes' personal hero.  PSR ¶ 124.  He would return from his work abroad with stories about responding to disease, genocide, war, and natural disasters and imparted the view that the most important thing he could do with his life was to help others.  Ex. A at 16 (C. Holmes Ltr. at 4).  From her father, Ms.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

Holmes learned the lessons of stoicism and sacrifice in service of the greater good, and she took them to heart early in her childhood as a foundational trait.  Her parents "instilled in her that life should not be wasted."  PSR ¶ 124.

Ms. Holmes was a studious and hard-working child.  She had, as her mother describes, a "gritty determination."  Ex. A at 30 (N. Holmes Ltr. at 1); *see also* PSR ¶ 124.  She was naturally curious with "a deep hunger for knowledge," Ex. A at 20 (C. Holmes Ltr. at 8), which she explored as a young child through talking about nature and the world with her parents, *id.* at 14 (C. Holmes Ltr. at 2), 32 (N. Holmes Ltr. at 3).  As a teenager, she poured that curiosity into schoolwork and extracurriculars, such as spending part of her Saturdays taking Chinese lessons from the time she was a pre-teen.  *Id.* at 20 (C. Holmes Ltr. at 8), 31, 33 (N. Holmes Ltr. at 2, 4), 133 (G. Fan Ltr. at 1).  Ms. Holmes' brother Christian describes her focus and work ethic as a teenager:

> She was driven and goal-oriented and thrived in whatever she set her mind to, whether it was academics, personal challenges she set for herself, developing a new skill, etc.  She had an extraordinary work ethic and has always exceled as a student.  She never cut corners . . . . It was critical to her to apply herself fully to whatever she took on. . . . She especially valued the relationships with people she felt she could learn from and be challenged by.  Teachers and mentors were just as important as friends, and she actively sought out direction from people with experience who she could learn from.

Ex. A at 162 (Christian Holmes Ltr. at 1).

Beyond academics, Ms. Holmes channeled that determination and work ethic into what she could do to help others.  As longtime family friend Mary Crane describes: "I often had the sense that [Elizabeth and Christian] knew 'to whom much is given, much is expected.'"  Ex. A at 100 (M. Crane Ltr. at 1).  Indeed, Ms. Holmes' childhood letters to her parents express a deep gratitude for the life she was given.  Ex. A at 32 (N. Holmes Ltr. at 3); Ex. C (letter).  In addition to her compassion towards individuals, Ms. Holmes looked to what she could do for the world.  "Even in high school, her idealism and drive to help people stood out.  During sophomore year, Liz led efforts to help victims of the Kosovo War—a world away from Houston."  Ex. A at 273 (C. Zygourakis Ltr. at 1); *see id.* at 193 (C. MacCormack Ltr.).  As she told her friend in an interview for her high school newspaper, she believed that "'[w]e have the potential to reform and to prevent the horrors of this world if we simply learn and act.'"  *Id.* at 273 (C. Zygourakis Ltr. at 1).  She organized similar campaigns for other causes, including

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

4

Turkey earthquake relief.  Ms. Holmes' Chinese tutor describes how, after she "read a story about how children in the remote areas of China lacked access to education," "[s]he immediately started contemplating how she could help" and "took action," developing "a plan to work with major software companies in the United States to provide software to schools in China at a low cost."  Ex. A at 133 (G. Fan Ltr. at 1).  "What inspired her was the story, but what made her work so hard . . . was her generous heart."  *Id.* at 134 (G. Fan Ltr. at 2).

Ms. Holmes was also a source of support within her own family.  Her father describes how, when Enron collapsed during Ms. Holmes' senior year of high school, he lost his job, savings, and healthcare.  "During that time, Elizabeth was not just my daughter; she was my wise friend and helper."  Ex. A at 20 (C. Holmes Ltr. at 8).

## 2.    College

Ms. Holmes began attending college at Stanford University in the fall of 2002.  Consistent with her longtime interest in science, Ms. Holmes focused on chemical engineering with an eye toward combining several engineering disciplines.  She brought to those difficult classes her deep work ethic and sound moral compass.  As her college friend Lauren Stat describes, Ms. Holmes insisted that there was no need to rely on study groups who had inherited the answers to problem sets, "those relics of dubious morality.  And so with her leadership, we proceeded to learn the right way, the hard way."  Ex. A at 246 (L. Stat Ltr. at 1).  Ms. Holmes started auditing graduate-level courses and working in the laboratory of Professor Channing Robertson, where she was part of a team developing microfluidic sensors.

Ms. Holmes also enjoyed the social aspects of college life, including the friends she made there.  Her mother describes that in her regular calls "she was full of joy and enthusiasm about her life."  Ex. A at 34 (N. Holmes Ltr. at 5).  Her brother Christian recalls how she came out of her academic shell towards the end of high school and that in the first year at Stanford "she seemed happy and well-adjusted to college life."  Ex. A at 162 (Christian Holmes Ltr. at 1).  Her friends describe her as a caring person who believed in the genuine goodness of people and loved to talk about ideas.  She was "full of vibrancy, curiosity, kindness, and warmth," "extremely intellectual yet unpretentious and always

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

looking to better herself and those around her."  Ex. A at 180 (J. Lamping Ltr. at 1).  As friend Prerna

Gupta describes:

> We spent countless hours traversing the Stanford hills and discussing the meaning of life.
> She was raised as a Christian, and I as a Hindu, but we found common ground in our
> explorations of Buddhism.  We shared a belief that we were meant to do good in the world.
> That the purpose of life was love.  That we could achieve anything we set our mind and
> hearts to, as long as we didn't give up.  And that, most of all, we must dedicate our lives to
> having a positive impact on the world.

Ex. A at 154 (P. Gupta Ltr. at 1); *see id.* at 130 (J. Ewing Ltr. at 1) ("While fraternity boys puked on

carpets and tried to coerce us into endless games of beer pong, Elizabeth whispered in the corner about

things like philosophy, psychology, consciousness, and the meaning of life."); *id.* at 255 (A. Sutro Ltr.).

This period was one of the happiest of Ms. Holmes' life.  PSR ¶ 128.

　　　　The summer following her freshman year at Stanford, Ms. Holmes interned at the Genome

Institute in Singapore.  Ex. A at 35 (N. Holmes Ltr. at 6).  Putting together concepts from various types

of research she had conducted, she came up with the idea that would form the basis for her first patent

application.  When she returned home from the summer abroad, she holed up in her room with her

research and filed the provisional patent application with a mind to build something from the invention

that would make early detection of disease easier.  Ex. A at 35 (N. Holmes Ltr. at 6).

　　　　Stanford's autumn quarter began in September 2003.  Ms. Holmes had moved into her sorority

house at Kappa Alpha Theta, surrounded by friends.  Less than two weeks into the quarter, Ms. Holmes

attended a fraternity party with some of her sorority sisters.  While intoxicated and initially unconscious,

she was raped by a friend who was a member of one of the Stanford-affiliated fraternities.  PSR ¶ 127;

*see also* Ex. A at 180 (J. Lamping Ltr. at 1), 154 (P. Gupta Ltr. at 1).

　　　　Following the rape, Ms. Holmes experienced acute self-blame, isolation, and depression, and

struggled with suicidal thoughts.  PSR ¶ 128.  Her demeanor "instantly changed."  Ex. A at 162

(Christian Holmes Ltr. at 1).  She moved out of the sorority house to a smaller dorm across campus,

where she lived alone.[2]  As a coping mechanism, Ms. Holmes devoted all of her energy and focus into

---

[2] During this time period, Ms. Holmes also felt isolated from her parents because of the extreme
self-blame and shame she felt.  She felt she had disappointed them because she had been drinking and
had been at a party the night she was raped. *See* Ex. D (10/16/2003 "Elizabeth's Formula" written by C.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

starting a company based around her invention.  PSR ¶ 128.  Her brother observes that after the assault, she "became more withdrawn, less social, and mono-focused on the next venture."  Ex. A at 162 (Christian Holmes Ltr. at 1).  "After her rape, she was both broken and resolute, using her anger and hurt as an impetus to make the changes she so strongly believed in."  Ex. A at 247 (L. Stat Ltr. at 2).  Rather than seeking to heal, she came to view the assault as a crucible that would help drive her work as she turned to the higher purpose of helping solve difficult health care challenges through the company she was forming.  *See* Holmes 11/29/21 Tr. 7848:21-7849:6; Ex. A at 22 (C. Holmes Ltr. at 10); *id.* at 197 (S. Mantri Ltr.).

After the winter quarter of 2004, Ms. Holmes chose to take a leave of absence from Stanford to focus on building the nascent company she was forming around her invention.  Holmes 11/29/21 Tr. 7848:21-24.  That company, originally called RealTime Cures, became Theranos.

### 3.    CEO of Theranos

When Ms. Holmes started the company that became Theranos, she was a teenager who had four quarters of college and some laboratory research experience under her belt but no business or management experience.  She learned how to navigate that complex world without the benefit of completing college, studying for a Masters in Business Administration, or obtaining years of industry experience, like most CEOs.  She relied instead on her personal determination, advisors, employees, and lessons learned from her own mistakes and successes.  She served as CEO from the company's founding until her June 2018 indictment.  At the time she was indicted, two and a half years after significant public controversy about Theranos had arisen, Ms. Holmes was just 34 years old, still a relative newcomer to the business world.

Though she lacked business and management experience, Ms. Holmes brought to Theranos the qualities she had developed in her childhood—a deeply held interest in improving lives and doing good;

---

Holmes for E. Holmes) (indicating that no drinking, no associating with bad quality people, and no laziness would lead to creativity and achievement, which was the formula for happiness); Ex. E at 1, 2 (1/4/2004 Ltr. from C. Holmes to E. Holmes) ("You have taken a critical step by moving into the dormitory but there could be tremendous temptation to return to old ways. . . . So, put the past behind you, begin anew in your new room.").

an unmatched work ethic; a creative mind and willingness to learn; and kindness, compassion, and gratitude.  Ms. Holmes recognized (at least some of) her limits and sought out advice from those who could provide the expertise that she lacked.  Sunny Balwani was one of them, and became her most important advisor.  *See* § II(A)(4).  But there were others as well.  A consultant who worked with Ms. Holmes in 2004 observes that Ms. Holmes "was very good to acknowledge where she did have expertise but also to respect when she didn't and to defer to those who did."  Ex. A at 85 (A. Cavers Ltr. at 1); *see id.* at 53 (A. Ashton Ltr. at 2).  As time went on, Ms. Holmes hired experienced scientists and other personnel with appropriate experience.  Over the company's life, it had hundreds of employees: dozens of scientists and engineers with Ph.Ds, M.D.s, and Masters degrees; employees who had previously worked at medical device, pharmaceutical, and software companies; manufacturing personnel who worked on machining, injection molding, and assembly; experienced marketing personnel; and in-house lawyers who had worked at major law firms.  Theranos also hired outside law firms, including Wilson Sonsini, Boies Schiller, and Hyman Phelps for corporate, intellectual property, and regulatory work; outside accounting firms; a leading laboratory consultant to help start and advise on Theranos' clinical laboratory; and outside marketing firms.  Ms. Holmes accepted recommendations for Board members whom she believed would provide an appropriate mix of business, public policy, legal, and medical expertise,  and who also had experience making sweeping changes to institutional structures that could help Theranos in its journey to fulfill its grand but challenging aspirations.[3]  Ms. Holmes was a visionary without a college degree who was learning how to be a CEO, but she surrounded herself with employees, directors, advisors, mentors, and consultants whom she believed had the right experience to make Theranos successful.

People who worked with her describe Ms. Holmes as an enthusiastic, inspiring, compassionate, and humble CEO.  Ms. Holmes' "drive and ambition was infectious."  Ex. A at 109 (C. Dillon Ltr.).  During some of Theranos' most difficult periods, "[w]hile there were without question more difficult

---

[3] For example, by Fall 2015, the Board of Directors included the former CEOs of Wells Fargo and Bechtel Corp., the Chairman and Managing Partner of a prominent national law firm, two medical doctors, multiple members of the boards of other companies, and multiple individuals with government experience.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

days than not, Elizabeth came to the office every single day with a highly engaging and positive energy that created the foundation of an environment that allowed us to focus on 'doing our very best work.'" Ex. A at 96 (T. Cooper Ltr. at 1).  Dr. Fabrizio Bonanni, a former Amgen executive who served on Theranos' Board of Directors from 2016 to 2018, was "struck" by Ms. Holmes' ability to listen: "She is really interested in hearing feedback, particularly when the feedback is critical of her, her actions, or her company.  She listens intently and internalizes the message for further processing.  She may ask clarifying questions but never interjects biases or defensiveness."  Ex. A at 74 (F. Bonanni Ltr. at 3). Craig Josephson, who was a member of Theranos' executive team in the last year of the company, echoes these sentiments, describing Ms. Holmes as focused on making decisions with integrity, doing the right thing for the patient, and being responsive to suggested changes.  Ex. A at 169 (C. Josephson Ltr. at 1).

Former Theranos employees observe that Ms. Holmes genuinely cared about the people who worked for her company.  *See* Ex. A at 78 (T. Brumett Ltr.) (Over decades-long career, "I found Elizabeth to be one of the most employee focused CEOs I have ever worked for.  She was approachable, attentive, and supportive."); *id.* at 87 (L. Cheng Ltr. at 1) ("polite, genuine, and naturally empathetic"); *id.* at 192 (J. Lu Ltr.) ("She is a hard working woman and was nothing but kind to her employees."); *id.* at 204 (J. Moalli Ltr. at 2) ("I personally witnessed Elizabeth working with her team on a daily basis, and despite the enormous amount of pressure she was under, she was always empathetic, understanding, and open to new ideas.").  Former Theranos Vice President of Hardware Manufacturing Tim Cooper notes: "Her display of genuine care for employees drove a tremendous sense of value and worth within many of us."  Ex. A at 97 (T. Cooper Ltr. at 2).  "She also reached out, to her best ability, to thank the employees for their dedication to the company."  Ex. A at 266 (H. Vu Ltr. at 1).  Whether it was addressing an employee's health or personal loss or considering difficult staffing decisions at key points in the company's history, Ms. Holmes demonstrated "care and compassion" about individual employees. *Id.* at 98 (T. Cooper Ltr. at 3); *id.* at 266 (H. Vu Ltr. at 1) ("One thing I had noticed was that she cares so much about the employees and their families.").  One former employee describes how, when Ms. Holmes heard about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, she "came to the Newark facility where I

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

9

1    worked, sought me out, embraced me and said she would completely support me in every way possible

2    ███████████████████████████████████████████.” *Id.* at 199 (M. McCarthy Ltr.).

3          When staffing reductions were necessary, “Elizabeth struggled with the implications of these

4    decisions on the individual and was never comfortable with the negative consequences for those

5    affected, regardless of the business rationalization or justification.” *Id.* at 98 (T. Cooper Ltr. at 3). This

6    care did not go unnoticed.  A former security supervisor for Theranos’ Arizona operations recalls:

7    “Elizabeth was there for every employee, especially when Theranos closed.  Elizabeth made it a point to

8    be there and show significant support during a sudden and arduous job search.  Theranos provided every

9    employee with a separation package, resume support services, and job placement before it closed its

10   doors.”  Ex. A at 207 (B. Morel Ltr.).  Former Theranos Laboratory Director Donald Tschirhart summed

11   it up: “Everyone at Theranos liked her; she was strong, she fought for us and she treated us well until the

12   last moments.”  Ex. A at 262 (D. Tschirhart Ltr. at 2).

13         Ms. Holmes did not build Theranos for nefarious reasons—indeed, the opposite is true.  PSR ¶

14   194.  The company’s mission was to provide access to actionable health information to improve human

15   health on an equitable basis.  Ms. Holmes was fundamentally committed to this lofty purpose, and not to

16   her own monetary gain.  As former Board Member Bill Foege, former Director of the Centers for

17   Disease Control and Prevention (CDC), puts it in his letter to the Court: “Ms. Holmes was not interested

18   in money.” Ex. A at 136 (W. Foege Ltr. at 2); *see also id.* at 75 (F. Bonanni Ltr. at 4).  Former Vice

19   President of Hardware Manufacturing Tim Cooper notes that through his many interactions with Ms.

20   Holmes, “it is my view and strong belief that she has never been motivated by anything other than

21   realizing this vision.  She never brought financial considerations into our discussions and always placed

22   a heavy emphasis and focus on ensuring that a positive experience and outcome for the individual

23   (patient) was at the forefront of our work.”  Ex. A at 97 (T. Cooper Ltr. at 2); *id.* at 109 (C. Dillon Ltr.)

24   (over 12 years on Theranos’ research and development team, “I never felt that the love of money or

25   greed was ever a motivation for her hard work and dedication.  In fact, I only knew her to be

26   compassionate wanting to help people receive better and more accurate healthcare.”).

27

28   MS. HOLMES’ SENTENCING MEMORANDUM
     CR-18-00258 EJD

1       Ms. Holmes did not personally profit from the investments of others into Theranos.  Those

2  investments were used to pay for research and development of groundbreaking inventions and the

3  company's operations—not to enrich Ms. Holmes or anyone else.  Ex. A at 136 (W. Foege Ltr. at 2).

4  Although Ms. Holmes was touted as a billionaire in the media, her purported "fortune" was entirely on

5  paper based on the Theranos stock she owned.  She never cashed in that ownership; in fact, she never

6  sold a share of stock, despite the opportunity to do so at several points over the years.  *See* Holmes

7  11/29/21 Tr. 7914:23-7915:23 (testimony of E. Holmes); *see* Ex. A at 241 (D. Sokol Ltr. at 4) ("In the

8  2015 timeframe, Ms. Holmes was offered the opportunity to sell hundreds of millions of dollars in her

9  stock holdings in Theranos.  She turned down that opportunity because she felt that she should not profit

10  until all of her investors had returned their investment profitably.").  She asked to be paid in Theranos

11  shares rather than cash for her work as CEO, *see* TX 10510, a request that the Theranos Board denied.

12  *See also* Ex. A at 74 (F. Bonanni Ltr at 3) (describing how Ms. Holmes was "far from being the most

13  compensated employee" at Theranos and the Board's efforts to increase her compensation were met by

14  "her strong resistance").  Near the end of the company's life, "she volunteered even to give up her

15  ownership of the company in hopes of saving it."  Ex. A at 262 (D. Tschirhart Ltr. at 2), and voluntarily

16  gave investors a "good portion of her own shares," *see id.* at 74 (F. Bonanni Ltr. at 3).  Nor did Ms.

17  Holmes use corporate resources inappropriately for her own benefit.  Dr. Foege, who was a member of

18  the Board of Directors from 2014 through 2018, recalls: "The Board had an audit performed which

19  found no evidence of fraud nor diversion of money."  Ex. A at 136 (W. Foege Ltr. at 2).

20       "She always put the interests of the company ahead of her own," notes Daniel Warmenhoven, a

21  technology industry executive who served on Theranos' Board from 2016 to 2018.  Ex. A at 269 (D.

22  Warmenhoven Ltr.).  Dr. Fabrizio Bonanni, also a Board member from 2016 to 2018, observes: "In my

23  almost fifty years in business, I have not seen or heard of a more selfless CEO."  Ex. A at 74 (F.

24  Bonanni Ltr.) at 3.

25             **4.**       **Relationship with Mr. Balwani**

26       It is impossible to understand Ms. Holmes' experience at Theranos, and particularly with respect

27  to the offense conduct, without closely examining her relationship with Sunny Balwani.  In the wake of

28

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

her rape, around the time she was considering leaving Stanford, Ms. Holmes reconnected with Mr. Balwani. Ms. Holmes first met Mr. Balwani just after she graduated from high school on the Stanford-sponsored trip to China. Ex. F (photo); Holmes 11/29/21 Tr. 7847:4-7. She was eighteen, and he was thirty-eight. *Id.* at 7847:8-11. She understood that he was a successful businessman who had built and sold his own company and had worked with Microsoft, and she viewed him as a potential advisor and mentor during that summer. *Id.* at 7847:12-24. As Ms. Holmes was thinking about leaving Stanford, she responded to outreach from Mr. Balwani. Mr. Balwani encouraged and supported her decision and offered his business advice. Ms. Holmes confided her trauma and depression to him. He told her she was safe now that she was with him. *Id.* at 7849:10-7850:3. They began a romantic relationship.

The relationship between Ms. Holmes and Mr. Balwani was characterized by severe emotional, psychological, and sexual abuse perpetrated by Mr. Balwani.

Mr. Balwani expressed his desire to help Ms. Holmes develop as a person and a leader. As time went on, that expressed love and desire manifested as progressively controlling behavior. *See What is Domestic Violence*, U.S. Department of Justice Office of Violence Against Women, https://www.justice.gov/ovw/domestic-violence (last visited Nov. 8, 2022) ("Domestic violence is a pattern of abusive behavior in any relationship that is used by one partner to gain or maintain power and control over another intimate partner."); Mary Ann Dutton & Lisa A. Goodman, *Coercion in Intimate Partner Violence: Toward a New Conceptualization*, 52 Sex Roles 743, 747 (2005) (describing intimate partner abuse as multifaceted and centered around coercive control). Some (but not all) of that behavior is described below.

Mr. Balwani demanded that Ms. Holmes follow a series of prescriptions, including keeping a strict schedule with little sleep, limiting her food intake, refraining from alcohol, and maintaining a particular manner and personality style. Mr. Balwani prescribed tenets for Ms. Holmes to follow, which he wrote for her, *see, e.g.*, TX 7734, and Ms. Holmes was required to write out her schedule regularly and confirm her commitment to his teachings, *see, e.g.*, TX 7731.

Mr. Balwani also insisted, in the form of verbal and written berating, that Ms. Holmes was incompetent, fundamentally flawed as a person and a leader, and needed to change who she was—in his

words, "kill" the current Elizabeth and become a new one—to become a worthy leader.  Holmes

11/29/21 Tr. 7859:16-21, 7863:11-23.  The "advice" he provided was large and small—from live

criticisms of her manner of speaking, *see* TX 5387F at -148 ("You are speaking with everyone in your

giddy voice"), -246 ("U r rambling now. Let's stay focused"), to lengthy diatribes that went to her core

as a leader.  Ms. Holmes' assistant from 2014 through 2018 confirms: "[Mr. Balwani] would constantly

go into her office, shut the door, and then kick out whoever was in her office.  He would then scream at

her.  I could overhear the screaming."  *See* Ex. A at 116 (L. Durkin Ltr.).  Because Mr. Balwani insisted

that she write down and repeat back to him what he was saying, Ms. Holmes captured some of these

tirades in iPhone notes, such as one modified April 5, 2015.  *See* TX 7534 at 2 ("Toughen up. Become

masculine be in battle [*sic*]. Masculine game. Business masculine game."); *id.* ("I'm so sick and tired of

this mediocrity you create. It's astonishing.  You'll never hold anybody responsible for any actions.

You'll never do that. . . . Monkey's [*sic*] can't fly spaceships.").  Text messages also show Ms. Holmes

seeking Mr. Balwani's approval as she repeated back his lessons.  *See* TX 5387F at -63 (Ms. Holmes:

"My new life as of this night and forever more: - total confidence in myself best business person of the

year - focus - details excellent - don't give what anyone thinks – engage employees in meetings by

stories and making it about them (ie prepare well)" . . . Mr. Balwani: "Awesome. U r listening and

paying attention.").

Ms. Holmes believed Mr. Balwani's criticisms of her and sought to do better.  She likewise

believed he was fundamentally important to the company: in her mind, as in his screeds, setbacks were

due to her failures, but success was due to him—after all, according to him: "I have molded you."  TX

5387F at -207.  Although the precise contours evolved over time, this pattern played out on a regular

basis throughout the relationship, including when Mr. Balwani was at the company.[4]  Dynamics such as

these are common in abusive relationships and especially effective at creating a culture of control.  *E.g.*,

---

[4] Mr. Balwani's rage was not solely directed at Ms. Holmes.  Ms. Holmes' sister-in-law, who
began dating Ms. Holmes' brother Christian while he was working at Theranos, observed that "the
Sunny I saw was certainly controlling. . . . In the communications I witnessed first hand, it was clear he
was adept at belitting people and making them feel stupid."  Ex. A at 152 (C. Gualy Ltr. at 1).  Others
whom the government interviewed but chose not to call at trial made similar observations.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

Hamberger et al., *Coercive Control in Intimate Partner Violence*, 37 Aggression & Violent Behavior 1, 3 (2017) ("[I]t is important to note that vulnerabilities and related threats are not limited to violence.  For example, the systematic tearing down of the target's self confidence and trust in her own decisions, opinions and abilities commonly seen in IPV may make her vulnerable to threats of abandonment . . ., judgment, humiliation, or failure if the perpetrator's desires are not met.  In this way, the consequences of a pattern of emotional abuse may make a target more vulnerable to coercive control.").

Over the first several years of their relationship, Ms. Holmes became increasingly isolated from friends and family.  *See* Holmes 11/29/21 Tr. 7860:13-7861:8.  Friends describe losing contact with Ms. Holmes.  Ex. A at 154 (P. Gupta Ltr. at 1) ("She also fell into an all-consuming relationship with Sunny, who seemed to pull her farther away from me.  She became reserved and withdrawn, and strangely secretive.  I was worried about the effect Sunny was having on her, and I urged her to take caution, but to no avail."); *id.* at 130 (J. Ewing Ltr. at 1) ("Sunny was significantly older than we were, to an alarming degree, but Elizabeth was very taken in by him.  He struck me at the time like a father figure, someone she trusted, who could guide and mentor her, who could validate her, as she shouldered this incredible undertaking she felt was necessary for the world.  I lost contact with Elizabeth after that.").

Ms. Holmes' parents recall their own discomfort and concern with their daughter's relationship with Mr. Balwani.  They were aware that Mr. Balwani insisted on listening when they spoke with their daughter on the phone, and they witnessed Mr. Balwani criticize and yell at Ms. Holmes until she cried, along with other behavior that made them uncomfortable.  *See generally* Ex. A at 35-37 (N. Holmes Ltr. at 6-8), 22 (C. Holmes Ltr.) at 10.  Noel Holmes recalls a trip she took with Ms. Holmes:

> In January 2007, we were finally able to go away to Big Sur for two days over the weekend with just our family.  Although it was difficult to connect by phone there[,] Sunny kept calling and berating Elizabeth.  He had her in tears and she insisted we needed to leave.  When we started driving back and the connection was better, I could hear him yelling at her for not working.  She became very nervous and kept asking if we could somehow drive faster to get home.

Ex. A at 36 (N. Holmes Ltr. at 7).  Ms. Holmes' brother Christian similarly recalls how his relationship with Ms. Holmes changed after she began her relationship with Mr. Balwani:

> In the years that followed, my relationship with my sister was reduced to a series of formalities around her work.  She spent all her time with Sunny and rarely included our

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

family.  She stopped coming to family gatherings and became more remote.  I lived within driving distance from Elizabeth for about 5 years during this time period and worked with her for a number of years, and can't remember sharing a meal with just the two of us more than a handful of times, let alone many meaningful conversations.

Ex. A at 162 (Christian Holmes Ltr. at 2); *see also* Ex. A at 152 (C. Gualy Ltr. at 1); *id.* at 116 (L. Durkin Ltr.) ("Elizabeth was not allowed to have lunch or dinner with anyone but Mr. Balwani because Mr. Balwani would not allow otherwise."); *id.* at 166 (M. Holmes Ltr.).  Isolating behavior is a hallmark abuse tactic.[5]

Mr. Balwani's abuse involved severe sexual elements that caused Ms. Holmes particular distress, including thoughts of suicide.  These events occurred in the home they shared, █████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Contemporaneous records corroborate the aftermath: after a February 2015 incident, Ms. Holmes both expressed her personal despair in an iPhone note, and also apologized to Mr. Balwani for her inability to be strong for him.  *See* TX 7517; TX 5387F at -121 (Ms. Holmes: "I'm sorry I wasn't stronger for you this morning.  That is my responsibility and my role.  I will never let that happen again." . . . Ms. Holmes: "My job is to love you when you're stressed." Mr. Balwani: "I know."). ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ Research on abusive relationships identifies sexual violence as deeply impactful because it "attack[s] core aspects of bodily integrity, autonomy, and trust." Logan et al., *Silenced Suffering: The Need for a Better Understanding of Partner Sexual Violence*, 16 Trauma, Violence, & Abuse 111, 115 (2015); *see also* Logan et al., *A Mixed-Methods Examination of Sexual Coercion and Degradation Among Women in Violent Relationships Who Do and Do Not Report Forced Sex*, 22 Violence and Victims 71 (2007).

That Ms. Holmes trusted Mr. Balwani and offered expressions of love to him while simultaneously suffering from his abuse should not come as a surprise.  Research on abusive

---

[5] *See generally* Dutton & Goodman, 52 Sex Roles at 749 (noting that "interfering with victims' social networks . . . wear down one's ability or will to resist").

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

15

relationships makes clear that the coexistence of love and abuse is a central conundrum of such relationships.  *See* Deborah K. Anderson & Daniel G. Saunders, *Leaving an Abusive Partner: An Empirical Review of Predictors, the Process of Leaving, and Psychological Well-Being*, 4 Trauma, Violence, & Abuse 163, 170-71, 172, 175-78 (2003).  Ms. Holmes was fearful of Mr. Balwani's wrath and sought to please him, but she also trusted him completely, believed he had her best interests at heart, and loved him.  The text messages between them show expressions of love, apologies, and attempts to appease—placating strategies well-recognized in the literature.  *E.g.*, TX 5387F at -42-43.  *See, e.g.*, Jessica R. Goodkind et al., *A Contextual Analysis of Battered Women's Safety Planning*, 10 Violence Against Women 514, 528 (2004) (describing placating strategies used by abused women and effects).

The severe abuse Ms. Holmes suffered at the hands of Mr. Balwani affected her deeply, including in her role as CEO of Theranos.  As she testified, the abuse occurred throughout the relationship, including during the period when they both worked at Theranos and in the course of and with regard to that work.  *See* Holmes 11/29/21 Tr. 7860:4-8, 7870-7872; *see also* TX 7534; Ex. A at 116 (L. Durkin Ltr.).  At Theranos, Mr. Balwani took primary responsibility for "operational" aspects of the company.  That included preparing the company's financial statements (including revenues and revenue projections), managing the retail partnership with Walgreens, overseeing operations of the clinical laboratory, as well as manufacturing operations and general personnel matters.  Mr. Balwani was also responsible for following up with potential investors after an initial meeting, as he was the best positioned to answer questions about Theranos' financial model and projections, as well as the operational issues that are often the topics of due diligence requests.  Mr. Balwani not only ran Theranos' operations but was also Ms. Holmes' most important advisor, and he had outsized influence given the circumstances of their relationship.  That is reflected in the government's most recent assessment of the relationship:

> Besides his position that we talked about, you can also infer that his close relationship with Ms. Holmes would have given him a lot of influence over her, more than just his title alone would provide.  Remember also that Mr. Balwani was older and more experienced than Ms. Holmes.  So it would be no surprise that his advise [*sic*], his input would carry a lot of weight with her.  And that's what showed up in the text messages.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

16

Balwani 6/24/22 Tr. 7652:9-17 (government rebuttal closing in S. Balwani trial).  Until late 2015 or early 2016, Ms. Holmes trusted Mr. Balwani completely.  Holmes 11/29/21 Tr. 7875:15-25, 7876:1-7877:10, 7879:16-21.  As Ms. Holmes explained, between 2010 and 2016, Mr. Balwani "had taught me everything that I thought I knew about business, and I thought he was the best business person that I knew.  And I think that I didn't question him in the way that I otherwise would have." *Id.* at 7875:21-25.  Ms. Holmes is still processing what effect the relationship had on her.  As she testified, Mr. Balwani "impacted everything about who I was, and I don't fully understand that." *Id.* at 7879:12-15.[6]  The fact that the abusive dynamic affected their workplace relationship and the fact that Ms. Holmes deferred to Mr. Balwani, especially in areas where he was formally responsible, is consistent with research on intimate partner abuse.  *E.g.*, Logan et al., 16 Trauma, Violence, & Abuse at 121 ("In essence, coercive control erodes an individual's capacity for independent decision making or personal agency. . . . Stark (2007) argues that the net effect of coercive control on a victim is global: Victims suffer from cumulative harms rather than just suffering from injuries resulting from specific and definable incidents."); Dutton & Goodman, 52 Sex Roles at 748-752; Hamberger et al., 37 Aggression & Violent Behavior at 2-3 ("Multiple authors agree that coercive control impacts virtually all dimensions of the target's life, including everyday actions, use of economic resources, relationships with family and friends, educational and occupational opportunities, sexuality, and general life activities.").

Ms. Holmes was finally able to leave her relationship with Mr. Balwani once he left the company.  When he was on a trip abroad, Ms. Holmes enlisted her brother to help her move out of their shared residence.  Ex. A at 152 (C. Gualy Ltr. at 2); *id.* at 116 (L. Durkin Ltr.).  Once Mr. Balwani understood what was happening, he began to text and call Ms. Holmes—he insisted she wait until he came home, told her she was making a mistake, and moved up his international travel to fly back to California from Asia as soon as possible.  TX 5387F at -440.

---

[6] This makes sense. *See, e.g.*, Dutton & Goodman, 52 Sex Roles at 751-52 ("The day-to-day 'rules' imposed by an abusive partner may be those that one becomes accustomed to as a personal risk management strategy—even without recognizing the extent of compliance."); Shannon B. Nicholson & David J. Lutz, *The Importance of Cognitive Dissonance in Understanding and Treating Victims of Intimate Partner Violence*, 26 Journal of Aggression, Maltreatment, & Trauma 475 (2017).

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

Since leaving the relationship, Ms. Holmes has been able to begin processing its effects and healing from it.  *See* Ex. A at 249 (D. Sterling Glasband Ltr. at 2).  Part of that has been supporting friends and family who have had similar experiences as they work through their own trauma.  Ex. A at 180, 181 (J. Lamping Ltr. at 1, 2); *id.* at ███████████████; *id.* at 123-24 (G. Evans Ltr. at 1-2).

### 5. Ms. Holmes' Current Family Life

Ms. Holmes began dating her partner, Billy Evans, in the first half of 2018.  Mr. Evans and multiple friends who have submitted letters describe their initial hesitation in befriending Ms. Holmes once they realized who she was, and how the woman they came to know despite their trepidation was a "gentle and naive," hopeful, loving, humble, patient, and dedicated "beyond what most people have ever experienced." Ex. A at 1-2, 8 (B. Evans Ltr. at 1-2, 8); *see also id.* at 126 (S. Evans Ltr. at 1), 212 (T. Offer Ltr. at 1).  To Mr. Evans, Ms. Holmes has become a supportive partner and coparent.  "She approaches my greatest mistakes the same as my limited triumphs, with an unwavering love and gentle touch." Ex. A at 4 (B. Evans Ltr. at 4).

Ms. Holmes and Mr. Evans seek to live a private, quiet life with meaningful relationships with family and friends.  Family has always been important to Ms. Holmes, and she brings that value into her new family—Billy's family—as well.  Mr. Evans describes how Ms. Holmes helps keep him close to his original nuclear family.  Sometimes this is through seemingly small things, like sending individually curated sets of photos to each of their son's grandparents each day "because she knows how much it means to our parents to be a part of our lives." Ex. A at 4 (B. Evans Ltr. at 4).  But she has had a more significant role as well.  Mr. Evans describes how Ms. Holmes' love and patience helped heal his relationship with his brother, who had gone through his own hardships: "My closeness to my brother is all thanks to her. . . . I am so proud of the man he has become, in no small part because of Liz's determination and patience." *Id.* at 4 (B. Evans Ltr. at 4); *see id.* at 214 (K. O'Neill Ltr. at 1).  Others in the Evans family agree that Ms. Holmes has been an overwhelmingly positive addition to the family, describing her as having "a soft-spoken manner and a generous heart," a person who "is happy to give her time to other family members when they need her help or advice," a person who "lift[s] others up and help[s] to make room at the table for one another," a "comforter" who is "very attentive to the needs

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

of others and is often helping with advice or just lending a listening ear." Ex. A at 64 (A. Billings Ltr),

120 (A. Evans Ltr.), 70 (G. Bolster Ltr.), 126 (S. Evans Ltr. at 1). "All these characteristics make me

very proud to know Elizabeth and to have her join our family circle," say Mr. Evans' mother. Ex. A at

127 (S. Evans Ltr. at 2).

Ms. Holmes and Mr. Evans welcomed their son, W█████████████ Evans in July 2021.

Family and friends observe Ms. Holmes' total love for and devotion to this little boy. Mr. Evans

describes Ms. Holmes in this new role of mother:

> I wish you could see his happiness; his deep belly laughs that Liz helps encourage and the
> confidence of a young mind who does not yet appreciate some of the difficulties this
> world has to offer him. His bond with Liz is incredible . . . I wish you could hear how
> she sings to him every morning when she brings him out of his crib and tells him how his
> day and the life ahead has so much good in store for him. I wish you could walk with us
> in the mornings and see how she has turned the fear he once had for the neighbors' horses
> into a carrot feeding frenzy . . . I wish you could see Liz and I dancing in the kitchen,
> W█ in our arms, giving him "doubles" as we kiss both sides of his cheeks. . . . I wish
> you could see how she is as enthusiastic to change his diaper as she is to paint with him
> and read to him. . . . I wish you could see how she rocks him to sleep every night while
> singing Amazing Grace and telling him the tales of a boy who values kindness, honesty,
> and generosity above all else. I wish you could hear how quickly she can turn his cries of
> exasperation to giggles as she helps calm his tired mind.

Ex. A at 5 (B. Evans Ltr. at 5).

Friends and family concur with Mr. Evans. "To join Elizabeth, Billy, and their son W██ on a

Sunday afternoon at their home in Woodside is to experience a family with strong roots at peace in a

loving atmosphere." *Id.* at 138 (J. Fogelsong Ltr.); *id.* at 198 (N. Mason Ltr.). "I have been witness to a

mother falling completely and utterly head over heels in love with her son," says one friend. Ex. A at

194 (T. MacNiven Ltr. at 1). She is a "hands-on, loving, attentive mother," with W██ "waddl[ing] after

her like a baby satellite," notes another. Ex. A at 258 (M. Thompson Ltr. at 2). *See also* Ex. A at 127

(S. Evans Ltr. at 2) ("Elizabeth is the most nurturing and loving parent to W██."), 37 (N. Holmes Ltr. at

8), 157 (J. Hamilton Ltr. at 2) ("I watched Elizabeth sit with little W███ for hours on the outside patio

of their home, overlooking the trees in the distance, explaining to him the sights and sounds of the

beauty in front of him. . . . And despite this incredibly difficult stage in her life, Elizabeth has continued

to build a beautiful life for W███ where he is loved with all the adoration and support one could

imagine providing this little human being."); 150 (H. Grenier Ltr. at 1); 176 (J. Koch Ltr. at 2) ("Liz sees

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

19

1   the world through W⬛ [*sic*] eyes and helps him to engage with his surroundings.  Liz creates a caring,

2   calm, and loving environment for W⬛"); 223 (B. & T. Raleigh Ltr.).  Ms. Holmes has "spared" W⬛

3   "any inkling of her worry and sadness" related to this case: "All he has experienced is his mother's joy

4   to be with him and her love for him."  Ex. A at 27 (C. Holmes Ltr. at 15).

### 6.      Volunteer Work

6          Despite her current circumstances, Ms. Holmes has worked to find ways to continue contributing

7   what she can to the world.  Dr. Foege, the former Director of the CDC who served on Theranos' Board

8   from 2014 to 2018, describes a conversation with Ms. Holmes after Theranos shut down, after her

9   indictment, in which "she was still asking for advice on how her skills could be used for good. . . . Her

10  questions revolved around what else could she do that would be of benefit to society.  She was not trying

11  to revive Theranos, but was looking for alternative ways of contributing to the world."  Ex. A at 137 (W.

12  Foege Ltr. at 3).  She can't help but think about solutions to the problems she learned so much about and

13  tried to solve while at Theranos, and has ideas about how technology can make it easier for consumers

14  to access and control their health care records.  PSR ¶¶ 137, 138.

15         More immediately, however, Ms. Holmes has dedicated herself to help those who have suffered

16  from traumas similar to her own.  After her conviction, Ms. Holmes became certified as a rape crisis

17  counselor and advocate, and has spent over five hundred hours volunteering in support of sexual assault

18  survivors, including victims of domestic violence, with the ⬛⬛⬛⬛⬛⬛⬛⬛

19  ⬛⬛⬛.  Ex. A at 46 (⬛⬛ Ltr. at 1).[7]  This work has included scores of shifts manning a

20  recently launched statewide helpline ⬛⬛ that provides survivors with trauma advocacy and support

21  and, as appropriate, connects survivors to resources they need, including law enforcement, government

22  agencies, and shelters.  *Id.*; PSR ¶ 136.  "She has worked with a variety of callers, including calls with

23  actively suicidal victims of sexual assault, calls with community professionals, and calls to local law

24  enforcement and/or [the Division of Child and Family Services] when necessary."  Ex. A at 47 (⬛⬛

25

26

27         [7] Ms. Holmes applied to volunteer with several organizations local to the Bay Area, but those organizations declined to work with her.

28  MS. HOLMES' SENTENCING MEMORANDUM
    CR-18-00258 EJD

1   Ltr. at 2).  Her work on the helpline has received praise from callers and law enforcement alike.  *Id.* at

2   46-47 (██████  Ltr. at 1-2).

3       The organization reports that Ms. Holmes has also worked on "assisting with the compilation of

4   sexual assault and domestic violence resources statewide for callers as well as identifying gaps in

5   resources available to ████ victims of crime throughout the state." Ex. A at 47 ██████ Ltr. at 2).  This

6   includes hours working on draft legislation to support survivors' rights and resources.  *See* Ex. A at 6 (B.

7   Evans Ltr. at 6).

8       This work is deeply personal to Ms. Holmes.  She sees it as a way to try to help others, and apply

9   learnings from her own journey toward being there for people in their hardest moments.  According to

10  ████: "The hours that Elizabeth has volunteered over the past months have filled a great need in the

11  community." Ex. A at 47 (██████ Ltr. at 2).

12      **B.      Personal Characteristics**

13      "There has been a great deal said and written about the fictional Elizabeth Holmes."  Ex. A at 13

14  (C. Holmes Ltr. at 1).  Ms. Holmes has been the subject of caricature in extensive and intrusive media

15  portrayals, whether that portrayal is couched as a nonfiction book or a fictionalized dramedy.  Those

16  caricatures, presented by people who do not know Ms. Holmes, are strikingly false, as the scores of

17  people who actually know Ms. Holmes make clear in their letters to the Court.  "I've been taken aback

18  by just how dramatically divergent the fictional character of Elizabeth Holmes presented in the media is

19  from the entrepreneur, woman, partner, mother, and friend I have come to know and care about."  Ex. A

20  at 62 (G. Bianchini Ltr. at 1); *id.* at 101 (M. Crane Ltr. at 2) ("I am offended by these portrayals of her

21  and find them infuriating and tragic.").  One of Ms. Holmes' friends describes the contrast between a

22  caricature who is "robotic, devoid of emotions" and the real human being: "She puts on a stoic face in

23  public, as she was trained to do, but with her trusted friends and family, Elizabeth is full of love,

24  empathy, kindness, and grace.  Sadness and despair, too.  When I dropped her off for court one morning,

25  . . . the tears welled up in her eyes as the unimaginable gravity of what she was facing hit her yet again."

26  Ex. A at 181 (J. Lamping Ltr. at 2).

27

28  MS. HOLMES' SENTENCING MEMORANDUM
    CR-18-00258 EJD

The collection of letters attached as Exhibit A paint a consistent picture of Ms. Holmes as a compassionate, generous, optimistic, honest, and thoughtful person.  The fact, volume, and substance of those letters is particularly meaningful given their context in this sensationalized case.  As Mr. Evans notes: "The fact that Liz still has the support she does despite the risks of associating with her is a testament to her goodness.  Many of the letters you will read were written and submitted by loyal people who know their careers and public standing will be put in jeopardy because of their public support for her. . . .  But the ones you'll see nonetheless feel compelled to . . . tell you what otherwise might be missed."  Ex. A at 8 (B. Evans Ltr. at 8).  One of Ms. Holmes' childhood friends emphasizes: "There are so many people who genuinely know and love Elizabeth, who is a real person with a resilience I have never seen in anyone else."  Ex. A at 58 (M. Thompson Ltr. at 2).

Friends, family, former employees, advisors, and others who know her describe her in positive terms.  She is "incredibly warm, intelligent, engaging, with a kind and gentle demeanor," Ex. A at 57 (E. Batzoglou Ltr.); a person of strong faith in God, *id.* at 60 (P. Berloty Ltr. at 1); "the kindest soul," "the kind of person who picks something up when she sees it has fallen," *id.* at 117 (L. Durso Ltr. at 1); "humble, extremely curious about others, always willing to put her priorities second, a bit quiet and very gracious," *id.* at 209 (R. Gross Ltr. at 2).  Several additional aspects of her character also stand out in the letters.

### 1.    Deep Interest in Making the World a Better Place

Ms. Holmes' heartfelt desire to do good in the world is core to her character.  As Senator Cory Booker, a champion of criminal justice reform and restorative justice, writes: "I've always been struck by the way our conversations focused on her desires to make a positive impact on the world. . . . Her focus was always thoughtful, demonstrating a depth of knowledge about such issues, a curiosity to know more, and a determination to make a difference herself."  Ex. A at 76 (C. Booker Ltr. at 1).  Friends, family, former coworkers, and advisors from all facets of her life consistently emphasize Ms. Holmes' intent to make the world a better place from the time she was a child to today and talk about the projects she has pursued to do so.  For example:

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

- A former employee notes: "Elizabeth is and has always been driven by a single and simple purpose; she wants to make the world a better place than it would have been without her."  Ex. A at 96 (T. Cooper Ltr. at 1); *see also id.* at 75 (F. Bonanni Ltr. at 4) ("[T]he Elizabeth Holmes I met in May 2016 and whom I got to know well and admire over the following years is a principled, deeply ethical, intelligent, hardworking, selfless woman, dedicated to the worthwhile mission of improving health care.").

- A former government official who first met Ms. Holmes in the hopes of a government partnership on widespread disease testing and tracking opines: "I believe the reason Elizabeth has so much passion about promoting this vision is her deep sense of humanitarian purpose.  She cares deeply about making the world a healthier and better place for future generations."  Ex. A at 270 (A. Weber Ltr.).

- An intellectual property attorney who served as an outside advisor observes that Ms. Holmes "had the right intentions—she wanted to put out a quality, accurate product that would expedite diagnosing ailments and thus improve our collective public health."  Ex. A at 82 (T. Carroll Ltr. at 1).

- A college friend explains: "That has always been her goal and the driving force behind her work.  To serve people and make the world a better place."  Ex. A at 255 (A. Sutro Ltr.); *see id.* at 197 (S. Mantri Ltr.).

- A longtime family friend describes: "She wanted to learn things to do things and to make an important contribution to society."  Ex. A at 139 (S. Freeman Ltr. at 1); *see also* Ex. A at 218 (C. Perez-Rubio Ltr.).

- A friend since 2019 says: "The woman who sits in front of you is humble, thoughtful, and a committed citizen of this country who truly and passionately wants to make the world a better place."  Ex. A at 245 (E. Sorgi Ltr. at 2); *see also id.* at 50 (I. Aboyeji Ltr. at 3) ("[T]he Liz I know is a kind, driven young woman who only seeks to leverage technology and innovation to change the world by making health care more accessible to billions of people . . . .").

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

23

These letters also describe how Ms. Holmes' devotion to doing good persists to this day, part of her authentic core.

Ms. Holmes combines this desire to do good with a persistent optimism and determination that friends and family find especially notable given her current circumstances. Mr. Evans explains: "Liz has always approached life through the lens of what is possible. . . . She approaches hard problems and easy alike, constantly in search of a solution and with a belief in doing what most others would deem impossible." Ex. A at 2 (B. Evans Ltr. at 2). "She believes deeply in the goodness of the world and all those around her." *Id.* at 3 (B. Evans Ltr. at 3). One letter describes the handwritten note Ms. Holmes wrote for her friends' newborn shortly after her indictment, which ends "Welcome to a wonderful world"—a testament to Ms. Holmes' "ardently resilient optimis[m]." Ex. A at 95 (A. & S. Kiessig Ltr.). Ms. Holmes' mother observes that the technology developed at Theranos is "out there in the world, and someone will finish doing it and make Elizabeth's vision come true. . . . Maybe that is why she remains so full of gratitude and optimism about the future of this world." Ex. A at 39 (N. Holmes Ltr. at 10).

### 2.      Caring and Reliable Friend

Ms. Holmes' desire to do good in the world does not come at the expense of touching the lives of individuals she loves. "[T]he thing about her is that she is not all about herself; she is into 'you.' When you are speaking to her, it's as if she 'disappears' herself to focus on you and what you are saying." Ex. A at 139 (S. Freeman Ltr. at 1). It is therefore perhaps not surprising that, as Mr. Evans notes, "in reading these letters you will come to realize how Liz is the go-to person for so many that are dealing with life's hard moments." Ex. A at 3 (B. Evans Ltr. at 3).

Numerous letters describe Ms. Holmes' thoughtful commitment to being there for her friends despite her personal travails. Ex. A at 62 (G. Bianchini Ltr. at 1); *see also* Ex. A at 143 (K. Gavrieli Ltr. at 1). She is a person who drives hours to ensure a friend ███████████████████████████████ ██████████████████████████████; who offers her support to a friend ████████████████████ ██████████████████████████████ who leaves an event on a moment's notice to let a friend vent frustrations about that friend's professional life, *see* Ex. A at 274 (C. Zygourakis Ltr. at 2); and who supports a friend in the aftermath of personal tragedy, *see* Ex. A at ███████████ As one

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

friend explains: "When I went through a deeply broken heart in 2018, Elizabeth could feel my pain from all the way across the country without me saying a word.  She sent flowers, called every day for weeks, and held space for me, never rushing away to deal with managing her own challenges.  During another difficult life event, she sent a teddy bear because she couldn't be there to hug me in person." Ex. A at 181 (J. Lamping Ltr. at 2); *see id.* at 231-32 (J. Randolph Ltr. at 1-2).  Mr. Evans' sister Grace describes how Ms. Holmes was there for her "[d]espite the chaos going on in [Ms. Holmes'] world":

> She would send me heartfelt messages reminding me of my worth or a simple call to see how I was doing.  Her calmness talked me through panic attacks when I was unable to get off my bathroom floor or say a coherent word.  She had patience with me – she was always there.  She became my escape, when I needed a place to go, I was always welcome at her home.  During this time, she showed me her inherent kindness and empathy.

Ex. A at 124 (G. Evans Ltr. at 2).  Another friend notes that "small as they may be compared to hers, my life's needs and challenges have often taken center stage in our friendship," including navigating professional challenges and "several difficult personal situations."  Ex. A at 271 (Y. Yu Ltr. at 1).  Another writes: "You truly get a sense of someone's character and heart when they are going through intense adversity.  Elizabeth was always there for me even as she was progressing through the toughest time of her life.  No matter how small or big of an issue I was dealing with, Elizabeth consistently listened to me and provided me with the support/guidance to overcome the issue."  Ex. A at 145 (A. Goldberg Ltr. at 1).  Other friends echo these sentiments.  *E.g.*, Ex. A at 248 (D. Sterling Glasband Ltr. at 1) ("Liz is a thoughtful and loyal friend – the kind of person who calls you on your birthday, who remembers when you have a big pitch meeting and checks in to see how it went.").  Mr. Evans' father succinctly observes: "In her world she comes last."  Ex. A at 121 (W. Evans Ltr. at 1).

### 3.    Advisor and Mentor

Consistent with Ms. Holmes' desire to help others and make a difference, she makes time to mentor and advise others—whether it is reflecting on and sharing her own mistakes and lessons learned, helping connect individuals who may face social barriers to the resources they need, or just encouraging a young person to pursue his or her entrepreneurial dream.  Mr. Evans' sister notes: "I often say I should write a book – everything I have learned through Elizabeth being in my life.  It would certainly be a page turner but endless."  Ex. A at 123 (G. Evans Ltr. at 1).  One friend describes how Ms. Holmes'

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

1  "mentorship and advice" "contributed considerably" to the success of a young Kenyan entrepreneur who

2  was working to bring greater medical care to small African clinics.  Ex. A at 49 (I. Aboyeji Ltr. at 2).

3  Another attributes her own literacy startup to the role model she found in Ms. Holmes: "Elizabeth

4  inspired me to start my own company, Literati, which helps kids find books and become stronger

5  readers.  We all need heroes that look like us."  *Id.* at 131 (J. Ewing Ltr. at 2).  One writer tells how, at

6  Theranos' apex, Ms. Holmes encouraged her young daughter in scientific pursuits and continued an

7  email relationship with her, "inspir[ing] her to dream at a critical time."  *Id.* at 201 (B. McIntyre Ltr. at

8  1); *see also id.* at 207 (B. Morel Ltr.) (describing Ms. Holmes' efforts to mentor female entrepreneurs

9  while she was CEO of Theranos).  A family friend similarly notes that Ms. Holmes met virtually with

10  her "10 year old niece who declared that she wanted to start her own business."  *Id.* at 219 (V. Perez-

11  Rubio Maffia Ltr.).  And a female venture investor recounts how Ms. Holmes "took time away from her

12  trial preparations to help me recruit advisors to support my career (with incredible insights as a function

13  of her own experience on who can truly be valuable versus who I might perceive to be valuable)."  Ex.

14  A at 271 (Y. Yu Ltr. at 1).

15              **4.    Intelligent and Visionary**

16          Those who know her also describe Ms. Holmes as a brilliant thinker whose vision has

17  contributed to the scientific community.  Her talents lie in bringing concepts from different scientific

18  contexts together for a new use.  Former Theranos Technology Advisory Board Member Dr. John

19  Moalli views Ms. Holmes as "the most intelligent person I have ever met.  The depth and breadth of her

20  brilliance cannot be overstated, and, perhaps more importantly, should not be overshadowed by mistakes

21  she has made in the business environment."  Ex. A at 203 (J. Moalli Ltr. at 1).  A lawyer who reviewed

22  Theranos' patent portfolio explains that "Elizabeth created valuable technologies; she contributed

23  greatly to science; and she is a brilliant innovator." Ex. A at 83 (T. Carroll Ltr. at 2).  Theranos Board

24  members Dr. Foege and Dr. Bonanni agree.  Ex. A at 137 (W. Foege Ltr. at 3) (noting "scientific gifts");

25  *id.* at 74 (F. Bonanni Ltr. at 3) (noting company's valuable technological developments).  Theranos

26  Laboratory Director Donald Tschirhart, who joined the company in 2016, asks that the Court "consider

27  the immense contributions that she has made to the field of laboratory medicine and to humanity, even if

28

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

at this point they don't understand what they have been given.  I hope in some way that you can find her redemption in these good deeds." Ex. A at 262 (D. Tschirhart Ltr. at 2).

### 5.    Positive Impact on Others

Ms. Holmes' positive qualities have the effect of inspiring those around her.  Former employees describe how her dedication, mission, and gratitude inspired them to work hard. For example, one Theranos employee explains how Ms. Holmes inspired her colleagues by "develop[ing] and foster[ing] a special energy within many of us to think differently about our work and impact it has on others," a worldview that he and others have taken with them to other endeavors: "I know of several colleagues who pivoted their experiences at Theranos into much the same with a higher motivation than before to make lasting positive change on those they work with and the world around us." Ex. A at 98 (T. Cooper Ltr. at 3).

This is true for her friends as well.  As her friend Lauren Stat puts it: "She learns the hard way, and challenges those around her to grow and learn as well." Ex. A at 247 (L. Stat Ltr. at 2).  Another college friend emphasizes the point: "In my journey as a young professional woman facing challenges in the business world of healthcare, Elizabeth has always extended a hand to motivate me to take small steps while thoughtfully dreaming big." Ex. A at 235 (S. Samagh Ltr.); *see id.* at 237 (B. Smith Ltr.) ("Throughout the years she has been there for me when I faced a headwind in my own career and her own strength has inspired and motivated me to persevere and pursue my ambitions and dreams.").

Mr. Evans reflects that because of his partnership with Ms. Holmes

> I finally like the person who I have become.  I'm proud of the father Liz has helped me become, I am proud of the relationship we have with our families and friends, I am proud of many things now that I was not before I met her.  She may have ultimately failed to change the world in the way she set out, but she has undeniably changed mine.  She continues to hold me accountable, not with harsh words or criticism but with a love and acceptance that caused me deep reflection on the improvements I can make in my life to begin to reciprocate the immense unjudging and unwavering support she has shown me.

*Id.* at 6 (B. Evans Ltr. at 6).  Friends of Mr. Evans confirm the positive effect she has had on him.  Ex. A at 253 (J. Stern Ltr.) ("I recall when Elizabeth and Billy returned from a months long camping trip across the western United States, he displayed a new level of compassion in his demeanor, a strong sense of intention with his actions, and a heightened desire to listen to and look at others with purpose.  I

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

attribute these changes, at least in part, to Elizabeth's ability to have a positive impact on those around her.").

## III.   CALCULATION OF THE SENTENCING GUIDELINES RANGE AND OBJECTIONS TO PRESENTENCE REPORT

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Presentence Report ("PSR") calculates the Guidelines range as follows:

| | |
|---|---|
| **Base Offense Level** | **7** |
| **Loss Enhancement (§ 2B1.1(b)(1)(P)):** | **+ 30** |
| **Enhancement for Number of Victims (§ 2B1.1(b)(2)(A)(i)):** | **+ 2** |
| **Adjustment for Role in Offense (§ 3B1.1(a)):** | **+ 4** |
| **Total Offense Level** | **43** |
| **Criminal History** | **Category I** |

PSR ¶¶ 102-113, 117.  Based on a criminal history category of I and an offense level of 43, as well as the statutory maximum of 20 years for each count, the PSR calculates the Guidelines range as "960 months (80 years), which is essentially a life sentence for someone who is 38 years old." *Id.* ¶ 194.

Ms. Holmes objects to the PSR's Guidelines calculations with respect to each of the enhancements applied to the PSR's calculation, and believes that additional downward adjustments are warranted here.  *First*, as the PSR acknowledges, the offense level is primarily driven by the PSR's calculation of loss.  As discussed in detail below, Ms. Holmes objects to that calculation, which is based entirely on a spreadsheet provided by the government, for several reasons.  *See infra* Section III(A). *Second*, Ms. Holmes objects to the enhancement for the number of victims because it is based on the same flawed methodology as the loss calculation.  *See infra* Section III(B).  *Third*, Ms. Holmes objects to the adjustment for the role in the offense as inconsistent with *United States v. Holden*, 908 F.3d 395, 402 (9th Cir. 2018), and the meaning of that enhancement.  *See infra* Section III(C).  *Fourth*, Ms. Holmes should receive credit for her substantial acceptance of responsibility in this case, despite the fact

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

28

that she has contested guilt.  *See infra* Section III(D).  Ms. Holmes captures her remaining objections to the PSR in the attached Appendix.

### A.    Ms. Holmes Objects to the PSR's Calculation of Loss.

The PSR relies on Section 2B1.1(b)(1)(P) of the Guidelines to increase the offense level on the basis of loss by 30 levels.  PSR ¶ 105.  As a matter of policy, Ms. Holmes objects to the application of § 2B1.1(b)(1) to increase her offense level in any amount.  For the reasons discussed in more detail in Section IV(A)(5), below, loss is unhelpful in assessing the statutory sentencing factors.

Although the PSR calculates loss over Ms. Holmes' objection, its calculation is incorrect.  The PSR appears to calculate loss by using the total amount purportedly invested in Theranos by all of the investors who participated in the so-called C-1 and C-2 fundraising rounds, based on a spreadsheet provided by the government and apparently using a preponderance of the evidence standard.[8]  *See* PSR ¶¶ 47, 105; PSR Addendum ¶¶ 7, 9, 16.  This approach to calculating loss is incorrect and insufficient.  Because the loss calculation has an extreme effect on the ultimate offense level, extra care—and a higher burden of proof—must be applied to the calculation.  But regardless of whether a preponderance or "clear and convincing" standard applies, the evidence does not meet it.  Here, the calculation of loss must consider the particulars of each individual investment and look beyond the total investment amount to properly assess whether and to what extent loss has been proven, and whether (and, if so, the extent to which) that loss was caused by the alleged fraudulent misrepresentations.  It is not appropriate to assume that every C-1 and C-2 investor in Theranos is properly included in the loss calculation.  At trial, witnesses associated with the investments charged in counts 3-8 testified about those investments, and the jury reached a verdict only as to counts 6-8.  While evidence as to certain other investors was introduced at trial, none of the evidence introduced as to those other investors would even arguably support a finding of fraud, much less meet the causation elements required for loss.  Finally, as even the

---

[8] This spreadsheet was not an exhibit in Ms. Holmes' trial and was not produced by the government prior to its sentencing disclosures.  It appears to be a document that was created by the government for sentencing purposes.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

government appears to concede, calculating loss is complex in a case like this one, where the company (and therefore investments in it) indisputably had substantial value regardless of any fraud. As discussed in the sections that follow, the government has not and cannot meet its burden to prove loss. Accordingly, no loss enhancement should apply.

### 1. Loss Must Be Proven by Clear and Convincing Evidence.

Given its dominant effect on the ultimate offense level and Guidelines range, the government must show loss by clear and convincing evidence. "[C]lear and convincing evidence is required for proof of disputed enhancements" when "the challenged sentencing factors [have] an extremely disproportionate effect on [the defendant's] sentence relative to the offense of conviction." *United States v. Jordan*, 256 F.3d 922, 927, 929 (9th Cir. 2001). The Ninth Circuit has articulated a non-exhaustive six-factor test to determine when "due process may require the government to demonstrate facts underlying disputed enhancements by clear and convincing evidence." *United States v. Lonich*, 23 F.4th 881, 910 (9th Cir. 2022).[9] Key among those factors are the last two, which focus on the increase in the number of offense levels caused by the disputed enhancements, and the increase in the sentence caused by the disputed enhancements. *See id.* at 911-12. Those concerns militate in favor of applying the higher standard. The PSR's Guidelines calculation is driven primarily by the loss amount, which more than quintuples the offense level, and leads to a staggering increase to the Guidelines range.

---

[9] "In determining when the government must meet a clear and convincing standard of proof," the Ninth Circuit looks to the "totality of the circumstances." *Lonich*, 23 F.4th at 910. The "six non-exhaustive factors" that have been articulated are:

> (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether the increase in the number of offense levels is less than or equal to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

*Id.* at 910-11 (quoting *Jordan*, 256 F.3d at 928) (internal quotation marks and alterations omitted).

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

1   In *Lonich*, the Ninth Circuit noted that the question of which standard applies becomes more

2   difficult in conspiracy cases because it can be difficult to determine what conduct was part of the

3   conviction.  23 F.4th at 913.  That difficulty is present here.  Count 1 charged an investor conspiracy

4   lasting from 2010 to 2015, but Ms. Holmes was only convicted of three of the six individual wire fraud

5   counts that went to the jury, all of which were for investments made in 2014.  Additionally, the PSR

6   appears to calculate loss based on a government-created spreadsheet of C-1 and C-2 investors, but the

7   evidence at trial was significantly more limited.  There was ***no evidence*** as to why the vast majority of

8   the investments the government seeks to include in the loss amount ($517.8 million) were made—even

9   though, as discussed below, each investor's investment experience was different.  Because of these

10  questions, as well as the fact that the application of this enhancement has such a dramatic effect on the

11  offense level,  the government must meet a clear and convincing standard in order to prove a loss

12  amount for consideration at sentencing.  The PSR's use of a preponderance standard is erroneous.  Even

13  under that lower standard, however, the government has not proven loss, as discussed below.

14          **2.          Each Investor and Associated Loss Must Be Considered Separately.**

15  The PSR's loss calculation rests on the assumption that every investment listed in a government-

16  created spreadsheet of purported C-1 and C-2 investments during a set time period was the result of the

17  offense conduct.  Basing loss on such an assumption is factually and legally erroneous in this case.

18  Instead, a transaction-by-transaction inquiry is required to determine whether the transactions identified

19  were but-for and proximately caused by the offense.  The information provided by the government is not

20  sufficient to make that showing (even under the lower preponderance standard) for the transactions

21  referenced on the spreadsheet on which the PSR's loss calculation relies.

22          As a matter of law, the government must prove that the offense conduct—here, wire fraud with

23  respect to investor victims—was the but-for and proximate cause of the loss.  *Lonich*, 23 F.4th at 916

24  ("The term 'resulted from' establishes a causation requirement, which includes both cause-in-fact (but-

25  for causation) and proximate cause. . . . These basic causation requirements apply to loss

26  enhancements." (internal quotation marks omitted)).  To prove "but-for" causation where fraudulent

27  investments are concerned, the government generally must show that an investor relied on fraudulent

28
MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

31

information in making the investment, *see United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017) (assessing but-for causation for loss under § 2B1.1(b)(1) for a securities fraud conviction), or, put differently, that the fraud was material to the particular investment argued to constitute loss, *see United States v. Executive Recycling, Inc.*, 953 F. Supp. 2d 1138, 1146 (D. Colo. 2013) (assessing loss in the context of a wire fraud conviction). Intervening causes, meanwhile, can lead to the failure to prove proximate cause. *Lonich*, 23 F.4th at 917-18; *United States v. Hicks*, 217 F.3d 1038, 1048-49 (9th Cir. 2000). Where the government fails to produce sufficient evidence to show proximate or but-for causation for asserted loss amounts, a sentence based on those loss amounts cannot stand. *Lonich*, 23 F.4th at 916.

The government has not proven that the fraud was a but-for or proximate cause of any loss. There are at least two issues with the PSR's approach based on the particular facts and circumstances of this case:

*First*, this is a case where the circumstances of each individual investment were different. The PSR erroneously reasons that at trial the evidence showed that "the C-1 and C-2 investors received the same information from Theranos before they invested[.]" PSR Addendum ¶ 7. This is simply incorrect. *E.g.*, 9/2/22 Hr'g Tr. 28:15-21 (gov't arguing different investors heard different information). For example, none of the C-1 investors who testified at trial were provided financial models, while the C-2 investors whose representatives testified at trial were provided such models.

The trial record made clear that this is *not* a case where all investors received the same information or spoke to the same people, nor did their investments happen at the same time. Some investors spoke with Ms. Holmes, some didn't. Some investors received financial models, some didn't. Some investors received demonstrations of the proprietary technology that Theranos was developing, some didn't. Some conducted extensive due diligence, some didn't. Some invested multiple times over many years, some invested once. Some anticipated forming a broader business or strategic partnership with Theranos, some didn't. Some had detailed and privileged information about the company because they were members of the Board of Directors, some didn't. Because the circumstances of each investment were different, and because different investors received different information, the

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

32

government has not shown and cannot show that each of the transactions that it has identified, much less all transactions from 2010 through 2015, were part of a conspiracy to defraud investors. The jury's verdict confirms this understanding. While the jury found Ms. Holmes guilty of Counts 6, 7, and 8—each a specific and unique C-2 transaction that took place *in 2014*—the jury was unable to reach agreement on Counts 3, 4, and 5, which were separate C-1 transactions with different individuals under different circumstances that all took place in 2013. *See Executive Recycling, Inc.*, 953 F. Supp. 2d at 1146 ("The fact that the jury only convicted Defendants on half of the fraud counts shows that it carefully considered the evidence related to each Count and the customer named in that Count and, in the process, clearly determined that the Government's evidence was adequate with respect to some customers, and lacking with regard to others."). In situations like this one, each transaction must be considered on its own merits.

To be clear, even the convictions for wire fraud do not satisfy this standard. Unlike its current burden in connection with proving loss under § 2B1.1, at trial the government was not required to prove causation or reliance as to any particular investment in order to prove wire fraud. *United States v. Holmes*, No. 5:18-CR-00258-EJD-1, 2021 WL 2044470, at *30 (N.D. Cal. May 22, 2021) ("Causation is not an element of wire fraud that the Government must prove."); Holmes 10/26/21 Tr. 4609:12 ("We don't need to prove reliance.") (gov't argument). Additionally, at trial, the government did not introduce *any* evidence regarding the vast majority of the individuals and entities listed on the government's spreadsheet—much less information about the circumstances of their investment, any representations made to them, or what they relied on in choosing to invest.

A review of the government's spreadsheet itself makes plain the problem with assuming that any C-1 or C-2 investor was a person who suffered loss as a result of a material misstatement by Ms. Holmes. As noted, the proof at trial addressed only a handful of the investments made by particular outside investors. But the government's spreadsheet includes investments from persons with substantial knowledge about the company, including board members and outside counsel. The spreadsheet identifies investments from entities associated with at least four Theranos Board Members—Richard Kovacevich, David Boies, Riley Bechtel, and Henry Kissinger. None of these individuals testified, and

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

no evidence was presented regarding the circumstances of their investments.  But all of these individuals had access to special information, including privileged information, that was not available to other investors.  Indeed, David Boies and his law firm Boies, Schiller & Flexner LLP, represented Theranos and Ms. Holmes as outside counsel (including in intellectual property matters, such as efforts to protect Theranos' trade secrets, and in interactions with regulators).[10]  While the trial record contains passing references to certain other investors, such as Andreas Dracopoulos, there was no evidence whatsoever about why either of those individuals chose to invest.  And some investors on the government's list made or offered to make additional investments in the company well after the alleged fraud was revealed, such as Mr. Bechtel and Cox Investment Holdings, Inc.

*Second*, the nature of the investment opportunity further explains why a specific showing as to each investor is necessary.  Theranos was a start-up company with limited operating and commercial history.  It also was a privately held company with securities that never traded on a public market and it did not issue market-wide statements.  Investors expressly acknowledged at the time of their investment that the opportunity was unique and speculative in nature, that there were serious risks of investing in the company, that the financial projections were speculative and unreliable, and the investors were themselves sophisticated actors. *See, e.g.*, TX 3530 at 7-8, §§ 4.3, 4.4, 4.5, 4.6.  It cannot be assumed that all of the sophisticated, wealthy investors who knew about these risks but proceeded to invest anyway would say that they relied on projections they previously affirmed in writing were inherently speculative—if they received financial projections at all.  As recent events have revealed, the reasons why sophisticated investors invest in an enterprise may have nothing to do with the representations made by a company, and instead be driven "more by vibes and grievances than due diligence."  Charlie Warzel, "Elon Musks's Texts Shatter the Myth of the Tech Genius," *The Atlantic* (Sept. 30, 2022)[11]; *see id.* ("Looking at these texts, it seems much easier to understand Andreessen Horowitz's recent $350

---

[10] Whether the amount attributed to Boies Schiller is even appropriately considered an investment is a further question.  The firm was paid for its legal work in part through shares and in part through cash.

[11] *Available at* https://www.theatlantic.com/technology/archive/2022/09/elon-musk-texts-twitter-trial-jack-dorsey/671619/.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

million investment in WeWork founder Adam Neumann's new real-estate start-up, or [Samuel] Bankman-Fried's admission that most venture-capitalist investments are not 'the paragon of efficient markets' and driven primarily by FOMO and hype. 'Like, all the models are made up, right?' he infamously told *Bloomberg* last April.").

Rather than relying on a government-created spreadsheet, the loss calculation requires a showing that each investor the government contends suffered loss received and relied on the fraudulent misrepresentations alleged in the indictment. If the government fails to make that showing, the loss cannot be counted. The government did not present sufficient information to the Office of Probation to make that showing, and the trial record does not supply it.

### 3. The Entirety of Each Investment Is Not An Appropriate Measure of Loss and the Government Has Not Shown a Reasonable Estimate by Clear and Convincing Evidence or a Preponderance of the Evidence.

Ms. Holmes also objects to calculating loss based on the entire amount invested by any purported victim-investor, as the PSR does, because the investments retained considerable and indisputable value well after the purported fraud was revealed. This changes the nature of the analysis under § 2B1.1. "The Guidelines do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007). The law distinguishes between the loss calculation involving investments in a "sham" company, in which a security is "literally worthless after the fraudulent scheme is exposed," and the loss calculation involving an "otherwise legitimate company." *Id.* at 719. In the case of an otherwise legitimate company, "because the stock continues to have residual value after the fraudulent scheme is revealed, the court may not assume that the loss inflicted equals the full pre-disclosure value of the stock; rather, the court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes." *Id.*; *see also United States v. Hussain*, No. 16-cr-00462-CRB-1, 2019 WL 1995764, at *4-6 (May 6, 2019) (analyzing complexity of calculating loss for a wire fraud related to investments in an otherwise legitimate company that was overvalued as a result of the fraud).

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

35

1      This case fits into the latter type: Unlike a Ponzi scheme, Theranos was a real company—a fact

2   which the government does not dispute.  *See* Holmes 9/8/21 Tr. 553:7-8 (gov't opening).  It developed

3   valuable, innovative technology (assays, hardware, and software), including inventions and

4   advancements that were recognized as innovative by the United States Patent & Trademark Office.  It

5   had real commercial relationships and provided real services to customers.  The investments were not

6   used to line Ms. Holmes' pockets or those of anyone else; to the contrary, the investments went toward

7   the company's mission to make health information more accessible.

8      For these reasons, it would be legally incorrect to assess the loss as the entire amount invested in

9   this case, as the PSR does.  *See Zolp*, 479 F.3d at 719.  Instead, the Guidelines suggest an appropriate

10  measure can be "[t]he reduction that resulted from the offense in the value of equity securities or other

11  corporate assets."  U.S.S.G. § 2B1.1 cmt. n.3(C)(v).  Calculating loss in such a circumstance is complex,

12  even impossible to do with any reasonable degree of certainty at this point given the backward-looking,

13  assumption-driven nature of such an analysis.  But there are indicators of substantial value in the

14  company.

15     Theranos developed a highly valuable intellectual property portfolio over time.  As of the second

16  half of 2017, the value of that intellectual property was assessed by multiple outside parties to be at least

17  in the hundreds of millions of dollars, and potentially over one billion dollars.  In 2017, an outside law

18  firm, Perkins Coie, performed an analysis of Theranos' patent portfolio to "see if there was an

19  opportunity to use it for licensing and whether the portfolio had significant value."  Ex. A at 82 (T.

20  Carroll Ltr. at 1).  The lawyer who led that charge explains the breadth of the portfolio in both number of

21  assets and different technologies: the team "discovered that Theranos had more than 1200 patent assets

22  across the globe" and "a vast number of patents in the Theranos patent portfolio were directed to

23  invention other than a testing machine," including real-time influenza detection and patents "that solved

24  technical problems related to aspects of blood testing."  *Id.* at 82, 83 (T. Carroll Ltr. at 1, 2).  "Theranos

25  had scores of inventions like these that were valuable on their own, even if they were never successfully

26  aggregated into a full and accurate testing machine."  *Id.* at 83 (T. Carroll Ltr. at 2).  Ultimately, Perkins

27  Coie prepared a series of analyses, in the form of PowerPoint presentations, which valued the potential

28

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

36

1   licensing opportunities for various subsets of patents and various potentially infringing companies.  One

2   such presentation dated August 2017 showed licensing opportunities at between $700 and $800 million

3   based on a small subset of Theranos' large asset portfolio and the products of eight companies.  Ex. G at

4   46 (Overview of Theranos' IP Assets and Near-Term Licensing Opportunities).  Notably, all of the

5   patents assessed in that presentation were issued by the end of 2014.  *Id.* at 9-15.[12]

6       An outside counterparty also valued Theranos' patent portfolio at several hundred million

7   dollars.  In November 2017, with Theranos in distress after two years of unrelenting public criticism,

8   Fortress Credit Corporation agreed to give a loan of $100 million in cash to Theranos, secured by the

9   value of the patent portfolio.  Ex. I (Term Sheet) at Dynasty003471-72.  Fortress had done its own

10  independent due diligence on the patent portfolio and "believe[d] that Theranos' patents are

11  foundational patents in the POC [Point of Care] field."  Ex. J (Fortress investment analysis) at SEC-

12  DEPO-004683.  A Fortress executive testified under oath in a separate proceeding that Fortress would

13  have expected to receive a return on its investment in the event Theranos defaulted and Fortress took

14  ownership of the patents, Ex. K (E. Levy Dep. Tr.) at 29:12-31:14; the return targeted by the Theranos-

15  related investment fund was "two to three times the money invested at a rate of return of about 25

16  percent," *id.* at 90:2-24; and Fortress "will not do the deal unless it meets certain return criteria," *id.* at

17  92:24-25.  *See also* Ex. A at 74 (F. Bonanni Ltr. at 3).  Other outside analyses also indicated that

18  Theranos' device had the potential to generate a substantial return.  Ex. A at 261 (D. Tschirhart Ltr. at 1)

19  ("Near the end, we had an independent third party consultant evaluate the business case for the machine

20  as it actually was and they concluded it would generate a billion dollars in revenue in the first ten

21  years.").[13]  In fact, "[t]he technology and clinical concepts that Theranos[] championed are becoming a

22  reality today."  Ex. A at 128 (Dr. Evans Ltr. at 1).

23

24

―――――――――

25      [12] Perkins Coie completed analyses that included additional patents and additional potentially
    infringing products identified an even greater potential revenue amount.  *See* Ex. H (2018 CIM with
26  cover email cc'ing Perkins Coie), at Slides 83-103.

27      [13] The C-2 investors, including RDV, approved the Fortress loan from Theranos' side in
    November 2017.
28
    MS. HOLMES' SENTENCING MEMORANDUM
    CR-18-00258 EJD

Theranos also had hundreds of millions of dollars cash on hand several months after the alleged fraud was revealed.  On April 17, 2016, six months after the *Wall Street Journal* had begun publishing articles on Theranos and two and half months after CMS's report on Theranos' laboratory became public, Theranos had over $367 million in cash on hand.  TX 5172 at col. JQ, row 16.  After Walgreens announced it was terminating the relationship with Theranos in June 2016, Ex. L, Theranos still had over $334 million of cash on hand, TX 5172 at col. JZ, row 16.

The government acknowledges both the complexity of assessing the company's value and the substantial value in the company through its commission of an expert report ("the Saba Report") that argues the total loss to all C-1 and C-2 investors as somewhere between $237 and $316 million.  *See* Ex. M (Saba Report) ¶¶ 15, 120-21.  In coming to that opinion, the Saba Report argues that the true value of the C-1 and C-2 investments at the time they were made was 58% to 71% of what investors paid for them—far from a worthless investment.  *See id.*  In other words, even under the government-commissioned analysis, Theranos was an extremely valuable company and a majority of that value was not the product of fraud.  (The PSR does not address the Saba Report, though it was provided to the Probation Officer and was discussed in Ms. Holmes' objections to the Draft PSR.)

But even a cursory read of the Saba Report makes clear that it still overstates the loss.  The Report's effort to assign a value to the investments is flawed, inherently speculative, and unreliable.  The Report does not establish a "reasonable estimate of the loss" by clear and convincing evidence or even a preponderance of the evidence such that the government can meet its burden.  § 2B1.1 cmt. n.3(C).  Several examples highlight why that is the case.  *First*, the use of a loss range of nearly $100 million—which cuts across § 2B1.1(b)(1) loss levels—cannot reflect a reasonably determined loss amount.  *See Hussain*, 2019 WL 1995764, at *5 (rejecting government's proposal of a loss range as sufficient because "a range is not an amount" and the "staggeringly large range" of a billion dollars does not meet the standard for a loss "reasonably … determined").  That the Saba Report could not reach a specific amount confirms the futility of this project.  *Second*, the valuation of a private company with limited operational history is inherently theoretical and speculative.  That is demonstrated by the Saba Report, which considers a variety of potential approaches and lacks a single defined and accepted

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

methodology.  The constraints on valuing a non-public start-up company is not a problem unique to Theranos, but is inherent within the entire venture capital industry.  *See* Gompers et al., *How Do Venture Capitalists Make Decisions?*, 135 J. Fin. Econ. 169, 170-71  (2020) ("The paucity of historical operating information and the uncertainty of future cash flows makes VCs' investment decisions difficult and less like those in the typical setting taught in MBA finance curricula.").  *Third*, the report overstates the loss because it does not include the value of intellectual property that could be achieved through licensing. *See supra* pp. 36-37 (discussing value of patent portfolio).  *Fourth*, the report calculates the loss to investors as a whole when that must be addressed on an investor-by-investor basis, as discussed above.

To be clear, it is the government's burden to prove loss, and *not* Ms. Holmes' burden to disprove it.  Even courts that have expressed a view that a defendant's conduct was "brazen" have declined to find loss where the government has failed to prove it.  For example, in *United States v. Block*, the court noted that the defendant, the Chief Financial Officer of a publicly traded real estate investment trust, had "brazenly" inflated values "by simply making up numbers to plug a gap that resulted from what would have been a proper calculation of the company's numbers." Dkt No. 169 at 68, No. 16-cr-595 (S.D.N.Y. Dec. 4, 2017) (Sentencing Tr.).  The court nevertheless determined that the government had failed to prove the $300 million loss it sought, declined to apply the loss enhancement, and gave the defendant an 18-month sentence in view of, among other things, the defendant's personal circumstances, the complex circumstances surrounding the offense, and the court's view that a longer sentence would not meaningfully affect general deterrence.  *Id.* at 68-72.

Because total invested amount is an inappropriate measure of loss, and because the government has failed to meet its burden of proof under an alternative reasonable estimate, another approach must be considered.

### 4.    Gain To Ms. Holmes As An Alternative Measure

Where loss amount cannot be reasonably estimated, the Guidelines indicate that the proper measure is gain to the defendant from the offense.  U.S.S.G. § 2B1.1 cmt. n.3(B); *see Hussain*, 2019 WL 1995764, at *7 (calculating gain as the premium on the stock that the defendant owned and sold).  Here, the appropriate measure of gain is $0.  Ms. Holmes never sold any of her equity in the company.  Ms.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

Holmes received a total of $1,546,025.37 in salaried compensation over the six years from 2010 through 2015. *See* Ex. N (E. Holmes Interrogatory Resp. in *Partner Investments, L.P. v. Theranos, Inc.*) at No. 8. But as the *Hussain* court pointed out, salaried compensation in a case where the company was engaged in legitimate business activities presents challenges because the Court may only include gain that "resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(B); *Hussain*, 2019 WL 1995764, at *6-7. Here, the government has not proven and cannot prove that Ms. Holmes' salary resulted from the offense conduct as opposed to the legitimate activities of Theranos.

### 5.    If the Court Accepts the PSR's Calculation of Loss, A Downward Departure is Warranted Under Section 2B1.1, Application Note 21(C).

If the Court finds that the PSR's calculation of loss is correct, Ms. Holmes moves for a downward departure based on the fact that the offense level resulting from the application of this Guideline "substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1 cmt. n.21(C). In his recommendation, the Probation Officer notes: "It is the undersigned's opinion that the guideline range is drastically overrepresented based solely on the amount of financial loss, which carries a 30-level increase." PSR Sentencing Recommendation at 2. For that reason, as well as the reasons described in Sections III(A)(1) and IV(A), many complex circumstances surround the offense conduct which causes the PSR's loss calculation to overstate the seriousness of the offense. Indeed, applying *all* of the other enhancements the PSR applies, but not the loss enhancement, the resulting offense level is 13, which puts the resulting Guidelines range at 12-18 months.

### B.    Ms. Holmes Objects to the Calculation of the Number of Victims.

The PSR erroneously includes a 2-level increase pursuant to § 2B1.1(b)(2) based on the number of alleged victims. PSR ¶ 106. "The Guidelines do not … allow a district court to 'estimate' the number of victims to enhance a sentence under § 2B1.1(b)(2)." *United States v. Showalter*, 569 F.3d 1150, 1160 (9th Cir. 2009). A "victim" under § 2B1.1 is a person (including corporations) "who sustained any part of the actual loss determined under subsection (b)(1)." § 2B1.1 cmt n.1.

For the reasons the government cannot show loss pursuant to § 2B1.1(b)(1), it also cannot prove that there were ten or more "victims" as defined by § 2B1.1. The Addendum to the PSR explains that its

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

1   calculation of the number of victims relied on the same spreadsheet discussed above.  *See supra* Section

2   III(A)(2); PSR Addendum ¶ 7.  For the reasons discussed above, that approach is flawed.  Even

3   assuming that every victim impact statement provided by an individual or entity who invested between

4   2010 and 2015 satisfies the elements for proving a "victim"—which it does not—only eight such entities

5   that are included on the government's spreadsheet have submitted statements claiming to be victims:

6   PFM, RDV Corp., the Shultz Great Grandfather Trust, Hall Group, Alan Eisenman, Cox Investment

7   Holdings, Inc., Crofton Capital, and Gordon Family Trust.  Because § 2B1.1 defines a victim as a person

8   who suffered actual loss pursuant to § 2B1.1(b)(1), Ms. Holmes objects to any calculation of victims

9   that does not meet the standards discussed above with respect to loss.

10       **C.      Ms. Holmes Should Not Receive a 4-Level Increase for Her Role.**

11       Ms. Holmes objects to the PSR's upward adjustment of her offense level based on her role in the

12   offense pursuant to U.S.S.G. § 3B1.1.  PSR ¶ 108; PSR Addendum ¶ 22.  This adjustment only applies if

13   the defendant "was an organizer or leader of a criminal activity" and that criminal activity "involved five

14   or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  Theranos was not a criminal

15   enterprise, the PSR has not identified more than two participants who were at most co-equals, and the

16   criminal activity was not "otherwise extensive."

17       **1.      Ms. Holmes Was Not a Leader of "Criminal Activity."**

18       Section 3B1.1 cannot be applied merely because Ms. Holmes was the CEO of or had decision-

19   making authority within *Theranos*.  As the Guideline makes clear, the leadership position at issue in the

20   rule is leadership in criminal activity, not merely leadership in a company.  U.S.S.G. § 3B1.1(a) (stating

21   adjustment may apply to "organizer or leader of a criminal activity").  "[T]o sustain a finding that a

22   defendant was an organizer or a leader, there must be evidence that the defendant exercised some

23   control over others involved *in the commission of the offense* [or was] responsible for organizing others

24   for the *purpose of carrying out the crime*."  *United States v. Avila*, 95 F.3d 887, 889 (9th Cir. 1996)

25   (emphasis added) (internal quotation marks omitted).  There is no dispute Theranos was a "real

26   company" with legitimate commercial activities.  Holmes 9/8/21 Tr. 553:7-8 (gov't opening).  The fact

27   that Ms. Holmes had some decision-making authority for aspects of the *company* or that she was a

28   MS. HOLMES' SENTENCING MEMORANDUM
    CR-18-00258 EJD

hands-on CEO of the *company* is not a sufficient basis to apply the adjustment.  *See* PSR Addendum ¶ 22 (explaining that the enhancement was applied because Ms. Holmes was "a 'hands-on' CEO who was always present at the company, and Ms. Holmes even said, 'The buck stopped with her.'").

### 2. The Adjustment Does Not Apply Because Ms. Holmes Was Co-Equal or Less Responsible Than Her Co-Defendant, the Other "Participant."

Additionally, Ms. Holmes did not have a higher level of responsibility than other participants in the alleged crime, i.e., Mr. Balwani.[14]  "This adjustment is included primarily because of concerns about relative responsibility."  U.S.S.G. § 3B1.1 cmt. background.  Thus, where the record demonstrates that the criminally responsible participants were "co-equal," the adjustment does not apply.  *United States v. Holden*, 908 F.3d 395, 402 (9th Cir. 2018) (finding organizer adjustment was inapplicable when record demonstrated that participants were "co-equal").  While at some points the government has taken the position that Ms. Holmes and Mr. Balwani "controlled Theranos as equals," Holmes 9/8/21 Tr. 552:23-553:5 (gov't opening), in its case against Mr. Balwani it argued that Mr. Balwani had outsized influence on Ms. Holmes, Balwani 6/24/22 Tr. 7652:9-17 (gov't rebuttal), and Mr. Balwani was convicted of every count in the applicable indictment.  It is undisputed that there were areas of the company for which Mr. Balwani and not Ms. Holmes had primary responsibility, such as the Clinical Laboratory Improvement Amendments ("CLIA") laboratory, the Walgreens relationship, and the financial projections that went to the investors—all of which were central to the government's allegations.  Under the government's positions at *either* trial, the adjustment does not apply to Ms. Holmes.  Without sufficient evidence that Ms. Holmes had a higher level of responsibility for criminal activity such that she could be said to be a leader, the adjustment cannot apply.  For this reason, the alternative identified in the Addendum to the PSR—that the two-level adjustment under § 3B1.1(c) might apply instead—is also not supported by the record.  PSR Addendum ¶ 22.[15]

---

[14]"A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted.  A person who is not criminally responsible for the commission of the offense . . . is not a participant." U.S.S.G. § 3B1.1 cmt. n.1.  The PSR does not identify any other "participant" in the crime beyond Mr. Balwani.

[15] Additionally, Ms. Holmes neither profited from the offense nor is at risk of committing an offense in the future, both concerns expressed by the comments to the Guidelines.  *See* U.S.S.G. § 3B1.1

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

### 3. The "Otherwise Extensive" Provision Does Not Apply.

The PSR's conclusion that the fraud "involved 5 or more participants or was otherwise extensive" is based on three potential arguments: (1) the number of people employed by and scope of activities of the company, (2) the size of the investments, and (3) the number of victims. *See* PSR ¶ 108; PSR Addendum ¶ 22. As to the first, the PSR errs because it relies on the activities of a legitimate enterprise, as opposed to focusing on the *criminal* activity (alleged misstatements to investors), and identifies no participant in that activity other than Ms. Holmes and Mr. Balwani. The second and third arguments, meanwhile, present a number of issues. For one, finding the conduct "otherwise extensive" based on the loss and number of victims infects this enhancement with the problems identified above in Sections III(A) and (B). Additionally, even if the number of victims and the loss amount were correct (which they are not), using the number of victims or loss amount to justify the adjustment would constitute double-counting. The PSR already includes adjustments for both the loss amount and the number of victims involved in the crime. Moreover, even if those factors could be considered, they should not be the sole basis for applying the adjustment because neither of those factors have anything to do with relative responsibility—the purpose of this adjustment. *See* U.S.S.G. § 3B1.1 cmt. background ("Th[e] adjustment [of § 3B1.1] is included primarily because of concerns about relative responsibility. . . . [I]t is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it . . . ."); *see also United States v. Egge*, 223 F.3d 1128, 1133 (9th Cir. 2000) ("Section 3B1.1 attempts to apportion *relative* responsibility where an offense involves multiple participants . . . ." (emphasis added)).

### D. Ms. Holmes Should Receive Credit for Acceptance of Responsibility Pursuant to U.S.S.G. § 3E1.1(a).

Ms. Holmes should receive a two-level credit for "clearly demonstrat[ing] acceptance of responsibility for [her] offense." U.S.S.G. § 3E1.1(a); *see* PSR ¶ 112; PSR Addendum ¶ 24. Ms. Holmes maintains her innocence with respect to fraud and exercised her Constitutional rights—an

---

cmt. background ("[I]t is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate.").

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

exercise that was plainly warranted given her acquittal on Counts 2 and 10-12 and the lack of a conviction on Counts 3, 4, and 5.  But both before she was charged and repeatedly during the trial, she made extensive efforts to uncover and acknowledge responsibility for errors made by her or the company, including with respect to issues the government has argued were criminal.

In response to criticisms that began in late 2015, Ms. Holmes embarked on a broad, resource-intensive effort to bring outside voices into Theranos and to identify, acknowledge, and correct errors or missteps, and restructure the company as appropriate.  Testimony, documents, and letters to the Court from reform-era Board members, employees, and consultants describe some of these efforts.  *See, e.g.*, Ex. A at 97 (T. Cooper Ltr. at 2).

- **Reconstituted Board:**  In 2016, Mr. Balwani left the company and Ms. Holmes reconstituted the Board of Directors in response to criticisms that its members lacked appropriate knowledge.  The new Board included physician and former head of the CDC Dr. William Foege (who had been on the Board previously); former Amgen senior executive Dr. Fabrizio Bonanni, who had expertise in medical devices; and technology industry executive Daniel Warmenhoven, who was asked to join the Board to help Ms. Holmes by a Board member who was retiring for medical reasons.  All three members of that reconstituted Board of Directors have written letters in support of leniency.  Ex. A at 72 (F. Bonanni Ltr.), 135 (W. Foege Ltr.), 269 (D. Warmenhoven Ltr.).

- **Scientific and Technical Advisory Boards:**  Ms. Holmes invited into the company new advisory boards whose members consisted of outside experts.  Dr. Susan Evans (no relation to Billy Evans), who has spent her career in diagnostics product development and technology assessment, was a member of the new Scientific and Medical Advisory Board.  She observes that "when the SAB was created in 2016 to help the company, I found a CEO who took ownership of previous missteps and shortfalls, and genuinely sought advice, input and guidance from advisors." Ex. A at 128 (Dr. Evans Ltr. at 1); *see* Ex. A at 136 (W. Foege Ltr. at 2) ("[Ms. Holmes] had outside experts spend time at the Theranos facility.  She allowed them to talk to anyone.  She allowed those experts to inspect the hardware, and make suggestions.").  Dr. John Moalli, who was a member of the Technical Advisory Board (also formed around the same

time), notes: "As a member of the TAB, I found that Elizabeth received advice openly and was constantly looking to fix things she recognized had been done incorrectly." Ex. A at 203 (J. Moalli Ltr. at 2).

- **New, Experienced Staff Focused on Compliance and Quality Control:** "Elizabeth hired additional staff with extensive diagnostic industry experience in engineering, assay development, and quality systems, and worked to establish a culture based on a quality management system." Ex. A at 128 (Dr. Evans Ltr. at 1); *see* Ex. O (July 2016 Press Release). One of those consultants observes: "During my committee involvement, Ms. Elizabeth Holmes was thoroughly engaged, wanted to learn and make improvements at Theranos.  She embraced our recommendations, worked hard to implement the recommendations, and understood what went wrong previously.  I felt her openness to continuous improvement was adopted within the company and was extremely helpful in making rapid changes and continuous improvements." Ex. A at 265 (M. VanTrieste Ltr.); *see also* Ex. A at 187 (B. Liptzin Ltr.) ("She did not avoid difficult conversations and demonstrated an understanding and care about doing the right thing.").  Dr. Bonanni reiterates: "As the board committee and the newly hired executives developed the quality system and compliance program, Elizabeth Holmes absorbed the relative concepts rapidly, as a sponge, and became their champion serving as a role model for the rest of the organization." Ex. A at 73 (F. Bonanni Ltr. at 2).

- **New, Experienced Laboratory Directors to "Turn Over Rocks":**  Theranos hired new laboratory directors, Dr. Kingshuk Das and Dr. Donald Tschirhart.  Ms. Holmes gave them the imprimatur to "turn over rocks," to look into errors and make any and all needed corrections, with her full support—reporting, for the first time in the company's history, to Ms. Holmes directly.  Holmes 11/10/21 Tr. 5933:18-20, 5996:12-18, 5997:1-3 (testimony of laboratory director Dr. Das).  Ultimately, Theranos shut down its clinical laboratory business and refocused its work on the small sample technology.

- **Openness with the Scientific Community:**  Theranos made efforts to explain and share its inventions with the scientific community.  In August 2016, Ms. Holmes presented the miniLab to

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

a hostile audience at the American Association of Clinical Chemistry conference.  TX 7673A.[16]

Additionally, Theranos worked to publish papers on its research.  *E.g.*, TX 7695, TX 7717, TX 7718, TX 7719.

Ms. Holmes' recognition, acknowledgement, and assumption of responsibility of her mistakes as Theranos' CEO were central to her reform efforts.  She took public personal responsibility for Theranos' failings as early as April 2016—more than two years before her indictment—in an interview with NBC News correspondent Maria Shriver.[17]  She told Ms. Shriver: "I feel devastated that we did not catch and fix these issues faster."  And when asked directly by Ms. Shriver what she held herself responsible for, Ms. Holmes said: "I'm the Founder and CEO of this company.  Anything that happens in this company is my responsibility at the end of the day."  She did the same in her SEC testimony, before her indictment in this case.  *See* Ex. T (SEC Tr.) at 347:12-13 ("I was the CEO of the company, so I take responsibility for this company."); *id.* at 353:12-13, 353:19-22, 620:22-621:2, 689:19-20, 697:2-3.

Ms. Holmes also did the same on the witness stand in this case.  *See* Holmes 11/30/21 Tr. 8005:13-15 (testimony on cross-examination) ("Q. And you take responsibility for the company; is that your testimony?  A. I do.").  For example, with respect to the company's response to the *Wall Street Journal*'s 2015 investigation, Ms. Holmes told the jury repeatedly that she wishes Theranos had handled its interactions with specific employees, and the entire response to the *Wall Street Journal*'s inquiries, differently.  Holmes 11/30/21 Tr. 7973:17-18, 7978:23-25, 7998:13-15 (testimony of E. Holmes); *see also id.* at 8136:18 ("There are many things that I wish I did differently.").  Ms. Holmes also did not shy away from personally acknowledging her role in conduct that the government questioned.  For example, with respect to pharmaceutical reports, Ms. Holmes testified about her own role in affixing pharma company logos to the reports, and also acknowledged she wishes she had handled it differently.  *Id.* at 8140:13, 8155:5-7; *see* Holmes 11/23/21 Tr. 7479:2-10.

---

[16] This presentation is available at https://www.youtube.com/watch?v=n6JRG733ReQ&t=1s (last accessed Oct. 20, 2022).

[17] The video of that interview is available at https://www.today.com/video/theranos-ceo-elizabeth-holmes-i-m-devastated-about-blood-test-issues-43442757745 (last accessed Sept. 25, 2022).

Letters from Ms. Holmes' friends and family make clear that in her personal life she regularly acknowledges her errors with sincere reflection and remorse. *See, e.g.*, Ex. A at 268 (J. Walker Ltr. at 1) ("Her contrition is real and appreciable"), 271 (Y. Yu Ltr. at 1) ("Liz showed more introspection and remorse than what I'd personally witnessed in any other failed founder, and I had seen many in my decade of investing."), 143 (K. Gavrieli Ltr. at 1), 140 (S. Freeman Ltr. at 2), 148 (K. Goldman Ltr. at 1), 160 (S. Heuser Ltr.), 197 (S. Mantri Ltr.), 250 (D. Sterling Glasband Ltr. at 3).

Ms. Holmes' efforts to root out and fix mistakes as well as her consistent acknowledgement of responsibility and errors should be considered acceptance of responsibility in this case. A defendant is not required to accept the government's view of every fact in a complex case—especially when the government's view is at odds with the facts—or give up her constitutional rights in order to receive credit for her sincere recognition of errors and remorse. *See* U.S.S.G. § 3E1.1 cmt. n.2. Ms. Holmes' actions prior to and at trial and in her personal life are well within the spirit of § 3E1.1.

## IV.  18 U.S.C. § 3553(a) SUPPORTS SUBSTANTIAL LENIENCY FOR MS. HOLMES.

The Court's task in sentencing is to identify and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Although the Sentencing Guidelines are the starting point for the calculation of an appropriate sentence, a district court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Instead, the Court "must make an individualized assessment based on the facts" of each case, recognizing that a within-Guidelines sentence may be greater than necessary to serve the purposes of sentencing. *Id.*; *Kimbrough v. United States*, 552 U.S. 85, 91 (2007); *see United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) ("Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors."). If the Guidelines calculation in a given case results in an "inordinate emphasis" on "putatively measurable quantities," like financial loss, a court should focus more on the statutory factors set forth in 18 U.S.C. § 3553(a) to determine an appropriate sentence. *United States v. Adelson*, 441 F. Supp. 2d 506, 509-12 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x. 93 (2d Cir. 2008). Indeed, the Court "may

vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101.

The Court must make an assessment of what sentence is reasonable based on all the factors, including: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the purposes of sentencing, including the need for deterrence and to protect the public; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) any relevant policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).  "[T]he amount by which a sentence deviates from the applicable Guidelines range is not a measure of how 'reasonable' a sentence is.  Reasonableness is determined instead by the district court's individualized application of the statutory sentencing factors."  *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall*, 552 U.S. at 46-47).  These factors support a sentence with no to minimal incarceration.

## A.       The Nature and Circumstances of the Offense Strongly Support Leniency.

Ms. Holmes has been convicted of defrauding certain sophisticated investors who knew they were investing in a company with a big, world-changing dream and substantial potential that had not yet been, and might never be, realized.  Far from a house of cards, Theranos was well on its way to achieving its mission: it was a technology company that developed substantial, innovative technology over its fourteen-year life through the research and development efforts funded by investments and performed by Theranos' many qualified, brilliant scientists and engineers.  Ms. Holmes, whose first real job was CEO of this company she founded at 19, was all-in on the company's mission to increase access to health information: she worked constantly, never sold any stock, and remained firmly committed to the company's mission until the company's end.  For the reasons discussed below, the circumstances of the offense strongly support a lenient sentence.

### 1.       The Offense Conduct Occurred Within a Unique World of Investments in Start-Up Companies.

Theranos was never a public company.  It had limited operational history and had never paid dividends to its shareholders.  Both Theranos and the offense conduct are best understood through the

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

1   lens of a Silicon Valley start-up company. That is the environment in which Theranos was founded, in

2   which it was built, and in which investors decided whether and how much to invest. Theranos had

3   massive potential, but its success was uncertain—even highly unlikely, in light of the overall odds for

4   start-ups.[18] The company and Ms. Holmes faced the typical challenges that confront such companies

5   and their inexperienced CEOs. No one is arguing these factors excuse fraud, but they do situate the

6   offense conduct in context, as § 3553(a) requires.

7           It is common sense that investing in any uncertain venture brings with it substantial risk.

8   Investors know that is especially true with investments in startups, the majority of which fail. Tim

9   Draper is a venture capitalist with 35 years of experience whose company backed some of Silicon

10  Valley's greatest technology success stories and was an early investor in Theranos. Ex. A at 112 (T.

11  Draper Ltr. at 1). Mr. Draper makes the simple observation that some companies succeed and some fail.

12  *Id.* David Sokol, an experienced venture capital investor who has built and led several companies,

13  including for Berkshire Hathaway, echoes that sentiment: "Through my career, I have invested in

14  venture capital transactions which have been failures and successes." Ex. A at 239 (D. Sokol Ltr. at 2).

15  He goes on to explain that because a venture investment usually relies on estimates of the business's

16  value *if* it succeeds, "[v]enture capital is inherently very risky investing and often only 1 out of 10 such

17  investments prove successful. The reason is obvious in that most venture capital ideas are attempting to

18  do something never before tried or achieved." *Id.* Yinne Yu, an investor in early-stage companies,

19  similarly observes: "A few of my first-time founders made it; most did not. . . . Even with the best of

20  intentions, all can go wrong." Ex. A at 271 (Y. Yu Ltr. at 1). Alex Moore, also a venture capitalist,

21  agrees: "90% of my 'bets' (they are bets, nothing is certain) fail and go to 0. This is expected." *Id.* at

22  206 (A. Moore Ltr. at 2).

23          Academic research supports these points: "On average, seven out of ten portfolio companies will

24  not return even the money invested in those startups; the majority will need to be written off. . . . Two

25

26  _____

27      [18] *E.g.*, Patel, Neil, "90% Of Startups Fail: Here's What You Need to Know About the 10%,"
    *Forbes*, Jan. 16, 2015, *available at* https://www.forbes.com/sites/neilpatel/2015/01/16/90-of-startups-
    will-fail-heres-what-you-need-to-know-about-the-10/?sh=559e79966792 (last visited 11/7/2022).

28  MS. HOLMES' SENTENCING MEMORANDUM
    CR-18-00258 EJD

are expected to return enough to cover all the losses; the third to provide the 20 to 30 percent internal rate of return (IRR) investors [in a venture fund] anticipate."  Hassan, Kama et al., "The Pervasive, Head-Scratching, Risk-Exploding Problem With Venture Capital*, Institutional Investor*, at 1 (Sept. 29, 2020).  Venture capitalists "are keenly aware of [the] asymmetrical return distribution" in which the results of a portfolio are explained by the performance of a minority of the stocks—in particular, the small number of winners.  Nicolas Rabener, "Portfolio Construction in Venture Capital," *Harvest*, at 3 (May 24, 2021).  Well-established investment theories explain why (even in an efficient capital market) a sophisticated investor may choose to include a high-risk investment like venture investing in a Silicon Valley startup as part of a broader portfolio of assets.  *See* B. Raasch & W. Cafero, 58 N.Y.U. Annual Institute on Fed'l Taxation § 22.02 (2022) ("adding a riskier asset class . . . could actually reduce the risk of a portfolio").

"All but the most naïve of investors know there are risks that go along with potential rewards of investments."  Ex. A at 67 (L. Blue Ltr. at 2).  Theranos did not seek investments from naïve investors, but it nevertheless made sure that investors understood and could take on the risks that came with investing in it.  *Cf.* Ex. A at 101 (M. Crane Ltr. at 2) ("We were certainly aware of the risks involved as in any such venture, and having weighted those risks, we were comfortable in the amount we invested. . . . We believe no one should invest more than they are prepared to lose.").  To that end, investors expressly acknowledged at the time of their investment that the opportunity was unique and speculative in nature, that there were serious risks of investing in the company, that the projections were unreliable, and the investors were themselves sophisticated actors.  TX 1505 §§ 4.3, 4.4, 4.5, 4.6.

Ms. Holmes' conduct should also be considered in the context of this world, and filtered through her role as a young, first-time founder without independent business experience.  Venture investors, advisors, and founders describe the unique challenges faced by a founder and CEO and the unique perspective required to bring a new venture to success.  "Inventing the future is hard.  Founders are called upon to strike the incredibly difficult balance between painting a picture of the world as it could be, and as it actually is."  Ex. A at 81 (J. Carr Ltr. at 1); *id.* at 217 (J. Orr Ltr. at 2) (noting the "delicate balance" involved in seeking investments).  "The CEO and founder must carry the torch of the vision

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

50

through every obstacle and terrain and protect its flame from naysayers, doubters, and challengers day in and day out to create an environment for innovation to take hold." Ex. A at 143 (K. Gavrieli Ltr. at 1).

Set against that backdrop is the role that optimism and lack of experience play in business challenges faced by start-up founders, who may not anticipate the setbacks. "Most first-time founders are visionary but naïve about how to build a business and how long it takes to build a business"— especially the latter. Ex. A at 271 (Y. Yu Ltr. at 1). "For example, recently one of my companies gave me a set of financial projections to review before fundraising. I cut the numbers by over 50% because I see operational hiccups that the first time CEO doesn't yet have the foresight to see." *Id.*; *see* Paul A. Gompers et al., *How Do Venture Capitalists Make Decisions?*, 135 J. of Fin. Econ. 160, 181 (2020) ("VCs report that fewer than 30% of the companies meet projections."). Dr. Susan Evans, a member of Theranos' Scientific and Medical Advisory Board (SMAB) beginning in 2016, has spent her career in product development and technology assessment in the diagnostics industry. She writes: "I have met many young entrepreneurs who have a dream and many if not most, oversell what they have, and when it will be ready for market. This optimism is what often drives innovation, and the development of new products that go beyond what is the norm." Ex. A at 128 (Dr. Evans Ltr. at 1); *see also id.* at 112 (T. Draper Ltr at 1) ("Venture-backed startup companies often announce and deliver products to the market before they are ready.").

These challenges are only compounded for female founders, as letters by female founders explain in sharing those writers' experiences. For example:

> Liz and I attended some of the same entrepreneurship events in Silicon Valley while she was at Theranos. These events often featured panels and fireside chats, where prominent people in business would make the case that a key reason less than 2% of venture capital goes to women is because female founders don't present bold enough visions. The advice at these conferences was to picture what massive success would look like in 5 or 10 years, and sell *that* vision, because *that's* what male founders were doing, and *that's* what venture capitalists expect to see. When I think back on my younger days as a CEO, I was frequently told that my financial projections were too conservative.

Ex. A at 250 (D. Glasband Sterling Ltr. at 3). Likewise:

> Speaking as a woman who has raised $60M in venture capital, I can confirm it is not easy. It is not easy for anyone, but I feel it's worth noting that approximately 3% of venture capital goes to women CEOs. The only scientific evidence I have

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

51

encountered between men and women when it comes to raising capital is that men are more frequently asked about opportunities and women are more frequently asked about risks.

Ex. A at 131 (J. Ewing Ltr. at 2).  "The nuanced elements of Elizabeth being a female CEO cannot be overstated."  Ex. A at 182 (J. Lamping Ltr. at 3); *see also id.* at 145 (A. Goldberg Ltr. at 1).

While they do not excuse fraud, these perspectives provide useful context for the circumstances of the offense conduct, as § 3553(a) requires.  First, they provide relevant context for the aspirational way Ms. Holmes spoke to investors: as she explained when she testified, Ms. Holmes was frequently speaking about projects Theranos was working on, ambitions, and the next generation device.  Holmes 11/19/21 Tr. 7238:22-25; Holmes 11/23/21 Tr. 7619:22-7620:3, 7623:19-23; Holmes 12/8/21 Tr. 8586:11-14; Holmes 11/29/21 Tr. 7912:12-7914:11.  Industry context and expectations help place Ms. Holmes' focus on the company's vision and future in its environment and explain how such efforts were perceived by Ms. Holmes as focusing the conversation on what investors in Silicon Valley startups expect to and were asking to hear from her.  They also help explain why she may have viewed a proactive detailed discussion of risks and uncertainties as less important to sophisticated investors investing in her company who would have been used to seeing failure in the vast majority of startup companies.  Second, the challenges that inexperienced CEOs have in setting financial projections and anticipating operational hurdles provide additional context for Ms. Holmes' reliance on Mr. Balwani to create and convey financial models that investors appropriately understand and to run Theranos' operations.  Third, they contextualize the challenges that surround making statements about the expected course of the development and commercialization of new technology, which could be set back by scientific, regulatory, and operational hurdles that a new CEO may not see.

### 2. Theranos Developed Innovative Technology and Provided Real Services to Real Customers in Furtherance of Its Mission to Improve Access to Healthcare.

Also crucial to understanding the nature and circumstances of the offense is the fact that Theranos "was a real company."  Holmes 9/8/21 Tr. 553:7 (government opening).  This was not an empty vehicle for Ms. Holmes' gain.  Money that was invested went into the research and development and operations of the company with real results.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

### a.    Theranos developed real, valuable technology.

Theranos spent most of its efforts developing products and improving the products it had developed.  Financial records show that the majority of the company's funds were spent on research and development and operations.  Holmes 9/14/21 Tr. 780:13-781:18 (testimony of Theranos controller S. Spivey).  Theranos also built and improved its sophisticated manufacturing capabilities in California to have the infrastructure to build its inventions as products.  The technology Theranos invented can be broadly categorized into three categories:

- Assays:  Assays include the chemicals and processes for testing blood samples for particular substances.  Theranos developed hundreds of small sample assays over its many years of research and development, and also developed the ability to manufacture the chemicals in-house.

- Hardware:  This set of technology included the various versions of Theranos Sample Processing Units ("TSPU"), as well as the small sample collection device (called the nanotainer) and various other hardware and components that Theranos developed to perform analysis of blood, urine, swabs, and other samples (and to complete other tasks).  Between 2010 and 2015, the time period at issue here, Theranos was working to build, perfect, and continuously improve its 4-series TSPU (the minilab), which had the capability to run a host of different types of assays at once.  Theranos submitted an application for approval of this device and one blood test to the FDA in 2014, and the FDA approved that application in 2015.  Theranos planned to put the 4-series TSPU into operation when a sufficient number of assays were approved.  Other hardware inventions, including other versions of the TSPU, were also developed.

- Software: Theranos' software developments included medical recordkeeping software, laboratory applications, diagnostic tracking, patient- and doctor-specific applications, and infectious disease modeling.

*See generally* Ex. H (2018 CIM) (describing some assay, hardware, and software inventions Theranos had developed).

The company obtained hundreds of patents in the United States and across the world covering many of its inventions.  *See* Ex. A at 82 (T. Carroll Ltr. at 1); Ex G at 3 (Overview of Theranos' IP

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

Assets and Near-Term Licensing Opportunities).[19]  The company chose to protect other innovative breakthroughs as trade secrets.  Holmes 11/23/21 Tr. 7584:6-7585:19 (testimony of E. Holmes).  To receive such protection under California law, Theranos was required to make "efforts that are reasonable under the circumstances" to ensure the continued secrecy of its technology.  Cal. Civ. Code § 3426.1(d)(2).  Theranos employed common methods, including nondisclosure agreements, security measures, limiting knowledge to "need to know," and legal enforcement of breaches of nondisclosure agreements.  *See* 1 Melvin F. Jager, Trade Secrets Law §§ 5:21, 5:26, 13:3 (2022); 1 Roger M. Milgrim & Eric E. Benson, Milgrim on Trade Secrets § 1.04 (2020).

> **b.  Theranos was on its way to achieving its mission to make health information more accessible through its commercial activities.**

The company also executed real contracts and provided real services to real customers.  In its early years, it worked with 10 pharmaceutical companies.  TX 7742 at 6-7; TX 7753.  Many of the pharmaceutical companies praised what Theranos had developed.  Theranos also ran studies in conjunction with leading academic medical institutions, including the Mayo Clinic.  TX 7742 at 6, 7.  It ultimately formed retail partnerships with Walgreens and Safeway in 2010 and, beginning in fall 2013, offered tests to customers in retail stores.  TX 372 (Walgreens); TX 387 (Safeway); TX 12464 (noting November 2013 public launch).

Theranos worked toward its goal of making health information more accessible through a number of different avenues.  Making the process of drawing blood more comfortable and humane, including by drawing smaller samples, was one.  Advocating to allow patients to order their own tests directly, without a doctor's visit, was another.[20]  Working to bring the lab testing equipment to retail

---

[19] The United States has continued to issue patents on which Ms. Holmes is an inventor based on Theranos' inventions after Ms. Holmes was indicted and, indeed, after her conviction. In the past four years, nearly 100 U.S. patents have been issued on Theranos' inventions.  At least 15 have been issued this year, with the most recent issued on July 12, 2022.  *See* Ex. B (U.S. Patent No. 11,385,252 B2).

[20] Theranos worked with Arizona legislators on a law that would allow patients to order their own blood work without a doctor's prescription.  The goal was to give patients control over their own health information and to ensure that patients were not prevented from doing so because they did not have access to, or could not afford, a visit with a primary care physician.  Ms. Holmes testified to lawmakers in support of that law.  The Arizona legislature passed the law nearly unanimously and HB

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

54

locations was a third.  While Theranos' brand symbol became the small sample collection device known as the nanotainer, Theranos learned that what was most important to patient-consumers was *cost*.  In that arena, Theranos was revolutionary: Theranos offered tests at substantially lower prices than the industry leaders; it offered the same price to insured and uninsured patients; and it posted the prices on its website—a practice that was unusual at the time.  Theranos' offering was so groundbreaking with regard to cost that customers *flew from other states* to get their blood tested at Theranos, and still paid less (including airfare) than what they would have paid to the industry incumbents.  Ex. U at 1 ("[Bot Anecdote] Mother and daughter came from California for a day to visit there [*sic*] Dr. and he sent them here for labs because at Quest Diagnostics the labs were $2,400 (she showed me the print out of the cost!) and they paid $177.00 and $192.00.  With there [*sic*] plane tickets, taxi, and labs they spent a total of 300.00 they said.  That isn't even half of what there [*sic*] labs would have been.  They were so thankful and love everything about Theranos[.]"); *see also* Ex. V, Ex. W.  The vast majority of Theranos' tests were processed using FDA-approved machines and processes.  All tests were processed in government-certified Theranos laboratories.  Customers raved about the experience in feedback provided to Ms. Holmes.  *See, e.g.*, Ex. U at 50 ("The main reason I went was because of the cost.  I am often sent a high bill for my bloodwork with insurance.  When I got there, the service was fast, the ladies were super and professional and I must say, it was the best experience I have ever had.  Plus, no bruising whatsoever!  I will continue going there for my bloodwork from now on and thank you!").

### c.       Theranos employed hundreds of employees.

These technological and commercial accomplishments were the work of hundreds of individual members of the community employed by Theranos over its life.  Investments in Theranos also paid the salaries of the many brilliant, talented, and committed members of the Theranos employee family working to achieve its mission.  As former employees describe, Ms. Holmes was personally invested in the well-being of these individuals and their families, and took their personal circumstances and professional accomplishments seriously.  *See* § II(A)(3), *supra*.

---

2645 went into effect on July 1, 2015.  *See* https://apps.azleg.gov/BillStatus/BillOverview/66902.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

1

2

### d. Theranos' technology and operations involved scientific and regulatory complexity.

3

4   Theranos operated in a space that involved serious scientific and regulatory complexities—

5   challenges that were known or knowable to investors through public research, beyond the information

6   they got from Theranos (if any).  Ms. Holmes did not work to address these complexities alone.

7   Company scientists—all more highly educated and experienced than she was—reported on the state of

8   the technology, including successes, efforts to resolve challenges, and response to criticisms or questions

9   from those now considered whistleblowers.  The company worked through regulatory questions and

10  solutions with sophisticated partners and experienced outside lawyers.  And policies and procedures

11  were also in place.  None of this is to say that Theranos operated without error; it is simply context to

12  understand (i) that Ms. Holmes did not sit at the top of a company that simply implemented her

13  commands and (ii) that Ms. Holmes understood there were teams and processes in place to address

14  issues.  This ambitious venture was full of the complications that come with launching any business,

    with the added complexities of scientific advancement and government regulatory schemes.

15      One regulatory challenge was how Theranos and its retail partners would operate the testing as a

16  practical matter.  Early in the retail partnerships, the parties had envisioned putting Theranos devices in

17  retail locations.  Those partners and Theranos soon recognized the potential regulatory barriers to that

18  approach—namely, a risk the devices might need to be FDA-approved or each retail location would

19  need to be certified as a high-complexity CLIA laboratory—and shifted the rollout strategy.  Theranos

20  and Walgreens agreed that Phase I of the company's retail operations would involve shipping samples

21  back to certified central CLIA laboratories and Phase II, putting Theranos devices in retail locations,

22  would occur once the Theranos devices had been FDA-approved.  As a result of this shift, during Phase

23  I, because the samples were being shipped to the Theranos laboratory for processing, the device used for

24  testing a sample was less important to the commercial project than the experience customers had in

25  stores.  Theranos shared the details of this strategic plan with the FDA shortly after it publicly

26  announced its partnership with Walgreens.  TX 7751 at 2, 3.[21]

27  ───────────────
    [21] Walgreens understood that Theranos had commercial equipment and would run samples
28  requiring venipuncture "on a traditional lab test machine or perhaps outsourced to a lab" and that such

**MS. HOLMES' SENTENCING MEMORANDUM**
CR-18-00258 EJD

56

1       Laboratory testing is also highly regulated.  By 2015, Theranos had two laboratories certified by

2  authorities in California and Arizona (working under the authority of federal agency CMS (Centers for

3  Medicaid & Medicare Studies)).  Those laboratories, which were staffed with qualified employees,

4  processed blood samples collected at retail locations (such as the Walgreens locations).  The vast

5  majority of the eight million-plus test results produced by Theranos were generated on FDA-approved

6  methods[22]; tests performed on lab-developed methods had been validated under appropriate standards,

7  with validation reports signed by a qualified laboratory director.  *See* Holmes 9/28/21 Tr. 1990:12-18,

8  1991:3-13, 2087:15-18, 2621:17-21 (testimony of lab director Dr. A. Rosendorff).  Ms. Holmes, who

9  does not have a college degree, was not qualified to and did not process patient samples.  Nor did she

10  determine what methods were appropriate for patient use.  *Id.* at 1986:23-1987:13, 1991:6-13, 2087:1-18

11  (testimony of Dr. Rosendorff).

12       In addition to being highly regulated, blood testing is scientifically complex.  Laboratory testing

13  has inherent imprecision and imperfections.  Even FDA-approved tests can produce inaccuracies for a

14  particular patient at a particular time.  Government regulations indicate that test results can be

15  considered "accurate" even if they differ from a target by large percentages.  *See, e.g.*, TX 7603 at

16  § 493.931 (criteria for acceptable performance of HDL is plus or minus 30%), § 493.933 (criteria for

17  acceptable performance of hCG is plus or minus three standard deviations), § 493.941 (criteria for

18  acceptable performance of platelet count is plus or minus 25% of the target).  Every test has some

19  expected inaccuracy rate, as its associated FDA labeling information makes clear.  Ex. P (FDA label for

20  FDA-approved HIV assay) at 12.  Even among well-accepted testing methodologies, different

21  measurement procedures can lead to different results that are difficult to compare.  *See* Myers, Gary L.

22  &W. Greg Miller, *The International Consortium for Harmonization of Clinical Laboratory Results*

23

---

24  samples "would not be run on the Edison."  Ex. X (W. Miquelon testimony in AZ litigation) at 237:13-

25  238:9.  Walgreens also had physical possession of an Edison machine for its own use.

26       [22] For example, patient E.T.'s blood test for HIV, which forms the basis of acquitted Count 10, was performed using FDA-approved methods and following the CDC's recommended testing algorithm.

27  TX 14259; *see* Holmes 9/29/21 Tr. 2264:18-20 (testimony of Dr. Rosendorff).

28  MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

*(ICHCLR) – a pathway for harmonization*, 27 The Journal of the International Federation of Clinical Chemistry and Laboratory Medicine 30, 30 (2016) ("A basic problem in laboratory medicine is that different laboratory measurement procedures that intend to measure the same measurand may give different results for the same specimen.").  And for some tests the risks of inaccuracy are common enough that physicians' groups recommend against giving the test in many circumstances because the risks of an inaccurate test outweigh the benefits.  *E.g.*, Holmes 11/18/21 Tr. 6879:20-6880:7, 6881:3-6; Ex. Q (TX 12332, American College of Physicians Statement re: PSA).  Additionally, even companies that make FDA-approved assays sometimes produce faulty chemicals or errant calculations that lead to erroneous results.  *E.g.*, Ex. R (Siemens HbA1C), S (Siemens Estradiol).  Whether and why any particular laboratory test result is incorrect is a deeply technical scientific issue.  These scientific complexities provide context for the impact that any anecdotal potential errors and inaccuracies that were brought to Ms. Holmes' attention may have had on her own beliefs in the state of Theranos' laboratory when she spoke to investors.

> **e.      Theranos' wide-ranging operations presented both promise and challenges.**

In addition to the scientific and regulatory complexities, Ms. Holmes' lack of prior executive or operational experience created challenges as Theranos grew.  Without a disciplined operational approach, Theranos' operations became scattered and overburdened as the company tried to achieve all of its potential use cases concurrently.  For example, at the same time that Theranos began rolling out its retail offering, the company was also working on several other projects for different phases of the company, including working to scale manufacturing operations and designing technology for low cost testing in developing countries.  Additionally, Theranos had a number of other projects that aligned with its broader mission: it was exploring infectious disease testing and tracking projects with international aid organizations, and it put millions of dollars of resources into customizing and improving its devices for potential future military use.  Over the course of 2016, when Ms. Holmes narrowed the company's operational focus at the suggestion of experienced executives and Board members she brought in, the company returned to being a manageable endeavor, though it then faced other challenges.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

\*                \*                \*

The very real assets and commercial operations of Theranos, combined with the serious complexities of its business, made the company's financial health and upcoming challenges all more difficult to understand, measure, and communicate—especially for a first-time CEO with vision and determination but no business experience.  One employee who worked at Theranos from 2013 through 2018 describes how Ms. Holmes grew as a leader as she started to understand the challenges that faced Theranos:

> I observed Elizabeth mature during this time and develop a deeper appreciation for the importance and quality of interim milestones towards end objectives.  She made necessary changes that broadened responsibilities and decentralized decision-making while also holding individual leaders to a higher accountability standard.  Elizabeth made difficult leadership changes in the later stages of the company's life and surrounded herself with individuals that were proven capable of navigating the organization under such challenging and complex conditions.  While she remained committed to the purpose and vision, she realized the importance and need to shift the approach and strategy based on changing assumptions and circumstances.

Ex. A at 97 (T. Cooper Ltr. at 2).

### 3. The Company Retained Substantial Value Even After the Alleged Fraud Was Revealed.

Although difficult to measure with precision, there is no question that Theranos had substantial value, both at the time of the investments at issue and after the revelation of the fraud.  As discussed above, *see* Section III(A)(3), *supra*, Theranos was not a worthless investment after alleged misstatements were brought to light.  To the contrary, the company had valuable intellectual property, substantial cash and capital goods, and a product with FDA approval for one assay, with more applications and technology in the pipeline.  *See* Section III(A)(3), *supra*.  The fact that Theranos had and retained substantial value is a mitigating factor with respect to the seriousness of the offense.

### 4. The Circumstances Show Ms. Holmes To Be a Founder and CEO Deeply Committed to the Company's Mission, Rather Than Her Own Personal Gain.

Ms. Holmes' actions showed her to be a selfless CEO focused on the success of the company and its mission, and not on increasing her own wealth.  As the Court knows, Ms. Holmes did not personally

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

1   profit from the investments Theranos received, never sold any of her stock, and was, as Dr. Bonanni

2   described it, a "selfless CEO."  Additionally, Ms. Holmes' actions in the wake of criticism that began in

3   late 2015 show a CEO interested in identifying errors, fixing them, and learning from them—not

4   running from them.  She did not flee the enterprise when the company faced criticism.  To the contrary,

5   as described in section III(E), above, Ms. Holmes embarked on a broad, resource-intensive effort to

6   bring outside voices into Theranos and to identify, acknowledge, and correct errors or missteps, and

7   went down with the ship when the company shuttered.  Ms. Holmes' extensive efforts in this regard are

8   relevant to consider when weighing the circumstances of the offense, especially given her youth and the

9   fact that her role as CEO of Theranos was her first business experience.  The fact that Ms. Holmes was

10  not motivated by personal gain or greed is a mitigating factor under § 3553(a)(2).  *See, e.g.*, *United*

11  *States v. Prosperi*, 686 F.3d 32, 50 (1st Cir. 2012) (affirming district court's sentence, including based

12  on finding that the defendants had not "sought to enrich themselves"); *United States v. Connors*, 2007

13  WL 2955612, at *3 (E.D. Pa. Oct. 9, 2007) (considering as a mitigating factor the fact that the defendant

14  was "motivated by a desire to save the company and to save the jobs of its employees," in contrast to

15  "greed and pure personal gain," which "are usually the driving force for many, if not most, fraud

16  offenders").

17          **5.      Because of Their Extreme Focus on Loss, the Guidelines Are Unhelpful in
18                    Fashioning a Fair, Just, and Reasonable Sentence.**

19          As described above, *see* Section III(A), the PSR's Guidelines Calculation is driven principally by

20  the alleged loss it attributes to the offense conduct pursuant to § 2B1.1, which quintuples the offense

21  level and dramatically increases the Guidelines range.  As noted above, the PSR's calculation of the

22  Guidelines is erroneous.  But in the event the Court finds the government has proven loss under § 2B1.1,

23  the Court should decline to impose any sentence primarily driven by the calculation of loss.

24          First, because of the high loss amount alleged by the government and the PSR, this is the type of

25  case where the impact of the loss enhancement means that the Guidelines fail to "provide reasonable

26  guidance," and are of no "help to any judge in fashioning a sentence that is fair, just, and reasonable."

27  *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir.

28  MS. HOLMES' SENTENCING MEMORANDUM
    CR-18-00258 EJD

2008).  "For the small class of defendants... convicted of fraud offenses associated with very large

guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a)

and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of

diminished value to sentencing judges." Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider*

*Frauds After* Booker, 20 Fed. Sent'g Rep. 167, 168 (2008).  Across the country, judges seem to agree:

the Sentencing Commission's own data shows that there is an "increasing divergence between the

average Guidelines minimum and the average sentence actually imposed as loss amount grows."  Mark

H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar*

*Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 22 (2013); *see* Jillian Hewitt, *Fifty*

*Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 Yale L. J. 1018, 1025 (2016)

(concluding that review of the post-*Booker* sentencing data "empirically corroborate[d] scholarly

criticism that the loss table often vastly overstates the seriousness of an offense").  Indeed, the Probation

Officer's own opinion that the loss guideline leads to a "drastic[] overrepresent[ation]" of the

appropriate sentencing range in this case serves to emphasize the point.  PSR Sentencing

Recommendation at 2.

Second, more generally, the loss guideline does not bear the weight the Sentencing Guidelines

give it.  Under § 2B1.1, in any modern white-collar case, loss has an inordinate and inappropriate effect

on the calculation of a Guidelines sentence that flies in the face of the statutory considerations in 18

U.S.C. § 3553(a).  The loss table "frequently produces arbitrary and unduly severe sentences for two

related reasons": (1) loss is "defined so broadly that it can produce lifelong sentencing ranges for

defendants who neither cause much economic harm nor derive much economic benefit from their

crimes" and (2) "the loss table's enhancements are so large that, in practice, they dwarf other potentially

more relevant considerations."  Hewitt, 125 Yale L.J. at 1032, 1033.  As result, like with narcotics

sentences, "[s]omewhere between 50 and 70 percent of the Sentencing Guidelines calculation . . . is

based on a single factor[.]"  Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should Be Scrapped*,

29 Fed. Sent'g Rep. 226, 227 (2017).  "But it should be obvious that in a great many, perhaps most,

cases,  . . . the amount of the loss does not fairly convey the reality of the crime or the criminal."  *Id.*

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

61

1    "By making a Guidelines sentence turn, for all practical purposes, on this single factor, the . . .

2    Commission  . . . . effectively guaranteed that many such sentences would be irrational on their face."

3    *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012); *see also United States v. Johnson*,

4    2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018); *United States v. Parris*, 573 F. Supp. 2d 744

5    (E.D.N.Y. 2008).  As a result, "[t]he higher the loss amount, the more distorted the guideline's advice to

6    sentencing judges."  *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J.,

7    concurring).  These issues are compounded by the fact that the loss Guideline "was not developed by the

8    Sentencing Commission using an empirical approach based on data about past sentencing practices."  *Id.*

9    at 379; *see id.* at 380 (describing the history of amendments to the Guideline and noting that "[t]he

10   history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed").

11           As Judge Rakoff has observed:

12           Where the Sentencing Guidelines provide reasonable guidance, they are of considerable
             help to any judge in fashioning a sentence that is fair, just, and reasonable. But where, as
13           here, the calculations under the guidelines have so run amok that they are patently absurd
             on their face, a Court is forced to place greater reliance on the more general considerations
14           set forth in section 3553(a), as carefully applied to the particular circumstances of the case
             and of the human being who will bear the consequences.
15

16   *Adelson*, 441 F. Supp. 2d at 515; *see also id.* at 509 (Guidelines place an "inordinate emphasis" on

17   "putatively measurable quantities, such as . . . the amount of financial loss in fraud cases," but they have

18   failed to "explain[] why it is appropriate to accord such huge weight to such factors."); *Corsey*, 723 F.3d

19   at 380 ("[T]he low marginal utility of the guideline in this very high intended loss case should have

20   prompted greater, not lesser, reliance on the section 3553(a) factors other than the Guidelines.").  Ms.

21   Holmes urges the Court to focus on the § 3553(a) factors that allow the Court to engage in the "uniform

22   and constant" exercise "in the federal judicial tradition" of  "consider[ing] every convicted person as an

23   individual and every case as a unique study in the human failings that sometimes mitigate, sometimes

24   magnify, the crime and the punishment to ensue."  *Koon v. United* States, 518 U.S. 81, 113 (1996).

25           **B.     Ms. Holmes' Personal History and Characteristics Strongly Support Leniency.**

26           "[I]f ever a [person] is to receive credit for the good [she] has done, and [her] immediate conduct

27   assessed in the context of [her] overall life hitherto, it should be at the moment of [her] sentencing, when

28   MS. HOLMES' SENTENCING MEMORANDUM
     CR-18-00258 EJD

[her] very future hangs in the balance." *Adelson*, 441 F. Supp. 2d at 513-14.  Described by over [130] different letters as a compassionate, honest, and humble woman with much to give the world and a deep commitment to doing so, Ms. Holmes' personal history and characteristics (outlined in section II, above) strongly counsel against a lengthy incarceration.  "Anyone who knows Liz recognizes that she is a genuine and generous person who cares deeply for those around her," someone to rely on "for an honest opinion, words of encouragement, and a selfless interest in [their] life and well-being."  Ex. A at 198 (N. Mason Ltr.).

Ms. Holmes asks the Court to consider the words of those who know her when weighing the importance of § 3553(a)(1) in this case, including on the following points:

- Ms. Holmes is no danger to the public.  She has no criminal history, has a perfect pretrial services compliance record, and is described by the people who know her repeatedly as a gentle and loving person who tries to do the right thing.

- Ms. Holmes is deeply devoted to her partner and son, and plays an integral and irreplaceable role in their lives.

- Ms. Holmes has lived her life with a purpose to change the world for the better, on scales large and small.  These basic qualities motivated her in founding and leading Theranos, and they continue to shine in the way she lives her life today.  She is the person her friends turn to when they need support, regardless of what is going on in her life.

- Ms. Holmes lives with this kindness, purpose, and selflessness despite significant personal trauma that occurred before and during the time period of the offense, and from which she is still recovering.

- Friends and family note with admiration that she has handled her indictment and trial with grace and without expressing and indeed discouraging ill-will towards the prosecutors who seek to incarcerate her, the media that has vilified her, or those who have been unwilling to stand by her. *E.g.*, Ex. A at 121 (W. Evans Ltr. at 1); *id.* at 157 (J. Hamilton Ltr. at 2).

Additionally, the letters are striking in showing how Ms. Holmes wholeheartedly commits to the things that matter to her—today, the people she loves and the service work she cares about.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

63

1    Courts in other cases have exercised their discretion to impose non-Guidelines sentences based

2    on the personal characteristics of the defendant.  *E.g.*, *United States v. Gupta*, 904 F. Supp. 2d 349, 353

3    (S.D.N.Y. 2012) (premising downward variance, in part, on defendant's "big heart and helping hand,

4    which he extended without fanfare or self-promotion, to all with whom he came in contact"); *Adelson*,

5    441 F. Supp. 2d at 513 (premising downward variance, in part, on letters from "persons from all walks

6    of life . . . attesting, from personal knowledge, to [defendant's] good works and deep humanity," his

7    "generosity of spirit," and his "integrity and generosity").  Similar considerations are present here.  Ms.

8    Holmes' mother "beg[s] you to see her goodness, her unique circumstances and her promise."  Ex. A at

9    39 (N. Holmes Ltr. at 10).

10   ### C.    Incarceration Is Not Necessary to Afford Adequate Deterrence or Protect the Public.

11

12   The needs "to afford adequate deterrence to criminal conduct" and "protect the public from

13   further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(B)-(C), are not served by a custodial sentence

14   for Ms. Holmes.

15   ### 1.    Incarceration Is Not Necessary for Specific Deterrence.

16   Incarceration is not necessary to either protect the public from Ms. Holmes or to deter her from

17   committing future offenses.[23] Ms. Holmes is not a danger to society.  She has been out of custody, with

18   a perfect pretrial services record, for more than four years.  PSR ¶ 195.  And there is no reason to believe

19   she would commit another fraud—or that she will ever be in a position to do so.  Ms. Holmes has readily

20   and repeatedly acknowledged the many mistakes she made while serving as CEO of Theranos—in

21   interviews, *see* n.17, *supra*; to the SEC, Ex. T (SEC Tr.) at 347:12-13, 353:12-13, 353:19-22, 620:22-

22   621:2, 689:19-20, 697:2-3; on the witness stand in front of the jury, *e.g.*, Holmes 11/30/21 Tr. 8005:13-

23   15; and to friends and family, *see* p. 47, *supra*.

24   "Elizabeth understands what has been lost."  Ex. A at 129 (Dr. Evans Ltr. at 2).  Ms. Holmes has

25   suffered the consequences of the offense daily for years, in ways large and small.  She has been formally

26

27   ---

[23] Social science research makes clear that "across all offenders, prisons do not have a specific deterrent effect."  Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S, 60S (2011).

28   MS. HOLMES' SENTENCING MEMORANDUM
     CR-18-00258 EJD

penalized for her mistakes in other forums—through the administrative state by CMS and by this Court

in connection with her settlement with the SEC.  Ms. Holmes spent her entire adult life building

Theranos until its collapse—a personal and public failure she feels deeply.  *E.g.*, Ex. A at 25, 26 (C.

Holmes Ltr. at 13, 14).  Beyond that failure and loss of this company she loved so much, eight years of

investigations and lawsuits have taken their toll.  Having never cashed in on the value of Theranos to her

own benefit, Ms. Holmes has incurred substantial debt from which she is unlikely to recover.  *See* PSR

¶¶ 165-166; Ex. A at 243 (D. Sokol Ltr. at 6).  She is unable to get a job and was prevented from

investing what money she did have when her trading accounts were repeatedly closed by financial

institutions as a result of her indictment.  PSR ¶ 165.  She has lost personal friendships to the process

surrounding investigations, lawsuits, and lawyers, Ex. A at 6-7 (B. Evans Ltr. at 6-7), and it is difficult

to make new ones, *id.* at 274 (C. Zygourakis Ltr. at 2).  Her conviction also brings with it so-called

"civil death," the operation of the "[m]yriad laws, rules, and regulations" which prevent the reintegration

of offenders into society, even after they have served their sentence.  *United States v. Nesbeth*, 188 F.

Supp. 3d 179, 180 (E.D.N.Y. 2016) (internal quotation marks omitted); *id.* at 184-86 (describing the

"nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or

disadvantages on convicted felons" covering a "range of subject matter" that "can be particularly

disruptive to an ex-convict's efforts at rehabilitation and integration into society").

Moreover, the incessant drum of media criticism has ensured Ms. Holmes will be punished for

the rest of her life.  The Court is well aware of the unusually intense media attention on this case before,

during, and after Ms. Holmes' trial.  The coverage of her as a person is universally negative.  Portrayals

of Ms. Holmes are at best unflattering caricature and at worst dehumanizingly cruel.  Almost all depict

her—inaccurately, as the scores of letters submitted with this filing make clear—as unfeeling and self-

absorbed.  Even putting aside the fact that her appearance and voice are considered appropriate for

mockery (a gender-specific punishment), her worst personal traumas have been treated as appropriate

for derision as well.  Following Ms. Holmes' testimony about the psychological and sexual abuse she

endured at the hands of Mr. Balwani, one outlet ran a *humor* column in which the author wondered

whether she would have been able to comply with Mr. Balwani's demands.  Alexandra Petri, "Opinion:

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

I tried the Elizabeth Holmes schedule, and here is how it went," *Wash. Post* (Dec. 3, 2021), *available at* https://www.washingtonpost.com/opinions/interactive/2021/elizabeth-holmes-schedule-tried-myself/. Ms. Holmes will never be able to seek another job or meet a new friend without the negative caricature acting as a barrier.  She worries about how her notoriety affects friends and family—and those effects are meaningful.  *See, e.g.*, Ex. A at 7-8 (B. Evans Ltr. at 7-8), 38 (N. Holmes Ltr. at 9), 153 (C. Gualy Ltr. at 2), 122 (W. Evans Ltr. at 2).  Several letters describe how Ms. Holmes avoids friends' life events and social occasions because she does not want to be a distraction.  "I cannot overemphasize the degree to which Liz is ostracized by people who do not know her and the degree to which this social isolation has affected Liz, Billy, and their families."  Ex. A at 274 (C. Zygourakis Ltr. at 2).

Ms. Holmes has also suffered a substantial loss of privacy, despite her best attempts to stay out of the public eye and to respect the legal process around this case.  Mr. Evans describes the precautions he and Ms. Holmes have taken in furtherance of their own privacy and safety, from dressing in hats and glasses to using P.O. boxes for mail to living in private buildings or a secluded location.  Yet members of the press have taken dramatic steps to identify and publish Ms. Holmes' address, leading to cameras, visits from the press and the public (as well as a recent visit from a key government witness), and threats.  Ex. A at 7 (B. Evans Ltr. at 7).  Ms. Holmes and Mr. Evans have moved several times as a result.  *Id.*; PSR ¶ 135.  Threats are also ever-present online.

These forms of punishment, including the extrajudicial collateral consequences going well beyond "civil death" that Ms. Holmes will endure for the rest of her life regardless of her sentence, make clear why incarceration is unnecessary and unhelpful in achieving specific deterrence in this case.

### 2.  Incarceration Is Not Necessary for General Deterrence.

Nor does incarceration of Ms. Holmes serve the goal of general deterrence of crime.  Section 3553(a)(2)(B) "does not require the goal of general deterrence be met through a period of incarceration." *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (not unreasonable for district court to reject prison sentence to promote general deterrence; defendant sentenced to five years of probation with seven months of home confinement on Guidelines range of 27-33 months); *see also* S. Rep. No. 98-225, at 92 (1983) ("It may very often be that release on probation under conditions designed to fit the

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

particular situation will adequately satisfy any appropriate deterrent or punitive purpose.").  This makes

sense.  As the Department of Justice recognizes: "Sending an individual convicted of a crime to prison

isn't a very effective way to deter crime."  United States Department of Justice National Institute of

Justice, *5 Things About Deterrence* (2016), at 1; *see also* Mirko Bagaric, *A Rational Theory of*

*Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*,

62 Buff. L. Rev. 1159, 1205 (2014) ("[D]eterrence properly informs sentencing only to the extent that it

requires a hardship to be imposed for criminal offending.  It does not require a particularly burdensome

penalty, merely one that people would seek to avoid.").  While some courts take the view that some

period of incarceration serves the goal of general deterrence, "there is a considerable evidence that even

relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."

*Adelson*, 441 F. Supp. 2d at 514; *see* Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80

(2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective

enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from

being convicted, regardless of the penalty."); Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*,

23 S. Ill. Univ. L. J. 485, 493 (1999) (finding empirical research on general deterrence "inconsistent").

The intense media scrutiny on this matter does not change the dynamic.  *See* Biz Carson, "Guilty or not,

the Elizabeth Holmes verdict won't change Silicon Valley," *Protocol* (Dec. 21, 2021), *available at*

https://www.protocol.com/theranos-elizabeth-holmes-verdict-impact ("For Holmes, the verdict will have

obvious personal consequences, including the threat of up to 20 years of prison.  But for the rest of tech,

experts outside the Silicon Valley bubble say it's unlikely there will be some dramatic revelation or

change in behavior, regardless of the outcome.").[24]

---

[24] The Probation Officer's recommended sentence of 108 months appears to be primarily driven by a perceived need to serve the goal of general deterrence.  Respectfully, the research indicates that a much lower sentence would equally serve that goal, and the Court's statutory obligation is to impose a sentence "no greater than necessary" to serve the purposes of sentencing.

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

**D.  Just Punishment and Respect for the Law Are Not Served by a Lengthy Incarceration.**

Section 3553(a)(2)'s goals "to promote respect for the law" and "to provide just punishment for the offense" are likewise not achieved by the incarceration of Ms. Holmes.  "Where offenders appear to have been unfairly singled out, respect for the law and law enforcement suffers."  Frase, *Punishment Purposes*, 58 Stanford L. Rev. at 80.

The prosecutorial and cultural focus on punishing Ms. Holmes stands out.  As numerous letters observe, the decision to prosecute Ms. Holmes and the associated vilification of her stands in stark contrast to the treatment of other prominent entrepreneurs who have been accused in media of fraud.  *See* Ex. A at 131 (J. Ewing Ltr. at 2); *see also id.* at 221 (J. Pfeffer Ltr. at 2).  Take Adam Neumann, the founder of WeWork, who was accused of diverting millions of corporate assets for personal gain and walked away from his first company with hundreds of millions of dollars.  Mr. Neumann recently received a *$350 million investment* in his next venture.[25]  Even observers who believe Ms. Holmes was rightly the subject of prosecution cannot help but notice the discrepant treatment.[26]  And within the Theranos story, Ms. Holmes has borne the brunt of the vitriol despite the fact that many factors—some failures of judgment on her part, some simply the operational hurdles of a complex endeavor, and some no doubt the missteps of others—contributed to Theranos' failures.  The government's decision to charge Ms. Holmes personally with wire fraud in connection with Theranos' laboratory practices is one example of that singling-out, given the regulatory and personnel structures that governed Theranos' laboratory operations.  Its attempt to paint Theranos' trade secrets practices as nefarious when such practices are commonplace and required by law is another.  *See, e.g.*, 1 Melvin F. Jager, Trade Secrets

---

[25] *See* Sean Harper, "Adam Neumann Gets A $350 Million Do-Over and Diverse Entrepreneurs Barely Get a Start," Forbes (Aug. 16, 2022), *available at* https://www.forbes.com/sites/shaunharper/2022/08/16/entrepreneurial-inequity-is-exacerbated-with-new-investment-into-failed-wework-founder-adam-neumann/?sh=622add8243c5 (last accessed Nov. 8, 2022).

[26] Ellen Pao, "The Elizabeth Holmes Trial Is a Wake-Up Call for Sexism in Tech," *New York Times* (Sept. 15, 2021).

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

1   Law §§ 5.21, 5.26, 13.3; 1 Roger M. Milgrim & Eric E. Benson, Milgrim on Trade Secrets § 1.04
2   (2020).

3   **E.      Section 3553(a)(6) Supports a Downward Variance from the Guidelines.**

4          The "need to avoid unwarranted sentence disparities among defendants with similar records who
5   have been found guilty of similar conduct" counsels in favor of a below-Guidelines sentence.  18 U.S.C.
6   § 3553(a)(6).  In this district, the majority of defendants convicted of crimes for which the main
7   Guideline is § 2B1.1 have received below-Guidelines sentences.  Exs. Y-1, Y-2 (Sentencing
8   Commission Data Capture).  From 2015 through 2021, in this district, the median sentence for a
9   defendant convicted of fraud, with no criminal history, and in Zone D of the guidelines received a
10  sentence that included a term of incarceration of 24 months.  Ex. Z (Sentencing Commission Data
11  Capture).  The national statistics are similar.  Exs. AA-1, AA-2 (Sentencing Commission Data Export);
12  Ex. BB (Sentencing Commission Data Capture).

13         Even if the Court determines—over Ms. Holmes' objection—that the government has proven a
14  substantial loss, the Court would be in good and abundant company in varying downward from the
15  Guidelines range.  Given the numerous and duplicative enhancements that apply to cases driven by
16  § 2B1.1, courts frequently sentence defendants with high loss figures and no criminal history to
17  substantially below-Guidelines sentences.  For example:

18  • In February 2021, the COO of a publicly traded biopharmaceutical company was sentenced after
19     a trial guilty verdict on one count of wire fraud to 12 months in custody in light of the ongoing
20     economic hardship he would face in the future, his general good works, his comparatively lower
21     culpability than his codefendant, and the need for some prison time to address general
22     deterrence; the "[b]izarre, barbaric," and "absurd" Guidelines range was the statutory maximum
23     of 20 years (on an initial range of 262 to 327 months).  *United States v. Taylor*, 1:19-cr-00850-
24     JSR (S.D.N.Y.), Sentencing Tr., Dkt. 157, at 2.

25  • In November 2019, a hedge fund trader who was found guilty after trial of overinflating the
26     hedge fund's assets by $100 million was sentenced to 40 months' imprisonment; the government

27

28  MS. HOLMES' SENTENCING MEMORANDUM
    CR-18-00258 EJD

and the Probation Office had calculated a Guidelines range of 168 to 210 months. *See United States v. Shor*, 1:18-cr-00328 (S.D.N.Y.), Dkt. Nos. 297, 301.

- In November 2018, an individual who was convicted of securities fraud after trial in the District of Massachusetts, was sentenced to a term of six months' imprisonment where the government had calculated a Guidelines prison sentence of 63 to 78 months. *See United States v. Wang*, 1:16-cr-10268 (D. Mass.), Dkt. Nos. 346, 429.

- In October 2018, a former State Street executive who was convicted after trial of securities fraud, was sentenced to a term of 18 months' imprisonment; the government had calculated a Guidelines sentence of 14 to 17 years. *See United States v. McClellan*, 1:16-cr-10094 (D. Mass.), Dkt. Nos. 517, 520.

- In October 2018, a serial fraudster who committed additional crimes while awaiting sentencing after his fraud guilty plea, was sentenced to 72 months' imprisonment where the government calculated a Guidelines sentence of 188 to 235 months and the government requested a sentence of 15 or more years. *See United States v. McFarland*, 1:17-cv-00600 (S.D.N.Y.), Dkt. Nos. 63, 68.

- In May 2018, a defendant convicted at trial of four conspiracies, including conspiracy to commit bank fraud, and facing a PSR Guidelines range of life and a Court-determined Guidelines range of 97 to 121 months was sentenced to 32 months based on his otherwise exemplary life and relative role. *United States v. Atilla*, 1:15-cr-00867-RMB (S.D.N.Y.), Sentencing Tr., Dkt. 520.

Even in cases where the conduct at issue has centered around personal greed, defendants have received substantially below-Guidelines sentences based on the totality of the § 3553(a) factors. For example, in *United States v. Tuzman*, No. 1:15-cr-00536 (S.D.N.Y.), after a hard-fought case and trial, defendant Kaleil Tuzman was convicted of multiple different securities fraud and wire fraud schemes related to the publicly-traded company he founded and of which he served as CEO. The court found that the frauds were motivated by the defendant's desire to make the company an attractive acquisition target, "sell the company[,] and become fantastically wealthy." Sentencing Tr., Dkt. No. 1216, at 62. The guidelines range was 210-262 months. Based on his service work while on pretrial release, the lack of a criminal

record, and severe trauma he experienced in a Colombian prison after his arrest, the court sentenced him to time served. *Id.* at 66-67. In *United States v. Rowan*, No. 1:16-cr-10343 (D. Mass.), defendant Joseph Rowan was convicted after trial with respect to his role in a racketeering conspiracy to bribe doctors to prescribe Insys Therapeutics Inc.'s fentanyl spray and to defraud insurance companies. The government and probation calculated his Guidelines range at 324-405 months, and the government sought a sentence of 10 years. Dkt. No. 1064, at 1. The court calculated the Guidelines range at 135-168 months and imposed a sentence of 26 months' imprisonment, noting that the defendant had otherwise lived a "good life and a respectful life" marked by "real decency." Sentencing Tr., Dkt. No. 1167, at 40.

Ultimately, the touchstone of this factor is the idea of treating defendants who are found to have committed similar crimes similarly. It is nearly impossible to do that here given the unique circumstances of the offense—the sophisticated investors investing in a non-public, novel technology company with limited history seeking to change a complex, established industry and the indisputable value of that company regardless of the offense conduct—and of Ms. Holmes—her intent to do good, her lack of greed, her commitment to fixing her errors, and her positive personal qualities. "Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).

**F.     Section 3553(a)(7) Does Not Counsel In Favor of Incarceration.**

The potential need for restitution in this case should not weigh in favor of incarceration, for at least three reasons. First, this is not a case where restitution would be required to return vulnerable victims to their proper status. Theranos did not solicit investments from members of the general investing public or from vulnerable and unsophisticated parties. To the contrary, Theranos' investors were required to represent that they were sophisticated, that they understood the limited operating history and uncertain future of the company, and that they could afford to lose their entire investment without suffering financial harm. Second, although she did not personally benefit from the investments, Ms. Holmes took dramatic and meaningful steps to give value to her investors following the *Wall Street*

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

*Journal*'s investigation—including several at her own personal expense and risk. Those included offering to give up ownership, actually giving some of her shares to investors, and settling with those who sought to bring civil claims; transferring her liability insurance coverage proceeds back to Theranos in order to conserve company assets, rather than saving that policy for her own future legal fees; and involving investors (including RDV) in decisions such as whether to agree to the Fortress loan and whether to allow additional investments in the company to support its work or instead force bankruptcy. Ex. A at 74 (F. Bonanni Ltr. at 3). Third, Ms. Holmes does not have the assets to pay restitution to any investors, *see* PSR ¶¶ 165-166, and, despite her sincere desire to do so, *see* Ex. A at 203-04 (J. Moalli Ltr. at 1-2), faces likely insurmountable hurdles in acquiring sufficient wealth to do so in light of her conviction and notoriety. [27]

### G.   Ms. Holmes' Capacity to Do Good Supports a Sentence That, In Part, Orders Ms. Holmes to Engage in Significant Community Service.

Despite her mistakes, Ms. Holmes' personal characteristics—including her deeply held desire to make the world a better place, her self-reflection, her determination and work ethic, and her visionary and creative mind—leave her with capacity and potential to positively contribute to the world. While the over 130 letters attached to this memorandum are consistent in believing that "society is better off with her in it," Ex. A at 95 (A. & S. Kiessig Ltr.), it is noteworthy how many different opportunities there are for Ms. Holmes to be a force for good. Whether it is working with individual survivors of sexual assault, teaching the lessons of her own errors, inventing new technologies, developing projects that have the potential to help solve social health problems, or something else entirely, the chorus of letters emphasize a belief among those who know her that society's best use of Ms. Holmes is "out in the world working on the next thing to improve the lives of others." Ex. A at 111 (M. Downes Ltr.); *see id.* at 74-75 (F. Bonanni Ltr. at 3-4) ("Her lessons learned through success and failure are precious. They will be invaluable if shared with the broader community of young entrepreneurs."), 50 (I. Aboyeji Ltr. at 3 ("I believe America and indeed the world has a lot to lose by keeping an entrepreneur like

---

[27] The Court cannot use Ms. Holmes' inability to pay to support a longer sentence. *See United States v. Burgum*, 633 F.3d 810, 814 (9th Cir. 2011) ("[I]t is well established that the Constitution forbids imposing a longer term of imprisonment based on a defendant's inability to pay restitution.").

Elizabeth Holmes behind bars instead of out in the world helping other young entrepreneurs learn from her painful experience at Theranos."), 163 (Christian Holmes Ltr. at 2) ("While she is brutally self-aware of her situation and the uncertainty of her future, she focuses on how she can possibly find a path in her coming years to bring some good to others from all she's learned and weathered."), 113 (T. Draper Ltr. at 2) ("Her vision for healthcare was only partially portrayed in her efforts at Theranos, and her ideas could save millions of lives over the course of the next few decades.  Restraining her would be a travesty."), 203 (J. Moalli Ltr. at 1) ("I am unequivocally certain that, given the space and opportunity, she is such a prolific inventor that she will continue to create technology that will greatly benefit humankind.").  Dr. Foege, the Presidential Medal of Freedom-winning former Director of the CDC, expresses his hope that the Court is "able to develop a creative approach that permits her to use her abilities to provide public benefits.  She could not make those contributions while incarcerated." Ex. A at 137 (W. Foege Ltr. at 3).  The letters are replete with friends and former colleagues who would support her efforts.  "Elizabeth Holmes has so much more to give."  Ex. A at 58 (R. & A. Bergeron Ltr. at 1).  Whatever combination of opportunities to make a difference Ms. Holmes takes up (pursuant to Court order or her own initiative), Ms. Holmes' personal history makes clear she will approach them with total dedication.

One meaningful approach would permit Ms. Holmes to continue the work she has done over the past several months volunteering in support of sexual assault survivors.  ████████ welcomes Ms. Holmes' continued services helping "the ever-increasing number of callers on the statewide sexual assault helpline" and "research[ing] gaps in services and resources for victims, while working to increase access to services throughout the state." *Id.* at 47 (███████ Ltr. at 2).  Requiring Ms. Holmes to continue these efforts as part of her sentence would be a better use of society's resources than incarcerating her.  Such an approach would allow her to fulfill the promise Senator Booker, a champion of criminal justice reform and restorative justice, sees: "I believe that Ms. Holmes has within her a sincere desire to help others, to be of meaningful service, and possesses the capacity to redeem herself.  . . . I pray that in the coming years she is able to fulfill her desires and more humble hopes to be of meaningful service to the world." Ex. A at 77 (C. Booker Ltr. at 2).

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

73

**CONCLUSION**

"In the end we have an intelligent, fearless woman who took on a huge project that should have changed the world and nearly succeeded." Ex. A at 262 (D. Tschirhart Ltr. at 2). "[N]o public good will be served by incarcerating Ms. Holmes. She poses no danger to anyone. She openly acknowledges her business mistakes and she did not benefit in any material way notwithstanding the opportunity to do so. Her suffering, including among other things extreme public ignominy, financial bankruptcy and the terrifying prospect of incarceration while the mother of a new baby, provides more than ample deterrence to others." Ex. A at 243 (D. Sokol Ltr. at 6). "We need more people like Elizabeth whose unique combination of intelligence, grit and compassion makes this world a better place." Ex. A at 124 (G. Evans Ltr. at 2). The Court's charge is to fashion a sentence that is "sufficient, but not greater than necessary," to serve the purposes of sentencing in this case. 18 U.S.C. § 3553(a). Although the defense views incarceration as unnecessary to meet that directive, if incarceration is deemed necessary, a period of incarceration of eighteen months or less followed by supervised release that includes a community service condition will more than capture the retributive and deterrent goals of sentencing while ensuring that our society's resources are not wasted incarcerating someone who poses no danger to it, who in the eyes of the public will never be truly free of even the counts on which she has been exonerated, and who will devote her life to meaningfully serving her fellow human beings. As one friend says: "I am confident that on the other side of this Elizabeth will do amazing things for society with her talents and boundless passion for changing the world for the better, and I can't wait to see how she rewards your possible leniency." Ex. A at 144 (K. Gavrieli Ltr. at 2).

DATED: November 10, 2022

KEVIN DOWNEY
LANCE WADE
AMY MASON SAHARIA
KATHERINE TREFZ
Attorneys for Elizabeth Holmes

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD

74

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 10, 2022, this under seal filing was delivered to the Court via ECF and by email and secure file transfer on government counsel of record.

/s/ Kevin Downey
Kevin Downey
Attorney for Elizabeth Holmes

MS. HOLMES' SENTENCING MEMORANDUM
CR-18-00258 EJD