1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

USA,

Plaintiff,

v.

ELIZABETH A. HOLMES,

Defendant.

Case No.   5:18-cr-00258-EJD-1

**ORDER ON SENTENCING**

On January 3, 2022, the jury found Defendant Elizabeth A. Holmes guilty of one count of conspiracy to commit wire fraud, 18 U.S.C. § 1349, and three counts of wire fraud, 18 U.S.C. § 1343, against Theranos investors.

In their respective sentencing memoranda, the government and Defendant dispute several findings and conclusions in the Presentence Investigation Report ("PSR"), including the probation officer's application of the U.S. Sentencing Guidelines ("U.S.S.G."). Revised Presentence Investigation Report, ECF No. 1640; *see also* Ms. Holmes' Sentencing Memorandum ("Def.'s Sent'g Mem."), ECF No. 1641-3; United States' Sentencing Memorandum ("Gov't Sent'g Mem."), ECF No. 1649. The Court addressed the parties' objections and disputes at Defendant's sentencing hearing on November 18, 2022. This Order memorializes the Court's reasoning in support of its determinations and sentence imposed at that hearing.

For the reasons stated on the record at the November 18, 2022 hearing and in this order, the Court finds that (A) the loss in this case can be reasonably found to be $120,146,247; (B) the offense involved 10 or more victims; (C) the offense as to Defendant did not involve a conscious or reckless risk of death or serious bodily injury; (D) the Defendant was not an organizer, leader,

Case No.: 5:18-cr-00258-EJD-1
ORDER ON SENTENCING

1

United States District Court
Northern District of California

manager, or supervisor in the criminal activity; and (E) the Defendant has not clearly demonstrated acceptance of responsibility for her offense.  These findings yielded an offense level of 33 and an undisputed Criminal History Category I.  *See* Gov't Sent'g Mem. 15.

## I.      LEGAL STANDARD

"All sentencing proceedings begin with the district court's calculations of the applicable Guidelines range."  *United States v. Prien-Pinto*, 917 F.3d 1155, 1157 (9th Cir. 2019); *see also United States v. Staten*, 466 F.3d 708, 710 (9th Cir. 2006) ("[A]lthough district courts are no longer required to follow the United States Sentencing Guidelines . . . 'the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals.'" (quoting *United States v. Booker*, 543 U.S. 220, 259 (2005))).

The government bears the burden of proving the facts necessary to enhance a defendant's offense level under the Guidelines.  *United States v. Burnett*, 16 F.3d 358, 361 (9th Cir. 1994); *accord United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005) (*en banc*) ("[W]hen the government seeks an upward adjustment, it bears the burden of proof." (citation omitted)).  While "the district court may rely on undisputed statements in the PSR at sentencing," if the defendant objects to those statements "the district court is obligated to resolve the factual dispute, and the government bears the burden of proof to establish the factual predicate. . . .  The court may not simply rely on the factual statements" in that report.  *Ameline*, 409 F.3d at 1085-86; *see also* Fed. R. Crim. P. 32(i)(3)(B).  In making factual determinations, "a sentencing judge is generally not restricted to evidence that would be admissible at trial.  However, 'inadmissible evidence cannot be considered [at sentencing] if it lacks sufficient indicia of reliability to support its probable accuracy.'"  *United States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000) (citation omitted, alternation in original).

## II.     GUIDELINES CALCULATION

### A.      Loss Enhancement, U.S.S.G. § 2B1.1(b)(1)

The commentary to the U.S. Sentencing Guidelines provides that courts "need only make a reasonable estimate of the loss," which is defined as "the greater of actual loss or intended loss."

Case No.: 5:18-cr-00258-EJD-1
ORDER ON SENTENCING

U.S.S.G. § 2B1.1 cmt 3(A), 3(C).  Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," whereas intended loss is "the pecuniary harm that the defendant purposely sought to inflict."  U.S.S.G. § 2B1.1 cmt 3(A)(i)-(ii).  The Ninth Circuit recognizes that the guidelines "do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  The district court's obligation is to "adopt a reasonable 'realistic, economic' projection of loss based on the evidence presented." *United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir. 2001).

Defendant had raised several objections to the PSR's calculation of the loss enhancement, which the Court resolved on the record at the sentencing hearing and arrived at a final loss amount.  Here, the Court provides the specifics of its loss calculation, which reflects the rulings on Defendant's objections.

### 1.        Standard of Proof

The government and Defendant dispute the correct standard of proof the Court should apply in this case.  During sentencing and in its analysis below, the Court applied the "preponderance of the evidence" standard for facts underlying the loss calculation.

"As a general rule, factual findings underlying a sentencing enhancement need only be found by a preponderance of the evidence," particularly where the enhancements are based on convictions.  *United States v. Lonich*, 23 F.4th 881, 910 (9th Cir. 2022); *United States v. Hymas*, 780 F.3d 1285, 1289–90 (9th Cir. 2015).  However, in instances where the "enhancement has an [] extremely disproportionate impact on the sentence," the Ninth Circuit has held "that due process may require the government to demonstrate facts underlying disputed enhancements by clear and convincing evidence." *Lonich*, 23 F.4th at 910 (internal quotation marks omitted).  When determining "whether a disproportionate effect on sentencing may require the application of a heightened standard of proof," courts consider the "totality of the circumstances." *Hymas*, 780 F.3d at 1289; *United States v. Valle*, 940 F.3d 473, 479 (9th Cir. 2019).  The Ninth Circuit has focused on three primary factors in assessing disproportionality: (1) whether the increase in

United States District Court
Northern District of California

1   sentence is based on the extent of a conspiracy; (2) whether the increase in the number of offense

2   levels is less than or equal to four; and (3) whether the length of the enhanced sentence more than

3   doubles the length of the sentence authorized by the initial sentencing guideline range.  *See*

4   *Lonich*, 23 F.4th at 910–16.

5          Here, the jury convicted Defendant of conspiracy to commit wire fraud against Theranos

6   investors, as well as three counts of wire fraud.  Given that actual loss is measured by the

7   "reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt

8   3(A)(i), the Court's task begins by identifying which investments were "reasonably foreseeable"

9   from Defendant's conspiracy.  In other words, whether a particular investment should be included

10  in the loss calculation is based on the extent of the conspiracy, and therefore need only be

11  established by a "preponderance of the evidence."  *Lonich*, 23 F.4th at 914.  Several courts have

12  "declined to apply the clear and convincing standard of proof when the enhancement at issue was

13  based entirely on the extent of the conspiracy . . . regardless of whether the disputed sentencing

14  enhancements resulted in an increase of the offense level by more than four points or whether it

15  resulted in a Guidelines range that more than doubled."  *Id.* (internal citations and quotation marks

16  omitted).  The Ninth Circuit has also repeatedly held that "where sentencing enhancements for

17  financial loss are based on the extent of the fraud conspiracy . . . facts underlying the disputed

18  enhancements need only be found by a preponderance of the evidence."  *United States v. Berger*,

19  587 F.3d 1038, 1048 (9th Cir. 2009) (collecting cases); *see also United States v. Laurienti*, 611

20  F.3d 530, 556 (9th Cir. 2010) ("Because each Defendant was convicted of conspiracy, and because

21  the losses were incurred because of that conspiracy, the 'preponderance of the evidence' standard

22  applies."); *United States v. Riley*, 335 F.3d 919, 926 (9th Cir. 2003) ("[T]his enhancement is based

23  on the extent of the conduct to which [defendant] pled guilty (the amount of loss intended by the

24  conspiracy's fraud).");  *Hymas*, 780 F.3d at 1289 ("District courts generally use the 'preponderance

25  of the evidence standard of proof when finding facts at sentencing, such as the amount of loss

26  caused by a fraud.'") (quoting *United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010),

27  overruled on other grounds by *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020)).  Because

28  Case No.: 5:18-cr-00258-EJD-1
    ORDER ON SENTENCING

4

the loss calculation in this case is based on the extent of the investor fraud conspiracy (*i.e.*, which Series C investments and corresponding losses were incurred because of the conspiracy), the correct standard of proof is "preponderance of the evidence."

Defendant nonetheless contended that the Court should apply the clear and convincing standard of proof, relying in part on *Lonich*. Def.'s Sent'g Mem. 30. However, the facts here are distinguishable from those in *Lonich*, where the government sought to incorporate losses associated with a bank's total collapse into the loss calculation of a loan fraud conspiracy conviction. 23 F.4th at 915. In holding that the clear and convincing standard applied in *Lonich*, the Ninth Circuit emphasized that the reasons for the bank's failure included a "substantial amount of uncharged and acquitted conduct" and was too attenuated from the convicted conspiratorial conduct. *Id.* at 915. By contrast, there is no such intervening causal factor here, where the evidence at Defendant's trial and in various victim impact statements indicated that the investments were a result of the convicted conduct, *i.e.*, misrepresentations of Theranos technology. *See infra* Section II(B). On these facts, this case more closely resembles the investor fraud in *Laurienti*, where the Ninth Circuit held that it was "reasonable to infer that *all clients of Defendants who purchased the* [] *stocks* were duped by the conspiracy." 611 F.3d at 556–57 (emphasis added). Indeed, even *Lonich* acknowledges that "[t]he preponderance of the evidence standard might have been appropriate if, for example, the loss enhancements were based on the value of [the] defaulted [] loans," 23 F.4th at 915, an approach that is analogous to the Court's loss calculation here using the value of certain Series C investments. *See infra* at Section II(A)(2).

Because this sentencing enhancement is based on the extent of Ms. Holmes' convicted conspiracy, the Court applied the preponderance standard to any facts supporting the loss calculation for U.S.S.G. § 2B.1(b)(1).

### 2.      Investment Calculation

Probation in the PSR calculated the total loss sustained by the Series C investors to be $730,840,209 across 29 separate investors. PSR ¶ 105. The Defendant objected to this calculation and the government bears the burden of proof to establish the total loss amount by a

United States District Court
Northern District of California

1  preponderance of the evidence.  *See Ameline*, 409 F.3d at 1086; *see supra* Section II(A)(1).

2        The Ninth Circuit applies a general loss causation principle at sentencing, "permitting a

3  district court to impose sentencing enhancements only for losses that 'resulted from' the

4  defendant's fraud."  *United States v. Berger*, 587 F.3d 1038, 1043 (9th Cir. 2009) (citing *United*

5  *States v. Hicks*, 217 F.3d 1038, 1048 (9th Cir. 2000)).

6        After reviewing the evidence presented by the government, the Court found by a

7  preponderance of the evidence that Defendant's fraudulent representations resulted in at least ten

8  (10) victims investing a total of $381,197,283.[1]  The table below sets forth this list of investors,

9  the relevant individual who testified to the investment, and an accounting and totaling of their

10  investment amounts:

| Investor (Testifying Individual) | Shares | Share Price | Investment Amount |
|---|---|---|---|
| **Hall Group** (Bryan Tolbert) | 325,000 | $15.00 | **$4,875,000** |
| **Richard Kovacevich** (Self) | 276,666 | $15.00 | **$4,149,990** |
| **Lucas Venture Group** (Donald A. Lucas) | 504,667 | $15.00 | **$7,570,005** |
| **Mendenhall TF Partners** (Pat Mendenhall) | 87,500 | $15.00 | **$1,312,500** |
| **Black Diamond Ventures** (Chris Lucas) | 356,660 | $15.00 | **$5,349,900** |
| **Peer Ventures Group** (Mark Campbell) | 1,169,995 | $15.00 | **$17,549,925** |
| **Peer Ventures Group** (Mark Campbell) | 779,411 | $17.00 | **$13,249,987** |
| **PFM Funds** (Brian Grossman) | 5,655,294 | $17.00 | **$96,139,998** |
| **Mosley Family Holdings** (Daniel Mosley) | 352,941 | $17.00 | **$5,999,997** |
| **RDV Corporation** (Lisa Peterson) | 5,882,352 | $17.00 | **$99,999,984** |
| **Keith Rupert Murdoch** (Natalie Ravitz) | 7,352,941 | $17.00 | **$124,999,997** |
| **TOTAL INVESTMENT AMOUNT** | | | **$381,197,283** |

22        In reaching this count and figure, the Court only included those investors who indicated

23  they had relied on or reviewed the Theranos misrepresentations propagated by Defendant's

24  conspiratorial conduct, instead of counting every Series C investor as the PSR does.[2]  *See infra*

---

[1] At the sentencing hearing, the Court had provided a mistakenly tallied sum, resulting in a slightly higher loss calculation.  The difference, however, does not affect the loss enhancement determination, and the figures in this Order provide the corrected calculations.

[2] Though the Court did not adopt it, the PSR's approach nonetheless appear to have some support

1    Section II(B); *see also* Leach Decl., Ex. B, ECF No. 1644-1.  The total investment amount,

2    however, was not the end of the Court's loss calculation analysis.

3              **3.      Share Value Offset**

4              In addition to calculating loss as either actual or intended loss, the Sentencing Guidelines

5    also require that a victim's loss be offset by the victim's benefits received when calculating loss.

6    U.S.S.G. § 2B1.1 cmt 3(E)(i); *see also W. Coast Aluminum Heat Treating Co.*, 265 F.3d at 992.

7    In the context of fraud cases involving induced stock purchases of an otherwise legitimate

8    company, this principle has been interpreted to mean that district courts "may not assume that the

9    loss inflicted equals the full pre-disclosure value of the stock." *Zolp*, 479 F.3d at 719.  Rather,

10   courts must "disentangle the underlying value of the stock" and identify "inflation of that value

11   due to the fraud." *Id.*

12             The Court found that, at the time the investor victims purchased their shares, Theranos

13   stock was not "practically worthless" and retained some intrinsic value separate from the

14   fraudulent representations.  *See Laurienti*, 611 F.3d at 558 (citing *Zolp*, 479 F.3d at 719).

15   Therefore, to "reasonably estimate" the loss amounts attributable to Defendant's offense, the Court

16   reduced the total investment amount identified in the preceding section by the "underlying value"

17   of the Theranos shares had no fraud occurred.  *See, e.g.*, *Berger*, 587 F.3d at 1046–47 (instructing

18   the district court to apply a loss calculation method that "attempt[s] to gauge the difference

19   between [the] share price—as inflated through fraudulent representation—and what that price

20   would have been absent the misrepresentation"); *United States v. Geringer*, 672 F. App'x 651, 653

21   (9th Cir. 2016) (finding district court erred by failing to "determine the actual value, if any, of the

22   fund, and to deduct that value from the amount of loss"); *United States v. Evans*, 744 F.3d 1192,

23   1196 (10th Cir. 2014) (finding district court erred by not "inquir[ing] into what loss, if any, the

24   investors would have suffered if [defendant] had come clean regarding the status of the

25   _____

26   in the Ninth Circuit.  Given the extent of Defendant's misrepresentations in widespread marketing
     materials and to the media for publication, it may be "reasonable to infer that all [Series C
27   investors] were duped by the conspiracy." *Laurienti*, 611 F.3d at 557.  The Court, however,
     declined to make such an inference in this case.

28   Case No.: 5:18-cr-00258-EJD-1
     ORDER ON SENTENCING

                                                         7

securities"); *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008) (finding "district court erred in not deducting from the purchase price the actual value of . . . illiquid securities").

The government sought to distinguish *Zolp* on two grounds: (1) *Zolp* involved a public company with liquid and market-responsive share prices that readily lent themselves to an investor impact analysis; and (2) the Theranos investors never received *any* value in return because the shares ultimately became worthless without any liquidation opportunity.  With respect to the first point, the Court acknowledges that valuing illiquid securities without a public market is certainly more difficult than valuing publicly traded securities.  However, the language in *Zolp* does not provide such a basis to distinguish the loss calculations for public securities from those involving private securities.  The Court also cannot avoid its obligation to conduct a "reasonable estimate" simply because a particular metric is not immediately available, a point that other courts have acknowledged in the private company context.  *See Leonard*, 529 F.3d at 93 ("We are mindful that illiquid securities for which there is no public market can be extremely difficult to value. . . . [W]e can only call on the district court to make a 'reasonable estimate' of the loss amount.").

As to the government's second point, the Court is persuaded by the Ninth Circuit's reasoning in *Lonich* where it held that the district court erred by attributing losses associated with a bank's ultimate collapse to the defendant's loan fraud.  23 F.4th at 918–19.  Analogously, the government here had not established—by either a preponderance or clear and convincing standard—that Theranos' ultimate collapse was the result of Defendant's conspiratorial conduct and should therefore be reflected in her loss calculation.  The fact that the investors did not have— and never will have—an opportunity to liquidate their shares is undoubtedly unfortunate, but illiquidity and resale difficulty does not deprive Defendant of credit for the inherent value of Theranos shares.  *See Leonard*, 529 F.3d at 93; *United States v. Crandall*, 525 F.3d 907, 913 (9th Cir. 2008) (finding district court erred by failing to credit the value of fraudulent condominiums, "even though the units may have been difficult or impossible to resell").

Accordingly, the Court concluded that the total investment amount was subject to a reduction based on the inherent value of Theranos stock absent Defendant's fraud.

United States District Court
Northern District of California

#### 4.     Net Loss Calculation

The final determination in the Court's loss calculation analysis involved reasonably estimating of Theranos' inherent value and deducting that value from the total investment amount to arrive at the actual loss that is attributable to Defendant's fraud.

Determining what the Theranos share price would have been if there had been no fraud is admittedly a difficult task, made all the more difficult by Theranos' status as a private company. The Court, however, is not "obligated to search for the perfect theoretical or statistical fit" but need only adopt a reasonable, realistic, economic, projection of loss based on evidence presented. *W. Coast Aluminum Heat Treating Co.*, 265 F.3d at 991.  To that end, the Court found that the government's expert, Mr. Carl Saba, provided a reasonable protocol in arriving at a loss amount that contains several indicia of reliability and incorporates multiple assumptions favorable to Defendant and Theranos.  ECF No. 1645 ("Saba Report").  The Court first summarizes the Saba Report's methodologies and evidence before addressing the figures it adopted from the Report.

The Saba Report provides valuations of 100% Theranos equity on three dates (February 7, 2014; December 31, 2014; and October 15, 2015) and then, from those valuations, extrapolates an estimate of what the share price would have been on each date.  For each date, the Saba Report provides two valuations using two different methods, each reflecting a different company metric generally recognized by the appraisal profession.  Saba Report ¶¶ 59, 65.  The first valuation is a combination of the "discounted cash flow" method and the "guideline public company" method (collectively, the "Income Method"), which reflects Theranos' earnings, cash flow, and standing in relation to similar public companies.  *Id.* ¶¶ 61-62; 65.  The Saba Report's second valuation uses the "adjusted net asset value" method ("Asset Method"), which values Theranos based on its then-present assets and liabilities.  *Id.* ¶ 77.  Generally, the Income Method yielded a higher Theranos valuation—and therefore a lower loss proportion and amount—than the Asset Method.  Once these two valuations were calculated, the Saba Report allocated those valuations to Theranos' shares using a methodology called "option pricing equity allocation" model.  *Id.* ¶ 111.  This method models the possible exit values for Theranos shares on a bell curve distribution, resulting

Case No.: 5:18-cr-00258-EJD-1
ORDER ON SENTENCING

1    in a projection of what the share price would have been on a selected date.  *Id.* ¶¶ 111-15.

2        Additionally, the Saba Report's valuation figures reflect several assumptions drawn in

3    Theranos' favor.  For instance, the Saba Report assumes that Theranos would continue to operate

4    as a going concern, *i.e.*, it was not in distress or facing near-term dissolution; Theranos' significant

5    technology challenges would be successfully resolved; Theranos would realize high revenue

6    growth in the near term; and it would earn significantly above industry margins.  *Id.* ¶¶ 7, 16.

7        Most critically, the Saba Report does not rely on Theranos forecasts provided to investors,

8    which were "associated with misrepresentations made to investors, and reflect extremely

9    optimistic assumptions."  *Id.* ¶ 84.  Instead, the Report relies on certain IRC 409A forecasts

10   prepared by an external professional services firm "for purposes of determining the fair market

11   value of Theranos stock, and as a basis for federal tax reporting."  *Id.* ¶ 86.  Defendant does not

12   object to the Saba Report's reliance on these 409(A) forecasts.  *See* Def.'s Sent'g Mem. 38-39.

13   Because the 409A forecasts were prepared for internal management use, were not provided to

14   investors, and are "optimistic" but "orders of magnitude lower than those in the investor forecasts"

15   (Saba Report ¶ 86), the Court was satisfied that the Saba Report's reliance on the 409A forecasts

16   provided a reasonable, realistic, and economic estimate of Theranos' inherent valuation with

17   minimal influence from Defendant's fraudulent representations.

18       Defendant objected that the Report purportedly provides a "loss range of nearly $100

19   million" and does not account for the revenue Theranos could have received by licensing its

20   intellectual property.  Def.'s Sent'g Mem. 38-39.  First, the Court rejected Defendant's

21   characterization of the Saba Report's loss range as $100 million—this range is the delta between

22   the upper limit of the Saba Report's *primary* loss estimate and the lower limit of the Report's

23   *alternative* loss estimate.  *See* Saba Report ¶ 15.  When viewed in their respective contexts, the

24   Saba Report's estimated loss ranges are closer to $36–38 million.  *Id.*  Regarding Defendant's

25   objection as to the value of Theranos' patent portfolio, the Court notes that the Asset Method does

26   account for "Theranos' underlying technology and brand intangible assets," by measuring the

27   "cost to obtain or reproduce functionally similar or identical assets."  Saba Report ¶¶ 77, 106.

28   Case No.: 5:18-cr-00258-EJD-1
     ORDER ON SENTENCING

United States District Court
Northern District of California

United States District Court
Northern District of California

1    This "cost to recreate" method is appropriate where the intangible asset is not the type that

2    generates a measurable amount of income, *id.* ¶ 106 n.55, and there is no indication that Theranos

3    was licensing its patents in 2015.[3]  For these reasons, Defendant's objections did not undermine

4    the Saba Report's ability to assist the Count in reaching a "reasonable estimate of the loss."

5            Having outlined the Saba Report's methods, the Court proceeds to its assessment of the

6    various methods and dates that the Saba Report's present as potential valuations.  At the

7    sentencing hearing, the Court noted that it adopted the Income Method calculation to estimate

8    Theranos actual share price absent fraud.  These valuations and metrics are more appropriate for

9    valuing ongoing—as opposed to non-operating—businesses and yield a higher company valuation

10   and a higher offset to Defendant's loss calculation.  *Id.* ¶ 64.  In identifying the proper valuation

11   date, the Court selected the date closest in time to the last of the Series C investments, which is

12   December 31, 2014.  This date also results in a higher company valuation than the February 2014

13   date, which again is more favorable to Defendant.  The Court declined to use the October 2015

14   Valuation Date (*i.e.*, when Defendant's fraud was exposed), because the Sentencing Guidelines

15   only contemplate crediting value that was provided to the victim *before* the offense was detected.

16   U.S.S.G. § 2B1.1, cmt. 3(E)(i).  In sum, the Court considered the Asset Method and December 31,

17   20214 valuation date to be the most appropriate—and the most Defendant-favorable—foundation

18   for its reasonable estimate of the loss resulting from Defendant's offense.

19           Using the Saba Report's estimate of Theranos' share prices on December 31, 2014, the

20   Court found that the $15 Series C-1 price would have been $10.36 absent the fraud ($4.64 net loss

21   per share); and the $17 Series C-2 price would have been $11.63 ($5.37 net loss per share).  When

22   multiplied by the total number of the identifiable victims' shares—2,720,488 Series C-1 shares

23   and 20,022,939 Series C-2 shares, *see supra* Section II(A)(2)—the total loss in share value

24   attributable to Ms. Holmes' fraud is approximately $120,146,247.  This figure is 31.5% of the

---

[3] In any event, as discussed below, the Court does not adopt the Asset Method and instead uses the Income Method valuation in its loss calculation, which yields a higher Theranos valuation, a lower proportion attributable to Defendant's fraud, and is generally more favorable to Defendant.

Case No.: 5:18-cr-00258-EJD-1
ORDER ON SENTENCING

1    total investment value—in other words, Theranos stock would have been approximately 31.5%

2    less expensive if there had been no fraud.

3         Based on the foregoing analysis and calculation, the Court reasonably estimated the loss

4    resulting from Defendant's offenses to be $120,146,247.  Because this amount is more than $65

5    million and less than $150 million, the loss amount falls under row M of U.S.S.G. § 2B1.1(b)(1),

6    and the Court accordingly increased Defendant's offense level by 24 levels.

7         **B.    Victim Number Enhancement, U.S.S.G. § 2B1.1(b)(2)(A)(i)**

8         The government has sufficiently shown by a preponderance of the evidence that at least ten

9    or more victims suffered a financial loss as a result of the conspiracy to commit wire fraud.

10        Section 2B1.1(b)(2)(A)(i) of the Sentencing Guidelines supports a 2-level enhancement if

11   the offense "involved 10 or more victims."  U.S.S.G. § 2B1.1(b)(2)(A)(i).  The guidelines define a

12   "victim" as a person, including a corporation, "who sustained any part of the actual loss

13   determined under subsection (b)(1)."  U.S.S.G. § 2B1.1(b)(1), cmt. 1.  Similar to estimating

14   losses, a district court need only "make a reasonable estimate . . . based on the available

15   information" in counting victims.  *United States v. George*, 949 F.3d 1181, 1186 (9th Cir. 2020),

16   *cert. denied*, 141 S. Ct. 605 (2020) (quoting *Zolp*, 479 F.3d at 719).

17        The PSR included a 2-level enhancement based on the number of victims.  PSR ¶ 106.

18   The government alleges that there are 29 victims who suffered a financial loss in the Series C

19   round of investments, summarized in the spreadsheet attached as Exhibit B to its supporting

20   declaration.[4]  ECF Nos. 1644-1;1643 at 20–21.  The government directs the Court to the testimony

21   at trial, U.S. Securities Exchange Commission ("SEC") depositions, Federal Bureau of

22   Investigation ("FBI") investigative reports, and victim impact statements.  Gov't Sent'g Mem. 3–

23   8, 20–21; ECF No. 1644.  In reviewing the record, the Court finds that the government has met its

24   burden of showing that at least ten investors relied on Ms. Holmes' fraudulent statements in

25   _____

26   [4] The government's spreadsheet includes 37 entries, which the PSR interprets as 29 victim
     investors, stating "[t]here are a total of 37 investors in the C-1 and C-2 groups; some of those are

27   grouped (i.e., Lucas Venture Funds and PFM).  As such, the number of 29 ensures none of the
     grouped investors are counted twice."  PSR ¶ 92.

28   Case No.: 5:18-cr-00258-EJD-1
     ORDER ON SENTENCING

United States District Court
Northern District of California

United States District Court
Northern District of California

1    making their decision to invest.  The evidence supports a finding that the following investors

2    satisfy the definition of "victim" under the Sentencing Guidelines: (1) Partner Investments L.P.,

3    PFM Healthcare Master Fund, L.P., and PFM Healthcare Principals Fund, L.P. (collectively,

4    "PFM"); (2) Mosley Family Holdings LLC; (3) RDV Corporation (Dynasty Financial II, LLC);

5    (4) Keith Rupert Murdoch; (5) Richard Kovacevich; (6) Peer Venture Partners (Peer Ventures

6    Group IV, L.P., or "PVP"); (7) Lucas Venture Group (Lucas Venture Group IV LP and Lucas

7    Venture Group XI); (8) Mendenhall TF Partners; (9) Hall Group (Hall Black Diamond II, LLC);

8    and (10) Black Diamond Venture (Black Diamond Ventures XII-B, LLC).  Accordingly, all ten

9    victims' losses are reflected in the loss calculation.

10        Investors PFM, Mosley Family Holdings LLC, and RDV Corporation undoubtedly qualify

11   as victims, as Defendant was convicted of wire fraud against all three investors beyond a

12   reasonable doubt.  Gov't Sentencing Memo. at 17–18; *see also* ECF Nos. 1235 at 2, 469 at 9,

13   1644-1.  Defendant does not dispute that these investments were made in Theranos.  She asserts,

14   however, that "there was no evidence as to why the vast majority of the investments the

15   government seeks to include in the loss amount . . . were made—even though . . . each investor's

16   investment experience was different."  Def.'s Sent'g Mem. 31 (emphasis omitted).  The Court

17   agrees that investors' experiences with Ms. Holmes varied to some degree, but the Court rejects

18   Defendant's characterization of the record as devoid of evidence regarding what information Ms.

19   Holmes provided investors prior to their investments.  Rather, the preponderance of the evidence

20   supports a finding that seven additional investors qualify as victims for sentencing purposes.

21        For example, representatives testified at trial on behalf of Hall Group, Black Diamond

22   Venture, and Mendenhall TF Partners as to the companies' reliance on the fraudulent statements

23   made by Ms. Holmes in their conversations with her and the 2013 Wall Street Journal ("WSJ")

24   promotion in reaching their decision to invest in the company.[5]  Bryan Tolbert, the Vice President

25

26   _____

27   [5] Mr. Pat Mendenhall testified on behalf of Mendenhall TF Partners during Ramesh "Sunny"
     Balwani's trial.  5:18-cr-00258-EJD-2, ECF No. 1537.  All citations to Mr. Mendenhall's
     testimony relate to his appearance as a witness in that matter on April 29, 2022.

28   Case No.: 5:18-cr-00258-EJD-1
     ORDER ON SENTENCING

United States District Court
Northern District of California

1    of Finance at Hall Group who was responsible for overseeing the company's investment portfolio

2    during the relevant years, testified that Ms. Holmes' misrepresentations in his December 20, 2013

3    phone call with her were influential considerations in his company's decision to invest in

4    Theranos.  10/22/21 Hr'g Tr. 4480:20–4484:2, 4486:13–4489:4, 4491:10–4493:3, 4497:7–4499:6,

5    4501:4–24, 4511:2–4513:24, 4515:4–4516:17.  Similarly, Chris Lucas of Black Diamond Venture

6    and Pat Mendenhall of Mendenhall TF Partners testified at trial that Ms. Holmes' 2013 WSJ

7    article was significant in making their investment decisions.  11/4/21 Hr'g Tr. 5407:1–5410:18;

8    Mendenhall 4/29/22 Hr'g Tr.4275:3–4278:4.

9            Testimony before the SEC also reveals investor reliance by PVP, Lucas Venture Group,

10   and Rupert Murdoch on Ms. Holmes' misrepresentations.  For example, Natalie Ravitz, the Chief

11   of Staff to Rupert Murdoch in 2014–2015 and the advisor and manager of his personal

12   investments, testified before the SEC that Ms. Holmes personally provided binders containing

13   financial and visionary materials about Theranos (including information containing

14   misrepresentations) to Mr. Murdoch.  ECF No. 1644-9 at 10:11–13:1, 16:21–20:24, 33:2–16,

15   34:3–21; *see also* 10/19/21 Hr'g Tr. 3996:16–4001:21 (trial testimony of Daniel Edlin regarding

16   binders created for Mr. Murdoch).  Ms. Ravitz further stated that, based on their conversations

17   with Ms. Holmes, she and Mr. Murdoch believed that the blood testing was performed on

18   Theranos' proprietary devices, not third-party devices.  ECF No. 1644-9 at 76:8–78:17, 85:4–13.

19   Ms. Ravitz also testified that the knowledge that blood tests were not actually being performed on

20   Theranos devices "would have changed how we thought about certainly the financial aspects of it,

21   if there wasn't an actual piece of technology that they had developed."  *Id.* at 78:18–25; *see also*

22   *id.* at 78:25–79:10.

23           Similarly, based on SEC interview memoranda,[6] representatives of PVP and Lucas

24

25   _____

26   [6] "In making factual determinations, a sentencing judge is generally not restricted to evidence that
     would be admissible at trial," so long as the evidence contains "sufficient indicia of reliability to
     support its probable accuracy."  *United States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000).  The
27   Court here is satisfied and finds that the SEC interview memoranda and sworn deposition
     testimony submitted by the government bear such hallmarks and indicia of reliability.

28   Case No.: 5:18-cr-00258-EJD-1
     ORDER ON SENTENCING
                                           14

United States District Court
Northern District of California

1  Venture Group testified that they were told by Ms. Holmes that Theranos proprietary devices were

2  being used in combat and medevac helicopters, and both investors indicated in their SEC

3  testimony that they were not aware that testing was being done on non-proprietary devices despite

4  meeting with Ms. Holmes. *See* ECF Nos. 1644-6; 1644-7.  In fact, Mark Campbell of PVP was

5  surprised to learn through the subsequent 2015 WSJ article that Theranos was not using their

6  proprietary device to run tests, which Theranos had never discussed.  ECF No. 1644-7 at 5.  Mr.

7  Campbell further noted that Theranos provided letters from Celgene and GlaxoSmithKline

8  validating its technology.  *Id.* at 2.  During trial, however, the government presented evidence that

9  Celgene had *not* comprehensively validated Theranos' technology.  9/29/21 Hr'g Tr. 2296:14–

10  2297:10, 2316:9–2318:7.  Similarly, Donald A. Lucas testified during his SEC interview that

11  during his meeting with Holmes prior to investing he was told "Theranos could run 50-75

12  simultaneous tests from one drop of blood," and he was not told that testing was done on non-

13  proprietary devices.  ECF No. 1644-6 at 1–3.  He believed that the blood collected from one finger

14  prick went into the Theranos device for analysis and that results were returned in 60 minutes.  *Id.*

15  at 3.  Ms. Holmes also told him that Theranos' devices were being used on modified Humvees in

16  Afghanistan and medevac helicopters.  *Id.* at 1–2.

17          Finally, the government produced an FBI memorandum summarizing its interview with

18  Richard Kovacevich during its investigation.  ECF No. 1644-5.  The memorandum indicated that,

19  before investing, Mr. Kovacevich was told that Theranos' proprietary devices were being used in

20  military operations and that these devices were cheaper, better, and faster than any other devices

21  on the market.  *Id.* at 2.  It also states that in 2013, neither Mr. Kovacevich nor any board member

22  knew that the proprietary device could only run twelve tests, and he did not recall Ms. Holmes

23  ever providing this information.  *Id.*  Mr. Kovacevich indicated that it mattered to him that

24  Theranos was able to run all the tests on its own proprietary devices, and that he did not learn that

25  the devices could not do so until the 2015 WSJ article.  *Id.* at 2, 3.  The FBI memorandum also

26  noted that Mr. Kovacevich received an email from Ms. Holmes containing materials about

27  Theranos, including valuation reports done by an "outside company."  *Id.* at 1.  He indicated

28  Case No.: 5:18-cr-00258-EJD-1
ORDER ON SENTENCING

1  during his interview that outside valuation was also important to him, and, in fact, was so

2  significant that Mr. Kovacevich resigned from the board after third-party valuation never

3  materialized.  *Id.* at 3.

4        In sum, the Court finds that the preponderance of the evidence supports the conclusion

5  that the aforementioned ten investors invested significant sums in reliance on Ms. Holmes'

6  misrepresentations.  At sentencing, it is reasonable to infer that investors who were told or

7  received information containing misrepresentations—including misrepresentations about the

8  financial projections of Theranos, the capabilities of its proprietary technology, the use of

9  Theranos' technology by the military, the company's reliance on third-party machines, and

10  valuations of the technology's performance—some time before deciding to invest thus relied on

11  such information in assessing their investment risk, which in turn affected whether they *would*

12  invest and the *amount* they chose to invest.  *See* PSR ¶ 18.

13        Although the Court counted ten victims, the reality may be that Defendant's fraud affected

14  many more qualifying investor victims.  Beginning in 2014 and 2015, binders were provided to

15  investors containing false information about Theranos.  Gov't Sent'g Mem. 3.  Daniel Edlin, a

16  Theranos project manager who reported to Ms. Holmes, testified that he prepared these binders

17  based on an approved checklist and stated that the binders were reviewed by Ms. Holmes before

18  they were provided to investors.  10/19/21 Hr'g Tr. 3993:15–14, 3995:7–23; 3996:18–4001:25.

19  Furthermore, Defendant provided false information to news reporters who then published and

20  circulated that information widely beyond potential investors.  PSR ¶¶ 27, 39, 42.  It would not be

21  an unreasonable inference to conclude that all potential C-1 and C-2 investors received fraudulent

22  information via Edlin's binders or were exposed to one of the multiple publications containing

23  Defendant's misrepresentations.  Gov't Sent'g Mem. 18, 20–21; *see George*, 949 F.3d at 1186

24  (noting that "the sentencing court reasonably [was allowed] to infer a pattern" in identifying the

25  number of victims of defendant's bank fraud scheme) (quoting *United States v. Pham*, 545 F.3d

26  712, 720 n.3 (9th Cir. 2008)); *Laurienti*, 611 F.3d at 557 (noting that "it is reasonable to infer that

27  all clients of Defendants who purchased the house stocks were duped by the conspiracy" where

28  Case No.: 5:18-cr-00258-EJD-1
ORDER ON SENTENCING

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Defendants were convicted of criminal conspiracy to defraud clients).  However, because the

2  Court has already identified ten victims whose losses do not require such an inference, the Court

3  need not—and declined to expand—the scope of victims to all investors who had received an

4  investor binder or read any of the misleading press releases.

5       Accordingly, the Court is satisfied that the preponderance of the evidence supports a

6  finding that at least these ten or more investors qualify as a victim under the Guidelines in support

7  of a 2-level enhancement to Ms. Holmes' sentence under U.S.S.G. § 2B1.1(b)(2)(A)(i).

8       **C.**    **Risk of Death or Serious Bodily Injury Enhancement, U.S.S.G. §
9  2B.1(b)(16)(A)**

10       The Guidelines permit a 2-level increase in offense level where "an offense involved [] the

11  conscious or reckless risk of death or serious bodily injury."  U.S.S.G. § 2B.1(b)(16)(A). To

12  establish that a defendant's conduct warrants the application of § 2B.1(b)(16)(A), the government

13  "need not show actual injury to any particular victim" and must instead focus on a defendant's

14  "disregard of risk."  *United States v. Henderson*, 893 F.3d 1338, 1351–52 (11th Cir. 2018).

15  Ignorance of the risk is not a defense to the application of this enhancement.  *United States v.*

16  *Johansson*, 249 F.3d 848, 859 (9th Cir. 2001).

17       The PSR does not apply this enhancement, but the government argues that such an

18  enhancement is warranted because Ms. Holmes' conduct created a significant risk of death or

19  bodily injury to Theranos patients as a result of misdiagnosis.  Gov't Sent'g Mem. 21.  However,

20  Ms. Holmes was acquitted of conspiracy to commit fraud against Theranos patients (Count Ten),

21  and the wire fraud charges with respect to specific Theranos patients (Counts Ten through

22  Twelve).  *See* ECF No. 1235.  The government urges the Court to consider acquitted conduct for

23  the purposes of sentencing because the conduct has been proven by a preponderance of the

24  evidence.  *United States v. Watts*, 519 U.S. 148, 157 (1997) (holding that a sentencing court may

25  consider conduct underlying an acquitted charge where such conduct has been proven by a

26  preponderance of the evidence).  In considering acquitted conduct, "sentencing enhancements do

27  not punish a defendant for crimes of which he was not convicted, but rather increase his sentence

28  Case No.: 5:18-cr-00258-EJD-1
ORDER ON SENTENCING

because of the manner in which he [or she] committed *the crime of conviction*." 515 U.S. at 402–03 (emphasis added).

The government asserts that Ms. Holmes continued to offer tests to patients "[d]espite knowing of the serious flaws in Theranos' testing" and that medical doctors and patients would rely on these test results to make medical decisions. *Id.* In reaching this conclusion, the government relies on Ms. Holmes' conviction for conspiring to defraud Theranos investors, arguing that her patient-related conduct was "part of the same course of conduct and scheme or plan as their fraud on investors." *Id.* at 24–25. The government theorizes that, in order to persuade investors to purchase Theranos stock, Defendants needed Theranos' technology to appear "market-ready" and equipped for clinical patient testing so as to reduce the risk associated with investing in an early-stage start-up that lacks fully developed technology. *Id.* at 25. It also notes that Ms. Holmes Co-Defendant, Mr. Balwani, was convicted on the count alleging a conspiracy between Ms. Holmes and Mr. Balwani to defraud patients "based on substantially overlapping evidence." *Id.* at 24

Here, the link between the convicted crime, *i.e.* conspiracy to commit defraud investors, is too attenuated to connect Ms. Holmes to the risk of death or serious bodily injury to the patients receiving Theranos' blood tests absent more evidence. The Court acknowledges that some of Ms. Holmes' actions, such as publicly touting the capabilities and accuracy of Theranos' technology in furtherance of the conspiratorial conduct in media and news outlets (such as the 2013 WSJ promotion or the June 2014 Roger Parloff article published in Fortune Magazine), may have had a downstream effect of influencing patients and medical practitioners to use Theranos' proprietary technology and rely on its test results. *See* Gov't Sentencing Memo. at 18. However, the government has not shown by a preponderance of the evidence that Ms. Holmes disregarded the risk of harm to Theranos patients when she committed the conduct for which she was convicted, *i.e.*, making fraudulent misrepresentations to Theranos investors. *See* PSR ¶¶ 27, 42.

Accordingly, Defendant's acquitted conduct has not been used to calculate the guidelines nor considered in the Court's sentencing decision in this case. The Court sustained Defendant's

objection and declined to enhance Ms. Holmes' sentence pursuant to U.S.S.G. § 2B.1(b)(16)(A).

### D.   Aggravating Role Adjustment, U.S.S.G. § 3B.1(a)

The PSR included a 4-level upward adjustment based on Defendant's aggravating role as an "organizer or leader of a criminal activity" pursuant to U.S.S.G. § 3B.1(a).  PSR ¶ 108.  Defendant objected to this enhancement, and the Court sustained the objection at Defendant's sentencing hearing.

The "organizer" enhancement is applied if Defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B.1(a).  To impose the enhancement, the government must show that "the defendant had control over other participants or organized other participants for the purpose of carrying out" the charged crimes."  *United States v. Holden*, 908 F.3d 395, 402 (9th Cir. 2018) (alteration and internal quotation marks omitted).  "Participants" are defined as individuals who are "criminally responsible for the commission of the offense"—therefore, a person who is not criminally responsible is not a "participant."  U.S.S.G. § 3B.1 cmt. 1.  "Mere facilitation of criminal activity is not sufficient to support the enhancement.  Nor is it sufficient for a defendant to have organized property or activities—the defendant must have organized participants."  *Holden*, 908 F.3d at 402 (internal citation omitted).

At Defendant's sentencing hearing, the Court found that, although Defendant was certainly an organizer or leader of her company, there was insufficient evidence to conclude that she was an "organizer or leader" of the *criminal activity*, *i.e.*, fraud and conspiracy to commit fraud against Theranos investors.  *See* PSR ¶ 108; Gov't Sent'g Mem. 26–27.  The PSR and the government's sentencing memorandum focus on Defendant's deep involvement in Theranos' operations, but the evidence indicated that Theranos was a "real company," not a criminal enterprise.  9/8/21 Hr'g Tr. 553:7-8.  To qualify for this enhancement, Defendant must have "organized other *participants for the purpose of carrying out the crime*."  *United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012) (emphasis added) (quoting *United States v. Ingham*, 486 F.3d 1068, 1074 (9th Cir. 2007)).  Indeed, the Sentencing Guidelines accounts for circumstances involving a defendant's control over

1    unwitting *non-participant* individuals, which is reflected in the "otherwise extensive" element but

2    not the "organizer or leader" element.  *See* U.S.S.G. § 3B1.1 cmt. 3 ("[A] fraud that involved only

3    three participants but used the unknowing services of many outsiders could be considered

4    *extensive*.") (emphasis added).  Accordingly, Defendant's control and organization of other

5    employees at Theranos do not satisfy the "organizer or leader" requirement; she must control or

6    organize other participants in the criminal activity.

7         The only other participant in the criminal activity that the government has identified is Co-

8    Defendant Balwani.  Although the government frequently mention Defendants together when

9    referencing the scheme to defraud investors, the evidence presented by the government does not

10   support a finding that Ms. Holmes exercised control or otherwise organized Mr. Balwani, only that

11   Defendants acted as co-equals.  *See*, *e.g.*, PSR ¶¶ 18, 21-22, 26-31; Gov't Sent'g Mem. 26–30.

12   The Ninth Circuit has expressly held that "co-equal" conspirators who are not "in charge" of each

13   other do not exhibit sufficient control to qualify for even the 2-level aggravated role enhancement.

14   *Holden*, 908 F.3d at 402–03.  Here, the only pertinent evidence identified by the government is

15   that Ms. Holmes had the "power to terminate anyone at the company, including second-in-

16   command Balwani."  Gov't Sent'g Mem. 27.  This fact—in and of itself and without further

17   evidence that Holmes directed or instructed Balwani's criminal activity—does not support a

18   finding that Holmes exercised control over Balwani, such that the Court can "apportion relative

19   responsibility" to Holmes.  *Holden*, 908 F.3d at 403.

20        Accordingly, the Court held that Defendant did not qualify for an aggravated role

21   enhancement under any sub-section of U.S.S.G. § 3B1.1.

22        **E.    Acceptance of Responsibility Adjustment, U.S.S.G. § 3E1.1(a)**

23        Finally, the Guidelines permit a 2-level deduction if the defendant "clearly demonstrates

24   acceptance of responsibility for his [or her] offense."  U.S.S.G. § 3E1.1(a).  At Defendant's

25   sentencing, the Court found that Ms. Holmes does not qualify for this deduction.

26        The Sentencing Guideline Commentary instructs that "[t]his adjustment is not intended to

27   apply to a defendant who puts the government to its burden of proof at trial by denying the

28   Case No.: 5:18-cr-00258-EJD-1
     ORDER ON SENTENCING

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1(a), cmt. 2.  The comments provide a non-exhaustive list of considerations that are appropriate to determine whether a defendant qualifies under subsection (a), including whether the defendant truthfully admitted the conduct comprising the offenses of conviction and whether the defendant truthfully admitted any additional relevant conduct.  U.S.S.G. § 3E1.1(a), cmt. 1(A).

In this case, Ms. Holmes was found guilty of conspiring to commit wire fraud and committing wire fraud against the investors of her company.  At sentencing, Ms. Holmes apologized more generally for Theranos and its "failings," but did not acknowledge nor accept responsibility for her conduct giving rise to her criminal convictions such that the reduction is appropriate.  11/18/22 Hr'g Tr. 121:23, 122:17–18.  Defendant has not clearly demonstrated acceptance of responsibility for her offenses that permit her an acceptance of responsibility reduction; such an outcome would make meaningless the spirit of the reduction for defendants who make wholehearted and unqualified statements accepting responsibility.  In reaching this decision the Court does not consider nor penalize the Defendant for maintaining her innocence.

**F.      Final Guidelines Calculation**

Based on the foregoing reasoning, the Court made the following findings at Defendant's sentencing hearing:

1. The base offense level for violations of 18 U.S.C. § 1343 is 7 (U.S.S.G. § 2B1.1(a)(1));

2. The total loss to identified investor victims is $120,146,247, which increases the offense level by 24 levels (§ 2B1.1(b)(1)(M));

3. There are ten or more victims, which increases the offense level by 2 levels (§ 2B1.1(b)(2)(A)(i)); and

4. There is insufficient evidence to support sentencing adjustments for risk of death or serious bodily injury, aggravating role as an organizer or leader, and acceptance of responsibility (§§ 2B1.1(b)(16); 3B1.1(a); 3E1.1).

Accordingly, the Sentencing Guidelines calculation resulted in an offense level of 33.

Case No.: 5:18-cr-00258-EJD-1
ORDER ON SENTENCING

1  Combined with Defendant's Category I Criminal History, this yielded a Guideline sentencing

2  range of 135 – 168 months.

3  **III.    INDIVIDUALIZED § 3553(A) ANALYSIS**

4         Once it arrived at the appropriate Sentencing Guidelines range at Defendant's sentencing

5  hearing, the Court proceeded to impose a sentence that is "sufficient, but not greater than

6  necessary to comply with the purposes" of sentencing.  18 U.S.C.S. § 3553.  In doing so, the Court

7  recognized that the Sentencing Guidelines' range is advisory, and it did not presume that the

8  Guidelines' sentence was reasonable.  *See Gall v. United States*, 552 U.S. 38, 46, 49–50 (2007).

9  Instead, the Court conducted "an individualized assessment based on the facts" of the case,

10  keeping in mind the factors listed at § 3553(a).

11        In determining the sentence, the Court considered the arguments and points presented in

12  both parties' memoranda and heard statements from Ms. Holmes and a victim present at the

13  sentencing hearing.  The Court considered the history and characteristics of the Defendant, as well

14  as the nature and circumstances of the offense.  The Court recognized that Defendant's sentence

15  must reflect the seriousness of the offense, promote respect for the law, provide just punishment

16  for the offense, and afford adequate deterrence in criminal conduct.

17  **IV.    SENTENCE**

18        Having considered the § 3553 factors, the Court imposed a sentence of 135 months'

19  imprisonment, 3 years' supervised release with conditions adopted from the PSR's

20  recommendations for supervised release, and a special assessment of $400 ($100 per Count).

21  Defendant's surrender date was set for April 27, 2023.  The parties were ordered to meet and

22  confer to determine a date for the restitution hearing.

23

24  Dated: January 10, 2023

25

26

27  EDWARD J. DAVILA
    United States District Judge

28  Case No.: 5:18-cr-00258-EJD-1
    ORDER ON SENTENCING

*United States District Court*
*Northern District of California*

22