STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS S. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFFREY B. SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Kelly.Volkar@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 18-CR-00258 EJD |
| Plaintiff, | ) |
| | ) UNITED STATES' OPPOSITION TO |
| | ) DEFENDANT ELIZABETH HOLMES' MOTION |
| v. | ) FOR RELEASE PENDING APPEAL |
| | ) |
| ELIZABETH HOLMES, | ) |
| | ) Date:   March 17, 2023 |
| Defendant. | ) Time:   10:00 a.m. |
| | ) Court:  Hon. Edward J. Davila |
| | ) |
| | ) |
| | ) |

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................1

LEGAL STANDARD...........................................................................................................2

ARGUMENT .........................................................................................................................4

    A.    Defendant Has Not Met Her Burden of Showing by Clear and Convincing Evidence That She Is Not a Flight Risk............................................................5

    B.    Defendant Has Not Met Her Burden of Showing by Clear and Convincing Evidence That She Is Not a Danger to the Community...................................6

    C.    The Questions Defendant Has Presented Are Not Likely to Result in Reversal or an Order for a New Trial on All Counts of Conviction....................................9

    D.    Defendant Has Not Met Her Burden of Showing That the Appeal Raises a Substantial Question of Law or Fact...................................................................13

        1.    The Court Properly Admitted Testimony of Dr. Kingshuk Das, the Patient Impact Assessment, the CMS Report, and Theranos' 2016 Voiding of All Tests Run on Theranos' Proprietary Blood Analyzer ..................13

        2.    The Court Did Not Err in Its Relevant Rulings Regarding the LIS Database ...............................................................................................16

        3.    The Court Properly Excluded Balwani's Prior Testimony Before the SEC ...........................................................................................................18

        4.    The Court Did Not Err in Its Relevant Rulings Regarding Dr. Rosendorff..................................................................................................19

        5.    The Court Did Not Err in Its Remaining Rulings ................................21

CONCLUSION.....................................................................................................................22

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3
*Morison v. United States*,
    486 U.S. 1306 (1988) ................................................................................................................ 4

4

5
*United States v. Abel*
    469 U.S. 45 (1984) .................................................................................................................. 20

6
*United States v. Bayko*,
    774 F.2d 516 (1st Cir. 1985) ................................................................................................ 4, 5

7

8
*United States v. Bilanzich*,
    771 F.2d 292 (7th Cir. 1985) ................................................................................................ 4, 5

9
*United States v. Gadson*,
    763 F.3d 1189 (9th Cir. 2014) ................................................................................................ 18

10

11
*United States v. Gerald N.*,
    900 F.2d 189 (9th Cir. 1990) (per curiam) ............................................................................. 3

12
*United States v. Giancola*,
    754 F.2d 898 (11th Cir. 1985) .................................................................................................. 3

13

14
*United States v. Handy*,
    761 F.2d 1279 (9th Cir. 1985) ......................................................................................... *passim*

15
*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000) ................................................................................................ 20

16

17
*United States v. Kakkar, No. 5:13-CR-00736-EJD*,
    2017 WL 4163291 (N.D. Cal. Sept. 20, 2017) ................................................................ 5, 6, 7

18
*United States v. Khan, No. 12-CR-0860-YGR*,
    2014 WL 2930656 (N.D. Cal. June 27, 2014) ...................................................................... 3, 6

19

20
*United States v. Lindsey*,
    680 F. App'x 563 (9th Cir. 2017) ............................................................................................. 7

21
*United States v. McCahill*,
    765 F.2d 849 (9th Cir. 1985) .................................................................................................... 2

22

23
*United States v. Mett*,
    41 F.3d 1281 (9th Cir. 1994) .................................................................................................... 3

24
*United States v. Miller*,
    753 F.2d 19 (3d Cir. 1985) .............................................................................................. 3, 4, 5

25

26
*United States v. Montoya*,
    908 F.2d 450 (9th Cir. 1990) ......................................................................................... 3, 5, 13

27
*United States v. Reynolds*,
    956 F.2d 192 (9th Cir. 1992) .................................................................................................... 7

28

**Statutes**

18 U.S.C. § 3142 ................................................................................................................. 9

18 U.S.C. § 3143 ............................................................................................................. 2, 3

**Federal Rules**

Federal Rule of Criminal Procedure 29 ............................................................................ 2

Federal Rule of Criminal Procedure 33 ............................................................................ 2

Federal Rule of Criminal Procedure 46 ............................................................................ 3

Federal Rule of Evidence 403 .......................................................................................... 20

Federal Rule of Evidence 608 .......................................................................................... 20

Federal Rule of Evidence 804 .......................................................................................... 18

**INTRODUCTION**

The government opposes Defendant Elizabeth Holmes' Motion for Release Pending Appeal. *See* ECF No. 1676 ("Motion"). More than a year ago, Defendant was found guilty on four felony fraud-related counts associated with a loss to victims of at least $120 million. The Court imposed a sentence of 135 months of imprisonment along with other conditions on November 18, 2022, but provided a generous self-surrender date almost six months out at least in part because Defendant informed the Court that she became pregnant with her second child between the jury returning a guilty verdict against her and her sentencing date. While facing these serious felony charges at trial and awaiting the Court's sentence, Defendant has lived on an estate with reportedly more than $13,000 in monthly expenses for upkeep and has conceived two children with her current partner. Defendant continues to show no remorse to her victims. While the criminal justice system presumes at this point that a criminal defendant would begin serving his or her custodial sentence, Defendant seeks, instead, to loosen the restrictions placed on her region of travel based upon vague references to her partner's work commitments. Defendant, however, cannot meet the stringent standard for release pending appeal mandated by Congress. There are not two systems of justice—one for the wealthy and one for the poor—there is one criminal justice system in this country. And under that system, the time has come for Elizabeth Holmes to answer for her crimes committed nearly a decade ago, as found by a jury made up of a fair cross section of individuals from this community, and to begin serving the term of imprisonment imposed by this Court as sufficient but not greater than necessary to account for those crimes. The government respectfully requests the Court deny Defendant's Motion.

**BACKGROUND**

On July 28, 2020, the government filed the Third Superseding Indictment ("TSI"), charging Defendant Holmes and co-Defendant Ramesh "Sunny" Balwani with ten counts of wire fraud (Counts 3-12) and two counts of conspiracy to commit wire fraud (Counts 1-2). ECF No. 469. The Court severed the case in March 2020. ECF No. 362. Beginning on August 31, 2021, Defendant's trial spanned four months, during which over 900 exhibits were admitted and 32 witnesses testified. *See generally* ECF Nos. 1256–1306, 1324. On January 3, 2022, the jury found Defendant Holmes guilty of four counts charging conspiracy to commit wire fraud during the period 2010 to 2015 and wire fraud against

1   three specific investors in Theranos.  ECF No. 1235.  The jury did not reach a unanimous verdict with

2   respect to the remaining investor-related counts and acquitted Defendant on the patient-related counts.

3   *Id.*  Co-Defendant Balwani's separate trial began in March 2022 on the same twelve counts.  Following

4   a comparably lengthy trial, the jury found Balwani guilty of all twelve counts.  ECF No. 1507.

5       Defendant moved for acquittal under Federal Rule of Criminal Procedure 29 ("Rule 29").  On

6   September 6, 2022, the Court denied Defendant's Rule 29 motion.  ECF No. 1575.  Defendant

7   subsequently filed three separate motions for a new trial purportedly based on newly discovered

8   evidence under Federal Rule of Criminal Procedure 33 ("Rule 33").  ECF Nos. 1574, 1576, 1577.  The

9   Court held an evidentiary hearing in connection with one of the Rule 33 motions and ultimately denied

10  all three of Defendant's Rule 33 motions.  ECF Nos. 1607, 1636.

11      On November 18, 2022, the Court calculated the applicable U.S. Sentencing Guidelines range to

12  be 135 to 168 months of imprisonment, in part based upon a finding that a reasonable estimate of the

13  loss to investor-victims was more than $120 million, and sentenced Defendant to 135 months'

14  imprisonment, at the low-end of the Guidelines range, on each count to run concurrently.  ECF No.

15  1712; 11/18/22 Tr. at 87–88, 132–33.  Over the government's objection, the Court did not consider

16  patient-related conduct in its Guidelines calculation.  ECF No. 1712 at 17–19.  The Court set

17  Defendant's self-surrender date on April 27, 2023.  *Id.* at 22.  On December 7, 2022, the Court made

18  similar findings for the Guidelines calculation and sentenced co-Defendant Balwani to 155 months of

19  imprisonment, among other conditions.  ECF No. 1682; 12/07/2022 Tr. at 92–93, 148–49.

20                          **LEGAL STANDARD**

21      Detention is the mandatory, routine norm for any defendant following conviction and the

22  imposition of a custodial sentence.  18 U.S.C. § 3143(b)(1).  The Bail Reform Act of 1984 ("the Act")

23  provides that after conviction and imposition of sentence, detention is mandatory absent clear and

24  convincing evidence that a defendant is not a flight risk or danger to the community.  Congress enacted

25  the Act to "toughen the law with respect to bail pending appeal" and to "make[ ] it considerably more

26  difficult for a defendant to be released on bail pending appeal."  *United States v. Handy*, 761 F.2d 1279,

27  1283 (9th Cir. 1985); *see also United States v. McCahill*, 765 F.2d 849, 850 (9th Cir. 1985)

28  (Kennedy, J.).  "Once a person has been convicted and sentenced to jail, there is absolutely no reason for

the law to favor release pending appeal or even permit it in the absence of exceptional circumstances." *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985) (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186–87 (1970) (discussing model for § 3143 within the Act)). Otherwise, "release of a criminal defendant into the community, even after conviction," runs the risk of "destroy[ing] whatever deterrent effect remains in the criminal law." *Id.* (internal quotation omitted).

Unlike in the pretrial-detention context, every defendant seeking bail pending appeal after her conviction and sentencing is presumed to be a danger and a flight risk—and it is the defendant's burden to overcome that presumption. *See United States v. Khan*, No. 12-CR-0860-YGR, 2014 WL 2930656, at *2 (N.D. Cal. June 27, 2014) ("Through this statute Congress created a presumption of detention and shifted the burden of proof to the defendant to show otherwise." (citing *Handy*, 761 F.2d at 1283)); *see also United States v. Giancola*, 754 F.2d 898, 900–01 (11th Cir. 1985) ("The 1984 Act was intended to change the presumption so that the conviction is presumed correct and the burden is on the convicted defendant to overcome that presumption."); *Miller*, 753 F.2d at 22 ("The Bail Reform Act of 1984 was enacted because Congress wished to reverse the presumption in favor of bail" for defendants seeking release pending appeal). As a result, "under the Bail Reform Act of 1984 it is no easy matter to obtain bail pending appeal." *United States v. Gerald N.*, 900 F.2d 189, 191 (9th Cir. 1990) (per curiam).

To overcome this legislative mandate, a defendant must prove: (1) by clear and convincing evidence that she is not a flight risk or a danger to the community; and (2) that her appeal is not for the purpose of delay and (3) raises a substantial question of law or fact that is (4) likely to result in (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to less than time served. 18 U.S.C. § 3143(b)(1); *see also United States v. Mett*, 41 F.3d 1281, 1282 n.3 (9th Cir. 1994) (listing requirements). Where a defendant fails to satisfy her burden in every respect, a request for bail pending appeal must be denied. *See United States v. Montoya*, 908 F.2d 450, 451 (9th Cir. 1990); Fed. R. Crim. P. 46(c).

A "substantial question" refers to a legal issue that is "fairly debatable" or "fairly doubtful" and "is one of more substance than would be necessary to a finding that it was not frivolous." *Handy*, 761 F.2d at 1283 (adopting the interpretation set forth in *Miller* and *Giancola*). "Fairly debatable" questions are those that are novel or not readily answerable, or that pose issues "debatable among jurists of

—

reason." *Id.* at 1281–82 (internal quotations and citations omitted). "'[L]ikely to result in reversal' defines the type of question that must be presented." *Id.* at 1281. This requirement "has generally been read to mean that if error is found, it must not be harmless or unprejudicial error." *United States v. Bayko*, 774 F.2d 516, 522 (1st Cir. 1985); *see also United States v. Bilanzich*, 771 F.2d 292, 299 (7th Cir. 1985) ("For example, harmless errors, errors that have no prejudicial effect, or errors that have been insufficiently preserved would not justify a court's granting bail."). Thus, a "substantial" question "may, nonetheless, in the circumstances of a particular case, be considered harmless, to have no prejudicial effect, or to have been insufficiently preserved" such that the question would not be likely to result in reversal. *Miller*, 753 F.2d at 23; *see Handy*, 761 F.2d at 1280, 1283 (adopting interpretation of the standard set forth in *Miller*). Put differently, "[a] court may find that reversal or a new trial is 'likely' only if it concludes that the question is so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." *Miller*, 753 F.2d at 23. In sum, while this standard is not so strict as to require that reversal be more likely than not, *Handy*, 761 F.2d at 1280–81, neither is it so toothless that it eviscerates Congress' intent to "tighten[ ] the standards for bail pending appeal." *Id.* at 1283.

Furthermore, a defendant must prove that her appeal is likely to result in reversal or an order for a new trial on *all counts* for which imprisonment has been imposed. *See*, *e.g.*, *Morison v. United States*, 486 U.S. 1306, 1306–07 (1988) (Rehnquist, C.J., in chambers, denying defendant's application for bail pending resolution of certiorari petition because even if he raised a "substantial question" with respect to certain counts of conviction, he had not done so with respect to *all counts* of conviction); *Handy*, 761 F.2d at 1283 (listing fourth requirement for granting bail pending appeal as "if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of *all counts* on which imprisonment has been imposed" (emphasis added)).

## ARGUMENT

Because the burden has shifted at this stage post-conviction and post-sentencing, Defendant's cursory arguments that she is not a flight risk or economic danger to the community do not suffice to meet the clear and convincing standard she faces. Furthermore, none of the arguments she has raised pose a substantial question, as described further below. Regardless of whether any of the topics she has

asserted do raise a substantial question, Defendant cannot meet the final requirement because each of the topics relate to harmless or non-prejudicial errors that do not affect all counts of conviction. *See Bayko*, 774 F.2d at 522; *Bilanzich*, 771 F.2d at 299; *Miller*, 753 F.2d at 23. Therefore, the Court should deny Defendant's Motion for bail pending appeal.

## A. Defendant Has Not Met Her Burden of Showing by Clear and Convincing Evidence That She Is Not a Flight Risk

Defendant asserts in cursory fashion that she is not a flight risk by relying on an overview of her pretrial record. Mot. at 7. However, that the parties had previously agreed upon—and the Court approved—conditions of release pre-trial and pre-sentencing does not alone meet the heightened burden Defendant now faces. As described above, after conviction and imposition of sentence, the burden of proof shifts from the government to the Defendant to demonstrate by clear and convincing evidence that she is not a flight risk. *See Handy*, 761 F.2d at 1283. The Ninth Circuit has held that this change, along with "[e]ach of the changes contained in the Bail Reform Act of 1984[,] makes it considerably more difficult for a defendant to be released on bail pending appeal." *Id.* The Ninth Circuit has also rejected cursory motions on contested issues given it is the defendant's burden to establish each requirement. *See, e.g.*, *Montoya*, 908 F.2d at 451. This Court, too, has rejected similar arguments from a defendant convicted of wire fraud given, among other factors, the "undeniably compelling motivation to flee given the convictions[ and] the length of the sentence imposed[.]" *United States v. Kakkar*, No. 5:13-CR-00736-EJD, 2017 WL 4163291, at *2 (N.D. Cal. Sept. 20, 2017).

Contrary to Defendant's assertion that she has a "flawless record with U.S. Pretrial Services" and claim that no evidence suggests she will flee while she pursues her appeal (Mot. at 7), the incentive to flee has never been higher and Defendant has the means to act on that incentive. As an initial matter, Defendant's record with Pretrial Services and the Court does not account for her attempt to flee the country shortly after she was convicted. The government became aware on January 23, 2022, that Defendant Holmes booked an international flight to Mexico departing on January 26, 2022, without a scheduled return trip. Declaration of Kelly I. Volkar in support of United States Opposition to Defendant's Motion for Release Pending Appeal ("Volkar Decl."), Exhibit 1. Only after the government raised this unauthorized flight with defense counsel was the trip canceled.

1   *Id.*  On information and belief, Defendant's partner, William Evans, left on the scheduled date with a

2   one-way ticket and did not return until approximately six weeks later, returning from a different

3   continent.  Volkar Decl. ¶ 3.  The government anticipates Defendant will note in reply that she did not in

4   fact leave the country as scheduled—but it is difficult to know with certainty what Defendant would

5   have done had the government not intervened.  *See, e.g.*, *Khan*, 2014 WL 2930656, at *4 (canceling a

6   flight ticket did not outweigh other indicators that defendant was a risk of flight).

7          Indeed, another judge in this District analyzed several factors that are also present here and found

8   the defendant failed to meet his burden of proving he was not a flight risk.  For example, Defendant

9   "never fully appreciated that [s]he would be incarcerated" based on "ill-founded hopes that the Court

10  would give [her] a probationary sentence."  *Id.*  Moreover, Defendant has never "demonstrated . . . in

11  [her] words or manner, a genuine acceptance that [s]he stole a significant amount of money from

12  [investors] by lying and falsifying documents[.]"  *Id.*  The court there also referred to a potential flight to

13  Portland, Oregon, and noted "[t]he Canadian border is not that far from Portland and the defendant has

14  . . . assets to assist him if necessary."  *Id.*  So too here.  Defendant has lived on an estate for over a year

15  where, based upon the monthly cash flow statement Defendant provided to the U.S. Probation Office,

16  monthly expenses exceed $13,000 per month.  Defendant asserted that her partner pays the monthly bills

17  rather than her but also listed her significant other's salary as "$0."  Nevertheless, at the same time when

18  her incentive to flee has never been higher, Defendant has requested the Court ease the restrictions on

19  her travel, permitting her to travel outside of the Northern District of California and perhaps out of the

20  state altogether "due to her significant other's employment."  ECF No. 1695.

21         In sum, as the court found in *Khan*, this Court should find that Defendant "has both the means

22  and the motive to flee."  *Khan*, 2014 WL 2930656, at *4; *see also Kakkar*, 2017 WL 4163291, at *2.

23  Defendant's cursory—and incomplete—overview of her record on pretrial release does not meet her

24  heightened burden now that she has been convicted and sentenced to a term of imprisonment.

25         **B.    Defendant Has Not Met Her Burden of Showing by Clear and Convincing Evidence**
            **That She Is Not a Danger to the Community**
26

27         Similarly, Defendant's one-sentence assertion that she poses no threat of potential future

28  pecuniary harm does not satisfy her heightened burden at this stage, either.  *Cf.* Mot. at 7.  Danger to the

community is not limited to physical violence but rather can encompass pecuniary or economic harm, as well.  *See, e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192–93 (9th Cir. 1992); *Kakkar*, 2017 WL 4163291, at *2 (citing *Reynolds*); *see also United States v. Lindsey*, 680 F. App'x 563, 567–68 (9th Cir. 2017) (upholding denial of bail pending appeal where defendant's "elaborate mortgage fraud scheme" caused the loss of millions of dollars and "targeted vulnerable and impoverished individuals").

Defendant asserts summarily that she presents "no threat of . . . causing pecuniary harm given her substantial notoriety."  Mot. at 7.  But Defendant's resourcefulness has shown itself over and over again throughout trial and sentencing.  First and foremost, as summarized at a high level below and in more detail in prior filings, whenever different revenue sources dried up for Theranos, Defendant effortlessly switched to new targeted sources—from pharmaceutical companies to retail services to the Department of Defense to private investors.  *See generally* ECF Nos. 1395, 1486, 1643.  Second, despite her "substantial notoriety[,]" Defendant submitted over a hundred letters of support—including from a U.S. Senator—before her sentencing (although as the Court noted not all of those supporters may have been aware of the extent of Defendant's fraudulent conduct).  *See* 11/18/22 Tr. at 6, 129–32.  Indeed, according to documents Defendant provided to the Probation Office, she secured $450,000 in so-called loans from individuals in New York, Montana, DC, Illinois, and the Philippines purportedly to fund the monetary portion of Defendant's settlement with the SEC in March 2018.  Third, Defendant has shown no remorse to the victims of her fraud, despite an associated loss that the Court found was at least $120 million.  *See* ECF No. 1712.  Fourth, Defendant shows no indication of changing course—the statements she provided to the Probation Office list patents she either holds or intends to work on as potential future sources of income.  Finally, despite the breadth of her conduct, Defendant has not acknowledged the fraudulent nature of her conduct, rendering it more likely that she will repeat it in the future.  *See* 11/18/22 Tr. at 98–99.

The government has described Defendant's conduct in detail elsewhere (*see*, *e.g.*, ECF Nos. 1395, 1486, 1643)—and the Court is familiar with the facts of this case having sat through two trials spanning nearly a year—but in brief summary of Defendant's elaborate scheme to defraud investors about the capabilities of her blood-testing device:

1    Defendant secured dozens of investors in Theranos over several years by falsely claiming that

2    Theranos had manufactured one single, proprietary blood analyzer device (the Edison, minilab, TSPU,

3    etc.) that could run any blood test that was run by conventional labs, all from a blood sample drawn via a

4    fingerstick rather than the traditional draw from a vein, with higher accuracy and less variability than

5    traditional methods, due in part to its more automated process that reduced human error inherent in

6    running blood tests in a laboratory.  To support her bold claims, Holmes repeatedly told potential

7    investors that Theranos' technology had been comprehensively validated by multiple major

8    pharmaceutical companies, and was being used in the battlefield by the Department of Defense to treat

9    wounded soldiers.  Defendant also asserted that Theranos was a profitable company and had a healthy

10   ongoing relationship with retail pharmacy company Walgreens, through which it provided blood tests to

11   patients beginning in September 2013.  Not only did several representatives of investors testify that

12   Defendant made these statements to them in meetings, Defendant also began providing written materials

13   and binders to investors in 2014 and 2015 that contained these false statements.

14    In truth, scientists who had worked at Theranos testified that Theranos' proprietary device could

15   never complete more than 12 types of blood tests, often with less accuracy, less automation, and more

16   variability than traditional "predicate" machines manufactured by third-party companies, such as

17   Siemens AG.  Because of these shortcomings, pharmaceutical companies curtailed their modest work

18   with Theranos and did not validate its technology, and the Department of Defense never used Theranos'

19   analyzer to clinically treat soldiers.  Defendant admitted while testifying that she had altered and

20   enhanced reports purportedly authored by pharmaceutical companies and then subsequently provided

21   those reports to investors.  Theranos had zero revenue in 2012 and 2013 and desperately needed new

22   sources of cash.  Defendant hid the shortcomings of Theranos' proprietary device by using—without

23   telling potential investors—modified and unmodified third-party machines to fulfill the remainder of

24   Theranos' available blood test menu to patients at Walgreens stores.  As a result, Theranos' relationship

25   with Walgreens was faltering because the percentage of traditional venous draws was too high.  But

26   none of this information was shared with investors in Theranos.

27    In sum, Defendant committed an elaborate fraud scheme that resulted in more than a hundred

28   million dollars of loss, with no consideration of the patients she endangered and with no remorse to this

day toward the investor-victims.  Given the nature and magnitude of the crime, as well as her lack of remorse and indicated willingness to continue operating in similar fields in the future, Defendant cannot meet her burden of demonstrating by clear and convincing evidence that she does not present a danger to the community under the relevant factors of 18 U.S.C. § 3142(g).

### C.     The Questions Defendant Has Presented Are Not Likely to Result in Reversal or an Order for a New Trial on All Counts of Conviction

Even if Defendant has presented a substantial question—which she has not for reasons stated below—she cannot meet her burden of proving the final requirement for bail pending appeal because she cannot demonstrate that favorable resolution on any of the questions she has presented would be likely to result in reversal of, or a new trial on, all counts of conviction.  *Cf.* Mot. at 9–20.  Given that each question presented addresses at most one subpart of Defendant's scheme to defraud investors, even if the Ninth Circuit were to find error, such error would be harmless or non-prejudicial in light of the overwhelming amount of evidence regarding Defendant's multi-faceted misrepresentations.

Fundamentally, seven of the ten issues Defendant has presented correspond almost entirely to the patient-related counts—not the investor-related counts on which she was convicted.  *See* ECF No. 1235.  Specifically:

- Defendant challenges the characterization of Dr. Kingshuk Das' testimony, even though Dr. Das began working for Theranos full-time in 2016 after the investor fraud was already completed (but not the patient fraud), and the admission through Dr. Das of a patient impact assessment where Dr. Das informed Defendant that there was a possible patient impact for every test ever run on Theranos' proprietary device.  *See* Mot. at 9–10.

- Similarly, Defendant challenges the admission for a limited purpose of CMS's January 2016 findings that led Dr. Das to the conclusion he reached and ultimately led to Theranos voiding all patient blood tests run on Theranos' proprietary device.  *See* Mot. at 10–12.  Defendant also renews the challenges raised in her motion to suppress and motion to strike, which sought to preclude the same evidence (in addition to the testimony of actual patients themselves).  *Id.*

- Defendant challenges the testimony of Dr. Adam Rosendorff, who was Theranos' laboratory director from 2013–2014 within the investor fraud period, but who did not have an externally facing role with investors.  *See* Mot. at 14–16.  *But see* ECF No. 1636 at 8.

- Finally, Defendant renews once again her LIS-related challenges.  *See* Mot. at 18–19.  *But see* ECF No. 1636 at 12–15 (holding Defendant was not prejudiced on this same topic).

One straightforward way of identifying the harmlessness of the patient-related errors that Defendant asserts, is that investors testified that the negative October 2015 *Wall Street Journal* article exposed the fraud and spurred questions from investors to Defendant about whether Theranos was using third party machines and the true capabilities of Theranos' proprietary device—and that article predated CMS' findings, Defendant's hiring of Dr. Das, Theranos' voiding all tests run on the Edison, and the LIS-related challenges that Defendant asserts. *See*, *e.g.*, 10/26/21 Tr. at 4698–4710; 11/02/21 Tr. at 4959. And, while Dr. Rosendorff's testimony demonstrated the falsity of claims Defendant made to investors about the capabilities of Theranos' analyzer, the government called several other witnesses who also provided overlapping evidence of falsity. *See* ECF Nos. 1395 at 13–23, 1587 at 18–19, 1636 at 5–6.

In an attempt to overcome this fatal disconnect, Defendant notes that the questions she has raised relate to "the accuracy and reliability of Theranos' technology"—citing TSI ¶ 12(A)—and selectively quotes from the government's closing argument. Mot. at 10–11, 18. But Defendant's argument asks the Court to rely on a logical fallacy confusing a sufficient condition as a necessary one. While the government has always argued that Defendant's misrepresentations about the accuracy and reliability of Theranos' testing would be sufficient to support a verdict on all counts alleged in the TSI and is the key overlapping misrepresentation between the two fraud schemes, it is far from a necessary finding, particularly on the investor fraud counts. As the government argued in closing, "[i]t's not the case that every investor heard every [kind of false] statement[,]" although some were more common than others, "especially this first one about the capabilities of the analyzer, and in particular its accuracy" because false statements about the accuracy is "the underlying false statement in the case" between the two fraud schemes—"but it is certainly not the only false statement." 12/16/21 at 8959. Indeed, the government recently argued that the patient-related conduct gave a sense of legitimacy to the product that aided in defrauding investors (ECF No. 1649 at 28–30), but the Court rejected that connection as "too attenuated" to justify a sentencing enhancement. *See* ECF No. 1712 at 18. The same holds true here.

TSI ¶ 12(A) alleges at least four deficiencies with the capabilities of Theranos' proprietary analyzer about which Defendant misled investor-victims—and the accuracy and reliability problems are only one deficiency. ECF No. 469 ¶ 12(A). Critically, ¶ 12(A) alleges that Defendants made false

1    statements to investor-victims that Theranos' analyzer "was presently capable of accomplishing certain

2    tasks, such as performing the full range of clinical tests" when, in fact, Defendants knew the analyzer

3    "performed a limited number of tests[.]" *Id.* The paragraph also references the speed of returning test

4    results and the method of testing patients' blood, all in addition to Defendants' claim that Theranos'

5    analyzer was "more accurate and reliable than those yielded by conventional methods[.]" *Id.* And,

6    of course, Defendant's lies to investors regarding the capabilities of Theranos' proprietary device are

7    themselves only one category among several misrepresentations she made. *See*, *e.g.*, *id.* ¶ 12(A)–(H);

8    ECF No. 1575 at 4–5 (referencing other misrepresentations to investor-victims in denying Defendant's

9    Rule 29 motion). As described further below, these other misrepresentations mattered to investors and

10   cannot be discounted.

11       The link Defendant asserts between the investor-related counts she was convicted on and one

12   subpart within a subpart of categories of false misrepresentations she made to investors is far too

13   attenuated to meet her burden of showing likely reversal or a new trial on the relevant counts. The three

14   remaining questions that Defendant has presented do not fare any better when stacked up against the

15   overwhelming evidence that the government presented at trial and would also present harmless or non-

16   prejudicial errors at best:

17   • Defendant challenges the Court's exclusion of portions of co-Defendant Balwani's SEC
18      deposition testimony, which she claims shows that Defendant "Holmes had little involvement
        with the financial projections sent to the investors." *See* Mot. at 12–14.

19   • Defendant challenges admission of certain trial exhibits showing that Defendant made similar
20      statements to representatives of the Department of Defense that she made to investors. *See* Mot.
        at 16–17.

21

22   • Defendant challenges a few lines plucked out of context from the government's rebuttal
        argument in the trial of her co-Defendant Balwani as inconsistent with the government's
23      argument in her trial. *See* Mot. at 17–18. *But see* ECF No. 1636 at 8–10 (holding same
        statements were not likely to result in an acquittal).

24

25       However, even if Defendant were to prevail on the substance of these claims (which is unlikely

26   as described in the next section below), any errors would be deemed harmless or non-prejudicial in the

27   context of the entire trial and thus unlikely to result in reversal or any other alternative outcome. None

28   of the errors Defendant has asserted would alter the admission of the text messages between Defendants,

which is strong evidence supporting Defendant's conviction on the conspiracy to defraud investor count. *See* ECF No. 1395 at 7–9. Furthermore, a sampling of the testimony of representatives of the three substantive investor-related wire fraud convictions, testifying about what was material to them, demonstrates that entire categories of false statements Defendant made to investors would not be affected *at all*, even if the Ninth Circuit were to resolve every question Defendant has posed favorably to her. For example, Daniel Mosley and Lisa Peterson, who testified as a representative of investor RDV Corporation ("RDV"), both identified, among other misrepresentations, the altered report purportedly written by Pfizer touting Theranos' capabilities as important to their decision to invest. 10/26/21 Tr. at 4666–67, 4681–83; 11/02/21 Tr. at 5100–01, 5107–10; *see also* 11/16/21 Tr. at 6426 (Grossman testified it would have been important to him to know that Theranos had zero revenue from pharmaceutical companies in 2013, contrary to Defendants' claims). Brian Grossman, the managing partner and chief investment officer at PFM Health Sciences ("PFM"), identified the fact that Defendants claim that Theranos was "vertically integrated"—"meaning that they made their own analyzers as opposed to using third parties" and "which was unusual for companies in the diagnostic space"—as a "very [ ] important part" of the information provided to them before investing. 11/16/21 Tr. at 6432–34, 6382–84; *see also* 10/26/21 Tr. at 4657–59 (Peterson testifying that Defendants told RDV that Theranos uses their own analyzer equipment and that was important to RDV). Similarly, Grossman testified that the number of tests Theranos could perform—"over a thousand CPT codes with their technology"—was impressive to learn before PFM invested, and as a result he felt duped when he learned Theranos' proprietary device could never do more than a handful of tests. *See* 11/16/21 Tr. at 6379–84, 6395–96, 6400–03, 6413–15, 6442–48.

Tellingly, even if every issue Defendant has raised in her Motion for bail pending appeal was resolved favorably to her, it would not impact any of the material misrepresentations listed above, which are themselves only a small sampling of false statements that Defendant made to investors connected to the counts on which Defendant was convicted. Therefore, Defendant cannot meet her burden of demonstrating that reversal, a new trial, or a different sentence on all counts of conviction would result from the questions she has posed, and the Court should deny her Motion.

**D.  Defendant Has Not Met Her Burden of Showing That the Appeal Raises a Substantial Question of Law or Fact**

Defendant presents ten issues that she might raise on appeal that she asserts raise substantial questions.  *Cf.* Mot. at 9–19.  But what counts as a substantial question is not measured by the number of possible arguments.  For reasons stated in the government's prior briefing on these topics and the Court's ruling on them, these ten issues do not present substantial questions.  Furthermore, to the extent Defendant references vague other issues that might constitute substantial questions (*id.* at 9), the Ninth Circuit has explicitly held that "cursory motion[s]" with "vague presentations" of issues are insufficient to meet the substantial question standard and are thus barred.  *See, e.g.*, *Montoya*, 908 F.2d at 451.

**1.  The Court Properly Admitted Testimony of Dr. Kingshuk Das, the Patient Impact Assessment, the CMS Report, and Theranos' 2016 Voiding of All Tests Run on Theranos' Proprietary Blood Analyzer**

The government incorporates by reference its prior briefing on these topics and the Court's corresponding orders.  *See, e.g.*, ECF Nos. 588, 675, 726, 798, 906, 926, 989, 1133, 1181, 1192.  As the government argued during the trial when seeking admission of this very same evidence:  "The government submits that the evidence and testimony it seeks to admit is directly relevant to prove allegations against Defendant in the TSI—specifically with respect to the conspiracy to defraud Theranos's patients from 2013 to 2016—and is necessary to rebut the presently misleading impression Defendant has introduced at trial that her state of mind in 2016 was solely that the technology worked when she was being told a different story internally by Dr. Das and through the January 2016 CMS Report and subsequent interactions with CMS.  Indeed, Theranos's decision in March 2016 to void all test results on its proprietary device from 2014 and 2015 as a result of the CMS Report and findings, and Dr. Das's internal review of those findings, demonstrates Defendant's knowledge of the severity of the inaccuracy and unreliability problems with Theranos's blood analyzer during the charged period."  ECF No. 1133 at 5; *cf.* Mot. at 9–12.

The January 2016 CMS Report (and letter) were properly admitted as Trial Exhibits 4621A and 4621B for the limited purpose of showing Defendant's state of mind as to the state of the CLIA lab (Theranos' clinical lab responsible for processing patient samples) in late 2015 and early 2016.  ECF

No. 1196.  The Court originally admitted the CMS report without any limitation in its pretrial order on the parties' respective motions *in limine*.  ECF No. 798 at 16–20.  Defendant proceeded to re-raise the issue multiple times throughout the trial, and the Court ultimately reconsidered its pretrial ruling and admitted the exhibits solely for a limited purpose.  *See* ECF Nos. 1133 at 5–8, 1192 at 2–4 (detailing procedural history).  Defendant also moved to strike admission of the CMS Report and Dr. Das' accompanying testimony at the end of the government's case-in-chief.  *See* ECF No. 1196.  As the government argued previously, the CMS Report and findings were relevant to show the ongoing notice to Defendant of problems with Theranos' clinical testing, as scientists had been raising to Defendants for years, not unduly prejudicial (contrary to her claims elsewhere), and particularly proper to show Defendant's state of mind regarding the state of Theranos' technology, given the evidence Defendant had already introduced to date at the trial claiming Defendant believed Theranos' technology worked (when it didn't) and her purported good intentions in 2016.  *See* ECF No. 1133 at 6–8 (detailing evidence admitted at trial for Defendant's state of mind after the January 2016 CMS Report).

Dr. Kingshuk Das testified at Defendant's trial as a percipient witness who described what he observed while performing the job Defendant hired him to do—namely, respond to the CMS deficiency findings including those detailed in the January 2016 CMS Report and elsewhere.  *See* ECF Nos. 906, 1133.  Defendant hired Dr. Das as Theranos' laboratory director in winter 2015 and full-time in spring 2016—in large part to analyze the findings described in the CMS Report and respond to questions posed by CMS.  *See* ECF No. 727-2 at 2.  Within the scope of his duties as lab director, and while attempting to respond to CMS as he was hired for his ability to do, Dr. Das observed concerns with certain lab practices—in particular with Theranos' proprietary blood analyzer device—and communicated those concerns to Defendant Holmes.  *See* ECF Nos. 727-2, 846-2.  At its core, that is fact witness testimony, even if it involved an explanation of his professional judgment as a lab director.  *See* ECF Nos. 798 at 47–54, 70–72, 75–78, 989.  As the Court previously found, the government was permitted to call Dr. Das to testify about his job, what he was hired by Defendant to do, what he discovered in performing the tasks the Defendant asked him to do (namely, investigate CMS's findings and concerns), and his perspective of the resulting discussion of what he discovered with senior management.  Each of those topics are squarely within his percipient knowledge.  Throughout Dr. Das' trial testimony, Defendant

repeatedly raised Rule 702 objections and the Court sustained some and overruled others. *See* 11/09/21

Tr. (holding oral arguments at outset of trial day regarding Dr. Das as an expert among other issues and

defense counsel raising Rule 702 objections periodically during Dr. Das' testimony).

Tellingly, it was during Defendant's *cross-examination* that Dr. Das was asked to expand on

more technical aspects—including the Sigma metric, which the Court had previously ruled would stray

into Rule 702 territory—rather than in response to the government's questions. *See*, *e.g.*, 11/10/21 Tr. at

5941–42 (cited by Mot. at 9).  There is no substantial question regarding whether the Court abused its

discretion in admitting and precluding certain testimony from Dr. Das pursuant to Rule 702.  Dr. Das'

testimony was properly admitted as percipient testimony and appropriate guardrails were enforced by

the Court throughout his testimony.

Dr. Das did the job that Defendant asked him to do—to analyze the findings in the CMS

Report—and reported back to Defendant that Dr. Das had concerns with results from Theranos'

proprietary blood analyzer.  11/09/21 Tr. at 5781–835.  Based on his discussion with Defendant, he

prepared on behalf of Theranos a Patient Impact Assessment, which was provided in response to CMS's

concerns, and concluded that there was "a global and long-term failure of the quality control program

for this instrument" and, as such, "[t]he laboratory has concluded that there is a possible patient impact

for every test reported from the laboratory's TPS 3.5 instruments [Theranos' proprietary analyzer]." *Id.*

at 5832; TX 4943.  Dr. Das found Theranos' analyzer "to be unsuitable for clinical use" and urged

Defendant to void all patient tests ever run on the device.  11/09/21 Tr. at 5833–35, 5860–61.  Theranos

did so shortly after Dr. Das recommended this course of action.  *Id.*  Dr. Das was obligated under

relevant CLIA regulations to void tests on behalf of Theranos and the fact that Defendant had to be

persuaded to follow Dr. Das' recommended course of action goes directly to the core of Defendant's

intent and knowledge.  Defendant asserts the voiding of tests run on Theranos' proprietary device is

irrelevant to the investor counts—which supports the government's point made above that any error

would be harmless—and now argues that admission of such evidence was unduly prejudicial, ignoring

the relevance to the patient counts. *See* Mot. at 11.  The Court properly admitted evidence of Theranos

voiding all patient tests run on its proprietary device as relevant to the charged conduct and involuntary

(thus not barred by Rule 407).

In sum, none of the above topics raise a substantial question, nor does Defendant's repackaging of them in her motion to suppress and motion to strike, and, even if there were error, it would likely be harmless and non-prejudicial given Defendant's acquittal on the patient-related counts.

### 2. The Court Did Not Err in Its Relevant Rulings Regarding the LIS Database

The Court has heard the facts surrounding the nature and destruction of Theranos' LIS on numerous occasions, and the government incorporates by reference its prior filings and arguments on this subject. *See*, *e.g.*, ECF Nos. 682, 846, 1181, 1426, 1440, 1454, 1586; 05/04/21 Tr. at 45–68, 79–85; 07/07/21 Tr.; 11/10/21 Tr. at 5877–5889; 11/19/21 Tr. at 7100–7104; 02/08/22 Tr.; 05/11/22 Tr. at 5291–5329; 05/23/22 Tr. Neither Defendant's motion to suppress on this basis nor motion for a new trial on LIS-related emails raises a substantial question, particularly where this Court has been given multiple opportunities to revisit the same topic and reach the same reasoned results. *Cf.* Mot. at 11–12, 18–19.

The Court did not err in denying Defendant's motion to suppress several categories of evidence regarding the patient-related counts based on the absence of the LIS database because Defendant cannot demonstrate the exculpatory value of data within the LIS database and, in any event, the government did not act in bad faith. *See* ECF Nos. 887, 1326 at 20–21, 30–37. Regardless, any error is harmless given Defendant was acquitted on the patient-related counts. ECF No. 1235. Prior to her trial, Defendant repeatedly asserted the missing LIS database was a reason to preclude patient-victims from testifying about the inaccuracy and unreliability of Theranos tests—along with suppressing the CMS report, voiding of all tests, and other evidence demonstrating the inability of Theranos' proprietary analyzer to produce accurate and reliable results to patients—because Defendant would be unable to show the "statistical insignificance" of their testimony without the LIS. *See*, *e.g.*, 5/4/21 Tr. at 40–100; 07/07/21 Tr. at 34–36 ("[W]ith respect **to the patient counts** that [information in LIS] would be exculpating evidence, your honor, because their claim is that Theranos technology was incapable of producing accurate and reliable results." (emphasis added)); ECF No. 810; *see also* ECF No. 846 (government's opposition).

The government has repeatedly argued that the LIS database would have been a "powerful tool" to identify additional patient-victims and quality-control data, but it would not have allowed the parties

1   to sort accurate from inaccurate patient results or determine an overall failure rate for Theranos' blood

2   tests. *See, e.g.*, ECF Nos. 846 at 7–8, 1440 at 5–7; 05/04/21 Tr. at 67, 70–72, 81–84, 95 (defense

3   counsel acknowledging LIS does not have an accuracy field); 10/05/21 Tr. at 2734–37 (Dr. Rosendorff

4   testifying that extrinsic factors that identify whether a patient's result is accurate were not stored in the

5   LIS database).  And, of course, Defendant had access to the LIS database in her role as Chief Executive

6   Officer (until approximately June 2018) and thereafter Chair of Theranos' Board (until the company

7   dissolved) throughout multiple lawsuits and—if she truly thought it contained exculpatory data—she

8   would have obtained a functioning copy of the LIS database long ago rather than waiting until the eve of

9   her trial to characterize the evidence as critical. *See* ECF No. 887 at 9 (finding no support for Defendant

10   Holmes' assertion that she always considered the database would be exculpatory); *see also* ECF No. 846

11   at 11.  Because of Defendant's continued position of power on Theranos' Board of Directors when the

12   only functioning copy of the LIS database was destroyed, Defendant just as vigorously argued that what

13   happened to the LIS database and who was responsible for its destruction was irrelevant at trial. *See*,

14   *e.g.*, 5/4/21 Tr. at 49–50, 54–58, 93–98.

15        The Court denied Defendant's motion to suppress in part because the Court found that the

16   government did not act in bad faith and "[t]he LIS database information alone would not provide a

17   conclusive determination of whether the Theranos blood tests were accurate, and *it could just as likely*

18   *contain incriminating evidence to the contrary*.  Any exculpatory value is therefore speculative in

19   nature." ECF No. 887 at 10 (emphasis added).  The evidence supports this conclusion.

20        Subsequently, Defendant moved for a new trial claiming a *Brady* violation based on eleven

21   emails the government produced during co-defendant Balwani's trial that provided substantively the

22   same information as the government provided to both defense counsel in a letter in October 2020. *See*

23   ECF No. 1577; *see also* ECF No. 1586.  The Court held that the government did not suppress the

24   relevant information and Defendant was not prejudiced as a result.  ECF No. 1636 at 12–15.

25   Specifically, the Court held that the eleven LIS-related emails do "not undermine confidence in the

26   outcome of the trial, nor would [they] have been reasonably likely to change the result." *Id.* at 14.

27   Indeed, the Court found the identities of government prosecutors—what Defendant again asserts is a

28

1  basis for a substantial question on appeal—had "*de minimis* relevance, if any, . . . on the issues at

2  trial[.]" *Id.*

3      In sum, for reasons stated here and in the government's prior arguments on this topic, Defendant

4  does not raise a substantial question with respect to the LIS database that Theranos destroyed.

5          **3.      The Court Properly Excluded Balwani's Prior Testimony Before the SEC**

6      There is no substantial question about whether the Court properly excluded co-defendant

7  Balwani's prior self-serving testimony about his role in creating financial models at Theranos under

8  Federal Rule of Evidence 804(b)(3) because the statements largely deflect or share blame by pointing to

9  others and, to the extent Balwani inculpates himself and exculpates Holmes, there is insufficient

10 indication of trustworthiness.  *See* ECF Nos. 1166, 1175.  The Court properly found co-Defendant's

11 statements insufficiently inculpatory given that, during the testimony before the SEC, Balwani described

12 how he created a financial model—rather than projections—and he did so with input from Safeway and

13 Walgreens and later from individuals at potential investor BDT.  *See* ECF No. 1163-2 at 6–7; ECF No.

14 1163-3 at 3–5.  The SEC asked Balwani who labeled the document "projections"—and he deflected by

15 pointing to Danise Yam's and BDT's roles.  ECF No. 1163-3 at 4–5.  The Ninth Circuit has held that

16 "[s]tatements that curry favor or deflect (or share) blame do not fall within the scope of Rule

17 804(b)(3)(A)." *United States v. Gadson*, 763 F.3d 1189, 1200 (9th Cir. 2014) (internal quotation

18 omitted).  As the Court noted, Balwani's prior statement that he "owned" the model does not in itself

19 denote a crime, rather "[i]t *might* be a crime to use fraudulent assumptions in the model and then share

20 those assumptions to investors"—but Balwani did not make statements to that effect.  ECF No. 1175 at

21 7–10.

22      Furthermore, the Court did not err in finding that the record supports the government's position

23 that Defendants worked together on the revenue piece and thus there was insufficient corroborating

24 evidence to demonstrate Balwani alone "was responsible for the financial model[.]"  Mot. at 12–14; *see*

25 ECF No. 1175 at 10.  Defendants texted repeatedly about the financial state of Theranos and in his prior

26 testimony before the SEC, co-Defendant Balwani stated he shared the financial models with Defendant

27 Holmes.  ECF No. 1175 at 10.  The Defendants' contemporaneous text messages contradict some of

28 Balwani's prior testimony before the SEC, further undermining its trustworthiness.  *Compare* TX 5387

1   at 34, 36 (Balwani referring to projections—rather than model—and asking if Holmes is comfortable

2   with explaining it to potential investors), *with* ECF No. 1163-3 at 6 (Balwani testifying that Holmes was

3   not familiar with the financial model he prepared).  Their collaboration on misleading financial

4   projections provided to investors is further corroborated by investors and their representatives who

5   testified that they heard about the financial status of the company from both Defendants.  *See*, *e.g.*,

6   11/16/21 Tr. at 6383–84 (Defendants told PFM that Theranos had historically earned over $200 million

7   in revenue, primarily from the company's work with the Department of Defense); 10/26/21 Tr. at 4645–

8   50, 4680 (Lisa Peterson testified about a phone call between RDV representatives and Defendant

9   Holmes—without co-Defendant Balwani—where Defendant discussed financial projections based on

10  Theranos providing testing in 900 Walgreens locations in 2015 despite Defendant knowing at the time

11  of the phone call that Walgreens was scaling back).  For the same reasons, there is no due process

12  violation.  *Cf.* Mot. at 13–14.

13              **4.      The Court Did Not Err in Its Relevant Rulings Regarding Dr. Rosendorff**

14              Defendant does not present a substantial question regarding the extent of her cross-examination

15  of Dr. Adam Rosendorff or his post-trial statements at her residence.  *Cf.* Mot. at 14–16.  Dr. Adam

16  Rosendorff worked as the CLIA laboratory director at Theranos from April 2013 until he resigned in

17  November 2014.  Since then, he has worked at a number of other large companies, some of which have

18  faced scrutiny from government entities.  Despite some of that scrutiny relating to time periods when

19  Dr. Rosendorff did not work for the relevant company or conduct wholly unrelated to his role in the

20  company, Defendant sought to use the simple fact of investigations at companies where he once worked

21  to impugn Dr. Rosendorff's competence and his motives for testifying in this trial.  *See* ECF No. 1405.

22  The Court permitted Defendant to make limited inquiry about a then-ongoing investigation of the lab

23  Dr. Rosendorff had been working at during the trial where one possible outcome was a sanction that

24  could have involved Dr. Rosendorff's professional license.  10/05/21 Tr. at 2567–68, 2717–20.

25  Subsequently, that investigation resolved without any sanctions imposed whatsoever.  *See* ECF Nos.

26  1405, 1405-2, 1405-3.

27              Based on the above facts, there is no substantial question that the Court properly held that

28  Defendant sought to introduce "inappropriate character evidence" that was more prejudicial than

probative for purposes of Federal Rule of Evidence 403.  10/05/21 Tr. at 2707–14.  The Court also referenced Federal Rule of Evidence 608 and its purpose of "avoid[ing] mini trials," and found that the proposed cross examination would also be cumulative after the cross had spanned over four trial days and covered a vast array of topics in great detail.  *Id.*  The evidence about Dr. Rosendorff's post-Theranos employment did not constitute evidence of bias.  "The point of a bias inquiry is to expose to the jury the witness' special motive to lie by revealing facts such as interest in the outcome of the trial or personal animosity or favoritism toward the defendant" or prosecution.  *United States v. Hankey*, 203 F.3d 1160, 1171 (9th Cir. 2000) (internal citations omitted) (citing *United States v. Abel*, 469 U.S. 45 (1984)).  For example, in *Abel*, the Supreme Court held that evidence showing defendant and a defense witness were both members in a gang and one of the gang's tenets required its members to lie to protect each other was admissible as bias evidence against that witness.  469 U.S. at 52–53.  By contrast, here, Defendant has not shown—and cannot show—that subsequent investigations of companies where Dr. Rosendorff worked at certain times after he resigned from Theranos gives rise to a motive for Dr. Rosendorff to lie or slant his testimony.  Furthermore, each of the investigations Defendant references began in 2021 *after* Dr. Rosendorff had already given prior consistent statements regarding his percipient observations while working at Theranos in civil depositions and multiple interviews with the FBI related to this case—cutting strongly against Defendant's claim that questioning regarding these three companies would show Dr. Rosendorff's motive to slant his testimony favorably for the prosecution.  *Compare* ECF No. 1401-3 at 92, 105 (Invitae subpoena announced November 2021), 273 (uBiome indictment announced March 2021), 279 (CMS sends findings to CDPH Branch Lab in February 2021), *with*, *e.g.*, 09/28/21 Tr. at 1976:4–13 (describing civil deposition in February 2019).

Similarly, there is no substantial question regarding Dr. Rosendorff's post-trial statements to Defendant's partner at her residence given that the Court held an evidentiary hearing on this topic and Dr. Rosendorff clarified under oath what he meant.  *See* 10/17/22 Tr.; ECF No. 1636 at 3–8.  Specifically, Dr. Rosendorff repeatedly "testified that he did *not* believe the government was making things sound worse than they were at trial" and clarified that his statements about employees working hard to do something good at Theranos "did not intend to include Ms. Holmes and Mr. Balwani[.]"  ECF No. 1636 at 3–8.  The Court further found that Dr. Rosendorff's post-trial statements were

1  "too vague and general to imply any specific [prior] testimony was actually false or misleading" and

2  thus failed under *Napue*. *Id.* at 6–8. Regardless, the Court held that the statements were immaterial and

3  unlikely to affect the counts of conviction given that "Dr. Rosendorff's post-trial statements only

4  pertained to the *internal* operations at Theranos and, therefore, are unlikely to affect the Defendant's

5  convictions for investor fraud that featured Defendant's representations of Theranos's *external*

6  partnerships." *Id.* at 8. Thus, even if there were error—which there is not—it would be harmless.

7        **5.**     **The Court Did Not Err in Its Remaining Rulings**

8        Defendant's two remaining issues do not raise substantial questions, either. *Cf.* Mot. at 16–18.

9        First, the false statements that Defendant made to the Department of Defense were inextricably

10  intertwined with the investor-related fraud counts because Theranos had to get the military branch

11  interested in its product to have something to exaggerate and misrepresent to investors later and, even

12  more importantly, the evidence was important to show Defendant's intent and knowledge that the

13  statements she made to investor-victims about Theranos' work with the Department of Defense were, in

14  fact, false. *See* 10/19/21 Tr. at 3896–99. Regardless, even if it were fairly debatable, any error would be

15  harmless and non-prejudicial to all counts of conviction. *See* ECF No. 1575 at 4 n.1 (noting there is

16  sufficient evidence to uphold Defendant's conviction even setting aside false statements about Theranos'

17  work with the Department of Defense). Defendant cannot show in a case involving lies on multiple

18  topics to investors and patients that somehow lies to the Department of Defense tipped the balance.

19        Second, the government's closing and rebuttal arguments in both trials were entirely consistent

20  and each elaborated on the evidence at the respective trials demonstrating that the two Defendants

21  worked in tandem, wielded the most power and control within Theranos, communicated constantly, and

22  had the ability to influence one another. *See* ECF Nos. 1585, 1636. The Court did not err in holding

23  that the government's opinion of the relationship between Defendants is not material and would be

24  unlikely to alter the outcome of a new trial, particularly given Defendant herself testified during her trial

25  that Balwani did not force her to make statements and all decisions were made jointly by her and

26  Balwani at Theranos. *See* ECF No. 1636 at 10. Regardless, even if it were fairly debatable, any error

27  would be harmless and non-prejudicial to all counts of conviction. *See* ECF No. 1636 at 10–11 (finding

28

statements are not material and would not be likely to result in acquittal as bases for denying

Defendant's motion for a new trial on this ground).

**CONCLUSION**

For the reasons stated above, the government respectfully requests that the Court deny Defendant

Holmes' Motion for release pending appeal.


DATED:  January 19, 2023                          Respectfully submitted,

                                                  STEPHANIE M. HINDS
                                                  United States Attorney


                                                   */s/ Kelly I. Volkar*
                                                  JEFFREY B. SCHENK
                                                  JOHN C. BOSTIC
                                                  ROBERT S. LEACH
                                                  KELLY I. VOLKAR
                                                  Assistant United States Attorneys